**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF VIRGINIA**
**Richmond Division**

| | | |
|---|---|---|
| **GERALD BRITTLE** | § | |
| | § | |
| **VS.** | § | **CIVIL ACTION NO. _____** |
| | § | |
| **TIME WARNER INC.;** | § | **TRIAL BY JURY DEMANDED** |
| | § | |
| **WARNER BROS. ENTERTAINMENT INC.;** | § | |
| | § | |
| **NEW LINE PRODUCTIONS, INC.;** | § | |
| | § | |
| **RATPAC-DUNE ENTERTAINMENT LLC;** | § | |
| | § | |
| **JAMES WAN;** | § | |
| | § | |
| **JAMES WAN PRODUCTIONS, INC.** | § | |
| | § | |
| **ATOMIC MONSTER INCORPORATED** | § | |
| | § | |
| **CHAD HAYES;** | § | |
| | § | |
| **CAREY HAYES**; | § | |
| | § | |
| **DAVID LESLIE JOHNSON;** | § | |
| | § | |
| **GARY DAUBERMAN: and** | § | |
| | § | |
| **DOES 1 to 10, inclusive** | § | |

## TABLE OF CONTENTS

PROLOGUE……………………………...................................................................... ..- 6 -

I. INTRODUCTION……………………….............................................. …………… - 10 -

   A. THE DEMONOLOGIST AND 1978 PRENTICE HALL AGREEMENT  – SUBSIDIARY MOVIE RIGHTS GRANT & NO COMPETING WORK PROVISION ....................... - 23 -

   B. THE COLLABORATION AGREEMENT - NO UNILATERAL GRANTS OF RIGHTS AND BRITTLE'S EXCLUSIVE RIGHT TO USE THE WARREN CASE FILES....... - 28 -

   C. AMENDMENT TO PRENTICE HALL AGREEMENT - WARREN AGREES TO IMMEDIATELY TRANSFER ALL SUBSIDARY RIGHTS TO BRITTLE ................ - 30 -

   D. DEFENDANTS WILLFUL AND MALICIOUS MISSAPPROPRIATION OF PLAINTIFF'S RIGHTS.................................................................................- 31 -

II. PARTIES…………………………....................................................................- 42 -

III.   JURISDICTION AND VENUE ........................................................................- 44 -

IV. DEFENDANTS' HISTORY OF PAST SIMILAR ACTS OF MISAPPROPRIATION,INFRINGEMENT & PRIOR PRELIMINARY INJUNCTIONS ISSUED AGAINST THEM……………….................................................................................- 52 -

V.   THREE AGREEMENTS CONTROL IN THE INSTANT MATTER .............................- 56 -

VI. The Contractual Agreements From 1978 - 2001 .................................................- 58 -

   A.  The Prentice Hall Agreement -  November 8, 1978: ....................................- 58 -

   B. THE COLLABORATION AGREEMENT (Addendum to Prentice Hall Agreement) - November 20, 1978:....................................................................................- 66 -

   C.  Prentice Hall's Confirmation of the Addendum to the Collaboration Agreement –....... - 75 -

     January 11, 1979 ......................................................................................- 75 -

   D.  PRENTICE HALL TO BERKLEY PARTIAL SUBSIDIARY RIGHTS TRANSFER   - April 14, 1981 ..........................................................................................- 77 -

   E. PRENTICE HALL AGREEMENT FIRST AMMENDMENT - December 8, 1981 .....- 79 -

   F. THE PRENTICE HALL OUT OF PRINT NOTICE - April, 18 1986 ..........................- 81 -

   G. FIRST AMENDMENT TO THE COLLABORATION AGREEMENT

     - April 16, 1990...........................................................................................- 83 -

   H. LOWENSTEIN AGENCY AGREEMENT -  April 16, 1990......................................- 87 -

   I.   PRENTICE HALL REVERSION REQUEST & RIGHTS REVERSION

     - May/June 1990 ......................................................................................- 90 -

   J.  The St. Martin's Press Agreement - September 4, 1990 ................................- 93 -

   K.  St. Martin's Press & Copyright Rider    -  September 4, 1990 ......................- 95 -

L.   Japan Lowenstein Contact   -   July 1991 .................................................- 96 -

M.  The Lowenstein Overpayments 1993-1994 ................................................- 96 -

N.   Reversion of Rights from St. Martin's Press to Brittle -   July 10, 2001 ......- 99 -

VII.  THE CONTRACTUAL EFFECT AND LEGAL SIGNIFICANCE OF THESE
HISTORICAL UNDERLYING CONTROLLING AGREEMENTS WITH REGARD TO THE
INSTANT MATTER                                                              - 103 -

A. Choice of Law Provision.............................................................- 104 -

B.  Plaintiff Is the Sole Author of The Demonologist ....................................- 105 -

C.  Plaintiff's owns the exclusive right use to the Warren Cases, Warren Case files and
related materials. ...........................................................................- 109 -

   1.  The Scope of the 1978 Collaboration Agreement as it Pertains to The Demonologist
   and the Warren Cases and Case Files ...............................................- 109 -

D. Defendant New Line's Agreement with Warrens for her "Case Library" cannot, by
Law, Include the Cases and Materials Already Exclusively Owned by Plaintiff Under
the 1978 Collaboration Agreement. .......................................................- 111 -

E. Plaintiff's Exclusive "Right to Use" the Warren's Materials as Defined by the 1978
Collaboration Agreement .................................................................- 116 -

F. Brittle's Exclusivity to the Materials ...................................................- 118 -

G. Ownership of All Warren Investigations Prior to June 26, 1980,
Transferred to Brittle ......................................................................- 127 -

H. Brittle Controls All Film Rights to the Warren Cases for Amityville, Annabelle,
Borley and Enfield.........................................................................- 130 -

I.   Lorraine Warren and The Defendants Know About Brittle's Exclusive Rights....- 135 -

J.   The 2011 New Line – Lorraine Warren Deal: An Unlawful Agreement ...............- 135 -

K. THE NO "COMPETING WORK" PROVISION  THRESHOLD PRECLUSION - 152 -

VIII. 1997 - WARNER BROTHER'S FIRST UNLAWFUL DEAL WITH LORRAINE
WARREN FOR THE DEMONOLOGIST AND PLAINTIFF'S PROPERTY ..........- 152 -

IX. PRECURSOR ISSUES TO COPYRIGHT INFRINGEMENT.......................- 159 -

A. DEFENDANTS' MOVIES ARE NOT BASED ON FACTS BASED ON THE
DOCUMENTED HISTORICAL RECORDS .............................................- 161 -

B. THE PERRONS' REMEMBRANCES AND WARREN'S OWN ADMISSIONS SHOW
THEY ARE NOT HISTORICAL FACTS. .................................................- 167 -

C. LORRAINE AND ED WARRENS HISTORY OF UNTRUTHS ...........................- 175 -

D. THE PATTERN OF THE WARREN'S SCAM EMERGES ......................................- 191 -

E. THE WARREN CASES ARE THEIR RETELLING OF "REMEMBRANCES" WHICH      DOES NOT EQUATE TO ACTUALLY BEING TRUE OR HISTORICAL FACT ................................................................................................- 195 -

F. DEFENDANTS' MULTITUDE OF PUBLIC ADMISSIONS THAT THEIR MOVIES ARE BASED ON THE WARREN CASE FILES AND NOT ON FACTS .............- 198 -

G. NEW LINE UNDERSTANDS SUBSIDIARY BOOK RIGHTS ...........................- 244 -

X. DEFENDANTS' COPYRIGHT INFRINGEMENT ..........................................- 246 -

A. Defendants Publicly Admit Having Access to Plaintiff's Work...................- 247 -

B. Intrinsic and Extrinsic Tests for Substantial Similarity in the Fourth Circuit..............- 256 -

C. The Intrinsic Test Standard in the Fourth Circuit .......................................- 256 -

D. The Extrinsic Test ......................................................................................- 269 -

E. THICK vs THIN COPYRIGHT PROTECTION .........................................- 270 -

F. Non-Fiction Does Not Mean Based on Historical Fact................................- 271 -

G. Even if The Demonologist was a compilation of historical fact it would still be entitled to copyright protection..................................................................................- 279 -

H. Plaintiff's Creative Expression Gives Rise to Copyright Protected Elements in The Demonologist ................................................................................................- 279 -

XI. The Extrinsic Test – Objective Analysis Requirement …………………………….  - 285 -

XII.  PLAINTIFF'S STATE LAW CLAIMS RELATING TO HIS PROPERTY UNRELATED TO ANY COPYRIGHT TO THE DEMONOLOGIST ........................................- 288 -

A. State Law Claims Not Preempted by Copyright Claim: No Construct of Copyright Act Applies to Plaintiff's Property...................................................................- 288 -

B. State Law Claims Not Preempted by Copyright Claim: No Construct of Copyright Act Applies to Conversion Under Virginia Law .............................................- 290 -

C. State Law Claims Not Preempted by Copyright Claim: Extra Element and Alternate Theory Exists for State Law Claims ........................................................- 291 -

XII. TRESPASS TO CHATTELS AND CONVERSION ...................................................- 292 -

XIII. ACCOUNTING CLAIM NOT PREEMPTED.......................................................- 293 -

XIV. DEFENDANT'S MISAPPROPRIATION OF PLAINTIFF'S PROPERTY ..............- 294 -

A. Defendants' Fraudulent Use of Illegal Contracts To Misappropriate Plaintiff's Property and Separately Infringe on his Subsidiary Motion Picture Rights............- 299 -

B. Defendants' Prior Knowledge of Plaintiff's Ownership of Property ......................- 304 -

C. Defendants Acknowledge Their Misappropriation of Plaintiff's Property: ...........- 309 -

The Conjuring ...............................................................................................- 309 -

D. Defendants Acknowledge Their Misappropriation of Plaintiff's Property: ...........- 313 -

Annabelle ......................................................................................................- 313 -

E. Defendants Acknowledge Their Misappropriation of Plaintiff's Property:............- 317 -

The Conjuring 2 ....................................................................................- 317 -

F. The Additional Results of Defendants' Misappropriation of Plaintiff's Property: - 328 -

 Common Law Trespass to Chattels..........................................................- 328 -

G. Defendants Admit They Used Warren Cases That Appear in The Demonologist That Belong To Plaintiff as Basis For Their Movies. .........................................- 328 -

H. The Release of Defendants Movies Degrades the value of  Brittle's Subsidiary Rights - 335 -

I.  TORTIOUS INTERFERENCE WITH CONTRACT...............................- 336 -

J.  STATUTORY BUSINESS CONSPIRACY ............................................- 337 -

XV. CONCLUSION…………… ................................................................- 338 -

COUNT I: THE CONJURING - COPYRIGHT INFRINGEMENT........................- 341 -

COUNT II: ANNABELLE - COPYRIGHT INFRINGEMENT...............................- 342 -

COUNT III: THE CONJURING 2 - COPYRIGHT INFRINGEMENT ...................- 344 -

COUNT IV: COMMON LAW TRESPASS TO CHATTELS................................- 346 -

COUNT V: STATUTORY BUSINESS CONSPIRACY.......................................- 347 -

COUNT VI: CONVERSION……………...........................................................- 349 -

COUNT VII TORTIOUS INTERFERENCE WITH CONTRACT .........................- 351 -

RELIEF REQUESTED…………….................................................................- 352 -

## PLAINTIFF'S FIRST AMENDED COMPLAINT

Plaintiff, Gerald Brittle ("Plaintiff," "Brittle" or "Mr. Brittle"), complains of Defendants TIME WARNER INC. ("Time Warner"), WARNER BROS. ENTERTAINMENT INC. ("Warner Bros."), NEW LINE PRODUCTIONS, INC. ("New Line"), RATPAC-DUNE ENTERTAINMENT LLC ("Ratpac-Dune"), JAMES WAN ("Wan"), JAMES WAN PRODUCTIONS, INC. ("James Wan Productions, Inc."), ATOMIC MONSTER INCORPORATED ("Atomic Monster Incorporated"), CHAD HAYES, CAREY HAYES, DAVID LESLIE JOHNSON ("Johnson"), GARY DAUBERMAN ("Dauberman") and DOES 1 TO 10 ("Does 1 to 10") (collectively, "Defendants"), jointly and severally, as follows:

## PROLOGUE

1.      On October 25, 2016 Warner Brothers filed a civil action in Federal Court in California against Innovative Artist Agency. *See* Exhibit 1 hereto, WARNER BROS. ENTERTAINMENT INC., vs. INNOVATIVE ARTISTS, USDC, Central District of California, Western Division, Case No. 2:16-cv-7902 (the "Innovative Matter").

2.      Warner Brothers, a defendant in the instant matter, alleged in the Innovative Matter that screening copies of its copyrighted movies, which the studio had given to Innovative, were to be used only by Innovative's agents and staff.   However, Warner Brothers claimed that those copyright protected screeners were unlawfully placed by Innovative on a cloud based server platform and then distributed to parties who were neither agents nor employees of Innovative. Warner Brothers complained that this "unauthorized" and "unlawful" act by Innovative infringed on exclusive rights Warner Brothers held in the copyrighted material.

3.      In its complaint in the Innovative Matter (See Exhibit 1), Warner Brothers alleged:

      a.      "Warner Bros. owns or controls the copyrights and exclusive rights in the content that it or its affiliates produce or distribute (the "Copyrighted Works")."

b.      Plaintiff owns or co-owns and has the exclusive U.S. rights (among others) to reproduce, distribute and publicly perform each of its Copyrighted Works."

c.      'Innovative Artists did not have Plaintiff's authorization, permission or consent to exercise any of Plaintiff's other exclusive rights under copyright with respect to the Copyrighted Works"

d.      "Plaintiff brings this action to remedy Innovative Artists' violation of its rights and for an injunction barring Innovative Artists from violating those rights in the future."

*See* Exhibit 1.

4.      Warner Brothers claims the screeners are its copyrighted material and that within the copyright also lives, among others, the exclusive copyright protected rights of reproduction, distribution and public performance.

5.      In making these claims it is clear that Warner Brothers understands that under the Copyright Act there are five exclusive rights granted to a copyright owner –  rights which they may sell or transfer in whole, or in part, to another party.  These five exclusive copyright protected rights are:  reproduction, distribution, public performance, public display and the exclusive right to prepare derivative works.

6.      In the Innovative Matter (*See* Exhibit 1), Warner Brothers delineates Innovative's "unlawful conduct" and sets forth the resultant causes of action which include claims of "Copyright Infringement, 17 U.S.C. § 106."  As part of these claims Warner Brothers alleges that:

a.      "Plaintiff is the owner of exclusive rights of copyright, as set forth in § 106 of the Copyright Act, in each of its Copyrighted Works."

b.      "Innovative Artists has infringed Plaintiff's exclusive rights, including the rights to reproduce, distribute, or publicly perform the Copyrighted Works, in violation of 17 U.S.C. § 106(1), (3), (4)."

c.      "Plaintiff has sustained and will sustain actual damage as the result of Innovative Artists'…violations, including, among other things,

damages to the value of the Copyrighted Works and the reduction in Plaintiff's goodwill in the Copyrighted Works. 17 U.S.C. § 1203(c)(2)."

d. "Innovative Artists has never had Plaintiff's authorization to exercise any of the rights of copyright with respect to any Copyrighted Work."

e. "Innovative Artists' acts of infringement are willful, in disregard of and with indifference to Plaintiff's rights."

7. In the Innovative Matter, Warner Brothers seeks very specific relief for Innovative's infringement on their exclusive copyright protected rights, including:

a. "As a direct and proximate result of the foregoing acts and conduct, Plaintiff has sustained and will continue to sustain substantial, immediate and irreparable injury, for which there is no adequate remedy at law.  Unless enjoined and restrained by this Court, Innovative Artists will continue to infringe Plaintiff's rights in its Copyrighted Works. Plaintiff is entitled to injunctive relief under 17 U.S.C. § 502."

b. "For Plaintiff's damages and Innovative Artists' profits from its infringing activity, in such amount as may be found…"

c. "For permanent injunctions enjoining Innovative Artists, and all persons acting in concert or participation with it, from reproducing, distributing, publicly performing, or otherwise infringing in any manner any copyrighted work owned or controlled by Plaintiff (including without limitation any Copyrighted Work)..."

*See* Exhibit 1.

8. Warner Brothers alleges that Innovative willfully ignored and then infringed upon its exclusive copyright protected rights (i.e., reproduction, distribution and performance) which has resulted in "irreparable harm" to Warner Brothers.  Warner Brothers further alleges the appropriate remedy under the law for knowing and willful infringement is disgorgement of all of the infringer's profits derived from said infringement and an injunction to insure the pattern of

infringement is stopped.

