**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF VIRGINIA**
**Richmond Division**

| | |
|---|---|
| **GERALD BRITTLE,** | ) |
| | ) |
| *Plaintiff,* | ) |
| | ) |
| **v.** | ) |
| | )　**Case No.: 3:16-cv-00908** |
| **TIME WARNER, INC., et al.** | )　**TRIAL BY JURY DEMANDED** |
| | ) |
| | ) |
| *Defendants.* | ) |

<u>**SECOND AMENDED COMPLAINT**</u>

Plaintiff Gerald Brittle ("Brittle"), by counsel, respectfully represents unto the Court as follows:

*Jurisdiction and Venue*

1.　This is a civil action in part for federal claims of copyright infringement and preliminary and permanent injunctive relief under the United States Copyright Act, 17 U.S.C. §§101 et seq. (hereinafter, "the Copyright Act") and the Lanham Act, 15 U.S.C.§§ lll7 and 1125.

2.　This Court has original subject matter jurisdiction over the claims set forth in this Complaint pursuant to the Copyright Act, 17 U.S.C. § 101 et seq., 17 U.S.C. § 1202; 28 U.S.C. §§ 1331, 1332, and 1338(a) and (b). The Court has jurisdiction over the state law claims under § 1367.

3.　Venue is proper in the Eastern District of Virginia pursuant to 28 U.S.C. §1391(b)(2), as Brittle resides in the Eastern District of Virginia and suffers damages from Defendants' prior and ongoing wrongful conduct which is directed at him while a resident of Virginia.

### Nature of Action

4.   This case arises out of the defendants' unlawful production of *The Conjuring* film and associated films (*The Conjuring 2*, *Annabelle*, *Annabelle 2, The Nun,* and *The Conjuring 3*) which are works derived from the plaintiff's book *The Demonologist* and from other materials the plaintiff has sole and exclusive rights to use. The defendants produced and continue to produce these films, without having validly acquired the requisite motion picture rights to *The Demonologist* and/or other materials that the plaintiff has exclusive rights to.  The defendants knowingly continue in this unlawful course of conduct with full knowledge of their malfeasance.

5.   The defendants intentionally and knowingly engaged in the conduct alleged in this Complaint, notwithstanding that several of the defendants are sophisticated multi-national corporations whose core businesses are based upon the value and enforcement of copyrights and other intellectual property.

### Parties

6.   Plaintiff Brittle is an individual residing in City of Richmond, Virginia. Brittle is a published  author whose works include *The Demonologist*, which he completed in 1980.

7.   Defendant Chad Hayes is an individual residing in Los Angeles, California. Chad Hayes transacts business in the City of Richmond and the Commonwealth of Virginia. Chad Hayes receives a portion of the profits and/or proceeds for his efforts and involvement in *The Conjuring* and other films subject to this lawsuit, including profits/proceeds from the movies distribution and sale in the Commonwealth of Virginia.

8.   Defendant Carey Hayes is an individual residing in Los Angeles, California. Carey Hayes transacts business in the City of Richmond and the Commonwealth of Virginia. Carey Hayes, receives a portion of the profits and/or proceeds for his efforts and involvement in *The Conjuring*

and other films subject to this lawsuit, including profits/proceeds from the movies distribution and sale in the Commonwealth of Virginia.

9.   Defendants Chad and Carey Hayes are screenwriters of many films including, *The Conjuring*, and are credited as writers on *The Conjuring 2* (along with co-writers Defendant David Leslie Johnson and James Wan), each of which was produced, financed and has already been distributed by Defendants New Line and Time Warner. Defendants Chad and Carey Hayes are accorded bonuses and a percentage of the profits of these aforementioned movies (i.e., *The Conjuring* and *The Conjuring 2* as part of their compensation for the writing services they provide to New Line and Warner Brothers. Said movies have already been exhibited in Virginia by Defendants New Line and Warner Brothers, and the Hayes' have and continued to make profits from this Virginia production.

10. Defendant James Wan is an individual residing in Los Angeles, California. James Wan is a screenwriter, producer and director of many films including  the following which are subject of the claims before this Court,  *The Conjuring*, *Annabelle*, and *The Conjuring 2*. Wan is further a producer of *Annabelle 2*, *The Conjuring 3* and *The Nun,* which are also subject of the claims in this action. The foregoing movies were all produced, financed and distributed by Defendants New Line and Time Warner. Wan is accorded bonuses and a percentage of the profits of these aforementioned movies that he provides producing, directing and/or writing services on (i.e., *The Conjuring, Annabelle*, *The Conjuring 2*, *Annabelle 2* and *The Nun*). *The Conjuring*, *Annabelle* and, *The Conjuring 2* have already been exhibited and distributed in the Commonwealth of Virginia, including the Richmond metropolitan area by Defendants New Line and Warner Brothers.  James Wan has profited directly from the sales in the Commonwealth.

11. Defendant Gary Dauberman is an individual residing in Los Angeles, California.

3

Dauberman is a screenwriter of many films including films *Annabelle, Annabelle* 2, each of which was or is being produced, financed and distributed by Defendants New Line and Time Warner and is subject of the violations set forth in this Complaint. Dauberman receives a portion of the profits and/or proceeds for his efforts and involvement in movies that have been and will be released in Virginia, including but not limited to *Annabelle, Annabelle* 2 and other movies subject to this lawsuit, including profits/proceeds from the movies distribution and sale in the Commonwealth of Virginia. Dauberman is accorded bonuses and a percentage of the profits of these aforementioned movies (i.e., *Annabelle and Annabelle 2*) as part of his compensation for the writing services he provides to New Line and Warner Brothers. These movies have already been exhibited, or are scheduled to be exhibited, in the Commonwealth of Virginia and in the Richmond metropolitan area by Defendants New Line and Warner Brothers. Dauberman has and will continue to directly profit from the movies activity in Virginia.

12. Defendant David Leslie Johnson is an individual residing in Los Angeles, California. Johnson is a screenwriter of many films, including but not limited *The Conjuring 2*, each of which was or is being produced, financed and distributed by Defendants New Line and Time Warner. Johnson receives a portion of the profits and/or proceeds for his efforts and involvement in the films that have been and will be released in Virginia, including but not limited to *The Conjuring 2* and other movies subject to this lawsuit, including profits/proceeds from the movies distribution and sale in the Commonwealth of Virginia. Johnson is accorded bonuses and a percentage of the profits of these aforementioned movies (i.e., *The Conjuring 2*) as part of his compensation for the writing services he provides to New Line and Warner Brothers. Said movies have already been exhibited, or are scheduled to be exhibited, in the Commonwealth of Virginia and in the Richmond metropolitan area by Defendants New Line and Warner Brothers.

13. Defendant Warner Bros. Entertainment Inc. is a Delaware corporation with its principal place of business in Los Angeles County, California, and is a wholly owned subsidiary of Defendant Time Warner Inc. Warner Bros. transacts business in the City of Richmond and the Commonwealth of Virginia.

14. Defendant New Line Productions, Inc. is a Delaware corporation with its principal place of business in Los Angeles County, California, and is a wholly owned subsidiary of Defendant Warner Bros. New Line transacts business in the City of Richmond and the Commonwealth of Virginia.

15. Defendants New Line and Warner Brothers make profits from the production of motion pictures and their distribution of same in theatres in the Commonwealth of Virginia, including the greater Richmond metropolitan  area. The defendants' distribution of movies throughout the Commonwealth includes but is not limited to *The Conjuring*, *Annabelle* and the *Conjuring 2*. These movies have all been distributed and sold throughout the Commonwealth of Virginia, for example the *Conjuring 2* movie was shown in multiple theatres in Richmond, Virginia.

16.  Defendant Time Warner Inc. is a Delaware corporation with its corporate headquarters in the State of New York. Time Warner is the parent company of Warner Bros. and New Line. Time Warner regularly conducts significant ongoing business in the Commonwealth of Virginia and City of Richmond, and maintains a registered agent within the Eastern District of Virginia.

17. Time Warner had knowledge of its wholly owned subsidiaries unlawful actions, as detailed in this Complaint, and has vastly profited from its agents improper and unlawful actions.

18. Defendant Ratpac-Dune Entertainment LLC is a Nevada corporation with its principal

place of business in Los Angeles, California, and transacts business in the City of Richmond and the Commonwealth of Virginia.

19. Defendants Ratpac-Dune, make profits from the production and distribution of motion pictures it finances and/or produces (in part or in whole) for and with New Line and Warner Brothers, including but not limited to *Annabelle* and *The Conjuring 2*, which are subject of the claims in this lawsuit. These movies are distributed nationwide and Ratpac makes profits from the distribution of the films in the Commonwealth of Virginia, including theatres located in Richmond.

20. Defendant Atomic Monster Incorporated is a California corporation with its principal place of business in Los Angeles, California, and transacts business in the City of Richmond and the Commonwealth of Virginia.

