UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF VIRGINIA
Richmond Division

|  |  |  |
|---|---|---|
| GERALD BRITTLE, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Case No.: 3:16-cv-00908 |
| | ) | |
| TIME WARNER, INC., et al., | ) | |
| | ) | |
| Defendant. | ) | |
| | ) | |

**DEFENDANTS WARNER BROS. ENTERTAINMENT INC.'S AND
NEW LINE PRODUCTIONS, INC.'S MEMORANDUM OF LAW IN SUPPORT
OF ITS MOTION TO DISMISS PLAINTIFF'S SECOND AMENDED
<u>COMPLAINT PURSUANT TO RULE 12(B)(6)</u>**

# TABLE OF CONTENTS

**Page**

INTRODUCTION ........................................................................................................ 1

I.    Factual and Procedural Background ..................................................... 1

    A.    Ed and Lorraine Warrens' Life Work ....................................... 1

    B.    *The Demonologist* Book ........................................................... 2

    C.    Tony DeRosa-Grund's Involvement with the Warrens and New Line ............................................................................................. 3

    D.    Brittle's Involvement in this Prior Litigation and His Related Admissions............................................................................... 4

    E.    The Current Lawsuit ................................................................. 5

ARGUMENT ............................................................................................................... 6

I.    None Of The *Conjuring* Movies Infringes The Book (Counts I-III, VIII). ........... 6

    A.    Background Legal Principles .................................................... 6

    B.    None of the *Conjuring*-Related Movies Infringes the Book....................... 8

II.    Brittle's Claims Based On The Case Files And His Contracts All Fail As Well, As They Misread The Agreements And Contravene His Prior Admissions.......................................................................................... 19

III.    Brittle's State Law Claims (Counts IV-VII) Are Time Barred, Preempted, And Run Afoul Of California's Anti-SLAPP Statute.......................................... 23

    A.    Governing Law. ....................................................................... 23

    B.    Three of Brittle's State-Law Claims Are Untimely. ................ 24

    C.    All of Brittle's State-Law Claims Are Preempted ................... 25

    D.    Brittle's Claims Run Afoul of California's Anti-SLAPP statute............. 26

IV.    Brittle's Lanham Act Claim (Count IX) Fails For Numerous Reasons................ 27

    A.    Brittle's Lanham Act Claim Is Barred by the First Amendment. ............. 27

    B.    Brittle's Lanham Act Claim Makes No Sense In Any Event, Given The Book.......................................................................... 28

    C.    Brittle's Authorship Claim is Precluded by *Dastar*................................. 29

CONCLUSION............................................................................................................ 30

i

## TABLE OF AUTHORITIES

**Page**

<u>**CASES**</u>

*ABLV Bank v. Ctr. for Advanced Def. Studies Inc.*,
  2015 WL 12517012 (E.D. Va. Apr. 21, 2015) ............................................................... 24, 26

*Acker v. King*,
  46 F. Supp. 3d 168 (D. Conn. 2014) ................................................................................ 17

*AdvanFort Co. v. International Registries, Inc.*,
  2015 WL 2238076 (E.D. Va. May 12, 2015) ...................................................................... 1

*Alexander v. Haley*,
  460 F. Supp. 40 (S.D.N.Y. 1978) ................................................................................ 7, 13

*AmerUS Life Ins. Co. v. Bank of Am., N.A.*,
  143 Cal. App. 4th 631 (2006) .......................................................................................... 24

*Arora v. TD Ameritrade, Inc.*,
  2010 WL 2925178 (N.D. Cal. July 26, 2010) ..................................................................... 4

*Ashcroft v. Iqbal*,
  556 U.S. 662 (2009) ........................................................................................................... 6

*Beaulieu Grp., LLC v. Mohawk Indus., Inc.*,
  2015 WL 11722814 (N.D. Ga. Oct. 26, 2015) ................................................................. 29

*Benay v. Warner Bros. Entm't, Inc.*,
  607 F.3d 620 (9th Cir. 2010) ...................................................................................... 8, 13

*Berkic v. Crichton*,
  761 F.2d 1289 (1985) ....................................................................................................... 17

*Boosey & Hawkes Music Publishers, Ltd. v. Walt Disney Co.*,
  145 F.3d 481 (2d Cir. 1998) ............................................................................................ 22

*Braddock v. Jolie*,
  2013 WL 12125754 (C.D. Cal. Mar. 29, 2013) ............................................................... 12

*Brown v. Flowers*,
  196 F. App'x 178 (4th Cir. 2006) ...................................................................................... 6

*Brown v. Twentieth Century Fox Home Entm't*,
  2015 WL 5081125 (E.D. Ky. Aug. 27, 2015) .................................................................. 17

*Burroghs v. Metro-Goldwyn-Mayer, Inc.*,
  491 F. Supp. 1320 (S.D.N.Y. 1980) ................................................................................ 21

## TABLE OF AUTHORITIES
### (continued)

**Page**

*C.A. Inc. v. Rocket Software, Inc.*,
    579 F. Supp. 2d 355 (E.D.N.Y. 2008) ................................................................... 26

*Cannon v. Bettinger*,
    2009 WL 1594082 (Cal. Ct. App. June 9, 2009) ........................................... 24, 26

*Cobra Capital, LLC v. RF Nitro Commc'ns, Inc.*,
    266 F. Supp. 2d 432 (M.D.N.C. 2003) ................................................................. 24

*Comins v. Discovery Commc'ns, Inc.*,
    200 F. Supp. 2d 512 (D. Md. 2002) ........................................................... 7, 12, 14

*Copeland v. Bieber*,
    789 F.3d 484 (4th Cir. 2015) ................................................................................. 7

*Crane v. Poetic Prods. Ltd.*,
    593 F. Supp. 2d 585 (S.D.N.Y. 2009)......................................................... 8, 12, 14

*Darden v. Peters*,
    488 F.3d 277 (4th Cir. 2007) ........................................................................... 6, 20

*Dastar Corp. v Twentieth Century Fox Film Corp.*,
    539 U.S. 23 (2003).......................................................................................... 29, 30

*DC Comics v. Pac. Pictures Corp.*,
    938 F. Supp. 2d 941 (C.D. Cal. 2013) ................................................................. 25

*Design Res., Inc. v. Leather Indus. of Am.*,
    789 F.3d 495 (4th Cir. 2015) ............................................................................... 28

*Devil's Advocate, LLC v. Zurich Am. Ins. Co.*,
    666 F. App'x 256 (4th Cir. 2016) .......................................................................... 7

*Eaton v. Nat'l Broad. Co.*,
    972 F. Supp. 1019 (E.D. Va. 1997) ......................................................... 11, 12, 18

*Edwards v. Raymond*,
    22 F. Supp. 3d 293 (S.D.N.Y. 2014)......................................................... 6, 11, 13

*Effie Film, LLC v. Murphy*,
    932 F. Supp. 2d 538 (S.D.N.Y. 2013)....................................................... 8, 11, 16

*Ellington v. EMI Music, Inc.*,
    24 N.Y.3d 239 (Ct. App. 2014) ........................................................................... 21

# TABLE OF AUTHORITIES
### (continued)

**Page**

*Feist Publ'ns, Inc. v. Rural Tel. Serv. Co.*,
   499 U.S. 340 (1991) ................................................................................ 7, 8, 11

*Filmvideo Releasing Corp. v. Hastings*,
   446 F. Supp. 725 (S.D.N.Y. 1978) ......................................................... 23

*Food Lion, Inc. v. Capital Cities/ABC, Inc.*,
   194 F.3d 505 (1999) ................................................................................ 27

*Ford Motor Co. v. Nat'l Indem. Co.*,
   972 F. Supp. 2d 850 (E.D. Va. 2013) .................................................... 23, 25

*Fox Searchlight Pictures, Inc. v. Paladino*,
   89 Cal. App. 4th 294 (2011) ................................................................... 26

*Friedman v. ITC Int'l Television Corp.*,
   644 F. Supp. 46 (E.D.N.Y. 1986) .......................................................... 13

*Funky Films, Inc. v. Time Warner Entm't Co., L.P.*,
   462 F.3d 1072 (9th Cir. 2006) ............................................................... 11

*Gardner v. Nizer*,
   391 F. Supp. 940 (S.D.N.Y. 1975) ......................................................... 12

*Gifford v. U.S. Green Bldg. Council*,
   2011 WL 4343815 (S.D.N.Y. Aug. 16, 2011) ........................................ 29

*Golan v. Holder*,
   565 U.S. 302 (2012) ................................................................................ 13

*Great Am. Ins. Co. v. Nextday Network Hardware Corp.*,
   73 F. Supp. 3d 636 (D. Md. 2014) ......................................................... 24

*Greenspan v. Random House, Inc.*,
   859 F. Supp. 2d 206 (D. Mass. 2012) .................................................... 29

*Groden v. Random House*,
   61 F.3d 1045 (2d Cir. 1995) ................................................................... 27

*Harbour v. Farquhar*,
   245 F. App'x 582 (9th Cir. 2007) ........................................................... 30

*Harper & Row Publishers, Inc. v. Nation Enterprises*,
   723 F.2d 195 (2d Cir. 1983) ................................................................... 26

iv

## TABLE OF AUTHORITIES
### (continued)

**Page**

*Hilb Rogal & Hobbs Co. v. Rick Strategy Partners, Inc.*,
   2006 WL 5908727 (E.D. Va. Feb. 10, 2006) ....................................... 25

*Hoehling v. Universal Studios, Inc.*,
   618 F.2d 972 (2d Cir. 1980) ........................................................... 12

*Hogan v. DC Comics*,
   48 F. Supp. 2d 298 (S.D.N.Y. 1999) ............................................... 17

*Houts v. Universal City Studios, Inc.*,
   603 F. Supp. 26 (C.D. Cal. 1984) ............................................... 9, 28

*In re Hughes*,
   353 B.R. 486 (Bankr. N.D. Tex. 2006) ............................................. 22

*Jackson v. Michalski*,
   2011 WL 3679143 (W.D. Va. Aug. 22, 2011) ................................... 30

*Jones v. CBS, Inc.*,
   733 F. Supp. 748 (S.D.N.Y. 1990) .................................................. 18

*Kashian v. Harriman*,
   98 Cal. App. 4th 892 (2002) ........................................................... 27

*Kronemyer v. Internet Movie Data Base, Inc.*,
   150 Cal. App. 4th 941 (2007) ......................................................... 26

*Law Debenture Trust Co. of N.Y. v. Maverick Tube Corp.*,
   595 F.3d 458 (2d Cir. 2010) ........................................................... 23