9.     Like Warner Brothers in the Innovative Matter, Plaintiff Brittle claims that the Defendants, inclusive of Warner Brothers and New Line Productions, have and continue to willfully ignore and infringe on Plaintiff's exclusive copyright protected rights (i.e., reproduction, distribution, public performance and the exclusive right to authorize derivative works, among others) within  his exclusive subsidiary motion picture rights in the book he authored, *The Demonologist.*[1]  This pattern of ongoing infringement by Defendants in the instant matter has caused Brittle irreparable harm.   Brittle seeks disgorgement of all of Defendants' profits derived from said infringement and an injunction to insure the pattern of infringement is stopped.  Plaintiff contends that in the case of studio defendants New Line and Warner Brothers, the profits to be disgorged are not limited to box office profits or licenses fees generated for the Defendants' from their infringing movies, but also include Defendants New Line and Warner Brothers' profits which fall to the bottom line of their corporate parent, defendant Time Warner. Therefore, the "profits" to be disgorged also include any increased value in Time Warner's stock that is attributable to Defendants infringing movies as well as any portion of the pending sale of Time Warner, inclusive of any premium paid over Time Warner's stock price, for said acquisition of the company.

10.     Warner Brothers' actions in the instant matter are almost identical to the acts of willful infringement Warner Brothers complains about in the Innovative Matter.   The law regarding infringement on exclusively owned copyright protected rights of reproduction, distribution, public performance and the right to authorize derivative works (among other rights) applies across the board, not selectively.   At a minimum, Plaintiff is entitled to the same relief that

---

1 While Brittle is the sole author of the book and a co-owner of the book's copyright, he is the sole owner of the subsidiary motion picture rights thereto per a written transfer of same to him as documented and discussed more fully below.

Warner Brothers seeks in the Innovative Matter – disgorgement of Defendants' profits as well as a preliminary and permanent injunction.

## I.  INTRODUCTION

11.     On July 16, 2013, three days prior to the theatrical opening of New Line and Warner Brothers' movie *The Conjuring*, New Line Cinema chairman Toby Emmerich told the industry trade publication Variety that New Line was exploring a potential franchise of motion pictures based on the investigations of Ed and Lorraine Warren. A copy is attached hereto as Exhibit 2. Mr. Emmerich went on to declare: "We have Lorraine's permission and support, and we are working on developing another film." *See* Exhibit 2. The article went on to state that the writing team of Carey Hayes and Chad Hayes, who penned "The Conjuring," were on board for the sequel (*The Conjuring 2*) and that the brothers had interviewed Lorraine Warren extensively as part of developing the script. *See* Exhibit 2. The Defendants did not just interview Lorraine Warren. Indeed, Defendants own marketing of the franchise, both domestically and internationally, proclaims their films are "based" on the "Case Files of the Warrens."  To date the Defendants' "franchise" which consists of *The Conjuring* motion picture, its sequel, and its separate "spin off" films have generated in excess of $895,000,000. *See* Exhibits 3 and 4.  An additional motion picture in Defendants' *The Conjuring* "franchise," *Annabelle 2*, is currently in being released on August 11, 2017 and Defendants have already announced two more films they are producing in the franchise, *The Conjuring 3* which is in the scripting stage, and *The Nun*, currently in "pre-production" and which is expected to commence production in the next seven weeks.

12.     The fundamental and foundational problem with all of the foregoing, and specifically the above statement from New Line's chairman, is that Lorraine Warren's "permission and support" were not what New Line and Warner Brothers needed in order to legally acquire the

rights to make the original *The Conjuring,* any of its sequels or its "spin-off" movies.  In fact, Lorraine Warren could not have legally given Defendants any rights that would allowed them to make their franchise of *The Conjuring* movies for several reasons.

13.     First, Lorraine Warren did not own the subsidiary motion picture rights that she conveyed to the Defendants which they in turn used to make their franchise of movies. As discussed in detail herein, Plaintiff alone owns these aforementioned subsidiary motion picture rights which include the copyright protected rights of reproduction, distribution, public performance and the right to make derivative works, all of which Defendants have knowingly and repeatedly infringed upon with malice and aforethought.

14.     Second, when Lorraine Warren granted the Defendants the right to use the Warren Case Files, which the Defendants themselves repeatedly state their movies are based on, she could not have done so because she had years earlier contractually granted that exclusive right to use those same Warren cases, Warren Case Files and related materials to the Plaintiff.   Lorraine Warren had nothing to convey.

15.     Third, decades before she entered into a contract with the Defendants to make a franchise of movies based on the Warrens' Cases, Case Files (and materials related thereto as well as the Warrens' lives and experiences as paranormal investigators), Lorraine Warren had entered into an agreement with Prentice Hall regarding *The Demonologist* book ("*The Demonologist*"). That Prentice Hall agreement, which the Warrens signed in 1978, refers to the to-be-published book as "*The Demonologist: The extraordinary careers of Ed and Lorraine Warren.*" The book's subject matter is both the Warrens careers as paranormal investigators as well as details of various Warren Cases and Warren Case files. As part of that 1978 Prentice Hall agreement the Warrens contractually agreed to a no "competing work" provision.  That no "competing work" provision,

which remains in full force and effect to this day, precludes the Warrens from making or contracting for any works, inclusive of movies (i.e., the Defendants franchise of motion pictures), that are based on the "same subject" as *The Demonologist* book, namely both the Warrens Cases and Case Files included in *The Demonologist* as well as the Warren's "lives and experiences as paranormal investigators."

16.     Lorraine Warren also agreed that under this same no "competing work" provision that she could not at any time contract for any work (i.e., Defendants' motion picture franchise) that competes with the aforementioned subsidiary rights of *The Demonologist* or the sale of the subsidiary rights thereto.  Defendants' entire franchise of *The Conjuring* motion pictures are based on the same subject matter as the book, the Warrens Cases, Case Files and/or their lives and experiences as paranormal investigators. As such, Defendants' entire franchise of movies are all conflicting and competing with the subsidiary motion picture rights to *The Demonologist* which the Plaintiff owns to this very day and remain in full force and effect. Therefore, Loraine Warren could not have authorized or contracted with any party, including but not limited to Defendants, to make any motion picture based on the Warren Cases, Warren Case Files or based on her and Ed Warren's lives and experiences as paranormal investigators.

17.     The Warrens could not grant Defendants any rights that Brittle unilaterally owned, including his copyright protected subsidiary motion picture rights and his exclusive right to use the Warren cases, Warren Case Files and materials related thereto. As a separate and additional "threshold" preclusion, Lorraine Warren could not have legally conveyed to any party the right to make any "competing work" that was based on the Warren cases, Warren Case Files, the materials related thereto or on the Warren's lives and experiences as paranormal investigators as same clearly competes with the sale of the subsidiary rights and violates the no competing work

provision she agreed to under the Prentice Hall Agreement. Both Brittle's unilaterally owned rights and the no competing work provision are still "live" and in full force and effect today.

18.     Above and beyond the foregoing Ed and Lorraine Warren could not have granted any rights which the Warrens may have co-owned with Brittle pursuant to the terms of the Collaboration Agreement *See* "Collaboration Agreement attached hereto as Exhibit 5. Under the Collaboration Agreement, *Lorraine and Ed Warren were contractually precluded from "disposing" of any of the rights. As a result Lorraine Warren could not have unilaterally granted any rights to New Line in 2011, including but not limited to having sold, transferred or "exclusively" licensed to Defendants the entire copyright for the Plaintiff's authored book The Demonologist, as she purported to do – without Plaintiff's knowledge, permission or consent because such actions were prohibited by the 1979 Collaboration Agreement.* The Collaboration agreement provides, in pertinent part:

> "8. All contracts for the sale, lease, license or other disposition of any and all rights in and to the Work now existing or which may hereafter come into existence shall require the unanimous consent of the Author and the Subjects."

See Exhibit 5, ¶ 8.

19.     Even if Brittle did not unilaterally own: (a) the subsidiary motion picture rights;(b) the exclusive right to use the Warren cases, the Warren Case Files and related materials (all of which he did own and still owns); and (c) even if there were never a no competing work provision in the Prentice Hall Agreement, the Collaboration Agreement itself precludes Lorraine Warren from unilaterally giving New Line's the items she attempted to convey in her 2011 OQA Agreement. Unfortunately, as set out in the agreement, she improperly attempted to convey the following specific items to New Line, as defined in the "Property" section:

a.    "(a) Any and all literary material owned or controlled by Owner,"

b.    "(b) Seventy-Five (75) case files in their entirety ("Case Files") from the Warrens' paranormal investigations case file library ("Case File Library"),"

c.    "(c) Any and all right, title and interest in and to the entire life stories of the Warrens ("Life Story Rights"), including, without limitation, all events, occurrences, experiences, stories, episodes, incidents, transactions and affairs related thereto or occurring therein, including without limitation, all paranormal investigations and paranormal experiences of the Warrens"

*See* Exhibit 6, Page 1, Paragraph 4, the "New Line – Lorraine Warren Direct Deal" also referred to herein as the "2011 OQA."

20.    Lorraine Warren unilaterally gave to New Line rights she did not own and had no right to convey at the time, namely: (i) all rights to "all" literary works inclusive of *The Demonologist* (unlawfully including Brittle's own separate share of the copyright to the book); (ii) the right to use the Warrens Case Files including those of Annabelle, Enfield, Amityville, Borley Rectory (aka the Borley Nun case)  and the Perron Farmhouse (Conjuring Case) even though the exclusive right to use them belonged to Brittle alone; and, (iii) all of the Warrens' right, title and interest in the stories of the Warrens' lives and experiences as paranormal investigators – even though same was prohibited by the no competing work provision in the Prentice Hall Agreement. **Even if Warren still owned, or even co-owned the subsidiary rights or the exclusive right to use the Warren case files (which she did not), she transferred said rights to Defendants unilaterally and illegally because such unilateral disposition of co-owned rights is precluded under the Collaboration Agreement which functions as an "agreement to the contrary" per the Copyright Act.**

- 14 -

21.     At no time did Warren, or the Defendants, seek or receive Brittle's permission or consent to transfer any rights to the Defendants.

22.     In actuality, what New Line and Warner Brothers needed to have, but knowingly never bothered to obtain, was the "permission and support" of Plaintiff Gerald Brittle.  Defendants in their 2009 and 20011 Option Quitclaim Agreements for Warren's rights have a chain of title condition precedent, which would have readily led Defendants to The Demonologist book, the Prentice Hall Agreements and addenda thereto. Such a chain-of-title search would have readily revealed to the Defendants that since 1978 it is Brittle, and not Lorraine Warren, who actually owns and controls the underlying motion picture rights to *The Conjuring* movie, and its sequels and spinoffs produced and distributed by the Defendants. Brittle also owns the exclusive right to use the Warrens Cases, Case Files and related materials that the Defendants themselves repeatedly concede that their movies are based on. Mrs. Warren had no rights to convey to the Defendants that would have allowed them to legally make any of the aforementioned movies because:

    a.   Under the Prentice Hall Agreement (Exhibit 12), Lorraine Warren, along with Brittle, had unanimously, knowingly and, voluntarily given the subsidiary motion picture rights to the publisher as part of the agreement the Warrens signed for the book written by the Plaintiff entitled *The Demonologist*. Chapters of *The Demonologist* are based in part on the Warren's Annabelle, Enfield and Amityville cases and Case Files (among others). Subsequently, and years before Lorraine Warren ever met New Line or Warner Brothers, Prentice Hall transferred those copyright protected subsidiary motion picture rights to the book and its contents exclusively to Gerald Brittle. See Exhibit 13. Lorraine Warren knew about and agreed to this transfer.

- 15 -

b. Under the Collaboration Agreement, Lorraine Warren knowingly granted Brittle the exclusive right to use the Warren's Cases, Warren Case Files and related materials for all the Warren investigations up to and including July 26, 1981. This includes, but is not limited to, the Warrens' Amityville, Annabelle, Enfield, Borley Rectory(Borley Nun) and Perron Farmhouse cases and Case Files that Defendants based their films on.

c. The no "Competing Work" provision of the Prentice Hall Agreement prohibited Lorraine Warren from entering into any deal that granted any party the right to make any movie based on either the Warren's cases, Warren Case Files and related materials or any movie based on the Warrens' lives and experiences as paranormal investigators. See Exhibit 12 at "Competing Work 15."

d. Under the Collaboration Agreement, Lorraine Warren cannot unilaterally grant any rights without the knowledge of and unanimous written consent of Plaintiff -- consent which neither she nor Defendants ever sought or obtained. There were absolutely no rights that Lorraine Warren conveyed to New Line that would have allowed the studio to legally make their franchise of motion picture – and the Defendants knew this, but elected to proceed anyways.

23.    The following table summarizes the Defendants' works and their separate violations of the Copyright Act (infringement of Plaintiff's copyright protected rights of distribution, performance, reproduction and right to authorize derivative works contained in his exclusive subsidiary motion picture rights to *The Demonologist*), Defendants' productions being unlawful  (i.e. violations of the no "Competing Work" clause of the Prentice Hall Agreement and separate violation of the no "unilateral" sale of rights provision under the Collaboration

Agreement), as well as his (Brittle) separate, unrelated and non-preempted state law claims of Defendants' misappropriation of his property (i.e., exclusive "right to use") the Warrens' Cases, Case Files and related materials):

*///*

## THE INFRINGING, UNLAWFUL AND MISAPPROPRIATING WORKS

| DEFENDANT'S WORK | INFRINGES ON PLAINTIFF'S COPYRIGHT PROTECTED SUBSIARY RIGHTS | UNLAWFULL UNDER THE NO "COMPETING WORK" PROVISION* (*Prentice Hall Agreement) Exhibit 12 | UNLAWFULL UNDER THE NO UNILATERAL SALE PROVISION‡ (‡Collaboration Agreement) Exhibit 5 at "8." | MISAPPROPRIATES PALINTIFF'S EXCLUSIVE RIGHT TO USE WARREN CASES, CASE FILES AND MATERIALS⚜ (⚜Collaboration Agreement) Exhibit 5 at "11." |
|---|---|---|---|---|
| **ALREADY RELEASED** | | | | |
| THE COJURING | YES | YES | YES | YES |
| THE COJURING 2 | YES | YES | YES | YES |
| ANNABELLE | YES | YES | YES | YES |
| **IN PRODUCTION** | | | | |
| ANNABELLE 2 | YES | YES | YES | YES |
| THE NUN | YES | YES | YES | YES |
| **ANNOUNCED/PRELIMINARY SCRIPTING** | | | | |
| CONJURING 3 | YES | YES | YES | YES |

24.     Defendants knew of Plaintiff's book and his rights related thereto before their first *The Conjuring* movie script was ever written. Defendant New Line told the writers on the original *The Conjuring* movie, Defendants Chad and Carey Hayes, not to read Plaintiff's *The Demonologist* because "the studio did not have the rights" to the book. Defendant New Line's own head of Business Affairs and legal counsel Craig Alexander ("Mr. Alexander") admitted in his testimony in a legal proceeding that: (i) New Line took not only took Plaintiff's exclusive right to use the Warrens' Perron Farmhouse Case File; (ii) New Line knowingly took portions of the Annabelle chapter of *The Demonologist* and used it in their original *The Conjuring* movie – despite the fact they knew they did not have the right to do so; and (iii) they knew there existed subsidiary motion picture rights and copyrights in and to *The Demonologist* book authored by Plaintiff.

25.     In this aforementioned legal proceeding, when asked if the studio used portions of *The Demonologist* – portions they had no permission to use –Mr. Alexander stated that Defendant indeed used such portions of Brittle's book. *See* Exhibit 7. In Mr. Alexander's first section of testimony, reproduced in part below (*See* Exhibit 7), he testified that New Line acquired the entirety of the film rights to *The Demonologist* book via a 2009 Option Quitclaim Agreement. *See* Exhibit 8 ("2009 Option Quitclaim Agreement" also referred to as the "2009 OQA"). This is a document that was later was re-executed as the 2011 Lorraine Warren Option Quitclaim Agreement (herein the "2011 OQA").  In his testimony, Mr. Alexander states:


Q. ARE THE FILM RIGHTS TO "THE DEMONOLOGIST" BOOK
RIGHTS THAT, UNDER THE TERMS OF THE OPTION
QUITCLAIM
AGREEMENT, ARE OWNED BY NEW LINE?

A. [ALEXANDER]YES.

> Q. AND TURNING YOUR ATTENTION AGAIN TO THAT SAME
> PROVISION, WHERE IT SAYS "ANY AND ALL RIGHTS
> HERETOFORE AND HEREAFTER ACQUIRED IN CONNECTION
> WITH THE PROPERTY," ONE OF THE PROPERTIES IS THE
> ENTIRE CASE FILE LIBRARY OFTHE WARRENS'
> PARANORMAL INVESTIGATIONS, RIGHT?
>
> A. YES.

Exhibit 7.