21. Atomic Monster Incorporated produced and/or is producing *The Conjuring, Annabelle*, *The Conjuring 2*, *Annabelle 2*, *The Conjuring 3* and *The Nun*. Atomic Monster is accorded fees and a percentage of the profits of these aforementioned movies, including directly from the distribution of these films in the Commonwealth of Virginia.

22. Defendant James Wan Productions, Inc. is a California corporation with its principal place of business in Los Angeles, California, and transacts business in the City of Richmond and the Commonwealth of Virginia.

23. James Wan Productions, Inc. is another James Wan owned company that was involved in the production of *The Conjuring*, *Annabelle*, *The Conjuring 2*, *Annabelle 2*, *The Conjuring 3* and *The Nun*. The defendant is accorded fees and a percentage of the profits of these aforementioned movies, including profits resulting directly from sales in the Commonwealth of Virginia.

24. Plaintiff is unaware of the true names and capacities of the Defendants sued herein

6

as DOES 1 through 10, inclusive, and for that reason, sues such Defendants under such fictitious names. Plaintiff is informed and believes and on that basis alleges that such fictitiously named Defendants are responsible in some manner for the occurrences herein alleged, including but not limited to providing general business insurance coverage, production insurance coverage, completion bonds, financing and loan out services for Defendants, their companies, subsidiary entities and single purpose companies that allowed for the Defendants' movies to be physically produced and that Plaintiff's damages as herein alleged were additionally proximately caused by the conduct of said Defendants. Plaintiff will seek to amend the complaint when the names and capacities of such fictitiously named Defendants are ascertained. As alleged herein, "Defendants" shall mean all named Defendants and all fictitiously named Defendants.

25. Defendants illegal and unauthorized *The Conjuring* film has generated over a third of a billion dollars in revenue for Defendants from ticket sales alone.

26. Defendants illegal and unauthorized *Annabelle* film has generated over a quarter of a billion dollars in revenue for Defendants just from ticket sales worldwide.

27. Defendants illegal and unauthorized *The Conjuring 2* has generated over $320 million dollars for Defendants just from ticket sales worldwide alone.

### Facts Common to All Counts

#### Mr. Brittle's Rights and the Contractual History with the Warrens

28. Ed and Lorraine Warren are self-proclaimed paranormal investigators. Mr. Warren is now deceased, and Mrs. Warren currently resides in Connecticut.

29. In 1978, Brittle, along with Ed & Lorraine Warren entered into an agreement, referred to as the "Prentice Hall Agreement" with publisher Prentice Hall for the book, *The Demonologist*, to be authored by Brittle. The Prentice Hall Agreement is attached hereto as Exhibit 1.

30.  Under The Prentice Hall Agreement the Warrens and Brittle transferred all subsidiary motion picture rights to *The Demonologist* book to Prentice Hall. *See* Exhibit 1.

31. Under the Prentice Hall Agreement, the Warrens and Brittle also agreed to a no "Competing Work" provision whereby they are prohibited from entering in any other motion picture deal that is based on the "same subject" of the book which is their lives and experiences as paranormal investigators as well as on any of their cases that appear in the book. The term of this provision is also still alive as it is also tied to the same clock as the subsidiary rights, the life of the copyright of the book. The rights remain in effect today. *See* Exhibit 1.

32. A mere 12 days after the Prentice Hall Agreement was finalized, the Warrens and Brittle entered into an agreement known as the "Collaboration Agreement" dated November 20, 1978, which is attached hereto as Exhibit 2.  The Collaboration Agreement was an addendum to the Prentice Hall Agreement, which clarified that Brittle was the sole writer/author and that Ed and Lorraine Warren were not writers and were not authors of *The Demonologist.*

33. The addendum was necessary as the Warrens were unable to meet many of the contractual requirements of the Prentice Hall Agreement, as they were not writers or authors.

34. The Collaboration Agreement makes clear that Brittle is the "Author" of *The Demonologist* and that the Warrens are the "Subjects." *See* Exhibit 2.

35. Under the Collaboration Agreement, Brittle conveyed to the Warrens one half of his interest in the copyright for *The Demonologist* book. While co-owners of the copyright, however, the Warrens also agreed that the Collaboration Agreement would function as an agreement to the contrary related to the Copyright Act, in that neither party could sell, transfer of dispose of any rights to the book without the "unanimous consent" of the other. *See* Exhibit 2.

36. Under the Collaboration Agreement, the Warrens granted the Plaintiff the exclusive

"right to use" all of the Warren's Cases, Case Files and related materials. The term of the Collaboration Agreement is defined as the term of the copyright for the book, which is at least for the next seventy years. *See* Exhibit 2.

37. Prentice Hall was not originally party to the Collaboration Agreement and required that the Collaboration Agreement be notarized by the parties to that agreement before accepting it. Prentice Hall acknowledged receipt of the notarized copies and its acceptance of the Collaboration Agreement, via letter dated January 11, 1979. A copy of the letter is attached hereto as Exhibit 3.

38. In the letter (Exhibit 3), Prentice Hall accepts the Collaboration Agreement and incorporates it into the Prentice Hall Agreement as an addendum. *See* Exhibit 3 (Prentice Hall letter); Exhibit 1.

39. The incorporation of the Collaboration Agreement into the Prentice Hall Agreement confirmed, for all relevant parties, that Brittle was the sole Author of *The Demonologist*.  It further re-confirms the subject matter for the book was the Warrens' lives and experiences as psychic [paranormal] investigators and grants Brittle exclusive right to use the Warren cases, case files and related materials. Exhibits 1-3.

40. Less than 3 years later, on December 8. 1981, the Warrens, Brittle and Prentice Hall entered in the "Prentice Hall Agreement First Amendment" which is attached hereto as Exhibit 4.

41. The Prentice Hall Agreement First Amendment, immediately "upon signature" transferred Prentice Hall's subsidiary rights of "(a) Motion Picture, (b) Dramatization, (c) Radio and (d) Television" from Prentice Hall to the "Author" (Gerald Brittle). *See* Exhibit 4.

42. The relevant terms of the Prentice Hall Agreement, The Collaboration Agreement and the

Prentice Hall Agreement First Amendment (Exhibits 1, 2 & 4 respectively) remain in full force and effect today.

43. Brittle still retains ownership of his subsidiary motion picture rights (and his copyright protected rights therein). Brittle's exclusive "right to use" the Warren Cases, Case Files and related materials, that they investigated up to including the date of July 27, 1981 remains in full force and effect today. Consequently Lorraine Warren is still bound by the no "Competing Work" provision to this day.

*Additional Contracts Regarding The Demonologist and Associated Motion Picture Rights*

44.  On April 16, 1990, Brittle and Ed & Lorraine Warren entered into the First Amendment to the Collaboration Agreement ("Collaboration Agreement First Amendment"), which is attached hereto as Exhibit 5. This amendment to the Collaboration Agreement allowed the parties to hire a literary agency, Lowenstein Associates, to represent them and then enter into a second reprint agreement for another paperback printing of *The Demonologist* with St. Martin's Press publishers. *See* Exhibit 5.

45. Collaboration Agreement First Amendment confirms Brittle as the sole author of *The Demonologist* and the nature of Brittle's rights, as discussed above, i.e., reconfirming subject of *The Demonologist* book is "dealing with the Subjects' [Warrens] lives and experiences as psychic [paranormal] investigators."

46. On the same day that the parties entered into the Collaboration Agreement First Amendment, they also entered into the "Lowenstein Agency Agreement," which is attached hereto as Exhibit 6.  This agreement confirmed the rights as detailed above.

47. On June 20, 1990, in response to a request from Mr. Brittle (Brittle's May 8, 1990 letter

is attached hereto as Exhibit 7, hereafter "Brittle 1990 Reversion of Rights Request") to the Trade Books Division Permissions Department of Prentice Hall, Prentice Hall sent a letter stating that all remaining unsold, unlicensed or previously transferred subsidiary rights granted to Prentice Hall now reverted pursuant to the Prentice Hall Agreement. A copy of the "1990 Prentice Hall Rights Reversion Letter" is attached hereto as Exhibit 8.

48. On February 14, 1990, Barbara Lowenstein and Associates, as agent on behalf of Gerald Brittle, Ed and Lorraine Warren, entered into an agreement with St. Martin's Press to republish the Work (*The Demonologist*). A copy is attached hereto for as Exhibit 9.  The agreement specifically excluded the movie and television rights, which Brittle already solely owned and still maintains today. Exhibit 9.

49. On July 10, 2001, Brittle requested a reversion of the subsidiary rights he granted to St. Martins (i.e., the subsidiary rights of reprint and sound) per the St. Martin's Press Agreement. A copy of the letter is attached hereto as Exhibit 10.