*Louis Vuitton Malletier S.A. v. Warner Bros. Entm't Inc.*,
   868 F. Supp. 2d 172 (S.D.N.Y. 2012) .............................................. 29

*Magnussen Furniture, Inc. v. Collezione Europa USA, Inc.*,
   116 F.3d 472, 1997 WL 337465 (4th Cir. 1997) ............................... 19

*Maisha v. Univ. of N. Carolina*,
   641 F. App'x 246 (4th Cir. 2016) .................................................... 26

*Midler v. Ford Motor Co.*,
   849 F.2d 460 (9th Cir. 1988) ......................................................... 22

*Name.Space, Inc. v. Internet Corp. for Assigned Names & Numbers*,
   795 F.3d 1124 (9th Cir. 2015) ....................................................... 26

**TABLE OF AUTHORITIES**
(continued)

Page

*Narell v. Freeman*,
   872 F.2d 907 (9th Cir. 1989) ........................................................................ 8, 11, 12

*Nash v. CBS, Inc.*,
   691 F. Supp. 140 (N.D. Ill. 1988) ...................................................................... 9, 28

*New York Times v. Sullivan*,
   376 U.S. 254 (1964) .............................................................................................. 27

*Novak v. Warner Bros. Pictures, LLC*,
   387 F. App'x 747 (9th Cir. 2010) ...................................................................... 7, 12

*Oliver v. Saint Germain Found.*,
   41 F. Supp. 296 (S.D. Cal. 1941) ...................................................................... 10, 28

*Olson v. Tenney*,
   466 F. Supp. 2d 1230 (D. Or. 2006) ....................................................................... 12

*PBM Prod., LLC v. Mead Johnson & Co.*,
   639 F.3d 111 (4th Cir. 2011) .................................................................................. 25

*Randolph v. Dimension Films*,
   634 F. Supp. 2d 779 (S.D. Tex. 2009) .................................................................... 17

*Random House, Inc. v. Rosetta Books LLC*,
   150 F. Supp. 2d 613 (S.D.N.Y. 2001) .................................................................... 21

*Ritani, LLC v. Aghjayan*,
   880 F. Supp. 2d 425 (S.D.N.Y. 2012) .................................................................... 19

*Schad v. Borough of Mount Ephraim*,
   452 U.S. 61 (1981) ................................................................................................. 27

*Scharpenberg v. Carrington*,
   686 F. Supp. 2d 655 (E.D. Va. 2010) ..................................................................... 26

*Shame on You Prods. v. Banks*,
   120 F. Supp. 3d 1123 (C.D. Cal. 2015) .................................................................. 13

*Skaff v. Progress Intern., LLC*,
   2014 WL 856521 (S.D.N.Y. Mar. 4, 2014) ............................................................ 20

*Stromback v. New Line Cinema*,
   384 F.3d 283 (6th Cir. 2004) .................................................................................. 11

## TABLE OF AUTHORITIES
### (continued)

Page

*Stutzman v. Armstrong*,
   2013 WL 4853333 (E.D. Cal. Sept. 10, 2013) .......................................................................... 27

*Thompson v. Looney's Tavern Prods.*,
   204 F. App'x 844 (11th Cir. 2006) ......................................................................................... 8

*Towler v. Sayles*,
   76 F.3d 579 (4th Cir. 1996) ........................................................................................ 6, 7, 11

*Twentieth Century Fox Film Corp. v. Marvel Enters., Inc.*,
   155 F. Supp. 2d 1 (S.D.N.Y. 2001) ....................................................................................... 17

*U.S. ex rel. Berge v. Bd. of Trustees of the Univ. of Ala.*,
   104 F.3d 1453 (4th Cir. 1997) .............................................................................................. 25

*Wharton v. Columbia Pictures Indus., Inc.*,
   907 F. Supp. 144 (D. Md. 1995) ........................................................................................... 26

*Willis v. HBO*,
   2001 U.S. Dist. LEXIS 17887 (S.D.N.Y. Nov. 5, 2001 ........................................................ 17

*Zak v. Chelsea Therapeutics Int'l Ltd.*,
   780 F.3d 597 (4th Cir. 2015) ................................................................................................. 6

## STATUTES

17 U.S.C. § 101 ............................................................................................................................. 22

17 U.S.C. § 102 ............................................................................................................................. 25

17 U.S.C. § 301 ............................................................................................................................. 25

17 U.S.C. § 507 ............................................................................................................................. 25

Cal. Civ. Proc. Code § 425.16 ..................................................................................................... 26

## OTHER AUTHORITIES

1 Patry, Copyright Law & Practice (1994) .................................................................................. 22

Black's Law Dictionary (10th ed. 2014) ..................................................................................... 22

Merriam Webster Dictionary (2017) ............................................................................................ 22

vii

## INTRODUCTION

Gerald Brittle's latest lawsuit—seeking some $1 billion for himself from *The Conjuring* movies—is no more meritorious than the spate of other cases that he and Tony DeRosa-Grund have brought against New Line and a range of other defendants over the past three years. Among other infirmities, Brittle's latest claims fail as a matter of copyright law, are time barred, preempted by the Copyright Act, and contradicted by Brittle's judicially noticeable admissions.

Brittle's latest complaint is without merit and should be dismissed, with prejudice.

## I.    Factual and Procedural Background

### A.    Ed and Lorraine Warrens' Life Work

Ed and Lorraine Warren were paranormal investigators based in Connecticut, whose life work—investigating hauntings and working with church officials to exorcise demons—the media has covered for decades.  The Warrens made their name in 1972 after "investigating a haunting at the Westpoint military academy," Decl. of Matt Kline ("KD") Ex. Y, and their Enfield investigation in England "remains one of the most well-documented … cases of its kind," *id.* ¶ 40(b).  News outlets like the *New York Times* and the *Washington Post* have covered the Warrens' work for five decades, *id*. Exs. T, BB, and movies like *The Exorcist* (1973) and *The Amityville Horror* (1979) popularized the sort of work the Warrens performed.[1]

The Warrens documented their life work in case files they kept, in photographs they took, and in audio recordings they made.  *See* Gerald Brittle, *The Demonologist:  The Extraordinary Career of Ed & Lorraine Warren* at ix-xi, 19-20, 67, 139-46 (Graymalkin Media 2013) ("the Book") (KD Ex. J).  They also worked with a variety of collaborators to publicize their work.

---

[1] The Court may take judicial notice of these news articles and other sources, *see AdvanFort Co. v. International Registries, Inc.*, 2015 WL 2238076, at *10, n.10 (E.D. Va. May 12, 2015), and New Line has filed a Request for Judicial Notice ("RJN") along with this Motion.  The Court need not take notice of these RJN sources to grant this Motion, but each supports that result.

### B.     *The Demonologist* Book

In November 1978, Brittle and the Warrens entered into a publishing agreement with Prentice-Hall granting it "the exclusive right to publish … an unpublished work tentatively entitled THE DEMONOLOGIST."  Dkt. No. 39 ("SAC") ¶ 29, Ex. 1 ¶ 1.  In a "Collaboration Agreement" executed the same month, the Warrens granted Brittle the "right to use" the Warrens' "vocal recollections … in the Work."  *Id*. Ex. 2 ¶ 11.

The Book was first published in 1980.  KD Ex. K.  Each of its 15 chapters highlights some of the Warrens' philosophies as well as a different one of their paranormal investigations— using the Warrens' real-life photographs and long passages of "dialogue as [the Warrens] recall the event, supported by first-person testimony by witnesses, and/or tape recordings the Warrens made on the scene while phenomena were in progress."  *Id.*; Book at xi.[2]  Much of the Book is long verbatim quotes from the Warrens describing their work, in their own words.  Book *passim*.

The Book purports to be a *true* account of events in the Warrens' lives and was marketed as such for decades.  KD Ex. J, K (covers touting "True Story" "True Accounts").  Brittle's "Author's Preface"—which appeared in 1980, *id.* Ex. K, and in recent editions, too—represents:

- "[A]ll the information presented in this book is true."  Book at ix.

- "These are real cases that happened to real people…."  *Id.*

- "Great care has been taken … to include only those cases in the Warrens' files that were witnessed by ordained clergymen and exorcists."  *Id.*

- "It should … be stressed that there is no exaggeration … [in] this book."  *Id.*

- "In this book Ed and Lorraine speak candidly…"  "[T]here are no more credible spokespersons on the subject of … supernatural phenomena."  Their statements are not only "correct" according to "authoritative theological and academic texts," but were "read for accuracy by two Roman Catholic exorcists."  *Id*. at x-xi.

---

[2] Brittle incorporates the Book by reference in his SAC and, thus, the Court may consider it on this Motion along with the contractual agreements he incorporates and attaches as well.  *See* RJN 5.  New Line has lodged two copies of two editions of the Book with the Court.  *Id.*

The Prentice Hall Agreement contained a provision for making a motion picture based on the Book, *see* SAC Ex. 1 ¶ 5, but no such movie was ever made—which is unsurprising given the Book's format, and its brief accounting of a number of specific cases the Warrens handled.

### C.     Tony DeRosa-Grund's Involvement with the Warrens and New Line

Tony DeRosa-Grund is a producer based in Texas.  *See* KD Ex. I at 4 ("JAMS Award"); RJN 2-4.  In 2009, he represented to New Line that he had a life-story agreement with the Warrens and proposed making a motion picture based on one of their cases.  *Id.*  New Line and DeRosa-Grund entered into agreements, pursuant to which New Line acquired all rights to, *inter alia*, a screenplay for the movie *The Conjuring*, the life rights of the Warrens, and the "entire case file library" of the Warrens' investigations.  JAMS Award at 5-10; SAC ¶ 69 & Ex. 17.

In the first of many difficulties with DeRosa-Grund, in August 2010 Lorraine Warren's attorney wrote to New Line (Ed Warren had passed away in 2006), claiming that Lorraine's signature was forged on the underlying rights agreements on which DeRosa-Grund had relied.  *See* JAMS Award at 12-13.  To remove any cloud on its title, New Line made an agreement directly with Lorraine—pursuant to which she granted New Line all her life rights and 75 cases from the Warrens' case file library.  *Id.*; SAC Ex. 18.  New Line also initiated a JAMS arbitration against DeRosa-Grund in June 2013.

New Line released *The Conjuring* in July 2013, and it was a commercial success.  SAC ¶ 89.  The movie (two DVD copies of which New Line lodges with the Court) depicts the Warrens' "Perron Farmhouse" investigation—which occurred when the Perron family moved into a home in Harrisville, Rhode Island, only to discover demonic spirits inhabited it.  KD Ex. L.  The Hayes Brothers wrote *The Conjuring* screenplay, and James Wan directed it.