26.     Mr. Alexander's testimony is at odds with the 1976 Copyright Act, 17 U.S. Code §

204, which states that for a copyright to be legally transferred said transfer must be: (i)

memorialized in writing; and, (ii) the specific copyright to be transferred must be enumerated in

that transfer document; and (iii) the transfer document must be signed by the owner of the

copyright. If all three of these requirements have not been met, then there is no transfer of copyright

under Federal Law.

27.     Mr. Brittle has never signed such a transfer document or any document with

Defendants. Brittle did not sigh the 2009 or 2011 OQA Agreements and they never mention *The

Demonologist* book or Demonologist copyright by name. As a result, and under applicable law,

there has never at any time been any transfer to Defendants of either the copyright to *The

Demonologist* or Brittle's subsidiary film rights.

28.     Brittle is the sole and exclusive owner of the subsidiary motion picture rights to *The

Demonologist* and the copyright protected rights therein of performance, distribution, reproduction

and exclusive right to authorize derivative works. Brittle has never signed any transfer agreement

for his motion picture rights.  Brittle has never been a party to any document or any agreement

with Defendants.  As a result, no transfer of either the copyright to *The Demonologist* nor Brittle's

subsidiary motion picture right has ever occurred or been effectuated.

29.     Also, under the Copyright Act as a co-owner of the copyright to *The Demonologist*, Lorraine Warren cannot enter into an "exclusive" sale of all "right, title and interest" in that literary work to New Line.  At best, a co-owner of a copyright can enter into a non-exclusive license for the copyrighted property.[2]  However, in this case there are at least two issues that prevent even the non-exclusion option from being permitted:

a) First, the Collaboration Agreement, per the Copyright Act, serves as an "agreement to the contrary."  Such written agreement to the contrary allows parties to agree to override the default rules of the Act.  The default copyright rules would allow a copyright co-owner to enter into a "non-exclusive license" for a co-owned copyright. However, as an agreement to the contrary, the Collaboration Agreement prohibits Warren, a co-owner of the copyright, from transferring **any** rights, even non-exclusive ones, without Brittle's consent and permission (which he never gave). *See* Exhibit 5 at "8."[3]

b) Second, the agreement Warren entered into with Defendant New Line (the 2011 OQA) (Exhibit 6) is not "non-exclusive," it is "exclusive" and therefore also unlawful under the Copyright Act.[4] *See* Exhibit 6. Specifically, the Agreement

---

2 The co–owners of a copyrighted work in the United States may license unilaterally only if the license is nonexclusive, and subject to a duty to account to their co–owners for a ratable share of the profits from the license. 1 Nimmer on Copyright §§ 6.10 & 6.11(2006)

3 Similarly, "[i]n the absence of an agreement to the contrary, one joint owner may always transfer his interest in the joint work to a third party, subject only to the general requirements of a valid transfer of copyright. However, one joint owner does not have the power to transfer the interest of another joint owner without the latter's consent. ." 1 Nimmer on Copyright § 6.11 (2006)

4 Any transfer of copyright ownership that transfers the interests of both joint owners must be unanimous among co–owners; an exclusive license is defined by the law as a variety of transfer of the joint interests in the copyright and therefore, must be jointly agreed. ." 1 Nimmer on Copyright § 6.11 (2006)

provides:

> "4. Grant of Rights: If the option is exercised, **Purchaser shall own, and subject only to such exercise Owner assigns and sells to Purchaser, exclusively, in perpetuity and throughout the universe, all right, title and interest in the Property** except for the Reserved Rights specified below."

Exhibit 6.

30.    There is no reasonable construct of the 2009 OQA, the 2011 OQA nor the Copyright Act under which New Line can claim it lawfully received any rights whatsoever of, or by, Plaintiff.

31.    It is also worth noting that New Line admits, by way of Mr. Alexander's testimony, that there are indeed film rights to *The Demonologist*. The import of Mr. Alexander's statement is that Defendants willfully and maliciously used said film rights which belonged exclusively to Plaintiff, and made and continue to make their franchise of movies even though they possess no rights to do so.

32.    In his JAMS testimony (*New Line vs DeRosa-Grund*) Mr. Alexander freely admitted Defendants used portions from *The Demonologist*, a book in which they had no copyright or subsidiary film rights, in Defendants' making the original *The Conjuring* movie (*See* Exhibit 10):

> Q. WAS THERE ANYTHING ABOUT "THE DEMONOLOGIST" IN YOUR MOVIE [referring to The Conjuring]?
>
> A. [Alexander] ANYTHING ABOUT THE -- OR FROM "THE DEMONOLOGIST"?
>
> Q. EITHER ONE, ABOUT OR FROM.
>
> A. YES.
>
> Q. WHAT ABOUT OR FROM "THE DEMONOLOGIST" WAS IN

YOUR FIRST MOTION PICTURE?

A. I DON'T KNOW IF THE PERRON --
"CONJURING"/PERRON
CASE FILE IS IN THERE, BUT THERE'S SOME REFERENCE
TO
"ANNABELLE" IN -- THERE'S SOME ELEMENTS OF
"ANNABELLE" IN OUR PICTURE."

33.     Incredulously, Defendants continued with malice aforethought to disregard and encroach upon Plaintiff's rights, including but not limited to his copyright protected subsidiary rights to *The Demonologist,* to make their *The Conjuring, The Conjuring 2*, *Annabelle*, *Annabelle 2* as well as their announced *The Conjuring 3* sequel and *The Nun* spin-off movies. Defendants have built a billion-dollar franchise based on rights they knew they did not possess. Defendants knew prior to their original *The Conjuring* movie they did not have the requisite rights that they needed from Plaintiff to make their movies. Indeed, they went ahead even after Plaintiff's lawyer sent a "Cease and Desist" letter to Defendant New Line telling them to stop, that New Line did not have the right to make their *Annabelle* and *The Conjuring 2* movies. *See* Exhibit 11. Defendants ignored Plaintiff's rights yet again and went ahead and made *The Conjuring 2*, *Annabelle 2* and are in the process of making *The Nun* and *The Conjuring 3*. Defendants have willfully and repeatedly and knowingly ignored Plaintiff's rights and this wrongful behavior continues to this day.

## A. THE DEMONOLOGIST AND 1978 PRENTICE HALL AGREEMENT – SUBSIDIARY MOVIE RIGHTS GRANT & NO COMPETING WORK PROVISION

34.     Ed and Lorraine Warren founded The New England Society for Psychic Research

in 1952 with the goal to investigate hauntings, the supernatural and paranormal occurrences. Since that time, the Warrens claim to have investigated thousands of cases of possession, demonic infestations, hauntings and other supernatural events as paranormal investigators.

35.     In 1978, Ed and Lorraine Warren were in discussions with publishing company Prentice Hall to have a book written, **the subject of which was the Warrens' lives and experiences as paranormal investigators**. Prentice Hall wanted the book to be written by Jay Anson, the author who wrote a book of similar genre entitled "*The Amityville Horror*," published by Prentice Hall in September of 1977. However, before any terms materialized between the parties, author Jay Anson became ill and could not take on the project. Mr. Anson died in March of 1980 from complications of that prolonged illness.

36.     During the initial conversations between Ed and Lorraine Warren, Jay Anson, and Prentice Hall, Ed and Lorraine Warren received a handwritten letter from George and Kathy Lutz, attached as Exhibit 24. George and Kathy Lutz were the subjects of Jay Anson's book, *The Amityville Horror*. In their letter, the Lutzs cautioned the Warrens as to what to be "concerned" about in negotiating any deal with Anson and Prentice Hall. Mr. Lutz's caution was based on the Lutz's own experiences and problems with Anson and Prentice Hall on the *Amityville Horror* book. Ed and Lorraine Warren forwarded this letter to Brittle in or about April of 1978. The concerns listed in the letter included use and control of the Warren's materials and any subsequent movie rights. In other words, the Warrens went into the deal with Prentice Hall with their eyes wide open.

37.     Subsequent to Anson being unable to proceed, in or about early 1978, Ed and Lorraine Warren met with another writer recommended by Prentice Hall, Gerald Brittle. Mr. Brittle is a writer with advanced degrees in literature and psychology, specializing in mystical

theology.  Plaintiff told Prentice Hall and the Warrens that book they were contemplating on the subject of the Warrens' lives and experiences as paranormal investigators, as well as the Warrens' cases, Warren Case Files and related materials, had to be an objective book regarding supernatural phenomena.

38.     The parties agreed that Brittle would write the book about the Warrens.  They also agreed that Ed and Lorraine Warren would give Brittle the exclusive right to their Cases, Case Files and universe of related materials in exchange for him authoring a book about their lives and experiences as paranormal/psychic investigators.  These "Warren Case Files" or "Case Files" as they are referred to herein included, but were not limited to, the Warrens' investigations (i.e., "Cases"), "Case Files" as well as their vocal recollections, stories, cases, tape recordings, proprietary information and other materials relating to those investigations.

39.     The Warrens then went into negotiations for a deal with Prentice Hall and Gerald Brittle for a book based on the Warren's "lives and experiences" as paranormal/psychic investigators, and their universe of materials, i.e., the Warren Case Files.  The Warrens did this with the full benefit of the experience of George and Kathy Lutz as to what terms the Warrens should themselves "try" to get in making their own book deal.

40.     In November of 1978, Mr. Brittle and the Warrens executed a written contract with Prentice Hall to publish *The Demonologist* (referred to as the "Prentice Hall Agreement" herein). *See* Exhibit 12.

41.     Under the Prentice Hall Agreement, Mr. Brittle and the Warrens granted the publisher the exclusive copyright protected publishing and subsidiary rights to the "unpublished work." **Per the Prentice Hall Agreement, the unpublished book was to be based on the Warrens' lives and experiences as paranormal investigators, which was to be titled:**

**"*The Demonologist*: *The Extraordinary Career of Ed and Lorraine Warren*."**

*See* Exhibit 12 at "1."

42.     *The Demonologist* contains entire individual chapters devoted to each of the Warrens' Annabelle, Amityville and Enfield cases and Case Files. *The Demonologist* also talks about the Borley Rectory/Borley Nun case.

43.     Under this same Prentice Hall Agreement, the Warrens and Brittle granted Prentice Hall "exclusive subsidiary rights," including but not limited to <u>film/motion picture rights</u> to the work which includes the Warren Cases Files and Warren Cases that are contained in the book. *See* Exhibit 12 at "1." and "5."

44.     Under the Prentice Hall Agreement, Ed and Lorraine Warren, along with Gerald Brittle, agreed that "during the term of the agreement" they would not "contract or furnish" any "<u>work upon the same subject matter that shall conflict with the sale of the work</u>," (i.e., compete with the exclusive publishing and subsidiary rights. Subsidiary rights which the publisher had exclusive contractual control over). *See* Exhibit 12 at "5." and "15." By the terms of the no "Competing Work" provision in the Prentice Hall Agreement, the Warrens themselves are prohibited from selling any movie rights for any motion picture that is based on the Warrens' lives and experiences as well as their cases and Case Files that appear in the book, as they are covered by the exclusive publishing and subsidiary rights granted to Prentice Hall.

45.     In other words, once the Warrens executed the Prentice Hall Agreement, by virtue of that agreement's no "Competing Work" provision (*See* Exhibit 12 at "15."), the Warrens could not later sell any motion picture rights that are based on the same subject matter as the work.  They are, quite simply, not permitted to sell motion picture rights based on **their lives and experiences as paranormal investigators nor based on any of the Warrens Cases, Case Files and related**

materials that appear in *The Demonologist.*

46.     Under the Prentice Hall Agreement, the "life" of the publishing rights and subsidiary rights run for different terms.

47.     The "term" for the life of the publishing rights runs until such time the "work shall go out of print and off sale for six (6) months in all editions." Exhibit 12 at "14."

48.     Separately, the exclusive subsidiary rights (i.e., the film and television rights) granted by the Warrens and Brittle to Prentice Hall run for a term based not on the book being in print, but rather based on and for the "<u>full term of the copyright and all renewals and extensions</u>" of *The Demonologist* book. Exhibit 12 at "1."

49.     The publishing rights granted by the Warrens and Brittle to Prentice Hall terminated per the Prentice Hall Agreement in April 18, 1986, when the work went out of print (Exhibit 25).

50.     However, the term of and for the subsidiary rights is still live as the copyright to the work is still in full force and effect and will remain so for at least the next seventy years.

51.     The Prentice Hall Agreement states that the agreement between the Warrens, Brittle and Prentice Hall shall be "binding upon and inure to the benefit of …the successors and assigns of the Publisher but no assignment shall be binding on either of the parties without the consent of the other." Exhibit 12 at "19." The Warrens fully consented to the transfer of the subsidiary rights from Prentice Hall to Brittle as evidenced by their signature on the transfer document. *See* Exhibit 12. The no "Competing Work" provision of the Prentice Hall Agreement is binding on Warren and inures to the benefit of Brittle.

52.     The Prentice Hall Agreement also states that the agreement "shall not be subject to change or modification, in whole or in part except by written instrument" signed by all the parties and there is no such writing in existence.

## B. THE COLLABORATION AGREEMENT - NO UNILATERAL GRANTS OF RIGHTS AND BRITTLE'S EXCLUSIVE RIGHT TO USE THE WARREN CASE FILES

53.     On November 20, 1978, twelve days after the Prentice Hall Agreement was executed, Ed & Lorraine Warren and Plaintiff Gerald Brittle, entered into a Collaboration Agreement. *See* Exhibit 5.

54.     The Collaboration Agreement sets forth Brittle and the Warrens' "understanding with respect to their respective rights in the Work," and defines how Brittle and the Warrens deal with each other as well as their rights and respective roles. *See* Exhibit 5.

55.     The Collaboration Agreement provides and clarifies that with regard to *The Demonologist* and the rights related thereto (i.e. subsidiary, publishing, royalties, etc.), that the Warrens and Brittle agree that Brittle was at all times the book's **sole author** and to be "hereinafter referred to as "the Author," and that Edward Warren and Lorraine Warren, who were at no time ever authors of the book, were "hereinafter referred to as "the Subjects" *See* Exhibit 5.

56.     The Collaboration Agreement further provides that the Warrens and Brittle are simultaneously entering into a publishing contract with Prentice-Hall for a book entitled "*The Demonologist* (hereinafter referred to as "the Work"), about the Warrens lives and experiences as paranormal investigators. *See* Exhibit 5. The subject matter of the book is clear and unmistakable.

57.     The Collaboration Agreement does not change or modify Brittle's or the Warren's rights or obligations vis-à-vis the publisher under the Prentice Hall Agreement. It only changes how the Warrens and Brittle deal with each other, and their rights relating to each other.

58.     The Collaboration Agreement delineated the payments and royalties that each of the Warrens and Brittle would receive for the disposition of any rights to *The Demonologist*, not inclusive of those rights which were to contractually revert solely to the Author (Brittle) (i.e.,

subsidiary motion picture rights which were solely Brittle's) upon termination of the Prentice Hall Agreement. (As discussed below, said subsidiary rights contractually reverted to Brittle before the termination of the Prentice Hall Agreement[5] under the First Amendment to the Prentice Hall Agreement[6].

59.     The term of the Collaboration Agreement is "co-extensive" with the life of the copyright for *The Demonologist*. *See* Exhibit 5.

60.     The Collaboration Agreement states that the "sale, lease, any contracts for any rights jointly owned by Brittle and the Warren could not be disposed of unilaterally by either of them. Any such disposition required "unanimous consent" of both Brittle and Warren to effectuate any transfer. Exhibit 5 at "8." This provision delineates how the parties agreed that the Collaboration Agreement would function as an "agreement to the contrary" changing the default rules of the Copyright Act.   When Brittle and Warren later agreed to and executed the First Amendment to the Prentice Hall Agreement (Exhibit 13) immediately reverting the subsidiary motion picture rights to Brittle, the Warrens executed that agreement acknowledging their "unanimous consent" to same. *See* Exhibit 13.

61.     Under the Collaboration Agreement the Warrens state they are giving Brittle extensive portions of the material. This material shall include (but is not limited to) "extensive portions of material which are the vocal recollections of the Subjects [Warrens]." Exhibit 5 at "11. This same provision grants Brittle the exclusive "right to use" all of the Warrens materials. That the "materials" the Warrens gave to Brittle were extensive and not limited to vocal recollections, is evidenced by not only the content of *The Demonologist* book itself, but it is confirmed by Mrs.

---

5 See Exhibit 12.
6 See Exhibit 13.

Warren in a taped phone call of June 26, 1980. *See* Exhibit 26 hereto the "Perron Taped Phone Call." During the call, Mrs. Warren states to Caroline Perron that she and Ed Warren gave Brittle "all" their "materials" including their "case histories [Case Files]" for the book Brittle was writing. *See* Exhibit 26 on CD attached to Complaint.

62.     Brittle wrote the book (*The Demonologist*) in accordance with the parties' agreement and it was first published on January 6, 1980.  The book's subject matter includes the Warrens lives and experiences as paranormal investigators as well as a recounting of the claims of the Warrens and those involved in the cases they investigated, various Warrens Cases and Case Files and material related thereto.