50. On August 13, 2001, Gerald Brittle received a letter in response to his aforementioned request for a reversion of those rights. The "St. Martins Rights Reversion Confirmation Letter" is attached hereto as Exhibit 11.

### *Copyright and Termination of Copyright Grant*

51. Effective February 12, 1981, the US Copyright Office issued Certificate of Registration for *The Demonologist* ("USCO COR The Demonologist") with the registration number TX628075 for *The Demonologist*. The USCO COR at "2" lists Gerald Brittle as the "Author of entire text." The USCO COR for *The Demonologist* is attached hereto as Exhibit 12.  The COR also lists the Warrens as co-owners of the copyright, having received there one-half share, via written agreement (Collaboration Agreement).

52. On October 23, 2015, Brittle sent Mrs. Warren formal Notice of Termination of his 1978 grant to her and Ed Warren of a half ownership of the copyright in *The Demonologist*. A copy of the Notice of Termination is attached hereto as Exhibit 13.  The effective date of the Notice of Termination is October 31, 2017.

53. The Warrens are co-owners of the copyright, they are not now, nor have they ever been co-authors, or joint authors, of *The Demonologist*.

*Brittle's Current Rights as it pertains to The Demonologist and the Warren Case Files*

54. Brittle's rights at all times relevant to this litigation, as it pertains to *The Demonologist* and the Warren Case Files can be summarized as follows:

a.   Brittle is the sole author of *The Demonologist*;

b.   Brittle owns the exclusive "right to use" the Warren Cases, Warren Case Files and related materials that were given to him by the Warrens. This right is in full force and effect" for at least the next seventy years;

c.   Brittle exclusively owns all subsidiary motion picture rights to *The Demonologist* which are inclusive of his copyright protected rights of reproduction, distribution, performance and exclusive right to authorize derivative works. Said subsidiary rights are in full force and effect and remain so for at least the next seventy years;

d.   All other persons and/or entities, including the defendants are prohibited from using the Warren's Cases, Case Files and related materials for all of the Warren's investigations that took place up to including July 26, 1981, as the basis of any movies, inclusive of the Perron Farmhouse Case, Case File and related materials (used in *The Conjuring*);

e.   Any and all persons and entities, including the Defendants are prohibited from

entering into any agreement with Lorraine Warren for motion picture rights to any material in and from *The Demonologist* – inclusive of the Amityville, Enfield, Annabelle and Borley Nun cases, Case Files and related materials of the Warrens; and

    f.   The no "Competing Work" provision in the Prentice Hall Agreement (Exhibit 1) is still in full force and effect today. This provision is a complete and absolute bar to any movie production, like the Defendants entire franchise of *The Conjuring* films, which has the same subject as *The Demonologist* book. The subject of *The Demonologist* Book includes the Warren's Cases, Case Files and related materials contained in *The Demonologist* as well as the Warren's lives and careers as paranormal investigation.

    g.   Under the "Competing Work" provision of the Prentice Hall Agreement (Exhibit 1), Lorraine Warren never could have successfully or effectively conveyed any rights to any third party, including any of the Defendants, to make any movies, like *The Conjuring* film and associated films developed and produced by the defendants.

    h.   Without Gerald Brittle's permission and express authorization, any film, like the entirety of the Defendants' *The Conjuring* franchise of films which are based on the same subject as Brittle's *The Demonologist* are unlawful.

55. The subject of *The Demonologist* (i.e., the Warren's cases and Case Files contained in the book, as well as their entire lives and experiences as paranormal investigators) cannot be the subject of any movie that is not derived directly from the subsidiary rights to *The Demonologist*. As such, any such movie requires the express permission and authorization of Gerald Brittle.

56. The no "Competing Work" provision in the Prentice Hall Agreement (Exhibit 1) precluded the Warrens, individually and collectively, from creating or assisting in the creation of any work that would conflict with the sale of *The Demonologist*, the subsidiary rights and

publishing rights thereto. Lorraine Warren could not at any time authorize the Defendants or contract with them (or any third party) to make any movies involving this material, including the Defendants' *The Conjuring* franchise of movies, without Brittle's express consent.

57. The Warrens, including Mrs. Warren are fully aware of Mr. Brittle's rights.

58. On June 26, 1980, during a recorded conversation with Gerald Brittle, Caroline Perron, and Lorraine Warren, the "Perron Taped Phone Call," Mrs. Warren states and verifies that she and Ed Warren gave Gerald Brittle, as part of their agreement with Brittle, all of the cases that the Warrens investigated up to that point and time, including the Perron/The Conjuring case. The Perron Taped Phone Call is attached hereto as Exhibit 14, on a zip drive. On the recording, Lorraine Warren tells Caroline Perron, the central figure in that case:

> … And we [Brittle and the Warrens] went through all our case histories… tapes…you know things like that…, and we were listening to them and this writer listened to your tape and was rather interested in writing the story of what happened to you at that Rhode Island home [the Perron farmhouse]…

Exhibit 14.

### *Defendants and Usual Practice for Securing Rights*

59.  Defendants are all involved in Motion Picture Industry.

60. The defendants, especially Warner Brothers and New Line are aware of the importance of intellectual property rights and the potential ramifications of violating such rights. These defendants have a history of being accused of such violations, and having court's issue injunctions in response to their malfeasance.

61. In developing projects, like the ones involved in the claims before this Court, the defendants conduct chain of title searches to determine whether they can properly secure the rights for whatever project they are contemplating. The defendants in this case, knew about Brittle's *The Demonologist*, Prentice Hall and the deals the Warrens made with Brittle, and made

the calculated decision to ignore those rights under the presumption that they would never get caught.

62. The defendants knew or should have known, before *The Conjuring* and the other movies in the series, about Mr. Brittle and his rights.

63. Several of the defendants did in fact know of Brittle and *The Demonologist* before *The Conjuring* was ever produced and has admitted the same publicly:

     a.  Defendant Cary Hayes stated publicly that prior to his commencing the writing of *The Conjuring* script in 2010, that New Line prohibited him from reading *The Demonologist* as New Line did not possess the rights to *The Demonologist* book, nor any subsidiary rights thereto (i.e., motion picture rights);

     b.  Warner Brothers, as was aware of *The Demonologist* and Mr. Brittle as earlier as 1997, *see infra* paragraphs 64-68;

     c.  James Wan (who directed *The Conjuring*, oversaw and contributed to the script for same, produced and contributed to the script of Defendant's *Annabelle* movie, and produced, directed and co-wrote the script for Defendant's *The Conjuring 2: The Enfield Poltergeist* movie) had access to and read *The Demonologist* before the script to the first film in *The Conjuring* franchise of films was even written. James Wan admitted publicly to reading *The Demonologist*, calling it the "….scariest book I've read" and the New Line did not have the rights to it. A copy of the statements is attached hereto as Exhibit 15.

<u>*Warrens' History of Unlawful and Ineffectual Efforts*</u>
<u>*to Transfer rights to the Defendants*</u>

64. Despite full knowledge of Brittle's rights, the Warrens engaged in a pattern of conduct of improperly attempting to convey rights that Brittle owned, without his consent knowledge or permission.

15

65. In approximately 1997, without the knowledge or consent of Brittle, Ed and Lorraine Warren entered into what was the first of many unlawful deals between them and Warner Brothers for *The Demonologist* and Brittle's exclusive property rights (the "1997 Warner Brother Deal"). This deal was purportedly for a feature film based on the Warren's lives and *The Demonologist* book.

66. Brittle learned of about 1997 Warner Brother Deal in 2014 in an email from a Yolande Suzin, a friend of the Warrens and a fan of Brittle's work. A copy of the email is attached hereto as Exhibit 16. In the email Ms. Suzin tells of her encounter with an "archivist from Warner Brothers" who spent a week at the Warrens' house in Connecticut in 1997. She states the archivist was going through the Warren's Cases, Case files, and materials and getting the Warrens' vocal recollection of same. This was pursuant to a movie deal that Warner Brothers made with the Warrens for their life rights and/or *The Demonologist* book.

67. The 1997 Warner Brothers Deal was never mentioned to Brittle by either Warner Brothers or the Warrens. Nor did they seek his agreement or permission as they were required to do for any deal that encompassed *The Demonologist*, the Warren Cases, Case Files, related materials or any of his subsidiary rights.

68. Upon information and belief, *The Demonologist* movie envisioned under the 1997 Warner Brothers Deal never came to fruition, and the 1997 Warner Brothers Deal expired, all unbeknownst to Brittle. Warner Brothers continued to be involved with the Warrens for the next 20 years, yet neither party informed Brittle.

69.  In 2009, the defendants obtained, without the consent or permission of Mr. Brittle, Rights that belonged to Mr. Brittle, via The 2009 Option Quitclaim Agreement, also referred to as "2009 OQA." The 2009 OQA is attached hereto as Exhibit 17.