Despite the success of *The Conjuring*, New Line's problems with DeRosa-Grund only worsened, with him continually breaching his agreements.  *See* JAMS Award at 24-27 (finding

such breaches occurred; affirming New Line's full rights in the Warrens' case files).  DeRosa-Grund also launched a "fraudulent" series of lawsuits seeking to undermine New Line's rights. *In re Tony DeRosa-Grund*, 4:09-bk-33264, Dkt. 122 at 69 (Bankr. S.D. Tex.) (KD Ex. E).[3]

### D.   Brittle's Involvement in this Prior Litigation and His Related Admissions

DeRosa-Grund recruited Brittle (and other "surrogates"[4]) to join his litigation campaign, and in prior lawsuits against New Line, the Warrens, and others, Brittle made admissions that directly contradict his claims in this new Virginia case.  To begin, in a JAMS arbitration between New Line and DeRosa-Grund (in which DeRosa-Grund sought, *inter alia*, writing credit on *The Conjuring* movie), Brittle submitted a sworn declaration in late 2014 attesting that the movie *The Conjuring* is "not related" to the Book, *see* KD Ex. H ¶ 12 (highlighting added):[5]

> 7
> 8
> 9
> 10
>
> 12.   "The Demonologist" focused on paranormal investigations and experiences associated with Mrs. Warren and Mr. Warren.  "The Demonologist" is not related to "The Conjuring" theatrical motion picture or the "Perron Farmhouse" case file that Mr. DeRosa-Grund used in creating his original story and treatment for "The Conjuring" theatrical motion picture.

Brittle, of course, now *takes the exact opposite position* in his SAC, claiming *The Conjuring* movie is a striking copy of his Book. *E.g.*, SAC ¶¶ 88-100.

Similarly, in prior federal litigation, Brittle repeatedly attested that *DeRosa-Grund* owned all of the rights required to make motion pictures based on the Warrens' life work and "Case Files."  *Evergreen Media Holdings, LLC, DeRosa-Grund, & Brittle v. Lorraine Warren, Tony*

---

[3]  *Id*. at 61 (court: "to an extreme degree, [DeRosa-Grund acted with] a bad faith intention to play fast and loose with the judicial system"), 71 (referring DeRosa-Grund to U.S. Attorney for possible prosecution); *id*. Dkt. 403 at 41 (condemning DeRosa-Grund's "sordid history of [] playing fast and loose with the truth and his willingness to sue New Line anywhere at any time").

[4]  *Id*. Dkt. 403 at 1, 41 (bemoaning that DeRosa-Grund and "his surrogates" had engaged in vexatious litigation and will "foment further frivolous litigation" despite series of court defeats).

[5]  *See Arora v. TD Ameritrade, Inc.*, 2010 WL 2925178, at *1 n.1 (N.D. Cal. July 26, 2010) (taking judicial notice of documents filed in arbitration); RJN 3-4 (collecting additional cases).

*Spera, Graymalkin Media, LLC, New Line Prods., Inc. & Warner Bros. Entm't Inc.*, 4:14-cv-01117, Dkt. 1 ¶ 68 (S.D. Tex.) ("*Brittle I*") (Brittle asserting that DeRosa-Grund's company acquired the "rights associated with the [Warrens'] Case Files, as well as the [Warrens'] life rights") (KD Ex. A); *Evergreen Media Holdings, LLC, DeRosa-Grund & Brittle v. Lorraine Warren, Tony Spera, & Graymalkin Media, LLC*, 3:14-cv-01068, Dkt. 1 ¶ 41 (D. Conn.) ("*Brittle II*") (same) (KD Ex. B); *id.* at 21 (Brittle seeking declaration that the agreements governing the Warrens' transfer of rights to DeRosa-Grund were "valid, binding and existing"); *Id.* Dkt. 69 ¶ 38 (Brittle asserting that DeRosa-Grund's company "acquired [Warrens'] life and case file rights") (KD Ex. C).  Of course, now that the JAMS arbitrator has ruled that *New Line* owns the "case files" and life rights, *see* JAMS Award at 31-32, Brittle has switched positions yet again and claims that *he* alone owns them, *e.g.*, SAC ¶¶ 54d, 69, 98.

Brittle made these admissions in federal litigation that mirrors the claims he makes here.  In *Brittle I*, Brittle sued New Line (and others) for copyright infringement and other claims.  He alleged that *The Conjuring 2* and *Annabelle*—two movies on which he sues again here—copied the "Annabelle" and "Enfield Poltergeist" chapters in the Book.  *Brittle I*, Dkt. 1 ¶¶ 39-47, 125-33.  Brittle abandoned *Brittle I* once New Line moved to dismiss and showed how its movies did not remotely infringe the Book.  *See Evergreen Media Holdings, LLC v. Warren*, 4:14-cv-00793, Dkt. 34 at 14-21 (S.D. Tex.) (KD Ex. G); *id.* Dkt. 39 (dismissing *Brittle I*) (KD Ex. D).

### E.    The Current Lawsuit

Brittle now brings this latest lawsuit, alleging the same baseless copyright infringement claims (and tag-along, preempted state-law claims) as he did in *Brittle I* about the same movies (*The Conjuring 2* and *Annabelle*); two new movies New Line has yet to release (*Annabelle: Creation* and *The Nun*); and one movie that is so early in its development that there is no script for it (*The Conjuring 3*).  He also asserts untimely claims about the original *Conjuring* movie,

even though he swore under oath in 2014 that this movie is "not related" to his Book.  *Supra* at 4.

Brittle's latest causes of action—all nine of them—are meritless and should be dismissed.

## ARGUMENT

"[O]nly a complaint that states a plausible claim for relief survives a motion to dismiss."

*Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).  While facts are taken "in the light most favorable"

to plaintiff, courts "need not accept" "legal conclusions[,] unwarranted inferences, unreasonable

conclusions, or arguments."  *Brown v. Flowers*, 196 F. App'x 178, 180 (4th Cir. 2006).  On a

Rule 12 motion, a court may consider exhibits attached to plaintiff's complaint, materials on

which it relies, or judicially noticeable records without turning the motion into one for "summary

judgment."  *Zak v. Chelsea Therapeutics Int'l Ltd.*, 780 F.3d 597, 606-07 (4th Cir. 2015).

## I.  None of the *Conjuring* Movies Infringes the Book (Counts I-III, VIII).

### A.  Background Legal Principles

Movie-theft claims are all too common in Hollywood, and courts have developed clear

legal rules to dispense with non-meritorious claims.  Five such principles are most on point here.

First, to prove infringement, plaintiff "must establish ownership of the copyright" and

"copying" by defendant.  *Darden v. Peters*, 488 F.3d 277, 285 (4th Cir. 2007).  Whereas here,

New Line concedes (only for purposes of this motion) that Brittle co-owns a copyright in the

Book,[6] but denies any "copying," Brittle must show a "substantial similarity" between protected

elements of the Book and each movie.  *Towler v. Sayles*, 76 F.3d 579, 581-82 (4th Cir. 1996).

"Bare legal conclusions" that the movies are similar do not suffice—Brittle must allege specifics

to state a claim.  *Edwards v. Raymond*, 22 F. Supp. 3d 293, 300 (S.D.N.Y. 2014).

Second, it is appropriate to dismiss plaintiff's copyright claims on the pleadings if no

---

[6] The Warrens co-own any copyrights in the Book, *see, e.g.*, SAC Ex. 2 ¶¶ 1-2, and, of course, Lorraine granted New Line full rights to make the *Conjuring* movies, *supra* at 3.

reasonable jury could find substantial similarity exists.  *See Devil's Advocate, LLC v. Zurich Am. Ins. Co.*, 666 F. App'x 256, 263 (4th Cir. 2016) (collecting cases).

Third, while the substantial-similarity test has an extrinsic part (an objective comparison of the works' "original elements") and an intrinsic part (a subjective inquiry "that centers on the impressions of a work's 'intended audience'"), courts need only apply the extrinsic test on a Rule 12 motion.  *Copeland v. Bieber*, 789 F.3d 484, 490 n.1 (4th Cir. 2015).  In applying this test, a court must first engage in an "'*analytic dissection*,' *separating out those parts of the work that are original and protected* from *those that are not*."  *Id.* at 489 (italics added).  After identifying these protected elements, the court must then analyze extrinsic similarities "such as those found in plot, theme, dialogue, mood, setting, pace, or sequence."  *Towler*, 76 F.3d at 584.

Fourth, "[n]o one may claim originality as to facts[,]" whether "historical, biographical, [or] news of the day."  *Feist Publ'ns, Inc. v. Rural Tel. Serv. Co.*, 499 U.S. 340, 347 (1991).  Thus, "[t]here is no [copyright] infringement" where "common sources exist for the alleged similarities, or the material that is similar is otherwise not original with the plaintiff."  *Alexander v. Haley*, 460 F. Supp. 40, 45 (S.D.N.Y. 1978); *Comins v. Discovery Commc'ns, Inc.*, 200 F. Supp. 2d 512, 519 (D. Md. 2002) (same).

As examples, in *Novak v. Warner Bros. Pictures, LLC*, 387 F. App'x 747, 748 (9th Cir. 2010), plaintiff's documentary and defendant's movie "We Are Marshall" shared the same "historical facts"—*i.e.*, a tragedy that struck a college football program when a plane crash killed most of the team's players, coaches, and boosters; and the community cohered to rebuild the football program.  The court rejected the documentarians' copyright claims, holding that the only "concrete or articulable similarities" between the works were historical facts or "unprotectable scenes a faire"—which all are free to exploit.  *Id.* at 749.

The "Last Samurai" case held similarly.  There, a movie script and Warner Bros. movie shared the same title as well as numerous "unprotectable" points of overlap, including real-life historical figures like the Japanese Emperor, "a samurai uprising in the 1870s" led by a so-called "Last Samurai" as well as common scenes "that flow naturally from the works' shared unprotected premise"—*e.g.*, "a scene of [an American] protagonist sailing into Japan, scenes in the Imperial Palace, scenes on the Imperial Army's training grounds, and battle scenes." *Benay v. Warner Bros. Entm't, Inc.*, 607 F.3d 620, 625-29 (9th Cir. 2010).  The rule of such cases is clear—no one has a monopoly to tell stories or make movies about true-life figures and events.