## C. AMENDMENT TO PRENTICE HALL AGREEMENT - WARREN AGREES TO IMMEDIATELY TRANSFER ALL SUBSIDARY RIGHTS TO BRITTLE

63.     Under the terms of the Prentice Hall Agreement, the subsidiary rights to the "Work", inclusive of the subsidiary film and television rights to *The Demonologist*, and the subsidiary film rights to the Warrens cases/Warren Case Files contained within the book (including the Warrens' Amityville, Enfield, Annabelle and Borley Rectory/Borley Nun cases), were to revert to the Author (Brittle) upon termination of the Prentice Hall Agreement.  Under that reversion scenario Prentice Hall would not be entitled to any proceeds of Brittle's sale or license of the subsidiary rights.

64.     However, later Prentice Hall decided that it wanted to modify such term so that the publisher would still enjoy a portion of the subsidiary right sale revenues, even after a reversion. On December 8, 1981, the Warrens, Brittle and Prentice Hall executed an amendment to the Prentice Hall Agreement (Exhibit 13 hereto the "Prentice Hall First Amendment"). Under that Prentice Hall First Amendment, the parties agreed not to wait until the publishing agreement terminated to deal with the reversion of the subsidiary film and television rights.  Under this First

Amendment to the Prentice Hall Agreement, the Warrens agreed that upon execution the document

the subsidiary film and television rights to the book immediately became Brittle's and Brittle's

alone as the "author":

> **"Upon signature by all parties, the control of the subsidiary rights enumerated in paragraph 5. (6) The right to sell or license through-out the world: (a) Motion Picture (b) Dramatization (c) Radio (d) Television will revert to the author."**

Exhibit 13 at ¶2. Per the prior executed Collaboration Agreement, the Warrens agreed that Brittle

alone would be the "author."  Under the Prentice Hall First Amendment, which the Warrens agreed

to and executed, the subsidiary motion picture and television rights immediately reverted and were

assigned by Prentice Hall to Brittle, the author. These motion picture and television rights remain

with Brittle to this day.

## D. DEFENDANTS WILLFUL AND MALICIOUS MISSAPPROPRIATION OF PLAINTIFF'S RIGHTS

65.     There is not now, nor has there ever been any agreement between any of the

Defendants and Plaintiff conveying any of Plaintiff's rights nor his property to Defendants as

delineated herein.

66.     Nonetheless,   with   knowledge   aforethought,   the   Defendants   willfully

misappropriated Plaintiff's property, including Plaintiff's exclusive contractual "Right to Use" the

Warren Cases and Case Files.

67.      The Plaintiff was accorded, by virtue of the Collaboration Agreement he executed

with Ed and Lorraine Warren in November of 1978, the exclusive right to use the Warren's Cases,

Warren Case Files and related materials thereto that the Warrens investigated up to and inclusive

of the date of July 26, 1980.  The Warren's Cases, Case Files and related materials include their

vocal recollections, stories, cases, tape recordings and proprietary information pertaining to their

aforementioned paranormal investigations. Large portions of the material included in the Warren Cases given to Brittle are recorded vocal recollections of Ed and Lorraine Warren speaking about their cases.

68.     The Warren Cases include, but are not limited to, Ed and Lorraine Warren's involvement with the investigations of the Amityville, Enfield, Annabelle, Borley Nun and Perron Farmhouse (The Conjuring) cases.

69.     This contractual "right to use" is a property right and Plaintiff will show below that this claim is neither pre-empted nor subsumed by the Copyright Act.

70.     With knowledge aforethought, the Defendants willfully infringed on Plaintiff's copyright protected rights. This includes Plaintiff's Exclusive Subsidiary Motion Picture Rights.

71.     Brittle exclusively owns, by virtue of contract, certain Subsidiary Rights to the book, *The Demonologist*, written by Plaintiff, and granted to him under the terms of the aforementioned 1978 Prentice Hall Agreement and the First Amendment to that agreement. *See* Exhibits 5, 12 and 13. Within Plaintiff's exclusive copyright protected subsidiary rights include; but are not limited to, the motion picture/film rights, television and dramatic rights for the Warrens' paranormal investigations, Warren Case Files and related materials including; the cases of Amityville, Enfield, Annabelle and the Borley Nun which are all contained in *The Demonologist* book.  These subsidiary motion picture rights of the Plaintiff that the Defendants infringed on include his copyright protected rights of reproduction, distribution, public performance and his exclusive right to make derivative works.

72.     The Defendants knew about Plaintiff's book, *The Demonologist*, and his exclusive rights.  On September 21, 2015 Plaintiff's attorney sent the studio Defendants a formal "Cease and Desist" letter. *See* Exhibit 24. Despite this knowledge, the Defendants disregarded Plaintiff's rights

and proceeded to make theatrical motion pictures that include and encompass Plaintiff's property, (i.e., Plaintiff's exclusive right to use the Warren Cases) and infringe on his subsidiary motion picture rights.  These motion pictures, part of Defendants' franchise of *The Conjuring* movies, are a direct result Defendants' willful acts of infringement and separately their misappropriation and unlawful exploitation of Plaintiff's property include the already theatrically released *The Conjuring, Annabelle* and *The Conjuring 2*. The Defendants other motion pictures either in post-production (Annabelle 2) or pre-production (*The Nun*), which are part of *The Conjuring* franchise, are also a direct result Defendants' infringement as well as separately misappropriating and unlawfully exploiting Plaintiff's property.

73.     Defendant Warner Brothers had specific knowledge of Plaintiff and *The Demonologist* as far back as the summer of 1997.  At that time, Ed and Lorraine Warren told multiple parties that they had entered into a deal with Warner Brothers for the Warrens' lives and experiences as paranormal investigators. This is supported by first-hand accounts of those that witnessed an "archivist" from Warner Brothers spending a week at the Warren home in Monroe, Connecticut going through the Warrens Case Files and talking to the Warrens in order to find a case for the studio to make into a movie.  Lorraine Warren also told witnesses the deal with Warner Brothers "superseded" her deal with Brittle.  One such person who witnessed the foregoing and had a direct conversation with the Warrens regarding the Warner Brothers "Demonologist" movie deal was Yolande Suzin, a confidant and friend the Warrens who witnessed these events and had conversations directly with Ed and Lorraine Warren regarding same. *See* Exhibit 28 ("Yolande Suzin Email" of February 12, 2014).


///

74.     The foregoing is further supported by a "screenshot" of the Warren's own website (Warrens.net) as it was on October 13, 1999 via the Internet Wayback Machine website (Exhibit 14), where the Warrens announce to the world that "scripting is in progress" for their aforementioned *"THE DEMONOLOGIST"* movie with Warner Brothers. *See* Exhibit 14. The Warrens announced not only the name of the movie; but, also showed an image of the source material for that movie, positioned directly opposite the Warner Brothers logo.



Exhibit 14.

75.     The image of the source material the Warrens displayed on their website is the cover of *The Demonologist* book which is on the left. *See* Exhibit 29 ("Demonologist Cover 1". The text between the images states the name of the movie is "The Demonologist."  The name and image of the studio that the Warrens displayed as having done the deal with them and was making "*The Demonologist*" movie is on the right – Defendant Warner Brothers. *See* Exhibit 30 ("Warner Brother Logo" from the website http://www.logosays.com/warner-bros-logo/ ).

76.     The image of the source material that Warren and Warner Brothers were using for the movie was "*The Demonologist*" book. The subsidiary motion picture rights to the book were not the Warrens to give to Warner Brothers, they belonged to the Plaintiff.

77.     However, at that time back in 1997, Plaintiff Brittle was not aware that Warner

Brothers had done a deal with the Warrens - a deal that both infringed on his exclusive contractual subsidiary motion picture rights and separately misappropriated his exclusive right to use the Warren Case Files. This 1997 deal, which was not disclosed to Brittle by either the Warrens or Warner Brothers, also violated the no "Competing Work" provision that the Warrens were bound to under the Prentice Hall Agreement.

78.     Brittle was also not aware of the Warrens illegal and unilateral disavowing of their contractual obligations to Brittle that were, and remain in full force and effect. Brittle was also only recently made aware of the Warrens knowing participation with Warner Brothers in a business conspiracy and fraud against him that began with this unlawful 1997 deal.[7]

79.     It is inconceivable that Warner Brothers, a company with vast legal resources, that has done thousands of deals over decades for motion picture rights, nor its subsidiary New Line, both of whom who incorporate "Chain of Title" conditions precedent in the deals they make for motion picture rights, were not aware of Brittle, the Prentice Hall Agreement, the Collaboration Agreement and the First Amendment to the Prentice Hall Agreement during any of the three times they conducted their own due diligence pursuant to the deals they did with Lorraine and Ed Warren.

80.     Additionally, as more fully described herein, per the terms of the 1978 Collaboration Agreement, Brittle owns the exclusive right to use the Warrens' "Bewitched Farmhouse" case (aka the Perron Farmhouse Case which was the basis of the Defendants' motion picture *The Conjuring)*. Plaintiff's exclusive right to use this particular case is memorialized in the Collaboration Agreement.

---

7 Brittle only recently became aware of the Warrens unlawful 1997 deal with Warner Brothers through an email from a party with first-hand knowledge of same attached as Exhibit 28.

81.     That the Warren's specifically gave the Perron Farmhouse Case and Case File to Brittle (under the Collaboration Agreement) is further evidenced and corroborated in the recorded telephone call between and among Plaintiff, the Warrens and Caroline Perron that occurred on June 26, 1980. *See* Exhibit 26. Transcription of the relevant part of the audio recording of that phone call is found at the 0:56 second mark, where Lorraine Warren states to Caroline Perron:

> Lorraine Warren: "Well listen hon, let me tell you why we were coming up to see you today. We met a young man who is very interested in doing some writing [Brittle] and we have a publisher [Prentice Hall] who is very interested in publishing some material. **And we [Brittle and the Warrens] went through all our case histories… tapes…you know things like that…, and we were listening to them and this writer listened to your tape and was rather interested in writing the story of what happened to you at that Rhode Island home [the Perron farmhouse].** But we wondered… are you people…do you want to? .... are you willing to go through with the interview [with Brittle]?
>
> Caroline Perron: "Well yeah I always had it in my mind to tell the story…."

Exhibit 26.

82.     It is clear that the Warrens gave Brittle the Perron Farmhouse Case as part of the Warren Cases, Case Files and related materials that he had the exclusive right to use under the Collaboration Agreement.

83.     Plaintiff has never granted permission for Defendants to use this or any of his property or rights and it was not until within three years of this filing that Plaintiff came to learn of the wrongdoing complained of herein.

84.     On September 21, 2015, Plaintiff served Defendants Warner Brothers and New Line with a Cease and Desist letter, (*See* Exhibit 27 ("Cease and Desist Letter")). and reproduced in part below), that clearly notified them that Plaintiff never granted them permission to use any of the Warren materials under Plaintiff's exclusive contractual right to use same. The letter

provided in pertinent part:

> Lorraine Warren may claim to have authority to grant movie rights for the above story. Included with the enclosed notices is our client's contract with Ed and Lorraine Warren (the "Collaboration Agreement") and paragraph 8 makes clear that all license grants require unanimous approval. You are on notice that Mr. Brittle never consented to any license proposed by Ms. Warren, and he does not consent to the filming of *The Conjuring 2*.
>
> Please also note paragraph 11 of the Collaboration in which Ed and Lorraine Warren granted our client exclusive rights to the material used in *The Demonologist*. Again, any attempt by Lorraine Warren to license or in any way authorize the use of this material without our client's consent is beyond her authority.

Exhibit 39 at ¶¶ 2-3.

85.    The Cease and Desist Letter also notifies Defendants Warner Brothers and New Line that they are infringing on Plaintiff's subsidiary motion picture rights which include his copyright protected rights of reproduction, performance, distribution and the exclusive right to authorize derivative works.   Plaintiff's letter also clearly stated that he did not consent to the filming and production of *The Conjuring 2*. Exhibit 27.   The letter specifically states:

> Lorraine Warren does not have legal authority to authorize or otherwise license the production of any films derived from, based upon, inspired by, or that include any material included or used by Mr. Brittle in connection with *The Demonologist*.

Exhibit 39 at Page2, ¶1.

86.    Defendants disregarded the letter and gave little, if any, consideration at the implications of violating Plaintiff's rights. Defendants' counsel claimed in a response to the Cease and Desist Letter, dated October 15, 2015, that the movies were based not on anything contained in *The Demonologist* book, but rather based on "historical facts." *See* Exhibit 30 ("NL-WB

Response Letter"). This is despite the fact that the entirety of the Defendants' marketing, as discussed in great detail below, claims that the movies are based on the "Case Files of the Warrens" – Case Files to which the Plaintiff has the exclusive right of use.

87.     New Line's attempt at conjuring an excuse for its flagrant misappropriation and conversion of Brittle's property (his exclusive right to use the Warren cases) and infringement of his subsidiary rights is belied by a slew of public documents and statements by the Defendants themselves. In one such example, the movie industry website Deadline.com spoke with Warner Bros. president of worldwide distribution Veronika Kwan Vandenberg about Defendants' *The Conjuring 2* movie. *See* Exhibit 32 ("Deadline Article July 20, 2016") (http://deadline.com/2016/07/the-conjuring-2-third-highest-grossing-horror-franchise-box-office-1201789474/)) The article at paragraph 6 stated:

> "The [Conjuring] series follows the Warrens' actual cases, and the sequel sees them travel to north London to help a single mother raising four children alone in a house plagued by malicious spirits."

Exhibit 32 at ¶ 6.

88.     The Defendants' entire franchise of *The Conjuring* movies are not based on historical fact, but on the Warrens Case Files that Plaintiff has the exclusive "right to use", a right he has never granted to the Defendants. Plaintiff will also show below that an "actual case" of the Warrens should never be conflated with fact, historical or otherwise. The evidence presented by Plaintiff herein leaves no doubt as to the Warrens' total lack of credibility regarding their business dealings as well as their Cases and Case Files.

89.     At no time did New Line's counsel ever address the substantive issue in Plaintiff's September 21, 2015 Cease and Desist letter. New Line did not address that Mrs. Warren did not have the legal right to give New Line any rights unilaterally without Brittle's permission. New

Line did not address their infringement on Brittle's copyright protected subsidiary rights. New Line did not address the no "competing preclusion" that acts as a legal barrier to all of Defendants' The Conjuring franchise of movies.

90.     Even if Plaintiff did not enjoy copyright protected subsidiary rights or the exclusive "right to use" the Warren Case files that they investigated through July 26, 1980, the no "Competing Work" provision that Lorraine Warren agreed to under the Prentice Hall Agreement (Exhibit 12) still means that at no time can she enter into any agreement with any party to:

> a)  make a movie on the same general subject as *The Demonologist* book – the Warrens live and experiences as paranormal investigators; or,
>
> b)   make a movie specifically about those Warren cases, Warren Case Files and related materials in *The Demonologist* – including the Warrens Amityville, Enfield, Annabelle and Borley Nun investigations -

91.     With regard, specifically to Brittle's exclusive right to use the Warren's cases, Warren Case Files and material related thereto granted to him under the Collaboration Agreement, this is not a copyright right, it is a property right. "The right to performance of a contract and the right to reap profits therefrom are property rights which are entitled to protection in the courts." *Worrie v. Boze*, 198 Va. 533, 536, 95 S.E.2d 192, 196 (1956). Defendants acted at all times knowingly, intentionally, purposefully, and without lawful justification in interfering with Plaintiff's exclusive property right to use the Warren's Cases, Cases Files and materials related thereto granted to him by the Warrens under the Collaboration Agreement.

92.     Under Virginia Law section 18.2-500, "[a]ny person who [is] injured in his reputation, trade, business or profession by reason of a violation of § 18.2-499" may seek relief in a civil court. In turn, Virginia Code section 18.499 imposes liability on: "[a]ny two or more persons

who combine, associate, agree, mutually undertake or concert together for the purpose of (i) willfully and maliciously injuring another in his reputation, trade, business or profession by any means whatever or (ii) willfully and maliciously compelling another to do or perform any act against his will, or preventing or hindering another from doing or performing any lawful act . . ." b. The statute specifically allows for the recovery of treble damages and "the costs of suit, including a reasonable fee to plaintiff's counsel." The statute also provides for damages if a plaintiff proves an attempted business conspiracy.

93.     Plaintiff, under his state law claim, is entitled to the disgorgement of Defendants' entire combined profits arising from, or related to, their knowing misappropriation and unlawful conversion of Plaintiff's property, specifically his exclusive right to use the actual Warren cases, Warren Case Files and materials related thereto. Pursuant to Virginia's business conspiracy statute, Plaintiff is entitled to recover three-fold his damage, including the loss of profits he sustained as a result of the illegal conspiracy among Defendants and Lorraine Warren, in addition to punitive damages. *Advanced Marine Enters., Inc. v. PRC Inc.*, 501 S.E.2d 148, 154 (Va. 1998).