70. In 2011, Lorraine Warren, without the consent of or permission of Mr. Brittle, and more importantly, without legal authority attempted to directly grant New Line rights that belonged to Mr. Brittle in the The 2011 Option Quitclaim Agreement, also referred to as "2011 OQA." The 2011 OQA is attached hereto as Exhibit 18.

71. This 2011 OQA agreement, which was backdated to December 7, 2009, was executed because of assertions made by Warren's counsel, constructively warning New Line that the grant of the Warren's rights, as conveyed by the 2009 OQA, was never valid.

72. The 2011 OQA deal purports to give New Line exclusive ownership of all events, experiences, stories and occurrences "without limitation," and to all of the Warrens' paranormal investigations and experiences.  *See* Exhibit 18.

73. The rights that Mrs. Warren attempted to convey in the  2011 OQA to  New Line could not be conveyed, as those rights already belong to Mr. Brittle.  See Exhibits 1-5, 8.

74. Prior to the 2011 OQA, New Line was already aware of *The Demonologist* and directed Writers (defendants Chad and Carey Hayes) to not read the book, as they did not have rights to it.

75. To satisfy the "Chain-of-Title" condition precedent in the 2011 OQA, the defendants should have conducted proper due diligence, including a detailed search of the rights. If they had done so, Defendants would have easily discovered the contracts and detailed rights related to *The Demonologist*, for which they were already aware.

76. Even assuming that the Warrens attempted to prevent the discovery of Brittle's rights through fraud or other improper means, Warner Brother and New Line had at least two separate and documented occasions (2009 and 2011 OQA) that required them to conduct due diligence, not to mention the 1997 deal. Defendants should have discovered Brittle's tandem rights

associated with *The Demonologist*, as they were aware of the book and its subject matter. At no time did they contact Mr. Brittle, or the publisher to determine the extent of Mr. Brittle's rights.

77. Despite not seeking or securing Mr. Brittle's permission, the defendants went forward and produced *The Conjuring* and associated films, and did not stop these efforts after receiving a cease and desist letter from legal counsel for Brittle. A copy of the cease and desist letter dated September 21, 2015 is attached hereto as Exhibit 19. The response to the cease and desist letter, dated October 20, 2015 is attached hereto as Exhibit 20.

78. Prior to the defendants unlawful commencement of production of *The Nun*, counsel for the defendants were sent a second Cease and Desist letter dated May 1, 2017. A copy of that letter is attached hereto as Exhibit 21.  Upon information and belief, the defendants have since begun production of *The Nun*, and have shown no indications that they intend to cease production. Exhibit 21.

<u>*Defendants Production of The Conjuring Films*</u>
<u>*based on the Warren Case Files and The Demonologist*</u>

79. The defendants films, *The Conjuring*, *The Conjuring 2*, *Annabelle*, *Annabelle 2*, *The Nun and The Conjuring 3* are based on and derived from the Warren Case files and/or *The Demonologist*.

80. The Defendants and Lorraine Warren have all publicly and repeatedly admitted that the Warren Cases, Case Files and related materials have been, and continue to be, used as the basis of the movies within the Defendants' franchise of *The Conjuring* movies, sequels and spin-offs.

81. Mrs. Warren has confirmed that *The Conjuring* movies are based on case files  (that

Brittle has exclusive rights to) on many occasions. For example, in an interview with USA Today, Mrs. Warren stated that the Defendants' *The Conjuring* movie is based on the Warrens' investigation (i.e. Case and Case File):

> Ed Warren died in 2006, but Lorraine, now 86, was a consultant on the film [The Conjuring] and remains a paranormal investigator. She insists that many of the movie's harrowing moments actually happened.
>
> "The things that went on there were just so incredibly frightening," she says, citing her own investigation nearly 40 years ago.

A copy of the article is attached hereto as Exhibit 22.

*82.* The cover page of the very first draft of Defendants' motion picture script for *The Conjuring* by the Chad and Carey Hayes lists the title as the "Untitled Ed and Lorraine Warren Demonologist Project" and being "based on the case files of Ed and Lorraine Warren." A copy of the cover page is attached hereto as Exhibit 22.

83. Warner Brothers and New Line admit that *The Conjuring* is based on the Warren case files in many public statements.

84. James Wan admits that *The Conjuring* films are based off the Warren files (that Brittle has a sole and exclusive right to use) and that he has access to their "repertoire" of cases.

85. Wan admits publicly that he knew the life rights of the Warrens were messy, yet that did not stop him from making these movies in violation of Brittle's rights.  Wan admits that he and Hayes defendant went through the Warrens' "some 4,000 cases" for material to be used in *The Conjuring* film and associated films.

86. On numerous occasions Chad and Carey Hayes admit that *The Conjuring* films are based on the Warren files (that Brittle has exclusive rights to) and that they were privy to the files.

87. Dauberman admits that in performing his work for New Line and Warner Brothers, he

stating "I definitely drew from…I mean why not…based on the Ed and Lorraine Warren Case

files." A video file of the interview is attached hereto as Exhibit 24 on the enclosed zip drive.

*Defendants Improper Movie Production & Overwhelming Similarities Between*
*The Demonologist (and case files) and the Defendants Movies*

88. The following is a chart setting out the basic violations of Brittle's rights as it pertains to

the films released by the defendants to date and those currently in production:

### THE INFRINGING, UNLAWFUL AND MISAPPROPRIATING WORKS

| DEFENDANT'S WORK | INFRINGES ON PLAINTIFF'S COPYRIGHT PROTECTED SUBSIARY RIGHTS | UNLAWFULL UNDER THE NO " COMPETING WORK" PROVISION* (*Prentice Hall Agreement) Exhibit 1 | UNLAWFULL UNDER THE NO UNILATERAL SALE PROVISION‡ (‡Collaboration Agreement) Exhibit 2 at "8." | MISAPPROPRIATES PALINTIFF'S EXCLUSIVE RIGHT TO USE WARREN CASES, CASE FILES AND MATERIALS⁑ (⁑Collaboration Agreement) Exhibit 2 at "11." |
|---|---|---|---|---|
| **ALREADY RELEASED** | | | | |
| THE COJURING | YES | YES | YES | YES |
| THE COJURING 2 | YES | YES | YES | YES |
| ANNABELLE | YES | YES | YES | YES |
| **IN PRODUCTION** | | | | |
| ANNABELLE 2 | YES | YES | YES | YES |

| THE NUN | YES | YES | YES | YES |
|---------|-----|-----|-----|-----|
| **ANNOUNCED/PRELIMINARY SCRIPTING** | | | | |
| CONJURING 3 | YES | YES | YES | YES |

### *The Conjuring*

89. *The Conjuring* was released on July 19, 2013 and has made at least $318,000,141 at the box office worldwide to this day.

90. James Wan, who previously read *The Demonologist* became a full writing partner with the Hayes' defendant on the script for *The Conjuring* and supervised the Hayes' defendants in the script development.

91. Wan made specific changes to the script, directing the Hayes' defendants to incorporate almost word for word the entire Annabelle Chapter of *The Demonologist* book into *The Conjuring* script.

92. In a January 30, 2012, email from *The Conjuring* screenplay writers, with the subject line "James' [Wan] revised opening and other tweaks," the Hayes' defendants delineate the changes Wan specifically incorporated into their latest version (the shooting script) of *The Conjuring* movie. *See* Exhibit 25.

93. The email (Exhibit 25) has attached to it a "production draft" of their script as an attachment. The production draft is attached hereto as Exhibit 26.

94. Wan's changes, identified in the script pages with asterisks (Ex. 26), were maintained in

the final shooting script for *The Conjuring* which began production approximately thirty days after the January 30, 2012 email and script were sent.

95. The chart attached hereto as Appendix A and incorporated by express reference, details the vast and overwhelming similarities between the Chapter III- Annabelle from *The Demonologist* and the defendants' shooting script from *The Conjuring*. A cursory review shows that the similarities are not just substantial, but are also striking.

96. The striking similarities have even been observed by independent scholars in the academic world. For example, Dr. Bernice M. Murphy of the School of English, Trinity College (Dublin, Ireland) who lectures on horror and gothic themes in music and literature, and has taught courses that have included *The Conjuring* movie, wrote that "[m]any of the beliefs espoused by the Warren's during the film- as well as, in particular, the "Annabelle" sequence- appear to come word-for-word from Gerald Daniel Brittle's *The Demonologist: The Extraordinary Career of Ed and Lorraine Warren.*

*97.* The virtually identical copying by the defendants of the Annabelle chapter of *The Demonologist* in their opening of *The Conjuring* film, as evidenced by the Hayes Brothers' shooting script, is clear and unmistakable upon comparison of these two works. It amounts to a wholesale misappropriation of Brittle's original expression found in *The Demonologist*.

98. *The Conjuring* was based off the Warrens' Perron Farmhouse case file,  a file that Brittle has a sole and exclusive right to.