Fifth, the only thing protected in works based on unprotected facts is an "original" "selection and arrangement" of those facts.  *Feist*, 499 U.S. at 348-49.  Thus, "[n]o matter how original" the arrangement is, the underlying "facts themselves" remain unprotected.  *Id.* at 349; *Narell v. Freeman*, 872 F. 2d 907, 911 (9th Cir. 1989) (copyright "in historical accounts is narrow indeed, embracing no more than the author's original expression of particular facts").  In addition, telling a story in chronological order is neither original nor protected.[7]

**B.     None of the *Conjuring*-Related Movies Infringes the Book.**

1. Count I.  *The Conjuring* movie, released in July 2013, stars Patrick Wilson and Vera Farmiga as Ed and Lorraine Warren.  Over 100 minutes of the movie is devoted to their "Perron Farmhouse case" and the haunting of the Perrons' home in Rhode Island.  The Perron case is

---

[7] *See, e.g., Crane v. Poetic Prods. Ltd.*, 593 F. Supp. 2d 585, 595 (S.D.N.Y. 2009), *aff'd*, 351 F. App'x 516 (2d Cir. 2009) ("The thin copyright protection afforded by *Feist* not infringement); arrangement, and coordination of facts surely does not extend to the presentation of historical events in the order in which they took place."); *Thompson v. Looney's Tavern Prods.*, 204 F. App'x 844, 853 (11th Cir. 2006) ("[T]here are very limited ways in telling the story, *i.e.*, in chronological order.  The repetition of these events in the screenplay w[as] not infringement."); *Effie Film, LLC v. Murphy*, 932 F. Supp. 2d 538, 554 (S.D.N.Y. 2013), *aff'd*, 564 F. App'x 631 (2d Cir. 2014) ("Historical 'facts' … are not copyrightable, only their creative selection and arrangement to form a new work.").

*never mentioned* in the Book, and, thus, it is unsurprising that Brittle swore under oath in 2014

that *The Conjuring* movie and the Book are "not related." *Supra* at 4.  Indeed, Brittle does not

identify a single scene in this last 107 minutes of the movie that he contends infringes the Book.

Instead, Brittle contends that the first five minutes of *The Conjuring* movie contain "vast

and overwhelming similarities" with Chapter III of the Book, titled "Annabelle."  SAC ¶ 95.

This untimely claim, *infra* at 24-25—which openly contradicts litigation positions that Brittle

took under oath in 2014, *supra* at 4—is specious.  The Book's "Annabelle" chapter concerns the

Warrens' investigation of a "Raggedy Ann" doll owned by two nurses.  Book at 49-67.  The

story was widely reported for decades; indeed, the facts of the case and pictures of the real

Warrens with the real-life Annabelle doll proliferate the public domain.  *E.g.*, KD Exs. R, Y-AA,

LL.  Like many parts of the Book, the Annabelle chapter is essentially a transcript of a recorded

interview that the Warrens conducted.  In the nurses' kitchen, Ed starts a tape recorder and says,

"I'd like to hear the whole story, right from the beginning."  Book at 50.  The nurses explain that

"the big Raggedy Ann doll" moves on its own and that they spoke with a medium who told them

that a seven-year-old (Annabelle Higgens) died on the property.  *Id.* at 51-53.  Annabelle asked

the nurses if she could stay with them and move into the doll, and the nurses said yes.  *Id.*  The

nurses recount their experiences with Annabelle in question and answer format.  *Id*. at 50-55.

Most of the chapter (the last 12 pages) recounts the experiences of Cal (a fiancé of one nurse)

with Annabelle and the Warrens' experiences had when they take Annabelle home.  *Id.* at 55-66.

All of these factual details—which Brittle for decades told the public are "true," *supra* at

2—are unprotected.  *E.g.*, *Nash v. CBS, Inc.*, 691 F. Supp. 140, 142 (N.D. Ill. 1988), *aff'd*, 899

F.2d 1537 (7th Cir. 1990) (plaintiff "estopped from claiming that [story was] fictional" where he

"represented his books to be factual accounts"); *accord Houts v. Universal City Studios*, 603 F.

Supp. 26, 28-30 (C.D. Cal. 1984); *Oliver v. Saint Germain Found.*, 41 F. Supp. 296, 299 (S.D. Cal. 1941). Moreover, most of the factual details that do appear in the Book do *not* appear in *The Conjuring* movie, including the events described in the last 12 pages of the 18-page chapter.

The few basic facts of the Annabelle case that *do overlap* in the Book and the movie are all unprotected, and there are significant differences in the ways the works present and arrange them. The movie begins with a short interview from the "Annabelle Case - Year 1968," KD Ex. L at 00:00:55—a real event—but in the movie, the Warrens interview the nurses in their living room instead, *id.* at 00:00:25-01:33 (pincites are to DVDs of the movie). As the nurses narrate, the scene cuts (again unlike the Book) to dramatic flashbacks with spine-chilling music depicting scenes in which a demonic Annabelle doll (*not* a Raggedy Ann) scribbles and leaves terrifying notes all over the walls, trashes the nurses' apartment, and is thrown away in a dumpster only to appear in the apartment again—all details *not* found in the Book. *Id.* at 00:01:34-03:51.

  

Image of doll in *Conjuring* (at 00:01:28)    Image of doll from Book (at 67)    Image of doll online (KD Ex. LL)

The movie cuts back to the interview, and the Warrens explain that there exists an inhuman spirit that the nurses gave permission to infest their lives. *Id.* at 00:03:52-04:50. The Annabelle case is not developed in the remaining 107 minutes of the movie; the nurses do not reappear; and the doll only briefly appears once more in a glass case in the Warrens' home (where, in real life, it is

kept).  *Id.* at 00:17:10-18:16.  Six minutes into the movie, the whole focus shifts to the Perron

family, the Warrens' marriage, and the terrifying work that the Warrens did in the Perrons' home

to exorcise Mrs. Perron and to stop her from harming her family.  *Id.* at 00:06:15-01:46:00.

While Brittle now alleges *The Conjuring* and the Book share "vast and overwhelming

similarities," SAC ¶ 95, and "virtually identical copying," *id.* ¶ 97, these "bare legal conclusions"

are meaningless.  *Edwards*, 22 F. Supp. at 300.  They are also refuted by the many differences in

the two works.  *See, e.g.*, *Funky Films, Inc. v. Time Warner Entm't Co., L.P.*, 462 F.3d 1072,

1078, 1081 (9th Cir. 2006) (similarities were at a "high level of generality"; "an actual reading of

the two works reveals greater, more significant differences"); *Eaton v. Nat'l Broad. Co.*, 972 F.

Supp. 1019, 1026-27, 1029 (E.D. Va. 1997), *aff'd*, 145 F.3d 1324 (4th Cir. 1998).

Brittle's list of points of comparison, *see* Dkt. 39-27 (Appendix A), is simply inapt, given

that he compares the Book to a *Conjuring* script—which includes scenes *not* in the movie, *cf.*

*Stromback v. New Line Cinema*, 384 F.3d 283, 299 (6th Cir. 2004) (must consider actual movie,

not script)—and given that courts deem such "list[s] comparing random similarities scattered

throughout the works [to be] 'inherently subjective and unreliable,'" *Towler*, 76 F.3d at 584.

If one does consider Appendix A, it lists one non-protectable fact after another—all of

which must be filtered out in a court's substantial similarity analysis.  *Narell*, 872 F.2d at 911;

*Feist*, 499 U.S. at 349; *Effie Film*, 932 F. Supp. at 554.  These unprotected facts include that:

there existed a demonically possessed doll Annabelle owned by two nurses; a medium told the

nurses that a dead girl inhabited it; the doll moved on its own and communicated with the nurses;

a priest performed an exorcism; and the Warrens investigated the case, recorded their interviews,

and kept the doll.  Similarly, to the extent the Book and movie contain "actual quotations by real

people"—and the Book touts they are real quotes, *e.g.*, *supra* at 2—these quoted spoken words,

too, are "facts that are not protectable by copyright." *Crane*, 593 F. Supp. 2d at 594.[8]

Any remaining similarities between the Book and movie are non-actionable scenes-a-faire. *See Eaton*, 972 F. Supp. at 1029. For example, an investigator asking a subject to start her story "right from the beginning" is not original. Even if it were, "[d]efendants could hardly be expected to change the sequence of [factual] events [and how Ed started the interview] simply to avoid an appearance of similarity." *Comins*, 200 F. Supp. at 520; *see Crane*, 593 F. Supp. 2d at 595 (thin "protection" for "coordination of facts surely does not extend to the presentation of historical events in the order in which they took place"); *Gardner v. Nizer*, 391 F. Supp. 940, 944 (S.D.N.Y. 1975) ("descriptions of historical facts which both authors derived from similar sources, such as interviews … hardly could have been simply stated in a different fashion.").

In short, Brittle's Count I claim has no merit, and he has not shown and cannot show (even if allowed to amend) that *The Conjuring*'s "dramatization" and rearrangement of some of the same historic facts infringes any protectable aspect of the Book. *Crane*, 593 F. Supp. 2d at 594; *Narell*, 872 F.2d at 911-12; *Novak*, 387 F. App'x at 749. Count I should be dismissed.[9]

---

[8] Other unprotectable facts cited in Appendix A (some which do not appear in the movie) include: Ed carried a "recorder, camera and black attaché"; "Debbie explained, 'I put [the doll] on my bed each morning … The arms would be off to its side and its legs would be straight out, but when we'd come home at night the arms and legs would be positioned [] different[ly]…'" "'That's right,' Angie replied, 'the big Raggedy Ann doll.['] 'That's Annabelle. She moves!'"; "Ed got up and walked into the living room to inspect the doll. It was big and heavy, the size of a four-year-old child…"; "The black pupil list [sic] eyes stared back at him, while the painted on smile gave the doll an expression of grim irony…"; "So we did little things like bookmarks on the Windows and doors or arrange the rug so anyone who came in would leave a trace that we could see but never once did it turn out there was a real outside intruder."; "The nurses tell the Warrens that they would find notes - written by Annabelle that say 'HELP US'"; "Ed tells the nurses that they inadvertently brought an evil spirit into their lives." *See also Olson v. Tenney*, 466 F. Supp. 2d 1230, 1238 (D. Or. 2006); *Braddock v. Jolie*, 2013 WL 12125754, at *7 (C.D. Cal. Mar. 29, 2013); *Hoehling v. Universal Studios, Inc.*, 618 F.2d 972, 980 (2d Cir. 1980).

[9] Brittle's "access" allegations—that James Wan read the Book and edited *The Conjuring* script, SAC ¶¶ 90-94, 104, or that actors "looked" to the Book "for guidance," *id.* ¶¶ 112-14—do

2. Count II.  Brittle's complaint also targets the movie *Annabelle*, released in 2014, SAC ¶¶ 109-14, 131-37, but again this claim fails.  *Annabelle* starts with 62 seconds of the same scene from the start of *The Conjuring*—*i.e.*, the Warrens interview the same nurses, in the same room, with the same clothes on, with the same demonic doll shown, and with nearly identical dialogue. KD Ex. O at 00:00:54-01:56.  As shown above, nothing in this scene infringes on the Book.