94.     Defendants' combined estimated profits are only able to be approximated to date as their *The Conjuring 2* motion picture was only recently released and continues to bring in millions of dollars in revenue weekly. To date, for their already released *The Conjuring*, *Annabelle* and *The Conjuring 2* movies, Defendants estimated profits from just the theatrical box office exploitation of same conservatively total approximately $282,000,000.[8] This figure does not include any home video, video-on-demand or television licenses for same. It also does not account

---

8 *The Conjuring* cost approximately $50,000,000 for production, distribution and interest, *Annabelle* costs estimated at $35,000,000 and *The Conjuring 2* costs at $80,000,000 for a total of $165,000.000.  Revenues for all three films are a total of $895,000,000 (from Boxofficemojo.com). Estimated profits are calculated at 50% of revenues minus cost which render an estimated profit of $282,000,000 for ticket sales alone.

- 40 -

for any increased premium valuation of its stock attributed to the profits generated by these films as calculated by AT&T in its pending acquisition of Time Warner.  These aforementioned license fees and stock premiums for Defendant Time Warner must also be disgorged, to the extent they are attributable to the violations.

95.     Separate and unrelated to the state law claims relating to misappropriation of Plaintiff's property, Defendants' already released motion pictures *The Conjuring*, *Annabelle*, *The Conjuring 2*, the pending *Annabelle 2* release and the announced *The Nun* production knowingly and willfully infringe on Plaintiff's copyright protected subsidiary motion picture rights in the book, *The Demonologist*, including his copyright rights or reproduction, distribution, public performance and exclusive right to make and authorize derivative works. Pursuant to the Copyright Act, Plaintiff is entitled to an accounting of Defendants' profits and to receive all of Defendants' profits attributable to such knowing and willful infringement. (17 U.S.C. §§ 101 et seq.)

96.     Plaintiff is entitled to a constructive trust for all monies derived from any and all of Defendants' past, current and future exploitation of Plaintiff's property, including but not limited to: (i) theatrical film exhibitions, (domestic and international), (ii) pay and free television; (iii) video-on-demand; (iv)  home video and (iv) any all increases in Time Warner's stock or premiums paid to Time Warner for any merger or acquisition of the company that can be attributed to Defendants' The Conjuring franchise of movies.

97.     Plaintiff is further entitled to preliminary and permanent injunctive relief for the post- production film, *Annabelle 2*, as well as any other motion pictures (e.g., *The Nun* and *The Conjuring 3*) that Defendants might attempt to develop, produce, or release that are based on Plaintiff's exclusive property rights or infringe on the copyright protected rights contained within his subsidiary motion picture rights.

98.     Additionally, Lorraine Warren and Defendants knowingly and intentionally interfered with and deprived Plaintiff of certain exclusive property and rights he acquired by execution of the Prentice Hall Agreement and the addenda thereto (including but not limited to the Collaboration Agreement), causing additional harm, injury, and damages for which Plaintiff seeks relief under Virginia's common-law trespass to chattels

## II.  PARTIES

99.     Plaintiff, Gerald Brittle, is an individual residing in the City of Richmond, Commonwealth of Virginia.

100.     Defendant Chad Hayes is, and at all times relevant hereto has been, an individual, who is a citizen of and/or who is engaged in doing business in the County of Los Angeles, State of California, and transacts business in the City of Richmond and the Commonwealth of Virginia.

101.     Defendant Carey Hayes is, and at all times relevant hereto has been, an individual who is a citizen of and/or who is engaged in doing business in the County of Los Angeles, State of California, and transacts business in the City of Richmond and the Commonwealth of Virginia.

102.     Defendant James Wan is, and at all times relevant hereto has been, an individual who is a citizen of and/or who is engaged in doing business in the County of Los Angeles, State of California, and transacts business in the City of Richmond and the Commonwealth of Virginia.

103.     Defendant Gary Dauberman is, and at all times relevant hereto has been, an individual who is a citizen of and/or who is engaged in doing business in the County of Los Angeles, State of California, and transacts business in the City of Richmond and the Commonwealth of Virginia.

104.     Defendant David Leslie Johnson is, and at all times relevant hereto has been, an

individual who is a citizen of and/or who is engaged in doing business in the County of Los Angeles, State of California, and transacts business in the City of Richmond and the Commonwealth of Virginia.

105.   Based on information and belief Defendant Warner Bros. Entertainment Inc. is a Delaware corporation with its principal place of business in Los Angeles County, California, and is a wholly owned subsidiary of Defendant Time Warner Inc.  Warner Bros. transacts business in the City of Richmond and the Commonwealth of Virginia.

106.   Based on information and belief Defendant New Line Productions, Inc. is a Delaware corporation with its principal place of business in Los Angeles County, California, and is a wholly owned subsidiary of Defendant Warner Bros.  New Line transacts business in the City of Richmond and the Commonwealth of Virginia.

107.   Based on information and belief Defendant Time Warner Inc. is a Delaware corporation with its corporate headquarters in the State of New York.  Time Warner is the parent company of Warner Bros. and New Line. Time Warner regularly conducts significant ongoing business in the Commonwealth of Virginia and City of Richmond.

108.   Based on information and belief Defendant Ratpac -Dune Entertainment LLC is a Nevada corporation with its principal place of business in Los Angeles County, California, and transacts business in the City of Richmond and the Commonwealth of Virginia.

109.   Based on information and belief Defendant Atomic Monster Incorporated is a California corporation with its principal place of business in Los Angeles County, California, and transacts business in the City of Richmond and the Commonwealth of Virginia.

110.   Based on information and belief Defendant James Wan Productions, Inc. is a California corporation with its principal place of business in Los Angeles County, California, and

transacts business in the City of Richmond and the Commonwealth of Virginia.

111.    Plaintiff is unaware of the true names and capacities of the Defendants sued herein as DOES 1 through 10, inclusive, and for that reason, sues such Defendants under such fictitious names. Plaintiff is informed and believes and on that basis alleges that such fictitiously named Defendants are responsible in some manner for the occurrences herein alleged, including but not limited to providing general business insurance coverage, production insurance coverage, completion bonds, financing and loan out services for Defendants, their companies, subsidiary entities and single purpose companies that allowed for the Defendants' movies to be physically produced and that Plaintiff's damages as herein alleged were additionally proximately caused by the conduct of said Defendants. Plaintiff will seek to amend the complaint when the names and capacities of such fictitiously named Defendants are ascertained. As alleged herein, "Defendants" shall mean all named Defendants and all fictitiously named Defendants.

112.    Based on information and belief, at all material times Defendants, and each of them, were the agents, employees, partners, joint venturers, co-conspirators, owners, principals, and employers of the remaining Defendants, and each of them, and are, and at all times herein mentioned were, acting within the course and scope of that agency, employment, partnership, conspiracy, ownership or joint venture.

113.    Based on information and belief the officers, directors and/or managing agents of the business entity Defendants authorized, directed and/or ratified the wrongful acts of the employees and representatives of said Defendants and, consequently, all of said Defendants are jointly and severally liable to Plaintiffs.

### III.   JURISDICTION AND VENUE

114.    This is a civil action in part for federal claims of copyright infringement and

preliminary and permanent injunctive relief under the United States Copyright Act, 17 U.S.C. §§ 101 et seq. (hereinafter, "the Copyright Act").

115.    Unrelated to the claims of copyright infringement this is also in part a civil action for state law claims of against Defendants for: (i) Common Law Trespass to Chattels; (ii) Statutory Business Conspiracy in violation of Code of Virginia § 18.2-499; (iii) Conversion; (iv)Tortious Interference With a Contract, as well as preliminary and permanent injunctive relief for said state law claims.

116.    Said state law claims are qualitatively different from Plaintiff's copyright claims because the state law claims: (i) all arise from circumstances unrelated to Plaintiff's copyright claims, as more fully described herein; (ii) are not derived from copyrighted material; and, (iii) have "extra elements" attached to them.  Because the state law claims relate only to the misappropriation of Plaintiff's property – his exclusive right of use granted under the Collaboration Agreement, these state law claims are separate and unrelated to his copyright claim, are not derived from copyrighted material and are qualitatively different from his infringement claim, they are not pre-empted by the Copyright Act.

117.    This Court has original subject matter jurisdiction over the claims set forth in this complaint pursuant to the Copyright Act, 17 U.S.C. § 101 et seq., 17 U.S.C. § 1202; 28 U.S.C. §§ 1331, 1332, and 1338(a) and (b).

118.    This Court also has jurisdiction over the subject matter of this action under federal diversity jurisdiction, 28 U.S.C. § 1332, as the parties are completely diverse in citizenship and the amount in controversy exceeds $75,000.

119.    This Court also has jurisdiction pursuant to 28 U.S.C. §§ 1331 (federal question), and § 1367 (supplemental jurisdiction over state claims).

120.    This Court has general and specific personal jurisdiction over the Defendants in that Defendants are regularly conducting business in the Commonwealth of Virginia and in this District, and they have continuous and systematic contacts with the Commonwealth of Virginia. The causes of action at issue in this lawsuit arise out of Defendants' contacts with the Commonwealth of Virginia.   Personal jurisdiction over the non-resident Defendants is proper because this lawsuit arises from and relates to the purposeful acts of the non-resident Defendants, and those purposeful acts are directed towards Virginia.   The assumption of jurisdiction by this Court over the non-resident Defendants does not offend traditional notions of fair play and substantial justice.

121.    Venue is proper in the Eastern District of Virginia pursuant to 28 U.S.C. §1391(b)(2) because Plaintiff resides in the Eastern District of Virginia and suffers damages from Defendants' wrongful conduct herein directed at him while a resident of Virginia.

122.    Plaintiff is a published author who lives and works in the City of Richmond, Virginia. Plaintiff is the sole author of the book entitled *The Demonologist*, which he completed in 1980.

123.    Defendants Chad and Carey Hayes are screenwriters of many films including, *San Andreas*, *The Conjuring*, and are credited as writers on *The Conjuring 2* (along with co-writers Defendant David Leslie Johnson and James Wan), each of which was produced, financed and has already been distributed by Defendants New Line and Time Warner.

124.    Defendant Gary Dauberman is a screenwriter of many films including films *Annabelle*, *Annabelle 2*, *Within* and the *Wolves at the Door*, each of which was or is being produced, financed and distributed by Defendants New Line and Time Warner.

125.    Defendant David Leslie Johnson is a screenwriter of many films including films

*The Conjuring 2*, *Within*, *Dungeons and Dragons*, and *A Nightmare on Elm Street*, each of which was or is being produced, financed and distributed by Defendants New Line and Time Warner.

126.   Defendant James Wan is a screenwriter, producer and director of many films including, *The Conjuring, Annabelle, The Conjuring 2, Lights Out, Aquaman, The Boy Who Drew Monsters* and a producer of *Annabelle 2, The Conjuring 3* and *The Nun* each of which was, or is being, produced, financed and distributed by Defendants New Line and Time Warner.

127.   Defendants New Line and Warner Brothers make profits from the production of motion pictures and their distribution of same in theatres in the Commonwealth of Virginia in the Richmond metropolitan area including *The Conjuring, Annabelle* and the *Conjuring 2.*   Three recent examples of Defendants' distribution of their motion pictures to theatres in the Commonwealth of Virginia in the Richmond metropolitan area are; (i) Defendants Warner Brothers' "Batman v Superman" movie recently played on not one, but two screens at the AMC Showplace Richmond 11; (ii) Defendants Warner Brothers and New Line's motion picture, *Barbershop 2: The Next Cut*  recently played in multiple theatres in Richmond including the Cinebistro, UA West Towers Cinema 10 and Regal Short Pump Stadium 14 and (iii) Warner Brothers' *The Conjuring 2* movie was shown in multiple theatres in Richmond, Virginia.

128.   Defendants Ratpac-Dune, make profits from the production and distribution of motion pictures it finances and/or produces (in part or in whole) for and with New Line and Warner Brothers, including *Annabelle*, *The Conjuring 2*, *San Andreas*, *Black Mass* and *Barbershop 2: The Next Cut* to theaters, including theatres in the Commonwealth of Virginia in the Richmond metropolitan area. Rat-Pac Dune's principals are producer Bret Ratner and Dune Capital's Steven Mnuchin. By way of example, Defendant Rat-Pac Dune financed, co-financed and/or coproduced movies with New Line and/or Warner Brothers: (i) Defendants Warner Brothers' "*Batman v*

*Superman*" movie recently played on not one, but two screens at the AMC Showplace Richmond 11; (ii) Defendants Warner Brothers and New Line's motion picture, *Barbershop 2*: *The Next Cut* recently played in multiple theatres in Richmond including the Cinebistro, UA West Towers Cinema 10 and Regal Short Pump Stadium 14 and (iii) Warner Brothers' *The Conjuring 2* recently was shown in multiple theatres in Richmond, Virginia .

129.    Defendants Chad and Carey Hayes are accorded bonuses and a percentage of the profits of these aforementioned movies (i.e., *The Conjuring* and *The Conjuring 2* as part of their compensation for the writing services they provide to New Line and Warner Brothers. Said movies have already been exhibited in Virginia by Defendants New Line and Warner Brothers.

130.    Upon information and belief, Defendant Gary Dauberman is accorded bonuses and a percentage of the profits of these aforementioned movies (i.e., *Annabelle and Annabelle 2*) as part of his compensation for the writing services he provides to New Line and Warner Brothers. Said movies have already been exhibited, or are scheduled to be exhibited, in the Commonwealth of Virginia and in the Richmond metropolitan area by Defendants New Line and Warner Brothers.

131.    Defendant David Leslie Johnson is a screenwriter of many films including films *The Conjuring 2*, *Within*, *Dungeons and Dragons*, and *A Nightmare on Elm Street*, each of which was or is being produced, financed and distributed by Defendants New Line and Time Warner.

132.    Defendant James Wan is a screenwriter, producer and director of many films including, *The Conjuring, Annabelle, The Conjuring 2, Lights Out, Aquaman, The Boy Who Drew Monsters* and a producer of *Annabelle 2, The Conjuring 3* and *The Nun* each of which was, or is being, produced, financed and distributed by Defendants New Line and Time Warner.

133.    Defendants New Line and Warner Brothers make profits from the production of motion pictures and their distribution of same in theatres in the Commonwealth of Virginia in the

Richmond metropolitan area including *The Conjuring, Annabelle* and the *Conjuring 2*.   Three recent examples of Defendants' distribution of their motion pictures to theatres in the Commonwealth of Virginia in the Richmond metropolitan area are; (i) Defendants Warner Brothers' "Batman v Superman" movie recently played on not one, but two screens at the AMC Showplace Richmond 11; (ii) Defendants Warner Brothers and New Line's motion picture, *Barbershop 2: The Next Cut*  recently played in multiple theatres in Richmond including the Cinebistro, UA West Towers Cinema 10 and Regal Short Pump Stadium 14 and (iii) Warner Brothers' *The Conjuring 2* movie was shown in multiple theatres in Richmond, Virginia since its release on June 10, 2016.

134.    Defendants Ratpac-Dune, make profits from the production and distribution of motion pictures it finances and/or produces (in part or in whole) for and with New Line and Warner Brothers, including *Annabelle,* The Conjuring 2, *San Andreas*, *Black Mass* and *Barbershop 2: The Next Cut* to theaters, including theatres in the Commonwealth of Virginia in the Richmond metropolitan area. Rat-Pac Dune's principals are producer Bret Ratner and Dune Capital's Steven Mnuchin. By way of example, Defendant Rat-Pac Dune financed, co-financed and/or coproduced movies with New Line and/or Warner Brothers: (i) Defendants Warner Brothers' "*Batman v Superman*" movie recently played on not one, but two screens at the AMC Showplace Richmond 11); (ii) Defendants Warner Brothers and New Line's motion picture, *Barbershop 2*: T*he Next Cut* recently played in multiple theatres in Richmond including the Cinebistro, UA West Towers Cinema 10 and Regal Short Pump Stadium 14 and (iii) Warner Brothers' *The Conjuring 2* movie was shown in multiple theatres in Richmond, Virginia since its release on June 10, 2016.

135.    Defendants Chad and Carey Hayes are accorded bonuses and a percentage of the profits of these aforementioned movies (i.e., *The Conjuring* and *The Conjuring 2* as part of their

compensation for the writing services they provide to New Line and Warner Brothers. Said movies have already been exhibited in Virginia by Defendants New Line and Warner Brothers.

136.   Upon information and belief, Defendant Gary Dauberman is accorded bonuses and a percentage of the profits of these aforementioned movies (i.e., *Annabelle and Annabelle 2*) as part of his compensation for the writing services he provides to New Line and Warner Brothers. Said movies have already been exhibited, or are scheduled to be exhibited, in the Commonwealth of Virginia and in the Richmond metropolitan area by Defendants New Line and Warner Brothers.