99. The defendants did not and have not sought permission from Brittle for these rights.

100. Defendants' entire franchise of *The Conjuring* motion pictures, each and every one, willfully ignores and then infringes on Plaintiff's subsidiary motion picture rights to *The Demonologist*, in violation of 17 U.S.C. § 106. Said subsidiary motion picture rights consist of

his exclusive copyright protected rights (i.e., reproduction, distribution, public performance and exclusive right to authorize derivative works, among others) in and to the book.

### The Conjuring 2

101.        *The Conjuring 2* was released on June 10, 2016, and has made at least $311,270,008 at the box-office worldwide to this day.

*102.*        The Defendants' pre-production and production publicity for *The Conjuring 2: The Enfield Poltergeist* movie stated that *The Conjuring 2* was also based on the cases of Ed and Lorraine Warren.

103.        The defendants did not have the right to use those files for *The Conjuring 2*, or for any other project.

104.        In the "Enfield Voices" chapter of *The Demonologist*, part of Brittle's original expression was his comparison of the Warren's Enfield case with their investigation of the Amityville case. This comparison is his protected expression, yet Defendant Wan who read Brittle's book and declared that it was the "scariest" book he ever read, misappropriated and used this protected expression as the canvas on which *The Conjuring 2* movie is based – that same comparison of those two cases.

105.        In *The Conjuring 2*, the upside down crucifix is an example of infringement on Brittle's rights.  Again, this protected expression is neither Wan's nor the Defendants independent creative effort, but it is merely taken directly from Brittle's *The Demonologist*. In the Enfield voices chapter of *The Demonologist* it describes crucifixes inverting by themselves:

> Lorraine suddenly jumps up from the couch and strides purposefully
> to the bedroom door. She then calls to Ed. Upon checking, the room
> reeks of alcohol; and on Lorraine's dresser, an ornamental crucifix
> set in a grotto is turned upside down!

106.        In the *Conjuring 2*, there is a demonic nun character that once again was not

Wan's original idea as he claims. The Beyond Amityville chapter of *The Demonologist* provides:

> we're going to England to try to get a photograph of the Brown Lady of
> Raynham Hall…. Not far from there is Borley, the most haunted area in
> England. Both Lorraine and I have seen the Borley Nun walking along the
> road…

107.     Wan did not create "The Nun" character; he took it directly from Brittle's *The Demonologist*. The infringement of Brittle's creative expression, his copyright protected subsidiary motion picture rights, and his exclusive right to authorize derivative works is evident.

108.     The Conjuring 2 reportedly uses sound recordings from the Warrens, which is material that Brittle has sole and exclusive rights to use.

### *Annabelle*

109.     Annabelle was released on October 3, 2014, and has made at least $256,873,813 at the box-office worldwide to this day.

110.     The scenes and footage of the Annabelle scenes in *The Conjuring,* which were copied from *The Demonologist* were reused and repurposed in the *Annabelle* movie, replicating their prior infringement, as detailed above.

111.     The chart attached hereto as Appendix B, shows the detailed similarities between the Chapter III- Annabelle from *The Demonologist* and scene from the *Annabelle* movie. A cursory review shows that the similarities are not just substantial, but are also striking.

112.     The actors who have starred in *The Conjuring* films looked to *The Demonologist* for guidance.

113.     In two separate interviews actress Vera Farmiga (who stars as Ms. Warren in the *The Conjuring* franchise admits that she read Brittle's *The Demonologist* as her main research to prepare for her role and knows "every detail about the Annabelle doll…" from Brittle's work.

114.     Other actors also looked to Brittle's *The Demonologist* for guidance for their

roles, which is not surprising considering the defendants' decision to take material directly from *The Demonologist*.

### Annabelle 2, The Nun, The Conjuring 3

115.     Unlike *The Conjuring, Annabelle and The Conjuring 2*, which have been released, *Annabelle 2*, *The Nun*, *The Conjuring 3* are either in production or pre-production phases.

116.     Despite receiving multiple cease and desist letters, the defendants continued to move forward with these projects, all which are derivative from Brittle's *The Demonologist* and/or from the case files that Brittle has sole and exclusive rights to use. *See* Exhibits 19 & 21.

117.     There can be no question that the Defendants:

(i) misappropriated Brittle's exclusive "right to use" the Warren Cases, Case Files and related materials;

(ii) conspired with Lorraine Warren to misappropriate and violate Plaintiff's exclusive "right to use" the Warren Cases, Case Files and related materials;

(iii) induced Mrs. Warren into violation the no "Competing Work" provision of the Prentice Hall Agreement (Exhibit 1), which remains bound in full force and effect to this day;

(iv) conspired with Lorraine Warren to violate the no "Competing Work" provision of the Prentice Hall Agreement (Exhibit 1); and

(v) infringed on Brittle's copyright protected rights contained in his subsidiary rights to *The Demonologist* (including but not limited to his subsidiary motion picture rights, rights of reproduction, distribution and right to authorize derivative works.

### Count I: Copyright Infringement- The Conjuring
### (Against All Defendants)

118.     Plaintiff re-allege and incorporate herein by reference the allegations set forth

in paragraphs 1 through 117, inclusive, as though fully set forth herein.

119.     There is not now, nor has there ever been any agreement between any of the Defendants and Brittle conveying any of Brittle's rights. Brittle did not convey his copyright protected rights, his separate and unrelated non-copyright protected rights, or his property to Defendants as delineated herein.

120.     At no time has Brittle consented to Defendants unlawful conduct described herein. Plaintiff never executed any assignment of copyright regarding *The Demonologist* book itself and his mutual consent is required per the Collaboration Agreement. Brittle also never granted any of the Defendants any license with respect thereto, whether exclusive or nonexclusive.

121.     Brittle never executed any assignment of the copyright protected subsidiary film rights to *The Demonologist* with or to the defendants, rights which he and he alone exclusively owns. These subsidiary film rights owned only by the Plaintiff do not require any consent other than his for sale or license of same. This includes his subsidiary film rights and the copyright protected rights of reproduction, distribution, performance, display as well as the exclusive right to authorize and make derivative works. Nor did Plaintiff ever grant any of the Defendants any license with respect thereto, whether exclusive or nonexclusive.

122.     To the extent (if any) that one or more of the Defendants purports to believe to have received some sort of implicit authorization from Plaintiff to exploit any of his copyright protected rights, Brittle and his counsel unequivocally informed Defendants that no such authorization exists on multiple occasions. Exhibits 19 and 21. Despite these notices, Defendants have continued to use and exploit Brittle's copyright protected rights without any right or authority.

123.    Defendants' copyright infringement has been and continues to be intentional, willful and with full knowledge of Brittle's copyright protected rights.

124.    By reason of Defendants' infringement, Brittle has sustained and will continue to sustain substantial injury, loss and damage to his owned copyright protected subsidiary film rights in *The Demonologist*.

125.    There is no question that if the trier of fact from the intended audience, the general public, engages in a comparison of *The Conjuring* movie and *The Demonologist* or between the *Annabelle* movie and *The Demonologist*, or even with *The Conjuring 2* and Brittle's book they would conclude that from their perspective, the "total concept and feel" of the compared works are sufficiently intrinsically similar to give rise to a valid infringement claim.

126.    The extrinsic similarities between Brittle's protected works, and the defendants' *The Conjuring*, *Annabelle* and *The Conjuring 2*, such as those found in plot, theme, dialogue, mood, setting, pace, or sequence is overwhelming.

127.    Further irreparable harm to Plaintiff is imminent as a result of Defendants' conduct and Brittle is without an adequate remedy at law. Brittle is entitled to a preliminary and permanent injunction restraining Defendants, their successors, assigns, licensees, agents, representatives and all persons acting in concert with them from engaging in additional such acts of copyright infringement.

128.    The defendants had access to the plaintiff's work prior to the script first film in *The Conjuring* franchise being written.

129.    Each of the motion pictures in defendants' *The Conjuring* franchise of films not only infringes on Brittle's copyright protected subsidiary motion picture rights, they are each additionally an unauthorized derivative work. Plaintiff alone owns and controls the copyright

protected subsidiary film rights to *The Demonologist* book inclusive of the exclusive the exclusive right to authorize, or not authorize, any derivative works. Plaintiff has never authorized the Defendants to make any such derivative works as the have and continue to do, despite being notified in writing to cease and desist from doing so.

130.     Brittle  is entitled to recover from Defendants the damages, including pre-judgment interest it sustained and will sustain, and any income, gains, profits, and advantages obtained by Defendants as a result of their wrongful acts alleged hereinabove, in an amount which cannot yet be fully ascertained, but which shall be assessed at the time of trial. Brittle is further entitled to his attorney's fees and full costs pursuant to 17 U.S.C. § 505.