The remaining 96 minutes of the *Annabelle* movie have *nothing* to do with the Book— and feature a young couple (never mentioned in the Book) who owned the Annabelle doll before the nurses (a storyline the Book never mentions).  Indeed, other than the brief appearance of Ed and Lorraine Warren, the only other people from the "Annabelle" chapter of the Book who appear in the movie are the two real-life nurses who owned Annabelle—and they make a fleeting appearance in *Annabelle* of less than two minutes.  Again, the Warrens and the nurses are real people; Annabelle was a real doll (although her appearance in the movies is quite different and more terrifying); and New Line had full rights—enshrined in both the Copyright Act and the First Amendment—to make a new movie involving these historical figures and artifact.  *See Benay*, 607 F.3d at 626-29; *Golan v. Holder*, 565 U.S. 302, 328-29 (2012); *supra* at 7-8.

Brittle contends that "the similarities are not just substantial, but are also striking" in the Book and *Annabelle* movie.  SAC ¶ 111.  These erroneous legal conclusions do not satisfy the Rule 12 test, *see Edwards*, 22 F. Supp. at 300, and are unsupported by any specifics.  Brittle's Appendix B (comparing the two works) lists story elements that appear nowhere in the movie

---

not change this analysis.  "No claim of copyright protection can arise from the fact that plaintiff has written about such historical and factual items, even if we were to assume that [defendant] was alerted to the facts in question by reading [plaintiff's work]."  *Alexander*, 460 F. Supp. at 45; *see also Friedman v. ITC Int'l Television Corp.*, 644 F. Supp. 46, 46, 48 (E.D.N.Y. 1986) (defendant did not infringe biography where access conceded but similarities were "generalized or otherwise nonprotectible"); *Shame on You Prods. v. Banks*, 120 F. Supp. 3d 1123, 1132, 1149, 1171 (C.D. Cal. 2015) (movie did not infringe screenplay even when actress and director had access to script because there was no substantial similarity between works as a matter of law).

(*e.g.*, "Try us.  Please, from the start"), and is infirm, as was Appendix A, because it merely lists

unprotectable story elements and does not grapple with the actual content of the movie.

Instead of depicting the Warrens' full interview of the nurses (as does the Book), the

*Annabelle* movie depicts what happened "Before The Conjuring" movie—and tells the story of a

young couple, Mia and John, who owned Annabelle before the nurses.  KD Ex. O at 00:02:26;

*id.* (DVD cover).  The couple's life unravels as a demon (a pale, skinny, ratty-haired woman, and

*not* the seven-year-old girl in the Book) possesses the Annabelle doll and tries to kill Mia and

John's baby.  *Id.* at 00:16:00-18:40, 00:48:38-50:10, 01:07:00-01:31:40.  The movie ends when

another mom buys Annabelle at a thrift shop for her daughter.  She says her daughter is a nurse,

alluding to one of the nurses from the first scene of *The Conjuring*.  *Id.* at 01:33:15-01:33:48.

Again, shortly after Brittle saw *The Conjuring*—and its five-minute opening sequence

featuring Annabelle—he swore under oath that *The Conjuring* movie and Book are "not related."

KD Ex. H ¶ 12.  His claim in this new case that a 62-second excerpt of that same five-minute

scene is now legally actionable copying is baseless—as a matter of copyright law and common

sense.  None of the 62 seconds at issue in *Annabelle* infringes original expression that Brittle

created.  Rather, the only points of overlap are basic facts that copyright law does not protect.

*E.g.*, *Crane*, 593 F. Supp. 2d at 594 (finding no substantial similarity in "selection, coordination,

and arrangement of facts" in two works detailing death of Pope); *Comins*, 200 F. Supp. 2d at 520

("comparison of the Book and the Film suggests only a similarity of facts and organization that

would be logical in any work describing an historical event such as the evolution of the Moon").

3.  Count III.  Brittle also targets *The Conjuring 2*, released in June 2016.  SAC ¶¶ 101-

08, 131-37.  This claim is so weak that Brittle does not even offer one of his Appendices to

support it, but instead claims copying occurred because both *The Conjuring 2* and the Book have

14

scenes with a crucifix and a nun, and in both works, two of the Warrens' real-life cases (the Amityville and Enfield cases) are explicitly compared.  *Id.* ¶¶ 104-06.  None of this is actionable.

*The Conjuring 2* begins with a scene in "Amityville, New York 1976," KD Ex. M at 00:01:07—the Amityville from the 1979 movie, *supra* at 1.  Lorraine Warren has an awful premonition in which she sees an entire family killed, and Lorraine is strangled by a horrifying, deathly, demonic nun.  KD Ex. M at 00:01:50-7:00.  The movie cuts to text explaining that the Amityville case "catapulted" the Warrens "into the public eye," and that there was a haunting occurring in Enfield, England that "many would later compare to Amityville."  *Id.* at 00:07:50-8:12.  The movie cuts to the "Hodgson Residence Enfield, England - 1977."  *Id.* at 00:10:48.  There, at night, two sisters play with an Ouija board and ask if there are any spirits who want to communicate.  *Id.* at 00:12:38-14:14.  Strange events unfold, and one daughter, Janet, becomes possessed, *id.* at 00:21:30-22:22, a television's channels change wildly, *id.* at 00:28:30-29:45, and a scary older man appears screaming "my house," *id.* at 00:31:37-32:05.

The movie cuts back and forth between Enfield and the Warrens in Connecticut.  In Enfield, the terrifying older man continues to appear, furniture moves on its own, and bite marks appear on Janet.  *Id.* at 00:37:30-40:00.  The media descends on the Hodgsons and widely reports their plight.  *Id.* at 00:48:55-54:37.  The Warrens fly to England to investigate, *id.* at 01:02:11-01:16:17, and ward off the evil spirits in a heart-pounding confrontation, including with the deathly nun.  *Id.* at 01:50:15-02:02:20.  The movie closes with a note that the Enfield haunting would "go on to become one of the most documented cases in paranormal history."  *Id.* at 02:05:25.  Indeed, a BBC miniseries was devoted to the case.  KD ¶ 40(a); Ex. KK.

"The Enfield Voices" chapter in the Book never mentions the Hodgsons by name, but tells the story of the "Enfield Poltergeist."  As explained by Ed in the Book, the case involved a

divorced 50-year-old woman who moved to a house in Enfield with her three children.  Book at

275.  Two children made contact with six demonic spirits after playing with an Ouija board.  *Id.*

The family experienced knockings, rappings, levitating, and black forms manifesting around the

house.  *Id.*  The police investigated, "but to no avail."  *Id.*  "In no time at all … the press got

wind of the case and reporters and psychic researchers descended on this brick rowhouse.…

[The media] not only put the family in the public eye, *they thoroughly documented the reality of*

*the phenomena occurring there*."  *Id.* (italics added).  Ed explains how he interviewed the family,

observed objects levitating and the girls' episodes of possession, and the most "compelling"

thing was the "physicalized voice manifestations" of six different spirits.  *Id.* at 276-77.  Much of

the Book's chapter is a transcript of an "extract" of an interrogation between Ed and the spirits,

*id.* at 279-85, with Ed explaining what happened as the interrogation occurred, *id.* at 281-82.

There were multiple factual sources for *The Conjuring 2*, and Brittle can point to no

None of these historic facts is protected.  *Supra* at 7-8, 12-13.  Indeed, as the Book itself

admits, *id.* at 275, the facts of this case were well documented before the Book was even written.

A "special features" part of the DVD, moreover—an excerpt of which Brittle appended to his

complaint, KD Ex. M—has an interview with the Hodgson family.  The real-life Hodgsons share

pictures, news clips, and recount the events depicted in the movie, including how a chest of

drawers slid into the doorway, a curtain wrapped itself around one of their necks, and objects and

people levitated.  *Id.*  A photographer from the "The Daily Mirror" gives an interview also.  *Id.*

There were multiple factual sources for *The Conjuring 2*, and Brittle can point to no

protectable expression in the Book that the movie copied.  To begin, because so many elements

of the works are drawn from the same historical events, "many of the key features—plot, setting,

characters—are largely excluded from the 'protectable' realm and, accordingly, from the

[substantial] similarity analysis."  *Effie Film*, 932 F. Supp. 2d at 553-54.

Nor is the "arrangement" of the facts in the two works actionably similar.  The Book chapter starts with Ed losing control of his car on a Pennsylvania road; then goes into a long discussion of precautions that the Warrens take on their cases; and then notes that Ed was just back from England where he was working on "This Enfield case [that] makes Amityville look like a playhouse."  Book at 271-74.  The movie, in stark contrast, begins with a seven-minute scene of Lorraine's premonitions, in which she sees the mass family murder that occurred in Amityville, as well as a demonic nun seeking to kill her and Ed.  KD Ex. M 00:00:40-07:46.

Nor do the only two specifics that Brittle cites—*i.e.*, the upside-down crucifix or the nun character, SAC ¶¶ 105-06—evince copying.  In movies about demonology, such symbols and characters are "familiar" "staples" that do not give rise to a copyright claim, except under a gross "misunderstanding" of the law.  *Berkic v. Crichton*, 761 F.2d 1289, 1293-94 (1985).  Indeed, in scores of movies in this genre, such symbols of Catholicism are replete.  *See* RJN 9-11.[10] Indeed, the repeated use of such symbols and characters—and even movie titles like *Upside Down Cross* and *The Nun*, *supra* n.10—flow naturally from the idea of a demonology story.[11]

_____

[10] Horror and occult movies referencing demons, Catholicism, nuns, and crosses include *The Exorcist* (1973); *The Amityville Horror* (1979 & 2005); *Stigmata* (1999); *Exorcist II* (1977); *Possessed* (2000); *Paranormal Activity* (2007); *Upside Down Cross* (2014); *The Omen* (1976 & 2006); *The Convent* (2000); and *La Monga* ("The Nun") (2005).  *Id.*  The Court may consider the contents and existence of these and other works in assessing whether alleged similarities are unprotectable scenes-a-faire.  *E.g.*, *Twentieth Century Fox Film Corp. v. Marvel Enters., Inc.*, 155 F. Supp. 2d 1, 41 (S.D.N.Y. 2001); *Randolph v. Dimension Films*, 634 F. Supp. 2d 779, 789 (S.D. Tex. 2009); *Willis v. HBO*, 2001 U.S. Dist. LEXIS 17887, at *6 (S.D.N.Y. Nov. 5, 2001).