137.   Upon information and belief, Defendant David Leslie Johnson is accorded bonuses and a percentage of the profits of these aforementioned movies (i.e., *The Conjuring 2*) as part of his compensation for the writing services he provides to New Line and Warner Brothers. Said movies have already been exhibited, or are scheduled to be exhibited, in the Commonwealth of Virginia and in the Richmond metropolitan area by Defendants New Line and Warner Brothers.

138.    Upon information and belief, Defendant James Wan is accorded bonuses and a percentage of the profits of these aforementioned movies that he provides producing, directing and/or writing services on (i.e., *The Conjuring, Annabelle, The Conjuring 2, Annabelle 2 and The Nun*). *The Conjuring, Annabelle* and, *The Conjuring 2* have already been exhibited, in the Commonwealth of Virginia and in the Richmond metropolitan area by Defendants New Line and Warner Brothers. Upon information and belief that *Annabelle 2* (in production*) and The Nun*, The Conjuring 3 (both in development by Defendants) will also be exhibited in the Commonwealth of Virginia and in the Richmond metropolitan area by Defendants New Line and Warner Brothers.

139.   Upon information and belief, Defendant Atomic Monster Incorporated, the James Wan owned company that produced and/or is producing *The Conjuring, Annabelle, The Conjuring 2, Annabelle 2, The Conjuring 3* and *The Nun* is accorded fees and a percentage of the profits of

these aforementioned movies.

140.   Upon information and belief, Defendant James Wan Productions, Inc. is another James Wan owned company that was involved in the production of *The Conjuring, Annabelle, The Conjuring 2, Annabelle 2, The Conjuring 3* and *The Nun* is accorded fees and a percentage of the profits of these aforementioned movies.

141.   To date, Defendants illegal and unauthorized *The Conjuring* film has generated over a third of a billion dollars in revenue for Defendants just from ticket sales worldwide. *See* Exhibit 3.

142.   To date, Defendants illegal and unauthorized *Annabelle* film has generated over a quarter of a billion dollars in revenue for Defendants just from ticket sales worldwide.  *See* Exhibit 3.

143.   Defendants illegal and unauthorized *The Conjuring 2* has generated over $320 million dollars in for Defendants just from ticket sales worldwide just from ticket sales.  *See* Exhibit 3.

144.   On March 8, 2016, industry website Screenrant.com ([http://screenrant.com/warner-bros-film-slate-2016-confidence-box-office/](http://screenrant.com/warner-bros-film-slate-2016-confidence-box-office/)) reported that Time Warner Chairman, Jeff Bewkes, when speaking at the Deutsche Bank Media, Internet and Telecom Conference (*See* Exhibit 33) predicted "another record year" for Warner Brothers, citing the numerous franchise films the studio is releasing over the course of 2016.  Bewkes identified *The Conjuring 2* by name as one of the studio's 2016 "franchise" films being released by Time Warner's Warner Brothers/New Line Divisions. *See* Exhibit 33. He further stated that he believes the horror sequel *The Conjuring 2* will turn a significant profit for the company. The original, *The Conjuring*, cost approximately $20,000,000 to make and generated revenues in excess of $318,000,000 for Warner Brothers and

New Line. *See* Exhibits 3 and 4.

## IV.  DEFENDANTS' HISTORY OF PAST SIMILAR ACTS OF MISAPPROPRIATION, INFRINGEMENT & PRIOR PRELIMINARY INJUNCTIONS ISSUED AGAINST THEM

145.    Defendants New Line and Warner Brothers have a long and well-established history, in the United States and abroad, of unlawfully misappropriating and/or infringing on the intellectual property of others. What is meant by well-established is that these reoccurring patterns of behavior are fully documented in past court cases.  A few examples demonstrating this specific pattern and type of unlawful behavior by Defendants are briefly mentioned directly below.

146.    In March of 2016, The Supreme Court of Spain ordered the Parque Warner Madrid resort theme park (co-owned by Time Warner and Parques Reunidos) to pay €321,450 ($358,651) in damages for knowingly playing, without a license, the music of Spanish artists on loudspeakers to park visitors between 2002 to 2008. (*See* Exhibit 34 from http://www.ibtimes.co.uk/time-warner-ordered-pay-damages-using-pirated-music-spanish-theme-park-six-years-1548784 .

147.    In another matter, Defendant Warner Brothers music publishing subsidiary Warner Chappell Music was sued for a nearly four-decade practice of demanding and receiving millions of dollars in unlawful royalty payments from thousands of companies and individuals for the right to include renditions of the song Happy Birthday in movies, TV shows and music videos. Warner Chappell based their demands for royalty payments to Happy Birthday on a copyright registration dating back to 1935 they claimed gave them the rights to the iconic song. (*Good Morning to You Productions Corp., et al. v. Warner/Chappell Music, Inc., et al*., Case No. CV 13-04460-GHK (MRWx).) In that matter, the class action plaintiffs claimed that the defendants had no valid copyright to the song and were illegally charging fees for licenses.

148.    On September 22, 2015, Judge King issued his decision in the *Good Morning* case (*See* Exhibit 35 hereto the "Judge King Ruling") in a 43-page memorandum where he concluded that the registration that Warner/Chappell relied on did not encompass a copyright in the Happy Birthday lyrics, and so Warner/Chappell was not entitled to summary judgment based on the presumption of validity.   As to the question whether Warner/Chappell owned copyright in the Happy Birthday lyrics based on the registration, Judge King decided that there was no credible or sufficient evidence in the records to find that Warner/ Chappell had any enforceable copyright in Happy Birthday as they claimed they did. In that same matter, **Warner's music division was also found to have willfully hidden key evidence that showed they knew that they had no valid copyright in the *Happy Birthday* song.**  *See* Exhibit 36 hereto the Hollywood Reporter article of July 27, 2015 entitled "Happy Birthday" Lawsuit: "Smoking Gun" Emerges in Bid to Free World's Most Popular Song".

149.    Rather than risk a trial after these adverse decisions, on February 8, 2016 Warner Chappell reached a global agreement to settle the matter.

150.    In yet another example, in February of 2008, Fox brought a lawsuit against Warner Bros. (Exhibit 37 hereto the "Fox v Warner Bros Complaint") asserting that in a series of legal agreements made between 1991 and 1994, they, and not Warner Brothers, retained distribution rights to a film based on *Watchmen,* a graphic novel. See *Twentieth Century Fox Film Corp. v. Warner Bros. Entertainment, Inc*., CV08-889DDP (C.D. California).   Fox's lawyers contacted Warner Brothers before production on the film began, with Fox telling Warner Brothers that its "Watchmen" deal violated Fox's 1991 and 1994 agreements.   Warner Brothers said that it was unaware of the 1994 deal when it chose to produce the movie in 2006.

151.    U.S. District Court Judge Gary Feess did not agree with Warner Brothers in the

*Watchmen* case.  In denying a Warner Bros. motion to dismiss the case (See Exhibit 38 hereto the "Judge Feess Watchmen Ruling."), Judge Feess said a key Warner Brothers argument "ignored a number of facts" and that "nothing on the face of the complaint or the documents . . . establishes that [Warner Brothers] . . . ever acquired any rights in 'Watchmen.'"  In that matter, Fox executives and lawyers pointed to another "chain-of-title" case which they claimed proved Warner Brothers has a well-established pattern of consistently playing fast and loose with its movie rights.

152.    The dispute Fox's lawyers were referencing was also before Judge Feess and was over Warner Brothers' 2005 film titled: "*The Dukes of Hazzard*," where Warner Brothers yet again failed to properly acquire the underlying rights necessary to make that movie. In that matter, the rights Warner Brothers failed to get were to the movie (1975's "*Moonrunners*") upon which Defendant Warner Brothers' own *Dukes of Hazzard* TV show was based. As discussed below, Warner Brothers settled that case after Judge Feess issued a preliminary injunction against Warner Brothers in which he stated he would block the movie's release.

153.    The facts in the instant matter bear a striking resemblance to the *Watchmen* and *Dukes of Hazzard*'s movie litigations against Warner Brothers.  The *Dukes of Hazzard* dispute was filed in the Central District of California in 2005, and may be found for reference as:  *Moonrunners v Time Warner Case* 2:09-cv-00674-GAF-VBK, the "Moonrunners matter" herein. *See* Exhibit 39 ("Moonrunners v Warner Bros Complaint.")

154.    In that *Moonrunners* matter, Defendant Warner Brothers had previously only acquired the rights to make a *Dukes of Hazzard* television series, which it did indeed produce and distribute.  This allowed a trier of fact to conclude that Warner Brothers had specific knowledge of which Moonrunners' subsidiary rights it owned and which it did not own.

155.    The actions by Defendant Warner Brothers in the *Moonrunners* matter parallels

their actions in the instant matter where, as discussed below, the Defendants, inclusive of Warner Brothers and its New Line subsidiary, had clear knowledge (or the professional standard of knowledge they are held to by industry custom) of what motion picture rights to *The Demonologist* and what rights to use the Warren Cases, Case Files and related materials that they did not own (i.e., those that belonged to the Plaintiff).

156.    In the *Moonrunners* matter, despite their knowledge that they only owned television rights to the *Dukes of Hazzard* property, Warner Brothers knowingly and willfully went ahead and commenced production of a *Dukes of Hazzard* motion picture without first properly acquiring the film rights to same from the company and individuals that owned such rights. Again, Defendants actions in the *Dukes* matter were nearly identical to the sequence of actions taken by Defendants against Plaintiff in the instant matter.  The Court in the *Dukes of Hazzard* matter found that not only were the Plaintiffs likely to prevail against Warner Brothers at trial based on their initial complaint, but the Court there also granted a preliminary injunction to stop the production and distribution of Warner Brothers' *Dukes of Hazzard* movie in order to protect Plaintiffs from the studio's continued misappropriation of Plaintiff's subsidiary film rights to their intellectual property among other things.  A copy of the initial complaint in that matter, and the Court's order granting a preliminary injunction against Defendant Warner Brothers in the Moonrunners matter is, are attached hereto as Exhibit 40 the "Moonrunners Preliminary Injunction Order."

157.    Although lengthy, a full review of the history of the facts and the supporting agreements in the instant matter is required in order to understand the source of Plaintiff's rights and just how egregious Defendants' knowing and malicious misappropriation of Plaintiff's property (i.e., his exclusive right to use the Warren Cases and Warren Case Files) and their separate infringement of his subsidiary film rights really is. It is also necessary in order to show how

Defendants' actions against Plaintiff directly align with their ongoing and protracted pattern of this type of behavior.

## V.   THREE AGREEMENTS CONTROL IN THE INSTANT MATTER

158.   All Plaintiff's claims in the instant matter emanate and flow from three agreements:

**a) The Prentice Hall Agreement:**

1) Signed in 1978 by Plaintiff, Ed and Lorraine Warren with publisher Prentice Hall for the book authored by Brittle, "The Demonologist."   Under this agreement the Warrens and Brittle transferred all subsidiary motion picture rights to Prentice Hall.

2) The term of these motion picture rights is for the same term as the life of the copyright of the book, which is for at least another seventy years.

3) Under this agreement the Warrens and Brittle also agreed to a no "Competing Work" provision whereby they are prohibited from entering in any other motion picture deal that is based on the "same subject" of the book which is their lives and experiences as paranormal investigators as well as on any of their cases that appear in the book. The term of this provision is also still live as is also tied to the same clock as the subsidiary rights, the life of the copyright of the book.

Exhibit 12.

**b) The Collaboration Agreement:**

1) Signed in 1978 by the Plaintiff on the one hand, and Ed and Lorraine Warren on the other, clarifies that Plaintiff is the "Author" of The Demonologist

and the Warrens are the "Subjects."

2) Brittle agreed to convey to the Warrens one half of this interest in the copyright for *The Demonologist* book. While co-owners of the copyright, however, the Warrens also agreed the Collaboration Agreement would function as an agreement to the contrary related to the Copyright Act in that neither party could sell, transfer of dispose of any rights to the book without the "unanimous consent" of the other.

3) Under this agreement the Warrens granted the Plaintiff the exclusive "right to use" all of the Warren's Cases, Case Files and related materials. The term of the Collaboration Agreement is defined as the term of the copyright for the book, which is at least for the next seventy years.

Exhibit 5.

c. **Prentice Hall Agreement First Amendment**: In 1981 Plaintiff, the Warrens and publisher Prentice Hall signed the first amendment to the Prentice Hall Agreement which did one thing, and one thing alone. It immediately "upon signature" transferred Prentice Hall's subsidiary rights of "(a)Motion Picture, (b)Dramatization, (c)Radio and (d)Television" from Prentice Hall to the "Author," the Plaintiff.

Exhibit13.

159.   The relevant terms of these three agreements enumerated above remain in full force and effect. Plaintiff still retains ownership of his subsidiary motion picture rights (and his copyright

protected rights therein).  Brittle's exclusive "right to use" the Warren Cases, Case Files and related materials, that they investigated up to including the date of July 27, 1981 remains in full force and effect today. Lorraine Warren is still bound by the no "Competing Work" provision to this day.

## VI. The Contractual Agreements From 1978 - 2001

### A.  The Prentice Hall Agreement -  November 8, 1978:

160.    The Prentice Hall Agreement ("Prentice Hall Agreement") executed on November 8, 1978, is the original written agreement between Ed and Lorraine Warren, Gerald Brittle and Prentice Hall Publishers for *The Demonologist*.  A true copy of the Prentice Hall Agreement is attached hereto as Exhibit 12.

161.    That the overall subject matter of the book is the Warrens' life and experiences as paranormal investigators is clearly delineated in the very first paragraph of the Prentice Hall Agreement where is states the deal is for:



an unpublished work tentatively entitled THE DEMONOLOGIST: The extra-ordinary careers of Ed and Lorraine Warren

Exhibit 12

162.    The Warrens were not gardeners, nor were they house painters; they made a career as being a husband and wife team of self-proclaimed paranormal investigators. Their life as paranormal investigators as well as the Warrens' Cases and Case Files contained in the book is what *The Demonologist* is about.

### 1.  The Publishing Rights:

163.    Under the Prentice Hall Agreement, Ed and Lorraine Warren agreed to give

Prentice Hall the exclusive contractual rights to publish a book entitled "*The Demonologist: The Extraordinary Careers of Ed and Lorraine Warren*.  The very first paragraph, Provision "1." of the Prentice Hall Agreement is the "Grant of Rights" which that states the Warrens and Brittle grant to the publisher, Prentice Hall, the exclusive publishing rights to *The Demonologist.*

**GRANT OF RIGHTS**    1.  The AUTHOR grants to the PUBLISHER the exclusive right to publish in the English language in book form in the United States of America, its territories and possessions, Canada, and the Republic of the Philippines *and throughout the world*

Exhibit 12

### 2.  The Subsidiary Rights:

164.     Under the Prentice Hall Agreement, the Warrens also agreed to give the publisher the exclusive contractual worldwide subsidiary rights to *The Demonologist* and the material contained in the book – the Warren's cases, Case Files (and related materials) that are either single full chapters in the book as well as those cases while not full chapters still referenced and/or discussed in the book. *See* Exhibit 12 at"1."



Exhibit 12.

165.    The term of the "life" of the subsidiary rights is defined as being for the full term of the copyright of the book and all extensions thereof. These rights are still in full force and effect today as is the copyright to the book.

166.    Lorraine Warren and Ed Warren's initials can clearly be seen to the left of the Grant of Rights Provision, signifying their agreement with same, just as they are next to each provision of the Prentice Hall Agreement, in addition to their signatures on the execution page of the Agreement. There is no question they agreed to the Prentice Hall Agreement itself and the provisions of same.

167.    On page 2 in provision "5." of the Prentice Hall Agreement (Ex. 12) there is a list of the subsidiary rights that the Warrens and Brittle agreed were granted to Prentice Hall.