***Count II: Copyright Infringement- Annabelle***
***(Against All Defendants)***

131.     Plaintiff re-allege and incorporate herein by reference the allegations set forth in paragraphs 1 through 130, inclusive, as though fully set forth herein.

132.     By their production and release of the *Annabelle* film, a motion picture derived from Plaintiff's *The Demonologist*, Defendants knowingly and willfully infringed, and do continue to infringe, Plaintiff's copyright protected rights of performance, distribution, reproduction and exclusive right to authorize derivative works contained within his subsidiary motion picture rights to The Demonologist.

133.     Plaintiff placed Defendants on notice of their infringement, but Defendants continue to willfully infringe Plaintiff's rights under copyright, in disregard of and indifference to Plaintiff's rights.

134.     Defendants' acts of direct, contributory, and/or vicarious copyright infringement are willful, deliberate, and in utter disregard of Brittle's copyright protected rights pursuant to the Copyright Act, 17 U.S.C. § 504.

135.    As a direct and proximate result of Defendants' copyright infringement, Plaintiff has suffered and will continue to suffer severe injuries and harm, much of which cannot be reasonably or adequately measured or compensated in money damages and certainly if such wrongful conduct is allowed to continue unabated. The ongoing harm this wrongful conduct will continue to cause Plaintiff is both imminent and irreparable. Plaintiff's injuries and damages include, but are not limited to, loss of customers, dilution of goodwill, injury to his reputation, and diminution of the value of his intellectual property.

136.    Pursuant to 17 U.S.C. § 502, Plaintiff is entitled to a preliminary injunction, during the pendency of this action, and to a permanent injunction enjoining Defendants, their officers, agents and employees, and all persons acting in concert with them, from engaging in such further violations of the Copyright Act.

137.    Plaintiff is further entitled to recover from Defendants the damages, including prejudgment interest he sustained and will sustain, and any income, gains, profits, and advantages obtained by Defendants as a result of their wrongful acts alleged hereinabove, in an amount which cannot yet be fully ascertained, but which shall be assessed at the time of trial. Plaintiff is further entitled to his attorney's fees and full costs pursuant to 17 U.S.C. § 505.

### Count III: Copyright Infringement- The Conjuring 2
### (All Defendants)

138.    Plaintiff re-allege and incorporate herein by reference the allegations set forth in paragraphs 1 through 137, inclusive, as though fully set forth herein.

139.    At no time did Plaintiff consented to Defendants' unlawful conduct described herein. Plaintiff never executed any assignment of copyright regarding his copyright protected rights as described herein, nor did he ever grant any of the Defendants any license with respect thereto, whether exclusive or nonexclusive.

140.     By their production and release of their *The Conjuring 2* film, a motion picture

derived from Plaintiff's *The Demonologist*, Defendants knowingly and willfully infringed, and

do continue to infringe, Plaintiff's copyright protected rights of performance, distribution,

reproduction and exclusive right to authorize derivative works contained within his subsidiary

motion picture rights to *The Demonologist*.

141.     Plaintiff placed Defendants on notice of their infringement, but Defendants

continue to willfully infringe Plaintiff's rights under copyright, in disregard of and indifference

to Plaintiff's rights.

142.     Defendants' acts of direct, contributory, and/or vicarious copyright infringement

are willful, deliberate, and in utter disregard of Brittle's copyright protected rights pursuant to the

Copyright Act, 17 U.S.C. § 504.

143.     As a direct and proximate result of Defendants' copyright infringement,

Plaintiff has suffered and will continue to suffer severe injuries and harm, much of which cannot

be reasonably or adequately measured or compensated in money damages and certainly if such

wrongful conduct is allowed to continue unabated. The ongoing harm this wrongful conduct will

continue to cause Plaintiff is both imminent and irreparable. Plaintiff's injuries and damages

include, but are not limited to, loss of customers, dilution of goodwill, injury to his reputation,

and diminution of the value of his intellectual property.

144.     Pursuant to 17 U.S.C. § 502, Plaintiff is entitled to a preliminary injunction,

during the pendency of this action, and to a permanent injunction enjoining Defendants, their

officers, agents and employees, and all persons acting in concert with them, from engaging in

such further violations of the Copyright Act.

145.     Plaintiff is further entitled to recover from Defendants the damages, including

prejudgment interest he sustained and will sustain, and any income, gains, profits, and advantages obtained by Defendants as a result of their wrongful acts alleged hereinabove, in an amount which cannot yet be fully ascertained, but which shall be assessed at the time of trial. Plaintiff is further entitled to his attorney's fees and full costs pursuant to 17 U.S.C. § 505.

### *Count IV: Common Law Trespass to Chattels*
### *(All the Defendants)*

146.     Plaintiff re-allege and incorporate herein by reference the allegations set forth in paragraphs 1 through 117, inclusive, as though fully set forth herein.

147.     Defendants are jointly and severally liable for their conduct by acting in concert to produce an indivisible injury, and acting pursuant to a common purpose to harm the plaintiff.

148.     At no time did Plaintiff consent to Defendants' unlawful conduct described herein. Plaintiff never executed any assignment of property as described herein, nor did he ever grant any of the Defendants any license with respect thereto, whether exclusive or nonexclusive.

149.     Defendants have used property, rights and information granted exclusively to Plaintiff without the consent of Plaintiff and with the intent to diminish the value of Plaintiff's exclusive rights.

150.     Defendants' actions in exploiting Plaintiff's exclusive right to use the Warren's Case files were unlawful and unauthorized.

151.     Defendants' actions have caused injury to Plaintiff, and have interfered with Plaintiff's ability to exploit the commercial value of his exclusive rights.

152.     Defendants' conduct was malicious, deliberate, and willful, or in the alternative at least grossly negligent.

153.     By virtue of Defendants' acts, Plaintiff is entitled to recover his actual damages

And Defendants' proceeds they derived from the exploitation of their *The Conjuring* franchise of films in an amount to be proved at trial, Plaintiff's attorneys' fees and costs of suit, and all other relief allowed.

154.     Plaintiff is entitled to a preliminary injunction, during the pendency of this action, and to a permanent injunction enjoining Defendants, their officers, agents and employees, and all persons acting in concert with them, from engaging in further misappropriation of Plaintiff's property (the exclusive right to use the Warren Cases, Case Files and related materials).

155.      As a direct result of Defendants' actions, Plaintiff has suffered and continues to suffer irreparable harm for which no adequate remedy at law exists, and which will continue unless Defendant's actions are enjoined.

156.     Plaintiff seeks injunctive relief and compensatory and punitive damages in an amount to be proven at trial.

### Count V: Statutory Business Conspiracy
### (Against All Defendants)

157.     Plaintiff re-allege and incorporate herein by reference the allegations set forth in paragraphs 1 through 117, inclusive, as though fully set forth herein.

158.     Defendants and Lorraine Warren combined together to deprive Plaintiff of his exclusive rights to use and exploit the Warren Cases and his subsidiary film rights to *The Demonologist*.

159.     At no time did Plaintiff consent to Defendants' unlawful conduct described herein. Plaintiff never executed any assignment of property as described herein, nor did he ever grant any of the Defendants any license with respect thereto, whether exclusive or nonexclusive.

160.     The intentional and knowing actions taken by Defendants resulted in the

misappropriation of Brittle's exclusive rights. Rights that the defendants were fully aware of at all times relevant to this litigation.

161.     Through their course of conduct, Lorraine Warren purported to sell to Defendants, and Defendants purported to acquire the same bundle of rights in the Warren Cases that Lorraine Warren had previously granted to Plaintiff.

162.     Defendants and Lorraine Warren acted intentionally, purposely, and without lawful justification in creating, marketing, and distributing films based upon the Warren Cases. Defendants acted either with actual knowledge that such exploitation was in violation of the previously acquired by Plaintiff, or with willful disregard for Plaintiff's rights.

163.     Defendants acted in concert with  Lorraine Warren to  intentionally, purposely, and without lawful justification in creating, marketing, and distributing films that deprive Plaintiff of the opportunity to exploit his subsidiary film rights to *The Demonologist*. Defendants acted with actual knowledge that such exploitation was in violation of the exclusive contractual rights owed by the Plaintiff.

164.     Plaintiff is an author. His business assets include, among other things, literary rights in his works of authorship, subsidiary rights deriving from his works of authorship, and rights he owns in original source material.

165.     The actions of Defendants and Lorraine Warren have deprived Plaintiff of his ability to commercially exploit his exclusive rights in the Warren Cases, a valuable business asset and a property right under Virginia law, as evidenced by the profits derived the defendants via their unlawful conduct.

166.     By virtue of Defendants' acts, Brittle is entitled to recover damages equal to

Defendants entire profits generated by the exploitation of their entire franchise of *The Conjuring*, movies in an amount to be proved at trial, but upon information and belief exceeding $300,000,000.