[11] *Cf., e.g.*, *Hogan v. DC Comics*, 48 F. Supp. 2d 298, 313 (S.D.N.Y. 1999) ("use of imagery of blood, religious symbolism such as crosses and allusions to the bible are unprotectable scenes a faire without which any vampire work would be incomplete"); *Acker v. King*, 46 F. Supp. 3d 168, 175 (D. Conn. 2014) ("using psychic abilities to save people, seeing and doing supernatural things, and defeating villains are scenes a faire that flow necessarily from the idea of a character using her psychic abilities to triumph over evil"); *Brown v. Twentieth Century Fox Home Entm't*, 2015 WL 5081125, at *11 (E.D. Ky. Aug. 27, 2015) ("thematic similarities" relate to "unprotectable idea of an 'anti-Mary' birthing multiple antichrists").

In any event, the fact that a cross appeared in the Enfield home, as reported in the Book, is an unprotectable historical fact, and the expression of these elements was not at all similar.  In the Book, Lorraine finds one cross upside down on her dresser after playing a recording of the demonic voices inside the Enfield house.  Book at 285.  In *The Conjuring 2*, Janet is transported to a locked room, in which there are scores of crosses nailed to the walls.  All at once, the crosses turn upside down, and a demon attacks Janet.  KD Ex. M 01:17:50-01:20:25.

As for the nun, "copyright law provides very limited protection to characters presented in a creative work.  Basic character types are not copyrightable" unless developed "with some degree of novelty."  *Eaton*, 972 F. Supp. at 1027-28.  Here, Brittle alleges that defendants copied a nun identified once in the Book (and not in the Enfield Chapter) when Ed states:  "Loraine and I have seen the Borley Nun walking along the road."  Book at 11; SAC ¶ 106.  Not only is the fact of their observation unprotected, but this nun character is never developed in the Book.

In contrast, the nun in *The Conjuring 2* is a horrifying, demonic spirit that plagues Lorraine and appears in her premonitions foreshadowing Ed's death.  KD Ex. M at 00:05:53-07:25, 00:32:25-33:05, 00:43:45-48:21, 01:44:07-01:47:40.  There is no similarity between the nuns in the two works, and the fact that a nun appears at all is a natural incident of the religious theme present in supernatural phenomena.  *See, e.g.*, *Jones v. CBS, Inc.*, 733 F. Supp. 748, 753 (S.D.N.Y. 1990) (no infringement: while plaintiff's work contained a "conjure lady" and defendant's worked contained "two voodoo practitioners," the former was "not a developed character" and "reveals only the most general similarity that may be said to connect all those who claim some knowledge of the occult").

4.  Count VIII.  One confusing aspect of Brittle's complaint is a chart at page 20, which claims that three yet-to-be-released movies—*Annabelle: The Creation* (*i.e.*, *Annabelle 2*), *The*

*Nun*, and *The Conjuring 3*—"INFRINGES ON PLAINTIFF'S COPYRIGHT PROTECTED

SUBSIARY [SIC] RIGHTS."  Without ever having seen the movies (the last one of which is not

even written) Brittle claims that there are "*Overwhelming Similarities*" between the Book and

these works, SAC ¶¶ 87-88, and Count VIII seeks to enjoin the release of these movies.

Brittle has zero basis to make these conclusory allegations or to obtain any relief.  With

respect to *The Nun*, and particularly with respect to *Annabelle 2*, Brittle has not—and cannot—

identify what defendants copied because the movies have not been released.  Absent specific

allegations showing what protectable elements were copied, Brittle's claims do not survive the

*Iqbal* or substantial-similarity tests.  *Supra* at 6-8.[12]  Brittle's claims about *The Conjuring 3* fare

even worse; there is no script, no budget, and no guarantee that the movie will even be made.[13]

These pleading defects are all fatal, and Counts I-III and VIII should be dismissed.

**II.    Brittle's Claims Based On The Case Files And His Contracts All Fail As Well, As
They Misread The Agreements And Contravene His Prior Admissions.**

Brittle's copyright infringement and state-law claims (Counts I-VII) further fail to the

extent they hinge on Brittle's alleged ownership of the Warrens' "case files"—which is an

ownership claim fundamentally at odds with representations Brittle has made to the courts in

prior litigation, and is unsupported by the plain terms of the parties' agreements in any event.

Citing generally (but conspicuously not quoting the operative text of) the Collaboration

Agreement, Brittle alleges that he owns the "exclusive right to use the Warren cases, case files

---

[12] *Ritani, LLC v. Aghjayan*, 880 F. Supp. 2d 425, 441 (S.D.N.Y. 2012) (dismissing copyright infringement claim where complaint fails to identify "any facts supporting plaintiff's claim").

[13] There are other reasons why an injunction is improper.  Among them, *The Nun* and *Annabelle 2* are not based on the Book, and neither even features the Warrens.  Brittle also cannot show that equitable relief is required.  One (of many) reason(s) why:  He never moved to enjoin *The Conjuring*, *Annabelle*, or *The Conjuring 2*.  *Cf., e.g.*, *Magnussen Furniture, Inc. v. Collezione Europa USA, Inc.*, 116 F.3d 472, 1997 WL 337465, at *3 n.6 (4th Cir. 1997) (failure to seek protection for 16 months grounds to deny injunction).

and related materials"—and that "[a]ll other persons and/or entities, including the defendants are prohibited from using the Warren's Cases, Case Files and related materials for all of the Warren's investigations that took place up to including July 26, 1981." SAC ¶¶ 39, 43, 54.

This erroneous claim borders on a Rule 11 violation.  In prior federal litigation, Brittle repeatedly claimed that *DeRosa-Grund*—and not Brittle—owned the Warrens' "Case Files" and related materials.  *Supra* at 4-5; *Brittle I*, Dkt. 1 ¶ 68 (Brittle contending that DeRosa-Grund's company Evergreen acquired the "rights associated with the [Warren] Case Files, as well as the life rights of [the] Warren[s]").  Knowing that his copyright claims premised on the Book are baseless, Brittle now asserts that *he* owns the Warrens' "Case Files" and sues defendants for their asserted use of the "Case Files" in the six *Conjuring* movies.  *E.g.*, SAC ¶¶ 54(b), (d), 79-87.

Such blatant factual and legal flip-flops are not permitted, and DeRosa-Grund rightly has been condemned for similar tactics in related *Conjuring* cases.  *Supra* at 4 nn. 3 & 4; Dkt. Nos. 33 at 2 n.3; 40 at 3 n.1.  Brittle, moreover, offers no proof—none—that he owns the copyright in the Warrens' case files or related materials (or has registered them), which is a further bar to any copyright claims based on these materials (Counts I-III, VIII).  *See, e.g.*, *Darden*, 488 F.3d at 285 (noting plaintiff must "establish ownership of the copyright" for infringement claim).

In any event, when looking at the plain terms of the Collaboration Agreement, it never mentions the "case files" or grants any rights in them.  The Agreement—which has no choice of law provision, but which Brittle says was made in connection with the Prentice Hall Agreement, SAC Ex. 1 ¶ 19—is governed by New York law.  *Skaff v. Progress Intern.*, LLC, 2014 WL 856521, at *4 (S.D.N.Y. Mar. 4, 2014) (where addendum silent on choice of law, original agreement's choice-of-law provision governed).  Under the law of that state, the plain meaning of a contract controls; extrinsic evidence is disfavored; and agreements that are "complete, clear

and unambiguous on [their] face must be enforced according to the plain meaning of [their] terms." *Ellington v. EMI Music, Inc.*, 24 N.Y.3d 239, 244 (Ct. App. 2014). Under New York law, grants of rights are only rarely implied—especially to valuable intellectual property. *E.g.*, *Random House, Inc. v. Rosetta Books LLC*, 150 F. Supp. 2d 613, 620-21 (S.D.N.Y. 2001) ("[T]he grant of rights follows from the grant language alone.").

Nowhere in the Collaboration Agreement do the Warrens assign copyright or any other rights in their "case files" to Brittle. Indeed, that term—which Brittle capitalizes in his SAC and in other lawsuits, *supra* at 4-5, 20—appears nowhere in the Collaboration Agreement, in marked contrast to the Warrens' and DeRosa-Grund's agreements with New Line (which mention the term repeatedly). *E.g.*, SAC Ex. 17 ¶ 1A.(a)(iii) (1A. PROPERTY. … "The entire case file library (approximately 8,000 case files) related to the Warrens' paranormal investigations ('Case Files')"); Ex. 18 at 2-4 ("Case Files," "Case File Summaries," "Unused Case Files").

All that the Collaboration Agreement mentions is that the Work will include some of the Warrens' vocal recollections. Paragraph 11 of the Collaboration Agreement states in full: "The Work [a book entitled <u>The Demonologist</u>] shall include extensive portions of material which are the vocal recollections of the [Warrens]. It is expressly understood that [Brittle] is entitled to make use of this material and has the exclusive right to use it in the Work." SAC Ex. 2 ¶ 11.

This permission to use this "material"—defined as "vocal recollections"—in the medium of a "book"—*i.e.*, the "Work"—is not a copyright grant, for many reasons. <u>First</u>, the Agreement makes plain that the Warrens and Brittle would be "co-owners of all rights in the Work," including "copyright." *Id.* ¶¶ 1-2. The Warrens relinquished no rights. *Cf. Burroghs v. Metro-Goldwyn-Mayer, Inc.*, 491 F. Supp. 1320, 1324 (S.D.N.Y. 1980) (agreement that transferred a "right to use characters" did not transfer any copyright); 1 PATRY, COPYRIGHT LAW & PRACTICE

392 (1994) ("[C]opyright owners should retain all rights unless specifically transferred.").

Second, vocal recollections are not "fixed in a tangible medium of expression" and thus are not copyrightable.  17 U.S.C. § 101; *Midler v. Ford Motor Co.*, 849 F.2d 460, 462 (9th Cir. 1988) ("A voice is not copyrightable.  The sounds are not 'fixed.'").

Third, while the Warrens' actual written case files, photographs, audio recordings, or other writings might be subject to copyright protection, the Collaboration Agreement mentions none of them.  The term "vocal recollections" does not include such sources.[14]

Brittle's claim fails for a further reason still:  the right to use vocal recollections in "the Work" is not a grant to own or use the materials exclusively in *any* medium, including movies. Rather, the Collaboration Agreement limits the right to "make use of the material" to one medium, *i.e.*, the Book.  The Agreement does not use broad language like "in any manner medium or form" that is required to make the sort of broad grant that Brittle suggests.  *Boosey & Hawkes Music Publishers, Ltd. v. Walt Disney Co.*, 145 F.3d 481, 486 (2d Cir. 1998).