///

**OTHER RIGHTS**

5. The exclusive subsidiary rights referred to in paragraph 1 are hereby defined to include the rights enumerated below and the proceeds from the sale or license thereof are to be shared by the AUTHOR and PUBLISHER in the percentages indicated:

| | To Author | To Publisher |
|---|---|---|
| (1) Digest, abridgment, condensation, anthology, selection, or novelty use | 50% | 50% |
| (2) Second serialization and syndication (including reproduction in compilations — magazines, newspapers, or books) | 50% | 50% |
| (3) Book clubs or similar organizations | 50% | 50% |
| (4) Reprint (including microfilm) edition through another publisher | 50% | 50% |
| (5) First serialization in North America (prior to the Publisher's official publication date) | 75% | 25% |
| (6) The right to sell or license throughout the world: | | |
|     (a) Motion Picture | 90% of Net | 10% of Net |
|     (b) Dramatization | 90% of Net | 10% of Net |
|     (c) Radio | 90% of Net | 10% of Net |
|     (d) Television | 90% of Net | 10% of Net |
| (7) The right to sell or license Mechanical Rendition and/or Recording | 50% of Net | 50% of Net |
| (8) The right to sell or license translation and foreign language publication | 75% of Net | 25% of Net |
| (9) The right to sell or license publication rights in: | | |
|     (a) United Kingdom—Book Rights | 75% of Net | 25% of Net |
|         First Serialization | 75% of Net | 25% of Net |
|     (b) British Commonwealth (exclusive of Canada)—Book Rights | 75% of Net | 25% of Net |
|         First Serialization | 75% of Net | 25% of Net |
|     (c) Other foreign countries (in English)— Book Rights | 75% of Net | 25% of Net |
|         First Serialization | 75% of Net | 25% of Net |

The use of the words "of Net" in (6) through (9) means that it may be necessary to employ agents to make certain of these sales, and that commissions paid to such agents shall be deducted first before the proceeds are divided between the PUBLISHER and the AUTHOR.

E.W. & R.W.

**INITIAL HERE**

Exhibit 12. The Warrens signature can be seen to the left of this provision that they agreed to These enumerated subsidiary rights include, but are not limited to film, radio and television production rights.  Exhibit 12 at "5. (6)."  It provides:

| (6) The right to sell or license throughout the world: | | |
|---|---|---|
| (a)  Motion Picture | 90 % of Net | 10% of Net |
| (b)  Dramatization | 90 % of Net | 10% of Net |
| (c)  Radio | 90 % of Net | 10% of Net |
| (d)  Television | 90 % of Net | 10% of Net |

### 3.  Term of Rights.

168.    The Prentice Hall Agreement specifies different terms for the life of the publishing rights and for the subsidiary rights. The duration of the term for the publishing rights is tied to the book being in print, while the term for the life of the subsidiary rights is tied to the life of the copyright of the book.

169.    Provision "14 of the Prentice Hall Agreement (Exhibit 12) provides that if *The Demonologist* book goes out of print or off sale for six months, all rights granted to the publisher under the agreement (including the exclusive subsidiary rights) shall revert to the "Author":

14.   If the work shall go out of print and off sale for six (6) months in all editions, including reprints, whether under the imprint of the PUBLISHER or another imprint, and if thereafter, after written notification from the AUTHOR, the PUBLISHER shall fail to place the work in print and on sale within six (6) months from the date of receipt of such notification (unless such failure is due to cir-cumstances beyond the control of the PUBLISHER), then this agreement shall terminate and all of the rights granted to the PUBLISHER  hereunder shall revert to the AUTHOR. The AUTHOR shall have the right for thirty (30) days after such

Ex. 12 at "14."

170.    However, the subsidiary rights run on a different "clock."   Provision "1" of the Prentice Hall Agreement states that the exclusive contractual subsidiary rights shall be live for the "full term of the copyright [of *The Demonologist*] and all renewals and extensions thereof." *See* Exhibit 12 at "1."  The aforementioned section of Provision "1." of the Prentice Hall Agreement is extracted and reproduced in part below for ease of reference:

an unpublished work tentatively entitled  THE DEMONOLOGIST: The extra-ordinary careers of Ed and Lorraine Warren and also the exclusive subsidiary rights listed in paragraph 5 below during the full term of copyright and all renewals or extensions thereof.

171.    The different "clocks" specified make absolute sense in that if Prentice Hall sold, transferred or licensed any of the subsidiary rights to a third party, the book going out of print could not extinguish those subsidiary rights sold or licensed.  If the subsidiary rights term was only for the same duration as the term of the publishing rights then any party who bought the subsidiary movie rights, investing millions of dollars in a motion picture production, would be at risk that their production based on those purchased subsidiary rights could be shut down in the middle of production if the book went out of print.   Under that scenario, the subsidiary rights, inclusive of motion picture rights, if tied to the publishing term, would also be dead. If that were so, then no movie studio would ever buy such subsidiary rights. That is why the publishing rights are tied to the book being in print while the subsidiary rights are tied to the life of the copyright – a totally separate and much longer "clock."  That is why only the publishing rights terminate when the book goes out of print. If the book goes out of print, then under the Prentice Hall Agreement, any subsidiary rights already sold or transferred, still remain "live" for the life of the copyright of the book with the party they were sold or transferred to. Also, if the book goes out of print any

remaining unsold subsidiary rights do not terminate, they "revert" to the Author and remain the authors to do with as he pleases and live for the life of the book's copyright.

### 4.  Proceeds from Sale/License of Subsidiary Rights

172.    The Prentice Hall Agreement (Ex. 12) states that any proceeds (i.e., fees and royalties) from the sale or license of the subsidiary rights, if sold prior to the termination of the agreement will be split between the author (90%) and the publisher (10%).   Those exclusive subsidiary rights, and the division of profits to the publisher are defined in the Prentice Hall Agreement at "5.(6)" reproduced below and  include the subsidiary motion picture (i.e., film) and television rights:

| (6) The right to sell or license throughout the world: | | |
|---|---|---|
| (a) Motion Picture | 90 % of Net | 10% of Net |
| (b) Dramatization | 90 % of Net | 10% of Net |
| (c) Radio | 90 % of Net | 10% of Net |
| (d) Television | 90 % of Net | 10% of Net |

Exhibit 12 at "5 (6)."

173.    As discussed more fully infra, Ed Warren, Lorraine Warren and Gerald Brittle all signed the Prentice Hall Agreement as "author".  However, just twelve days after they executed the Prentice Hall Agreement, the Warrens and Brittle would execute an addendum to that agreement, the Collaboration Agreement (Ex. 5), clarifying that between them Brittle was the sole "author" of *The Demonologist* and the Warrens were the "subjects" of the book.

### 5.  No "Competing Work" Provision:

174.    The Prentice Hall Agreement provision "1.  Grant of Rights" gives the publisher

the rights to the "work," namely the "unpublished" *The Demonologist* book inclusive of the publishing and subsidiary rights thereto. The Prentice Hall Agreement at "5. OTHER RIGHTS" gives the publisher the exclusive right to sell or license these rights to the work worldwide.  See Exhibit 12 at "5."

175.    The sale of the work includes the sale of both the publishing and subsidiary rights to the work.

176.    Under the Prentice Hall Agreement at "Competing Work  15." the Warrens agreed to a no "Competing Work" provision whereby they agreed not to "contract…or furnish " "any work upon the "same subject that shall compete with the sale of the work herein specified." *See* Exhibit 12 at "15."

COMPETING WORK    15.   The AUTHOR agrees, during the term of this agreement, not to contract to publish or furnish to any other publisher for sale or trade, or otherwise, any work upon the same subject that shall conflict with the sale of the work herein specified.

177.    This provision prohibits the Warrens from entering into any contract for any subsidiary rights production (i.e., film or television production) based on the "same subject" matter. The subject of *The Demonologist* is undoubtedly their lives and experiences as paranormal investigators as well as the Warrens' cases and Case Files contained in *The Demonologist*.

178.    The Warrens are prohibited by this provision from entering into a contract with any party for "any work on the same subject" matter (i.e., book, movie, television show, etc.) if such other work is based on the "same subject" matter that *The Demonologist* is.  Any and all other works based on the same subject matter are precluded and prohibited as same the sale of same "shall conflict with the sale of the work herein specified." The sale of the work specified in the

Prentice Hall Agreement is the publishing rights and subsidiary rights to *The Demonologist*. Any sale of any motion picture rights by Warren to the Defendant that is based on either the Warren's experiences as paranormal investigators or on the Warren Cases and Case Files in *The Demonologist* is precluded, prohibited and unlawful as they compete with the sale of the Plaintiff's subsidiary motion picture rights.

179.     Furthermore, a competing book or subsidiary rights production would render the exclusive contractual publishing rights and exclusive subsidiary rights the Warrens' granted Prentice Hall effectively "non-exclusive" and meaningless.  Hence, the no "Competing Work" provision also serves as a reconfirmation of the exclusive contractual rights that the Warrens granted Prentice Hall. The Warrens initials also appear next to this provision of the Agreement. *See* Exhibit 12.


**B. THE COLLABORATION AGREEMENT (Addendum to Prentice Hall Agreement) - November 20, 1978:**

180.     The first addendum to the Prentice Hall Agreement[9], the Collaboration Agreement, (Exhibit 8), was executed twelve days after the Prentice Hall Agreement.

181.     Shortly after the execution of the Prentice Hall Agreement (Ex. 12) the publisher started to have discussions with Brittle and the Warrens about the manuscript for *The Demonologist.* It quickly became clear that Ed and Lorraine Warren were never actual "Authors" of *The Demonologist*, and that Gerald Brittle was the sole writer and literary author of that work. As such, the Warrens were not able to perform a multitude of the contractual clauses and provisions in the Prentice Hall Agreement that they executed as "Author(s)".

---

9 The first addendum to the Prentice Hall Agreement is the Collaboration Agreement. This is not to be confused with the First Amendment to the Collaboration Agreement, as the two are totally separate documents.

182.    Paragraph 7 of the Prentice Hall Agreement states the Author's changes to *The Demonologist* manuscript are to be delivered by the "Auth              "

AUTHOR'S
CHANGES           7.  The manuscript in duplicate to be delivered by the AUTHOR to the PUB-
                  LISHER shall be typewritten in proper form for use as copy for the printer
                  and shall be in such form and content as the AUTHOR and PUBLISHER are
                  willing to have appear in print.

Exhibit 12 at "7." Since Brittle was the sole Author of the manuscript, he was the only one that could (and did) deliver such changes as specified by the contract.

183.    Provision 3 of the Prentice Hall Agreement states the "Author" is required to supply the physical manuscript for *The Demonologist* to the publisher.

3.  The manuscript, containing about  **75,000**   words or their equiva-
lent, will be delivered in duplicate by the AUTHOR to the PUBLISHER in final
form and content acceptable to the PUBLISHER by  ~~March~~ *30*  , 19~~7~~9.
A third copy will be retained by the AUTHOR.

Exhibit 12 at "3." Again, since Ed and Lorraine Warren were not the Authors, they were never able to comply with this contractual provision.  Brittle delivered the physical manuscript to Prentice Hall editor Tam Mossman on May 9, 1980, in person at St. Patrick's Cathedral in New York City.

184.    Provision "8." of the Prentice Hall Agreement also required certain materials to be supplied by the Author to Prentice Hall.  Such materials enumerated include a preface to be supplied by the Author with the manuscript.

8.  The AUTHOR will supply with the manuscript a preface or foreword.

Exhibit 12 at "8." The Warrens could not supply the preface as they were never the "Authors" and did not write *The Demonologist* book.  In *The Demonologist* book, the preface contained therein

was both written and supplied by Gerald Brittle alone, not Ed and Lorraine Warren.

185.    Provision "9." of the Prentice Hall Agreement states that the Author represents and warrants that he is the "sole author" of the work.

> 9.   The AUTHOR warrants that he is the sole author of the work

Exhibit 12 at "9." The Warrens signing of the Prentice Hall Agreement as "author" constituted an incorrect representation and warranty because they were never authors of the work, let alone "sole authors" of any part of the work.

186.    It was determined by the parties that the best way to address these issues was for the Warrens and Brittle to enter into an addendum to the Prentice Hall Agreement, which they did on November 20, 1978.  That addendum was the Collaboration Agreement (Exhibit 5).

187.    The Prentice Hall Agreement states that the agreement itself "shall not be subject to change or modification, in whole or in part except by written instrument" (Prentice Hall Agreement at "18.") and signed by all the parties (i.e., all of Brittle, Prentice Hall and the Warrens). The Collaboration Agreement, between only the Warrens and Brittle, and only executed by them, cannot and does not change Brittle and the Warrens' contractual rights and obligations with, or to, Prentice Hall. The Collaboration Agreement only sets forth Brittle and the Warrens "understanding with respect to their respective rights in the Work," their roles within their relationship and defines how Brittle and the Warrens deal with each other. The Collaboration Agreement made it clear Brittle was the "sole author" of the work and also specified the respective rights held by each of the parties with regard to *The Demonologist*.

188.    In a letter from Prentice Hall dated January 11, 1979 (*See* Exhibit 41) the publisher acknowledges the Collaboration Agreement, accepts it and states it now an "Addendum" to the

Prentice Hall Agreement and incorporated as part of same. *See* Exhibit 41; *See also* Exhibits 12 and 5.

189.    The Collaboration Agreement (also referred to herein as the "1978 Collaboration Agreement" or just the "Collaboration Agreement") was executed by Gerald Brittle and Ed and Lorraine Warren on November 20, 1978.   The Collaboration Agreement is an addendum to the original Prentice Hall Agreement and memorializes the following:

### 1. "Author" - Brittle Defined as Sole Author:

190.    The Collaboration Agreement defines, by contractual agreement by and between the Warrens and Brittle, who is, and who is not, an "Author."   In the first paragraph the Collaboration Agreement states:



Exhibit 5.

191.    Upon the Warren' signing of the Collaboration Agreement, Ed and Lorraine Warren confirmed and agreed that they were not the "Authors" of *The Demonologist*, that they were only the "Subjects" of the work. Under the Collaboration Agreement the Warrens agreed to and confirmed literarily and contractually that Gerald Brittle was the sole author of "*The

*Demonologist*."   The signature block of the Collaboration Agreement confirms this and is reproduced below:



Exhibit 5 at signature page.

### 2. Term of the Collaboration Agreement

192.    The term of the Collaboration Agreement is tied not to the term of the publishing rights or the Prentice Hall Agreement itself.   Like the subsidiary rights in the Prentice Hall Agreement, the term of the Collaboration agreement is tied to the "life of the Work" – the copyright of *The Demonologist* book, which is "live" for at least the next seventy years – just like the subsidiary rights, as show below.

> 7.  The terms of this agreement shall be co-extensive with
> the life of the Work.

Exhibit 5 at "7." The terms of the Collaboration Agreement remain in full force and effect today.

### 3. Subsidiary Rights and Reversion

193.    Paragraph 2 of the Collaboration Agreement (Ex. 5) states that Brittle and Warren were entering into an agreement with Prentice Hall and refers specifically to the Prentice Hall Agreement. The Collaboration Agreement sets forth the respective rights of each of the parties with regard to each other.  The first paragraph of the Collaboration Agreement states that Brittle and the Warrens co-own all rights in the work. This "co-owner[ship]" refers only to any rights that they had not already granted, sold, transferred, etc. to another party as they could not own rights they had already given away – i.e., the publishing and subsidiary rights to *The Demonologist* previously granted to the publisher under the Prentice Hall Agreement.  This also did not apply to any rights the parties would later agree would be owned by only one of them – i.e., the Prentice Hall transfer of the subsidiary rights to Brittle alone.

> The following shall set forth the Author's and the Subjects'
> understanding with respect to their respective rights in the Work
> and the expenses, royalties, and other considerations to which they
> may be entitled pursuant to the Contract.
>
> 1.  The Author and the Subjects agree that as collaborators they
> are co-owners of all rights in the Work.

Exhibit 5 at ¶3.

194.    The Collaboration Agreement at "8." also confirms that the parties may grant any remaining rights they may co-own to any party, but only if they do so unanimously.

> 8.   All contracts for the sale, lease, license or other disposition of any and all rights in and to the Work now existing or which may hereafter come into existence shall require the unanimous consent of the Author and the Subjects.

Ex. 5 at "8."

195.    The publishing rights and exclusive subsidiary rights defined in the original Prentice Hall Agreement were granted by Brittle and the Warrens unanimously to the publisher when they signed the Prentice Hall Agreement. Once these specific rights were granted to Prentice Hall under the original agreement, these rights became Prentice Hall's exclusively, the sole property of the publisher.  Once these rights were granted, it was Prentice Hall's exclusive right during the term of the agreement to determine if they were going to license any of the subsidiary rights (inclusive of motion picture/film rights) and to whom they were going to license such subsidiary rights.  Per the Prentice Hall Agreement, upon its termination, any unsold subsidiary rights granted to Prentice Hall would revert to the "Author."

196.    The Collaboration Agreement did nothing, nor could it do anything, to change, alter or amend the termination provision or reversion provisions of the original Prentice Hall Agreement - which states that a termination effectuates a reversion of all the subsidiary rights to the "Author." However, since the first paragraph of the Collaboration Agreement (Ex. 5) defines Brittle as the

sole "Author," then upon any termination of the Prentice Hall Agreement, all unsold rights granted to Prentice Hall (inclusive or Subsidiary Rights) revert solely to Brittle *See* Exhibit 12 at "14." As more fully discussed below, to avoid any confusion Prentice Hall drafted the December 8, 1981 letter, the Prentice Hall First Amendment ("Prentice Hall First Amendment").  *See* Exhibit 13. Prentice Hall had both Brittle and the Warrens both sign this amendment. In the letter it states that the subsidiary rights of motion picture, television, radio and dramatization revert only to Brittle, and not to the Warren parties.  Also, to insure there was documented unanimous consent to this immediate reversion and transfer of these aforementioned subsidiary rights to Brittle, and not to a third party, Prentice Hall had the Warrens sign the Amendment.