167.     Pursuant to Code of Virginia § 18.2- 500, Plaintiff is entitled to recover treble damages, including loss of profits, he sustained as a result of the illegal conspiracy among Defendants and Lorraine Warren, and the costs of suit, including reasonable attorney's fees. Plaintiff, upon information and belief estimates this amount to be approximately $900,000,000.

168.     Pursuant to Code of Virginia § 18.2- 500, Plaintiff further requests that this court temporarily and permanently enjoin Defendants from any further action causing harm to Plaintiff's exclusive rights to use the Warren Cases.

*169.*     Because of Defendants unlawful actions in connection with *The Conjuring*, *The Conjuring 2*, *Annabelle*, *Annabelle 2* and *The Nun*, Plaintiff has suffered and will continue to suffer severe injuries and harm, much of which cannot be fully measured or compensated in monetary damages and certainly if such wrongful conduct is allowed to continue unabated. The ongoing harm this wrongful conduct will continue to cause Plaintiff is both imminent and irreparable. Plaintiff's injuries and damages include, but are not limited to, loss of customers, dilution of goodwill, injury to his reputation, and diminution of the value of his property.

### Count VI: Conversion
### (All defendants)

170.     Plaintiff re-allege and incorporate herein by reference the allegations set forth in paragraphs 1 through 117, inclusive, as though fully set forth herein.

171.     At no time did Plaintiff consent to Defendants' unlawful conduct described herein. Plaintiff never executed any assignment of property as described herein, nor did he ever grant any of the Defendants any license with respect thereto, whether exclusive or nonexclusive.

172.     Plaintiff owns the sole and exclusive right to use certain property, including but not limited to, the Warren Cases, the Warren Case Files and related materials pursuant to the Collaboration Agreement (Exhibit 2). Defendants have interfered with, unlawfully and without authorization, and dispossessed Plaintiff of his exclusive rights and property.

173.     Plaintiff exclusively owns the exclusive right to use all the Warren Cases as discussed herein, including the exclusive right to use the Warren's investigations of Amityville, Enfield, Annabelle, Borley Rectory (Borley Nun) and the Perron Farmhouse/The Conjuring cases, as well as all the materials and vocal recollections related to same. Defendants have interfered with, unlawfully and without authorization, and dispossessed Plaintiff of his exclusive contractual rights (i.e., his property rights under Virginia law).

174.     Defendants have, without authority, and with the intent to profit, converted and used Brittle's exclusive right to use the Warren Cases, Case Files and related materials owned by Plaintiff to their own benefit, thereby extinguishing Plaintiff's exclusive rights and any value associated therewith.

175.     By virtue of Defendants' acts, Plaintiff is entitled to recover his actual damages and Defendants' profits they derived from the exploitation of their *The Conjuring* franchise of films in an amount to be proved at trial, plus attorneys' fees and costs of suit, and all other relief deemed proper by this Court.

176.     Plaintiff further seeks injunctive relief and compensatory and punitive damages in an amount to be proven at trial, including without limitation the return of Defendants' ill-gotten profits.

177.     As a direct result of Defendants' actions, Plaintiff has suffered and continues to

suffer irreparable harm for which no adequate remedy at law exists, and which will continue unless Defendant's actions are enjoined.

178.     Plaintiff is entitled to a preliminary injunction, during the pendency of this action, and to a permanent injunction enjoining Defendants, their officers, agents and employees, and all persons acting in concert with them, from engaging in further misappropriation and conversion of Plaintiff's property and rights.

### Count VII: Tortious Interference with Contract
### (Against Defendants New Line, Warner Bros. Entertainment, James Wan, Chad Hayes, Carey Hayes, Gary Dauberman and certain John Doe Defendants)

179.     Plaintiff re-allege and incorporate herein by reference the allegations set forth in paragraphs 1 through 117, inclusive, as though fully set forth herein.

180.     Plaintiff has valid and existing contract rights pursuant to the Collaboration Agreement through which he obtained and owns the exclusive right to use the Warren Case, Case Files and related materials as detailed above.

181.     Warren, New Line, Warner Bros. Entertainment, James Wan, Chad Hayes, Carey Hayes, Gary Dauberman, and possibly other Defendants, have and have had actual knowledge of Plaintiff's valid and existing contract rights, at all times relevant to this litigation.

182.     Despite having actual knowledge of Plaintiff's exclusive rights to use the Warren Cases via the Collaboration Agreement, Defendants created and distributed *The Conjuring*, *The Conjuring 2* and *Annabelle* and are preparing for the release of three more Conjuring franchise movie in violation of Brittle's contractual rights.

183.     *The Conjuring*, *Annabelle*, and *Conjuring 2* all exploit the same rights Warren previously granted exclusively to Brittle and Brittle has not consented to the use in any movie or film of any of the material in which he owns exclusive rights.

*184.*     Because of Defendants unlawful use of such rights in connection with *The Conjuring*, *The Conjuring 2* and *Annabelle,*  Brittle has suffered and will continue to suffer severe injuries and harm, much of which cannot be reasonably or adequately measured or compensated in monetary damages and certainly if such wrongful conduct is allowed to continue unabated. The ongoing harm this wrongful conduct will continue to cause Plaintiff is both imminent and irreparable. Plaintiff's injuries and damages include, but are not limited to, loss of customers, dilution of goodwill, injury to his reputation, and diminution of the value of his property.

185.     The actions of Warren, New Line, Warner Bros. Entertainment, James Wan, Chad Hayes, Carey Hayes, Gary Dauberman, and possibly other Defendants are not accidental or unintentional.

186.     By virtue of Defendants' acts, Plaintiff is entitled to recover his actual damages and Defendants' proceeds they derived from the exploitation of their *The Conjuring* franchise of films in an amount to be proved at trial, Plaintiff's attorneys' fees and costs of suit, and any and all other relief the Court deems appropriate.

### Count VIII: Injunction
### (Against All Defendants)

187.     Plaintiff re-allege and incorporate herein by reference the allegations set forth in paragraphs 1 through 186, inclusive, as though fully set forth herein.

188.     Unless enjoined and restrained by order of the Court, Defendants' conduct will infringe Plaintiffs' copyrights and interests, through the continued production, release and distribution of *The Conjuring* films, including the upcoming films in this series, including but not limited to those currently in production.

189.     By reason of Defendants' ongoing or imminent copyright infringement and

Defendants' other improper conduct, as set forth in this Complaint,   Brittle has sustained and, unless and until Defendants are enjoined, will continue to sustain substantial imminent and irreparable injury, loss and damage, including repeated infringement of  and interests, diminution of the value of his copyrights and interests, loss of customers, dilution of goodwill, and injury to his business reputation.

190.     Brittle has no adequate remedy at law for many of his injuries in that such injuries cannot be reasonably, adequately or precisely measured or compensated in monetary damages if such wrongful conduct is not restrained and allowed to continue unabated.

191.     Plaintiffs are entitled to a preliminary injunction during the pendency of this action and a permanent injunction ordering that Defendants, their agents, employees, licensees and assigns be enjoined from producing, reproducing, distributing and exploiting or authorizing the production, reproduction, distribution or exploitation of *The Conjuring* film franchise, ancillary products based thereon, derived from *The Demonologist* and/or materials that Brittle has sole and exclusive rights to use.

### *Count IX: Violation of the Lantham Act § 43(a), 15 U.S.C. § 1125*

192.     Plaintiff re-allege and incorporate herein by reference the allegations set forth in paragraphs 1 through 191, inclusive, as though fully set forth herein.

193.     Brittle and the defendants are competitors for the purposes of selling horror and or paranormal stories to the public.

194.     Defendants have and continue to willfully misrepresent in their commercial advertising and promotional materials for *The Conjuring* and the associated films (*Annabelle* and *The Conjuring 2*), the origin of the materials and story, ignoring *The Demonologist* upon which such derivative works are actually based, all with an intention to mislead and misrepresent the

nature, characteristics and qualities of Defendants' goods, services or commercial activities to the general public.

195.     Defendants' false representations, which are in violation of the Lantham Act, have caused and are likely to continue causing Brittle competitive or commercial injury, including, but not limited to, loss of sales, loss of goodwill, and the loss of his ability to monetize his intellectual property rights.

196.     Defendants, in connection with the marketing and sale of *The Conjuring* and associated films (*Annabelle* and *The Conjuring 2*) have made and continue to make false and/or misleading representations of fact in commercial advertising used in interstate commerce.

197.     Defendants have and continue to willfully misrepresent in their commercial advertising and promotional materials for *The Conjuring* and the associated films, claiming that they are based on a true story.

198.     The advertisements, including, but not limited to, the movie posters and trailers for *The Conjuring* are false and/or misleading because they provide that the movie is "Based on the True Case Files of the Warrens" or "Based on Real Events."

199.     The advertisements, including, but not limited to, the movie posters and trailers for *Annabelle* are false and/or misleading because they provide that "Before The Conjuring there was Annabelle." Thus, the advertisements for *Annabelle* adopt the advertisements for *The Conjuring* and convey the appearance that *Annabelle* is based on real events.