Indeed, for Brittle to prevail, he has to rewrite the words of the Collaboration Agreement (without Lorraine even being named as a party here) to have the two words "vocal recollections" also include "the Warren cases, case files, and related materials … for all of the Warren's investigations," and he needs the word "Work," *defined* as "the Book," to mean motion pictures also.  Both New York law and common sense forbid these readings.  "[C]ourts may not by construction add or excise terms, nor distort the meaning of those used and thereby make a new

---

[14] *See* Book at x-xi (differentiating "reconstructions of dialogue as Ed and Lorraine[] recall the event" from "tape recordings" Warrens made); *Vocal*, MERRIAM WEBSTER DICTIONARY (2017) ("uttered by the voice[,] oral"); *Oral*, BLACK'S LAW DICTIONARY (10th ed. 2014) ("spoken or uttered; not expressed in writing"); *Recollection*, *id.* ("The action of recalling something to the mind"); *see also In re Hughes*, 353 B.R. 486, 500 (Bankr. N.D. Tex. 2006) ("Creditors are not required to accept a debtors *oral recitations or recollections* of his transactions; rather to qualify for a discharge in bankruptcy, a debtor is required to keep and produce *written documentation*….") (italics added).

contract for the parties under the guise of interpreting the writing." *Law Debenture Tr. Co. of N.Y. v. Maverick Tube Corp.*, 595 F.3d 458, 468 (2d Cir. 2010).

Moreover, under Brittle's newly asserted reading, he contends that he has owned, since 1978, all movie rights related to the Warrens' life work before 1981. Yet when *The Conjuring* was released, he did nothing, except to declare that *The Conjuring* was "not related" to the Book. *Supra* at 4. And when *Annabelle* and the *Conjuring 2* were released, he filed suit arguing that *DeRosa-Grund*—and *not* he—owned the case files, life rights, and rights to make the movies. *Supra* at 5. Post-contractual conduct evinces contractual intent. *See Filmvideo Releasing Corp. v. Hastings*, 446 F. Supp. 725, 728-29 (S.D.N.Y. 1978). Here, Brittle's actions speak volumes. Only now that DeRosa-Grund has lost his JAMS arbitration—which found that "New Line owns all right, title and interest to the [Warrens'] approximately 8000 Case Files," KD Ex. I at 27, 32—does Brittle assert his misreading of the Collaboration Agreement to attack New Line and Lorraine Warren. This reading can and should be rejected by the Court as a matter of law.[15]

## III. Brittle's State Law Claims (Counts IV-VII) Are Time Barred, Preempted, And Run Afoul Of California's Anti-SLAPP Statute.

**A. Governing Law.** Virginia applies "the law of the place of the wrong[] to tort actions." *Ford Motor Co. v. Nat'l Indem. Co.*, 972 F. Supp. 2d 850, 856 (E.D. Va. 2013). "The place of the wrong is the place the last event necessary to make an [actor] liable for an alleged tort takes place," irrespective of where plaintiff was injured. *Id.* California law applies to

---

[15] Brittle devotes 20 paragraphs, six pages, and nine exhibits to other contractual claims and arguments that are neither relevant to this dispute nor ripe, including: who owns the subsidiary motion picture rights in the Book (him or the Warrens), SAC ¶¶ 30, 40-41, 43, 47-50, 54(c); who is the author of the Book (him alone, or with the Warrens), *id.* ¶¶ 33-34, 39, 44-45, 53, 54(a); whether Brittle may validly terminate co-ownership rights with Lorraine in the Book, *id.* ¶¶ 51-52; and whether she purportedly breached a "no competing work" and "no unilateral sale" provisions, *id.* ¶¶ 31, 35, 43, 54(f)-(h), 56. All of these matters are contested, implicate a party not before the Court, and do not give rise to a claim against New Line or the other defendants.

Brittle's four tort claims because defendants' alleged wrongful conduct took place in California. Brittle contends that defendants trespassed on and converted his property rights, *see* SAC ¶¶ 149, 173; tortiously interfered with his Collaboration Agreement with the Warrens, *id.* ¶ 182; and conspired with Lorraine to deprive Brittle of his "exclusive rights," *id.* ¶ 158.  New Line's deal with Lorraine to which Brittle objects—her 2011 Life Story Option Purchase Agreement—was executed by New Line in California and is governed by California law.  *Id.* Ex. 18.  New Line, which produced and distributed the movies at issue, is based in California, *see* SAC ¶ 14, as are the other defendants, *id.* ¶¶ 7-8, 10-13, 16-22.  Brittle does not allege, nor can he, that any of the *Conjuring* movies was written, produced, filmed, or edited in Virginia—because none was.

Thus, California law—the alleged origin of Brittle's alleged harms—governs his state-law claims.  *See, e.g.*, *ABLV Bank v. Ctr. for Advanced Def. Studies Inc.*, 2015 WL 12517012, at *2 (E.D. Va. Apr. 21, 2015) (District of Columbia law governed where "it is undisputed that [the] report [at issue] was published … in [Washington] D.C.  It is irrelevant that the negative effects of that publication were felt in New York; any reputational damage caused by [defendant] occurred everywhere due to the nature of online publication."); *accord Cobra Capital, LLC v. RF Nitro Commc'ns, Inc.*, 266 F. Supp. 2d 432, 436-37 (M.D.N.C. 2003); *Great Am. Ins. Co. v. Nextday Network Hardware Corp.*, 73 F. Supp. 3d 636, 640 (D. Md. 2014).

**B.  Three of Brittle's State-Law Claims Are Untimely.**  Brittle's claims for trespass (Count IV), conversion (Count VI), and interference (Count VII) are all time barred.  Claims for trespass and conversion are governed by a three-year statute and are "triggered by the act of wrongfully taking property."  *AmerUS Life Ins. Co. v. Bank of Am., N.A.*, 143 Cal. App. 4th 631, 639 (2006); *Cannon v. Bettinger*, 2009 WL 1594082, at *3-4 (Cal. Ct. App. June 9, 2009).  Interference claims are governed by a two-year statute, which commences "at the date of the

wrongful act." *DC Comics v. Pac. Pictures Corp.*, 938 F. Supp. 2d 941, 948 (C.D. Cal. 2013). Defendants allegedly took Brittle's property and tortiously interfered with his contract on February 7, 2011, when Lorraine transferred to New Line "exclusive ownership of all events, experiences, stories and occurrences 'without limitation,' and to all of the Warrens' paranormal investigations and experiences." SAC ¶ 72; *see* SAC ¶¶ 70, 180-82, Ex. 18. Brittle had to bring any claim for interference by February 7, 2013, and any claims for trespass or conversion by February 7, 2014. Brittle waited until November 2016, and thus these claims are time barred.[16]

**C. All of Brittle's State-Law Claims Are Preempted.** The Copyright Act preempts "legal or equitable rights that are equivalent to any of the exclusive rights within the general scope of copyright." 17 U.S.C. § 301(a). The Act defines the "Subject matter of copyright" to include "literary works" like the Warrens' case files. 17 U.S.C. § 102(a).

State laws that intrude on the domain of copyright are preempted. *See U.S. ex rel. Berge v. Bd. of Trs. of the Univ. of Ala.*, 104 F.3d 1453, 1463 (4th Cir. 1997). The gravamen of Brittle's four state-law claims is that New Line wrongly used the Warrens' case files and related materials in creating the *Conjuring* movies. *E.g.*, SAC ¶ 4 (defining the "Nature of Action" as one for "defendants' unlawful production of [the Pictures,] which are works derived from the

---

[16] California law likewise precludes Brittle's claim for business conspiracy (Count V), as that Virginia statutory claim is not actionable in other states. *See Ford Motor*, 972 F. Supp. 2d at 861 ("[T]he law of Michigan applies… [B]ecause Michigan law does not encompass the Virginia Business Conspiracy Statute, the motion for summary judgment [is] granted."); *Hilb Rogal & Hobbs Co. v. Rick Strategy Partners, Inc.*, 2006 WL 5908727, at *8 (E.D. Va. Feb. 10, 2006).

Brittle's Copyright and Lanham Act claims (Counts I, IX) based on *The Conjuring* are also untimely—at least in part. New Line released *The Conjuring* on July 19, 2013, SAC ¶ 89, and Brittle delayed bringing suit until November 2016, Dkt. 1—over three years later. Lanham Act claims are subject to a two-year statute, *see PBM Prod., LLC v. Mead Johnson & Co.*, 639 F.3d 111, 121 (4th Cir. 2011), and copyright claims must be filed within three years, *see* 17 U.S.C. § 507(b). Count I—to the extent it challenges distribution predating November 11, 2013—is time barred. So, too, is any aspect of Count IX based on conduct predating November 11, 2014.

[Book] and from other materials the plaintiff has sole and exclusive rights to use"); *id.* at 20-21

(chart).  Indeed, Brittle's claims for trespass (Count IV), conspiracy (Count V), conversion

(Count VI), and interference (Count VII) all pivot on New Line's asserted wrongful "use" of the

"Warrens' Case files" in making and distributing *The Conjuring* franchise of films."  SAC ¶¶

149-53, 158, 162, 172-75, 182-84.  As such, Counts IV through VII are all clearly preempted.[17]

**D.  Brittle's Claims Run Afoul of California's Anti-SLAPP statute.**  California law

shields moviemakers from meritless claims that challenge the content of free speech like movies.

*See* CAL. CIV. PROC. CODE § 425.16(b)(1); *ABLV Bank*, 2015 WL 12517012, at *2 (noting that

California's anti-SLAPP statute applies in federal cases, given the substantive rights it affords).