197.   No subsequent addendum or amendment to the Collaboration Agreement ever changed this reversion provision of the subsidiary rights to Brittle as delineated in the Prentice Hall Agreement First Amendment.

### 4. Subject matter of book as Warrens careers as paranormal investigators reconfirmed

198.   The second paragraph of the Collaboration Agreement re-confirms the subject matter for the book was the Warrens' lives and experiences as psychic [paranormal] investigators:

The Demonologist (hereinafter referred to as "the Work"), dealing with the Subjects' lives and experiences as psychic investigators.

Exhibit 5 at ¶ 2.

## 5. Term of Collaboration Agreement is for at least next seventy years

199.    Provision "7." of the Collaboration Agreement confirms that the term of the Collaboration Agreement runs for the "life of the work" which is the copyright to the work.

> 7.  The terms of this agreement shall be co-extensive with the life of the Work.

Exhibit 5 at "7."

200.    Since Brittle, the Author, is alive, per the Copyright Act the term of the Collaboration Agreement is for at least the next seventy years.

## 6. Exclusive right to use Warren Cases, Case Files and related material granted to Brittle

201.    Provision of the Collaboration Agreement provides:

> 11.  The Work shall include extensive portions of material which are the vocal recollections of the Subjects.  It is expressly understood that the Author is entitled to make use of this material and has the exclusive right to use it in the Work.

Exhibit 5 at "11."

## 7.Collaboration Agreement is "complete and binding"

202.    Provision "12." of the Collaboration Agreement states it is a complete and binding agreement between the parties:

> 12.   The terms and conditions of this agreement shall be
> binding and inure to the benefit of the executors, administrators,
> successors, and assigns of the Author and the Subjects.

Exhibit 5 at "12."

203.   By signing the Prentice Hall Agreement. amendments and addenda thereto, the Warrens and Brittle unanimously agreed to the sale, disposition of those subsidiary rights to Prentice Hall and for the reversion of those rights to the "Author," Brittle. *See* Exhibits 5, 12, 13 and 41.

### C.  Prentice Hall's Confirmation of the Addendum to the Collaboration Agreement – January 11, 1979

204.   Prentice Hall required that the signatures of the parties to the Collaboration Agreement be notarized. *See* Exhibit 5.  On January 11, 1979, Prentice Hall's in-house counsel, Mark J. Lawless, acknowledged Prentice Hall's receipt of the notarized copy of the Collaboration Agreement and confirmed that it was effective as of that date and included as an addendum to the Prentice Hall agreement (*See* Exhibit 41) and reproduced below:

///

PRENTICE-HALL, INC.
ENGLEWOOD CLIFFS, NEW JERSEY 07632                    201-592-2011

OFFICE OF THE GENERAL COUNSEL

January 11, 1979

Mr. Gerald Brittle
62 Nanel Drive
Glastonbury, CT 06033

     Re: The Demonologist

Dear Mr. Brittle:

This office has received the notarized copy of the collaboration
agreement between yourself and the Warrens and now include it as an
addendum to the existing contract, effective this date.

                                   Very truly yours,

                                   Mark J. Lawless
                                   Attorney

     MJL:jjm
     Enc.

## D.  PRENTICE HALL TO BERKLEY PARTIAL SUBSIDIARY RIGHTS TRANSFER - April 14, 1981

205.    As discussed above, under paragraph 5 of the Prentice Hall Agreement entitled "Subsidiary Rights", Prentice Hall acquired from Brittle and the Warrens the exclusive right to all Subsidiary Rights in and to *The Demonologist*.  Upon their acquisition of the Subsidiary Rights, Prentice Hall was free to unilaterally exploit or dispose of these rights as they saw fit.

206.    Under Section 5. (4) of the Prentice Hall Agreement, included in the bundle of subsidiary rights granted to the publisher by the Warrens and Brittle was the subsidiary right of "Reprint":

| | | |
|---|---|---|
| (4) Reprint (including microfilm) edition through another publisher | 50% | 50% |

Exhibit 12.  As such, Prentice Hall could, and ultimately did, unilaterally transfer the subsidiary reprint rights to another publisher, Berkley Books.  Prentice Hall did this, as they were contractually permitted to do so, without having to give any notice, or attain any further permission from either Ed and Lorraine Warren or Gerald Brittle.

207.    To that end, on April 14, 1981, Prentice Hall entered into an agreement with Berkeley Books for a paperback reprint of *The Demonologist*.  The fact that Prentice Hall exercised total and absolute control over all subsidiary rights is also evidenced by the fact that no signature of the Warrens or Brittle was required on the Berkeley subsidiary rights ("Reprint") agreement. *See* Exhibit 42 ("Prentice Hall Letter and Berkley Agreement.") The signature block thereto reproduced in part below:

*///*

- 77 -

IN WITNESS WHEREOF, the parties have duly executed this Agreement on the date first written above.

Witness:                                          Berkley Publishing Corporation

_____     By _____
                                                  Victor Temkin, President

                                              By _____
                                                  Rena Wolner, Vice President
                                                      & Publisher

Witness:                                          Licensor

_____     By _____
                                                  PRENTICE-HALL, INC.
                                                  General Publishing Division

Exhibit 42 at signature page.

208.    On July 23, 1981, a copy of the Prentice Hall Berkeley Contract ("Prentice Hall

Berkeley Contract") was sent to Gerald Brittle, with a copy to Ed and Lorraine Warren, from John

E Nelson, the <u>Subsidiary Rights Director</u> for Prentice Hall. *See* Exhibit 42, Page 1.



Prentice-Hall, Inc.
Englewood Cliffs, N.J. 07632

Telex No. 13-5423

July 23,1981

Mr. Gerald Brittle
62 Nanel Drive
Glastonbury, CT  06033

Dear Gerald:

Today, I received the completely executed copy of the Berkley contract
for THE DEMONOLOGIST.

Enclosed you'll find a copy of that contract.  Separately by a copy of
this letter, I am sending a copy of the contract to Ed and Lorraine.

Sincerely,

John B. Nelson
Subsidiary Rights Director

- 78 -

209.     Under the Subsidiary Rights provision "Other Rights 5." of the Prentice Hall Agreement, the owner of the subsidiary right had to send a copy of any agreements they entered into for said rights. Exhibit 12. The Prentice Hall Letter and Berkley Agreement satisfies that requirement. *See* Exhibits 12 & 42.

210.     Neither the Warrens nor Brittle ever took exception with the deal that Prentice Hall made with Berkley for the exclusive subsidiary reprint rights, rights that they had willingly granted to the publisher under the Prentice Hall Agreement.  All the subsidiary rights to the work belonged to Prentice Hall at this time and the publisher was free to unilaterally dispose of same to any party as it wished and saw fit.


### E. PRENTICE HALL AGREEMENT FIRST AMMENDMENT - December 8, 1981

211.     On December 8, 1981, the first amendment (separate and unrelated to the prior "First Addendum"[10]) to the Prentice Hall agreement (the "Prentice Hall First Amendment") was signed by Ed and Lorraine Warren, Gerald Brittle and Prentice Hall. Exhibit 13. This Prentice Hall First Amendment reconfirms that all subsidiary rights, including rights for motion pictures, dramatizations, radio and television would "immediately" revert to the "Author" (i.e., Brittle). See Exhibit 13, the Prentice Hall First Amendment which is reproduced below.




///

---

10 *See* Exhibits 5 and 41.



**Prentice-Hall, Inc.**
Englewood Cliffs, N.J. 07632

Telex No. 13-5423

CERTIFIED MAIL, RETURN RECEIPT REQUESTED

AMENDMENT TO AGREEMENT

Reference is made to the agreement dated November 8, 1978 between
Gerald Brittle, Ed Warren and Lorraine Warren and Prentice-Hall, Inc.
for

THE DEMONOLOGIST:  The Extraordinary Careers
of Ed and Lorraine Warren.

Upon signature by all parties, the control of the subsidiary rights
enumerated in paragraph 5. (b)  The right to sell or license through-
out the world:  (a)  Motion Picture
               (b)  Dramatization
               (c)  Radio
               (d)  Television

will revert to the author.  It is understood that Prentice-Hall, Inc.
will receive 10% of the net amount received from the sale or license of
these rights.  It is further understood that the 10% will be paid directly
to Prentice-Hall, Inc. from any agent employed to represent the rights.

In all other respects, the agreement is ratified and affirmed and remains
in full force and effect.

December 8, 1981

_____
Gerald Brittle

_____
Ed Warren

_____
Lorraine Warren

_____
PRENTICE-HALL, INC.

212.     This Prentice Hall First Amendment confirms that immediately "upon signature by all parties" the "control" and "right to sell or license throughout the world" the aforementioned copyright protected Subsidiary Rights, (i.e., Motion Picture, Dramatization, Radio and Television), immediately revert to the "Author," Brittle. *See* Exhibit 13; *See also*, Exhibits 5, 12, 13, 41.

213.     This Prentice Hall First Amendment changes the royalty structure for subsidiary rights as to allow Prentice Hall to retain a percentage of the sale of said subsidiary rights, even upon termination of the publishing rights and the book going out of print. Exhibit 13. This is due to the fact that the subsidiary rights, as agreed to by the Warrens, were immediately transferred by Prentice Hall to Brittle. Brittle now owned these subsidiary rights which the Prentice Hall Agreement delineated as being live for the "life of the work" – the life of the copyright to *The Demonologist* which is at least the next seventy years. [11]

214.     The Warrens' signatures on the Prentice Hall First Amendment confirm their agreement and understanding that all other aspects of the original Prentice Hall Agreement are re-ratified "and affirmed and remain in full force and effect. Exhibit 13 at ¶4.

## F. THE PRENTICE HALL OUT OF PRINT NOTICE - April, 18 1986

215.     On April 18, 1986, Charlotte Wilson, the Contract Administrator for Prentice Hall, sent a letter to Gerald Brittle notifying him that the hardcover version of the work (*The Demonologist*) was not selling sufficient quantities to remain in print, thus partially triggering the termination clause under the original Prentice Hall Agreement for the hardcover version of the

---

11 Plaintiff believes that Prentice Hall, or any successor in interest thereto would be entitled to 10% of any recovery it makes from Defendants related to the subsidiary rights.

book. *See* Exhibit 43 ("Out of Print Letter.").

216.    It is important to note that the letter is addressed only to Mr. Brittle. It is not "cc'd"

to the Warrens. In the letter, Ms. Wilson asked Mr. Brittle if he, as the "Author" under the Prentice

Hall Agreement, wished the balance of the subsidiary rights that were granted to Prentice Hall,

those which did not previously revert to him under the Prentice Hall First Amendment, to revert

now to him. *See* Exhibit 42 at ¶ 2.

```
                    PRENTICE-HALL, Inc.
                 Englewood Cliffs, N. J. 07632


                                           April 18, 1986


          Gerald D. Brittle
          PO Box 61
          East Glastonbury CT 06025

             RE:    Demonologist ()
             ISBN:  0131983334
             PRICE: 0.75
             QTY:   0

      Dear Mr. Brittle:

             Reference is made to the above Titles(s) and the Agree-
      ment(s) between you and us concerning the above Work(s).  We have
      determined that the demand for the work no longer is sufficient
      to keep it in print.

             We may decide to reprint the book at a future time.  If, on
      the other hand, you wish us to revert the rights to you, please
      send the appropriate notice in accordance with the terms of our
      contract with you.
```

217.    However, Ms. Wilson was incorrect as the balance of the remaining subsidiary

rights could not be fully reverted until "all edition, including reprints" inclusive of the Berkley

book (i.e., the paperback reprint version) was also out of print, which it was not at this time.  As

the "Termination and Reversion" clause, at "14." in the Prentice Hall Agreement states:

TERMINATION AND REVERSION OF RIGHTS

14.   If the work shall go out of print and off sale for six (6) months in all editions, including reprints, whether under the imprint of the PUBLISHER or another imprint, and if thereafter, after written notification from the AUTHOR, the PUBLISHER shall fail to place the work in print and on sale within six (6) months from the date of receipt of such notification (unless such failure is due to circumstances beyond the control of the PUBLISHER), then this agreement shall terminate and all of the rights granted to the PUBLISHER hereunder shall revert to the AUTHOR. The AUTHOR shall have the right for thirty (30) days after such termination to purchase the plates, if any, of the work at one-half the original cost of composition and plating, and any remaining copies or sheets of the work at the manufacturing cost, all F.O.B. point of shipment. If the AUTHOR fails to purchase, as aforesaid, the PUBLISHER may dispose of all such plates, copies and sheets without further liability for royalties.

Exhibit 12.

218.   Brittle would have to wait until the Berkley paperback reprint was either out of print, or the term of the Berkley Agreement concluded (a seven-year term ending on April 15, 1987), before he could notify the publisher that he wished the remaining subsidiary rights, those not previously transferred to him under the Prentice Hall First Amendment, to revert to him as the Author.   As discussed below, Brittle's notice to Prentice Hall that he wished the balance of the Subsidiary Rights to be reverted back to him was made on May 8, 1990. Exhibit 46.

### G. FIRST AMENDMENT TO THE COLLABORATION AGREEMENT   -  April 16, 1990

219.   On April 16, 1990, Ed and Lorraine Warren, and Gerald Brittle entered into the First Amendment to the Collaboration Agreement,[12] ("Collaboration Agreement First Amendment").   This amendment to the Collaboration Agreement allowed the parties to hire a literary agency, Lowenstein Associates, to represent them and then enter into a second reprint agreement for another paperback printing of *The Demonologist* with St. Martin's Press publishers.

_____

12 The "First Amendment" and "First Addendum" to the Prentice Hall Agreement are two entirely different documents and not to be confused. Likewise, there is a "First Amendment" to the Prentice Hall Agreement and a "First Amendment" to the Collaboration agreement which are also separate and unrelated documents.

*See* Exhibit 44.

220.    The Collaboration Agreement First Amendment amends and changes only a few terms of the original Collaboration Agreement. It does not in any way change the original Prentice Hall Agreement between the parties. It does not change Brittle's legal status as the sole "Author," or the Warrens as the "Subjects."  Nor does it change the reversion of the subsidiary rights to Brittle as the "Author."  *See* Exhibit 44.

221.    The Collaboration Agreement First Amendment at ¶ 1, again defines Brittle as the sole "Author," while Ed and Lorraine Warren are identified again as the "Subjects.":

> **AMENDMENT TO THE COLLABORATION AGREEMENT**
>
> THIS AMENDMENT TO THE COLLABORATION AGREEMENT is made as of 16ᵗʰ April_____, 1990 between Gerald D. Brittle (hereinafter referred to as "the Author") and Edward Warren and Lorraine Warren (hereinafter referred to as "the Subjects").

See Exhibit 44 at ¶ 1.

222.    According provision "B." of the Collaboration Agreement First Amendment, the Collaboration Agreement itself is attached to the First Amendment and made a part thereof.

> B.    The Collaboration Agreement is attached hereto and made a part hereof.
>
> NOW THEREFORE, in consideration of the foregoing, the parties hereto agree to amend the Collaboration Agreement as follows:

See Exhibit 44.

223.     Under section "1." of the Collaboration Agreement First Amendment, the "Author"
and the "Subjects" are going to enter into a new publishing contract with St. Martin's press for the
book "*The Demonologist*."

> 1.    The second paragraph of the Collaboration Agreement
> ("Simultaneously herewith . . . psychic investigators.") is
> hereby deleted and replaced to read as follows:
>
> > Simultaneously herewith the Author and Subjects
> > are entering into a publishing contract (hereinafter
> > referred to as "the Contract") pursuant to which they
> > are licensing to St. Martin's Press, Incorporated, 175
> > Fifth Avenue, New York, New York 10010 (hereinafter
> > referred to as "the Publisher") certain publication
> > rights in and to a book entitled The Demonologist
> > (hereinafter referred to as "the Work"), dealing with
> > the Subjects' lives and experiences as psychic
> > investigators.

See Exhibit 44.

224.     This document, signed by the Warrens, reconfirms that the subject of *The
Demonologist* book is "dealing with the Subjects' [Warrens] lives and experiences as psychic
[paranormal] investigators." The fact that the Warrens are repeatedly defined in all the agreements
herein as the "Subjects" further confirms that they and their lives are the subject matter of *The
Demonologist* book.

225.     Under section "2." of the Collaboration Agreement First Amendment, the monies
derived from any publishing royalties for the St. Martins reprint of *The Demonologist* are to be
split equally between the "Author" and the "Subjects" after $5,200 in advances/royalties are first
paid to Brittle, which he did receive as evidenced and more fully discussed below:

///