200.     The advertisements, including, but not limited to, the movie posters and trailers for *The Conjuring 2* are false and/or misleading because they provide that the movie is "The Next True Story from the Case Files of Ed and Lorraine Warren" or "Based on the True Case Files of the Warrens."

201.     The defendants knew, prior to marketing *The Conjuring* and associated films, that the films were not based on true stories, yet elected to proceed in this deceitful manner.

202.     The defendants also knew, prior to marketing *The Conjuring* and associated films, that the films were not based on the true relationship and family dynamic between Ed and Lorraine Warren yet elected to proceed in this deceitful manner.

203.     The defendants elected to falsely market these films as true because they knew that modern day audiences crave true stories and that the public is more likely to purchase tickets to movies promoted as such. The false statements were made for the purpose of increasing profits, and without concern for deceiving the public.

204.     Defendants' representations deceived and/or are likely to deceive consumers, and the defendants made these representations with that express intention.

205.     Defendants' false representations constitute false advertising in violation of Section 43(a)(1)(B) of the Lanham Act, codified as U.S.C. § 1125(a)(1)(B).

206.     Defendants' false representations have caused and are likely to continue causing Brittle competitive and commercial injury, including, but not limited to, loss of sales, loss of goodwill, and the loss of his ability to monetize his intellectual property rights.

207.     The Defendants submitted copyright applications for their films that willfully and incorrectly identified Chad and Carey Hayes as the sole writers, omitting any credit to Brittle, in contravention of Brittle's registered copyright to *The Demonologist* book.

208.     By purposefully not providing the correct attribution to Brittle for the extensive materials that were copied from *The Demonologist* in *The Conjuring* script and corresponding motion picture (and associated films), inclusive of; but not limited to, the on-screen credits for the Defendants' aforementioned movies and in their worldwide advertising publicity for same,

the defendants' deliberately harmed Brittle, his reputation as a serious author and also served to confuse the public.

209.     Defendants intentionally removed and/or altered/ or omitted the copyright management information contained in *The Demonologist* copyright registration (i.e., Brittle's authorship) with the intent to induce, enable, facilitate, or conceal an infringement of Plaintiff's rights under the Copyright Act. Defendants have replaced such correct information with false, altered, and inaccurate copyright management information, which falsely identifies one or more Defendants, or another person or entity, that has no copyright ownership interest as the creator and owner of copyright protected material contained in *The Demonologist* book.  This claim of intentionally removed and/or altered the copyright management information is separate violation of the Lantham Act.

210.     Plaintiff are informed and believe and thereon allege that the Defendants, notwithstanding their knowledge to the contrary, falsely represented to third parties that they have the rights to exploit theatrical motion picture and ancillary rights to the material on which *The Conjuring* film, and associated films (*The Conjuring 2*, *Annabelle*, *Annabelle 2*, *The Nun,* and *The Conjuring 3*)  is based and willfully omitted disclosure of the true status of such rights to such third parties, and that based upon such false claims, representations and omissions, Defendants have induced such third parties enter into agreements with them, including but not limited to agreements to develop, produce and distribute *The Conjuring* and associated films, and to license ancillary derivative products based thereon, all of which is derived from *The Demonologist* and /or other materials that Brittle had sole and exclusive rights to use.

211.     Defendants used such  misrepresentations and omissions in interstate commerce

in order to induce others to enter into contracts or other forms of business arrangements with Defendants. Such actions constitute the use of false description or representation in interstate commerce, likely to cause confusion, mistake or to deceive and is in opposition to the protection of the public interest.

212.     Defendants will likely continue such misrepresentations and omissions, thus wrongfully misappropriating and encumbering Brittle's rights to the use and enjoyment of his intellectual property and the goodwill attendant thereto, and resulting in likely confusion of and a fraud on the public.

213.     As a direct and proximate cause of Defendants' unfair trade practices and unfair competition, Brittle has suffered and will continue to suffer severe injuries and harm, much of which cannot be reasonably or adequately measured or compensated in damages if such wrongful conduct is allowed to continue unabated. The ongoing harm this wrongful conduct will continue to cause Brittle is both imminent and irreparable. Plaintiff's injuries and damages include but are not limited to loss of fair compensation for his intellectual property, loss of customers, dilution of goodwill, injury to their business reputation, and diminution of the value of his intellectual property.

214.     By reason of the foregoing, Defendants have violated and continue to violate the Lanham Act, 15 U.S.C. §§ 1117 and 1125.

215.     Plaintiffs are entitled to an injunction, during the pendency of this action, and permanently (i) enjoining Defendants, their officers, agents and employees, and all persons acting in concert with them, from engaging in such further violations of the Lanham Act, 15 U.S.C.§§ lll7and 1125.

216.     Plaintiffs have no adequate remedy at law with respect to these ongoing

violations.

217.    Plaintiffs are further entitled to recover from Defendants the damages, including attorneys' fees and costs, it sustained and will sustain, and any income, gains, profits and advantages obtained by Defendants as a result of their wrongful acts and omissions alleged hereinabove, in an amount which cannot yet be fully ascertained, but which shall be assessed at the time of trial.

WHEREFORE, plaintiff Gerald Brittle respectfully prays that this Court will grant relief and judgment against the defendants, jointly and severally, as follows:

1. Grant a temporary and permanent injunction enjoining (a) the defendants from producing, reproducing, distributing and exploiting or authorizing the production, reproduction, distribution or exploitation of *The Conjuring* film franchise, ancillary products based thereon, derived from *The Demonologist* and/or materials that Brittle has sole and exclusive rights to use, (b) enjoining Defendants, their officers, agents and employees, and all persons acting in concert with them, from engaging in such further violations of the Lanham Act, 15 U.S.C.§§ lll7and 1125;

2. Enter an order that Defendants' products and materials that infringe Brittle's copyright, including but not limited to any of Defendants' masters, tapes, film negatives (digital or physical film, raw, edited or unedited, released or unreleased to the public), and other articles by which copies of the works embodied in Brittle's copyright may be reproduced, be impounded pursuant to 17 U.S.C. § 503(a);

3. For an accounting and restitution to Plaintiff of all gains, profits and advantages Defendants have derived from their production, distribution and exploitation of: (i) *The Conjuring*; (ii) *The Conjuring 2*; and (iii) The *Annabelle* film, and from their copyright infringement of Brittle's copyright protected rights contained within his subsidiary film rights in

43

and to *The Demonologist*, as well as any increase in Time Warner's stock price or premium to be paid to it in the event of a merger or acquisition of the company;

4.   Award compensatory damages to Brittle in the amount of $300,000,000 which should then be trebled to $900,000,000;

5.   Award punitive damages to Brittle in an amount to be determined at trial;

6.   Award Brittle prejudgment and post-judgment interest on all damages incurred;

7.   Award Brittle his costs and attorney's fees incurred in pursuing this action;

8.   Granting Brittle any other and further relief as the Court deems just and appropriate.

TRIAL BY JURY IS DEMANDED.

GERALD BRITTLE

By:_____/s/_____
          Counsel


Bradley P. Marrs (VSB#25281)
Patrick C. Henry II (VBS#80468)
Marrs & Henry
7202 Glen Forest Drive, Suite 307
Richmond, VA  23226
(804) 662-5715
(804) 662-5712 (fax)
bmarrs@marrs-henry.com
phenry@marrs-henry.com

## **CERTIFICATE OF SERVICE**

I hereby certify that on this 16th day of May, 2017, a true and accurate copy of the foregoing was served via ECF procedures of this Court to the following counsels of record:

J. Benjamin Rottenborn (VSB #84796)
WOODS ROGERS PLC
Wells Fargo Tower, Suite 1400
10 S. Jefferson Street
Roanoke, Virginia 24011
Telephone: 540-983-7600
Fax: 540-983-7711
brottenborn@woodsrogers.com

Matthew T. Kline, Esq.
Lauren Rakow, Esq.
O'MELVENY & MYERS LLP
1999 Avenue of the Stars, 8th Floor
Los Angeles, California 90067
Telephone: 310-246-6840
Fax: 310-246-6779
mkline@omm.com
lrakow@omm.com

Laura Lorenz, Esq.
O'MELVENY & MYERS LLP
1625 Eye Street, NW
Washington, D.C. 20006
Telephone: 202-383-5300
Fax: 202-383-5414
llorenz@omm.com

_____/s/_____
Bradley P. Marrs (VSB#25281)
Patrick C. Henry II (VBS#80468)
Marrs & Henry
7202 Glen Forest Drive, Suite 307
Richmond, VA  23226
(804) 662-5715
(804) 662-5712 (fax)
bmarrs@marrs-henry.com
phenry@marrs-henry.com
*Counsel for Plaintiff*