To prevail on a SLAPP motion (and recover its fees and costs on Brittle's state-law

claims), New Line must first show, under Prong 1 of California's SLAPP test, that Brittle's

claims arise from speech made in connection with a "public issue."  *Fox Searchlight Pictures,

Inc. v. Paladino*, 89 Cal. App. 4th 294, 306 (2011).  The creation, content, and distribution of

motion pictures—which Brittle challenges—easily meets the test.  *E.g., Kronemyer v. Internet

Movie Data Base, Inc.*, 150 Cal. App. 4th 941, 949 (2007) (movie "My Big Fat Greek Wedding"

constituted "a topic of widespread public interest").  Under Prong 2 of the SLAPP test, the

---

[17] *See, e.g., Wharton v. Columbia Pictures Indus., Inc.*, 907 F. Supp. 144, 146 (D. Md. 1995) (conspiracy claim based on "the right to prepare derivative works" preempted because the "central allegation" was that defendants plagiarized his copyrighted screenplay); *Maisha v. Univ. of N. Carolina*, 641 F. App'x 246, 250 (4th Cir. 2016) (conversion claim based on "plagiarism and lack of attribution" preempted); *C.A. Inc. v. Rocket Software, Inc.*, 579 F. Supp. 2d 355, 367 (E.D.N.Y. 2008) (preempting trespass to chattels claim because the rights asserted were equivalent to rights covered by Copyright Act); *Harper & Row Publishers, Inc. v. Nation Enters.*, 723 F.2d 195, 201 (2d Cir. 1983), *rev'd on other grounds*, 471 U.S. 539 (1985) (tortious interference claim preempted where "unauthorized publication" allegedly caused the violation). *See also Cannon*, 2009 WL 1594082, at *3 (listing elements of trespass and conversion claim); *Scharpenberg v. Carrington*, 686 F. Supp. 2d 655, 661 (E.D. Va. 2010) (same; conspiracy); *Name.Space, Inc. v. Internet Corp. for Assigned Names & Numbers*, 795 F.3d 1124, 1133 (9th Cir. 2015) (same; tortious interference).

burden shifts to Brittle to establish a probability of prevailing on his claims.  To meet his burden, he must overcome New Line's legal defenses.  *See Kashian v. Harriman*, 98 Cal. App. 4th 892, 910 (2002).  As shown above, Brittle's four state-law claims are preempted by the Copyright Act and are time-barred.  *Supra* at 24-26.  These four claims should be stricken as well as dismissed.

## IV.     Brittle's Lanham Act Claim (Count IX) Fails For Numerous Reasons.

For the first time in his SAC, Brittle asserts a "Lantham [sic] Act" claim.  SAC at 38.  He contends that defendants used false or misleading advertising in promoting *The Conjuring*, *The Conjuring 2*, and *Annabelle*.  And he asserts that defendants violated the law by failing to credit him as the author of *The Conjuring* and *The Conjuring 2*.  Neither theory has merit.

### A.      Brittle's Lanham Act Claim Is Barred by the First Amendment.

Motion pictures are afforded full protection under the First Amendment.  *See Schad v. Mt. Ephraim*, 452 U.S. 61, 65 (1981).  As a result, a plaintiff who claims that a movie is not "true" and harmed him, must meet the tests the First Amendment requires for such defamation-like claims.  He must show that the allegedly false scenes were "of and concerning" him, *New York Times v. Sullivan*, 376 U.S. 254, 288 (1964), and false and made with the requisite standard of fault, *see Food Lion, Inc. v. Capital Cities/ABC, Inc.*, 194 F.3d 505, 522 (1999).  Brittle does not (and cannot) allege that any of the allegedly false scenes were about him; the movie does not concern him at all.  Thus, his attempt to invoke the Lanham Act is simply an "an end-run around First Amendment strictures," *id.*, which is impermissible on many grounds, *see*, *e.g.*, *Stutzman v. Armstrong*, 2013 WL 4853333, at *17-19 (E.D. Cal. Sept. 10, 2013) (defendants' promotions that described books as "nonfiction" were "inextricably bound to the non-commercial contents of the books" and protected under the First Amendment); *Groden v. Random House,* 61 F.3d 1045, 1051-52 (2d Cir. 1995) (noting "any attempt to apply the Lanham Act to" publisher's ad (*i.e.*, that Oswald did kill Kennedy alone) "would raise substantial free speech issues").

**B.      Brittle's Lanham Act Claim Makes No Sense In Any Event, Given The Book.**

Brittle cannot complain that defendants engaged in misleading advertising by describing

*The Conjuring*, *The Conjuring 2*, and *Annabelle* as based on a "true story," SAC ¶¶ 196-97, 200-

01.  For decades, he repeatedly said and profited from claims that the Warrens' story is "true"—

*e.g.*, "These are <u>real cases</u> that happened to <u>real people</u>"; "there is <u>no exaggeration</u>," Book at ix;

*supra* at 2.  Indeed, the cover of the first edition of the Book proclaims:  "YOU ARE ABOUT

TO BEGIN THE MOST TERRIFYING <u>TRUE EXPERIENCE</u> OF OUR TIME"; "The <u>true story</u>

of Ed Warren and Lorraine Warren, the world famous exorcism team."  KD Ex. K.  The back of

the book jacket amplifies the claim:  "The horror that Ed and Lorraine Warren have fought for 35

years <u>is real</u>.  They have smelled it, touched it, seen it, spoken with it."  *Id.* (all underling added)

Thus, by Brittle's own admissions—which he cannot escape now, *see*, *e.g.*, *Nash*, 691 F.

Supp. at 142; *Houts*, 603 F. Supp. at 28-30; *Oliver*, 41 F. Supp. at 299—defendants' "based on a

true story" marketing was accurate, and Brittle fails the first, most basic elements of his claim.[18]

All but conceding this defect, Brittle offers an alternate theory.  He says the "dynamic

between Ed and Lorraine" as depicted in the movies is inaccurate, *id.* ¶ 202, and he objects to the

*Annabelle* marketing tagline "Before the Conjuring there was Annabelle," *id.* ¶ 199.  These

claims are specious also.  *First*, in contravention of *Iqbal*, Brittle offers no specifics how the

Warrens' family dynamic is erroneously portrayed, much less how that harmed him and

---

[18] To plead a Lanham Act claim, Brittle must establish that "(1) the defendant made a false or misleading description of fact or representation of fact in a commercial advertisement about his own or another's product; (2) the misrepresentation is material, in that it is likely to influence the purchasing decision; (3) the misrepresentation actually deceives or has the tendency to deceive a substantial segment of its audience; (4) the defendant placed the false or misleading statement in interstate commerce; and (5) the plaintiff has been or is likely to be injured as a result of the misrepresentation, either by direct diversion of sales or by a lessening of goodwill associated with its products."  *Design Res., Inc. v. Leather Indus. of Am.*, 789 F.3d 495, 501 (4th Cir. 2015).

consumers.[19]  *Second*, as the marketing tagline "based on a true story" makes plain—as a matter

of grammar and practice—obviously not every aspect in these movies is true.  *Cf., e.g.,*

*Greenspan v. Random House, Inc.*, 859 F. Supp. 2d 206, 220 (D. Mass. 2012), *aff'd*, 2012 WL

5188792 (1st Cir. 2012) (dismissing Lanham Act claim; "[t]he term nonfiction only means that

the literature is based on true stories or events, not that every statement is in fact demonstrably

true").  *Third, Annabelle* does, in fact, tell a fictional back-story about the doll's owners prior to

the nurses in *The Conjuring*:  "In this thriller based on the terrifying doll from *The Conjuring*…."

KD Ex. O.  Brittle can cite no marketing that calls this back-story the literal truth.

### C.  Brittle's Authorship Claim is Precluded by *Dastar*.

In *Dastar Corp. v Twentieth Century Fox Film Corp.*, 539 U.S. 23, 26 (2003), plaintiff

created a t.v. series titled "Crusade in Europe" based on rights it held in a book.  When plaintiff

failed to renew its copyright in the series, defendant copied the series and sold edited segments

of it to the public, omitting any mention of plaintiff.  *Id.*  Plaintiff sued, claiming that defendant

violated the Lanham Act by selling the videos without giving plaintiff proper credit.  *Id.* at 31.

The Supreme Court rejected plaintiff's claim:  Such an interpretation of the Lanham Act

"conflict[s] with the law of copyright," is "out of accord with the history and purpose of the

Lanham Act and [is] inconsistent with precedent."  *Id.* at 32, 33.  "['Origin of goods' in the

Lanham Act] refers to the producer of the tangible goods that are offered for sale, and not to the

author of any idea, concept, or communication embodied in those goods."  *Id.* at 37.

---

[19] *Cf., e.g., Louis Vuitton Malletier S.A. v. Warner Bros. Entm't Inc.*, 868 F. Supp. 2d 172,
182 (S.D.N.Y. 2012) (dismissing Lanham Act claim where allegations of consumer confusion
failed to "cross the line into the realm of plausibility"); *Gifford v. U.S. Green Bldg. Council*,
2011 WL 4343815, at *3 (S.D.N.Y. Aug. 16, 2011) (dismissing plaintiffs' false advertising claim
because any allegations of harm caused by defendant were "entirely speculative"); *Beaulieu
Grp., LLC v. Mohawk Indus., Inc.,* 2015 WL 11722814, at *6 (N.D. Ga. Oct. 26, 2015)
(dismissing false advertising claim where plaintiff "failed to set forth anything other than
conclusory allegations and legal conclusions").

*Dastar* bars Brittle's authorship claim.  *Compare* SAC ¶¶ 207-13, *with Jackson v. Michalski*, 2011 WL 3679143, at *13 (W.D. Va. Aug. 22, 2011) (*Dastar* foreclosed plaintiff's claim that defendant violated the Lanham Act by claiming defendant was sole author); *accord Harbour v. Farquhar*, 245 F. App'x 582, 582-83 (9th Cir. 2007).  Brittle's only remedy is a copyright claim, which fails for the reasons shown in Parts II-III, *supra*.

## CONCLUSION

For the foregoing reasons, the SAC should be dismissed, with prejudice.

Dated:  June 20, 2017

Respectfully submitted,

By: /s/ J. Benjamin Rottenborn

Matthew T. Kline, Esq. (*pro hac vice*)
Lauren Rakow, Esq. (*pro hac vice*)
O'MELVENY & MYERS LLP
1999 Avenue of the Stars, 8th Floor
Los Angeles, California 90067
Telephone: 310-246-6840
Fax: 310-246-6779
mkline@omm.com
lrakow@omm.com

Laura Lorenz, Esq. (*pro hac vice*)
O'MELVENY & MYERS LLP
1625 Eye Street, NW
Washington, D.C. 20006-4001
Telephone: 202-383-5300
Fax: 202-383-5414
llorenz@omm.com

J. Benjamin Rottenborn (VSB #84796)
WOODS ROGERS PLC
Wells Fargo Tower, Suite 1400
10 S. Jefferson Street
Roanoke, Virginia 24011
Telephone: 540-983-7600
Fax: 540-983-7711
brottenborn@woodsrogers.com

*Attorneys for New Line*

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on June 20, 2017, I caused to be served a copy of the foregoing

document upon all counsel of record via the CM/ECF system for the United States District Court

for the Eastern District of Virginia.

*/s/ J. Benjamin Rottenborn*

J. Benjamin Rottenborn (VSB #84796)
WOODS ROGERS PLC
Wells Fargo Tower, Suite 1400
10 S. Jefferson Street
Roanoke, Virginia 24011
Telephone: 540-983-7600
Fax: 540-983-7711
brottenborn@woodsrogers.com