# EXHIBIT A

# UNITED STATES DISTRICT COURT
# SOUTHERN DISTRICT OF TEXAS
# HOUSTON DIVISION

| | | |
|---|---|---|
| **EVERGREEN MEDIA HOLDINGS, LLC, TONY DEROSA-GRUND,** and **GERALD D. BRITTLE** | § § § § | **CIVIL ACTION NO. 4:14-CV-1117** |
| **VS.** | § § § | **JURY DEMANDED** |
| **LORRAINE WARREN, TONY SPERA, GRAYMALKIN MEDIA, LLC, NEW LINE PRODUCTIONS, INC.,** and **WARNER BROS. ENTERTAINMENT, INC.** | § § § § § § | |

## PLAINTIFFS' ORIGINAL COMPLAINT

Plaintiffs, EVERGREEN MEDIA HOLDINGS, LLC, TONY DEROSA-GRUND AND GERALD D. BRITTLE, complain of Defendants, LORRAINE WARREN, TONY SPERA, GRAYMALKIN MEDIA, LLC, NEW LINE PRODUCTIONS, INC., and WARNER BROS. ENTERTAINMENT, INC., as follows:

### Parties

1.      Evergreen Media Holdings, LLC, is a Texas limited liability company with its principal place of business in Montgomery County, Texas.

2.      Tony DeRosa-Grund is an individual residing in Montgomery County, Texas.

3.      Gerald D. Brittle is an individual residing in Richmond, Virginia.

4.      Lorraine Warren is an individual who may be served with process at 30 Knollwood Street, Monroe, Connecticut 06468, or wherever she may be found. Mrs. Warren has transacted business in and/or purposefully directed her acts toward the Southern District of Texas.

5.     Tony Spera is an individual who may be served with process at 122 Mine Hill Road, New Milford, Conecticut 06776, or wherever he may be found.   Mr. Spera has transacted business in and/or purposefully directed his acts toward the Southern District of Texas.

6.     Graymalkin Media, LLC is a California limited liability which may be served with process by serving its principal, David Zindel, at 1413 Greenfield Avenue, Suite 103, Los Angeles, California 90025, or wherever it may be found.  The company transacts business in, has transacted business in, and/or has purposefully directed its acts toward the Southern District of Texas.

7.     New Line Productions, Inc. is a California corporation which may be served with process by serving its registered agent, CT Corporation System, at 818 West Seventh Street, 2nd Floor, Los Angeles, California 90017, or wherever it may be found.  The company transacts business in, has transacted business in, and/or has purposefully directed its acts toward the Southern District of Texas.

8.     Warner Bros. Entertainment, Inc. is a Delaware corporation which may be served with process by serving its registered agent, CT Corporation System, at 818 West Seventh Street, 2nd Floor, Los Angeles, California 90017, or wherever it may be found.  The company transacts business in, has transacted business in, and/or has purposefully directed its acts toward the Southern District of Texas.

## Jurisdiction and Venue

9.     This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. §§ 1331 (federal question) and 1338(a) (acts of Congress relating to patents, trademarks and copyrights), 28 U.S.C. §§ 2201, *et seq*. (declaratory judgment act) and 28 U.S.C. § 1367

-2-

(supplemental jurisdiction over state claims). This Court also has jurisdiction pursuant to federal diversity jurisdiction, 28 U.S.C. § 1332, as the parties are completely diverse in citizenship and the amount in controversy exceeds $75,000.

10. Personal jurisdiction over the non-resident Defendants is proper because this lawsuit: (i) arises from acts and/or transactions occurring within and/or directed towards Texas; (ii) is connected with acts and/or transactions occurring within and/or directed towards Texas; and/or (iii) relates to the purposeful acts and/or transactions of the non-resident Defendants, and those purposeful acts occurred within and/or were directed towards Texas. The assumption of jurisdiction by this Court over the non-resident Defendants does not offend traditional notions of fair play and substantial justice.

11. Venue is proper in this Court pursuant to 28 U.S.C. § 1391(b) because, *inter alia*, a substantial part of the acts complained of herein occurred in this jurisdiction.

### Factual Allegations Common To All Counts

12. Lorraine Warren and her late husband, Ed Warren ("Mr. Warren"), were paranormal investigators involved in thousands of paranormal investigations over the course of the last five decades. Their investigations are part of approximately 8,000 case files compiled by Mrs. Warren and Mr. Warren over decades of paranormal investigations (collectively, the approximately 8000 case files are referred to as the "Case Files"). Mr. Warren passed away in August 2006.

13. Mr. DeRosa-Grund is a motion picture producer and the Executive Chairman of Evergreen.

14.     Mr. DeRosa-Grund's dealings with Mrs. Warren and Mr. Warren date back nearly twenty-three (23) years.  Throughout that period, Mr. DeRosa-Grund held thousands of hours of discussions with Mrs. Warren and Mr. Warren regarding their Case Files.  Indeed, during those thousands of hours, Mr. Warren, in particular, would propose and discuss with Mr. DeRosa-Grund various Case Files that he felt were particularly suitable for exploitation as a theatrical motion picture.  During those discussions, Mr. DeRosa-Grund would take notes and, on occasion, tape record the discussions.

15.     At all times, the actual Case Files were held by Mr. Warren.

16.     The discussions between Mr. DeRosa-Grund and Mr. Warren and Mrs. Warren included, but were not limited to, the "Perron Farmhouse" Case File, the "Annabelle" Case File, and "The Enfield Poltergeist" Case File.

17.     Approximately fifteen (15) years ago, Mr. DeRosa-Grund and Mr. Warren specifically discussed the "Perron Farmhouse" Case File.  During this conversation, which was recorded, Mr. DeRosa-Grund revealed his strategy and vision to develop and produce a theatrical motion picture based on the "Perron Farmhouse" Case File.  It was this conversation, as reflected in the recording, and in particular Mr. DeRosa-Grund's strategy and vision, that ultimately developed into and became the basis for Mr. DeRosa-Grund's written story and treatment based on the "Perron Farmhouse" Case File, and that Mr. DeRosa-Grund sought to sell as part of a motion picture series under "The Conjuring" trademark that he had created (Later, it was the recording of Mr. DeRosa-Grund's conversation with Mr. Warren and Mr. DeRosa-Grund's strategy, vision, story and treatment that was used as the foundation of and basis for the hit theatrical motion picture that was entitled "The Conjuring" and released in 2013).

-4-

18.      In 2009, Mr. DeRosa-Grund and the Warrens entered into four agreements (the "Warren Agreements"), for the exploitation of the Life Stories of the Warrens and the Case Files. The Warren Agreements, entered into in Texas and Pennsylvania/Connecticut, were dated May 6, 2009, June 1, 2009 and June 19, 2009 (two agreements).  The Warren Agreements were executed: (i) by Mr. DeRosa-Grund on behalf of Evergreen Media Holdings, LLC ("Evergreen"); and (ii) either: (a) by Harrison Smith on behalf of Mrs. Warren and the Estate of Mr. Warren; or (b) by Mrs. Warren personally and by Mr. Smith on behalf of Mrs. Warren and the Estate of Mr. Warren.  The Warren Agreements gave Evergreen and Mr. DeRosa-Grund the exclusive right to exploit film and television rights in and to the Life Stories of the Warrens and in and to the Case Files.

19.      Mr. DeRosa-Grund worked with two screenwriters, Chad Hayes and Carey Hayes, to turn the recording of Mr. DeRosa-Grund's conversation with Mr. Warren and Mr. DeRosa-Grund's strategy, vision, and his original story and treatment into a "pitch" and, finally, a formal script.

20.      On or around March 29, 2010, Evergreen and New Line Production, Inc. ("New Line") entered into an Option Quitclaim Agreement, with a date as of November 11, 2009 (the Option Quitclaim Agreement is referred to herein as the "OQA").  Pursuant to the OQA, New Line acquired an option to purchase theatrical motion picture rights to an agreed upon, and very limited, selection of the Case Files, i.e., less than one percent (1%) of the Case Files, and to the Life Stories of the Warrens in conjunction therewith.  In particular, from the approximately 8,000 Case Files, under the terms of the OQA, New Line selected a limited number of Case Files, namely, just twenty-five (25) of the approximately 8,000, which included the "Perron

Farmhouse" Case File, the "Annabelle" Case File, and "The Enfield Poltergeist" Case File, which were reserved exclusively by New Line solely for the purposes of theatrical motion picture exploitation. In exchange, New Line agreed to pay Mr. DeRosa-Grund and Evergreen a purchase price amount (the "Purchase Price"), and a percentage of the adjusted gross receipts of any motion picture made pursuant to the OQA.

21. Evergreen and New Line also entered into a Producer Loanout Agreement on or around March 31, 2010, with a date as of November 11, 2009 (the Producer Loanout Agreement is referred to herein as the "Producer Agreement" (collectively the Producer Agreement and the OQA are referred to herein as the "Agreements"), for the producer services of Mr. DeRosa-Grund. New Line agreed to engage and credit Mr. DeRosa-Grund as a producer in connection with any theatrical motion picture made pursuant to the Agreements, including, but not limited to, any theatrical motion picture associated with the "Perron Farmhouse" Case File, the "Annabelle" Case File, and the "The Enfield Poltergeist" Case File.

22. New Line and Warner Bros. Entertainment, Inc. ("Warner Bros.") ultimately entered into a deal with Chad and Carey Hayes to write the script based on the "Perron Farmhouse" Case File, during which time New Line and Warner Bros. received copies of the recording of Mr. DeRosa-Grund's conversation with Mr. Warren and Mr. DeRosa-Grund's story and treatment as well as any and all notes and materials he possessed relating to the "Perron Farmhouse" Case file. Accordingly, New Line and Warner Bros. were acutely and actually aware that: (i) Mr. DeRosa-Grund's original story and treatment were the underlying foundation of and basis for the screenwriters' work; and (ii) "The Conjuring" was the trademark that Mr.

DeRosa-Grund had single-handedly created for a series of productions based upon the Case Files and that "The Conjuring" trademark belonged exclusively to him.

23. After entering into the OQA, Evergreen gave New Line permission to enter into a direct deal for any rights held by Mrs. Warren. Evergreen agreed to an amendment of the OQA to allow for this new direct deal based on New Line's assurances that the OQA and Producer Agreement would remain the same and that Evergreen's rights and benefits under all of the aforementioned agreements would not change. On that basis, the parties executed an "Amendment #1" to the OQA, entered into on or around February 7, 2011, with a date as of October 19, 2010 (Amendment #1 to the OQA is referred to herein as the "Amendment").

24. Pursuant to the OQA, Amendment, and Producer Agreement, which were entered into in Texas and California, New Line produced the theatrical motion picture, which was titled "The Conjuring," based on the aforementioned "Perron Farmhouse" Case File. Pursuant to the OQA, Amendment, and Producer Agreement, New Line paid Evergreen and Mr. DeRosa-Grund the initial Purchase Price for "The Conjuring" theatrical motion picture prior to commencing principal photography. "The Conjuring" theatrical motion picture was released on or around July 19, 2013, and was hugely successful, grossing over $318,000,000 worldwide to date. With a production budget of approximately $20,000,000, "The Conjuring" theatrical motion picture has been reported to be one of the most profitable theatrical motion picture films of 2013.

25. A separate action has been filed by Mr. DeRosa-Grund and Evergreen against New Line and Warner Bros. concerning the OQA, the Producer Agreement, and the Amendment. The action, *Evergreen Media Holdings, LLC, et al. vs. Warner Bros. Entertainment, Inc., et al.*, is currently pending in the U.S. District for the Southern District of

Texas, Houston Division, case number 4:14-CV-00793. This complaint is not an action under, related to, nor concerning the OQA, the Producer Agreement or the Amendment. Therefore the action at hand is totally separate and distinct from the aforementioned case number 4:14-CV-00793.

26. Relevant to this Complaint, after releasing the "The Conjuring" theatrical motion picture, Evergreen and Mr. DeRosa-Grund believe and are informed that New Line and Warner Bros. have developed, produced and completed production on a motion picture production currently entitled "Annabelle," based on the "Annabelle" Case File. In particular, it has been reported that the story line in Annabelle includes a demonic doll in the possession of the Warrens, which was described in the "Annabelle" Case File. It has also been reported that production of "Annabelle" began on or about January 27, 2014.

27. Additionally, Evergreen and Mr. DeRosa-Grund are informed and believe that New Line and Warner Bros. intend to produce a theatrical motion picture sequel to "The Conjuring," based upon "The Enfield Poltergeist" Case File. Specifically, New Line and Warner Bros. have already publically announced a release date of October 23, 2015 for the sequel as "The Conjuring 2: Enfield" and on March 27, 2014 registered that title with the Motion Picture Association of America ("MPAA").

28. Evergreen and Mr. DeRosa-Grund are further informed and believe that New Line commissioned Chad and Carey Hayes to write the script for said sequel on or about July of 2013, said script is completed and New Line and Warner Bros. intend to commence principal photography on said sequel, i.e., "The Conjuring 2: Enfield", by the end of 2014.

29. New Line and Warner Bros. have not provided any payment to Evergreen and Mr. DeRosa-Grund in connection with the underlying rights to produce another motion picture based on the Case Files.

30. Furthermore, despite previously representing and agreeing that Mr. DeRosa-Grund would be a producer in connection with all projects based on New Line's selected Case Files, New Line and Warner Bros. have refused to engage Mr. DeRosa-Grund's producer services, to compensate him for the rights, or to provide him with a producer credit, or Evergreen corporate credit, in connection with "Annabelle," the anticipated sequel to "The Conjuring," i.e., "The Conjuring 2: Enfield," or any other prequel, sequel, remake, or spinoff of "The Conjuring."

31. After learning that New Line and Warner Bros. intended to produce "Annabelle", Evergreen and Mr. DeRosa-Grund contacted New Line and Warner Bros. in or around January 2014 regarding payment to Evergreen of the Purchase Price for the production and development of the "Annabelle" Case File pursuant to the parties' Agreements. Astonishingly, although New Line and Warner Bros. admitted that they were producing "Annabelle", New Line and Warner Bros. refused and continue to refuse to pay anything to Evergreen in connection with the production of "Annabelle."

32. Despite the fact that the "Annabelle" Case File had previously been selected by New Line for exploitation, as one of the twenty five (25) limited Case Files which they were entitled to exploit **only** as a theatrically released feature film under the OQA, New Line and Warner Bros. based their refusal to pay upon the claim that they intended to produce "Annabelle" as a direct-to-video production, rather than a theatrical production for distribution in theaters, and that as such **the OQA did not apply**.

-9-

33. Registration reports from the MPAA evidence that New Line registered the title "The Conjuring: Annabelle" on March 10, 2014, casting serious doubt on their claim that they plan to release "Annabelle" as a direct-to-video movie. The MPAA does not register titles for direct-to-video productions. The MPAA only registers titles for theatrically released productions.

34. Nevertheless, if, as New Line and Warner Bros. claim, the OQA does not apply to their direct-to-video production based upon the "Annabelle" Case File, then New Line and Warner Bros. have not been granted the contractual right to produce the direct-to-video production based upon the "Annabelle" Case File by Evergreen and Mr. DeRosa-Grund and any such action by them would be in violation of the rights which Evergreen and Mr. DeRosa-Grund exclusively secured from the Warrens under the Warren Agreements.

35. In other words, any production based upon the "Annabelle" Case File - if not under the OQA - would be a violation of the rights of Evergreen and Mr. DeRosa-Grund under the Warren Agreements.

36. Evergreen and Mr. DeRosa-Grund have learned that New Line and Warner Bros. intend to move forward and/or are already moving forward with production of a theatrical motion picture based upon "The Enfield Poltergeist" Case File, without the involvement of or compensation to Evergreen and/or Mr. DeRosa-Grund, i.e., in circumvention of the OQA, Amendment and Producer Agreement, despite the fact that "The Enfield Poltergeist" Case File had previously been selected by New Line for exploitation as the so-called sequel, "The Conjuring 2: Enfield."

37. To the extent that New Line and Warner Bros. have not paid Evergreen for the rights to produce the so-called sequel, "The Conjuring 2: Enfield," New Line and Warner Bros.

are, self-evidently, again claiming that the OQA does not cover their production based upon "The Enfield Poltergeist" Case File. New Line and Warner Bros. have thus not been granted the contractual right to produce the production based upon "The Enfield Poltergeist" Case File by Evergreen and Mr. DeRosa-Grund and any such action by them would be in violation of the rights which Evergreen and Mr. DeRosa-Grund exclusively secured from the Warrens under the Warren Agreements.

38.     In other words, any production based upon "The Enfield Poltergeist" Case File - if not under the OQA - would be a violation of the rights of Evergreen and Mr. DeRosa-Grund under the Warren Agreements.

39.     Plaintiffs believe that New Line is attempting to justify their actions and to circumvent the OQA, Amendment and Producer Agreement by attempting to claim that their productions based upon the "Annabelle" and "The Enfield Poltergeist" Case Files are somehow based upon a parallel set of rights to those owned by Evergreen and Mr. DeRosa-Grund, namely, rights in connection with chapters from *The Demonologist* acquired from Mrs. Warren and/or Mr. Spera and Graymalkin Media, LLC ("Graymalkin Media").

40.     It is more than coincidental that James Wan ("Mr. Wan"), the director of "The Conjuring" theatrical motion picture, and listed by New Line as a producer of New Line and Warner Bros.' "Annabelle" and "The Conjuring 2: Enfield" theatrical motion pictures, is intimately aware of the content contained in *The Demonologist*, as well as an openly admitted huge fan of *The Demonologist*. Indeed, on or about November 29, 2011, Mr. Wan posted the following to his personal Twitter page: "I watch/read a lot of scary stories. But [f**k], THE DEMONOLOGIST, true life account of Ed & Lorraine Warren, is the scariest book I've read."

-11-

This statement demonstrates that New Line is purportedly relying on a parallel set of rights to those owned by Evergreen and Mr. DeRosa-Grund, namely, rights in connection with chapters from *The Demonologist* acquired from Mrs. Warren and/or Mr. Spera and Graymalkin Media. However, New Line does not possess any such rights.

41.     On or about November 20, 1978, Mrs. Warren and Mr. Warren entered into, and executed, an agreement with Mr. Brittle concerning publishing rights, and certain ancillary rights related thereto, in and to a book entitled *The Demonologist*.  The agreement was amended, and executed on or about April 16, 1990 (collectively, the agreement and the amendment are collectively referred to herein as the "Collaboration Agreement"). As set forth in the Collaboration Agreement, *The Demonologist* concerned Mrs. Warren and Mr. Warren's "lives and experiences as psychic investigators."

42.     Among other things, in the Collaboration Agreement, Mrs. Warren, Mr. Warren, and Mr. Brittle agreed as follows:

> All contracts for the sale, lease, license or other disposition of any and all rights in to [*The Demonologist*] now existing or which may hereafter come into existence shall require the unanimous consent of [Mr. Brittle] and [Mrs. Warren and Mr. Warren].

43.     The Collaboration Agreement is valid and existing and continues in full force and effect to the present day.

44.     Following months of substantial work by Mr. Brittle, including, but not limited to, extensive interviews with Mrs. Warren and Mr. Warren, site-visits, testimonials, theological research and steps to vet the accuracy of *The Demonologist* by two Roman Catholic exorcists,

*The Demonologist* was first released in or about December 1980 by Prentice-Hall, Inc. ("Prentice Hall").

45.     *The Demonologist* focused on several experiences associated with Mrs. Warren and Mr. Warren.

46.     One experience which *The Demonologist* focused upon was entitled "Annabelle." As discussed in the relevant chapter of *The Demonologist*, "Annabelle" involved a Raggedy Ann doll used by a demonic spirit that terrified a family.

47.     Another experience which *The Demonologist* focused upon was entitled "The Enfield Voices." As discussed in the relevant chapter of *The Demonologist*, "The Enfield Voices" involved a single mother, Margaret Hodgson, who called police to her home in Enfield, England after two of her four children claimed that furniture was moving and knocking sounds were heard on walls. A female police constable witnessed a chair slide across the floor on its own. "The Enfield Voices" involved demonic voices, loud noises, thrown rocks and toys, overturned chairs and levitation of children.

48.     Since it was first released in 1980, by Prentice Hall, *The Demonologist* has been re-released several times, always pursuant to and in compliance with the terms of the Collaboration Agreement, including, most recently, in or about September 2002 through iUniverse.

49.     In or about June 2013, notwithstanding the long-existing Collaboration Agreement, Mr. Brittle received a telephone call from David Zindel ("Mr. Zindel"), the principal and owner of Graymalkin Media. In the phone call, Mr. Zindel informed Mr. Brittle that Mr. Spera, Mrs. Warren's son-in-law, had "taken charge" of *The Demonologist* and would now

"change publishers" from iUniverse to Graymalkin Media. Mr. Zindel further informed Mr. Brittle that he would send a contract to Mr. Brittle for his signature and represented that Mrs. Warren had **already** executed a contract with Graymalkin Media "changing publishers" for *The Demonologist* from iUniverse to Graymalkin Media.

50.     Among other things, Mr. Brittle correctly informed Mr. Zindel that Mr. Spera had no right or authority to "change publishers" in connection with *The Demonologist* in view of the Collaboration Agreement and, in particular, that the Collaboration Agreement requires the unanimous approval of both Mr. Brittle and Mrs. Warren **before** any action to "change publishers" can be taken with respect to *The Demonologist*.

51.     Notwithstanding the fact that in purporting to "change publishers" Mrs. Warren, Mr. Spera and Mr. Zindel had not been acting in compliance with the Collaboration Agreement, Mr. Brittle agreed to review the contract proposed by Mr. Zindel. However, on or about June 22, 2013, Mr. Brittle rejected the proposed contract (as was his right).

52.     Over the ensuing months, Mr. Zindel aggressively pursued Mr. Brittle, including, but not limited to, sending him a letter on or about July 3, 2013, untenably saying, among other things, that "Mrs. Warren is free to exploit [*The Demonologist*] on a non-exclusive basis subject to her obligation to pay you your proportional share of the profits." In other words, Mr. Zindel did not acknowledge the existence of the Collaboration Agreement, but rather, incorrectly claimed that Mrs. Warren could proceed as a copyright co-owner **without** Mr. Brittle's involvement (i.e., that Mrs. Warren merely had an obligation to account to Mr. Brittle regarding any monies she received).

-14-

53.     As a result, on or about August 3, 2013, Mr. Brittle spoke with Mrs. Warren directly and explained that the Collaboration Agreement, among other things, prohibits unilateral action by Mrs. Warren, or any of her agents, including Mr. Spera.  Instead of discussing the issue with Mr. Brittle, Mrs. Warren told Mr. Brittle to speak with Mr. Spera.

54.     Shortly after the conversation with Mrs. Warren, Mr. Spera responded to Mr. Brittle via e-mail on or about August 3, 2013.  In summary, Mr. Spera ignored the existence of the Collaboration Agreement and rejected the fact that Mr. Brittle's approval was required for any action to be taken to "change publishers" with respect to *The Demonologist*.

55.     On or about August 4, 2013, Mr. Brittle responded to Mr. Spera's e-mail.  In relevant part, Mr. Brittle noted the existence of the Collaboration Agreement.

56.     That same day, Mr. Spera responded and, in relevant part, acknowledged the existence of the Collaboration Agreement and the obligation upon Mrs. Warren and Mr. Brittle to unanimously agree to "change publishers" for *The Demonologist*, but then said: "Don't call [Mrs. Warren] again.  Don't e-mail me again.  You were made aware of the publishing deal.  You chose not [t]o participate.  It's now being handled by the publisher.  Send your petty correspondence to them."

57.     Meanwhile, in our about late July 2013, Mr. Zindel, in direct violation of the Collaboration Agreement and without Mr. Brittle's knowledge or consent, at least twice contacted the Author's Guild and informed the Author's Guild that Graymalkin Media was the "new publisher" of *The Demonologist*.  More specifically, Mr. Zindel attempted on two occasions, without Mr. Brittle's knowledge or permission, to have the Author's Guild send him all "permissions" related to *The Demonologist*.  Mr. Zindel fraudulently represented that he was

-15-

allowed to do this on the basis that Mrs. Warren controls two-thirds (2/3) of the copyright of *The Demonologist*. However, the Author's Guild was aware that *The Demonologist* was actually jointly and equally held and controlled by Mr. Brittle and Mrs. Warren insofar as Paragraph 8 of the Collaboration Agreement requires "unanimous consent" in order to take any action with respect to *The Demonologist*. Accordingly, the Author's Guild was aware that the actions requested by Mr. Zindel required **unanimous** permission of Mr. Brittle and Mrs. Warren and properly rejected the request. The Author's Guild, in turn, alerted Mr. Brittle to the fact that Mr. Zindel contacted the Author's Guild and that the request had been denied because Mr. Zindel could not provide Mr. Brittle's approval (such approval had, of course, never been given to Mr. Zindel).

58. Mr. Brittle was advised by the Author's Guild to file a formal complaint, but Mr. Brittle elected not to do so. Instead, over the next several months, Mr. Brittle and Mr. Zindel discussed the possibility of a contract with Graymalkin Media concerning *The Demonologist*. Ultimately, however, Mr. Brittle and Mr. Zindel could not reach an agreement

59. Inexplicably, without Mr. Brittle's approval, consent or knowledge, Mrs. Warren, Mr. Spera, and Graymalkin Media nevertheless moved forward and republished *The Demonologist* with Graymalkin Media as the "new publisher," in clear violation of the Collaboration Agreement, among other things.

60. In an after-the-fact attempt to legitimize the actions of Mrs. Warren, Mr. Spera and Graymalkin Media, Mr. Zindel sent Mr. Brittle an email on April 10, 2014 in which he made false statements and assertions, to wit:

-16-

> [Mrs. Warren's] side has told me that no collaboration agreement was ever signed.
>
> * * *
>
> Even though [Mrs. Warren] owns 2/3 of the book according to US Copyright law ...

61.     The effort by Mrs. Warren to try to claim that she never signed the Collaboration Agreement is part of a fraudulent modus operandi that Mrs. Warren has sought to use in the past. On December 9, 2009, Robert Unkel contacted Tony DeRosa-Grund and claimed that he had an agreement with Mrs. Warren to act as her manager. When questioned regarding Mr. Unkel's claim, Mrs. Warren advised Mr. DeRosa-Grund and his legal representative in a telephone conference call, that she had never signed an agreement with Mr. Unkel. Mr. Unkel then produced a copy of the signed agreement, and further added to his claim that he had paid a large advance payment to Mrs. Warren; whereupon Mrs. Warren recanted and admitted that she had signed the agreement, but claimed that she had never received any payment from Mr. Unkel. Mr. Unkel then provided evidence of payment. Whereupon Mrs. Warren recanted on this point as well.

62.     Mrs. Warren's fraudulent claim that she did not sign the Collaboration Agreement; refuted by the testimony of Judy Penney who is prepared to testify that she witnessed the execution of the Collaboration Agreement by Mrs. Warren, Mr. Warren and Mr. Brittle, and that she thereafter signed the Collaboration Agreement herself as a witness in their presence.

63.     Mrs. Warren's fraudulent claim that she did not sign the Collaboration Agreement is untrue given the fact that Mr. Brittle is listed as the author of *The Demonologist* copyright and

-17-

Mrs. Warren's rights as a copyright claimant flow, if at all, via transfer through a "written agreement."  As such, if Mrs. Warren presses her fraudulent claim that she did not sign the Collaboration Agreement, she thereby admits that she has no claim in the copyright to *The Demonologist.*

64.     Mrs. Warren's fraudulent claim that she did not sign the Collaboration Agreement is untrue given the fact that she accepted advances paid to her by the publisher on the original contract.

65.     Finally, Mrs. Warren's fraudulent claim that she did not sign the Collaboration Agreement is untrue given the testimony of a handwriting expert who will confirm that the signature on the Collaboration Agreement is, in fact, Mrs. Warren's signature.

66.     Mr. Zindel's claim that "[Mrs. Warren] owns two-thirds (2/3) of the book according to US Copyright law" is in conflict with the express terms of the Collaboration Agreement and false.

67.     In accordance with the terms of the Collaboration Agreement, rights in *The Demonologist* are owned and controlled on an equal basis by: (i) Mr. Brittle; and (ii) the Warrens, i.e.,  neither party can sell, lease, license or otherwise dispose of rights in and to *The Demonologist* without the permission of the other.

68.     Other than the limited publishing rights covered by the Collaboration Agreement, all other rights associated with the Case Files, as well as the life rights of Mrs. Warren and Mr. Warren, have been granted to Evergreen and Mr. DeRosa-Grund by the Warren Agreements.

69. Mrs. Warren, and by extension Mr. Spera and Graymalkin Media, have no rights in connection with "*The Demonologist*" that can be exploited by New Line and/or Warner Bros. without Mr. Brittle's permission.

70. Mr. Brittle has given no such permission to Mrs. Warren, Mr. Spera, Graymalkin Media, New Line and/or Warner Bros to further exploit "*The Demonologist.*"

71. Moreover, Mrs. Warren, Mr. Spera, and Graymalkin Media, even if acting with Mr. Brittle, have no such rights which can be granted to New Line and/or Warner Bros inasmuch as all such rights have been granted by the Warrens to Evergreen and Mr. DeRosa-Grund under the Warren Agreements.

72. Moreover, Mr. Brittle has previously granted an option to Evergreen to acquire his rights to further exploit "*The Demonologist*" (the "Demonologist Option"), which rights Evergreen acknowledges and agrees are exercisable if and only if Evergreen secures corresponding rights from Mrs. Warren.

73. In other words, much like Mr. Zindel represented in his March 10, 2014 e-mail that, in view of Graymalkin Media's agreement with Mrs. Warren, no further exploitation of *The Demonologist* can occur without the involvement of Graymalkin Media, in view of Evergreen's Demonologist Option with Mr. Brittle, no further exploitation of "*The Demonologist*" can occur without the involvement of Evergreen.

74. In sum, in view of the facts set forth herein, it appears that Mrs. Warren, Mr. Spera and/or Graymalkin Media, in addition to republishing *The Demonologist* in violation of the Collaboration Agreement, upon information and belief, have entered into an illegal agreement and/or otherwise assisted and/or are assisting New Line and Warner Bros. to illegally create,

-19-

produce and distribute a direct-to-video and/or a theatrical motion picture based on the "Annabelle" chapter in Mr. Brittle's *The Demonologist* publication as well as a theatrical motion picture based on "The Enfield Voices" chapter in Mr. Brittle's *The Demonologist* publication in violation of Evergreen and Mr. DeRosa-Grund's rights under the Warren Agreements.

75.     As a result of the aforesaid conduct, Plaintiffs have been -- and continue to be -- damaged.

## COUNT I: TORTIOUS INTERFERENCE WITH CONTRACT
### (Evergreen and Mr. DeRosa-Grund Against Mrs. Warren, Mr. Spera and Graymalkin Media)

76.     Plaintiffs incorporate herein, by reference, the same as if set forth at length verbatim, the factual allegations contained herein above.

77.     At all relevant times, there were valid, existing contracts between Mr. Warren, Mrs. Warren, Mr. DeRosa-Grund and Evergreen (i.e., the aforementioned "Warren Agreements").  Upon information and belief, Mrs. Warren, Mr. Spera and Graymalkin Media knew of the existence of the Warren Agreements as well as the contents, terms and conditions thereof, but nevertheless interfered with the Warren Agreements.

78.     Among other things, Mrs. Warren, Mr. Spera and Graymalkin Media have interfered with the Warren Agreements by collaborating with New Line and Warner Bros. in connection with the producing and/or creating of direct-to-video and/or theatrical motion pictures based on the "Annabelle" and "The Enfield Voices" chapters as they appear in *The Demonologist.*

79.     Moreover, Mrs. Warren, Mr. Spera and Graymalkin Media have acted with malice and in conscious and deliberate disregard to the rights and/or interests of Evergreen and Mr. DeRosa-Grund.

80.     As a direct and proximate result of Mrs. Warren, Mr. Spera and Graymalkin Media's conduct, Evergreen and Mr. DeRosa-Grund have been damaged in an amount to be determined at trial.

### COUNT II: TORTIOUS INTERFERENCE WITH CONTRACT
### (Evergreen and Mr. DeRosa-Grund Against Warner Bros. and New Line)

81.     Plaintiffs incorporate herein, by reference, the same as if set forth at length verbatim, the factual allegations contained herein above.

82.     At all relevant times, there was a valid, existing contract between Mr. Brittle and Evergreen and Mr. DeRosa-Grund, namely, the Demonologist Option.  Upon information and belief, Warner Bros. and New Line knew of the existence of the Demonologist Option, but they nevertheless interfered with the Demonologist Option.

83.     Among other things, Warner Bros. and New Line have interfered with the Demonologist Option by producing and/or creating direct-to-video and/or theatrical motion pictures based on content from *The Demonologist.*

84.     Moreover, Warner Bros. and New Line have acted with malice and in conscious and deliberate disregard to the rights and/or interests of Evergreen and Mr. DeRosa-Grund.

85.     As a direct and proximate result of Warner Bros. and New Line's conduct, Evergreen and Mr. DeRosa-Grund have been damaged in an amount to be determined at trial.

## COUNT III: COPYRIGHT INFRINGEMENT
### (Evergreen and Mr. DeRosa-Grund Against Warner Bros and New Line)

86.     Plaintiffs incorporate herein, by reference, the same as if set forth at length verbatim, the factual allegations contained hereinabove.

87.     As set forth herein, Evergreen and Mr. DeRosa-Grund own or are exclusively granted the right to exercise an option to exploit copyrights in *The Demonologist*.

88.     Warner Bros. and New Line's infringing acts are willful, intentional and purposeful in disregard of and with indifference to Evergreen and Mr. DeRosa-Grund's rights.

89.     Warner Bros. and New Line's infringing acts have been committed with prior notice and knowledge of Evergreen and Mr. DeRosa-Grund's rights.

90.     Accordingly, Warner Bros. and New Line are liable, jointly and severally, to Evergreen and Mr. DeRosa-Grund for copyright infringement pursuant to 17 U.S.C. §§ 101, 501, *et seq.*, and for damages in an amount to be proven at trial.  Evergreen and Mr. DeRosa-Grund are also entitled to Warner Bros. and New Line's profits attributable to the infringement, pursuant to 17 U.S.C. § 504, including an accounting of and a constructive trust with respect to such profits.  In the alternative, Evergreen and Mr. DeRosa-Grund are entitled to statutory damages pursuant to 17 U.S.C. § 504(c).  These statutory damages should be enhanced by 17 U.S.C. § 504(c)(2) because of Warner Bros. and New Line's willful infringement and conduct.

## COUNT IV: CONTRIBUTORY COPYRIGHT INFRINGEMENT
### (Evergreen and DeRosa-Grund Against Mrs. Warren, Mr. Spera and Graymalkin Media)

91.     Plaintiffs incorporate herein, by reference, the same as if set forth at length verbatim, the factual allegations contained hereinabove.

-22-

92.     As set forth herein, Evergreen and Mr. DeRosa-Grund own or are exclusively granted the right to exercise an option to exploit copyrights in *The Demonologist*.

93.     Mrs. Warren, Mr. Spera and Graymalkin Media's infringing acts are willful, intentional and purposeful in disregard of and with indifference to Evergreen and Mr. DeRosa-Grund's rights.

94.     Mrs. Warren, Mr. Spera and Graymalkin Media's infringing acts have been committed with prior notice and knowledge of Evergreen and Mr. DeRosa-Grund's rights.

95.     Mrs. Warren, Mr. Spera and Graymalkin Media contributed to Warner Bros. and New Line's infringing actions by falsely and illegally advising Warner Bros. and New Line that they could create and/or produce direct-to-video and/or theatrical motion pictures based upon the "Annabelle" and "The Enfield Voices" chapters as they appear in *The Demonologist*.

96.     Accordingly, Mrs. Warren, Mr. Spera and Graymalkin Media are liable, jointly and severally, to Evergreen and Mr. DeRosa-Grund for copyright infringement pursuant to 17 U.S.C. §§ 101,  501 *et seq*, and for damages in an amount to be proven at trial.  Evergreen and Mr. DeRosa-Grund are also entitled to Mrs. Warren, Mr. Spera and Graymalkin Media's profits attributable to the infringement, pursuant to 17 U.S.C. § 504, including an accounting of and a constructive trust with respect to such profits.  In the alternative, Evergreen and Mr. DeRosa-Grund are entitled to statutory damages pursuant to 17 U.S.C. § 504(c).  These statutory damages should be enhanced by 17 U.S.C. § 504(c)(2) because of Mrs. Warren, Mr. Spera and Graymalkin Media's willful infringement and conduct.

## COUNT V: BREACH OF CONTRACT
### (Mr. Brittle Against Mrs. Warren)

97.     Plaintiffs incorporate herein, by reference, the same as if set forth at length verbatim, the factual allegations contained hereinabove.

98.     The Collaboration Agreement (as amended) is a valid, binding and enforceable contract.

99.     Mr. Brittle has performed all of his obligations pursuant thereto, and all conditions for Mrs. Warren's performance have occurred.

100.     By engaging in the above-referenced conduct, including but not limited to, permitting Graymalkin Media to republish *The Demonologist* without Mr. Brittle's consent and/or approval, Mrs. Warren has breached the Collaboration Agreement.

101.     As a direct and proximate result of Mrs. Warren's breach, Mr. Brittle has been damaged in an amount to be determined at trial.

## COUNT VI: BREACH OF THE IMPLIED COVENANT OF GOOD FAITH AND FAIR DEALING
### (Mr. Brittle Against Mrs. Warren)

102.     Plaintiffs incorporate herein, by reference, the same as if set forth at length verbatim, the factual allegations contained hereinabove.

103.     There is implicit in every contract an implied covenant of good faith and fair dealing.  The Collaboration Agreement (as amended) contains an implied covenant of good faith and fair dealing under which the parties must refrain from arbitrary or unreasonable conduct which has the effect of preventing the other party to the contract from receiving the fruits of that bargain.

104. Mr. Brittle has duly performed all covenants, conditions and promises required to be performed by them under the Collaboration Agreement in accordance with the terms and conditions, except for those obligations that have been prevented, delayed or excused by acts or omissions of Mrs. Warren.

105. By permitting Graymalkin Media to republish *The Demonologist* without Mr. Brittle's consent and/or approval, Mrs. Warren has acted in bad faith and prevented Mr. Brittle from receiving the fruits of the bargain under the Collaboration Agreement.

106. Accordingly, by engaging in the above-referenced conduct, Mrs. Warren has breached the implied covenant of good faith and fair dealing. As a direct and proximate result of Mrs. Warren's breach, Mr. Brittle has been damaged in an amount to be determined at trial.

## COUNT VII: FRAUD
### (Mr. Brittle Against Mrs. Warren)

107. Plaintiffs incorporate herein, by reference, the same as if set forth at length verbatim, the factual allegations contained hereinabove.

108. The foregoing acts of Ms. Warren constitute fraud.

109. Mrs. Warren has intentionally misrepresented to third-parties, namely, Mr. Zindel and Graymalkin Media, that she did not sign or enter into the Collaboration Agreement and, thereby, misrepresented to Mr. Zindel and Graymalkin Media that Mr. Brittle does not have certain rights related to *The Demonologist* -- rights he expressly has pursuant to the Collaboration Agreement. The fact that such false and fraudulent misrepresentations were made was confirmed in the April 10, 2014 e-mail from Mr. Zindel to Mr. Brittle referenced herein above.

110.    The effort by Mrs. Warren to try to claim that she never signed the Collaboration Agreement is part of a fraudulent modus operandi that Mrs. Warren has sought to use in the past.

111.    Moreover, Mrs. Warren fraudulently concealed from Mr. Brittle the fact that she was seeking to change the publisher of *The Demonologist* from iUniverse to Graymalkin Media, as evidenced by the fact that she signed an agreement with Graymalkin Media prior to involving or otherwise advising Mr. Brittle of her actions.

112.    Accordingly, Mrs. Warren has committed fraud.

113.    Moreover, Mrs. Warren has acted with malice and in conscious and deliberate disregard to the rights and/or interests of Mr. Brittle.

114.    As a result of Mrs. Warren's fraud, Mr. Brittle has been damaged in an amount to be determined at trial.

### COUNT VIII: TORTIOUS INTERFERENCE WITH CONTRACT
### (Mr. Brittle Against Mr. Spera and Graymalkin Media)

115.    Plaintiffs incorporate herein, by reference, the same as if set forth at length verbatim, the factual allegations contained herein above.

116.    At all relevant times, there was a valid, existing contract between Mr. Brittle and Mrs. Warren, namely, the Collaboration Agreement.  Mr. Spera and Graymalkin Media knew of the existence of the Collaboration Agreement as well as the contents, terms and conditions thereof, but Mr. Spera and Graymalkin Media nevertheless interfered with the Collaboration Agreement.

117.    Among other things, Mr. Spera and Graymalkin Media interfered with the Collaboration Agreement by re-releasing *The Demonologist* without "unanimous approval", namely, without Mr. Brittle's approval, as is required by the Collaboration Agreement.

118.    Moreover, Mr. Spera and Graymalkin Media have acted with malice and in conscious and deliberate disregard to the rights and/or interests of Mr. Brittle.

119.    As a direct and proximate result of Mr. Spera and Graymalkin Media's, Mr. Brittle has been damaged in an amount to be determined at trial.

## COUNT IX: COPYRIGHT INFRINGEMENT
### (Mr. Brittle Against Mr. Spera and Graymalkin Media)

120.    Plaintiffs incorporate herein, by reference, the same as if set forth at length verbatim, the factual allegations contained hereinabove.

121.    Mr. Brittle is an owner of *The Demonologist* copyright.

122.    Mr. Spera and Graymalkin Media's infringing acts are willful, intentional and purposeful in disregard of and with indifference to Mr. Brittle's rights.

123.    Mr. Spera and Graymalkin Media's infringing acts have been committed with prior notice and knowledge of Mr. Brittle's rights.

124.    Accordingly, Mr. Spera and Graymalkin Media are liable, jointly and severally, to Mr. Brittle for copyright infringement pursuant to 17 U.S.C. §§ 101, *et seq*. and for damages in an amount to be proven at trial.  Mr. Brittle is also entitled to Mr. Spera and Graymalkin Media's profits attributable to the infringement, pursuant to 17 U.S.C. § 504, including an accounting of and a constructive trust with respect to such profits.  In the alternative, Mr. Brittle is entitled to statutory damages pursuant to 17 U.S.C. § 504(c).  These statutory damages should be enhanced

by 17 U.S.C. § 504(c)(2) because of Mr. Spera and Graymalkin Media's willful infringement and conduct.

## COUNT X: TORTIOUS INTERFERENCE WITH CONTRACT
### (Mr. Brittle Against Warner Bros. and New Line)

125.     Plaintiffs incorporate herein, by reference, the same as if set forth at length verbatim, the factual allegations contained herein above.

126.     At all relevant times, there was a valid, existing contract between Mr. Brittle and Mrs. Warren, namely, the Collaboration Agreement.  Upon information and belief, Warner Bros. and New Line knew of the existence of the Collaboration Agreement as well as the contents, terms and conditions thereof, but nevertheless interfered with the Collaboration Agreement.

127.     Among other things, Warner Bros. and New Line interfered with the Collaboration Agreement by exploiting chapters from *The Demonologist*, namely, the "Annabelle" and "The Enfield Voices" chapters.

128.     As a direct and proximate result of Warner Bros. and New Line's conduct, Mr. Brittle has been damaged in an amount to be determined at trial.

## COUNT XI: COPYRIGHT INFRINGEMENT
### (Mr. Brittle Against Warner Bros. and New Line)

129.     Plaintiffs incorporate herein, by reference, the same as if set forth at length verbatim, the factual allegations contained hereinabove.

130.     Mr. Brittle is an owner of *The Demonologist* copyright.

131.     Warner Bros. and New Line's infringing acts are willful, intentional and purposeful in disregard of and with indifference to Mr. Brittle's rights.

-28-

132.    Warner Bros. and New Line's infringing acts have been committed with prior notice and knowledge of Mr. Brittle's rights.

133.    Accordingly, Warner Bros. and New Line are liable, jointly and severally, to Mr. Brittle for copyright infringement pursuant to 17 U.S.C. §§ 101, 501, *et seq*., and for damages in an amount to be proven at trial.  Mr. Brittle is also entitled to Warner Bros. and New Line's profits attributable to the infringement, pursuant to 17 U.S.C. § 504, including an accounting of and a constructive trust with respect to such profits.  In the alternative, Mr. Brittle is entitled to statutory damages pursuant to 17 U.S.C. § 504(c).  These statutory damages should be enhanced by 17 U.S.C. § 504(c)(2) because of Warner Bros. and New Line's willful infringement and conduct.

### COUNT XII: DECLARATORY JUDGMENT
#### (Mr. Brittle Against All Defendants)

134.    Plaintiffs incorporate herein, by reference, the same as if set forth at length verbatim, the factual allegations contained hereinabove.

135.    An actual and justiciable controversy has arisen and now exists between Mr. Brittle and all of the Defendants concerning their respective rights in connection with *The Demonologist*.  Mr. Brittle has never given any of the Defendants authorization, consent and/or permission to exploit and/or otherwise use *The Demonologist* or any portion thereof for any purpose whatsoever.  Notwithstanding that fact, Defendants have exploited and/or otherwise used (and are exploiting and/or otherwise using) *The Demonologist* and/or portions thereof without Mr. Brittle's authorization, consent and/or permission.

136.     Accordingly, pursuant to 28 U.S.C. § 2201, Mr. Brittle is entitled to a declaratory judgment that none of the Defendants have any right and/or authority to exploit and/or use *The Demonologist*, including, but not limited to, any portion thereof, without the consent and/or approval of Mr. Brittle.

### COUNT XIII: CIVIL CONSPIRACY
### (All Plaintiffs Against All Defendants)

137.     Plaintiffs incorporate herein, by reference, the same as if set forth at length verbatim, the factual allegations contained hereinabove.

138.     Defendants, acting in concert and in furtherance of a conspiracy, have acted together to interfere with the Collaboration Agreement, the Warren Agreements and the Demonologist Option in order to deprive Plaintiffs of their rights.

139.     Together, in furtherance of the conspiracy, Defendants have committed the acts complained of herein.

140.     As a proximate result of Defendants' conduct, Plaintiffs have been damaged.

### RELIEF

WHEREFORE, Plaintiffs, EVERGREEN MEDIA HOLDINGS, LLC, TONY DEROSA-GRUND and GERALD D. BRITTLE, respectfully request that the court grant the following relief against Defendants, LORRAINE WARREN, TONY SPERA, GRAYMALKIN MEDIA, LLC, WARNER BROS. ENTERTAINMENT, INC. and NEW LINE PRODUCTIONS, INC., as follows:

1.     Awarding Plaintiffs actual damages;

2.     Awarding Plaintiffs punitive damages in an amount set by the trier of fact;

3.     Awarding Evergreen and Mr. DeRosa-Grund damages for tortious interference with a contract by Mrs. Warren, Mr. Spera and Graymalkin Media and by Warner Bros. and New

Line;

4.      Awarding Evergreen and Mr. DeRosa-Grund damages pursuant to 17 U.S.C. §§ 101, 501, *et seq*. for copyright infringement by Warner Bros. and/or New Line;

5.      In addition to Evergreen and Mr. DeRosa-Grund's actual damages, awarding Evergreen and/or Mr. DeRosa-Grund the profits made by Warner Bros. and/or New Line from their wrongful acts pursuant to 17 U.S.C. § 504;

6.      In the alternative, awarding Evergreen and/or Mr. DeRosa-Grund statutory damages pursuant to 17 U.S.C. § 504(c), as well as enhanced statutory damages pursuant to 17 U.S.C. § 504(c)(2);

7.      Awarding Evergreen and Mr. DeRosa-Grund damages pursuant to 17 U.S.C. §§ 101, 501, *et seq* for contributory copyright infringement against Mrs. Warren, Mr. Spera and Graymalkin Media;

8.      In addition to Evergreen and Mr. DeRosa-Grund's actual damages, awarding Evergreen and/or Mr. DeRosa-Grund the profits made by Mrs. Warren, Mr. Spera and Graymalkin Media from their wrongful acts pursuant to 17 U.S.C. § 504;

9.      In the alternative, awarding Evergreen and/or Mr. DeRosa-Grund statutory damages pursuant to 17 U.S.C. § 504(c), as well as enhanced statutory damages pursuant to 17 U.S.C. § 504(c)(2) for contributory infringement against Mrs. Warren, Mr. Spera and Graymalkin Media;

10.      Awarding Mr. Brittle damages for breach of contract by Mrs. Warren;

11.      Awarding Mr. Brittle damages for breach of the implied covenant of good faith and fair dealing by Mrs. Warren;

12.      Awarding Mr. Brittle damages for the fraudulent conduct of Mrs. Warren;

13.      Awarding Mr. Brittle damages for tortious interference with a contract by Mr. Spera, Graymalkin Media, Warner Bros., and New Line;

14.      Awarding Mr. Brittle damages pursuant to 17 U.S.C. §§ 101, 501 *et seq*. for copyright infringement by Mr. Spera , Graymalkin Media, Warner Bros., and/or New Line;

15.      In addition to Mr. Brittle's actual damages, awarding Mr. Brittle the profits made by Mr. Spera, Graymalkin Media, Warner Bros., and/or New Line from their wrongful acts pursuant to 17 U.S.C. § 504;

16.     In the alternative, awarding Mr. Brittle statutory damages pursuant to 17 U.S.C. § 504(c), as well as enhanced statutory damages pursuant to 17 U.S.C. § 504(c)(2);

17.     Entering a declaratory judgment that none of the Defendants have any right and/or authority to exploit and/or use *The Demonologist*, including, but not limited to, any portion thereof, without the authorization, consent and/or permission of Mr. Brittle.

18.     Awarding Plaintiffs damages for civil conspiracy by Defendants;

19.     Awarding an accounting to Plaintiffs for the gains and profits of Defendants and all damages sustained by Plaintiffs by reason of Defendants' unlawful acts as alleged herein pursuant;

20.     Awarding the maximum pre-judgment and post-judgment interest as allowed by law;

21.     Awarding Plaintiffs their attorneys' fees and cost, including, but not limited to, attorneys' fees and costs pursuant to 17 U.S.C. § 505;

22.     Enjoining and restraining Defendants from: (i) further publication of *The Demonologist* permanently without the permission of Mr. Brittle; and/or (ii) proceeding with development and production of a direct-to-video and/or theatrical motion picture based upon either the "Annabelle" or "The Enfield Voices" chapters in *The Demonologist*;

23.     Awarding Plaintiffs any other remedy to which they may be entitled to as provided under applicable federal or state law; and

24.     Awarding Plaintiffs such other and further relief as the Court might deem proper.

### **Jury Demand**

Plaintiffs hereby demand a jury trial on issues so triable pursuant to Rule 38 of the Federal Rules of Civil Procedure.

Respectfully submitted,


By:\_\_\_\_/s/ Sanford L. Dow_____
   Sanford L. Dow
   S.D. Texas No. 17162
   Texas Bar No. 00787392
   Nine Greenway Plaza, Suite 500
   Houston, Texas 77046
   (713) 526-3700/FAX (713) 526-3750
   dow@dowgolub.com

   ATTORNEY-IN-CHARGE FOR PLAINTIFFS


OF COUNSEL:

DOW GOLUB REMELS & BEVERLY, LLP
Stephanie A. Hamm
S.D. Texas No. 108779
Texas Bar No. 24069841
Nine Greenway Plaza, Suite 500
Houston, Texas 77046
(713) 526-3700/FAX (713) 526-3750
sahamm@dowgolub.com

GRIMES LLC
Charles W. Grimes
Connecticut Juris No. 304368
(to be admitted pro hac vice to S.D. Texas)
grimes@gandb.com
Michael R. Patrick
Connecticut Juris. No. 423632
(to be admitted pro hac vice to S.D. Texas)
patrick@gandb.com
488 Main Avenue
Norwalk, Connecticut 06851
Tel: (203) 849-8300/FAX: (203) 849-9300

N:\users\SDow\DeRosa-Grund\Evergreen Media Group, LLC\Brittle\Plaintiffs' Original Complaint.doc

-33-

# EXHIBIT B

# UNITED STATES DISTRICT COURT
## DISTRICT OF CONNECTICUT

EVERGREEN MEDIA HOLDINGS, LLC,     )
TONY DEROSA-GRUND and          )
GERALD D. BRITTLE                )
                                     )
     Plaintiffs,                )
                                     )
          v.                  )     Civil Action No.
                                     )
LORRAINE WARREN, TONY SPERA and    )     JURY TRIAL DEMANDED
GRAYMALKIN MEDIA, LLC         )
                                     )
     Defendants.              )
_____)

## COMPLAINT

Plaintiffs, EVERGREEN MEDIA HOLDINGS, LLC, TONY DEROSA-GRUND AND GERALD D. BRITTLE (collectively "Plaintiffs"), for their Complaint against Defendants, LORRAINE WARREN, TONY SPERA, GRAYMALKIN MEDIA, LLC, by and through their attorneys Grimes LLC, allege as follows:

## NATURE OF THE ACTION

1.    This is an action for breach of contract, breach of the implied covenant of good faith and fair dealing, fraud, tortious interference with a contract, copyright infringement and declaratory judgment.

## THE PARTIES

2.    Plaintiff Evergreen Media Holdings, LLC ("Evergreen"), is a Texas limited liability company with its principal place of business in Montgomery County, Texas.

3.    Plaintiff Tony DeRosa-Grund ("Mr. DeRosa-Grund") is an individual residing in Montgomery County, Texas.  Mr. DeRosa-Grund is a motion picture producer and the Executive Chairman of Evergreen.

4.      Plaintiff Gerald D. Brittle ("Mr. Brittle") is an individual residing in Richmond, Virginia.  Mr. Brittle is a writer and is the author of *The Demonologist*, among other works.

5.      Defendant Lorraine Warren ("Mrs. Warren") is an individual residing at 30 Knollwood Street, Monroe, Connecticut 06468.

6.      Defendant Tony Spera ("Mr. Spera") is an individual residing at 122 Mine Hill Road, New Milford, Connecticut 06776.

7.      Defendant Graymalkin Media, LLC ("Graymalkin") is a California limited liability company with its principal place of business at 1413 Greenfield Avenue, Suite 103, Los Angeles, California 90025.

## JURISDICTION AND VENUE

8.      This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. §§ 1331 (federal question) and 1338(a) (acts of Congress relating to patents, trademarks and copyrights), 28 U.S.C. §§ 2201, *et seq*. (declaratory judgment act) and 28 U.S.C. § 1367 (supplemental jurisdiction over state claims).  This Court also has jurisdiction pursuant to federal diversity jurisdiction, 28 U.S.C. § 1332, as the parties are completely diverse in citizenship and the amount in controversy exceeds $75,000.

9.      Personal jurisdiction over non-resident Defendant Graymalkin is proper because, *inter alia*, this lawsuit: (i) arises from acts and/or transactions occurring within and/or directed towards Connecticut; (ii) is connected with acts and/or transactions occurring within and/or directed towards Connecticut; and/or (iii) relates to the purposeful acts and/or transactions of the non-resident Defendant, and those purposeful acts occurred within and/or were directed towards

Connecticut. The assumption of jurisdiction by this Court over the non-resident Defendant Graymalkin does not offend traditional notions of fair play and substantial justice.

10.     Venue is proper in this Court pursuant to 28 U.S.C. § 1391(b) because, *inter alia*, a substantial part of the acts complained of herein occurred in this jurisdiction.

### FACTS COMMON TO ALL COUNTS

11.     Mrs. Warren and her late husband, Ed Warren ("Mr. Warren"), were paranormal investigators involved in thousands of paranormal investigations over the course of the last five decades. Their investigations are part of approximately 8,000 case files compiled by Mrs. Warren and Mr. Warren over decades of paranormal investigations (collectively, the approximately 8,000 case files are referred to as the "Case Files"). Mr. Warren passed away in August 2006.

12.     Mr. DeRosa-Grund's dealings with Mrs. Warren and Mr. Warren date back nearly twenty-three (23) years. Throughout that period, Mr. DeRosa-Grund held thousands of hours of discussions with Mr. Warren, and occasionally Mrs. Warren, regarding their Case Files. Indeed, during those thousands of hours, Mr. Warren, in particular, would propose and discuss with Mr. DeRosa-Grund various Case Files that he felt were particularly suitable for exploitation as a theatrical motion picture.

13.     In 2009, Mr. DeRosa-Grund and the Warrens entered into four agreements (the "Warren Agreements") for the exploitation of the Life Stories of the Warrens and the Case Files. The Warren Agreements, entered into in Texas and Pennsylvania/Connecticut, were dated May 6, 2009, June 1, 2009 and June 19, 2009 (two agreements). The Warren Agreements were executed: (i) by Mr. DeRosa-Grund on behalf of Evergreen; and (ii) either: (a) by Harrison Smith

-3-

on behalf of Mrs. Warren and the Estate of Mr. Warren; or (b) by Mrs. Warren personally and by Mr. Smith on behalf of Mrs. Warren and the Estate of Mr. Warren. The Warren Agreements gave Evergreen and Mr. DeRosa-Grund the exclusive right to exploit film and television rights in and to the Life Stories of the Warrens and in and to the Case Files.

14.　　On or about November 20, 1978, Mrs. Warren and Mr. Warren entered into, and executed, an agreement with Mr. Brittle concerning publishing rights, and certain ancillary rights related thereto, in and to a book to be entitled *The Demonologist*. The agreement was amended, and executed, on or about April 16, 1990 (collectively, the agreement and the amendment are collectively referred to herein as the "Collaboration Agreement"). As set forth in the Collaboration Agreement, *The Demonologist* concerned Mrs. Warren and Mr. Warren's "lives and experiences as psychic investigators." From the beginning the understanding between Mr. Brittle and the Warrens was that all earnings and judgments concerning this literary property be conducted on a 50-50 basis, and no action or decisions on said property could be executed on a unilateral basis. For the benefit of both parties this understanding was formalized in writing, resulting in the cited Agreement on the date above.

15.　　Among other things, in the Collaboration Agreement, Mrs. Warren, Mr. Warren, and Mr. Brittle agreed as follows:

> All contracts for the sale, lease, license or other disposition of any and all rights in and to [*The Demonologist*] now existing or which may hereafter come into existence shall require the unanimous consent of [Mr. Brittle] and [Mrs. Warren and Mr. Warren].

-4-

16.     The Collaboration Agreement is valid and existing and continues in full force and effect to the present day.  Throughout, Mr. Brittle has abided -- without exception -- to the terms of this Agreement.  The Warrens (now Mrs. Warren and Tony Spera) have not.

17.     Following years of substantial work by Mr. Brittle, including, but not limited to, extensive interviews with Mrs. Warren and Mr. Warren, site-visits, testimonials, theological research and steps to vet the accuracy of *The Demonologist* by two Roman Catholic exorcists, *The Demonologist* was first released in or about December 1980 by Prentice-Hall, Inc. ("Prentice Hall").

18.     *The Demonologist* focused on several experiences associated with Mrs. Warren and Mr. Warren.

19.     One experience which *The Demonologist* focused upon was entitled "Annabelle." As discussed in the relevant chapter of *The Demonologist*,  "Annabelle" involved a Raggedy Ann doll used by a demonic spirit that terrified a family.

20.     Another experience which *The Demonologist* focused upon was entitled "The Enfield Voices."  As discussed in the relevant chapter of *The Demonologist*, "The Enfield Voices" involved a single mother, Margaret Hodgson, who called police to her home in Enfield, England after two of her four children claimed that furniture was moving and knocking sounds were heard on walls.  A female police constable witnessed a chair slide across the floor on its own.  "The Enfield Voices" involved demonic voices, loud noises, thrown rocks and toys, overturned chairs and levitation of children.

21.     Since it was first released by Prentice Hall in 1980, *The Demonologist* has been re-released several times, always pursuant to and in compliance with the terms of the

Collaboration Agreement, including, most recently, in or about September 2002 through iUniverse.

22.     In or about June 2013, notwithstanding the long-existing Collaboration Agreement, Mr. Brittle received a telephone call from David Zindel ("Mr. Zindel"), the principal and owner of Graymalkin.  In the phone call, Mr. Zindel informed Mr. Brittle that Mr. Spera, Mrs. Warren's son-in-law, had "taken charge" of *The Demonologist* and would now "change publishers" from iUniverse to Graymalkin.  Mr. Zindel further informed Mr. Brittle that he would send a contract to Mr. Brittle for his signature and represented that Mrs. Warren had **already** executed a contract with Graymalkin "changing publishers" for *The Demonologist* from iUniverse to Graymalkin.

23.     Among other things, Mr. Brittle correctly informed Mr. Zindel that Mr. Spera had no right or authority to "change publishers" in connection with *The Demonologist* in view of the Collaboration Agreement and, in particular, that the Collaboration Agreement requires the unanimous approval of both Mr. Brittle and Mrs. Warren **before** any action to "change publishers" can be taken with respect to *The Demonologist*.

24.     Notwithstanding the fact that in purporting to "change publishers" Mrs. Warren, Mr. Spera and Mr. Zindel had not been acting in compliance with the Collaboration Agreement, Mr. Brittle agreed to review the contract proposed by Mr. Zindel.  However, on or about June 22, 2013, Mr. Brittle rejected the proposed contract (as was his right).

25.     Over the ensuing months, Mr. Zindel aggressively pursued Mr. Brittle, including, but not limited to, sending him a letter on or about July 3, 2013, untenably saying, among other things, that "Mrs. Warren is free to exploit [*The Demonologist*] on a non-exclusive basis subject

-6-

to her obligation to pay you your proportional share of the profits." In other words, Mr. Zindel did not acknowledge the existence of the Collaboration Agreement, but rather, incorrectly claimed that Mrs. Warren could proceed as a copyright co-owner **without** Mr. Brittle's involvement (i.e., that Mrs. Warren merely had an obligation to account to Mr. Brittle regarding any monies she received).

26. As a result, on or about August 3, 2013, Mr. Brittle spoke with Mrs. Warren directly and explained that the Collaboration Agreement, among other things, prohibits unilateral action by Mrs. Warren, or any of her agents, including Mr. Spera. Instead of discussing the issue with Mr. Brittle, Mrs. Warren told Mr. Brittle to speak with Mr. Spera.

27. Shortly after the conversation with Mrs. Warren, Mr. Spera responded to Mr. Brittle via e-mail on or about August 3, 2013. In summary, Mr. Spera ignored the existence of the Collaboration Agreement and rejected the fact that Mr. Brittle's approval was required for any action to be taken to "change publishers" with respect to *The Demonologist*.

28. On or about August 4, 2013, Mr. Brittle responded to Mr. Spera's e-mail. In relevant part, Mr. Brittle noted the existence of the Collaboration Agreement.

29. That same day, Mr. Spera responded and, in relevant part, acknowledged the existence of the Collaboration Agreement and the obligation upon Mrs. Warren and Mr. Brittle to unanimously agree to "change publishers" for *The Demonologist*, but then said: "Don't call [Mrs. Warren] again. Don't e-mail me again. You were made aware of the publishing deal. You chose not [t]o participate. It's now being handled by the publisher. Send your petty correspondence to them."

30. In 2002, Mr. Brittle and the Warrens jointly arranged for a new reprint of *The Demonologist* through a program offered by the Authors Guild in New York. In or about late July 2013, Mr. Zindel, in direct violation of the Collaboration Agreement and without Mr. Brittle's knowledge or consent, surreptitiously and with forethought contacted the Author's Guild at least twice and deceptively informed the Author's Guild that Graymalkin was the "new publisher" of *The Demonologist*. More specifically, Mr. Zindel attempted on two occasions, without Mr. Brittle's knowledge or permission, to have the Author's Guild send him all "permissions" related to *The Demonologist* in order to facilitate the illegal publication of said book by his company. Mr. Zindel fraudulently represented that he was allowed to do this on the basis that Mrs. Warren allegedly controls two-thirds (2/3) of the copyright of *The Demonologist*. However, the Author's Guild was aware that *The Demonologist* was actually jointly and equally held and controlled by Mr. Brittle and Mrs. Warren insofar as Paragraph 8 of the Collaboration Agreement requires "unanimous consent" in order to take any action with respect to *The Demonologist*. Accordingly, the Author's Guild was aware that the actions requested by Mr. Zindel required **unanimous** permission of Mr. Brittle and Mrs. Warren and properly rejected the request. The Author's Guild, in turn, alerted Mr. Brittle to the fact that Mr. Zindel contacted the Author's Guild and that the request had been denied because Mr. Zindel could not provide Mr. Brittle's approval (such approval had, of course, never been given to Mr. Zindel).

31. Mr. Brittle was advised by the Author's Guild to file a formal complaint, but Mr. Brittle elected not to do so believing a solution could be reached through discussion with the interested parties. Accordingly, over the next several months, Mr. Brittle and Mr. Zindel discussed the possibility of a contract with Graymalkin concerning *The Demonologist*.

Ultimately, however, Mr. Brittle and Mr. Zindel could not reach an equitable and satisfactory agreement

32.     Inexplicably, without Mr. Brittle's approval, consent or knowledge, Mrs. Warren, Mr. Spera, and Graymalkin nevertheless moved forward and republished *The Demonologist* with Graymalkin as the "new publisher," in clear violation of the Collaboration Agreement, among other things.

33.     In an after-the-fact attempt to legitimize the actions of Mrs. Warren, Mr. Spera and Graymalkin, Mr. Zindel sent Mr. Brittle an email on April 10, 2014 in which he made false statements and assertions, to wit:

> [Mrs. Warren's] side has told me that no collaboration agreement was ever signed.
>
> * * *
>
> Even though [Mrs. Warren] owns 2/3 of the book according to US Copyright law ...

34.     The effort by Mrs. Warren to try to claim that she never signed the Collaboration Agreement is part of a fraudulent modus operandi and repeated pattern of conduct that Mrs. Warren has sought to use in the past.  Just one example of this protracted pattern of fraudulent, deceitful and egregious behavior of Mrs. Warren -- conduct that is now also employed by Mr. Spera -- took place on December 9, 2009.  Robert Unkel ("Mr. Unkel") contacted Mr. DeRosa-Grund and claimed that he had an agreement with Mrs. Warren to act as her manager.  When questioned regarding Mr. Unkel's claim, Mrs. Warren advised Mr. DeRosa-Grund and his legal representative in a telephone conference call that she had never signed an agreement with Mr. Unkel.  Mr. Unkel then produced a copy of the signed agreement and further added to his claim

that he had paid a large advance payment by check to Mrs. Warren. Whereupon Mrs. Warren recanted and admitted that she had signed the agreement, but claimed that she had never received any payment from Mr. Unkel. Mr. Unkel then provided evidence of payment, a copy of a check endorsed and negotiated by Mrs. Warren. Whereupon Mrs. Warren recanted on this point as well.

35. Mrs. Warren's fraudulent claim that she did not sign the Collaboration Agreement is refuted by the testimony of Judy Penney who is prepared to testify that she witnessed the execution of the Collaboration Agreement by Mrs. Warren, Mr. Warren and Mr. Brittle, and that she thereafter signed the Collaboration Agreement herself as a witness in their presence.

36. Mrs. Warren's fraudulent claim that she did not sign the Collaboration Agreement is untrue given the fact that Mr. Brittle is listed as the author of *The Demonologist* copyright and Mrs. Warren's rights as a copyright claimant flow, if at all, via transfer through a "written agreement." As such, if Mrs. Warren presses her fraudulent claim that she did not sign the Collaboration Agreement, she thereby admits that she has no claim in the copyright to *The Demonologist.*

37. Mrs. Warren's fraudulent claim that she did not sign the Collaboration Agreement is untrue given the fact that she accepted advances paid to her by the publisher on the original contract, as well as accepting her 50% share of options and royalty earnings since the inception date of the Agreement.

38. Finally, Mrs. Warren's fraudulent claim that she did not sign the Collaboration Agreement is untrue given the testimony of a handwriting expert who will confirm that the signature on the Collaboration Agreement is, in fact, Mrs. Warren's signature.

39.     Mr. Zindel's extraordinary claim that "[Mrs. Warren] owns two-thirds (2/3) of the book according to US Copyright law" is in conflict with the express terms of the Collaboration Agreement and is entirely false.

40.     In accordance with the terms of the Collaboration Agreement, rights in *The Demonologist* are owned and controlled on an equal basis by: (i) Mr. Brittle; and (ii) the Warrens, i.e., neither party can sell, lease, license or otherwise dispose of rights in and to *The Demonologist* without the permission of the other.

41.     Other than the limited publishing rights covered by the Collaboration Agreement, all other rights associated with the Case Files, as well as the life rights of Mrs. Warren and Mr. Warren, have been granted to Evergreen and Mr. DeRosa-Grund by the Warren Agreements.

42.     Mr. Brittle has previously granted an option to Evergreen to acquire his rights to further exploit "*The Demonologist*" (the "Demonologist Option"), which rights Evergreen acknowledges and agrees are exercisable if and only if Evergreen secures corresponding rights from Mrs. Warren.

43.     In other words, much like Mr. Zindel represented in his March 10, 2014 e-mail that, in view of Graymalkin's agreement with Mrs. Warren, no further exploitation of *The Demonologist* can occur without the involvement of Graymalkin, in view of Evergreen's Demonologist Option with Mr. Brittle, no further exploitation of "*The Demonologist*" can occur without the involvement of Evergreen.

44.     On or about July 17, 2014, declarations were filed in *Evergreen Media Holdings, LLC, et al. v. Warren, et al.* (4:14-cv-01117; Southern District of Texas) wherein Mrs. Warren,

under oath, claimed that she "never entered into" the Warren Agreements. This is an entirely false and fraudulent statement. The Warren Agreements are valid, binding and existing.

45. In addition to making a false and fraudulent representation to the U.S. District Court for the Southern District of Texas, Mrs. Warren has intentionally, falsely and fraudulently misrepresented to third-parties, e.g., to New Line Productions, Inc., that she did not sign or enter into the Warren Agreements. Indeed, Mrs. Warren fraudulently entered into an agreement (the "Lorraine Warren Direct Agreement") with New Line Productions, Inc. that controverts and violates the Warren Agreements, e.g., by, *inter alia*, granting to New Line Productions, Inc. purported rights to the Case Files which Mrs. Warren did not have the right to grant inasmuch as such rights had already been previously granted to Evergreen by virtue of the Warren Agreements.

46. Moreover, Mrs. Warren fraudulently hid and concealed the contents and implications of the Lorraine Warren Direct Agreement from Mr. DeRosa-Grund and Evergreen by, among other things, failing to disclose to them the contents and/or implications of the Lorraine Warren Direct Agreement.

47. Upon information and belief, Mr. Spera has aided, abetted, caused, induced and/or otherwise helped Mrs. Warren to: (i) make false and fraudulent statements that the Warren Agreements do not exist or were never executed; (ii) hide and/or conceal the contents and/or implications of the Lorraine Warren Direct Agreement from Mr. DeRosa-Grund and Evergreen; and (iii) breach the Warren Agreements by, inter alia, entering into the Lorraine Warren Direct Agreement.

48.     As a result of the aforesaid conduct, Plaintiffs have been -- and continue to be -- damaged.

## COUNT I: BREACH OF CONTRACT
### (Mr. Brittle Against Mrs. Warren)

49.     Plaintiffs incorporate herein, by reference, the same as if set forth at length verbatim, the factual allegations contained hereinabove.

50.     The Collaboration Agreement (as amended) is a valid, binding and enforceable contract.

51.     Mr. Brittle has performed all of his obligations pursuant thereto, and all conditions for Mrs. Warren's performance have occurred.

52.     By engaging in the above-referenced conduct, including but not limited to, permitting Graymalkin to republish *The Demonologist* without Mr. Brittle's consent and/or approval, Mrs. Warren has breached the Collaboration Agreement.

53.     As a direct and proximate result of Mrs. Warren's breach, Mr. Brittle has been damaged in an amount to be determined at trial.

## COUNT II: BREACH OF THE IMPLIED COVENANT
## OF GOOD FAITH AND FAIR DEALING
### (Mr. Brittle Against Mrs. Warren)

54.     Plaintiffs incorporate herein, by reference, the same as if set forth at length verbatim, the factual allegations contained hereinabove.

55.     There is implicit in every contract an implied covenant of good faith and fair dealing.  The Collaboration Agreement (as amended) contains an implied covenant of good faith and fair dealing under which the parties must refrain from arbitrary or unreasonable conduct

-13-

which has the effect of preventing the other party to the contract from receiving the fruits of that bargain.

56.     Mr. Brittle has duly performed all covenants, conditions and promises required to be performed by him under the Collaboration Agreement in accordance with the terms and conditions, except for those obligations that have been prevented, delayed or excused by acts or omissions of Mrs. Warren.

57.     By permitting Graymalkin to republish *The Demonologist* without Mr. Brittle's consent and/or approval, Mrs. Warren has acted in bad faith and prevented Mr. Brittle from receiving the fruits of the bargain under the Collaboration Agreement.

58.     Accordingly, by engaging in the above-referenced conduct, Mrs. Warren has breached the implied covenant of good faith and fair dealing.  As a direct and proximate result of Mrs. Warren's breach, Mr. Brittle has been damaged in an amount to be determined at trial.

## COUNT III: FRAUD
### (Mr. Brittle Against Mrs. Warren)

59.     Plaintiffs incorporate herein, by reference, the same as if set forth at length verbatim, the factual allegations contained hereinabove.

60.     Mrs. Warren has falsely and fraudulently  misrepresented to third-parties, namely, Mr. Zindel and Graymalkin, that she did not sign or enter into the Collaboration Agreement.

61.      The effort by Mrs. Warren to try to claim that she never signed the Collaboration Agreement is part of a fraudulent modus operandi that Mrs. Warren has sought to use in the past.

-14-

62.     Mrs. Warren falsely and fraudulently misrepresented to Mr. Zindel and Graymalkin that Mr. Brittle does not have certain rights related to *The Demonologist* -- rights he expressly has pursuant to the Collaboration Agreement.

63.     The fact that such false and fraudulent misrepresentations were made by Mrs. Warren was confirmed in the April 10, 2014 e-mail from Mr. Zindel to Mr. Brittle referenced herein above.

64.     Accordingly, Mrs. Warren has committed fraud.

65.     As a result of Mrs. Warren's fraud, Mr. Brittle has been damaged in an amount to be determined at trial.

### COUNT IV: TORTIOUS INTERFERENCE WITH CONTRACT AND/OR BUSINESS EXPECTENCY
### (Mr. Brittle Against Mr. Spera and Graymalkin Media)

66.     Plaintiffs incorporate herein, by reference, the same as if set forth at length verbatim, the factual allegations contained herein above.

67.     At all relevant times, there was a valid, existing contract between Mr. Brittle and Mrs. Warren, namely, the Collaboration Agreement.  Mr. Spera and Graymalkin knew of the existence of the Collaboration Agreement as well as the contents, terms and conditions thereof, but Mr. Spera and Graymalkin nevertheless interfered with the Collaboration Agreement.

68.     Among other things, Mr. Spera and Graymalkin interfered with the Collaboration Agreement by re-releasing *The Demonologist* without "unanimous approval", namely, without Mr. Brittle's approval, as is required by the Collaboration Agreement.

69.     Moreover, Mr. Spera and Graymalkin have acted improperly, with malice and in conscious and deliberate disregard to the rights and/or interests of Mr. Brittle.

-15-

70.     As a direct and proximate result of the actions Mr. Spera and Graymalkin, Mr. Brittle has been damaged in an amount to be determined at trial.

## COUNT V: COPYRIGHT INFRINGEMENT
### (Mr. Brittle Against Mr. Spera and Graymalkin Media)

71.     Plaintiffs incorporate herein, by reference, the same as if set forth at length verbatim, the factual allegations contained hereinabove.

72.     Mr. Brittle is an owner of *The Demonologist* copyright.

73.     The acts of Mr. Spera and Graymalkin are infringing, willful, intentional and in purposeful disregard of and with indifference to Mr. Brittle's rights.

74.     The infringing acts of Mr. Spera and Graymalkin have been committed with prior notice and knowledge of Mr. Brittle's rights.

75.     Accordingly, Mr. Spera and Graymalkin are liable, jointly and severally, to Mr. Brittle for copyright infringement pursuant to 17 U.S.C. §§ 101, *et seq*. and for damages in an amount to be proven at trial.  Mr. Brittle is also entitled to the profits of Mr. Spera and Graymalkin attributable to the infringement, pursuant to 17 U.S.C. § 504, including an accounting of and a constructive trust with respect to such profits.  In the alternative, Mr. Brittle is entitled to statutory damages pursuant to 17 U.S.C. § 504(c).  These statutory damages should be enhanced by 17 U.S.C. § 504(c)(2) because the conduct of Mr. Spera and Graymalkin constituted willful infringement.

## COUNT VI: DECLARATORY JUDGMENT
### (Mr. Brittle Against All Defendants)

76.     Plaintiffs incorporate herein, by reference, the same as if set forth at length verbatim, the factual allegations contained hereinabove.

77.     An actual and justiciable controversy has arisen and now exists between Mr. Brittle and all of the Defendants concerning their respective rights in connection with *The Demonologist*.  Mr. Brittle has never given any of the Defendants authorization, consent and/or permission to exploit and/or otherwise use *The Demonologist* or any portion thereof for any purpose whatsoever.  Notwithstanding that fact, Defendants have exploited and/or otherwise used (and are exploiting and/or otherwise using) *The Demonologist* and/or portions thereof without Mr. Brittle's authorization, consent and/or permission.

78.     Accordingly, pursuant to 28 U.S.C. § 2201, Mr. Brittle is entitled to a declaratory judgment that none of the Defendants have any right and/or authority to exploit and/or use *The Demonologist*, including, but not limited to, any portion thereof, without the consent and/or approval of Mr. Brittle.

### COUNT VII: FRAUD
**(Evergreen and Mr. DeRosa-Grund Against Mrs. Warren)**

79.     Plaintiffs incorporate herein, by reference, the same as if set forth at length verbatim, the factual allegations contained hereinabove.

80.     By virtue of the forgoing, namely, by fraudulently entering into the Lorraine Warren Direct Agreement and by fraudulently concealing and/or hiding the contents of the Lorraine Warren Direct Agreement from Mr. DeRosa-Grund and/or Evergreen, Mrs. Warren has committed fraud.

81.     As a result of Mrs. Warren's fraudulent conduct, Mr. DeRosa-Grund and Evergreen have been damaged in an amount to be determined at trial.

## COUNT VIII: DECLARATORY JUDGMENT
### (Evergreen and Mr. DeRosa-Grund Against Mrs. Warren)

82.     Plaintiffs incorporate herein, by reference, the same as if set forth at length verbatim, the factual allegations contained hereinabove.

83.     An actual and justiciable controversy has arisen and now exists between Evergreen and Mr. DeRosa-Grund, on the one hand, and Mrs. Warren, on the other hand.

84.     In a sworn declaration submitted to the U.S. District Court for the Southern District of Texas on July 17, 2014, Mrs. Warren claimed that, among other things, she never entered into the Warren Agreements.  This claim is false.

85.     Moreover, notwithstanding the existence of the Warren Agreements, Mrs. Warren fraudulently entered into the Lorraine Warren Direct Agreement.

86.     The Warren Agreements are valid, binding and existing whereas the Lorraine Warren Direct Agreement is unlawful, invalid and/or unenforceable.  Accordingly, pursuant to 28 U.S.C. § 2201, Evergreen and Mr. DeRosa-Grund are entitled to a declaratory judgment that: (i) the Warren Agreements are valid, binding and existing; and (ii) the Lorraine Warren Direct Agreement is invalid and/or unenforceable.

## COUNT IX: BREACH OF CONTRACT
### (Mr. DeRosa-Grund and Evergreen Against Mrs. Warren)

87.     Plaintiffs incorporate herein, by reference, the same as if set forth at length verbatim, the factual allegations contained hereinabove.

88.     The Warren Agreements are valid, binding and enforceable contracts.

89.     Mr. DeRosa-Grund and/or Evergreen have performed all of their obligations pursuant thereto, and all conditions for Mrs. Warren's performance have occurred.

-18-

90. By engaging in the above-referenced conduct, namely, by entering into the Lorraine Warren Direct Agreement and concealing and/or hiding the contents of the Lorraine Warren Direct Agreement from Mr. DeRosa-Grund and/or Evergreen, Mrs. Warren has breached the Warren Agreements.

91. As a direct and proximate result of Mrs. Warren's breach, Mr. DeRosa-Grund and/or Evergreen have been damaged in an amount to be determined at trial.

## COUNT X: BREACH OF THE IMPLIED COVENANT OF GOOD FAITH AND FAIR DEALING
### (Mr. DeRosa-Grund and Evergreen Against Mrs. Warren)

92. Plaintiffs incorporate herein, by reference, the same as if set forth at length verbatim, the factual allegations contained hereinabove.

93. There is implicit in every contract an implied covenant of good faith and fair dealing. The Warren Agreements contain an implied covenant of good faith and fair dealing under which the parties must refrain from arbitrary or unreasonable conduct which has the effect of preventing the other party to the contract from receiving the fruits of that bargain.

94. Mr. DeRosa-Grund and/or Evergreen have duly performed all covenants, conditions and promises required to be performed under the Warren Agreements in accordance with the terms and conditions, except for those obligations that have been prevented, delayed or excused by acts or omissions of Mrs. Warren.

95. By engaging in the above-referenced conduct, including, but not limited to, by misrepresenting to third-parties, e.g., to New Line Productions, Inc., that she did not sign or enter into the Warren Agreements, by entering into the Lorraine Warren Direct Agreement, and by hiding the contents of the Lorraine Warren Direct Agreement from Mr. DeRosa-Grund and/or

Evergreen, Mrs. Warren has breached the implied covenant of good faith and fair dealing in connection with the Warren Agreements.

96.     As a direct and proximate result of Mrs. Warren's breach, Mr. DeRosa-Grund and/or Evergreen have been damaged in an amount to be determined at trial.

### COUNT XI: TORTIOUS INTERFERENCE WITH CONTRACT AND/OR BUSINESS EXPECTENCY
### (Mr. DeRosa-Grund and Evergreen Against Mr. Spera)

97.     Plaintiffs incorporate herein, by reference, the same as if set forth at length verbatim, the factual allegations contained herein above.

98.     At all relevant times, the Warren Agreements were valid, binding and existing. Mr. Spera knew of the existence of the Warren Agreements as well as the contents, terms and conditions thereof, but Mr. Spera nevertheless interfered with the Warren Agreements.

99.     Among other things, Mr. Spera interfered with the Warren Agreements by: (i) inducing, causing and/or helping Mrs. Warren to make fraudulent and false statements that the Warren Agreements do not exist or were never executed; and (ii) inducing, causing, and/or helping Mrs. Warren to hide and/or conceal the contents and implications of the Lorraine Warren Direct Agreement; and (iii) by inducing, causing and/or helping Mrs. Warren to breach the Warren Agreements.

100.    Moreover, Mr. Spera has acted improperly, with malice and in conscious and deliberate disregard to the rights and/or interests of Mr. DeRosa-Grund and/or Evergreen.

101.    As a direct and proximate result of the foregoing, Mr. DeRosa-Grund and/or Evergreen have been damaged in an amount to be determined at trial.

-20-

## **REQUEST FOR RELIEF**

WHEREFORE, Plaintiffs, EVERGREEN MEDIA HOLDINGS, LLC, TONY DEROSA-GRUND and GERALD D. BRITTLE, respectfully request that the court grant them the following relief against Defendants, LORRAINE WARREN, TONY SPERA, and GRAYMALKIN MEDIA, LLC:

1.      Awarding Plaintiffs actual damages;

2.      Awarding Plaintiffs punitive damages in an amount set by the trier of fact;

3.      Awarding Mr. Brittle damages for breach of contract by Mrs. Warren;

4.      Awarding Mr. Brittle damages for breach of the implied covenant of good faith and fair dealing by Mrs. Warren;

5.      Awarding Mr. Brittle damages for the fraudulent conduct of Mrs. Warren;

6.      Awarding Mr. Brittle damages for tortious interference with a contract by Mr. Spera and/or Graymalkin;

7.      Awarding Mr. Brittle damages pursuant to 17 U.S.C. §§ 101, 501 *et seq.* for copyright infringement by Mr. Spera, and/or Graymalkin;

8.      In addition to Mr. Brittle's actual damages, awarding Mr. Brittle the profits made by Mr. Spera and/or Graymalkin from their wrongful acts pursuant to 17 U.S.C. § 504;

9.      In the alternative, awarding Mr. Brittle statutory damages pursuant to 17 U.S.C. § 504(c), as well as enhanced statutory damages pursuant to 17 U.S.C. § 504(c)(2);

10.      Entering a declaratory judgment that none of the Defendants have any right and/or authority to exploit and/or use *The Demonologist*, including, but not limited to, any portion thereof, without the authorization, consent and/or permission of Mr. Brittle.

11.      Awarding Mr. DeRosa-Grund and/or Evergreen damages for the fraudulent conduct of Mrs. Warren;

12.      Entering a declaratory judgment that: (i) the Warren Agreements are valid, binding and existing; and (ii) the Lorraine Warren Direct Agreement is invalid and/or unenforceable.

13.      Awarding Mr. DeRosa-Grund and/or Evergreen damages for breach of contract

by Mrs. Warren;

14.     Awarding Mr. DeRosa-Grund and/or Evergreen damages for breach of the implied covenant of good faith and fair dealing by Mrs. Warren;

15.     Awarding Mr. DeRosa-Grund and/or Evergreen damages for tortious interference with a contract by Mr. Spera;

16.     Awarding an accounting to Mr. Brittle for the gains and profits of Defendants and all damages sustained by reason of Defendants' unlawful acts as alleged herein pursuant;

17.     Awarding the maximum pre-judgment and post-judgment interest as allowed by law;

18.     Awarding Mr. Brittle his attorneys' fees and costs, including, but not limited to, attorneys' fees and costs pursuant to 17 U.S.C. § 505;

19.     Permanently enjoining and restraining Defendants from further publication of *The Demonologist* without the permission of Mr. Brittle;

20.     Awarding Plaintiffs any other remedy to which they may be entitled to as provided under applicable federal or state law; and

21.     Awarding Plaintiffs such other and further relief as the Court might deem proper.

## **DEMAND FOR JURY TRIAL**

Plaintiffs hereby demand a jury trial on issues so triable pursuant to Rule 38 of the Federal Rules of Civil Procedure.

Respectfully submitted,

By:___/s/ Michael R. Patrick_____
        Charles W. Grimes (ct7233)
        Michael R. Patrick (ct26556)
        GRIMES LLC
        488 Main Avenue
        Norwalk, Connecticut 06851
        Tel: (203) 849-8300
        Fax: (203) 849-9300
        Email: grimes@gandb.com

-22-

Email: patrick@gandb.com

*Attorneys for Plaintiffs Evergreen Media
Holdings, LLC, Tony DeRosa-Grund
and Gerald D. Brittle*

# EXHIBIT C

# UNITED STATES DISTRICT COURT
## DISTRICT OF CONNECTICUT

EVERGREEN MEDIA HOLDINGS, LLC,       )
TONY DEROSA-GRUND and                )
GERALD D. BRITTLE                    )
                                     )
    Plaintiff,    )
                                     )
        v.       )    Civil Action No. 3:14-cv-01068
                                     )
LORRAINE WARREN, TONY SPERA and      )    JURY TRIAL DEMANDED
GRAYMALKIN MEDIA, LLC                )
                                     )
    Defendants.   )
_____)

## CORRECTED FIRST AMENDED COMPLAINT

Plaintiff, GERALD D. BRITTLE,[1] for his First Amended Complaint against Defendants,

LORRAINE WARREN, TONY SPERA, and GRAYMALKIN MEDIA, LLC, alleges as follows:

## NATURE OF THE ACTION

1.    This is an action for breach of contract, breach of the implied covenant of good

faith and fair dealing, fraud, tortious interference with a contract, copyright infringement and

declaratory judgment.

## THE PARTIES

2.    Plaintiff, Gerald D. Brittle, is an individual residing in Richmond, Virginia.  Mr.

Brittle is a writer and is the author of *The Demonologist*, among other works.

3.    Defendant, Lorraine Warren, is an individual residing at 30 Knollwood Street,

Monroe, Connecticut 06468.

---

[1] Plaintiffs, Evergreen Media Holdings, LLC and Tony DeRosa-Grund, hereby dismiss their claims against the Defendants *without prejudice*, pursuant to Federal Rule of Civil Procedure 41(a)(1)(A)(i).

4. Defendant, Tony Spera, is an individual residing at 122 Mine Hill Road, New Milford, Connecticut 06776.

5. Defendant, Graymalkin Media, LLC ("Graymalkin"), is a California limited liability company with its principal place of business at 1413 Greenfield Avenue, Suite 103, Los Angeles, California 90025.

## JURISDICTION AND VENUE

6. This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. §§ 1331 (federal question) and 1338(a) (acts of Congress relating to patents, trademarks and copyrights), 28 U.S.C. §§ 2201, *et seq.* (declaratory judgment act) and 28 U.S.C. § 1367 (supplemental jurisdiction over state claims). This Court also has jurisdiction pursuant to federal diversity jurisdiction, 28 U.S.C. § 1332, as the parties are completely diverse in citizenship and the amount in controversy exceeds $75,000.

7. Personal jurisdiction over non-resident Defendant Graymalkin is proper because, *inter alia*, this lawsuit: (i) arises from acts and/or transactions occurring within and/or directed towards Connecticut; (ii) is connected with acts and/or transactions occurring within and/or directed towards Connecticut; and/or (iii) relates to the purposeful acts and/or transactions of the non-resident Defendant, and those purposeful acts occurred within and/or were directed towards Connecticut. The assumption of jurisdiction by this Court over the non-resident Defendant Graymalkin does not offend traditional notions of fair play and substantial justice.

8. Venue is proper in this Court pursuant to 28 U.S.C. § 1391(b) because, *inter alia*, a substantial part of the acts complained of herein occurred in this jurisdiction.

## FACTS COMMON TO ALL COUNTS

9.    Mrs. Warren and her late husband, Ed Warren, were paranormal investigators involved in thousands of paranormal investigations over the course of the last five decades. Their investigations are part of the approximately 8,000 cases that the Warrens claim to have investigated over several decades of paranormal investigations (collectively, the approximately 8,000 cases and any corresponding files thereto are referred to as the "Case Files"). Mr. Warren passed away in August 2006.

10.    On or about November 20, 1978, Mrs. Warren and Mr. Warren entered into, and executed, an agreement with Gerald Brittle concerning publishing rights, and certain ancillary rights related thereto, in and to a book to be entitled *The Demonologist*. The agreement was amended, and executed, on or about April 16, 1990 (the agreement and the amendment are collectively referred to herein as the "Collaboration Agreement").[2] As set forth in the Collaboration Agreement, *The Demonologist* concerned the Warrens' "lives and experiences as psychic investigators." From the very beginning, the understanding between Mr. Brittle and the Warrens was that all earnings and judgments concerning this literary property would be conducted on a 50-50 basis, and no action or decisions regarding the property could be executed on a unilateral basis. For the benefit of both parties, this understanding was formalized in writing in the Collaboration Agreement. This Collaboration Agreement functions as a general partnership between them under the Connecticut Uniform Partnership Act, CONN. GEN. STAT. § 34-300 *et seq.*

---

[2] A true and correct copy of the Collaboration Agreement is attached hereto as "Exhibit A."

11.     Among other things, in the Collaboration Agreement, Mrs. Warren, Mr. Warren, and Mr. Brittle agreed as follows:

> COLLABORATION AGREEMENT made this 20th day of November. 1978 between Gerald D. Brittle (hereinafter referred to as "the Author") and Edward Warren and Lorraine Warren (hereinafter referred to as "the Subjects"_.
>
> ***
>
> …a book entitled The Demonologist (hereinafter referred to as "the Work"),
>
> ***
>
> All contracts for the sale, lease, license or other disposition of any and all rights in and to [*The Demonologist*] now existing or which may hereafter come into existence **shall require the unanimous consent of [Mr. Brittle] and [Mrs. Warren and Mr. Warren]** (emphasis added).
>
> ***
>
> The copyright of the Work shall be secured and held in the named Gerald G. Brittle, Ed Warren and Lorraine Warren…

12.     The Collaboration Agreement is valid and existing and continues in full force and effect to the present day.  Throughout, Mr. Brittle has abided -- without exception -- to the terms of this Agreement.  The Warrens (now Mrs. Warren and Tony Spera) have not.

13.     Following years of substantial work by Mr. Brittle, including, but not limited to, extensive interviews with Mrs. Warren and Mr. Warren, site-visits, testimonials, theological research, and steps to vet the accuracy of *The Demonologist* by two Roman Catholic exorcists, *The Demonologist* was first released in or about December 1980 by Prentice-Hall, Inc. ("Prentice Hall").

-4-

14.     *The Demonologist* focused on several experiences associated with Mrs. Warren and Mr. Warren.

15.     One experience that *The Demonologist* focused upon was entitled "Annabelle." As discussed in the relevant chapter of *The Demonologist*, "Annabelle" involved a Raggedy Ann doll used by a demonic spirit that terrified a family.

16.     Another experience that *The Demonologist* focused upon was entitled "The Enfield Voices" also colloquially known as The Enfield Poltergeist.  As discussed in the relevant chapter of *The Demonologist*, "The Enfield Voices' involved a single mother, Margaret Hodgson, who called police to her home in Enfield, England after two of her four children claimed that furniture was moving and knocking sounds were heard on walls.  A female police constable witnessed a chair slide across the floor on its own.  "The Enfield Voices" involved demonic voices, loud noises, thrown rocks and toys, overturned chairs, and levitation of children.

17.     Since it was first released by Prentice Hall in 1980, *The Demonologist* has been re-released several times, always pursuant to and in compliance with the terms of the Collaboration Agreement, including, most recently, in or about September 2002 through iUniverse.

18.     In or about June 2013, notwithstanding the long-existing Collaboration Agreement, Mr. Brittle received a telephone call from David Zindel, the principal and owner of Graymalkin.  During the phone call, Mr. Zindel informed Mr. Brittle that Mr. Spera (Mrs. Warren's son-in-law) had "taken charge" of *The Demonologist* and would now "change publishers" from iUniverse to Graymalkin.  Mr. Zindel further informed Mr. Brittle that he would send a contract to Mr. Brittle for his signature and represented that Mrs. Warren had

-5-

**already** executed a contract with Graymalkin "changing publishers" for *The Demonologist* from iUniverse to Graymalkin.

19.     Among other things, Mr. Brittle correctly informed Mr. Zindel that Mr. Spera had no right or authority to "change publishers" for *The Demonologist* and, in particular, that the Collaboration Agreement requires the unanimous approval of both Mr. Brittle and Mrs. Warren **before** any action to "change publishers" can be taken with respect to *The Demonologist*.

20.     Notwithstanding the fact that, in purporting to "change publishers," Mrs. Warren, Mr. Spera and Mr. Zindel had not been acting in compliance with the Collaboration Agreement, Mr. Brittle agreed to review the contract proposed by Mr. Zindel.  However, on or about June 22, 2013, Mr. Brittle rejected the proposed contract (as was his right).

21.     Over the ensuing months, Mr. Zindel aggressively pursued Mr. Brittle, including, but not limited to, sending him a letter on or about July 3, 2013, untenably claiming, among other things, that "Mrs. Warren is free to exploit [*The Demonologist*] on a non-exclusive basis subject to her obligation to pay you your proportional share of the profits."  In other words, Mr. Zindel did not acknowledge the existence of the Collaboration Agreement, but rather, incorrectly claimed that Mrs. Warren could proceed as a copyright co-owner **without** Mr. Brittle's involvement (i.e., that Mrs. Warren merely had an obligation to account to Mr. Brittle regarding any monies she received).  Although co-owners of a copyright generally are permitted to act unilaterally, such is only the case if there is no agreement to the contrary. Here there is an agreement to the contrary, the Collaboration Agreement, in full force and effect at all relevant times hereto, which specifically prohibits any unilateral action with the regard to the sale or

license of any and all rights to *The Demonologist* without the express and unanimous approval of both parties.

22.     As a result, on or about August 3, 2013, Mr. Brittle spoke with Mrs. Warren directly and explained that the Collaboration Agreement, among other things, prohibits unilateral action by Mrs. Warren, or any of her agents, including Mr. Spera.  Instead of discussing the issue with Mr. Brittle, Mrs. Warren told Mr. Brittle to speak with Mr. Spera, whom she said was responsible now for all her business affairs and had full authority to act on her behalf.

23.     Shortly after the conversation with Mrs. Warren, Mr. Spera responded to Mr. Brittle via email on or about August 3, 2013.  In summary, Mr. Spera ignored the existence of the Collaboration Agreement and rejected the fact that Mr. Brittle's approval was required for any action to be taken to "change publishers" with respect to *The Demonologist*.

24.     On or about August 4, 2013, Mr. Brittle responded to Mr. Spera's email.  In relevant part, Mr. Brittle noted the existence of the Collaboration Agreement.

25.     That same day, Mr. Spera responded and, in relevant part, acknowledged the existence of the Collaboration Agreement and the obligation upon Mrs. Warren and Mr. Brittle to unanimously agree to "change publishers" for *The Demonologist*, but then said: "Don't call [Mrs. Warren] again.  Don't e-mail me again.  You were made aware of the publishing deal.  You chose not [t]o participate.  It's now being handled by the publisher.  Send your petty correspondence to them."

26.     Meanwhile, Mr. Zindel's aggressive and improper pursuit of the publishing rights to *The Demonologist* continued.  In 2002, Mr. Brittle and the Warrens had jointly arranged for a new reprint of *The Demonologist* through a program offered by the Authors Guild in New York.

Mrs. Warren and Mr. Brittle, in compliance with the Collaboration Agreement, both unanimously approved the deal with the Authors Guild. In or around late July 2013, Mr. Zindel, in direct violation of the Collaboration Agreement and without Mr. Brittle's knowledge or consent, surreptitiously contacted the Authors Guild at least twice and deceptively informed the Authors Guild that Graymalkin was the "new publisher" of *The Demonologist*. More specifically, Mr. Zindel attempted on two occasions, without Mr. Brittle's knowledge or permission, to have the Authors Guild send him all "permissions" related to *The Demonologist* in order to facilitate the illegal publication of the book by his company. Mr. Zindel fraudulently represented to the Authors Guild that he was allowed to do this on the basis that Mrs. Warren allegedly controls two-thirds (2/3) of the copyright of *The Demonologist*. However, the Author's Guild was aware that *The Demonologist* was actually jointly and equally held and controlled by Mr. Brittle and Mrs. Warren insofar as Paragraph 8 of the Collaboration Agreement requires "unanimous consent" in order to take any action with respect to *The Demonologist*. Accordingly, the Authors Guild was aware that the actions requested by Mr. Zindel required **unanimous** permission of Mr. Brittle and Mrs. Warren and properly rejected the request. The Authors Guild, in turn, alerted Mr. Brittle to the fact that Mr. Zindel contacted the Authors Guild and that the request had been denied because Mr. Zindel could not provide Mr. Brittle's approval (such approval had, of course, never been given to Mr. Zindel).

27. Mr. Brittle was advised by the Authors Guild to file a formal complaint, but Mr. Brittle elected not to do so believing a solution could be reached through discussion with the interested parties. Accordingly, over the next several months, Mr. Brittle and Mr. Zindel discussed the possibility of a contract with Graymalkin concerning *The Demonologist*.

Ultimately, however, Mr. Brittle and Mr. Zindel could not reach an equitable and satisfactory agreement

28.    Inexplicably, without Mr. Brittle's approval, consent, or knowledge, Mrs. Warren, Mr. Spera, and Graymalkin nevertheless moved forward and republished *The Demonologist* with Graymalkin as the "new publisher," in clear violation of the Collaboration Agreement, among other things.

29.    In an after-the-fact attempt to legitimize the actions of Mrs. Warren, Mr. Spera and Graymalkin, Mr. Zindel sent Mr. Brittle an email on April 10, 2014 in which he made false statements and assertions, to wit:

> [Mrs. Warren's] side has told me that no collaboration agreement was ever signed.
>
> * * *
>
> Even though [Mrs. Warren] owns 2/3 of the book according to US Copyright law . . . .

30.    The effort by Mrs. Warren to try to claim that she never signed the Collaboration Agreement is part of a longstanding protracted fraudulent modus operandi started by Ed Warren, which was then continued and perfected as a  repeated pattern of misconduct by Mrs. Warren that she has sought to use in the past—and continues to use to this day.  Although Mrs. Warren has attempted to cultivate and maintain a "grandmotherly" public persona over a number of decades, this is nothing more than a charade.  In fact, Mrs. Warren (now knowingly aided and abetted by the equally complicit Mr. Spera), is a cold and calculating pathological liar.  She readily and repeatedly ignores prior existing contracts and agreements that she has entered into in

order to illicitly reap additional monies from new parties—all at the expense of her unsuspecting partners in those earlier deals.

31.     The above-described lies, deceptions, and frauds perpetuated on Mr. Brittle by Mrs. Warren (with the help of Mr. Spera), are illustrative of the protracted pattern of knowing, willful, fraudulent, deceitful and egregious behavior of Mrs. Warren directed toward those with whom she has previously entered into valid agreements.

32.     Another example of Mrs. Warren's lies and fraudulent conduct took place on December 9, 2009. Robert Unkel contacted Tony DeRosa-Grund[3] and claimed that he had a longstanding prior agreement with Mrs. Warren to act as her manager. When questioned regarding Mr. Unkel's claim, Mrs. Warren advised Mr. DeRosa-Grund and his attorney in a telephone conference call that she had never signed an agreement with Mr. Unkel. She stated that her manager was actually Harrison Smith, who was empowered to make deals and sign agreements on her behalf. (A near exact duplication of the representation she made to Mr. Brittle regarding Mr. Spera in the instant matter.) Mr. Unkel then produced a copy of his signed agreement with Mrs. Warren. Mr. Unkel then further added to his claim, stating that he had paid a large advance payment by check to Mrs. Warren. Mrs. Warren then recanted and admitted that she had signed the agreement, but then claimed that she had never received any payment from

---

[3] Mr. DeRosa-Grund is a motion picture producer whose dealings with the Warrens date back nearly twenty-three (23) years. The publishing rights delineated in the Collaboration Agreement were granted to Prentice Hall by the Warren and Brittle parties. Mrs. Warren granted the rights associated with the Case Files, as well as the life rights of herself and Mr. Warren, to Evergreen Media Holdings, LLC ("Evergreen"). Subsequently, New Line Productions acquired Evergreen's aforementioned rights. At no time did Mrs. Warren disclose the existence of the Collaboration Agreement to Evergreen.

Mr. Unkel. Mr. Unkel then provided evidence of the payment -- a copy of a check endorsed and negotiated by Mrs. Warren. Mrs. Warren then recanted on this point as well.

33. One only has to look at Mrs. Warren's public statements to see her pervasive pattern of revisionist history and selective memory. On her *warrens.net* website, Mrs. Warren represented for decades that she had amassed over 10,000 case files. Then, when questioned about this during contract negotiations on the motion picture *The Conjuring*, she recanted and then reduced the number to 8,000 case files. Ultimately, when confronted by New Line Cinema Vice President of Business and Legal Affairs, Craig Alexander, Mrs. Warren admitted that she only had maybe 100 case files, maybe less.

34. In June of 2009, after making a deal for her life rights with Evergreen Media Group, via her manager at the time, Lorraine Warren and Tony Spera, by email, sent Evergreen a W-9 form for Lorraine. In additional emails through 2009 Mr. Spera asked from when Summit Entertainment would be "paying" Lorraine on the motion picture deal for a move based in part on her life rights held by Evergreen.

35. Later, Evergreen moved its deal to New Line. In January of 2010 Mr. Spera again sent emails to Mr. DeRosa-Grund asking:

> It seems that Lorraine has been promised payment from New Line
> many times, but the payment has never been forthcoming.

36. Mr. DeRosa-Grund then provided Mr. Spera evidence that the deal with New Line was a reality. Shortly thereafter, in or around May 2010, Mr. Spera (and members of his immediate family) signed releases that New Line needed to perfect the chain of title for "The

-11-

Conjuring" property. Mr. Spera also complied with New Line's request for conservatorship papers and the will pursuant to the late Ed Warren's estate.

37. Incredibly, after two years of acknowledging the sale of her rights to Evergreen and, in turn, Summit and ultimately New Line, Mr. Spera and Mrs. Warren claimed that they never signed the deal, and that her manager, Harrison Smith, was never authorized to enter into the deal on her behalf. In other words, after two years of asking when they (Mrs. Warren and Mr. Spera) were getting paid by not just one, but two different studios, after executing numerous releases and documents, after providing additional documentation to s studios, and after providing a W-9 for Mrs. Warren so that she could get paid under the deal, Mrs. Warren and Mr. Spera then claimed that they never entered into a deal to sell the rights in the first place. While their claims have no credible basis in fact, they are absolutely consistent with Mrs. Warren's protracted pattern of lying and disavowing contracts to: (1) extort more money from those she has entered into previous deals with; or (2) jettison those existing legitimate deals in favor of more lucrative new deal that will pay her more money by fraudulently disavowing the existence of the earlier deals.

38. At one point during the making of *The Conjuring* motion picture, Mrs. Warren received a letter from Caroline Perron, the mother of the family depicted in the motion picture. In the letter, Mrs. Perron accused Mrs. Warren of stealing a number of items from her home that were artifacts related to that case. Mrs. Warren then asked that Evergreen Media Group provide legal assistance at Evergreen's expense, because (i) Evergreen had acquired her life and case file rights; and, (ii) Mrs. Warren was worried that if this dispute were made public, it would not be good for Evergreen or the potential motion picture. Ultimately, Mrs. Warren admitted that she

did indeed have the items enumerated in Mrs. Perron's letter, she claimed that she was "given" them items by Mrs. Perron - a claim that Mrs. Perron vigorously denied.

39.     Ray Gorton was associated with Ed and Lorraine Warren, and was the author of the book *In a Dark Place*, which was based on one of the Warrens' case files. The case was ultimately made into the motion picture "The Haunting in Connecticut." Recently, Mr. Gorton has revealed a number of disturbing facts about Mr. and Mrs. Warren, and his business dealings with them, that further evidence their longstanding pattern of lying - not just in business matters, but also to the public about the very so-called supernatural events that the Warrens supposedly investigated:

> "I went to Connecticut and spent time with the Warrens and the Snedekers. When I found that the Snedekers couldn't keep their individual stories straight, I went to Ed Warren and explained the problem. **"They're crazy," he said. "All the people who come to us are crazy, that's why they come to us. Just use what you can and make the rest up. You write scary books, right? Well, make it up and make it scary. That's why we hired you."**

> ***

> "The Warrens repeatedly told me they had videotape of actual supernatural activity shot in the house and they were going to show it to me while I was there, but they never did."

> ***

> "The Warrens explained that this was because the house had been cleansed by a priest who had performed an exorcism, but to the best of my knowledge, the Catholic Church has absolutely nothing to do with the Warrens in any official way and there are questions about the legitimacy of the priests who work with them."

> ***

> "Since writing the book, I've learned a lot that leaves no doubt in my mind about the fraudulence of the Warrens…" -

40.     In the instant matter, Mrs. Warren's fraudulent claim that she did not sign the Collaboration Agreement is refuted by the testimony of Judy Penny, who is prepared to testify that she witnessed the execution of the Collaboration Agreement by Mrs. Warren, Mr. Warren, and Mr. Brittle, and that she thereafter signed the Collaboration Agreement herself as a witness in their presence.

41.     Mrs. Warren's fraudulent claim that she did not sign the Collaboration Agreement is untrue given the fact that Mr. Brittle is listed as the author of *The Demonologist* copyright and Mrs. Warren's rights as a copyright claimant flow, if at all, via transfer through a "written agreement." As such, if Mrs. Warren presses her fraudulent claim that she did not sign the Collaboration Agreement, she thereby admits that she has no claim in the copyright to *The Demonologist*. If this is her position then Mrs. Warren has no rights whatsoever to assign anything to anyone relating to the book *The Demonologist*.

42.     Mr. and Mrs. Warren were not the authors of the book *The Demonologist*. In fact, the Collaboration Agreement states that Mr. Brittle was the sole author and that the Warrens, "the Subjects" were to be given a fifty percent share in the copyright from Mr. Brittle only as part of the terms of the Collaboration Agreement. If the Collaboration Agreement was never entered into, Mr. Brittle, as the sole author, would be entitled to one hundred percent of the copyright to *The Demonologist*.

43.     Mrs. Warren's fraudulent claim that she did not sign the Collaboration Agreement is untrue given the fact that she accepted advances paid to her by the publisher on the original

-14-

contract, as well as accepting her 50% share of options and royalty earnings since the inception date of the Collaboration Agreement.

44.     Finally, Mrs. Warren's fraudulent claim that she did not sign the Collaboration Agreement is untrue given the testimony of a handwriting expert who will confirm that the signature on the Collaboration Agreement is, in fact, Mrs. Warren's signature.

45.     Mr. Zindel's extraordinary claim that "[Mrs. Warren] owns two-thirds (2/3) of the book according to US Copyright law" is in conflict with the express terms of the Collaboration Agreement and is entirely false.

46.     In accordance with the terms of the Collaboration Agreement, rights in *The Demonologist* are owned and controlled on an equal basis by: (i) Mr. Brittle; and (ii) the Warrens, i.e.,  neither party can sell, lease, license or otherwise dispose of rights in and to *The Demonologist* without the permission of the other.  Graymalkin and Mr. Spera were both made aware of the Collaboration Agreement, and Mrs. Warrens' limited rights thereunder, before Graymalkin published *The Demonologist*.

47.     As a result of the aforesaid conduct, Gerald Brittle has been, and continues to be, damaged.

### COUNT I: BREACH OF CONTRACT
### (Mr. Brittle Against Mrs. Warren)

48.     Plaintiff incorporates by reference the factual allegations set forth in the preceding paragraphs, as if fully set forth herein.

49.     The Collaboration Agreement (as amended) is a valid, binding and enforceable contract.

-15-

50.    Mr. Brittle has performed all of his obligations pursuant thereto, and all conditions for Mrs. Warren's performance have occurred.

51.    By engaging in the above-referenced conduct, including but not limited to, permitting Graymalkin to republish *The Demonologist* without Mr. Brittle's consent and/or approval, Mrs. Warren has breached the Collaboration Agreement.

52.    As a direct and proximate result of Mrs. Warren's breach of the Collaboration Agreement, Mr. Brittle has been damaged in an amount to be determined at trial.  Mr. Brittle's damages include, but are not limited to, his share of any profits from the publication of *The Demonologist* by Graymalkin, as well as compensatory damages for the dilution of the market as a result of Graymalkin's improper publication of *The Demonologist*.

### COUNT II: BREACH OF THE IMPLIED COVENANT OF GOOD FAITH AND FAIR DEALING (Mr. Brittle Against Mrs. Warren)

53.    Plaintiff incorporates by reference the factual allegations set forth in the preceding paragraphs, as if fully set forth herein.

54.    There is implicit in every contract an implied covenant of good faith and fair dealing.  The Collaboration Agreement (as amended) contains an implied covenant of good faith and fair dealing under which the parties must refrain from arbitrary or unreasonable conduct which has the effect of preventing the other party to the contract from receiving the fruits of that bargain.

55.    Mr. Brittle has duly performed all covenants, conditions and promises required to be performed by him under the Collaboration Agreement in accordance with the terms and

-16-

conditions, except for those obligations that have been prevented, delayed or excused by acts or omissions of Mrs. Warren.

56.     By permitting Graymalkin to republish *The Demonologist* without Mr. Brittle's consent and/or approval, Mrs. Warren has acted in bad faith and prevented Mr. Brittle from receiving the fruits of the bargain he reasonably expected to receive under the Collaboration Agreement.  Further, Mrs. Warren has engaged in actual and/or constructive fraud, and has also attempted to mislead and deceive both Mr. Brittle and others, by falsely and fraudulently representing that she did not sign the Collaboration Agreement, and also that she owns 2/3 of the copyright to *The Demonologist*.  Such conduct was also in bad faith and has prevented Mr. Brittle from receiving the fruits of the bargain he reasonably expected to receive under the Collaboration Agreement.  Among other things, Mrs. Warren's conduct has prevented Mr. Brittle from being able to fully exercise his rights with respect to *The Demonologist*.

57.     Accordingly, by engaging in the above-referenced conduct, Mrs. Warren has breached the implied covenant of good faith and fair dealing.  As a direct and proximate result of Mrs. Warren's breach, Mr. Brittle has been damaged in an amount to be determined at trial.

### COUNT III: TORTIOUS INTERFERENCE WITH CONTRACT AND/OR BUSINESS EXPECTANCY
### (Mr. Brittle Against Mr. Spera and Graymalkin Media)

58.     Plaintiff incorporates by reference the factual allegations set forth in the preceding paragraphs, as if fully set forth herein. At all relevant times, there was a valid, existing contract between Mr. Brittle and Mrs. Warren, namely, the Collaboration Agreement.  Mr. Spera and Graymalkin knew of the existence of the Collaboration Agreement as well as the contents, terms,

-17-

and conditions thereof, but Mr. Spera and Graymalkin nevertheless interfered with the Collaboration Agreement.

59.     Among other things, Mr. Spera and Graymalkin interfered with the Collaboration Agreement by re-releasing *The Demonologist* without "unanimous approval", namely, without Mr. Brittle's approval, as is required by the Collaboration Agreement.

60.     Moreover, Mr. Spera and Graymalkin have acted improperly, with malice, and in conscious and deliberate disregard to the rights and/or interests of Mr. Brittle.

61.     As a direct and proximate result of the actions Mr. Spera and Graymalkin, Mr. Brittle has been damaged in an amount to be determined at trial.

## COUNT IV: COPYRIGHT INFRINGEMENT
### (Mr. Brittle Against Mr. Spera and Graymalkin Media)

62.     Plaintiff incorporates by reference the factual allegations set forth in the preceding paragraphs, as if fully set forth herein.  Mr. Brittle is an owner of *The Demonologist* copyright. Mrs. Warren's rights with respect to *The Demonologist*, if any, flow through the Collaboration Agreement.   The Collaboration Agreement requires unanimous approval regarding "[a]ll contracts for the sale, lease, license or other disposition of any and all rights in and to [*The Demonologist*] now existing or which may hereafter come into existence . . . ."  Graymalkin and Mr. Spera were aware of the unanimous approval requirement before Graymalkin began publishing *The Demonologist*.

63.     The acts of Mr. Spera and Graymalkin are infringing, willful, intentional and in purposeful disregard of and with indifference to Mr. Brittle's rights.

-18-

64.   The infringing acts of Mr. Spera and Graymalkin have been committed with prior notice and knowledge of Mr. Brittle's rights.

65.   Accordingly, Mr. Spera and Graymalkin are liable, jointly and severally, to Mr. Brittle for copyright infringement pursuant to 17 U.S.C. §§ 101, *et seq.* and for damages in an amount to be proven at trial.   Mr. Brittle is also entitled to the profits of Mr. Spera and Graymalkin attributable to the infringement, pursuant to 17 U.S.C. § 504, including an accounting of and a constructive trust with respect to such profits.   In the alternative, Mr. Brittle is entitled to statutory damages pursuant to 17 U.S.C. § 504(c).   These statutory damages should be enhanced by 17 U.S.C. § 504(c)(2) because the conduct of Mr. Spera and Graymalkin constituted willful infringement.

### COUNT V: DECLARATORY JUDGMENT
#### (Mr. Brittle Against All Defendants)

66.   Plaintiff incorporates by reference the factual allegations set forth in the preceding paragraphs, as if fully set forth herein.  .

67.   An actual and justiciable controversy has arisen and now exists between Mr. Brittle and Mrs. Warren concerning the terms and enforceability of the Collaboration Agreement, as well as between Mr. Brittle and all of the Defendants concerning their respective rights in connection with *The Demonologist.*   Mr. Brittle has never given any of the Defendants authorization, consent and/or permission to exploit and/or otherwise use *The Demonologist* or any portion thereof for any purpose whatsoever.   Notwithstanding that fact, Defendants have exploited and/or otherwise used (and are exploiting and/or otherwise using) *The Demonologist* and/or portions thereof without Mr. Brittle's authorization, consent and/or permission.

-19-

68. Accordingly, pursuant to 28 U.S.C. § 2201, Mr. Brittle is entitled to a declaratory judgment that (i) Mrs. Warren is a party to the Collaboration Agreement; (ii) the Collaboration Agreement requires the unanimous consent of both Mrs. Warren and Mr. Brittle for all contracts for the sale, lease, license or other disposition of any and all rights in and to *The Demonologist* now existing or which may hereafter come into existence; (iii) Mrs. Warren's agreement with Graymalkin concerning *The Demonologist* is void and/or invalid; and (iv) none of the Defendants have any right and/or authority to exploit and/or use *The Demonologist*, including, but not limited to, any portion thereof, without the consent and/or approval of Mr. Brittle.

### COUNT VI: DECLARATORY JUDGMENT FOR DISASSOCIATION OF LORRAINE WARREN FROM THE GENERAL PARTNERSHIP UNDER THE COLLABORATION AGREEMENT
#### (Mr. Brittle Against Mrs. Warren)

69. Plaintiff incorporates by reference the factual allegations set forth in the preceding paragraphs, as if fully set forth herein.

70. An actual and justiciable controversy has arisen and now exists between Mr. Brittle and Mrs. Warren concerning the terms and enforceability of the Collaboration Agreement, as well as between Mr. Brittle and all of the Defendants concerning their respective rights in connection with *The Demonologist*.  The Collaboration Agreement was the instrument of a general partnership between Mrs. Warren (and her late husband) and Mr. Brittle and as such constitutes a general partnership as defined by the Connecticut Uniform Partnership Act

71. Under CONN. GEN. STAT. § 34-355, a partner is dissociated from a partnership upon the occurrence of any of the following events:

> On application by the partnership or another partner, the partner's expulsion by judicial determination because: (A) The partner engaged in

-20-

wrongful conduct that adversely and materially affected the partnership business; (B) the partner willfully or persistently committed a material breach of the partnership agreement or of a duty owed to the partnership or the other partners under section 34-338; or (C) the partner engaged in conduct relating to the partnership business which makes it not reasonably practicable to carry on the business in partnership with the partner.

72. Mrs. Warren has repeatedly and continuously engaged in wrongful conduct that adversely and materially affected the partnership business. She has willfully and persistently committed a material breach of the partnership agreement and her duty owed to the partnership (i.e., Mr. Brittle) under section 34-338. Mrs. Warren has repeatedly engaged in conduct relating to the partnership business which makes it not reasonably practicable to carry on the business in partnership with the partner. Therefore, Mr. Brittle is entitled to have Mrs. Warren disassociated from the partnership by judicial determination.

## COUNT VII: DECLARATORY JUDGMENT FOR DISSOLUTION OF THE PARTNERSHIP UNDER THE COLLABORATION AGREEMENT
### (Mr. Brittle Against Mrs. Warren)

73. Plaintiff incorporates by reference the factual allegations set forth in the preceding paragraphs, as if fully set forth herein. .

74. An actual and justiciable controversy has arisen and now exists between Mr. Brittle and Mrs. Warren concerning the terms and enforceability of the Collaboration Agreement, as well as between Mr. Brittle and all of the Defendants concerning their respective rights in connection with *The Demonologist*. The Collaboration Agreement was the instrument which gave rise to a General Partnership between Mrs. Warren (and her late husband) and Mr. Brittle and as such constitutes a General Partnership as defined by the Connecticut Uniform Partnership Act.

75. GEN. STAT. §. 34-338 provides as follows

General standards of conduct of a partner.

(a) The only fiduciary duties a partner owes to the partnership and the other partners are the duty of loyalty and the duty of care set forth in subsections (b) and (c) of this section.

(b) A partner's duty of loyalty to the partnership and the other partners is limited to the following:

(1) To account to the partnership and hold as trustee for it any property, profit or benefit derived by the partner in the conduct and winding up of the partnership business or derived from a use by the partner of partnership property, including the appropriation of a partnership opportunity;

(2) To refrain from dealing with the partnership in the conduct or winding up of the partnership business as or on behalf of a party having an interest adverse to the partnership; and

(3) To refrain from competing with the partnership in the conduct of the partnership business before the dissolution of the partnership.

(c) A partner's duty of care to the partnership and the other partners in the conduct and winding up of the partnership business is limited to refraining from engaging in grossly negligent or reckless conduct, intentional misconduct or a knowing violation of law.

(d) A partner shall discharge the duties to the partnership and the other partners under sections 34-300 to 34-399, inclusive, or under the partnership agreement and exercise any rights consistently with the obligation of good faith and fair dealing.

76. Mrs. Warren has repeatedly acted in violation of the aforementioned statue as follows:

(a) Not accounted to the partnership property, profits or benefits she has derived by her derived from her use by of partnership property, including

-22-

the appropriation of a partnership opportunity (i.e., the unauthorized deal with Graymalkin).

(b)     In making her unilateral and unauthorized deal with Graymalkin, Mrs. Warren has refused to refrain from competing with the partnership in the conduct of the partnership business before the dissolution of the partnership.

(c)     In her unilateral and unauthorized publishing deal with Graymalkin expressly prohibited by the Collaboration Agreement, the basis of the General Partnership between Mrs. Warren and Mr. Brittle, Mrs. Warren has knowing willingly and repeatedly engaged in grossly negligent and reckless conduct, intentional misconduct or a knowing violation of law.

(d)     In her unilateral and unauthorized publishing deal with Graymalkin expressly prohibited by the Collaboration Agreement Mrs. Warren has clearly not  discharged her duties to the partnership and the other partners under sections 34-300 to 34-399, inclusive, nor under the partnership agreement and has not exercise any rights consistently with the obligation of good faith and fair dealing.

(e)     Mrs. Warrens actions were calculated on her part at all times to further her own interests and agenda at the expense of the partnership and Mr. Brittle.

77.     Accordingly, pursuant to CONN. GEN. STAT. § 34-372, the General Partnership between Mrs. Warren and Mr. Brittle must be dissolved by this Court.

78.     Under CONN. GEN. STAT. § 34-372:

A partnership is dissolved, and its business must be wound up, only upon the occurrence of any of the following events . . . (5) On application by a partner, a judicial determination that: (A) The economic purpose of the partnership is likely to be unreasonably frustrated; (B) another partner has engaged in conduct relating to the partnership business which makes it not reasonably practicable to carry on the business in partnership with that partner; or (C) it is not otherwise reasonably practicable to carry on the partnership business in conformity with the partnership agreement; or

-23-

79.     The general partnership between Mrs. Warren and Mr. Brittle must be dissolved by judicial determination and the instrument that formed the basis of the partnership, the Collaboration Agreement, between Mrs. Warren and Mr. Brittle must be also terminated.  As a result of such a judicial determination, as the sole author of *The Demonologist*, all rights in the copyright thereto must as a matter of law revert to Mr. Brittle exclusively.

# REQUEST FOR RELIEF

WHEREFORE, Plaintiff, GERALD D. BRITTLE, respectfully requests that the Court enter

judgment against Defendants, LORRAINE WARREN, TONY SPERA, and GRAYMALKIN MEDIA, LLC:

1.      Awarding Plaintiff actual damages;

2.      Awarding Plaintiff punitive damages in an amount set by the trier of fact;

3.      Awarding Mr. Brittle damages for breach of contract by Mrs. Warren;

4.      Awarding Mr. Brittle damages for breach of the implied covenant of good faith and fair dealing by Mrs. Warren;

5.      Awarding Mr. Brittle damages for tortious interference with a contract by Mr. Spera and/or Graymalkin;

6.      Awarding Mr. Brittle damages pursuant to 17 U.S.C. §§ 101, 501 *et seq.* for copyright infringement by Mr. Spera, and/or Graymalkin;

7.      In addition to Mr. Brittle's actual damages, awarding Mr. Brittle the profits made by Mr. Spera and/or Graymalkin from their wrongful acts pursuant to 17 U.S.C. § 504;

8.      In the alternative, awarding Mr. Brittle statutory damages pursuant to 17 U.S.C. § 504(c), as well as enhanced statutory damages pursuant to 17 U.S.C. § 504(c)(2);

9.      Entering a declaratory judgment that none of the Defendants have any right and/or authority to exploit and/or use *The Demonologist*, including, but not limited to, any portion thereof, without the authorization, consent and/or permission of Mr. Brittle;

10.     Awarding an accounting to Mr. Brittle for the gains and profits of Defendants and all damages sustained by reason of Defendants' unlawful acts as alleged herein pursuant;

11.     Awarding the maximum pre-judgment and post-judgment interest as allowed by law;

12.     Awarding Mr. Brittle his attorneys' fees and costs, including, but not limited to, attorneys' fees and costs pursuant to 17 U.S.C. § 505;

13.     Permanently enjoining and restraining Defendants from further publication of *The Demonologist* without the permission of Mr. Brittle;

-25-

14.     Disassociating Mrs. Warren from the general partnership with Mr. Brittle;

15.     Dissolution of the general partnership between Mrs. Warren and Mr. Brittle;

16.     Termination of the Collaboration Agreement and awarding all right, title, and interest in *The Demonologist* copyright to Mr. Brittle, solely and exclusively;

17.     Awarding Plaintiff any other remedy to which they may be entitled to as provided under applicable federal or state law; and

18.     Awarding Plaintiff such other and further relief as the Court might deem proper.

## DEMAND FOR JURY TRIAL

Plaintiff hereby demands a jury trial on issues so triable pursuant to Rule 38 of the Federal Rules of Civil Procedure.

Respectfully submitted,

PLAINTIFFS GERALD D. BRITTLE, TONY DEROSA-GRUND and EVERGREEN MEDIA HOLDINGS, LLC

/s/ Sanford L. Dow
Sanford L. Dow (phv07590)
Texas Bar No. 00787392
dow@dowgolub.com
Dow Golub Remels & Beverly, LLP
9 Greenway Plaza, Suite 500
Houston, Texas 77046
Telephone: (713) 526-3700
Facsimile: (713) 526-3750

Local Counsel:
Mark Carta, Esq.
Carta, McAlister & Moore, LLC
1120 Boston Post Road
Darien, Connecticut 06820
Phone: 203-202-3100
Email: Mark@CMM-Law.com

-26-

## CERTIFICATE OF SERVICE

I hereby certify that on July 22, 2015, a copy of the foregoing Corrected First Amended Complaint was filed electronically and served by mail on anyone unable to accept electronic filing. Notice of this filing will be sent by e-mail to all parties by operation of the Court's electronic filing system or by mail to anyone unable to accept electronic filing as indicated on the Notice of Electronic Filing. Parties may access this filing through the Court's CM/ECF system.

                    /S/ (ct06645)
                 MARK R. CARTA

# EXHIBIT D

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | | |
|---|---|---|
| EVERGREEN MEDIA HOLDINGS, LLC, and TONY DEROSA-GRUND<br>    *Plaintiffs,*<br>v.<br><br>WARNER BROS. ENTERTAINMENT, INC. and NEW LINE PRODUCTIONS, INC.<br>    *Defendants* | §<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§ | Civil Action No. 4:14-cv-00793<br>(SENIOR CASE) |
| EVERGREEN MEDIA HOLDINGS, LLC, TONY DEROSA-GRUND, and GERALD D. BRITTLE,<br>    Plaintiffs,<br>v.<br><br>LORRAINE WARREN, TONY SPERA, GRAYMALKIN MEDIA, LLC, NEW LINE PRODUCTIONS, INC., and WARNER BROS. ENTERTAINMENT, INC.,<br>    Defendants. | §<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§ | Civil Action No. 4:14-cv-01117<br>(JUNIOR CASE) |

## PLAINTIFFS' NOTICE OF DISMISSAL OF THE JUNIOR CASE (CIVIL ACTION NO. 4:14-CV-01117)

Pursuant to Federal Rule of Civil Procedure 41(a)(1)(A)(i), Plaintiffs Evergreen Media Holdings, LLC, Tony DeRosa-Grund and Gerald D. Brittle (collectively, "Plaintiffs") hereby dismiss all causes of action in Civil Action No. 4:14-cv-01117 (the "Junior Case"), **without prejudice**.

This Notice of Dismissal is filed as of right pursuant to Federal Rule of Civil Procedure 41(a)(1)(A), which provides that "the plaintiff may dismiss an action without a court order by filing: (i) a notice of dismissal before the opposing party serves either an answer or a motion for summary judgment . . . ." None of the Defendants in the Junior Case have filed an answer or a motion for summary judgment.

1

This dismissal of the causes of action in the Junior Case is without prejudice, including without prejudice to the re-filing of any of Plaintiffs' causes of actions against the Defendants, and for any other claim that Plaintiffs have, known or unknown, against Defendants.

Respectfully submitted,

By: _____/s/ Sanford L. Dow_____
        Sanford L. Dow
        S.D. Texas No. 17162
        Texas Bar No. 00787392
        Nine Greenway Plaza, Suite 500
        Houston, Texas 77046
        (713) 526-3700/FAX (713) 526-3750
        dow@dowgolub.com

ATTORNEY-IN-CHARGE FOR PLAINTIFFS

OF COUNSEL:
DOW GOLUB REMELS & BEVERLY, LLP
Stephanie A. Hamm
S.D. Texas No. 108779
Texas Bar No. 24069841
Nine Greenway Plaza, Suite 500
Houston, Texas 77046
(713) 526-3700/FAX (713) 526-3750
sahamm@dowgolub.com

GRIMES LLC
Charles W. Grimes - Connecticut Juris No. 304368
(admitted pro hac vice to S.D. Texas)
grimes@gandb.com
Michael R. Patrick - Connecticut Juris. No. 423632
(admitted pro hac vice to S.D. Texas)
patrick@gandb.com
488 Main Avenue
Norwalk, Connecticut 06851
Tel: (203) 849-8300/FAX: (203) 849-9300

## CERTIFICATE OF SERVICE

On July 25, 2014, I electronically submitted the foregoing document with the Clerk of the Court of the United States District Court for the Southern District of Texas using the electronic case filing system of the Court.  I hereby certify that I have served all counsel and/or pro se parties of record electronically using the CM/ECF filing system or by any other manner authorized by Federal Rule of Civil Procedures 5(b)(2).

By:____/s/ Stephanie A. Hamm_____
          Stephanie A. Hamm

# EXHIBIT E

**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION**

ENTERED
01/22/2016

| | | |
|---|---|---|
| In re: | § | |
| | § | |
| **Tony DeRosa-Grund** | § | **Case No. 09-33264** |
| **aka Pro Jo Poker** | § | |
| | § | **Chapter 7** |
| **Debtor.** | § | |

<u>**MEMORANDUM OPINION ON THE DEBTOR'S MOTION TO REOPEN
CHAPTER 7 CASE PURSUANT TO 11 U.S.C. § 350**</u>
**[Doc. No. 92]**

**I. INTRODUCTION**

At bar is a dispute between Hollywood insiders and a Texas outsider concerning certain rights involving a blockbuster movie from 2013 entitled "The Conjuring." In the 1982 movie entitled "The Verdict," Paul Newman, who had the starring role as a solo practitioner suing a hospital for medical malpractice, delivers a brief closing to the jury which includes the following line: "We become tired of hearing people lie." This Court feels the same way about the debtor here.

The resolution of the dispute at bar requires a walk down memory lane. On May 7, 2009, (the "<u>Petition Date</u>"), an involuntary Chapter 7 bankruptcy petition was filed against Tony DeRosa-Grund aka Pro Jo Poker (the "<u>Debtor</u>"), [Doc. No. 1], and on June 8, 2009, this Court entered an order for relief. [Doc. No. 11]. The Debtor received a discharge on July 26, 2010, [Doc. No. 54]; the case was administered, and pro rata distributions were made to creditors, [Doc. No. 88]; and on May 8, 2014, this Court signed a final degree closing this case. [Doc. No. 90]. As of that date, it appeared that this case was over.

1

However, a second act began on September 23, 2015, when the Debtor, pursuant to 11 U.S.C. § 350(b),[1] filed a motion to reopen his Chapter 7 case (the "Motion to Reopen"). Two objections were lodged to the Motion to Reopen. The first was filed by PSG Poker, LLC ("PSG") and Phil Gordon ("Gordon") on October 14, 2015, [Doc. No. 93], but was later withdrawn on November 25, 2015, [Doc. No. 97]. A second objection was also filed on October 14, 2015 by New Line Productions, Inc. ("New Line"), a subsidiary and affiliate of Warner Brothers Entertainment ("Warner Brothers"), [Doc. No. 94]. Since the filing of its objection, New Line, unlike PSG and Gordon, has vigorously prosecuted its objection.

This Court held a multi-day hearing on the Motion to Reopen on December 1, 2015, December 2, 2015, December 3, 2015, and December 7, 2015, on which date the parties delivered closing arguments and the Court took the matter under advisement (hereinafter, the multi-day hearing is referred to the "Hearing"). During the Hearing, the Debtor presented his case-in-chief by calling one witness—himself—and by introducing six exhibits. New Line presented its case-in-chief by calling two witnesses—the Debtor and Michael J. O'Connor ("O'Connor")—and by introducing fifteen exhibits.[2]

The Debtor contends that his case should be reopened on the basis that he failed to list a particular asset on his original schedules that he now believes should have been scheduled. Specifically, the Debtor, who is a movie and television producer and writer, asserts that he should have scheduled an asset that, in the movie business, is known as a "treatment." A "treatment" is an "abridged script; longer than a synopsis. It consists of a summary of each

---

[1] Hereinafter, any reference to a section (i.e., §) refers to a section in 11 U.S.C., which is the United States Bankruptcy Code. Further, any reference to "the Code" refers to the United States Bankruptcy Code. Finally, any reference to a Rule refers to the Federal Rules of Bankruptcy Procedure.

[2] With respect to three of these exhibits—Exhibits No. 8, 9, and 10—the Court admitted less than all of the pages. The twelve exhibits that this Court admitted in their entirety are: Exhibits No. 1, 2, 4, 5, 6, 7, 13, 15, 16, 20, 21 and 22.

2

major scene of a proposed movie, and may even include snippets of dialogue."[3]  Here, the
Debtor contends that he should have scheduled the "treatment" for what subsequently became
the screenplay for "The Conjuring" (hereinafter this particular treatment will be referred to as the
"Treatment," and the movie itself will be referred to as "The Conjuring").  The Debtor now
wants this Court to reopen his case so that: (1)  he can amend his schedules to include the
Treatment, for which he believes has value; (2) the Chapter 7 trustee can then investigate and
determine the value of the Treatment; (3) the trustee can then sell or otherwise dispose of the
Treatment in order to bring in needed cash to the estate; and (4) the trustee can then distribute
these proceeds to pay off the two remaining allowed claims in this case, which total
approximately $185,000.00.[4]  Left unsaid by the Debtor is his hope—indeed, his strong belief—
that the Treatment is so valuable that the trustee, after administering this asset, will generate so
much cash for the estate that after payment of the two remaining claims, as well as the Trustee's
fee, there will be a substantial amount of cash remaining to be distributed to the Debtor himself.
*See e.g.* 11 U.S.C. § 726(a)(6); *In re Solomon*, 129 F.3d 608, n.10 (5th Cir. 1997)(under the
statutory distribution of property of the Chapter 7 estate, once all the claims are paid in full, the
debtor generally receives the remaining proceeds).

      New Line, which is in the movie-making business and is an affiliate of Warner Brothers,
strongly opposes reopening the Debtor's case.  It asserts that the only reason that the Debtor now

---

[3] Film Glossary, Glossary, Student Resources, N.Y. FILM ACAD.  (last visited Dec. 9, 2015, 3:18 PM),
https://www.nyfa.edu/student-resources/glossary/#T.  The Writers Guild of America, West considers a "treatment"
one example of  "Literary Material."  WRITERS GUILD OF AMERICA, WEST & WRITERS GUILD OF AMERICA, EAST,
SCREEN       CREDITS       MANUAL,       16       (2010),       https://www.wgaeast.org/wp-
content/uploads/typo3/user_upload/files/Screen_Credits_Manual_2010.pdf.

[4] In the trustee's final account and distribution report filed on March 26, 2014, [Doc. No. 88], four general
unsecured creditors held allowed claims that remained unpaid. Two of those creditors, Gordon and PSG, settled with
the Debtor on the eve of the Hearing, and their claims have been satisfied in full.  [Doc. No. 97].  Stated differently,
the Debtor paid off these creditors to ensure that they would not prosecute their objection to the Motion to Reopen.
The two remaining creditors on the trustee's final account and distribution report, Matt Maranz and the Internal
Revenue Service, had remaining allowed claims of $171,426.84 and $13,473.91, respectively.  [Doc. No. 88];
[Debtor's Ex. No. 4, pp.4–5 of 12].

seeks to reopen his case is because an arbitrator recently ruled against the Debtor in his dispute with New Line over the extent of any rights that he has to revenues generated by "The Conjuring" and any sequels to be made to this movie. New Line asserts that: (1) it acquired the Treatment several years ago from one of the Debtor's wholly-owned entities; (2) the Debtor himself has never owned the Treatment; (3) the Debtor has fabricated the story that he personally owned the Treatment on the Petition Date; and (4) the Debtor, angry that New Line has been unwilling to pay him a dime to settle the various lawsuits that he and his privately-held entities have brought against New Line, is now attempting to bring in the Chapter 7 trustee to do his bidding for him. Essentially, New Line's argument is that the Debtor believes that there is strength in numbers, and by having to fend off not only the Debtor, but also the trustee, New Line will cave in and pay good money to the trustee for the rights to the Treatment, much of which will wind up in the Debtor's pockets after payment of the two remaining claims and the Trustee's fees. Under these circumstances, New Line contends that the Debtor is gaming the bankruptcy system and therefore that this Court should not reopen his case.

Alternatively, New Line argues that even if this Court concludes that the Debtor, as opposed to one of his companies, owned the Treatment on the Petition Date—and that therefore the case should be reopened so that the Debtor can schedule the Treatment—the Debtor should be judicially estopped from receiving any benefits from the Trustee's eventual disposition of the Treatment because the Debtor's initial failure to disclose the Treatment was not inadvertent. *See e.g.*, *In Re Jackson*, 2012 WL 3071218, *aff'd* per curiam by the Fifth Circuit on direct appeal at *In Re Jackson*, 574 F. App'x 317 (5th Cir. 2014) (Where debtor's failure to disclose his interest in a patent was not inadvertent, the court, although allowing the debtor to schedule the patent, nevertheless held that the debtor was estopped from receiving any funds remaining after the

4

trustee administered the patent and paid claims in full, with any excess funds to either escheat to the United States or be made available to public interest, charitable, educational, and other public service organizations).

This Court now issues findings of fact and conclusions of law pursuant to Rules 9014 and 7052. To the extent that any finding of fact is construed as a conclusion of law, it is adopted as such; and to the extent that any conclusion of law is construed as a finding of fact, it is adopted as such. The Court reserves the right to make additional findings and conclusions as it deems appropriate, or as the parties may request. For the reasons set forth herein, this Court will grant the Motion to Reopen; however, because the Court finds that the Debtor's failure to schedule the Treatment was not inadvertent, the Debtor will be estopped from receiving any proceeds from the Trustee's administration of the Treatment.

## II. FINDINGS OF FACT

The relevant facts—as established by the pleadings, the admitted exhibits, the testimony of the witnesses, the stipulations and admissions of the parties, and the judicial notice that this Court takes of four complaints filed by the Debtor in the United States District Court for the Southern District of Texas—are as follows:

### A. Entities Owned and Controlled by the Debtor

1. The Debtor owns, or has owned, various entities, all of which have been corporations except one entity that was initially a dba (but became a LLC). The Debtor formed these entities to help him in his career as a movie producer and writer. For example, the Debtor testified that he used one entity "for marketing purposes." [Hr'g Tr. 104:5–6, Dec. 1, 2015].[5]

---

[5] Any reference to a hearing transcript is a reference to the transcript of the Hearing.

2. One of the entities owned by the Debtor is named Silverbird Media Group, LLC ("Silverbird").

3. A second entity owned by the Debtor is named Evergreen Media Group, LLC ("Evergreen"). Originally, this entity was a dba known as Evergreen Media Group (the "DBA").

4. A third entity owned by the Debtor is Gallows Hill Pictures, LLC ("Gallows Hill").

**B. Entity Owned by the Debtor's Family Trust**

5. Aside from the above described entities which the Debtor has controlled, and still controls, there exists another entity named Evergreen Media Holdings, LLC ("Holdings"). [Hr'g Tr. 96:19–24, Dec. 1, 2015]. This entity, which was formed in 2009, is controlled by what the Debtor has referred to as the family-owned trust. [*Id*.]. The name of this trust is the DeRosa-Grund Family Trust (the "Family Trust"), and the trustee of the Family Trust is the Debtor's step-daughter. [Hr'g Tr. 98:7–9, Dec. 1, 2015]. It is unclear as to whether the Family Trust owns 100% of Holdings, or whether the Debtor also has a direct stock interest in Holdings. The Debtor is, however, an employee of Holdings. [Hr'g Tr. 83:3–4, Dec. 1, 2015]. Indeed, the Debtor is more than a mere "employee" of Holdings; he signed two key contracts (to be subsequently discussed herein) as the "Manager" of Holdings, [New Line Ex. Nos. 4 & 5], and as the "Executive Chairman" of Holdings, [New Line Ex. No. 7].

**C. Relevant Prepetition Events**

6. In the 1990s, the Debtor was introduced to Ed and Lorraine Warren (the "Warrens"). [Hr'g Tr. 40:16–25, Dec. 1, 2015]. The Debtor and the Warrens developed a friendship and discussed "lots and lots of cases that Ed thought could be movies or

television shows." [Hr'g Tr. 40:19–21, Dec. 1, 2015]. During one of their discussions, Ed Warren played a tape recording of an interview between himself and Carolyn Perron (the "Carolyn Perron Interview"). [Hr'g Tr. 41:2–3, Dec. 1, 2015]. Throughout this discussion, Ed Warren would "start and stop the tape and give [the Debtor] comments." (the "Ed Warren Commentary") [Hr'g Tr. 41:5–6, Dec. 1, 2015]. The Debtor taped this discussion with Ed Warren on a digital recorder. [Hr'g Tr. 41:6–7, Dec. 1, 2015]. This recording included the Carolyn Perron Interview, the Ed Warren Commentary, and also the Debtor's ideas of how to turn the Perrons' story (the "Perron Life Rights") and the Warrens' story (the "Warren Life Rights") into a movie. [Hr'g Tr. 41:6–7; 12–16, Dec. 1, 2015]. From his digital recording, the Debtor made the Treatment. [Hr'g Tr. 41:17–21, Dec. 1, 2015]. The Treatment is not only on a tape; it is also in a written format drafted by the Debtor. [Hr'g Tr. 41:19–22, Dec. 1, 2015].

7. Subsequently, sometime in the late '90s, Silverbird, one of the companies owned by the Debtor, acquired the Perron Life Rights, but the exact date of this acquisition is unclear from the record. The Debtor testified that Silverbird acquired the Perron Life Rights in "Maybe [the] late '90s." [Hr'g Tr. 48:13, Dec. 1, 2015]. Hence, Silverbird acquired the Perron Life Rights many years prior to the Petition Date (i.e. prior to May 7, 2009).

8. On February 9, 2009—three months before the Petition Date—the Debtor, in his capacity as the managing member of Silverbird, executed a document entitled "Assignment of Rights," for the benefit of another company that the Debtor owned— namely, Evergreen—[New Line Ex. No. 2]. By executing this document, the Debtor

intended for Silverbird to convey to Evergreen all of the "rights title and interest, inclusive of any and all ownership and options agreements to the Life Rights to the Perron Family and the feature film project currently entitled 'the Conjuring.' " [*Id.*]. The Debtor testified that when he executed the Assignment of Rights, he was shutting down Silverbird and that he was making this assignment to Evergreen for "housekeeping purposes." [Hr'g Tr. 103:9–11, Dec. 1, 2015]. However, on February 9, 2009, Evergreen was not yet in existence; it was actually formed three days later, on February 12, 2009. [Hr'g Tr. 101:12–13, Dec. 1, 2015]. The Debtor testified that he "wasn't aware that it didn't exist at the time." [Hr'g Tr. 103:6, Dec. 1, 2015].

9. Sometime in 2009, after Silverbird executed the Assignment of Rights to Evergreen, Holdings—the company controlled by the Family Trust for which the Debtor is an officer—acquired both the Perron Life Rights and the Warren Life Rights. [Hr'g Tr. 48:14–24, Dec. 1, 2015]. The exact date of the acquisition by Holdings is not clear; the Debtor testified only that the acquisition was "somewhere in 2009." [Hr'g Tr. 48:24, Dec. 1, 2015].

10. In neither the Assignment of Rights (which expressly referenced the Perron Life Rights) nor the documents executed "somewhere in 2009," by which Holdings acquired both the Perron Life Rights and the Warren Life Rights, was the Treatment expressly referenced. [*See* New Line Ex. No. 2]; [Hr'g Tr. 48:14–49:4, Dec. 1, 2015].

**D. Background of the Debtor's Chapter 7 Case, Relevant Representations Made in His Schedules and Statement of Financial Affairs, and Other Actions Taken and Orders Entered Relating to the Debtor's Chapter 7 Case.**

### i. <u>General Background</u>

11. On May 7, 2009 (already defined as the "<u>Petition Date</u>"), an involuntary Chapter 7 bankruptcy petition was filed against Tony DeRosa-Grund, aka Pro Jo Poker (already defined as the "<u>Debtor</u>").  [Doc. No. 1].  The case was assigned to the Honorable Bankruptcy Judge Wesley W. Steen.[6]

12. On June 8, 2009, Bankruptcy Judge Steen entered an order for relief.  [Doc. No. 11].

13. On June 15, 2009, David J. Askanase was appointed the Chapter 7 Trustee (the "<u>Trustee</u>").

14. The Debtor chose Nelson Hensley ("<u>Hensley</u>") to represent him in this Chapter 7 case. Hensley is a very experienced bankruptcy lawyer who has been practicing for over 30 years.

### ii. <u>Representations on Schedules and Statement of Financial Affairs</u>

15. On July 10, 2009, the Debtor filed his original Schedules and Statement of Financial Affairs (SOFA).  [Doc. No. 19].  The Debtor reviewed his Schedules and SOFA with his attorney (i.e. Hensley) before he signed them.  [Hr'g Tr. 84:2–**7**, Dec. 1, 2015]. At the Hearing, the Debtor testified that "to the best of [his] understanding [his Schedules and SOFA were] all honest and true at the time [he] signed [them]." [Hr'g Tr. 86:2–4, Dec. 1, 2015].

16. Item No. 13 on Schedule B required the disclosure of "Stock and interests in incorporated and unincorporated businesses."  The Debtor represented that he had an

---

[6] On January 17, 2011, the Debtor's Chapter 7 case was randomly reassigned to the undersigned judge due to Judge Steen's retirement. [Doc. No. 56].

interest in Gallows Hill and that the value of this interest was $1.00. [Doc. No. 19. p. 5 of 31].

17. In the same column the Debtor represented that he had an interest in Evergreen and that the value of this interest was $1,000.00. [*Id.*].

18. The Debtor did not disclose his stock interest in Silverbird on his Schedule B.

19. Item No. 22 on Schedule B required the disclosure of "Patents, copyrights, and other intellectual property." The Debtor represented that he had an "Application Pending" and that the value of this application was $1.00. [Doc. No. 19. p. 6 of 31]. Although Schedule B required the Debtor to "Give Particulars" about any patent, copyright, or other intellectual property, the Debtor did not do so. At the Hearing, the Debtor made it clear that the "Application Pending" was not an application to copyright the Treatment, but rather was an application for a patent unrelated to "The Conjuring." [Hr'g Tr. 90:1–11; 91:11–92:9, Dec. 1, 2015].

20. The Debtor testified that he disclosed the patent application in Item No. 22 because he knew that the patent was registered. [Hr'g Tr. 87:5–9, Dec. 1, 2015].

21. The Debtor did not disclose the Treatment on his Schedule B. [See Debtor's Ex. No. 2]; [Hr'g Tr. 84:20–86:6, Dec. 1, 2015]. Stated differently, by not scheduling the Treatment, the Debtor represented to this Court and to his creditors that he, in his individual capacity, did not own the Treatment.

22. One reason that the Debtor did not disclose the Treatment was "[b]ecause I didn't have a registration on it, sir." [Hr'g Tr. 88:10–20, Dec. 1, 2015].

23. A second reason that the Debtor did not disclose the Treatment was because:

> I didn't think that there was anything to put down because (a) I didn't think it had any value, (b) New Line said they weren't using it. I

10

couldn't use it without the Perron Family rights and the Warren rights. I couldn't use it without getting sued, and I didn't think it had any value. No one was using it. I wasn't thinking about a copyright registration for it. I didn't think there was any reason to register it because I couldn't use it. New Line had it blocked.

[Hr'g Tr. 90:12–19, Dec. 1, 2015].

24. Item No. 18a of the SOFA required the Debtor to "list the names, addresses, taxpayer-identification numbers, nature of the businesses, and beginning and ending dates of all businesses in which the debtor was an officer, director, partner, or managing executive of a corporation, partner in a partnership, sole proprietor, or was self-employed in a trade, profession, or other activity either full- or part-time within **six years** immediately preceding the commencement of this case, or in which the debtor owned 5 percent or more of the voting or equity securities within **six years** immediately preceding the commencement of this case." The Debtor failed to make proper disclosure required by this Item Number 18a because he failed to list the required information of the following entities: Holdings, Silverbird, Evergreen, Gallows Hill, DBA, and Holdings.[7] Rather, the Debtor's skeletal and misleading response to Item Number 18a was as follows: "Tony DeRosa-Grund, XXX-XX-9860, Magnolia Texas, Patent Development." [Debtor's Ex. No. 2]; [Doc. No. 19].

---

[7] The record is unclear whether, and to what extent, the Debtor had any equity interest in Holdings. However, he was a "manager" of this entity as evidenced by his signing the Option Quitclaim Agreement and Producer Loanout Agreement in that capacity, [*See* New Line Ex. Nos. 4 & 5]. Thus, the Debtor needed to disclose Holdings by virtue of his position as its "manager." Moreover, there is no question that the Debtor, on the Petition Date, had a substantial, if not 100%, ownership interest in Silverbird and Evergreen, and that he was an executive of these entities. Indeed, New Line's Exhibit No. 4 (the Option Quitclaim Agreement) reflects that he was a member of Silverbird and a manager of Evergreen at the time he executed this contract, [New Line Ex. No. 4]; and New Line's Exhibit No. 7 (amendment to the Option Quitclaim Agreement) reflects that he was a director of both Silverbird and Evergreen when executing this particular contract, [New Line Ex. No. 7]. Therefore, in responding to Item No. 18a, the Debtor should have disclosed the information requested about Silverbird and Evergreen.

### iii. **Pleadings and Orders Entered Regarding Nondischargeability of One Particular Debt and a General Discharge for the Debtor (Except for the One Nondischargeable Debt)**

25. On February 15, 2010, PSG and Gordon filed a complaint against the Debtor under § 523(a) seeking to prevent the discharge of a certain judgment that the United States District Court for the Southern District of New York had entered against the Debtor on September 24, 2008. [Adv. Proc. No. 10-03068, Adv. Doc. No. 1-2]. This judgment was for $340,000.00 in compensatory damages, $200,000.00 in punitive damages, and $36,266.70 in attorneys' fees, for a total amount of $576,266.70. (the "$576,266.70 New York Judgment") [Adv. Proc. No. 10-03068, Doc. Nos. 1–1 & 1–4]. The $576,266.70 New York Judgment arose due to the Debtor's fraudulent conduct relating to a television program involving professional poker players competing against amateurs. [Adv. Proc. No. 10-03068, Adv. Doc. No. 12–2].

26. On June 23, 2010, Bankruptcy Judge Steen entered an order declaring that the $576,266.70 New York Judgment was a non-dischargeable debt. [Adv. Proc. No. 10-03068, Doc. No. 14].

27. On July 26, 2010, Bankruptcy Judge Steen granted the Debtor a discharge pursuant to § 727 of the Code. [Doc. No. 54]. The order entered on the docket granted the Debtor a discharge of all of his debts except the $576,266.70 New York Judgment. [*Id.*].

### iv. **The Trustee's Final Accounting and This Court's Closure of the Case**

28. On March 26, 2014, the Trustee submitted his final account and distribution report certifying that the Debtor's Chapter 7 estate (the "Estate") had been fully administered. [Doc. No. 88]; [Debtor's Ex. No 4]. The Estate yielded net receipts of

$100,013.67. [Doc. No. 88]; [Debtor's Ex. No. 4]. Of this amount, $48,952.08 was distributed to pay allowed claims, and the remaining $49,128.59 was used to pay administrative expenses. [*Id.* at p. 1 of 12]. The aggregate amount of debts discharged without payment totaled $1,121,996.43. [*Id.* at p. 1 of 12]. On May 8, 2014, the Debtor's Chapter 7 case was closed. [Doc. No. 90].

### E. Transactions Occurring During the Debtor's Chapter 7 Case

#### i. Transactions involving New Line, the Debtor, Silverbird, Evergreen, and Holdings

29. On November 11, 2009, New Line (on the one hand) and Holdings, the Debtor, Silverbird, and Evergreen (on the other) executed an Option Quitclaim Agreement (the "Option Quitclaim Agreement"). [New Line Ex. No. 4]. This agreement, subject to certain conditions precedent, granted New Line a right to acquire all of the Debtor, Holdings, Evergreen, and Silverbird's right, title, and interest, except for certain reserved rights, in and to certain assets, including:

   a. "Any and all literary material in connection with the project currently known as 'the Conjuring' fka 'The Untitled Hayes Brothers Project'[8] . . . " [*Id.* at p.2 of 38, ¶1A(a)];

   b. "The entire case file library. . . related to the Warren's paranormal investigations. . . including but not limited to all interviews, case histories, photographs, notes, timelines. . . " [*Id.*, p. 3 of 38, ¶1A(a)(iii)];

---

[8] The Hayes brothers are independent writers whom New Line (or New Line's affiliate, Warner Brothers) hired to write the screenplay for "The Conjuring." [Hr'g Tr. 57:17–19, Dec. 1, 2015]. In certain documents introduced into the record at the Hearing, references were occasionally made to the "Hayes Brothers Project." [Hr'g Tr. 22:9–12, Dec. 1, 2015]. This phrase is nothing more than a reference to the putative screenplay for "The Conjuring."

c. "Any and all right, title and interest in and to the entire life stories of Ed and Lorraine Warren and the Perrons. . . including without limitation, all paranormal investigations of the Warrens and the paranormal experiences of the Perrons," [*Id.* at ¶1A(b)]; and

d. "Any and all agreements, assignments, instruments and other documents heretofore made pursuant to which services are to be rented, and/or material furnished in connection with any and all motion pictures or other productions to be based in whole or in part on the Literary Material. . . or which transfer rights in and to the Literary Material. . ." [*Id.* at ¶1A(c)];

e. "Any and all rights and interests of every type and nature heretofore or hereafter acquired by [the Debtor, Holdings, Evergreen or Silverbird] with respect to the Property[9] and/or pursuant to the Agreements, including without limitation, all motion picture and other rights to the life stories of the Warrens, the life stories of the Perrons and the characters of Ed and Lorraine Warren." [*Id.* at p. 5 of 38, ¶1A(d)].

f. The Option Quitclaim Agreement was subsequently amended on October 19, 2010. [*See* Finding of Fact No. 41].

30. Also on November 11, 2009, New Line and Holdings, the Debtor, Silverbird, and Evergreen executed a Producer Loanout Agreement (the "<u>Producer Loanout</u>

---

[9] The term "Property" is defined as "any and all literary material (collectively, the 'Literary Material') in connection with the project currently known as 'THE CONJURING' fka 'THE UNTITLED HAYES BROTHERS PROJECT' fka 'THREE KNOCKS ON THE DOOR: THE LIVES AND CAREER OF ED AND LORRAINE WARREN' fka 'THE DEMONOLOGISTS,' including without limitations… any and all drafts, revisions, and rewrites of that certain screenplay…and related material written by Harrison Smith, Jr….of that certain screenplay… and any related material written by Chad Hayes and Carey Hayes… entire case file library… any and all right, title, and interest in and to the entire life stories… any and all agreements, assignments, instruments and other documents heretofore made pursuant to which services are to be rendered, and/or materials furnished…" [New Line Ex. No. 4, p. 2-3 or 38].

Agreement"). [New Line Ex. No. 5]. The Producer Loanout Agreement is an agreement "by which Mr. DeRosa-Grund serves [sic] as a producer were provided by his loanout company. . . And that's a provision that provides that all the results and proceeds of anything that Mr. DeRosa-Grund did either before or after the agreement are deemed the property of New Line including ideas, suggestions, themes, plots, stories, characterizations, dialogue, etc." [Hr'g Tr. 173:10–24, Dec. 1, 2015].

31. Additionally, on November 11, 2009, the Debtor, Holdings, and New Line entered into an agreement entitled Certificate of Employment (the "COE"). The essential terms of the COE are that the Debtor agrees for "good and valuable consideration" to render services in connection with "The Conjuring" including "all ideas, suggestions, themes, plots, stories, characterizations, dialogues, titles and other materials, whether in writing or not in writing at any time heretofore or hereafter created or contributed… copyrights, neighboring rights, trademarks and any and all other ownership." [New Line Ex. No. 22].

32. The Trustee was *not* a party to, nor did he sign, the Option Quitclaim Agreement, the amendment to the Option Quitclaim Agreement, the Producer Loanout Agreement, or the COE. [*See* New Line Ex. Nos. 4, 5, 7 & 22].

33. Because the Trustee was not a party to, and did not execute, the Option Quitclaim Agreement, the Amendment to the Option Quitclaim Agreement, the Producer Loanout Agreement, or the COE, no property of the Estate was transferred by virtue of the execution of these documents.

### ii. <u>Transactions Involving the Trustee, New Line, Holdings, the Debtor and Peter Safran</u>[10]

34. On December 22, 2009, the Trustee filed a Motion to Approve Agreement Between Trustee and Evergreen Media Holdings, LLC, New Line Productions, Inc., Peter Safran, and Tony DeRosa-Grund (the "<u>Trustee's Motion</u>"). [Doc. No. 33].

    a. In the Trustee's Motion, he asserted that he lacked sufficient information to evaluate whether the Estate had an interest in the proceeds to be generated from the movie to be made called "The Conjuring," although he noted that the Debtor maintained "that because Debtor's family trust purportedly owns Evergreen Media Holdings and because the deal was entered into post-petition, the Estate lacks any interest in the rights related to the movie." [Doc. No. 33, ¶ 4].

    b. Further, the Trustee represented that he was not in a "position to evaluate the factual allegations that Debtor and [Holdings]. . . made regarding the ownership of the intellectual property and any other thing of value to be transferred to New Line," [Doc. No. 33, ¶ 5], and that the Debtor and Holdings represented to the Trustee that if the "Trustee fails to accept the proposal deal and release New Line of any claim that the Estate will forfeit that collection of $100,000.00. . . [and] there will not be a second opportunity to receive payment for a similar motion picture deal." [*Id.*]

    c. According to the Trustee, he was faced with a "difficult choice:" if he were to conduct an "adequate investigation. . . of the facts surrounding Evergreen Media Holdings' acquisition of the motion picture rights, he risks the

---

[10] Peter Safran was one of the producers of "The Conjuring."

threatened loss of $100,000.00 for the estate (which, according to the Debtor, currently does not have a penny)." [*Id.*].

    d.  The Trustee's Motion requested that the Court "authorize him to release New Line from any claim arising out of any of the intellectual property or other rights to be assigned or otherwise transferred to New Line in exchange for the payment of $100,000.00. . ." [Doc. No. 33]; [New Line Ex. No. 19].

35. No creditor or party-in-interest (including the Debtor) ever objected to the allegations set forth in the Trustee's Motion, nor did anyone object to the relief sought therein.

36. On January 27, 2010, Bankruptcy Judge Steen entered an order approving the Trustee's Motion (the "Order Approving Agreement"). [Doc. No. 38]. The Order Approving Agreement authorized the Trustee, in exchange for a $100,000.00 payment made by New Line to him for the benefit of the Estate, to release any claims for injunctive relief that the Estate had or may have against New Line, its affiliates, or any entities involved in the "exploitation, marketing, distribution or production of the material described in the Deal Memo. . . arising out of the execution of and performance under any of the agreements contemplated by the Deal Memo." [*Id.* at ¶ 1]. Additionally, the Order Approving Agreement authorized the Trustee to accept the $100,000.00 payment from New Line in "full satisfaction and release of any claims for injunctive relief that the Estate has, had or may come to have against New Line arising out of or relating to the transfer of intellectual property and any other rights associated therewith or related thereto contemplated by the Deal Memo." [*Id.* at ¶ 2]. Finally, the Order Approving Agreement recognized that in authorizing the Trustee to release any Estate claims, the release related to agreements concerning the

"Untitled Hayes Brothers Project"—otherwise known as "the Picture." [Debtor's Ex. No. 3]. [11]

37. After the Order Approving Agreement was signed and entered on the docket, the Trustee and New Line consummated the agreement, and New Line paid $100,000.00 to the Trustee—funds that were eventually distributed to pay allowed claims. [*See* Finding of Fact No. 28].

**F. Dispute Breaks Out Over Whether New Line Has Misappropriated the Treatment**

38. At some point after Judge Steen signed the Order Approving Agreement on January 27, 2010, a dispute broke out between the Debtor and New Line over whether New Line was misappropriating the Treatment in order to have its own writers work up the screenplay for the "The Conjuring." [*See* New Line Ex. No. 6]; [Debtor's Ex. No. 6].

39. Negotiations ensued over this dispute, but no agreement was reached.

40. On October 7, 2010, at 5:49 P.M., the Debtor, sent an e-mail to Craig Alexander ("Alexander"), the senior vice president and head of business and legal affairs of New Line, inquiring as to whether they could confer the following day regarding "John's proposed compromise." [Debtor's Ex. No. 6]. This e-mail concerned a proposed compromise about the Debtor's belief that the Hayes brothers and New Line were stealing the Treatment and using it to write the screenplay for "The Conjuring." [12]

---

[11] Attached to the Order Approving Agreement was a so-called "Deal Memo" dated December 4, 2009. This document was signed by Holdings, the Debtor, New Line and Peter Safran. The Trustee did not execute this document, and this is understandable because the "Deal Memo" added terms to the Option Quitclaim Agreement and the Producer Loanout Agreement (to which the Trustee was also not a party). The Deal Memo was attached to the Order Approving Agreement in order to document why New Line was paying $100,000.00 to the Trustee (i.e. to ensure that the Trustee would not seek an injunction against New Line for any rights that New Line was acquiring under the Option Quitclaim Agreement and the Producer Loanout Agreement, and any other agreements referenced in the Deal Memo).

[12] As set forth in fn. 8, the Hayes brothers are independent writers whom New Line (or New Line's affiliate, Warner Brothers) employed to write the script/screenplay for "The Conjuring." [Hr'g Tr. 57:17–19, Dec. 1, 2015].

[Debtor's Ex. No. 6]. On October 7, 2010, at 7:51 P.M., Alexander responded to the Debtor's e-mail by sending an e-mail back to him stating that: "I am afraid, I [i.e. New Line] can't buy your treatment. I don't think the writers ever saw it, and it would not be fair to them to introduce that into the credit determination."[13] [*Id.*] On October 7, 2010, at 8:44 P.M., the Debtor replied to Alexander's e-mail by stating the following: "Bullshit Craig, at least 60%-65% of the story if not more, is from *my* Treatment." [New Line Ex. No. 6](*emphasis added*). The Debtor then made the following threat:

> I shut my mouth up till now to get this [movie] made, but no more. All bets are off. I had the conversation with Peter Safran [one of the producers] a while back and also with John, even before there were any "issues" that this script was based on *my story/treatment* and transited way beyond any producer duties, so shouldn't I be credited/paid for that work. No more Mr. Nice guy, no more patience. *No one rips me off creatively or otherwise. So I'll just sue everyone here because I have had enough of being defrauded and now screwed with. See you in court.*

> [New Line Ex. No. 6](*emphasis added*).

41. On October 19, 2010, the Option Quitclaim Agreement was later amended to add an additional paragraph that read, in relevant part, "[i]f DeRosa-Grund contributed any oral or written material to the screenplay for the motion picture currently entitled 'The Conjuring' (including but not limited to, a treatment), such material is owned and controlled by [the Debtor, Evergreen, Silverbird, and Holdings] pursuant to the terms of the Certificate of Employment dated as of November 11, 2009 between New Line and Holdings for the services of DeRosa-Grund. . ." [New Line Ex. No. 7, p. 9 of 11]. [Hr'g Tr. 171:24–172:13, Dec. 1, 2015].

---

[13] The phrase "credit determination" refers to whether someone who has written a screenplay for a movie should be given credit at the end of the movie for writing the screenplay.

## G. "The Conjuring" is Released and Becomes a Huge Success

42. On July 19, 2013, "The Conjuring" was released and became one of the highest grossing films of that year. [Hr'g Tr. 6:17–18, Dec. 1, 2015]; [Debtor's Ex. No. 5, p. 2] (District Judge Lee Rosenthal's Memorandum Opinion finding that the movie "grossed over $300 million worldwide.").

43. After the release of "The Conjuring" began generating substantial revenues, the Debtor continued to insist that New Line and Warner Brothers had misappropriated the Treatment and used it to write the screenplay for "The Conjuring." [Debtor's Ex. No. 6]; [New Line Ex. No. 6]. New Line and Warner Brothers both denied this accusation.

## H. After the Debtor's Chapter 7 Case was Fully Administered, the Debtor Initiated Lawsuits Seeking to Recover Damages for, Among Other Actions, the Alleged Misappropriation by New Line of the Treatment.

44. On March 28, 2014—two days after the Trustee filed his final account and distribution report, [Doc. No. 88]—the Debtor and Holdings filed suit against New Line and Warner Brothers in the United States District Court for the Southern District of Texas (the "District Court") alleging (1) breach of contract; (2) breach of the implied covenant of good faith and fair dealing; (3) fraud in the inducement; (4) promissory estoppel; (5) conversion; (6) declaratory judgment; and (7) violation of the Lanham Act. [Civil Action No. 14-00793, Doc. No. 1].[14]

---

[14] The Court was made aware of Civil Action No. 14-00793 and Civil Action No. 14-01117 because Debtor's Exhibit No. 5 is a Memorandum and Opinion issued by the District Court presiding over those lawsuits. Further, counsel for the Debtor made this Court award of another suit pending in the District Court bearing Civil Action Number 15-02763. [Hr'g Tr. 14:17–15:6, Dec. 1, 2015]. The Court has reviewed the docket sheet of these suits, as well as the docket sheet of one other suit filed by the Debtor against New Line in the District Court. The Court has also reviewed the complaints filed by the Debtor to initiate these suits. In this Court's Findings of Fact Nos. 44, 45, 46, 52, & 53, this Court cites to various allegations about the Treatment that the Debtor made in these complaints. The Court is allowed to do so because "[c]ourt documents from another case may be used to show that the document was filed, that [a] party took a certain position, and that certain. . . allegations or admissions were made. . ." *In re*

**a.** The civil action was assigned to the Honorable United States District Judge Lee H. Rosenthal.

**b.** Sanford L. Dow ("Dow"), a partner at the Houston law firm of Dow Golub Remels & Beverly, LLP), represented the Debtor in the civil action. [*Id.*].

**c.** In this lawsuit, the Debtor made the following allegations with respect to the Treatment: (1) the Debtor's "strategy and vision…developed into and became the basis for the written story and treatment based on the 'Perron Farmhouse' Case File, all of which was used as the foundation and basis of the hit theatrical motion picture 'The Conjuring;' " (2) the Debtor "created, conceived, and authored the story and treatment of the 'Perron Farmhouse' Case File;" (3) the Debtor "created the 'The Conjuring' trademark;" (4) the Debtor sought to sell the aforementioned story and treatment, as well as the Warrens' life rights and Case Files, in conjunction with a feature motion picture series using 'The Conjuring' trademark that he had created;" (5) the Debtor "prior to entering into an agreement" with New Line worked with the Hayes brothers to turn the story and treatment into a " 'pitch' and, finally, a formal script;" (6) the Hayes brothers "received copies of the [Debtor's] story, treatment, and recording," and (7) New Line knew the Hayes brothers used the Debtor's "original story and treatment" as the "underlying foundation and basis" for their work. [*Id.* at 5–6].

---

*FedEx Ground Package Sys.*, 2010 U.S. Dist, LEXIS 30303, at *10 (N.D. Ind. Mar. 29, 2010) (citation omitted); see also *Anderson v. Dallas Cty.*, No. 3:05-CV-1248-G, 2007 WL 1148994, at *3 (N.D. Tex. Apr. 18, 2007) *aff'd*, 286 F. App'x 850 (5th Cir. 2008) ("The Fifth Circuit has determined that a court may take judicial notice of a document filed in another court. . . to establish the fact of such litigation and related filings, but cannot take notice of the factual findings of another court.") (quoting *Taylor v. Charter Med. Corp.*, 162 F.3d 827, 830 (5th Cir. 1998) ) (internal quotations omitted).

    **d.** The Debtor requested, among other relief, that New Line and Warner Brothers pay damages for their alleged improper use of the Treatment. [*Id.* at 29–30].

    **e.** The Debtor did not notify the Trustee of this suit.

    **f.** The Debtor did not amend his Schedule B to disclose the Treatment.[15]

    **g.** The Debtor did not amend his Schedule B to disclose that he had filed a suit based, at least in part, on events that occurred prior to the Petition Date (i.e. the Debtor's writing of the Treatment).[16]

    **h.** The Debtor's case was still open on the date of the Debtor's filing of this suit; therefore, the Debtor could have amended his Schedule B without having to reopen his case.

45. On April 23, 2014—less than one month after the Trustee filed his final account and distribution report—the Debtor, Holdings and Gerald D. Brittle[17] filed suit against Lorraine Warren, Tony Spera, Graymalkin Media, LLC, New Line, and Warner Brothers in the District Court alleging copyright infringement. [Civil Action No. 14-01117, Doc. No. 1].

---

[15] There is no question that Holdings, in addition to the Debtor, was the other plaintiff in this suit and that the prayer paragraph of the complaint reflects that they jointly sought the relief requested. But, this fact did not relieve the Debtor from his duty as the debtor in his Chapter 7 case from amending his Schedule B to disclose that he had filed suit (i.e. owned an asset) seeking damages based upon events that occurred, at least in part, prior to the Petition Date (i.e. his writing the Treatment). *See In re Robert's Plumbing & Heating, LLC*, No. 10-23221, 2011 WL 2972092, at *11 (Bankr. D. Md. July 20, 2011) ("For purposes of the Schedules, which are intended to relate to facts or events occurring before the filing of the Petition, the Debtor disclosed all facts or events through and including [the petition date]."); *see also, In re Castillo*, 508 B.R. 1, 7-8 (Bankr. W.D. Tex. 2014) ("debtors have an express, affirmative duty to disclose all assets even if there is uncertainty about if those assets are property of the estate"); *Kimberlin v. Dollar Gen. Corp.*, 520 F. App'x 312, 314 (6th Cir. 2013) ("Applying judicial estoppel under these circumstances recognizes the importance of the bankruptcy debtor's *affirmative and ongoing duty* to disclose assets, including unliquidated litigation interests.") (*emphasis added*).

[16] *See* fn. 15.

[17] Gerald D. Brittle is the author of "The Demonologist," a book about the lives and experience of Ed and Lorraine Warren. [Civil Action No. 14-01117, Doc. No. 1, p. 12 of 33].

a. This suit was initially assigned to the Honorable United States District Judge David Hittner.

b. The Debtor, again represented by Sanford Dow, sought actual and punitive damages. [*Id.*].

c. In this particular lawsuit, the Debtor asserted the following in regard to the Treatment: (1) the Debtor's "strategy and vision…developed into and became the basis for" the treatment based on Perron Family Case file; (2) the Debtor's "strategy, vision, story and treatment" was used as the "foundation and basis" for "The Conjuring;" (3) New Line and Warner Brothers received copies of the Debtor's story, treatment, recording, "as well as any and all notes and materials he possessed related to the 'Perron Farmhouse' Case file;" and (4) New Line and Warner Brothers were "acutely and actually aware that" the Debtor's story and treatment were the "underlying foundation and basis for the screenwriters work." [*Id.* at 4–6].

d. The Debtor again requested, among other relief, that New Line, Warner Brothers, and other defendants, pay damages for their alleged improper use of the Treatment. [*Id.* at 30–32].

e. The Debtor did not notify the Trustee of this suit.

f. The Debtor did not amend his Schedule B to disclose the Treatment.[18]

g. The Debtor did not amend his Schedule B to disclose that he had filed a suit based, at least in part, on events that occurred prior to the Petition Date (i.e. the Debtor's writing of the Treatment).[19]

---

[18] *See* fn. 15.

    **h.**  The Debtor's case was still open on the date of the Debtor's filing of this suit; therefore, the Debtor could have amended his Schedule B without having to reopen his case.

46.  On June 25, 2014, District Judge Rosenthal entered an order transferring Civil Action 14-01117 to her court and consolidating it under Civil Action 14-00793. [Debtor's Ex. No. 5, p. 24 of 24]; [Civil Action No. 14-00793, Doc. No. 21]; [Civil Action No. 14-01117, Doc. No. 22].

    **a.**  On October 28, 2014, Judge Rosenthal granted the Motion of New Line and Warner Brothers to Dismiss or Stay in Favor of Ongoing Arbitration; or in the Alternative to Transfer Venue. [Civil Action No. 14-00793, Doc. No. 44].

    **b.**  On November 4, 2014, District Judge Rosenthal issued a Memorandum Opinion and corresponding order dismissing Civil Action 14-00793 and Civil Action 14-01117 in favor of arbitration. [Civil Action No. 14-00793, Doc. No. 45, p. 24 of 24]; [Civil Action No. 14-00793, Doc. No. 46].

    **c.**  The Debtor did not notify the Trustee of District Judge Rosenthal's decision.

    **d.**  The Debtor did not amend his Schedule B setting forth that he had a claim in arbitration against New Line that was based upon New Line's alleged misappropriation of the Treatment.

## I. Results of the Arbitration Proceeding

47.  After District Judge Rosenthal issued her dismissal order, the parties proceeded to arbitration in California. [Hr'g Tr. 157:7–10, Dec. 1, 2015]. The Debtor was represented by two attorneys at this arbitration whose names are Charles W. Grimes and Michael R. Patrick. [New Line Ex. No. 13, p. 1]. Extensive discovery was

---

[19] *See* fn. 15.

conducted, including depositions; a full evidentiary hearing was held, which included

testimony and the introduction of 497 exhibits; and then the arbitrator took the matter

under advisement.  [Hr'g Tr. 166:3–8, Dec. 1, 2015].  The Debtor failed to notify the

Trustee of the existence of this arbitration proceeding.

48. On February 5, 2015, the arbitrator issued a final arbitration award completely in

favor of New Line and Warner Brothers.  [New Line Ex. No. 13, p. 32 of 32].

Indeed, the arbitrator ruled that the Debtor had failed to meet his burden of proof on

any of his claims, and that "New Line is the prevailing party in this arbitration."  [*Id.*].

49. After the issuance of the final arbitration award in favor of New Line and Warner

Brothers, the Debtor filed an appeal of this award.  [New Line Ex. No. 14].

Meanwhile, the Debtor, through his attorney, conducted negotiations with New Line

and Warner Brothers in an effort to achieve a settlement.  However, no settlement

was ever reached.

## J. The Letter Sent By the Debtor's Attorney to New Line After the Arbitrator Ruled Against the Debtor

50. On July 20, 2015, Dow, as the attorney for the Debtor and Holdings, e-mailed a letter

to O'Connor, the attorney for New Line (the "Dow Letter").  [New Line Ex. No. 15].

The Dow Letter stated that "we have discovered several other causes of action that we

intend to file against your clients, Lorraine Warren, Tony Spera, New Line

Productions, Inc. ("New Line"), and Warner Bros Entertainment Inc. ("Warner

Bros"), in the very near future," [*Id*. at p. 1 of 73], and further stated that:

> Mr. DeRosa-Grund intends to file a concurrent motion to reopen his
> personal bankruptcy in light of the fact that the above-referenced
> treatment should have been listed as an asset in the original bankruptcy
> matter, but inadvertently was not.  The reopening will address that
> inadvertent error as his treatment was, and remains an asset of the

25

bankruptcy estate. Mr. DeRosa-Grund and I have already met with the U.S. Bankruptcy Trustee who was originally involved in the bankruptcy, and have explained the facts and circumstances to him. Based on our conversations, he has authorized us to convey to the court that he will not oppose the reopening of the bankruptcy. A copy of the motion to reopen the bankruptcy is also attached.

Finally, Mr. DeRosa-Grund and [Holdings] intend to file a motion with the bankruptcy court requesting a Show Cause Order. Pursuant to the Deal Memo, and the bankruptcy court's order approving the same, Safran and [Holdings] were supposed to be an indivisible producing team. When New Line refused to employ and compensate [Holdings] as producer on any and all sequel productions, New Line was clearly in contempt of the bankruptcy court's order. Because the foregoing original order of the bankruptcy court was part of a core proceeding, this adversarial proceeding cannot be adjudicated in any other forum (i.e. mediation), as bankruptcy courts have the sole and exclusive jurisdiction over core proceedings and proceedings related thereto.

[*Id.* at p. 2 of 73]. After making the above-referenced threat to next sue New Line in bankruptcy court, the Dow Letter subsequently proposes the following: "*If a settlement can be reached, my clients will agree to withdraw all current and contemplated litigation*." [*Id.* at p. 3 of 73][emphasis added]. Among the attachments to this e-mail was a copy of an unfiled application to reopen the Debtor's case under § 350, and a copy of an unfiled Show Cause Order Against New Line to be filed in the Debtor's case once it was reopened. [*Id.* at pp. 68–73 of 73]. A review of the draft show cause order reflects that the Debtor, together with Holdings, was going to request that this Court impose sanctions of $250,000.00 per day against New Line for its alleged contempt of the Order Approving Agreement. [New Line Ex. No. 15, the last ¶ on the penultimate page].

51. O'Connor, attorney for New Line, understood the Dow Letter to mean that "if [New Line] agreed to [the] demands and paid [the Debtor] the monies that the Arbitration Award denied him, that he wouldn't file the litigation and he wouldn't seek to reopen

26

this bankruptcy case. . ."  [Hr'g Tr. 17:12–16, Dec. 2, 2015].  O'Connor testified that when he received the Dow Letter, he was "appalled" because "we [] spent 2-1/2 years litigating the issues in the Arbitration Award and Mr. DeRosa-Grund was essentially seeking a do-over by making a claim that the Bankruptcy Court was somehow implicated in this, which is a claim that he had never made." [Hr'g Tr. 15:23; 16:13– 17, Dec. 2, 2015].  No settlement was reached after Dow sent his letter to O'Conner.

**K. Post-Arbitration Lawsuit Filed By the Debtor**

52. On August 7, 2015, the Debtor, as the sole plaintiff, and once again represented by Dow, filed suit against Time Warner, Inc. ("Time Warner"), Warner Brothers, New Line, Chad Hayes, Carey Hayes, and Peter Safran in the District Court alleging copyright infringement, violation of the Lanham Act, and violation of Texas common law.  [Civil Action No. 15-02273, Doc. No. 1, ¶4].

   a.  The suit was assigned to the Honorable District Judge Nancy F. Atlas.

   b.  The Debtor sought declaratory judgment, injunctive relief, actual and punitive damages, attorney's fees, court costs, and pre and post judgment expenses. [*Id*.].

   c.  In this lawsuit, the Debtor asserted the following in regard to the Treatment: (1) the Debtor wrote the Treatment as a work of fiction, [*Id*. at p. 7]; (2) the Debtor attempted to sell the Treatment to motion pictures studios for years [*Id*.];  (3) the Debtor sent a copy of the Treatment to Stacey Snider, then chairwomen of Dream Works who informed the Debtor she "definitely understands the commercial potential for such a deliciously creepy story, [*Id*.];" (4) in February of 2009, the Debtor sent a copy of the Treatment to

Gold Circle Films, who "was interested in entering into a deal with [the Debtor], whereby it would acquire the rights to The Conjuring Treatment… however, the two sides [the Debtor and Gold Circle Films] could not ultimately agree to the terms, [*Id*. at 7–8];" (5) New Line and Warner Brothers "unlawfully produced and exploited… 'The Conjuring,' a work derived from the [Debtor's] original story and treatment, [*Id*. at p. 1];" (6) "At no time did [New Line and Warner Brothers] negotiate with the Trustee to exclude the [Debtor's Treatment] from the bankruptcy estate, [*Id*. at p. 2];" (7) New Line and Warner Brothers never filed a motion with the bankruptcy court to exclude the Treatment from the bankruptcy estate, [*Id*.]; and (8) New Line and Warner Brothers never requested that the bankruptcy court transfer the Treatment from the bankruptcy estate to either New Line or Warner Brothers, [*Id*.].

d. The Debtor requested, among other relief, that New Line and the other defendants be enjoined from "infringing the copyrights in The Conjuring Treatment." [*Id*. at p. 32 of 36]. Additionally, the relief requested by the Debtor was for "an accounting and restitution… of all gains, profits, and advantages Defendants have derived from their…copyright infringement of The Conjuring Treatment." [*Id*.].

e. The Debtor did not seek to reopen his case at this time to file an amended Schedule B disclosing this cause of action, which was based, at least in part, on events that occurred prior to the Petition Date (i.e. the Debtor's writing of the Treatment).

    **f.** The Debtor did not seek to reopen his case at this time in order to file an amended Schedule B disclosing the Treatment.

    **g.** The Debtor moved to dismiss this suit on August 28, 2015. [Civil Action No. 15-02273, Doc. No. 4]. On this same day, District Judge Nancy Atlas granted this relief. [Civil Action No. 15-02273, Doc. No. 5].

53. On September 22, 2015, the Debtor, representing himself *pro se*, filed yet another suit against Time Warner, Warner Brothers, New Line, Chad Hayes, and Carey Hayes in the District Court alleging copyright infringement, violation of the Lanham Act, and violation of Texas common law. [Civil Action No. 15-02763, Doc. No. 1].

    **a.** This suit was assigned to the Honorable United States District Judge Alfred H. Bennett.

    **b.** The Debtor is representing himself *pro se* in this suit.

    **c.** With regards to the Treatment, the Debtor asserted the exact same allegations previously asserted in Civil Action No. 15-02273 but without Peter Safran listed as a defendant. [*See* Civil Action No. 15-02763, Doc. No. 1 and Civil Action No. 15-02273, Doc. No. 1].

    **d.** The Debtor requested, among other relief, that New Line and the other defendants be enjoined from "infringing the copyrights in The Conjuring Treatment." [*Id*. at p. 33 of 36]. Additionally, the relief requested by the Debtor was for "an accounting and restitution. . . of all gains, profits, and advantages Defendants have derived from their. . . copyright infringement of The Conjuring Treatment." [*Id*.].

29

    **e.** On December 22, 2015, District Judge Bennett dismissed this suit. [Civil Action No. 15-02763, Doc. No. 16].

## L. The Filing of the Motion to Reopen

54. On September 23, 2015, the Debtor filed the Motion to Reopen. [Doc. No. 92]. Two objections were lodged to the Motion to Reopen; the first was filed by PSG and Gordon on October 14, 2015, [Doc. No. 93], but was later withdrawn on November 25, 2015, [Doc. No. 97]. It was withdrawn because the Debtor paid PSG and Gordon the $576,266.70 New York Judgment on the eve of the Hearing. [*Id.* at p. 2 of 2]. The second objection was lodged by New Line, which was also filed on October 14, 2015. [Doc. No. 94].

55. This Court held a multi-day hearing on the Motion to Reopen on December 1, 2015, December 2, 2015, December 3, 2015, December 7, 2015, on which date the parties delivered closing arguments and the Court took the matter under advisement.

## M. Checks Remitted by New Line to the Debtor or Entities with which He is Affiliated

56. On April 16, 2010, New Line delivered a check for $75,000.00 made payable to the law firm of Stroock & Stroock & Lavan LLP, representing full payment of the initial option payment under the Option Quitclaim Agreement. [New Line Ex. No. 8]. At this time, Stroock & Stroock & Lavan represented the Debtor and the entities with which he is affiliated, and was authorized to serve as the designated recipient for these funds.

57. On January 23, 2012, New Line delivered a check for $385,000.00, made payable to Stroock & Stroock & Lavan LLP, representing a full payment of the purchase price, less the initial option payment and third party rights payments, as set forth in

paragraph 4 of the Option Quitclaim Agreement. [New Line Ex. No. 9, p. 3]. At this time, Stroock & Stroock & Lavan was still representing the Debtor and the entities with which he is affiliated, and this law firm was authorized at that time to serve as the designated recipient for these funds.

58. On July 2, 2014, New Line delivered a check to the Debtor for $750,000.00, representing the theatrical sequel rights payment at set forth in paragraph 5(c) of the Option Quitclaim Agreement. [New Line Ex. No. 10]. The check was made payable to "Tony DeRosa-Grund" and "Evergreen Media Holdings, LLC." [New Line Ex. No. 10, p. 2]. New Line sent this check directly to the Debtor at his residential address in Magnolia, Texas. [*Id.*].

### III. CREDIBILITY

There were two witnesses who testified at the Hearing: (1) the Debtor; and (2) O'Connor, an attorney who has extensive involvement representing New Line in the numerous lawsuits that the Debtor has filed against this company; O'Connor's representation has also included the arbitration proceeding. In regards to the credibility of these two witnesses, the Court makes the following findings:

### 1. The Debtor

The Court finds that the Debtor is not a credible witness on several material issues. The Court makes this finding after listening to extensive testimony from the Debtor and, additionally, comparing certain answers that he gave under oath at the Hearing with information that he set forth under oath in his Schedules and SOFA as well as certain allegations that he made, and relief that he requested, in the various lawsuits that he filed against New Line in the District Court. Attached hereto as **Appendix "A"** to this Opinion are this Court's specific observations

31

and findings about the Debtor's credibility. Because the Debtor is not a credible witness on several issues, the Court gives his testimony little or no weight on these issues. On certain other issues, where the Debtor actually responded to the questions posed to him and where there was no controverting testimony or documentation—for example the Debtor's testimony describing the events that resulted in his writing the Treatment—the Court gives at least some weight to the Debtor's testimony.

### 2. Michael O'Connor

The Court finds that O'Connor is a very credible witness who forthrightly answered the questions posed to him. This Court gives his testimony considerable weight with one exception. The Court gives little weight to his specific testimony that New Line acquired title to the Treatment as a result of the execution of the Option Quitclaim Agreement (as amended), the Producer Loanout Agreement, and the COE. [Hr'g Tr. 30:7–33:19, Dec. 2, 2015]. Given certain language in these documents, the Court understands how O'Conner could, in good faith, honestly testify that he believes that New Line acquired title to the Treatment as a result of these documents. But, the Court places much greater weight on the unambiguous assertion made several months after the execution of these documents by New Line's senior vice president, Alexander stating that: "I'm afraid I [i.e. New Line] can't buy your treatment. I don't think the writers ever saw it, and it would not be fair to them to introduce that into the credit determination." [Finding of Fact No. 40]. Alexander's statement reflects that New Line's own executive did not believe that New Line had ever acquired title to the Treatment.

# IV. CONCLUSIONS OF LAW

## A. Jurisdiction

The Motion to Reopen is a contested matter under Rule 9014. The Court has jurisdiction over this contested matter pursuant to 28 U.S.C. §§ 1334(b) and 157(a). Section 1334(b) provides that "the district courts shall have original but not exclusive jurisdiction of all civil proceedings arising under title 11 [the Code], or arising in or related to cases under title 11." District courts may, in turn, refer these proceedings to the bankruptcy judges for that district. 28 U.S.C. § 157(a). In the Southern District of Texas, General Order 2012-6 (entitled General Order of Reference) automatically refers all eligible cases (which include contested matters) and adversary proceedings to the bankruptcy courts.

## B. Venue

Venue is proper pursuant to 28 U.S.C. § 1408(1), as the Debtor resided in the Southern District of Texas for the 180 days preceding the Petition Date. Specifically, the Debtor resides in Magnolia, Montgomery County, Texas; and this county is located within the Southern District of Texas.

## C. Constitutional Authority of this Court to Enter a Final Order on the Motion to Reopen

In the wake of the Supreme Court's issuance of *Stern v. Marshall*, 131 S. Ct. 2594 (2011), this Court is required to determine whether it has the constitutional authority to enter a final order in any dispute brought before it. In *Stern*, which involved a core proceeding brought by the debtor under 28 U.S.C. § 157(b)(2)(C), the Supreme Court held that a bankruptcy court "lacked the constitutional authority to enter a final judgment on a state law counterclaim that is not resolved in the process of ruling on a creditor's proof of claim." *Id.* at 2620. The pending dispute before this Court is a core proceeding pursuant to 28 U.S.C. § 157(b)(2)(A) because

33

reopening this case under § 350(b) concerns the administration of the Estate. Because *Stern* is replete with language emphasizing that the ruling is limited to the one specific type of core proceeding involved in that dispute (i.e. § 157(b)(2)(C)), this Court concludes that the limitation imposed by *Stern* does not prohibit this Court from entering a final order here. A core proceeding under § 157(b)(2)(A)—particularly one involving an express Code provision governing the reopening of a case—is entirely different than a core proceeding under § 157(b)(2)(C). *See, e.g.*, *Badami v. Sears (In re AFY, Inc.)*, 461 B.R. 541, 547–48 (8th Cir. B.A.P. 2012) ("Unless and until the Supreme Court visits other provisions of Section 157(b)(2), we take the Supreme Court at its word and hold that the balance of the authority granted to bankruptcy judges by Congress in 28 U.S.C. § 157(b)(2) is constitutional."); *see also In re Davis*, 538 F. App'x 440, 443 (5th Cir. 2013) *cert. denied sub nom. Tanguy v. W.*, 134 S. Ct. 1002 (2014) ("[W]hile it is true that *Stern* invalidated 28 U.S.C. § 157(b)(2)(C) with respect to 'counterclaims by the estate against persons filing claims against the estate,' *Stern* expressly provides that its limited holding applies only in that 'one isolated respect'. . . We decline to extend *Stern*'s limited holding herein.").

Alternatively, even if *Stern* applies to all of the categories of core proceedings brought under § 157(b)(2), *see In re Renaissance Hosp. Grand Prairie Inc.*, 713 F.3d 285, 294 n.12 (5th Cir. 2013) ("*Stern*'s 'in one isolated respect' language may understate the totality of the encroachment upon the Judicial Branch posed by Section 157(b)(2). . ."), this Court still concludes that the limitation imposed by *Stern* does not prohibit this Court from entering a final order in the dispute at bar. In *Stern*, the debtor filed a counterclaim based *solely* on state law, and the resolution of that counter claim would not necessarily lead to a determination of the validity or invalidity of the claim filed by the defendant against the debtor's estate. Conversely,

in the case at bar, the Motion to Reopen is based solely on an express provision of the Code, §

350(b), [and judicially-created bankruptcy law interpreting this provision; there is no state law

involved whatsoever].  This Court is therefore constitutionally authorized to enter a final order

on the Motion to Reopen.  *See In re Airhart*, 473 B.R. 178, 181 (Bankr. S.D. Tex. 2012) (noting

that the bankruptcy court has constitutional authority to enter a final order when the dispute is

based upon an express provision of the Code and no state law is involved).

Finally, in the alternative, this Court has the constitutional authority to enter a final order

on the Motion to Reopen because the parties in this contested matter have consented, impliedly if

not explicitly, to adjudication of this dispute by this Court.  *Wellness Int'l Network, Ltd. v.

Sharif*, 135 S. Ct. 1932, 1947 (2015) ("Sharif contends that to the extent litigants may validly

consent to adjudication by a bankruptcy court, such consent must be expressed.  We disagree.

Nothing in the Constitution requires that consent to adjudication by a bankruptcy court be

expressed. Nor does the relevant statute, 28 U.S.C. § 157, mandate express consent. . .").

Indeed, the Debtor filed the Motion to Reopen in this Court, [Doc. No. 92]; New Line filed its

response opposing the Motion to Reopen, [Doc. No. 94]; and the parties proceeded to make a

record in a multi-day hearing without ever objecting to this Court's constitutional authority to

enter a final order on the Motion to Reopen, [*See* Finding of Fact No. 55].  If these circumstances

do not constitute consent, nothing does.

### D. Circumstances Under Which the Debtor's Case May be Reopened

A bankruptcy court has the authority to reopen a bankruptcy case under § 350(b) "to

administer assets, to accord relief to the debtor, or for other cause."  11 U.S.C. § 350(b).  The

term "for other cause" is a broad term which gives the bankruptcy court discretion to reopen a

closed estate when cause for such reopening has been shown. *Matter of Case,* 937 F.2d 1014, 1018 (5th Cir.1991).

In the case at bar, the Debtor, pursuant to Rule 5010, requests that this Court reopen his case to allow the Trustee to administer an asset—namely, the Treatment—that the Debtor asserts he owned on the Petition Date but inadvertently failed to disclose. New Line vigorously opposes the reopening of the case; alternatively, New Line argues that if the case is reopened, then the Debtor should be estopped from receiving any proceeds from the Trustee's sale or other disposition of the Treatment because the Debtor's failure to initially disclose the Treatment was not inadvertent. *See e.g.*, *In re Coastal Plains, Inc.*, 179 F.3d 197, 205 (5th Cir. 1999); *In re Superior Crewboats, Inc.*, 374 F.3d 330, 334-35 (5th Cir. 2004) (holding that where nondisclosure of an asset is not inadvertent, the debtor is estopped from taking action concerning this asset that would personally benefit him financially). Under these circumstances, the threshold question for this Court is to determine whether the Debtor, in his individual capacity, actually owned the Treatment on the Petition Date. If he did not own this asset, then there is no basis to reopen the case, as the Trustee would have no asset to administer. Conversely, if the Debtor did own the Treatment on the Petition Date, then there is a sound basis for reopening: namely, for the Debtor to schedule the Treatment, which in turn would allow the Trustee to administer this asset and use any proceeds from its sale or other disposition to pay off remaining allowed claims—in part, if not in whole. [*See* f.n. 4, describing the existing unpaid allowed claims of approximately $185,000.00 in the aggregate].

For the reasons set forth below, the Court concludes that the Debtor did own the Treatment on the Petition Date, and that therefore the Motion to Reopen should be granted so that the Debtor can amend his Schedule B to disclose the Treatment and, further, so that the

Trustee can then sell or otherwise dispose of this asset in order to generate proceeds to pay the remaining allowed claims. This Court, although granting the Debtor's request to reopen his case, will nevertheless bar the Debtor: (1) from having any standing to object to any proposed sale or other disposition of the Treatment by the Trustee; and (2) from receiving the excess proceeds, if any, after payment of all allowed claims and the Trustee's fee. Relying upon Fifth Circuit precedent, the Court imposes this bar against the Debtor because it has concluded that the Debtor's failure to initially disclose the Treatment was not inadvertent. *See Reed v. City of Arlington*, 650 F.3d 571 (5th Cir. 2011); *Love v. Tyson Foods Inc.*, 677 F.3d 258 (5th Cir. 2012); *In Re Jackson*, 2012 WL 3071218, *aff'd* per curiam by the Fifth Circuit on direct appeal at *In Re Jackson*, 574 F. App'x 317 (5th Cir. 2014).[20]

### E. The Debtor, in His Individual Capacity, Owned the Treatment on the Petition Date and Therefore the Case Should Be Reopened So That the Trustee Can Administer This Asset for the Benefit of Creditors Whose Claims Remain Unpaid

As already noted above, in deciding whether to grant the Motion to Reopen, this Court must necessarily determine whether the Debtor, in his individual capacity, owned the Treatment on the Petition Date. It is Black Letter law that all assets owned by a debtor on the date of the filing of his bankruptcy petition become property of the bankruptcy estate. 11 U.S.C. § 541(a); *In re Carlton*, 309 B.R. 67, 71 (Bankr. S.D. Fla. 2004) ("11 U.S.C. §

---

[20] The Debtor will no doubt be unhappy with this Court's ruling and may have second thoughts about wanting to reopen his case to amend his Schedule B to disclose the Treatment. So that there is absolutely no confusion in the Debtor's mind, he will have no choice but to amend his Schedule B. The order that this Court will enter reopening this case will require the Debtor to amend his Schedule B to disclose the Treatment. *In re Paine*, 250 B.R. 99, 106 (B.A.P. 9th Cir. 2000) ("Furthermore, § 105(a) authorizes a bankruptcy court to act *sua sponte* to order the debtors to amend the schedules or statements."). Further, this Court will require the Debtor to not only list the Treatment on his Schedule B, but it will require him to set forth the value of this asset. *See In re Solly*, 392 B.R. 692, 697 (Bankr. S.D. Tex. 2008) ("The Court finds that it is inconsistent with the intent of the Code to permit a debtor to schedule the value of an asset as 'unknown.' Accordingly, in the case at bar, the Debtor must amend her Schedules to set forth a specific dollar value on the Malpractice Claim."). The Court will also require the Debtor to amend his Schedule B to disclose all other assets that he should have listed in his initial Schedule B—for example, his interest in Silverbird.

541(a)(1) defines property of the estate to include all legal or equitable interests of the debtor in property as of the commencement of the case.").

At the Hearing, the Debtor testified that he—and he alone—wrote the Treatment. Specifically, he testified as follows:

> And at that point the light bulb really went off and it was a stream of consciousness. And for the next 15 or 20 minutes on the tape I gave him what I thought would be the way to make a movie out of this. You know, the story, the start, the finish, the first act, middle, the ending. And that was really the beginning of all of this. . . I took that tape and then I wrote a treatment. I mean, I put the words on the paper and made a written treatment of it. And I, you know, enhanced it and embellished it and added some things to it. You know, sort of fine-tuned it.

[Hr'g Tr. 41:11–22, Dec. 1, 2015]. This testimony leaves no doubt that the Debtor, and only the Debtor, developed the Treatment; therefore, he became its owner at the time of its creation. *Schiller & Schmidt, Inc. v. Nordisco Corp.*, 969 F.2d 410, 413 (7th Cir. 1992) ("The creator of the property is the owner, unless he is an employee creating the property within the scope of his employment."). Indeed, New Line does not dispute that the Debtor wrote the Treatment, and that he had an interest in the Treatment when he completed it. And, because the Debtor developed the Treatment several years prior to the Petition Date, [Findings of Fact Nos. 6 & 11], the Treatment became property of the Debtor's Chapter 7 estate on the Petition Date—unless the Debtor conveyed the Treatment to some third party prior to the Petition Date.

According to the Debtor, he has always owned the Treatment. [Hr'g Tr. 124:19–23, Dec. 1, 2015]. Specifically, when asked whether he has always owned the Treatment, the Debtor responded as follows: "I would say yes, I didn't think about it, but I would say that I believed I've always owned it." [*Id.*]. Later in the Hearing, the Debtor once again reiterated that he—and he alone—has always owned the Treatment:

38

Q: Okay. So you told us that, to summarize here, you never let go of ownership of "The Conjuring" rights is what you testified, and the Perron rights and the Warren rights were transferred to my client after you filed your Bankruptcy Schedules, right? Yes or no?

A: If I can parse it out.

Q: Yes or no?

A: *I always owned "The Conjuring" treatment rights*. When you conflate "The Conjuring" rights to include everything, it can't include everything, because they're separate and discreet bundles of rights. You got—never got the treatment, your client never got the treatment rights. They got the rights from the Perron family under the bankruptcy agreement, and they got the Warren's rights under the Option Quitclaim Agreement, and that's the correct statement.

[Hr'g Tr. 153:14–154:3, Dec. 1, 2015][*emphasis added*].

At the Hearing, there was no contrary testimony or documentation indicating that the Debtor sold the Treatment prior to the Petition Date. Granted, several years prior to the Petition Date, Silverbird acquired the Perron Life Rights. [Finding of Fact No. 7]. And, granted, three months before the Petition Date, Silverbird conveyed—or attempted to convey—the Perron Life Rights to Evergreen. [Finding of Fact No. 8]. Granted also, that Holdings acquired both the Perron Life Rights and the Warren Life Rights, possibly prior to the Petition Date. [Finding of Fact No. 9]. But, the Treatment is a separate and distinct asset from the Perron Life Rights and the Warren Life Rights, [Hr'g Tr. 153:21–154:3, Dec. 1, 2015]; [Hr'g Tr. 21:1-9, Dec. 2, 2015]; [Hr'g Tr. 59:3–8, Dec. 2, 2015], and there is no written document evidencing that prior to the Petition Date, the Debtor ever conveyed the Treatment to Silverbird, Evergreen, Holdings or, for that matter, to any other entity or person. Thus, this Court finds that as of the Petition Date, the Debtor owned the Treatment. And, because the Debtor owned the Treatment as of the Petition Date, this Court finds that the Treatment became property of the Debtor's chapter 7 estate on the Petition Date and that the Trustee, by operation of law, took title to the Treatment on this date. *In Re Calvin*, 329 B.R. 589, 602 (Bankr. S.D. Tex. 2005) ("When a debtor files a Chapter 7 petition, the debtor is automatically divested of virtually all property interest held as of the

39

commencement of the case and, in turn these interest immediately vest in the estate.") (internal quotes and citations omitted); *see also In re Engman*, 395 B.R. 610, 617 (Bankr. W.D. Mich. 2008) (providing an overview of the purpose of Chapter 7 and the duties of a trustee, including conveying title to sell estate assets in order to generate proceeds to pay claims).[21]

New Line takes the position that it purchased the Treatment by virtue of the Option Quitclaim Agreement, the Producer Loanout Agreement, and the COE. [*See* Findings of Fact Nos. 29, 30, & 31]; [Hr'g Tr. 30:7–31:19, Dec. 2, 2015]. The Court rejects this position for two reasons. First, several months after the execution of these documents, Alexander, the senior vice president and head of business and legal affairs of New Line, responded to an email from the Debtor concerning a proposed settlement over the Debtor's contention that New Line was misappropriating the Treatment to develop the screenplay for "The Conjuring." [Finding of Fact No. 40]. Alexander's response, set forth in an email dated October 7, 2010, was as follows: "I'm afraid I [i.e. New Line] can't buy your treatment. I don't think the writers ever saw it, and it would not be fair to them to introduce that into the credit determination." [*Id*.]. This language unambiguously shows that New Line's own executive did not believe that New Line had purchased the Treatment as a result of the execution of the Quitclaim Agreement, Producer Loanout Agreement, or the COE.[22]

Second, even if the Quitclaim Agreement (as amended), the Producer Loanout Agreement, and the COE did transfer title of the Treatment from the Debtor to New Line, such

---

[21] The Petition Date was the date that the involuntary was filed against the Debtor, not the date that the order for relief was entered. There is no question that when an involuntary petition is filed, its filing creates an estate consisting of all of the putative debtor's property. 11 U.S.C. § 303(b)(1) & (h)(1); *In re E.D. Wilkins Grain Co.*, 235 B.R. 647, 649 (Bankr. E. D. Cal. 1999). Thus, the Treatment became property of the Estate on May 7, 2009 (i.e. the Petition Date), not June 8, 2009 (i.e. the date the order for relief was entered on the docket).

[22] New Line, the Debtor, Holdings, Silverbird, and Evergreen did execute an 11-page amendment to the Option Quitclaim Agreement on October 19, 2010—i.e. ten days after Alexander's email, [New Line Ex. No. 7]—but the Court does not find any language contained in this amendment whereby the Debtor conveys the Treatment to New Line.

transfer is void. This is so because these agreements were executed only by New Line, Holdings, the Debtor, Silverbird and Evergreen, [Findings of Fact Nos. 29, 30, & 31]; the Trustee was not a party to these agreements and he never executed these agreements, [Finding of Fact No. 32]— nor, for that matter, did the Trustee ever execute any document conveying the Treatment to New Line or any other third party. [*Id.*]. For New Line to take title to the Treatment, it must have a bill of sale (or other similar document) executed by the owner of the Treatment—which is the Trustee; a bill of sale or assignment executed by the Debtor does not effectuate the conveyance. *See Calvin*, 329 B.R. at 602 ("Title [to assets that became property of the estate on the filing date] does not revest in the debtor until the property is either properly claimed and allowed as exempt, or abandoned by the trustee.").[23]

Indeed, because the Treatment is property of the Estate that is subject to the exclusive jurisdiction of this Court, for New Line to take title to the Treatment, it must not only have a bill of sale from the Trustee; there must also be an order from this Court approving the Trustee's sale to New Line. *See, e.g., In re Sunland, Inc.*, 507 B.R. 753, 759 (Bankr. D.N.M. 2014) ("[A]bsent court approval, an agreement to sell estate property outside the ordinary course of business is not a binding contract"); *In re Missler*, 418 B.R. 259, 262 (Bankr. N.D. Ohio 2009) ("In order to facilitate a trustee's duty to administer a debtor's bankruptcy estate, § 363 empowers a trustee to sell estate property. This power, however, is circumscribed in a number of respects. The first such limitation, for example, set forth in § 363 provides that court approval is necessary before a trustee may sell property of the estate outside the ordinary course of business.")(internal quotes and citations omitted). Because this Court has never approved a sale of the Treatment to New Line, this Court finds that New Line has never taken title to this asset and that this asset remains

---

[23] The Treatment has never revested in the Debtor because: (1) the Trustee has never abandoned this asset; and (2) the Debtor has never claimed it as exempt property.

41

property of the Estate.  *In re Smith*, 352 B.R. 500, 501 (Bankr. N.D. Ala. 2006) ("Court approval is a prerequisite before a contract can become binding upon the bankruptcy estate."); *In re Lavigne*, 183 B.R. 65, 69 (Bankr. S.D.N.Y. 1995) *aff'd*, 199 B.R. 88 (S.D.N.Y. 1996) *aff'd*, 114 F.3d 379 (2d Cir. 1997) ("an extraordinary transaction undertaken by the debtor or trustee without notice and a hearing is unenforceable"); *In re Zeman*, No. 09-52559-C, 2010 WL 3123144, at *2 (Bankr. W.D. Tex. Aug. 6, 2010) ("If a debtor, acting with the powers of a Trustee, disposes of property out of the ordinary course of business without prior court approval, then the transaction may be unwound as invalid.").

It is true that New Line paid $100,000.00 to the Trustee pursuant to the Trustee's Motion. [Findings of Fact Nos. 34, 36, & 37].  However, this payment was *not* in exchange for the sale of the Treatment by the Trustee.  Rather, in exchange for this payment, the Trustee released any claims for injunctive relief that the Estate had against New Line for the "exploitation, marketing, distribution or production of the material described in the Deal Memo. . .  arising out of the execution of and performance under any of the agreements contemplated by the Deal Memo." [Finding of Fact No. 36].  Further, the Trustee accepted the $100,000.00 in "full satisfaction and release of any claims for injunctive relief that the Estate has, had or may come to have against New Line arising out of or relating to the transfer of intellectual property and any other rights associated therewith or related thereto contemplated by the Deal Memo."  [*Id.*].  In sum, New Line's payment of $100,000.00 to the Trustee did *not* transfer title of the Treatment to New Line; rather, New Line's $100,000.00 payment seems to bar the Trustee from—among other actions— seeking to enjoin New Line from using the Treatment to develop a screenplay for the "The Conjuring."  Thus, the Treatment remains property of the bankruptcy estate.

As previously noted, § 350(b) allows this Court to reopen a debtor's case "to administer assets." In the case at bar, an asset exists: the Treatment. Of course, the basis for reopening a case is particularly compelling if there is an asset in existence that has value. *In re Winburn*, 196 B.R. 894, 898 (Bankr. N.D. Fla. 1996) ("[T]he facts and circumstances surrounding this case compel reopening, even after four years. The "asset", as it currently stands, has a potential value in excess of $5 million dollars."); *In re Ward*, 60 B.R. 660, 662 (Bankr. W.D. La. 1986). Here, the Treatment seems to have value to the extent that New Line has used the Treatment—without paying for such use—in producing "The Conjuring" because this movie has grossed over $300 million in revenues worldwide, [Finding of Fact No. 42]. The Treatment may also have value to the extent that New Line has used the Treatment to produce sequels to "The Conjuring."[24] The exact amount of the value of the Treatment is unclear based upon the record before this Court. Neither party adduced testimony or introduced exhibits on this particular point, and this Court presently makes no specific finding as to the exact amount of the Treatment's value. At this juncture, the Court finds only that the Treatment appears to have some value—at least sufficiently so that cause exists to reopen the Debtor's case and allow the Trustee to investigate its value and to determine whether and how to administer the Treatment. *In re Nagy*, 432 B.R. 564, 568 (Bankr. M.D. La. 2010) ("[T]he trustee has a duty to investigate the value to the estate of scheduled property and to decide whether the property should be administered. . .").

In sum, because the Debtor owned the Treatment on the Petition Date, the Treatment became property of the Estate and should have been disclosed by the Debtor. Because it was not

---

[24] The parties do not dispute that a sequel to "The Conjuring" is forthcoming. [*See* Hr'g Tr. 17:19–21, Dec. 1, 2015]. "The studio has set a release date for the film, putting it smack in the middle of the warm season on June 10, 2016." Tyler McCarthy, *The Conjuring 2' Release Date Announced; Everything We Know About 'The Enfield Poltergeist' June 2016 Premiere*, INT'L BUS. TIMES, Nov. 12, 2014, available at: http://www.ibtimes.com/conjuring-2-release-date-announced-everything-we-know-about-enfield-poltergeist-june-1722701.

disclosed, and because title has continuously remained in the Estate up to this date, it is an asset that the Trustee needs to administer, as there are still unpaid allowed claims of approximately $185,000.00 that could be paid if the Trustee can generate proceeds from the sale or other disposition of the Treatment.  [Debtor's Ex. No. 4, pp. 4–5 of 12].  Stated differently, there are two reasons under § 350 to reopen this case: (1) there is an asset to be administered, i.e. the Treatment; and (2) cause exists because this asset seems to have some value, which in turn means that there is a possibility that the Trustee can monetize this asset to generate proceeds for distribution to allowed claims that still have not yet been paid.  *Nagy*, 432 B.R. at 568.

Under the circumstances described above, this Court will grant the Motion to Reopen; and to this extent the Debtor has succeeded in his objective of reopening his case in order to amend his Schedule B to disclose the Treatment and afford the Trustee the opportunity to administer this asset for the benefit of those creditors whose allowed claims remain unpaid. However, to the extent that the Debtor expects to benefit himself from the Trustee's sale or other disposition of the Treatment, the Debtor will be sorely disappointed.  This Court, which has wide discretion whether to reopen the case and, if so, whether to place any conditions thereon, *see*, *e.g.*, *Citizens Bank & Trust Co. v. Case (In re Case),* 937 F.2d 1014, 1018 (5th Cir.1991), has decided to place restrictions on the Debtor.  Specifically, as discussed below in section IV(F), because this Court finds that the Debtor's failure to initially disclose the Treatment was not inadvertent, this Court invokes the doctrine of judicial estoppel to bar the Debtor from ever benefitting from the Trustee's administration of the Treatment.

At the Hearing, counsel for the Debtor suggested that it would be premature for this Court to invoke the doctrine of judicial estoppel and that this Court should only focus on whether the case should be reopened to allow the Debtor to amend his Schedule B and provide the

Trustee with the opportunity to administer the Treatment. Counsel seemed to suggest that no decision should be made on the Debtor's rights to any excess proceeds from the Trustee's sale or other disposition of the Treatment unless and until this asset is sold, all allowed claims are paid, and there is an actual excess of monies available for distribution to the Debtor. [Hr'g Tr. 73:15–75:15, Dec. 7, 2015]. This Court disagrees with counsel for the Debtor that this particular issue is not ripe. First, New Line has raised this issue. [Hr'g Tr. 29:14-33:2, Dec. 1, 2015]; [Hr'g Tr. 26:16-57:6, Dec. 7, 2015]. Second, even if New Line had not raised the issue, this Court has the right—indeed, it has the independent duty—to raise judicial estoppel *sua sponte*. *Grigson v. Creative Artists Agency, LLC*, 210 F.3d 524, 530 (5th Cir. 2000) ("Judicial estoppel is *not* raised; but, because that doctrine protects the judicial system, we can apply it *sua sponte* in certain instances.") (internal citation omitted); *In re Airadigm Communications, Inc.,* 616 F.3d 642, 664, n. 14 (7th Cir.2010) ("The FCC did raise the issue of judicial estoppel in its opening brief. . ., although the doctrine can be raised by courts *sua sponte* because judicial estoppel concerns the integrity of the judicial system independent of the interests of the parties.").

### F. The Principle of Judicial Estoppel Bars the Debtor From Ever Benefiting from the Trustee's Administration of the Treatment

"The doctrine of judicial estoppel prevents a party from asserting a claim in a legal proceeding that is inconsistent with a claim taken by that party in a previous proceeding." *Reed,* 650 F.3d at 573–74 (quoting 18 James Wm. Moore et al., Moore's Federal Practice § 134.30 at 63 (3d ed.2011)). "In a bankruptcy case, judicial estoppel both deters the dishonest debtors—whose failure to fully and honestly disclose all their assets undermines the integrity of the bankruptcy system—and protects the rights of creditors to an equitable distribution of the estate's assets." *In re Jackson*, No. 06-36268, 2012 WL 3071218, at *26 (Bankr. S.D. Tex. July 27, 2012) citing *Id.* at 574. Where a debtor "fails to disclose an asset to a bankruptcy court, but then

45

pursues a claim in a separate tribunal based on that undisclosed asset," judicial estoppel is particularly appropriate. *Jethroe v. Omnova Solutions, Inc.*, 412 F.3d 598, 600 (5th Cir. 2005). "In assessing whether judicial estoppel should apply, we look to see whether the following elements are present: (1) the party against whom judicial estoppel is sought has asserted a legal position which is plainly inconsistent with a prior position; (2) a court accepted the prior position; and (3) the party did not act inadvertently." *In re Jackson*, No. 06-36268, 2012 WL 3071218, at *26.*; *Superior Crewboats*, 374 F.3d at 335.

### 1. Element #1: The Debtor has Asserted a Legal Position in the District Court which is Plainly Inconsistent with the Initial Position that He Asserted in this Court

In the case at bar, the Debtor initially represented to this Court that he did not own the Treatment. He made this representation precisely because he did <u>not</u> list this asset on his Schedule B. [Finding of Fact No. 21]. However, after the Debtor received his discharge, he began filing suit in the District Court representing to that Court that he <u>did</u> own the Treatment and that he wanted a judgment against New Line for damages resulting from New Line's alleged misappropriation of the Treatment. [Findings of Fact Nos. 44, 45, & 52]. Thus, the first element of judicial estoppel has been met.

### 2. Element #2: Prior to the Debtor's Assertion in the District Court that He Owned the Treatment, This Court Had Already Accepted the Debtor's Prior Representation in this Chapter 7 Case that He Owned No Interest in this Asset.

On July 26, 2010, this Court issued a discharge to the Debtor, [Finding of Fact No. 27], because this Court had accepted his initial position that the only assets he owned on the Petition Date were those listed on his Schedules A and B; namely, that he owned the following assets: (1) one red fabric recliner; (2) miscellaneous personal clothes; (3) a stock interest in Gallow Hill Pictures, LLC; (4) a stock interest in Evergreen Media Group, LLC; and (5) a pending patent application. [Debtor's Ex. No. 2]; [Findings of Fact Nos. 16 & 17]; [Doc. No. 19, pp. 3–7 of 31].

Stated differently, this Court issued a discharge to the Debtor because this Court had accepted his initial position that he did not own the Treatment, as this asset was not listed on his Schedules. After this Court accepted the Debtor's representation that he did not own the Treatment, the Debtor asserted an inconsistent legal position in the District Court by seeking a judgment against New Line for damages resulting from New Line's alleged misappropriation of the Treatment. [Findings of Fact Nos. 44, 45, 52 & 53]. Thus, the second element of judicial estoppel has been met.

There is also another basis for this Court to conclude that the second element of judicial estoppel has been satisfied. In the Trustee's Motion, he set forth that the Debtor represented to him that the Estate lacks any interest "in the rights related to the movie" and that the Estate "currently does not have a penny." [Finding of Fact No. 34a & c]. The Trustee's Motion contained language setting forth that any response had be filed within 21 days, and there is no question that the Debtor and his counsel of record received this motion. [Doc. No. 33, p. 5 of 5]. The Debtor filed no response to the Trustee's Motion, nor did any other creditor or party in interest. [Finding of Fact No. 35]. In reliance upon the representations made in the Trustee's Motion, as well as the fact that no responses thereto were filed, this Court entered an order approving the Trustee's Motion. [Finding of Fact No. 36]. Stated differently, this Court approved the $100,000.00 agreement negotiated by the Trustee with New Line because the Court had no information suggesting that the Estate had any rights "related to the movie" and therefore there seemed to be no viable alternative to bringing in any money into the Estate for distribution to creditors. Yet, at the time the Trustee's Motion was filed, the Debtor did, in fact, have information that the Estate had certain rights "related to the movie." This is so because the Debtor believed at the time of the filing of the Trustee's Motion that he owned the Treatment—

and he had always believed that he owned the Treatment [Hr'g Tr. 153:14–154:3, Dec. 1, 2015]. Moreover, the Debtor knew that New Line might want to purchase the Treatment to develop the script/screenplay for "The Conjuring." [*See* Hr'g Tr. 11:25–13:22, Dec. 3, 2015];[New Line Ex. No. 15, p. 3]. Because the Debtor owes a duty to make complete disclosure of all his assets *In re Coastal Plains, Inc.*, 179 F.3d at 207-08, he had duty to speak up—in this instance, to file a response informing the Court that the Trustee's allegation that "the Estate lacks any interest in the rights related to the movie" was incorrect. The Debtor had a duty to inform the Court that the Estate did, in fact, have an interest in a right related to movie: namely, the Treatment. If the Court had known that the Estate owned the Treatment, it might not have approved the Trustee's Motion, but instead informed the Trustee that the $100,000.00 agreement was not sufficiently beneficial to the Estate and that he needed to return to the bargaining table with New Line to attempt to obtain greater consideration for the Estate.

The Fifth Circuit has held that: "[s]ilence alone, where there is a duty to speak, may create an estoppel." *Ashland Oil & Ref. Co. v. Beal*, 224 F.2d 731, 738 (5th Cir. 1955). "From pure but misleading silence, coupled with a duty to speak, an estoppel will arise." *Id.* The Debtor's failure to file a response to the Trustee's Motion led this Court to accept the incorrect allegation in the Trustee's Motion that "the Estate lacks any interest in the rights related to the movie" and thereby approve the relief requested by the Trustee. After this Court accepted this incorrect allegation, the Debtor subsequently took an inconsistent legal position in the District Court by asserting that he owned the Treatment and that New Line should be required to pay him damages resulting from its alleged misappropriation of the Treatment. [Findings of Fact Nos. 44, 45, 52 & 53]. Thus, under these circumstances, the second element of judicial estoppel is met.

### 3. Element #3: the Debtor Did Not Inadvertently Fail to Disclose the Asset.

A "debtor's failure to satisfy its statutory disclosure is 'inadvertent' only when, in general, the debtor either lacks knowledge of the undisclosed [asset] or has no motive for [its] concealment." *In re Coastal Plains, Inc.*, 179 F.3d at 210. Neither consideration exculpates the Debtor in the case at bar. The evidence reflects that: (1) on the date that the Debtor signed his Schedule B under oath—which was July 10, 2009 (the "Schedule Date")—the Debtor had knowledge of the Treatment; and (2) the Debtor did indeed have a motive to conceal the Treatment from his creditors.

### i. As of the Petition Date, the Debtor had Knowledge of the Treatment

The Debtor's own testimony at the Hearing reflects that he had knowledge of the Treatment. First, when asked why he did not disclose the Treatment, the Debtor responded as follows: "[B]ecause I didn't have a registration on it sir." [Finding of Fact No. 22]. The Debtor's answer unequivocally shows that he knew about the existence of the Treatment as of the Schedule Date. While the fact that the Treatment was unregistered is not a sound basis for failing to disclose this asset, what is key for purposes of analyzing inadvertence is whether the Debtor knew about the existence of the Treatment. His answer clearly indicates that he knew about this asset.

Second, the Debtor testified that he did not schedule the Treatment because "I didn't think it had any value." [Finding of Fact No. 23]. Once again, the Debtor's answer unequivocally shows that he knew about the Treatment. And, once again, while the fact that the Treatment may not have had any value in his mind is not a sound basis for failing to disclose this asset,[25] what is key for purposes of analyzing inadvertence is whether the Debtor knew about the

---

[25] Case law is clear that the debtor's "belief that an interest has no value does not except it from being scheduled." *In re Darr*, 472 B.R. 888, 899 (Bankr. E.D. Mo. 2012). Stated differently, "[a] debtor's belief that property had no

existence of the Treatment on the Schedule Date. His answer clearly indicates that he knew about this asset.

Indeed, when responding to the question as to why he did not schedule the Treatment, the Debtor never asserted that he failed to schedule this asset on the grounds that he did not know about it or did not own it. In fact, two exchanges between New Line's counsel and the Debtor at the Hearing leaves no doubt that the Debtor had knowledge of the Treatment as of the Schedule Date *and* that he believed he owned the Treatment on this date:

> Q: You always believed that you owned [the Treatment] even at the time at that you filled out the Bankruptcy Schedules, right?
> A: *I would say yes, I didn't think about it, but I would say that I believed I've always owned it.*
>
> [Hr'g Tr. 124:19–23, Dec. 1, 2015][*emphasis added*].

> Q: Okay. So you told us that, to summarize here, you never let go of ownership of "The Conjuring" rights is what you testified, and the Perron rights and the Warren rights were transferred to my client after you filed your Bankruptcy Schedules, right? Yes or no?
> A: If I can parse it out.
> Q: Yes or no?
> A: *I always owned "The Conjuring" treatment rights*. When you conflate "The Conjuring" rights to include everything, it can't include everything, because they're separate and discreet bundles of rights. You got—never got the treatment, your client never got the treatment rights. They got the rights from the Perron family under the bankruptcy agreement, and they got the Warren's rights under the Option Quitclaim Agreement, and that's the correct statement.
>
> [Hr'g Tr. 153:14–154:3, Dec. 1, 2015][*emphasis added*].

Thus, this Court finds that the Debtor did not lack knowledge of the Treatment as of the Schedule Date. Moreover, this Court finds that the Debtor affirmatively knew about the existence of the Treatment and, in his mind, believed that he owned this asset. The Court's

---

value is not license to omit it from Schedule B." *Id*. at 897; *see also In re McCarthy*, 488 B.R. 814, 828 (B.A.P. 1st Cir. 2013) ("In addition, a debtor cannot claim that he omitted an asset because it had little or no value.").

findings mean that inadvertence cannot be satisfied unless the Debtor can prove that he had no motive for concealing the Treatment. *In re Jackson*, No. 06-36268, 2012 WL 3071218, at *31 (Bankr. S.D. Tex. July 27, 2012), citing *In re Coastal Plains, Inc.*, 179 F.3d at 210.

### ii. The Debtor had Motive to Conceal the Treatment

In *Love,* the Fifth Circuit's discussion on when motive to conceal exists makes it very difficult for any debtor to show that he had no motive to conceal what he failed to disclose. Specifically, the Fifth Circuit declared that "the motivation sub-element is almost always met if a debtor fails to disclose a claim or possible claim to the bankruptcy court. Motivation in this context is self-evident because of potential financial benefit resulting from the nondisclosure." *Love,* 677 F.3d at 262 (citing *Thompson v. Sanderson Farms, Inc.,* 2006 U.S. Dist. LEXIS 48409, 12–13 (S.D.Miss. May 31, 2006) (citation omitted)). Granted, in *Love,* what the debtor failed to disclose was a cause of action—as opposed to literary material such as the Treatment— but this Court sees no logical reason why the very high bar that the Fifth Circuit has established in *Love* for debtors to prove that they had no motive to conceal a cause of action should be any lower when debtors are attempting to prove that they had no motive to conceal any other type of asset, such as the Treatment. After all, it can be just as compellingly argued that motivation for potential financial benefit resulting from nondisclosure is self-evident when the nondisclosure is literary material such as the Treatment.[26]

In performing its analysis, this Court notes that the Fifth Circuit left the "no motive" door open very slightly by stating that "the motivation sub-element is *almost always* met if a Debtor fails to disclose a claim or possible claim to the bankruptcy court." *Id.* (emphasis added). The

---

[26] Indeed, because the Debtor filed suit and based one of his causes of action on the grounds that New Line had misappropriated the Treatment and therefore owed him damages, [Findings of Fact Nos. 44, 45, 52 & 53], the Debtor's conduct is very similar to the debtor's conduct in *Love* because in the case at bar, the Trustee is also the proper party-plaintiff in any suit brought by the Debtor against New Line for misappropriating the Treatment.

words "almost always" indicate that the Fifth Circuit recognizes that there are certain circumstances where nondisclosure of an asset does not automatically establish motivation. In *Love,* the Fifth Circuit did not articulate any laundry list of examples where nondisclosure does not automatically establish motivation, so presumably this exception to the general rule is left up to the sound discretion of the bankruptcy court. The Fifth Circuit does, however, emphasize one factor that a bankruptcy court should consider when assessing whether motivation exists when there is nondisclosure: "When reviewing potential motive, the relevant inquiry is intent at the time of non-disclosure." *Id.* at 263 (citing *Robinson v. Tyson Foods,* 595 F.3d 1269, 1276 (11th Cir. 2010)).

Here, the Debtor had motive to conceal the Treatment on the Schedule Date. By failing to disclose the Treatment on his Schedule B, the Debtor was able to receive a general discharge from this Court for debts exceeding $1.0 million, [Finding of Fact No. 28], while simultaneously pursuing financial gain from this undisclosed asset—i.e. seeking some unspecified amount of dollars from New Line for its use of the Treatment to develop the screenplay for and thereafter produce "The Conjuring." The Debtor's conduct has effectively deprived his creditors from having any chance to receive full payment on their claims.[27]

Indeed, only a few months after filing his Schedule B without disclosing the Treatment, the Debtor began threatening New Line with a lawsuit on the grounds that it was misappropriating the Treatment in order to develop a screenplay for "The Conjuring." This threat came not only less than three months after the Schedule Date; it came less than ten weeks after the Debtor received his discharge, which was July 26, 2010 (the "Discharge Date"). And, it

---

[27] It is no small point that the Debtor's actions sought to avoid paying not only the creditors who held dischargeable debts, but also the two creditors who held the judgment that was a nondischargeable debt—i.e. the $576,266.70 New York Judgment. [*See* Findings of Fact Nos. 25 & 26]. It was only after the Debtor filed the Motion to Reopen and drew an objection thereto from these two creditors did he decide to pay them off—in effect to purchase their agreement to withdraw their opposition to the Motion to Reopen. [*See* Doc. No. 97].

came while the Debtor's case was still open, so the Trustee was still fulfilling his duties of trying

to locate assets of the Estate to administer.  Specifically, on October 7, 2010, the Debtor sent a

very hostile email to New Line's senior vice president and head of business and legal affairs

(Craig Alexander).  [Finding of Fact No. 40].  The Debtor sent this email less than one hour after

receiving an email from Alexander in which Alexander stated that: "I'm afraid I [i.e. New Line]

can't buy your treatment. I don't think the writers ever saw it, and it would not be fair to them to

introduce that into the credit administration."   [*Id.*].   The Debtor, upset by this statement,

responded with the following threat:

> [A]t least 60-65% of that story [for the screenplay of "The Conjuring"] if not
> more, is from *my treatment*… I shut my mouth up till now to get this [movie]
> made, but no more. All bets are off. I had this conversation with Peter Safran a
> while back and also with John, even before there were any 'issues' that this script
> was based on *my story/treatment* and transited way beyond any producer duties,
> so shouldn't I be credited/paid for that work. No more Mr. Nice Guy, no more
> patience. No one rips me creatively or otherwise. So I'll just sue everyone here
> because I have had enough of being defrauded and now screwed with. See you in
> court.
>
> [*Id.*][*emphasis added*].

The language that the Debtor used in this email unequivocally shows that: (1) the Debtor

believed that he owned the Treatment; (2) the Debtor believed that New Line was improperly

using the Treatment to develop the script (or screenplay) for "The Conjuring;" (3) the Debtor

wanted New Line to pay him for its use of the Treatment; and (4) if New Line would not pay him

for its use of the Treatment, he would file suit against New Line.  The Debtor's own language

thus shows that he had a motive to conceal the Treatment from his creditors: he wanted New

Line to pay him directly for its use of the Treatment—as opposed to paying the Trustee (who

would then use the proceeds to pay the Debtor's creditors).

Indeed, the Debtor's very specific language in this email reflects not only a financial motive in not disclosing the Treatment on his Schedule B; it reflects a criminal intent. His statement that "I shut my mouth up till now to get this made" suggests that he committed a bankruptcy crime by deliberately lying under oath in his Schedule B (by not disclosing the Treatment) because he believed that if he had disclosed it, then linking it to his bankruptcy would have undermined the development of the script for the "The Conjuring." *See, e.g., In Re Woodruff*, 78 B.R. 554, 555 (Bankr. E. D. Ark. 1987) (citing 18 U.S.C. § 152, the court states that "[t]he debtor perjured himself and gave a false oath when he submitted his 1984 bankruptcy petition [and] schedules. Thereon he signed a statement, under oath, that the information contained in the schedules was true and correct."); *In re Arana*, 456 B.R.161, 169 (Bankr. E.D.N.Y. 2011) ("And the knowing and fraudulent concealment of property belonging to the estate of a debtor is a federal crime punishable by a fine, a prison term of up to five years, or both."). Stated differently, the Debtor deliberately did not disclose the Treatment on his Schedule B because he wanted the screenplay for "The Conjuring" to be developed as quickly as possible—through the use of the Treatment—and this objective could be best accomplished by his hiding this asset from the bankruptcy process and directly selling it himself to New Line.

In sum, just ten weeks after he received his discharge but while his case was still open, the Debtor, having received the ultimate benefit from the bankruptcy system, was abusing the system by threating to sue New Line for refusing to pay him for the Treatment—an asset which the Debtor testified he did not disclose when he filed his Schedule B on July 10, 2009 "because I didn't think it had any value." [Finding of Fact No. 23]. Even if the Debtor did not believe the Treatment had any value on July 10, 2009—and the Court does not believe the Debtor's testimony on this point—there is no question that the Debtor believed the Treatment had value as

of October 7, 2010, when he sent his hostile email to New Line's senior vice president threatening to file suit because New Line would not pay him for "my Treatment." One simply does not threaten to sue someone else for alleged theft of one's work unless one believes that this work has value.

What the Debtor knew as of October 7, 2010 is extremely important in this Court's "motive to conceal" analysis. The Debtor unequivocally knew that the Treatment had value as of October 7, 2010. Thus, while he did not disclose it on July 9, 2009 because "I didn't think it had any value," [Finding of Fact No. 23], he should have disclosed it once he knew that it did have value. All he needed to do was file an amended Schedule B on October 7, 2010; indeed, his case was still open, so he did not even need to reopen his case to schedule the Treatment.

Yet, the Debtor did not file an amended Schedule B disclosing the Treatment. There is no question that he had a duty to do so and there is also no question that, by his own testimony, he should have scheduled the Treatment once he knew it had value. *In re Coastal Plains, Inc.*, 179 F.3d at 210 ("The duty of disclosure in a bankruptcy proceeding is a continuing one. . ."); *In re Castillo*, 508 B.R. 1, 7–8 (Bankr. W.D. Tex. 2014) ("[D]ebtors have an express, affirmative duty to disclose all assets even if there is uncertainty about if those assets are property of the estate."); *Kimberlin v. Dollar Gen. Corp.*, 520 F. App'x 312, 314 (6th Cir. 2013) ("Applying judicial estoppel under these circumstances recognizes the importance of the bankruptcy debtor's *affirmative and ongoing duty* to disclose assets, including unliquidated litigation interests.") (*emphasis added*). The Debtor's failure to return to this Court on October 7, 2010 to disclose the Treatment underscores his intent to conceal this asset. *See Jethroe v. Omnova Sols., Inc.*, 412 F.3d 598, 600 (5th Cir. 2005) ("The obligation to disclose [assets] in bankruptcy proceedings is an ongoing one" and the bankruptcy court properly inferred intentionality when the debtor filed

and pursued claims during the pendency of his bankruptcy case but never amended his petition to include the lawsuit).

There is more. After New Line refused to buckle under to the Debtor's threat to sue in his email of October 7, 2010, the Debtor did in fact carry out his threat to sue New Line. Indeed, he proceeded to file a plethora of lawsuits against New Line, among others, in the District Court. First, on March 28, 2014, the Debtor—together with Holdings—filed suit against New Line and Warner Brothers (the "First Suit"). [Finding of Fact No. 44]. Second, on April 23, 2014, the Debtor—together with Holdings and Gerald D. Brittle—sued New Line, Warner Brothers and three other defendants (the "Second Suit"). [Finding of Fact No. 45]. Third, on August 7, 2015, the Debtor, as the sole plaintiff, filed suit against New Line, Warner Brothers, and three other defendants (the "Third Suit"). [Finding of Fact No. 52]. Fourth, on September 22, 2015, the Debtor, once again as the sole plaintiff, sued New Line, Warner Brothers, and three other defendants (the "Fourth Suit"). [Finding of Fact No. 53]. The complaints that the Debtor filed in all of these suits expressly alleged that the defendants (including New Line) pilfered the Treatment in developing the script for "The Conjuring;" and the relief sought in each of these complaints, among other things, was that damages be awarded for the defendants' improper use of the Treatment to develop the script for "The Conjuring." [Findings of Fact Nos. 44c-d, 45c-d; 52c-d, 53c-d]. In filing all of these suits, the Debtor clearly was taking the position that the Treatment had value. Yet, at no point prior to the filing of any of these lawsuits did the Debtor return to this Court to amend his Schedule B to disclose the Treatment. His actions highlight his intention to conceal the Treatment from this Court, the Trustee, and his creditors.[28]

---

[28] In the First Suit and the Second Suit, there were plaintiffs other than the Debtor, but the complaints did not contain any allegations that one of the plaintiffs *other than the Debtor* owned the Treatment and that therefore that particular plaintiff—and not the Debtor—was seeking damages for the alleged misappropriation of the Treatment. Thus, the Debtor cannot contend that the reason he failed to return to this Court when he filed the First Suit and the

56

There is even more.  After the Debtor filed the First Suit and the Second Suit, the District Court consolidated these suits and then, on October 28, 2014, dismissed them in favor of arbitration.  [Finding of Fact No. 46a].  Thereafter, the Debtor, New Line and Warner Brothers underwent arbitration in California; extensive discovery was conducted, including depositions; and a full evidentiary hearing was held, which included testimony and the introduction of 497 exhibits.  [Finding of Fact No. 47].  On February 5, 2015, the arbitrator issued a 32-page written decision that ruled in favor of New Line and Warner Brothers on every point in dispute. [Finding of Fact No. 48].  The Debtor then appealed this ruling, [Finding of Fact No. 49], and this appeal is pending as of the date of this Opinion.

The Court reviews these events—which took place between October 26, 2014 and February 5, 2015—because of certain testimony that the Debtor gave at the Hearing. Specifically, the Debtor testified that it was only in late 2014 that he first became aware that the Treatment had value.  [Hr'g Tr. 125:8–9; 126:13–20; 147:3–12, Dec. 1, 2015].  Assuming that the Debtor's testimony is really true—and this Court does not believe him on this point—his own words provide a further basis for this Court to find that the Debtor had a motive to conceal. This is so because if he really had an "Ah Hah" moment in the fall of 2014 and concluded that the Treatment had value, then he had a duty to return to this Court *at that time* and seek to reopen his case to amend his Schedule B and disclose the Treatment.  *Jethroe,* 412 F.3d at 600–01; *Kimberlin*, 520 F. App'x at 314.  He had a duty to take this action so that the Trustee could administer this asset—which would have necessarily included stepping into the shoes of the

---

Second Suit is because he believed one of the other plaintiffs owned the Treatment.  And, if the Debtor did try to offer such an explanation, it would ring hollow for two reasons.  First, he has testified that he has always owned the Treatment.  [Hr'g Tr. 124:19–23, Dec. 1, 2015].  Second, the Debtor was the only plaintiff in the Third Suit, [Finding of Fact No. 52] which—like the First Suit and Second Suit—sought damages for the alleged misuse of the Treatment.  Yet, when he filed the Third Suit, the Debtor still did not return to this Court to disclose the Treatment. [Finding of Fact No. 52f].

Debtor in the arbitration. Instead, what did the Debtor do when he had his "Ah Hah" moment in late 2014 and realized that the Treatment had value? He did <u>not</u> seek to reopen his case in order to disclose the Treatment and its value to the Trustee and his creditors, but rather plowed forward on his own in the arbitration hoping to convince the arbitrator to grant him, and only him (to the exclusion of the Trustee and his creditors), monetary damages. These actions further underscore his intent to conceal the Treatment.

But, there is even more. After the arbitrator ruled against the Debtor on February 5, 2015, what did the Debtor do? He did <u>not</u> seek to reopen his case at that time to disclose the Treatment. Rather, he appealed the arbitration decision as a tactic to convince New Line and Warner Brothers to negotiate a settlement with him—and him alone (to the exclusion of the Trustee and his creditors). When this tactic failed—New Line and Warner Brothers refused to be bullied into a settlement—what did the Debtor do next? He did <u>not</u> seek to reopen his case at that time to disclose the Treatment. Rather, he had his attorney, Sanford Dow, write a letter threatening more lawsuits against New Line and Warner Brothers. [Finding of Fact No. 50]. However, this letter contained more than a threat. That was the "stick." The "carrot" was a settlement proposal that, at least in this Court's view, might well constitute a bankruptcy crime and most assuredly undermines any argument of the Debtor that his failure to disclose the Treatment was inadvertent.

Here is why. In his letter to New Line's attorney, Dow makes the following assertions:

> Additionally, Mr. DeRosa-Grund intends to files a concurrent motion to reopen his personal bankruptcy in light of the fact that the above-referenced treatment should have been listed as an asset in the original bankruptcy matter, but inadvertently was not. The reopening will address that inadvertent error as his treatment was, and remains, an asset of the bankruptcy estate. Mr. DeRosa-Grund and I have already met with the U.S. Bankruptcy Trustee who was originally involved in the bankruptcy, and have explained the facts and circumstances to him. Based on our conversations, he has authorized us to convey to the court that

58

he will not oppose the reopening of the bankruptcy. A copy of the motion to reopen the bankruptcy is also attached.

Finally, Mr. DeRosa-Grund and [Holdings] intend to file a motion with the bankruptcy court requesting a Show Cause Order. Pursuant to the Deal Memo, and the bankruptcy court's order approving same, Safran and [Holdings] were an supposed to be indivisible producing team. When New Line refused to employ and compensate [Holdings] as producer on any and all sequel productions, New Line was clearly in contempt of the bankruptcy court's order. Because the foregoing original order of the bankruptcy court was part of a core proceeding, this adversarial proceeding cannot be adjudicated in any other forum (i.e. mediation), as bankruptcy courts have sole and exclusive jurisdiction over core proceedings related thereto.

[Finding of Fact No. 50]; [New Line Ex. No. 15].

After setting forth the Debtor's intention to return to this Court to seek to reopen his case, disclose the Treatment, and request this Court to issue a show cause order to New Line, Dow then made the following offer to New Line: "*If a settlement can be reached, my clients [which include the Debtor] will agree to withdraw all current and contemplated litigation*." [*Id.*] [*emphasis added*].

Dow sent this letter on July 20, 2015. On this date, the only litigation pending was the arbitration appeal. [Finding of Fact No. 50]. The Debtor had certainly not filed the Motion to Reopen; indeed, he would not do so for another 63 days. [Finding of Fact No. 54]. Thus, the only reasonable conclusion that one could draw from Dow's proposal is this: if a settlement could be reached to the Debtor's satisfaction, then the Debtor would dismiss his appeal of the arbitrator's ruling and, additionally, would <u>not</u> seek to reopen his case so as to disclose the Treatment and seek a show cause order against New Line. Once again, the Debtor's actions— this time, through the actions of his attorney[29]—reveal a clear and unequivocal financial motive

---

[29] An attorney's actions are imputed to the client. *Pioneer Inv. Servs. Co. v. Brunswick Associates Ltd. P'ship*, 507 U.S. 380, 396, 113 S. Ct. 1489, 1499, 123 L. Ed. 2d 74 (1993) ("[W]e have held that clients must be held accountable for the acts and omissions of their attorneys"); *In re Moser*, 347 B.R. 471, 472 (Bankr. W.D.N.Y. 2006) ("As a general rule, the actions and inactions of an attorney are imputed to a client… the action 'of counsel is

to conceal the Treatment from this Court, the Trustee, and the Debtor's creditors.  Essentially, the proposal in the letter was an attempt at extortion, with the Debtor effectively saying to New Line the following: "Listen, New Line, if you will only pay me the money I deserve for the Treatment, I will not tell the Bankruptcy Court, the Trustee, or my creditors about the Treatment nor will I sue you in Bankruptcy Court.  We can then both quietly walk away with each of us having achieved our respective objectives: you will have unfettered use of the Treatment to generate revenues from making sequels of 'The Conjuring' and I will become a millionaire from your generous payment while continuing to cheat the bankruptcy system by ensuring that none of these funds fall into the hands of those creditors holding unpaid claims from my Chapter 7 case." *See* 18 U.S.C. § 152(6).[30]

New Line, to its credit, did not take the bait.  Indeed, its attorney (O'Connor) quite justifiably testified at the Hearing that he was "appalled" when he read Dow's letter.  [Finding of Fact No. 51]; [Hr'g Tr. 15:23, Dec. 2, 2015].  And, when New Line did not buckle under and pay off the Debtor, what did the Debtor do?  He did <u>not</u> seek to reopen his case at that time to disclose the Treatment.  Rather, he tried yet again to bring New Line to the negotiating table *sub rosa* by filing the Third Suit on August 7, 2015.  [Finding of Fact No. 52].  But, this ploy failed, as New Line (and other defendants sued in the Third Suit) refused to settle with the Debtor.

Apparently, at this point, Dow (the Debtor's attorney of record) and the Debtor had some disagreement about prosecuting the Third Suit because they sought dismissal of this suit on August 28, 2015—which the District Court granted on the same day.  But then the Debtor,

---

imputed to his or her client, who is bound thereby, under the rule that the acts and omissions of an attorney acting within the scope of his or her authority are regarded as the acts of the person he or she represents.' ") (citing 7 Am. Jur. 2d *Attorneys at Law,* § 157 (1997)).

[30] 18 U.S.C. § 152 is entitled "Concealment of Assets: False Oaths and claims; Bribery."  Subsection 6 sets forth that "a person who… knowingly and fraudulently gives, offers, receives, or attempts to obtain any money or property, remuneration, compensation, reward, advantage, or promise thereof for acting or forbearing to act in any case under title 11 shall be fined under this title, imprisoned not more than 5 years, or both."

representing himself *pro se*, filed the Fourth Suit three weeks later on September 22, 2015 seeking the same relief against the same defendants as the Third Suit. [Findings of Fact Nos. 52(d) & 53]. Then, one day later, on September 23, 2015, the Debtor filed the Motion to Reopen. [Finding of Fact No. 54].

Under all of the above-described circumstances, it strains credulity to believe that the Debtor now comes to this Court with the good faith intention of "trying to do the right thing" [Hr'g Tr. 13:8, Dec. 1, 2015], by reopening his case to disclose the Treatment. Rather, the Debtor's timing of returning to this Court on September 23, 2015 demonstrates, to an extreme degree, a bad faith intention to play fast and loose with the judicial system. The Debtor only filed the Motion to Reopen on September 23, 2015 because, having failed for almost six years— both in and out of the courtroom—to obtain payment from New Line for the Treatment, he now wants the Trustee to lay claim to ownership of the Treatment, monetize this asset, and then, after paying off remaining allowed claims and the Trustee's fee, remit the remaining proceeds to himself. If the Debtor's timing in now returning to this Court with the Motion to Reopen does not demonstrate the Debtor's motive to conceal, then nothing does. *Love v. Tyson Foods, Inc.*, 677 F.3d 258, 262 (5th Cir. 2012) ("[T]he motivation sub-element is almost always met if a debtor fails to disclose a claim or possible claim to the bankruptcy court. Motivation in this context is self-evident because of potential financial benefit resulting from the nondisclosure") (quoting *Thompson v. Sanderson Farms, Inc.,* No. 3:04CV837–WHB–JCS, 2006 U.S. Dist. LEXIS 48409, at *12–13 (S.D. Miss. May 31, 2006).

In sum, given all of the circumstances discussed above, this Court finds that there was no inadvertence by the Debtor's failure to disclose the Treatment. Therefore, while the Court will reopen this case in order to allow the Trustee to administer the Treatment, the Debtor will be

judicially estopped from receiving any benefit from the Trustee's sale or other disposition of the Treatment, or any rights associated therewith (such as filing suit to recover damages for any misappropriation of the Treatment).

### G. The Debtor's Position that His Failure to Disclose the Treatment on His Original Schedule B was Due to Reliance Upon His Bankruptcy Attorney Does Not Make the Debtor's Nondisclosure Inadvertent

During the Hearing, the Debtor gave testimony suggesting that his failure to disclose the Treatment on his initial Schedule B was due to the fact that his attorney (Nelson Hensley) filled out the Schedules and that he (i.e. the Debtor) relied upon his attorney's work. [Hr'g Tr. 91:19–20, Dec. 1, 2015]. The thrust of the Debtor's testimony was that his failure to disclose was an error on the part of his attorney—which, in his view, means that his failure to disclose was "inadvertent." There are two reasons why this position does not stand.

First, the Debtor admitted that before signing his Schedules, he reviewed them with his attorney. [Finding of Fact No. 15]. The Debtor also admitted that he (i.e. the Debtor) signed the last page of his Schedules—namely the Declaration Concerning Debtor's Schedules—under penalty of perjury, representing under oath that they were true and correct. [Finding of Fact No. 15]; [Debtor's Ex. No. 2, p. 31 of 31]. It is Black Letter law that a debtor who reviews his Schedules with his attorney cannot blame his attorney for inaccuracies in the Schedules—even if the debtor is purportedly inexperienced with financial affairs. *See In re Sholdra*, 249 F.3d 380, 383 (5th Cir. 2001); *see also Estel v. Bigelow Mgmt., Inc.*, 323 B.R. 918, 923 (E.D. Tex. 2005) (holding that the "argument that it is all his lawyer's fault is not persuasive"); *In re Hansen*, 325 B.R. 746, 760 (Bankr. N.D. Ill. 2005). Thus, the Debtor, not Hensley, is responsible for his inaccurate representation on his Schedule B that he does not own the Treatment. Such an inaccuracy precludes the Debtor from establishing inadvertence. *See Love* 677 F.3d at 262

("[T]he motivation sub-element is almost always met if a debtor fails to disclose a claim or possible claim to the bankruptcy court. Motivation in this context is self-evident because of potential financial benefit resulting from the nondisclosure") (internal quotations omitted).

Second, even if the Debtor had not reviewed the Schedules with Hensley before signing them, but rather simply signed them in reliance on the answers that he claimed Hensley inputted on the Schedules, such circumstances would still not constitute inadvertence.  This is so because of Supreme Court precedent that precludes a client from escaping the legal consequences of his attorney's negligent conduct:

> There is certainly no merit to the contention that dismissal of petitioner's claim because of his counsel's unexcused conduct imposes an unjust penalty on the client. Petitioner voluntarily chose this attorney as his representative in the action, and he cannot now avoid the consequences of the acts or omissions of this freely selected agent. Any other notion would be wholly inconsistent with our system of representative litigation, in which each party is deemed bound by the acts of his lawyer-agent and is considered to have 'notice of all facts, notice of which can be charged upon the attorney.'

*Link v. Wabash R. Co.*, 370 U.S. 626, 633-34, 82 S. Ct. 1386, 1390, 8 L. Ed. 2d 734 (1962), (quoting *Smith v. Ayer*, 101 U.S. 320, 326, 25 L.Ed. 955); *see Pioneer Inv. Servs. Co. v. Brunswick Associates Ltd. P'ship*, 507 U.S. 380, 381, 113 S. Ct. 1489, 1491, 123 L. Ed. 2d 74 (1993) (stating that "the proper focus is upon whether the neglect of respondents *and their counsel* was excusable").

Here, the Debtor freely chose Hensley to represent him in his Chapter 7 case.  [Finding of Fact No. 14].  As one court has said in rejecting a debtor's attempt to prove inadvertence by blaming his attorney: "[Y]ou take them as you get them. If [the debtor] choose poorly in his selection of counsel, such does not provide relief here."  *Estel*, 323 B.R. at 923.  Therefore, the Debtor is bound by the acts of Hensley—including Hensley's answers to the questions  posed on Schedule B.  Thus, even if Hensley himself filled in the information on Schedule B—which

clearly did not disclose that the Debtor owned the Treatment, [Finding of Fact No. 21]—the Debtor is bound by Hensley's answers. The Debtor therefore cannot establish that the failure of his attorney to disclose the Treatment on Schedule B constitutes inadvertence on the Debtor's part. *See, e.g., Hibernia Nat'l Bank v. Perez*, 124 B.R. 704, 710 (E.D. La. 1991) *aff'd sub nom. Matter of Perez*, 954 F.2d 1026 (5th Cir. 1992) ("[T]he advice of counsel is not a defense when it is transparently plain that the property should be scheduled.") (internal quotation marks and citation omitted). To allow the Debtor to establish inadvertence under these circumstances would—using the Supreme Court's language—"be wholly inconsistent with our system of representative litigation." *Link*, 370 U.S. at 634.

### H. The Debtor's Position that He Did Not Have the Financial Means to File the Motion to Reopen Any Earlier is Wholly Unpersuasive and Therefore Does Not Make the Debtor's Nondisclosure of the Treatment Inadvertent

At the Hearing, after the Debtor testified that it was in late 2014 that he concluded the Treatment had value, New Line's counsel asked him why he waited until the fall of 2015 to file the Motion to Reopen. The Debtor responded that he "did not have the financial resources" to seek to reopen the case until September of 2015. [Hr'g Tr. 126:22–25, Dec. 1, 2015]. This is the only reason that the Debtor gave as to why he waited approximately one year between concluding that the Treatment has value and returning to this Court to disclose the Treatment through the filing of the Motion to Reopen.

The Debtor's explanation for this year-long delay is, to put it mildly, hard to swallow. During this year-long gap between "discovering" that the Treatment had value and his filing of the Motion to Reopen, the Debtor was being represented by very high-powered attorneys who were prosecuting the First Suit and the Second Suit before District Judge Rosenthal, [Findings of Fact Nos. 44 & 45]; and then, when she dismissed these suits in favor of arbitration, the Debtor

was being represented by two attorneys from Connecticut at this arbitration. [New Line Ex. No. 13, p. 1, which sets forth the names of the attorneys representing the Debtor in the arbitration]. And then, after the arbitrator ruled against the Debtor, the Debtor, through the same attorney who filed the First Suit and the Second Suit (i.e. Dow), filed the Third Suit in the District Court [Finding of Fact No. 52]. These attorneys were assuredly not working pro-bono for the Debtor; somehow, he was paying them.

Moreover, on July 2, 2014, New Line remitted a check payable to the Debtor and Holdings for the amount of $750,000.00. [Finding of Fact No. 58]. The Debtor therefore could have easily used some of these funds to retain counsel to file the Motion to Reopen at a much earlier date than September 23, 2015. Indeed, when the Debtor, according to his own testimony, had his "Ah Hah" moment in late 2014 and concluded the Treatment had value, he surely had access $750,000.00 that he had received on July 2, 2014 to retain counsel for filing the Motion to Reopen at that time.

Finally, the Debtor was both the manager and the executive chairman of Holdings, [Hr'g Tr. 106:15–107:4; 110:10–13, Dec. 1, 2015]; he assuredly was receiving compensation in these capacities during the year-long hiatus between his "discovery" that the Treatment had value and his filing the Motion to Reopen.

In sum, it strains credulity that up until September 23, 2015, the Debtor lacked the financial wherewithal to pay the $260.00 filing fee for filing the Motion to Reopen and to retain counsel to draft and prosecute this motion; to allow the Debtor to establish inadvertence on this flimsy basis would be absurd. The Court simply does not believe the Debtor's testimony that he was impecunious during the one-year gap between the Debtor's "discovery" that the Treatment had value and his filing of the Motion to Reopen. Rather, the Court finds that the one-year delay

65

in filing the Motion to Reopen was due *not* to lack of funds, but rather to lack of honesty. The Court finds that the Debtor deliberately held off returning to this Court because he hoped, by prosecuting multiple suits against New Line, [Findings of Fact Nos. 44, 45, & 52], participating in arbitration, [Findings of Fact Nos. 47 & 48], as well as threatening more suits, [Finding of Fact No. 50], that New Line and he could quietly reach a settlement whereby New Line would pay him a substantial amount for the Treatment and he would slip away with the funds in his pocket and prevent the funds from ever being distributed to those creditors holding unpaid claims in his Chapter 7 case. The Debtor's strategy was a woeful failure.

### I. Judicial Estoppel Bars the Debtor from Ever Benefitting from the Trustee's Administration of the Treatment

Because this Court will reopen the Debtor's case so that the Debtor can amend his Schedule B to disclose the Treatment, the Trustee will have a duty to administer this asset for the benefit of creditors; stated differently, the Trustee's duty will be to sell or otherwise dispose of the Treatment and use the proceeds to pay remaining unpaid claims—in part, if not in full. *See Matter of Troy Dodson Const. Co., Inc.*, 993 F.2d 1211, 1216 (5th Cir. 1993). Normally, the Trustee would also owe a duty to the Debtor to ensure he received any excess funds after all creditors are paid in full. *See In re Kazis*, 257 B.R. 112, 114 (Bankr. D. Mass. 2001) ("The Trustee also owes a duty to the Debtor to maximize value, particularly here where there is a real chance that all creditors may be paid in full and the Debtor may receive funds back."); *see also In re Kay*, 223 B.R. 816, 821 (Bankr. M.D. Fla. 1998) ("[A]ll surplus funds are returned to the Debtor."). Thus, the Debtor, as a party in interest would typically have standing to object to any sale or disposition of the Treatment the Trustee might propose in the future if the Debtor believed that the Trustee's proposed disposition was not generating as many proceeds as possible. *In re Hutchinson*, 5 F.3d 750, 756 (4th Cir. 1993) (noting that a party in interest is

"generally understood to include all persons whose pecuniary interests are directly affected by the bankruptcy proceedings") (citation omitted); *In re Delta Underground Storage Co., Inc.*, 165 B.R. 596, 598 (Bankr. S.D. Miss. 1994) (noting that a party in interest "has been held to refer to anyone who has a practical stake in the outcome of a case").

Here, however, under *Reed*, the Debtor has lost his standing to object to any proposed disposition of the Treatment by the Trustee because the Debtor is barred from receiving any benefit due to his failure to disclose this asset. *See Reed,* 650 F.3d at 573. Prohibiting the Debtor from ever receiving any benefit from the Trustee's administration of the Treatment fulfills the fundamental objective of the doctrine of judicial estoppel: "The purpose of the doctrine is to protect the integrity of the judicial process, by preventing parties from playing fast and loose with the courts to suit the exigencies of self interest." *In re Coastal Plains, Inc.*, 179 F.3d at 205 (internal quotation marks, parentheses, brackets and citation omitted).

In the case at bar, the Debtor like many film-makers, has played fast and loose with the truth in order to create a picture upon which this Court would issue a ruling that would keep the door open for the Debtor to personally benefit from the Treatment. His strategy has not worked. The Court is now closing—indeed slamming—the door shut to the possibility that the Debtor can ever benefit from the Trustee's administration of the Treatment. This Court wants to emphasize to the Debtor here and now that if any excess proceeds remain after the Trustee administers the Treatment and completely pays off all claims and his own fee, then this Court will direct that these excess proceeds go *not* to the Debtor, but rather to the United States or be made available to public interest, charitable, educational, and other public service organizations. *See In re Premiere Holdings of Texas LP*, 393 B.R. 156, 159 (Bankr. S.D. Tex. 2008); *see also In re Xpedior Inc.*, 354 B.R. 210, 239 (Bankr. N.D. Ill. 2006). In fact, this Court took this approach in

*Jackson*—where the debtor lied about his ownership of a patent—and the Fifth Circuit endorsed this approach regarding distribution of excess proceeds. *In Re Jackson*, 2012 WL 3071218, *aff'd* per curiam by the Fifth Circuit on direct appeal at *In Re Jackson*, 574 F. App'x 317, 320 (5th Cir. 2014) ("The bankruptcy court's ruling does not allow [the defendants in undisclosed lawsuit initiated by the debtor] to get off scot-free. The estate can pursue the claims [the debtor] asserted, and if successful, the bankruptcy court ordered that any recovery exceeding the $40,538.00 in remaining claims would either escheat to the United States or be made available to public interest, charitable, educational, and other public service organizations.")

This Court will do even more to ensure that the Debtor's persistent, pernicious, perfidy towards the judicial system stops. It is possible—although unlikely—that the Trustee, after investigating the history of the Treatment and the litigation over this asset, concludes that the Treatment either has no value or is of inconsequential value. Stated differently, it is possible that the Trustee concludes that he cannot administer the Treatment for the benefit of the Estate. Under this scenario, the normal result would be that the Treatment would be abandoned to the Debtor pursuant to § 554(c) once the case was closed. *In re Nagy*, 432 B.R. 564, 568 (Bankr. M.D. La. 2010) ("Abandonment takes place by operation of law when a case is closed under Bankruptcy Code section 554(c), which deems abandoned to the debtor *any* scheduled property of the estate that is unadministered at the close of the case.") (internal quotation marks and citation omitted). Indeed, "[p]roperty abandoned under [§] 554 reverts to the debtor, and the debtor's rights to the property are treated as if no bankruptcy petition was filed." *Kane v. Nat'l Union Fire Ins. Co.*, 535 F.3d 380, 385 (5th Cir. 2008). Although the Debtor is barred under *Reed* from receiving any benefit from the Trustee's administration of the Treatment, the Debtor could still wind up with title to this asset revesting in his name. Such a result would accord him

68

the standing that he needs to file yet another lawsuit against New Line once again alleging that New Line has wrongfully appropriated the Treatment and needs to pay him damages for so doing. Under this scenario, there is a possibility that the Debtor could end up pocketing money himself. Such a result would undermine the very purpose of judicial estoppel.

Fortunately, the Code allows this Court to prevent this scenario from occurring. Section 554(c) sets forth that property of the estate that a Trustee abandons is deemed abandoned to the debtor unless "the court orders otherwise." Given the Debtor's perjurious conduct in this case, and his penchant for filing multiple suits in the District Court, [*See* Findings of Fact Nos. 44, 45, 52, & 53], this Court, as part of its decision to reopen this case, will "order otherwise" by barring the Trustee from ever abandoning the Treatment. If necessary, the Court will close this case with the Treatment simply remaining part of the Estate. The Court will take this action using its powers under § 105(a). *In re Trevino*, 535 B.R. 110, 132 (Bankr. S.D. Tex. 2015) ("One of the primary functions of § 105(a) is to 'prevent an abuse of process.' A bankruptcy court has broad authority to take necessary or appropriate actions to prevent an abuse of process.") (citing *Marrama v. Citizens Bank of Mass.,* 549 U.S. 365, 375, 127 S.Ct. 1105, 166 L.Ed.2d 956 (2007)). Whatever else happens, this Debtor will never again be able to have a scintilla of an argument that he has standing to bring suit on the grounds that he has an interest in the Treatment and that therefore he is entitled to damages for its misappropriation. It is time to put a stop to the Debtor's vexatious and fraudulent litigation tactics.

Finally, after the Debtor amends his Schedule to list the Treatment, this Court will also invoke its powers under § 105(a) to enjoin the Debtor from amending his Schedule C to claim that the Treatment is exempt property to which he is entitled. Not only does § 105 allow this Court to issue orders "to prevent an abuse of process;" this section authorizes the Court to issue

"any order... that is necessary or appropriate to carry out the provisions of this title." Here, if the Debtor, after amending his Schedule B to list the Treatment, could then amend his Schedule C to exempt this asset, he would be defeating the very purpose of the principle of judicial estoppel: he would be obtaining a financial benefit for himself despite his fraudulent conduct of hiding the existence of the Treatment in the first place. This Court will not allow such a result to occur, as it would constitute an abuse of process. Indeed, this Court will not be the first court to deny an exemption based upon a debtor's misconduct. *In re Colvin,* 288 B.R. 477, 483 (E.D. Mich. 2003) ("In this case, it is commensurate with the debtors' conduct in failing to disclose their $10,000 tax refund to deny to them their claim of exemption in that refund. As the Seventh Circuit observed, if debtors could omit assets at will, with the only penalty that they had to file an amended claim once caught, cheating would be altogether too attractive. . .") (internal quotations and citations omitted); *In re Talmo*, 185 B.R. 637, 644 (Bankr. S.D. Fla. 1995) ("Despite the permissive language of the rule, the Court has the discretion to not permit amendments: (i) if the proposed amendment would prejudice creditors; (ii) if the debtor has acted in bad faith; or (iii) if the debtor concealed assets."). In short, the Debtor will not be allowed to do an "end run" around the principle of judicial estoppel by exempting the Treatment after amending his Schedule B to disclose this asset.

## V. CONCLUSION

It is noteworthy that after this Court entered an order for relief in this case, PSG and Gordon filed a complaint to determine dischargeability against the Debtor and successfully obtained an order from this Court declaring that the $576,266.70 New York Judgment was a nondischargeable debt. [Findings of Fact Nos. 25 & 26]. The $576,266.70 New York Judgment arose from the Debtor's fraudulent acts relating to a television program about poker. [Finding of

70

Fact No. 25]. The game of poker necessarily requires a participant to take risk in order to win a pot of cash.

In the case at bar, the Debtor decided to play poker with this Court when he filed the Motion to Reopen because he submitted himself for cross examination under oath at the Hearing. He took this risk in the hope that he would convince this Court to reopen his case so that the Trustee can administer the Treatment, pay off remaining creditors, and leave enough money on the table so that the Debtor could rake in a substantial amount of cash. Unfortunately for the Debtor, his gamble has not paid off. Based upon his testimony at the Hearing, and the exhibits introduced and the testimony adduced by New Line, and a review of the Debtor's Schedules and SOFA, this Court finds the Debtor to be a conniving and dissembling individual whose failure to schedule the Treatment was anything but inadvertent. His explanations of why he did not initially disclose the Treatment in July of 2009, and why he did not get around to disclosing it to this Court until September of 2015, are nothing more than fictionalized concoctions that he conjured up as a litigation strategy for the Hearing.

Like the poker player in the old westerns who gets shot for his cheating ways, the Debtor here has cheated the bankruptcy system and will now suffer the consequences. Specifically, while this Court will reopen the Debtor's case, the Court will bar him from ever benefiting from the Trustee's sale or other disposition of the Treatment. And, for his efforts to game the bankruptcy system, this Court will refer him to the United States Attorney for the Southern District of Texas for that office to investigate whether his conduct amounts to a bankruptcy crime worthy of prosecution. The Debtor's conjuring up various and sundry explanations to justify his lengthy nondisclosure of the Treatment could cost him dearly in cash and might cost

him dearly in his freedom.  Sir Walter Scott's observation is unquestionably applicable to the

Debtor: "Oh what a tangled web we weave, when first we practise to deceive."[31]

An order consistent with this Memorandum Opinion will be simultaneously entered on

the docket.

Signed: January 22, 2016

_____

Jeff Bohm

Chief United States Bankruptcy Judge

---

[31] Sir Walter Scott, *Marmion, Canto vi. Stanza 17*. The Court notes that the word "practise" is not misspelled in this quotation.

# EXHIBIT F

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE SOUTHERN DISTRICT OF TEXAS
## HOUSTON DIVISION

| | | |
|---|---|---|
| In re: | § | |
| | § | |
| **TONY DEROSA-GRUND,** | § | **Case No. 09-33264** |
| | § | |
| Debtor. | § | **Chapter 7** |
| | § | |

## MEMORANDUM OPINION ON THE TRUSTEE'S APPLICATION TO COMPROMISE CONTROVERSY UNDER BANKRUPTCY RULE 9019
### [Doc. No. 306]

### I. Brief Introduction

This case was initiated on May 7, 2009 (the "Petition Date"), and has been anything but a typical Chapter 7 proceeding. Now pending before this Court is the application (the "Application") of the Chapter 7 trustee, Eva S. Engelhart (the "Trustee"), to approve a settlement that she has negotiated with Tony DeRosa-Grund, the debtor (the "Debtor"). New Line Productions, Inc. ("New Line"), a party-in-interest, vigorously objects to the proposed settlement. For the reasons set forth herein, this Court approves the Application. The Court does so, however, with misgivings, as it has little doubt that the Debtor, who has already made material misrepresentations under oath to this Court, will foment further frivolous litigation once the order approving the Application becomes final.

### II. Factual and Procedural Background

On September 23, 2015, the Debtor filed a motion to reopen his Chapter 7 case (the "Motion to Reopen"). [Doc. No. 92]. In the Motion to Reopen, the Debtor requested this Court to reopen his case so that he could amend his schedules to disclose an asset that he claimed to have inadvertently left off his original schedules. On October 14, 2015, New Line lodged an

1

objection to the Motion to Reopen. [Adv. Doc. No. 94]. This Court held a multi-day hearing on December 1, 2, 3, and 7, 2015, and the Court took the matter under advisement.

On January 22, 2016, this Court issued a Memorandum Opinion (the "Opinion"), [Doc. No. 122], and an order corresponding to the Opinion (the "First Order"), [Doc. No. 123]. A true and correct copy of the Opinion and the First Order are attached hereto as **Exhibits A** and **B** and incorporated herein for all purposes. The First Order ordered that this Chapter 7 case, which was closed in 2014, be reopened so that the Trustee could administer certain previously undisclosed assets. The Opinion discusses in detail how the Debtor deliberately failed to disclose certain assets on his original schedules; and then, after he received his discharge of a substantial amount of debt, attempted to collect hundreds of thousands of dollars for these assets and, when unsuccessful, then prosecuted numerous unsuccessful lawsuits against New Line (among others) seeking to obtain judgments for huge amounts.

The Opinion describes the two key assets that the Debtor failed to disclose. One is the so-called "Treatment," and the other is an entity called Silverbird Media Group LLC ("Silverbird"). The latter is a company owned by the Debtor as of the Petition Date. The former is an abridged script for what subsequently became the screenplay for a blockbuster movie entitled "The Conjuring." This movie generated revenues of over $300 million in 2013, and a sequel has since been made.

The Opinion also explains why the Court reopened the Debtor's case and the conditions that the Court imposed in doing so. Specifically, the Court required the Debtor to schedule the Treatment and Silverbird so that the Trustee could administer these assets for the benefit of the estate—i.e., for those creditors whose allowed claims had not been paid when the case was initially closed in 2014. The Opinion also set forth that if, after the Trustee administered these

previously undisclosed assets, any excess funds remained in the estate, they would **not** be distributed to the Debtor. The Court issued this particular ruling on the grounds that the Debtor's skullduggery should, as a matter of equity, bar him from receiving any distribution. The Debtor has appealed this ruling, and the Trustee is defending this holding.

To the Trustee's credit, she has been able to sell the estate's interest in the Treatment, plus take certain other actions, such that more than enough cash has been generated to pay all allowed unsecured claims and all allowed administrative claims. [Doc. No. 371]. Indeed, the holders of unsecured claims have received interest on their claims. [*Id.*]. This result is exceptional, and the Trustee deserves much credit for her efforts.

And, also to her credit, the Trustee is trying to comply with the Opinion and the First Order by not distributing any excess funds to the Debtor. Specifically, after she paid off all allowed unsecured claims, and set aside what she believes is a sufficient amount of funds to pay off all allowed administrative claims, the Trustee calculated that there are excess funds in the estate. On February 1, 2017, she filed a motion requesting this Court's approval to pay a portion of these excess monies to two charitable organizations as follows: (1) to the Ronald McDonald House of Houston, Inc., the sum of $35,000.00; and (2) to the Covenant House Texas, the sum of $35,000.00. [Doc. No. 287]. The Court approved this request in an order dated February 9, 2017 (the "Second Order"), and the Debtor timely appealed this ruling. [Doc. No. 289]. As with the Debtor's appeal of the First Order, the Trustee is defending the Second Order. Both appeals are presently pending before the Honorable Sim Lake, United States District Judge for the Southern District of Texas ("Judge Lake"). [Doc. No. 290 & 303]; [Civ. Act. No. 4:17cv591].

At a status conference before Judge Lake, the following exchange, in pertinent part, occurred among Judge Lake, counsel for the Trustee, and counsel for the Debtor:

| | |
|---|---|
| The Court: | Is there a chance that this matter can be resolved? I mean, I hate to spend – let me just talk a second. I hate to spend money when the creditors have been paid. Of course, it benefits your law firm, that's great. I have also been skeptical of awarding money to a charity from a party. That's like forced contributions. It's just not something that, I don't think courts – who's going to decide which charity? |
| Trustee's Attorney: | The trustee. Judge Bohm has ordered the trustee should decide what charity they go to. I would say this about settlement. I believe that if Mr. Patterson and I in a different context had this pool of money and these issues we would settle it. In bankruptcy court, any settlement that we would reach would have to be approved by Judge Bohm. And I am very confident, given that opinion you read and the record so far, he is not going to approve any settlement whereby I let Mr. Patterson's client walk away with any money. |
| The Court: | Well, he might if the reference were withdrawn and I were going to approve it. |
| Debtor's Attorney: | If that were to happen, Judge, I feel like there is probably an 80 percent chance we could resolve everything. |
| The Court: | I am not saying I am going to do that, but I am looking at the specter of writing three long opinions and I am looking at the specter -- and nothing more do I love than writing bankruptcy opinions. That's the reason I wanted to become a federal judge. But seriously, it's just if we're spending a huge amount of attorney and judge time on an issue that could be resolved, I would seriously consider any reasonable relief you could suggest. |
| Trustee's Attorney: | I appreciate that, Your Honor. |

4

| The Court: | That's all I am going to say. |
|---|---|

. . .

| Debtor's Attorney: | Quite frankly, as far as settlement, we haven't. I mean, all of us work here, work together. We work in that little environment downstairs in bankruptcy court all the time. And so, this is something that can be resolved. It's not something that can be resolved and approved by Judge Bohm at this stage, quite frankly. I mean, that's just – |
|---|---|
| The Court: | Well, Judge Bohm is a fine judge, but the appeal is to me. The way the courts work, sometimes the Fifth Circuit does things that I didn't think would be a good idea, but that's the way the system works. |

[Trustee's Ex. 18, 23:9–24:17, 25:2–12].

After reflecting upon Judge Lake's comments, the Trustee became concerned that she would not prevail in the appeals, and that therefore the Debtor—not the two charities—would end up receiving all of the surplus funds in this case. [Mar. 10, 2017 Tr. 4:15–24]. Accordingly, she entered into settlement discussions with the Debtor, and has negotiated a compromise that, if approved, results in the two charities still each receiving $35,000.00. [Mar. 10, 2017 Tr. 28:3–11]; [Doc. No. 306, p. 8 ¶ 33]. The terms of the proposed settlement (the "Proposed Settlement") are set forth in the Application, which the Trustee filed on February 24, 2017. [Doc. No. 306]. The material terms are as follows:

(1) The Debtor will dismiss his appeal of the First Order with prejudice;

(2) The Debtor will dismiss his appeal of the Second Order with prejudice ;

(3) The Trustee will proceed to pay $35,000.00 to each of the two charitable organizations as set forth in the Second Order;

(4) Upon closing this Chapter 7 case, the Trustee will abandon the estate's interest in two entities: Silverbird and Evergreen Media Group LLC ("EMG"). The former is the entity that the Debtor did not initially disclose in his schedules, but, as required by the First Order, did subsequently disclose, representing that the value of his interest in this corporation is $0.00. The latter is an entity that the Debtor did initially disclose—representing that his interest in this corporation has a value of $1,000.00;

(5) The Trustee will disclaim any right that she has to receive any portion of future payments relating to "The Conjuring";

(6) The Trustee will exchange mutual releases with the Debtor, Silverbird, EMG, and Evergreen Media Holdings LLC ("Holdings"). The latter entity is a corporation that has never been property of the estate, but that has been the party to litigation over the Treatment; the Debtor is the manager and the executive chairman of this entity, [Doc. No. 122, p. 6 ¶ 5].

[*Id.* at p. 8 of 15].

On March 7, 2017, New Line filed an objection to the Application. [Doc. No. 318]. New Line is a subsidiary and an affiliate of Warner Brothers Entertainment, Inc. and it is this entity, among others, that the Debtor has frequently sued to recover what he has alleged are his damages from the use of the Treatment by New Line and its affiliates. The gravamen of New Line's objection is this: Pursuant to an order of this Court on December 16, 2016 approving a compromise between New Line and the Trustee (the "New Line/Trustee Settlement"), New Line paid $200,000.00 to the Trustee for all of the estate's interest in the Treatment; the Debtor now takes the position that EMG has actually owned the Treatment since February 9, 2009;[1] the Debtor also takes the position that Silverbird has an interest in the Treatment, [*see* Doc. No.

---

[1] One of the documents introduced by New Line (obtained through an order from this Court) purports to be a pre-petition assignment (dated February 9, 2009) of the Treatment from the Debtor to EMG. [New Line Ex. Y, p. 2]. The first page of New Line Ex. Y reflects that the Debtor allegedly discovered the existence of this assignment on November 22, 2016. Thus, the Debtor, who testified in 2015 that he, and he alone, owned the Treatment, but who assuredly became unhappy with the Opinion and the First Order when they were issued on January 22, 2016, just happened to locate a document several months later showing—Surprise, Surprise!—that he did not own the Treatment on the Petition Date after all.

275]; and if the Trustee abandons the estate's interests in EMG and Silverbird to the Debtor, he will use these two entities to orchestrate further litigation against New Line seeking damages for New Line's alleged misappropriation of the Treatment. Stated differently, New Line complains that if this Court approves the Proposed Settlement, New Line will be deprived of the benefit of the bargain that it negotiated with the Trustee and will once again find itself spending attorneys' fees and time fending off frivolous lawsuits initiated by the Debtor.

On March 10, 2017, this Court held a hearing on the Application and New Line's objection thereto. Only one witness testified at this hearing: the Trustee herself. The Court finds that her testimony was very credible and the Court gives it substantial weight. Additionally, both the Trustee and New Line introduced several exhibits. The Trustee introduced Exhibits 1 through 20, and New Line introduced Exhibits A through W. After admitting exhibits, hearing testimony, and listening to closing arguments of counsel, the Court took the matter under advisement.

Then, on April 11, 2017, New Line filed an emergency motion to reopen the evidence and allow additional discovery. [Doc. No. 359]. On May 2, 2017, the Court held a hearing on this motion, and granted New Line's request in part. [Doc. No. 382]. Specifically, the Court admitted five additional exhibits from New Line, all of which were documents produced by the attorney for Silverbird, EMG, and Holdings at a hearing held on March 31, 2017. The Court admitted these additional exhibits as New Line exhibits A, B, D, E, and F, but they have since been re-lettered as New Line exhibits X, Y, Z, AA, and BB. [Doc. No. 393, pp. 3–4 of 6]. Accordingly, this Court's ruling on the Application is based upon: (1) the record made at the March 10, 2017 hearing (the "Hearing"); (2) the five exhibits admitted during the May 2, 2017; and (3) certain testimony given at a "show cause" hearing on March 31, 2017 by David Lake, the

7

attorney for Silverbird, EMG, and Holdings, together with a stipulation by Debtor's counsel, all of which concern the Debtor's status as the corporate representative of Silverbird, EMG, and Holdings, and his giving authorization to Mr. Lake to file pleadings in Judge Lake's court and in this Court, [*see infra* note 21].[2]

Pursuant to Federal Bankruptcy Rules 9014 and 7052, this Court now issues the following Findings of Fact and Conclusions of Law.[3] To the extent that any Finding of Fact is construed to be a Conclusion of Law, it is adopted as such. To the extent that any Conclusion of Law is construed to be a Finding of Fact, it is adopted as such. The Court reserves the right to make any additional Findings and Conclusions as may be necessary or as requested by any party.

### III. Conclusions of Law

### A. Jurisdiction, Venue, and Constitutional Authority to Enter a Final Order

1. Jurisdiction

The Court has jurisdiction over this matter pursuant to 28 U.S.C. §§ 1334(b) and 157(a). Section 1334(b) provides that "the district courts shall have original but not exclusive jurisdiction of all civil proceedings arising under title 11 [the Bankruptcy Code], or arising in or related to cases under title 11." District courts may, in turn, refer these proceedings to the bankruptcy judges for that district. 28 U.S.C. § 157(a). In the Southern District of Texas, General Order 2012-6 (entitled General Order of Reference) automatically refers all eligible cases and proceedings to the bankruptcy courts.

---

[2] *Cf. In re Acequia, Inc.*, 787 F.2d 1352, 1358–59 (9th Cir. 1986) (holding that a bankruptcy court is not precluded "from considering evidence presented by the parties at prior evidentiary hearings . . . [and that] [t]o require the bankruptcy court to ignore prior evidence would impose a harsh and unnecessary administrative burden."); *Credit Alliance Corp. v. Idaho Asphalt Supply, Inc. (In re Blumer)*, 95 B.R. 143, 146 (B.A.P. 9th Cir. 1988) (acknowledging that "a bankruptcy judge may, but need not, consider evidence from a prior hearing in the same case").

[3] Hereinafter, any reference to a "Rule" is a reference to the Federal Rules of Bankruptcy Procedure. Further, any reference to "the Code" refers to the United States Bankruptcy Code, and reference to any section (i.e., §) refers to a section in 11 U.S.C., which is the United States Bankruptcy Code, unless otherwise noted.

This matter is a core proceeding pursuant to 28 U.S.C. § 157(b)(2)(A) because its resolution affects the administration of the Debtor's bankruptcy estate. Additionally, this dispute is a core proceeding under the general "catch-all" language of 28 U.S.C. § 157(b)(2). *See In re Southmark Corp.*, 163 F.3d 925, 930 (5th Cir. 1999) ("[A] proceeding is core under § 157 if it invokes a substantive right provided by title 11 or if it is a proceeding that, by its nature, could arise only in the context of a bankruptcy case."); *In re Ginther Trusts*, No. 06-3556, 2006 WL 3805670, at *19 (Bankr. S.D. Tex. Dec. 22, 2006) (holding that a matter may constitute a core proceeding under 28 U.S.C. § 157(b)(2) "even though the laundry list of core proceedings under § 157(b)(2) does not specifically name this particular circumstance"). Here, the dispute between the Trustee and New Line is a core proceeding because it is governed by Rule 9019, which expressly allows the Trustee to seek approval of the compromise that she has negotiated with the Debtor (i.e., the Proposed Settlement). Stated differently, the dispute between New Line and the Trustee over the Proposed Settlement could arise only in the context of a bankruptcy case.

2. Venue

Venue is proper pursuant to 28 U.S.C. § 1408(1) because the Debtor resided in the Southern District of Texas for the 180 days preceding the Petition Date.

3. Constitutional Authority to Enter a Final Order on the Application

Approval of any compromise proposed under Rule 9019 is a final order. *In re Nutraquest, Inc.*, 434 F.3d 639, 643–44 (3d Cir. 2006) ("Because the Court's order approving the settlement agreement is a final order, we have appellate jurisdiction under 28 U.S.C. § 1291). In the wake of the Supreme Court's issuance of *Stern v. Marshall*, 564 U.S. 462 (2011), this Court is required to determine whether it has the constitutional authority to enter a final order in any matter brought before it. In *Stern*, which involved a core proceeding brought by the debtor under

28 U.S.C. § 157(b)(2)(C), the Supreme Court held that a bankruptcy court "lacked the constitutional authority to enter a final judgment on a state law counterclaim that is not resolved in the process of ruling on a creditor's proof of claim." *Id.* at 503. As already noted above, the pending matter before this Court is a core proceeding pursuant to 28 U.S.C. § 157(b)(2)(A). Because *Stern* is replete with language emphasizing that the ruling is limited to the one specific type of core proceeding involved in that dispute, this Court concludes that the limitation imposed by *Stern* does not prohibit this Court from entering final orders here. A core proceeding under 28 U.S.C. § 157(b)(2)(A) is entirely different than a core proceeding under 28 U.S.C. § 157(b)(2)(C). *See, e.g., Badami v. Sears (In re AFY, Inc.)*, 461 B.R. 541, 547–48 (B.A.P. 8th Cir. 2012) ("Unless and until the Supreme Court visits other provisions of Section 157(b)(2), we take the Supreme Court at its word and hold that the balance of the authority granted to bankruptcy judges by Congress in 28 U.S.C. § 157(b)(2) is constitutional."). *See also In re Davis*, 538 Fed. App'x 440, 443 (5th Cir. 2013) *cert. denied sub nom. Tanguy v. W.*, 134 S. Ct. 1002 (2014) ("[W]hile it is true that *Stern* invalidated 28 U.S.C. § 157(b)(2)(C) with respect to 'counterclaims by the estate against persons filing claims against the estate,' *Stern* expressly provides that its limited holding applies only in that 'one isolated respect.' . . . We decline to extend *Stern*'s limited holding herein.").

Alternatively, even if *Stern* applies to all of the categories of core proceedings brought under 28 U.S.C. § 157(b)(2), *see In re Renaissance Hosp. Grand Prairie Inc.*, 713 F.3d 285, 294 n.12 (5th Cir. 2013) ("*Stern*'s 'in one isolated respect' language may understate the totality of the encroachment upon the Judicial Branch posed by Section 157(b)(2) . . . ."), this Court still concludes that the limitation imposed by *Stern* does not prohibit this Court from entering a final order in the dispute at bar. In *Stern*, the debtor filed a counterclaim based *solely* on state law;

10

whereas, here, the dispute between the Trustee and New Line arises from the Trustee's request for this Court to approve the Proposed Settlement, which is governed by an express Bankruptcy Rule—namely, Rule 9019—as well as judicially-created law from federal courts as to how this rule should be applied. Stated differently, the matter before the Court does not involve solely state law, but rather heavily involves bankruptcy law. For all of these reasons, the Court concludes that it has the constitutional authority to enter a final order on the Application. *In re Junk*, Case No. 13-55139, 2017 Bankr. LEXIS 1105, at *10 (S.D. Ohio Apr. 19, 2017) ("For even after *Stern v. Marshall*, bankruptcy courts have the constitutional authority to enter final orders approving settlements under Rule 9019(a) . . . .") (citations omitted).

Finally, in the alternative, this Court has the constitutional authority to enter a final order because the parties have consented, impliedly if not explicitly, to adjudication of this dispute by this Court. *Wellness Int'l Network, Ltd. v. Sharif*, 135 S. Ct. 1932, 1947 (2015) ("Sharif contends that to the extent litigants may validly consent to adjudication by a bankruptcy court, such consent must be expressed. We disagree. Nothing in the Constitution requires that consent to adjudication by a bankruptcy court be expressed. Nor does the relevant statute, 28 U.S.C. § 157, mandate express consent . . . ."). Indeed, the Trustee filed the Application; New Line filed its objection thereto; this Court held a hearing on March 10, 2017; this Court held a further hearing on May 2, 2017; and at no time did the Trustee or New Line ever object to this Court's constitutional authority to enter a final order on the Application. If these circumstances do not constitute consent, nothing does.

## B. Standing of New Line to Object to the Application

At the Hearing, counsel for the Debtor asserted that New Line has no standing to object to the Proposed Settlement. [Mar. 10, 2017 Tr. 28:20–30:25]. This Court disagrees.[4] In *In re A.P.I., Inc.*, the court aptly articulated the requirements that an entity must satisfy to achieve "party in interest" status for lodging an objection:

> Over several decades of jurisprudence, the Supreme Court has formulated a two-component test to enable the federal courts to determine the standing of complainants before them. Such parties must demonstrate both constitutional and prudential standing . . . "To meet the requirement of constitutional standing, [a party] must show that it has suffered an injury in fact that is: concrete and particularized and actual or imminent; fairly traceable to the challenged action of the [opposing party]; and likely to be redressed by a favorable decision." The party must have such a *personal stake* in the outcome of the controversy as to assure . . . concrete adverseness. The injury-in-fact must be palpable, though this requirement is not onerous. *The injury need not be current; even a threatened injury will suffice.*

> Once a party has met these constitutional requirements, its standing may yet be challenged on three "prudential" grounds . . . A complainant's bid for standing may be defeated if: (a) it is asserting a third party's rights; (b) it alleges a generalized grievance rather than an injury particular to it; or (c) it asserts an injury outside the zone of interest the statute was designed to protect.

---

[4] The Court notes that at the Hearing, after counsel for the Debtor asserted that New Line had no standing to object to the Proposed Settlement, this Court ruled that the Debtor had no standing to participate at the hearing on the Application. [Mar. 10, 2017 Tr. 28:20–30:25]. Counsel for the Debtor argued that the Application seeking approval of the Proposed Settlement is a joint application and that therefore the Debtor did have standing to participate at the Hearing. [*Id.* at 6:13–23]. This Court disagreed on the grounds that Rule 9019(a) only allows a trustee to file a motion seeking approval of a compromise. ("On motion by *the trustee* and after notice and hearing, the court may approve a compromise or a settlement.") (emphasis added); [Mar. 10, 2017 Tr. 30:10–23]. Moreover, the Court noted that only counsel for the Trustee signed the Application, [Mar. 10, 2017 Tr. 7:1–7]; the pleading is not styled as a "joint application." Finally, the Court noted that pursuant to the applicable local bankruptcy rules, New Line had filed a written response opposing the Application as well as witness and exhibit lists, thus giving proper notice of its position. [*Id.* at 30:20–23]; [Doc. No. 320]. Additionally, the Trustee also filed witness and exhibit lists. [Doc. No. 321]. The Debtor could have filed a response supporting the Application as well as exhibit and witness lists, but did not do so. Under these circumstances, the Court held that the Debtor had no standing to participate at the hearing, [*id.* at 7:6–25; 30:10–25], because to do so would sandbag New Line; indeed, New Line's counsel objected to the Debtor's participation, [*id.* at 29:7–10]. Nevertheless, the Court believes that it should address whether New Line has standing to object to the Proposed Settlement because the Court has an independent duty to review the merits of the Application, and such a review necessarily includes whether the party opposing the Application has standing. *In re Roqumore*, 393 B.R. 474, 480 (Bankr. S.D. Tex. 2008).

12

331 B.R. 828, 857–58 (Bankr. D. Minn. 2005) (second emphasis added) (internal citations and quotations omitted).

Here, New Line is threatened with an injury: if the Debtor regains his interest in Silverbird and/or EMG, he will have the opportunity to use these entities to seek to recover damages from New Line on the grounds that New Line has allegedly misappropriated the Treatment at the expense of Silverbird and/or EMG; thus, New Line will have to expend more time and attorneys' fees litigating over who owns the Treatment, thereby depriving New Line of the benefit of its bargain when it paid the Trustee $200,000.00 for the Treatment pursuant to the New Line/Trustee Settlement. These future litigation costs sufficiently constitute a "threatened injury" for New Line to be a party-in-interest with standing to object to the Application.[5]

And, any challenge to New Line's standing on "prudential" grounds fails. This is so because New Line is not asserting any third-party rights; it is asserting its own rights to the Treatment pursuant to the New Line/Trustee Settlement that it negotiated with the Trustee in late 2016. Nor is New Line asserting a generalized grievance in opposing the Proposed Settlement; rather, New Line is alleging that if this Court approves the Proposed Settlement, New Line itself will suffer a specific injury: namely, deprivation of the benefit of its bargain in that the $200,000.00 that it paid to the Trustee will have gone for naught, and that the Debtor will drag

---

[5] This Court issued the Opinion after hearing extensive testimony in 2015 about who owned the Treatment, including definitive testimony from the Debtor himself that he—and he alone—has always owned the Treatment. [Dec. 1, 2015 Tr. 124:19–23, 153:14–154:3]. After hearing this testimony, the Court, in the Opinion, made an express finding that the Debtor owns the Treatment. Therefore, the Court wants to emphasize here and now that: (1) it does *not* believe that either EMG or Silverbird—or any other entity with which the Debtor is affiliated—owns the Treatment; and (2) any future lawsuits that the Debtor instructs be filed on behalf of EMG or Silverbird—or any other entity with which the Debtor is affiliated—seeking damages for New Line's alleged misappropriation of the Treatment would be a frivolous lawsuit. Nevertheless, it is the very threat of such lawsuits—however frivolous they may be—and New Line's need to pay attorneys' fees to defend against any suits that are actually filed, that constitute the "threatened injury" here for purposes of analyzing whether New Line has demonstrated constitutional standing to challenge the Application. And, given the Debtor's history of filing numerous suits against New Line—the Opinion reviews in detail the four lawsuits that he filed in 2014/2015 in the Southern District of Texas alone—there is no question that there is a palpable threat that he will use Silverbird and EMG to file more suits against New Line in the future.

New Line into further litigation seeking damages for what the Debtor asserts is New Line's misappropriation of the Treatment. Finally, the particular injury about which New Line is concerned is not outside the zone of interest that Rule 9019 is designed to protect. Rule 9019(a) expressly requires that notice and a hearing be held whenever a trustee seeks court approval of a compromise. Here, having received and reviewed the Application, New Line has objected on the grounds that the Proposed Settlement undermines the New Line/Trustee Settlement that this Court previously approved, the terms of which have already been fully effectuated pursuant to a final, non-appealable order.

For all of these reasons, this Court finds that New Line is a party-in-interest that has standing to object to the Application.

## C. Analysis of the Proposed Settlement Between the Trustee and the Debtor Under Rule 9019 and Applicable Case Law

Rule 9019 authorizes bankruptcy courts to approve compromises and settlements submitted by a trustee. Ultimately, a compromise must be "fair, equitable and in the best interest of the estate." *In re Jackson Brewing Co.*, 624 F.2d 599, 605 (5th Cir. 1980).

When considering whether a compromise is "fair, equitable and in the best interest of the estate," *id.*, the Court must weigh the "terms of the compromise with the likely rewards of litigation," *id.* at 602 (quoting *Protective Comm. for Indep. Stockholders of TMT Trailer Ferry, Inc. v. Anderson*, 390 U.S. 414, 424–25 (1968)). Courts must consider the following factors:

> (1) The probabilities of ultimate success should the claim or claims be litigated;
> (2) The complexity, expense, and likely duration of litigating the claims;
> (3) The difficulties of collecting a judgment rendered from such litigation; and
> (4) All other factors relevant to a full and fair assessment of the wisdom of the compromise.

*TMT Trailer Ferry*, 390 U.S. at 424.

With respect to the fourth factor, the Fifth Circuit, and other courts, have elaborated on what issues this Court should consider in assessing the wisdom of the compromise:

> (1) The paramount interest of creditors with proper deference to their reasonable views. *Matter of Cajun Elec. Power Coop., Inc.*, 119 F.3d 349, 356 (5th Cir. 1997); *In re Foster Mortg. Corp.*, 68 F.3d 914, 917 (5th Cir. 1996); *In re Justice Oaks II, Ltd.*, 898 F.2d 1544, 1549 (11th Cir. 1990); *In re Flight Transp. Corp. Sec. Litig.*, 730 F.2d 1128, 1135 (8th Cir. 1984).
> (2) The extent to which the proposed settlement is the product of arms-length negotiations. *Matter of Cajun*, 119 F.3d at 356; *In re Foster Mortg. Corp.*, 68 F.3d at 918; *D'Amato v. Deutsche Bank*, 236 F.3d 78, 85 (2d Cir. 2001).
> (3) Whether the proposed settlement is with an insider. *In re Foster Mortg. Corp.*, 68 F.3d at 919; *In re Dow Corning Corp.*, 192 B.R. 415, 422 (Bankr. E.D. Mich. 1996).
> (4) Whether the proposed settlement promotes the integrity of the judicial system. *In re Kallstrom*, 298 B.R. 753, 761 (B.A.P. 10th Cir. 2003); *In re Lakeland Dev. Corp.*, 48 B.R. 85, 90 (Bankr. D. Minn. 1985).

"The trustee bears the burden of establishing that the balance of the above factors supports a finding that the compromise is fair, equitable, and in the best interest of the estate." *In re Roqumore*, 393 B.R. at 480. *See also In re Gen. Motors Corp. Pick-Up Truck Fuel Tank Prods. Liab. Litig.*, 55 F.3d 768, 785 (3d Cir. 1995); *In re A & C Props.*, 784 F.2d 1377, 1381 (9th Cir. 1986). "[T]he Trustee's burden is not high. The Trustee need only show that his decision falls within the range of reasonable litigation alternatives." *In re Roqumore*, 393 B.R. at 480 (internal citations omitted). The decision to approve a "compromise lies within the discretion of the trial judge." *Matter of Aweco, Inc.*, 725 F.2d 293, 297 (5th Cir. 1984). Indeed, in exercising its discretion, this Court can give more weight to one or more of the above-referenced factors than to the other factors. *In re Bard*, 49 Fed. App'x 528, 532–33 (6th Cir. 2002) (affirming bankruptcy court's ruling even though the bankruptcy court stated that: "While the Court does consider the Debtors' interest as a legitimate factor, the Court gives it less

weight than the other factors."); *In re Adelphia Commc'ns. Corp.*, 327 B.R. 143, 160–65 (Bankr. S.D.N.Y. 2005) (giving certain factors "some weight," "no weight," or "moderate weight"). The Court now addresses each of the above-referenced factors.

    1.   The Probabilities of Ultimate Success on the Claim or Claims to be Litigated

    At the Hearing, the Trustee testified that based upon Judge Lake's comments, she does not believe she can prevail on the Debtor's appeal of the First Order (ordering that no surplus funds are to be distributed to the Debtor) or the Debtor's appeal of the Second Order (authorizing the Trustee to distribute a portion of the existing surplus funds, i.e., $70,000.00, to the two charities). [Mar. 10, 2017 Tr. 10:13–12:13]. Granted, Judge Lake did not definitively state that he would hold that the Trustee may not distribute the $70,000.00 to the charities; and it might well be after hearing oral argument and reviewing the entire record and the briefs filed by the parties, he would approve distribution to the charities. Or, as New Line has suggested, it might be that Judge Lake would hold that the $70,000.00 may not be paid to charity, but instead can be distributed to some third party other than the Debtor—such as the Clerk of Court.[6] [Mar. 10, 2017 Tr. 90:11–25]. Nevertheless, Judge Lake's words are fairly adamant and have caused legitimate concern for the Trustee, and this Court finds eminently reasonable her belief that she will probably lose on this issue in his court and that he will rule that the Trustee must distribute all excess funds (including the $70,000.00 presently earmarked for the charities) to the Debtor.

---

[6] Such a ruling would certainly accord with the Opinion and the First Order because the Debtor would **not** receive a dime. This Court is not wedded to the notion that the funds have to be paid to charity. Indeed, in the Opinion, this Court stated the following: "This Court wants to emphasize to the Debtor here and now that if any excess proceeds remain after the Trustee administers the Treatment and completely pays off all claims and his own fee, then this Court will direct that these excess proceeds go *not* to the Debtor, but rather to the United States or be made available to public interest, charitable, educational, and other public service organizations." *In re DeRosa-Grund*, 544 B.R. 339, 383 (Bankr. S.D. Tex. 2016) (emphasis in original). Thus, it would be completely consistent with the Opinion and the First Order if the excess proceeds were distributed to the Clerk of Court.

Arguably, the analysis of this first factor stops right here with this Court finding that the first factor weighs in favor of approving the Proposed Settlement. Yet, an argument can be made that the analysis should also focus on what rulings might emanate from higher appellate courts. After all, the first factor is entitled the "probabilities of ultimate success" on the claim to be litigated, and the word "ultimate" suggests that the Trustee should look beyond the district court level—at least to the level of the Fifth Circuit. Here, the Trustee has done so. In the Application, she acknowledges that the Fifth Circuit, in *In re Jackson*, 574 Fed. App'x. 317 (5th Cir. 2014), seems to endorse a trustee giving excess funds to charity when the debtor has failed to disclose an asset.[7] However, the Trustee also points to language from the Fifth Circuit in *Kane v. Nat'l Union Fire Ins.*, in which the Fifth Circuit, in issuing a ruling about a debtor in Chapter 7 who failed to disclose an asset, stated the following: "Moreover, the Kanes [i.e., the debtors] stand to benefit only in the event that there is a surplus after all debts and fees have been paid." 535 F.3d 380, 387 (5th Cir. 2008). This sentence suggests that the Fifth Circuit believes that even if a debtor fails to disclose an asset, he is nevertheless entitled to distribution of any excess funds after all claims are paid in full. The language from *Kane* is admittedly incongruent with the language in *Jackson*, and therefore the Trustee has shown that she is reasonable in her belief that if this issue ends up before the Fifth Circuit, she might not prevail.

Although the Trustee gave no testimony about her concerns of losing if the issue were ever before the Supreme Court, there are three cases from the Supreme Court germane to the issue of whether a bankruptcy court can invoke its inherent powers and its equitable powers

---

[7] Specifically, the Fifth Circuit stated the following: "The estate can pursue the claims [the debtor] asserted, and if successful, the bankruptcy court ordered that any recovery exceeding the $40,538.00 in remaining claims would either escheat to the United States or be 'made available to public interest, charitable, educational, and other public service organizations.'" *In re Jackson*, 574 Fed. App'x. at 320.

under § 105 to bar a dishonest debtor from receiving any surplus funds.[8]  In *Marrama v. Citizen Bank of Mass.*, 549 U.S. 365 (2007), the Supreme Court was confronted with the issue of whether a debtor who tries to hide assets has the unfettered right to convert his Chapter 7 case to a Chapter 13 case and retain ownership of those assets by confirming a Chapter 13 plan.  While the plain language of § 706(a) permitted the debtor to convert his case to Chapter 13 without any limitations, the bankruptcy court and appellate courts construed this provision to include a bad faith exception and therefore these lower courts prohibited the debtor from converting.  The Supreme Court affirmed this decision by holding that the bankruptcy court's equitable powers of § 105(a) and the inherent power of every federal court could be used to stop abusive litigation practices.  *Id.* at 375.   And, in applying that principle, the Supreme Court telegraphed to bankruptcy courts that they have the power to bar a dishonest debtor from converting his case from Chapter 7 to Chapter 13 despite the plain language of the statute.  Application of *Marrama* to the case at bar supports the undersigned judge's invocation of § 105 and the doctrine of judicial estoppel to prevent the Debtor, who failed to disclose his ownership of the Treatment and of Silverbird, from receiving any distribution of excess proceeds in the estate.

However, in *Law v. Siegel*, the Supreme Court held that the bankruptcy court could not utilize its equitable powers under § 105(a) to allow a Chapter 7 trustee to surcharge the debtor's exempt property because of the debtor's misconduct. 134 S. Ct. 1188, 1198 (2014).  In fact, the Supreme Court stated that: "*Marrama* most certainly did not endorse, even in dictum, the view that equitable considerations permit a bankruptcy court to contravene express provisions of the

---

[8] Even though the Trustee did not address the probability of success at the Supreme Court level, this Court may do so *sua sponte*, as it has an independent duty to assess the Proposed Settlement.  Indeed, in assessing a proposed compromise, "[t]he Court [cannot] simply accept the trustee's word that the settlement is reasonable, nor may he merely 'rubber-stamp' the trustee's proposal."  *In re Roqumore*, 393 B.R. at 480 (internal citations omitted).  Rather, "a judge in bankruptcy must make a well-informed decision."  *Matter of Cajun*, 119 F.3d at 356.  Included in the process at arriving at a well-informed decision is an analysis of any applicable Supreme Court opinions.

Code." *Id.* at 1197.  There is no question that § 726(a)(6) expressly states that after all allowed claims are paid in full, "any excess property of the estate shall be distributed . . . to the debtor." There is no language in § 726(a)(6) that expressly bars distribution of excess funds to a debtor if he has misbehaved in some respect (such as failing to disclose assets).     Under the "plain meaning" rule articulated by the Supreme Court in *U.S. v. Ron Pair Enters., Inc.*, 489 U.S. 235, 242 (1989), the Debtor here would receive all of the excess funds held by the Trustee.  Thus, application of *Siegel* and *Ron Pair* to the case at bar, contrary to the application of *Marrama*, do not support the undersigned judge's invocation of § 105 to prevent the Debtor from receiving any distribution of excess proceeds from the estate.

In sum, given Judge Lake's comments, the difficulty in reconciling the Fifth Circuit's language in *Jackson* with its language in *Kane*, and the difficulty in reconciling the Supreme Court's holdings in *Marrama* with its holdings in *Siegel* and *Ron Pair*, this Court finds that the probability of the Trustee ultimately prevailing on the Debtor's appeals of the First Order and the Second Order is less than fifty percent.  Stated differently, this Court finds that there is a greater probability of failure than success with respect to the Trustee ultimately prevailing on the issues of whether the Debtor can be barred from receiving all excess proceeds of the estate and whether some of the excess proceeds can be paid to the two charities.  Under these circumstances, the Court finds that this first factor weighs heavily in favor of approving the Proposed Settlement. *See In re Myers*, Case No. 11-61426, 2015 WL 5254954, at *11 (Bankr. N.D. Ohio Sept. 8, 2015) (court approved a trustee's proposed compromise where the probability of success on the merits was less than fifty percent).

2. The Complexity, Expense, and Likely Duration of Litigating the Claims

The Trustee testified at the Hearing that approval of the Proposed Settlement would result in the estate not having to involve itself in any further litigation—including not only the two appeals presenting pending before Judge Lake, but also the interpleader lawsuit that is presently pending in this Court.[9]   [Mar. 10, 2017 Tr. 20:2–13].   Moreover, approval of the Proposed Settlement would mean that the Trustee would have nothing else to do but to pay the administrative claims and file her final report so that this case may be closed. Thus, approval of the Proposed Settlement would certainly mean that the estate would incur no further expense, be involved in no further litigation, and be fully administered. Such circumstances accord with § 704(a)(1)'s language that the Trustee shall "collect and reduce to money the property of the estate for which such trustee serves, and close such estate as expeditiously as is compatible with the best interests of parties in interest." *In re Hutchinson*, 5 F.3d 750, 753–54 (4th Cir. 1993) ("[T]he duty to close the estate expeditiously is the trustee's 'main duty' and 'overriding responsibility.'") (internal citations omitted).

Additionally, at the status conference that Judge Lake held, he stated that if the parties did not settle, he was "looking at the specter of writing three long opinions . . . ." [Trustee's Ex. No. 18, p. 24, lns. 8–9]. Judge Lake's remarks are telling. It is no mean point that with respect to the Debtor's appeal of the First Order, the Debtor has designated nine issues in his "Statement of the Issues" filed pursuant to Rule 8009(a)(1)(A). [Doc. No. 155]. Not surprisingly, one of the issues is whether the undersigned judge erred in barring the Debtor from receiving any benefits

---

[9] The style of this interpleader is *New Line Productions, Inc. v. Tony DeRosa-Grund, Evergreen Media Holdings, LLC, Evergreen Media Group, LLC, Silverbird Media Group, LLC, and Eva S. Engelhart*, Adv. Proc. No. 16-03137. New Line filed this suit on June 14, 2016 in order to deposit the sum of $750,000.00 into the registry of the Court. [Adv. Proc. No. 16-03137, Adv. Doc. No. 1]. This sum represented what is referred to in the complaint initiating this interpleader as the "Sequel Payment." [*Id.* at p. 2 ¶ 1]. New Line has recently filed another motion in this adversary proceeding seeking approval to deposit additional funds into the registry of the Court. [Adv. Proc. No. 16-3137, Adv. Doc. No. 23]. If this Court approves the Proposed Settlement, then the Trustee will no longer need to be a defendant in this interpleader action.

from the Trustee's administration of the assets of the estate (i.e., whether the Debtor is entitled to receive any excess proceeds from sale of estate assets), but there are several other issues that the Debtor has designated that will require Judge Lake to spend substantial time analyzing and issuing rulings thereon. For example, the first issue that the Debtor has designated is whether the undersigned judge's finding that the Debtor intentionally failed to schedule the Treatment and Silverbird is erroneous. [*Id.*]. Another issue is whether the undersigned judge erred in barring the Debtor from amending his Schedule C to claim any type of exemption relating to any assets that he did not initially disclose on his original Schedule B. [*Id.*]. These issues, and the other issues designated by the Debtor, will definitely require substantial time for the parties to brief and for Judge Lake to analyze.[10] Moreover, some of the issues fall outside of the "garden variety" bankruptcy issues that are appealed—including, for example, whether the undersigned judge can bar the Debtor from ever receiving a distribution of excess proceeds. Stated differently, some of the issues are relatively complex.

Thus, not only would approval of the Proposed Settlement allow the Trustee to expeditiously finish fulfilling her duties so that this case may be closed, but it would also free up Judge Lake to handle other pressing matters pending in his court. Additionally, the Trustee does not have unlimited excess funds, and there is no question that if the appeals proceed to the Fifth Circuit—which they assuredly will if the Proposed Settlement is not approved—further substantial attorneys' fees will be incurred by the estate, and there is no guarantee that the estate will have sufficient funds to pay the Trustee's law firm in full under this scenario. After all, the

---

[10] In order for the reader to gain an appreciation of the amount of time that Judge Lake will have to spend on the appeal of the First Order, attached hereto as **Exhibit C** is a true and correct copy of the Statement of Issues that the Debtor filed with respect to this appeal. The nine issues that the Debtor has set forth are on pages two and three of **Exhibit C**.

Trustee does not have any more assets to administer that would generate large sums of money like the Treatment did in 2016.[11]

The above-referenced circumstances, taken together, weigh heavily in favor of approval of the Proposed Settlement. *See Depoister v. Mary M. Holloway Found.*, 36 F.3d 582, 587–88 (7th Cir. 1994) (discussing the bankruptcy court's analysis of the "complexity, expense, and likely duration of litigation" factor and holding that the bankruptcy court did not abuse its discretion in approving the proposed compromise by finding that this factor provided the "most compelling argument for approving the compromise").

### 3. The Difficulty of Collecting a Judgment Rendered From Such Litigation

Here, the Trustee is not attempting to collect a judgment against the Debtor. Rather, she is attempting to ensure that the First Order and the Second Order are affirmed—thus ensuring that the Debtor does not receive any of the $70,000.00 or, for that matter, any other excess funds in the estate. Thus, this third factor is inapplicable for the analysis of approving or denying the Proposed Settlement.

### 4. All Other Factors Bearing on the Wisdom of the Compromise

As noted above, this fourth category encompasses four separate factors. This Court now addresses each in turn.

    *a. The paramount interest of creditors with proper deference to their reasonable views*

At first blush, this factor appears to be inapplicable, as no creditors filed any responses to the Application. Indeed, no unsecured creditors have voiced any opinion—one way or the

---

[11] New Line has offered to pay the Trustee the sums of $9,000.00 and $10,000.00 for the estate's interest in Silverbird and EMG, respectively. [New Line Exs. I & J]. The sum of $19,000.00 is a *de minimis* amount compared to the $200,000.00 that New Line paid for the estate's interest in the Treatment, and the $19,000.00 will assuredly not go a long way in helping the Trustee pay her attorneys' fees if she finds herself dealing with the two appeals before the Fifth Circuit, and perhaps the Supreme Court thereafter.

other—because they have now all been paid in full. [*See* Doc. Nos. 232, 371, & 306, p. 5 ¶ 20]. Moreover, no administrative claimants have expressed their views because they know that they their claims will be paid in full due to the substantial amount of funds still held by the Trustee. [*See* Doc. No. 371]. Only New Line has filed a response, but New Line is not a creditor in this case, as it has not filed a proof of claim or any application seeking to establish an administrative claim.[12]

However, New Line is a party-in-interest, and case law is clear that in assessing whether to approve a proposed compromise, a bankruptcy court should consider not only the paramount interest of the creditors, but also "whether other parties in interest support the settlement." *In re Iridium Operating LLC*, 478 F.3d 452, 462 (2d Cir. 2007); *In re Sabine Oil & Gas Corp.*, 555 B.R. 180, 308 (Bankr. S.D.N.Y. 2016). Thus, the "paramount interest" factor does come into play in this case and this Court now considers New Line's position that the Proposed Settlement should be denied.

---

[12] From time to time, at hearings in this Court, New Line's counsel has stated that New Line is a creditor because it has a claim against the estate for reimbursement of its attorneys' fees associated with showing this Court the skullduggery that the Debtor has committed. [*See, e.g.*, Mar. 10, 2017 Tr. 29:24–30:7]. There is no doubt that New Line's efforts have exposed the Debtor's lies and deception to this Court. Indeed, it was New Line who opposed the Motion to Reopen this case; and while New Line did not prevail in convincing this Court to deny the Debtor's motion, it did introduce the testimony and exhibits at that hearing to convince this Court to invoke the doctrine of judicial estoppel and its § 105 powers to issue an order that the Debtor could not benefit from the Trustee's administration of any assets that the Debtor failed to disclose (i.e., the Treatment and Silverbird) and also could not amend his Schedule C to exempt any proceeds from the Trustee's administration of these assets. And, since this Court has reopened the case, New Line has introduced evidence further demonstrating that the Debtor continues to play fast and loose with the judicial process. Nevertheless, this Court fails to see at this time how New Line has a claim against the estate. It has never filed a proof of claim for any pre-petition amounts owed to it by the Debtor, nor has it filed any application seeking to establish an administrative claim. Indeed, there does not appear to be a statutory vehicle for New Line to obtain an administrative claim. Section 503(b)(3) provides an avenue for obtaining an administrative claim by making a "substantial contribution" to a case, but this section only applies to Chapter 9 cases and Chapter 11 cases, and only a "creditor" has standing to file such an application. *See In re Hackney*, 351 B.R. 179, 201 (Bankr. N.D. Ala. 2006) ("Congress knew how to create a 'substantial contribution' administrative expense for cases it believed were appropriate for that benefit. It did that in section 503(b)(3)(D) for Chapter 9 and Chapter 11 cases. It could have done the same in Chapter 7 cases. It did not."). The case at bar is a Chapter 7 case, and New Line is simply not a creditor; hence, although this Court believes that New Line has made a substantial contribution insofar as it has exposed the Debtor's pernicious and persistent perfidy throughout his case, the Court does not see how it can award an administrative claim to New Line. Therefore, this Court disagrees with New Line's position that it is a creditor in this case.

New Line's arguments opposing the Proposed Settlement have some merit—although not to the extent that New Line contends. First, it points out that it paid the Trustee the sum of $200,000.00 in exchange for the Trustee's conveyance to New Line of the estate's interest in the Treatment. Now, if this Court approves the Proposed Settlement, the Debtor will unquestionably own and be in control of EMG and Silverbird. Then, according to New Line, the Debtor will invariably take the position that these two entities, or one of them, own the Treatment, which, in turn, will lead the Debtor, on their behalf, to initiate one of more lawsuits against New Line seeking damages for its alleged misappropriation of the Treatment. Indeed, New Line emphasizes that the Debtor has, in recent months, taken the position that there is more than one version of the Treatment, and he is now contending that EMG owns a different version of the Treatment—thereby setting the stage for more lawsuits to be orchestrated by the Debtor. [*See* Mar. 10, 2017 Tr. 15:1–9, 53:20–54:21]. New Line rightfully suspects that it will find itself expending more time and attorneys' fees defending against these claims, thereby depriving New Line of the benefit of the bargain that it negotiated in 2016 with the Trustee when it paid $200,000.00 for the estate's interest in the Treatment. New Line's point is particularly well taken given that: (1) the Debtor emphatically testified in this Court in 2015 that he—and he alone—owned the Treatment prior to his bankruptcy filing, [New Line Ex. M, p. 50]; and (2) the Debtor filed numerous lawsuits in the United State District Court for the Southern District of Texas alleging that he personally owned the Treatment, [*id.* at p. 56]. Under these circumstances, New Line's assertion that this Court should not approve the Proposed Settlement—thus giving the Debtor the opportunity to use EMG and Silverbird as vehicles for filing more suits over the Treatment—is a reasonable position, and the Court finds merit to this argument.[13]

---

[13] The Court subsequently discusses herein its finding that the Debtor, not the Trustee, already owns EMG;

The Court finds less merit in New Line's second point. New Line asserts that as part of the New Line/Trustee Settlement, not only did New Line pay $200,000.00 for the estate's interest in the Treatment, it also paid for the Trustee's release, on behalf of the estate, of "any and all claims or causes of action the estate may possess against New Line." [Doc. No. 263, p. 1 ¶ 2]. New Line's position is that this release includes any claims that Silverbird and EMG might have against New Line. New Line contends that because the estate owns Silverbird and EMG, it follows that the Trustee owns any claims held by these entities and therefore had the power and authority to release these claims and, in fact, did so as part of the New Line/Trustee Settlement in 2016. So, New Line asserts that this Court should not approve the Proposed Settlement because to do so would give the Debtor the opportunity to use EMG and Silverbird as vehicles for filing claims over the Treatment when these claims—to the extent that they have ever existed—have already been released.[14]

The weakness in New Line's argument is that it is by no means clear that the Trustee released any claims held by Silverbird and EMG as part of the New Line/Trustee Settlement for which New Line paid $200,000.00 to the estate. This is so for two reasons.

First, case law suggests that the release actually given by the Trustee does not encompass any claims held by either Silverbird or EMG. It is black-letter law that settlements are construed according to state law, *In re Mahan*, 373 B.R. 177, 182 (Bankr. M.D. Fla. 2007); therefore, this Court applies Texas law. The Texas Supreme Court has held that "general categorical release clauses are narrowly construed." *Victoria Bank & Trust Co. v. Brady*, 811 S.W.2d 931, 938

---

therefore, to the extent that New Line is arguing that approval of the Proposed Settlement would effectively result in the Trustee conveying the estate's interest in EMG to the Debtor, New Line is incorrect. However, New Line is correct in asserting that approval of the Proposed Settlement would effectively result in the Trustee conveying the estate's interest in Silverbird to the Debtor, and this is why the Court finds merit to New Line's argument that the Debtor, once he regains his interest in Silverbird, will use Silverbird as a vehicle for suing New Line for allegedly misappropriating the Treatment.

[14] The Court wants to emphasize once again that it believes that no such claims exist. *See supra* note 5.

(Tex. 1991); *Duncan v. Cessna Aircraft Co.*, 665 S.W.2d 414, 422 (Tex. 1984); *McCullough v. Scarbrough, Medlin & Assocs., Inc.*, 435 S.W.3d 871, 885 (Tex. App.—Dallas 2014). The release that the Trustee gave to New Line, which is set forth solely in this Court's order of December 16, 2016 approving the New Line/Trustee Settlement, reads as follows: "Immediately and automatically upon receipt of the Settlement Payment [i.e., the $200,000.00], the Trustee, on behalf of the Debtor's estate, releases and discharges any and all claims or causes of actions the estate may possess against New Line." [Doc. No. 263, p. 1 ¶ 2].

There is no question that this language constitutes a general categorical release and therefore must be narrowly construed. A reasonable argument exists that a narrow construction of the Trustee's release precludes any claims not held by the estate directly—i.e., this release encompasses claims held by the Debtor himself as of the Petition Date, but not claims held by the corporations owned by the Debtor on the Petition Date. Granted, a plausible argument exists that because the Trustee owns the membership interests of any entities owned by the Debtor as of the Petition Date, she had the authority in 2016 to release any claims held by these entities. *See In re Am. Housing Found.*, 518 B.R. 386, 391 (Bankr. N.D. Tex. 2014) (holding that the release that was actually executed did not release the asserted claims because the release was not signed by the person who had the authority to do so). Nevertheless, the "narrow construction" rule is long established in Texas, and therefore it is quite possible that the Trustee's release of New Line did not encompass any claims held by Silverbird and EMG. This possibility undermines New Line's argument that approval of the Proposed Settlement would allow the Debtor, using Silverbird and/or EMG, to bring claims that the Trustee has already released.

There is a second point that calls into question the strength of New Line's argument. It is highly questionable that the Trustee had the power to release any claims of EMG for a very

simple reason: she did not own any interest in EMG when the Trustee's release became effective in December of 2016. Rather, the estate's interest in EMG revested in the Debtor when this Court initially closed this case on May 8, 2014. This is so because the initial trustee (David Askanase) never administered the estate's interest in EMG prior to the entry of the order closing the case, and therefore the Debtor automatically reacquired his interest in EMG by operation of law pursuant to § 554(c). The Court discusses this section in greater detail below. [*See infra* Part III.C.4.d].

In sum, New Line has one—but only one—meritorious argument that it will be harmed if this Court approves the Proposed Settlement; namely, that the approval will generate more lawsuits orchestrated by the Debtor. Because only New Line filed a response opposing the Proposed Settlement, and because it has at least one meritorious argument as to why this Court should not approve the Proposed Settlement, the Court finds that the "paramount interests" factor weighs against approval. While the Court finds that this factor disfavors approval, the Court does not give as much weight to this factor as the weight that the Court gives to the two factors already discussed above that favor approval of the Proposed Settlement. This is because, as discussed below, the Court believes that New Line will be able to prevail relatively quickly in any lawsuits filed by Silverbird and/or EMG (orchestrated by the Debtor) in the future. Stated differently, this Court believes that the ultimate harm to New Line from having to deal with frivolous suits from the Debtor in the future will probably be *de minimis*.

>    b. *The extent to which the proposed settlement is the product of arms-length negotiations*

Based upon the credible testimony that the Trustee gave at the hearing, this Court has no doubt that the Trustee, through her attorney, negotiated at arms-length with the Debtor, through his attorney. This factor therefore weighs in favor of approval of the Proposed Settlement. *In re*

*Charter Commc'ns*, 419 B.R. 221, 260 (Bankr. S.D.N.Y. 2009); *In re Enron Corp.*, Case No. 01-16034 (AJG), 2004 Bankr. LEXIS 2549, at *80 (Bankr. S.D.N.Y. July 15, 2004) (confirming plan and finding good faith requirement satisfied in part because plan resulted from "extensive arm's-length discussions").

> c.   *Whether the proposed settlement is with an insider*

There is no question that the Debtor is an "insider."   Therefore, because the Proposed Settlement is with an insider, this factor weighs against approval of the agreement.   *See In re HyLoft, Inc.*, 451 B.R. 104, 113 (Bankr. D. Nev. 2011) (denying the trustee's proposed settlement after reviewing several factors and noting that the "parties to the Proposed Settlement Agreement, excluding the Trustee, are insiders of the Debtor").

> d.   *Whether the proposed settlement promotes the integrity of the judicial system*

Whether the Proposed Settlement promotes the integrity of the judicial system requires more than passing discussion.   In one significant sense, it does.   By approving the Proposed Settlement, the Debtor will receive no excess funds held by the Trustee and, moreover, $70,000.00 that would normally be distributed to the Debtor under § 726(a)(6) will instead go to two charitable organizations.   This result substantially promotes the integrity of the judicial system because it demonstrates to all future debtors and their attorneys that any debtor who fails to disclose all of his assets can suffer material adverse consequences.   This is no mean point, as complete disclosure is a crucial requirement for the proper functioning of the bankruptcy system. *In re Coastal Plains, Inc.*, 179 F.3d 197, 207–08 (5th Cir. 1999) ("It goes without saying that the Bankruptcy Code and Rules impose upon bankruptcy debtors an express, affirmative duty to disclose all assets, including contingent and unliquidated claims. The duty of disclosure in a bankruptcy proceeding is a continuing one, and a debtor is required to disclose all potential

causes of action.") (internal quotation marks, emphasis, and citations omitted); *see United States v. Beard*, 913 F.2d 193, 197 (5th Cir. 1990) (explaining that debtors have a "duty to disclose to the court the existence of assets whose immediate status in the bankruptcy is uncertain, even if that asset is ultimately determined to be outside of the bankruptcy estate").

Conversely, by approving the Proposed Settlement, this Court will unquestionably be allowing the Debtor to regain all of his interest in an asset that he failed to disclose (i.e., Silverbird)—an outcome that, at first blush, is inconsistent with the First Order. This is so because the First Order sets forth that "the Debtor is barred from receiving any benefits, monetary or otherwise, from the Chapter 7 trustee's administration of the Treatment or any other asset that the Debtor did not disclose." [Doc. No. 123, p. 2]. However, if this Court approves the Proposed Settlement, it does not necessarily follow that the Debtor will receive any benefits in the future, monetary or otherwise, through regaining his ownership interest in Silverbird. This is so because after this Court issued the First Order requiring the Debtor to schedule undisclosed assets, he proceeded to schedule this interest in Silverbird, and he represented that the value of this interest is $0.00. He made this representation under oath, and case law is clear that he is bound by this representation. *Sovran Bank, N.A. v. Anderson*, 743 F.2d 223, 225 n.1 (4th Cir. 1984) ("Thus, the Schedules have not been corrected and are binding on [the Debtor]."); *In re Keen*, No. 13-71705, 2014 WL 6871867, at *6 n.6 (Bankr. W.D. Va. Dec. 3, 2014) ("This is troubling, in that it is well established that statements contained in the schedules of a bankruptcy debtor can constitute binding admissions of the factual matters set forth in such schedules, especially when they have not been amended.").

Hence, after regaining his interest in Silverbird, if the Debtor authorizes the filing of a lawsuit in Silverbird's name seeking damages for New Line's alleged misappropriation of the

29

Treatment, the Debtor will have to explain just exactly how he can reconcile stating under oath that Silverbird is worth nothing but nevertheless has a claim for damages for several hundred thousand dollars.[15] He might also have to explain why he asserted the Fifth Amendment when he represented in his amended Schedule B that Silverbird has no value. [New Line Ex. E, which is the Debtor's amended Schedule B filed on May 13, 2016 (Doc. No. 199)]. He will also have to explain how Silverbird is entitled to any damages for New Line's alleged use of the Treatment when he has already testified that he—and he alone—has always owned the Treatment. [*See* Dec. 1, 2015 Tr. 124:19–23, 153:14–154:3]. This, he will be unable to do as a matter of law, and the suit should be dismissed as a frivolous filing. Stated differently, the suit should be dismissed because the Debtor scheduled his interest in Silverbird to have no value and testified that he personally owned the Treatment, and he will be bound by what he has represented under oath in his schedules and in open court. *See, e.g., Cannon-Stokes v. Potter*, 453 F.3d 446, 449 (7th Cir. 2006) ("[A] debtor in bankruptcy is bound by her own representations, no matter why they were made . . . ."). *See also In re Miller*, 403 B.R. 804, 810 (Bankr. W.D. Mo. 2009) ("Statements and representations made by a debtor in his schedules have the force and effect of oaths under § 727(a)(4)."). Thus, the probability is very low that the Debtor will be able to benefit from reacquiring his ownership interest in Silverbird. Therefore, New Line's argument that approval of the Proposed Settlement will undermine the integrity of the Opinion and the First Order is not as compelling as New Line would have this Court believe.

New Line's argument regarding EMG is even weaker. This is so because unlike Silverbird, the Debtor did in fact originally schedule his ownership interest in EMG, and he

---

[15] The Court cannot predict how much in damages the Debtor will have Silverbird seek to recover from New Line. Whatever the amount, it will assuredly not be *de minimis*. Indeed, the Debtor would not be willing to give up his chance to receive the excess funds from the estate unless he believes that he can use Silverbird as a vehicle for suing New Line to recover substantially more money than the amount of excess funds presently in the estate.

valued his interest at $1,000.00. [Mar. 10, 2017 Tr. 22:7–16]. Hence, the initial trustee (David Askanase) and the Debtor's creditors were fully aware of EMG's existence.[16] The initial trustee did not, however, administer this asset, and it was therefore simply part of the estate at the time this case was initially closed on May 8, 2014. [*See* Doc. No. 90, which is the order closing the case]. Under these circumstances, the Debtor reacquired his interest in EMG on May 8, 2014 pursuant to § 554(c), which reads as follows: "Unless the court orders otherwise, any property scheduled under section 521(a)(1) of this title not otherwise administered at the time of the closing of a case is abandoned to the debtor and administered for purposes of section 350 of this title." Thus, as of May 8, 2014, the Debtor reacquired EMG by operation of law. Stated differently, the Debtor reacquired the estate's interest in EMG under the rule of irrevocable abandonment. *Kane*, 535 F.3d at 385 ("Property abandoned under [§] 554 reverts to the debtor, and the debtor's rights to the property are treated as if no bankruptcy petition was filed."); *In re Brio Refining Inc.*, 86 B.R. 487, 490 (N.D. Tex. 1988) ("[o]nce the abandonment is final, the abandonment is irrevocable . . . ."). Therefore, New Line's position that this Court's approval of the Proposed Settlement is harmful to New Line because it would allow the Debtor to regain his interest in EMG is incorrect. The Debtor already owns this asset. Thus, with respect to EMG, New Line's argument that approving the Proposed Settlement would undermine the judicial process by contradicting the Opinion and the First Order is simply wrong.[17]

---

[16] David Askanase was the initial trustee who administered the case between the Petition Date and the date that this Court initially closed the case. He retired prior to the date that this Court reopened the case, and Eva Engelhart was appointed the successor Trustee. However, upon her appointment, she assuredly reviewed the Debtor's schedules and became aware that he had initially disclosed his interest in EMG.

[17] At the Hearing, counsel for the Trustee informed the Court that the Debtor has told the Trustee that his position is that he verbally disclosed his interest in Silverbird to the initial trustee (i.e., David Askanase), [Mar. 10, 2017 Tr. 70:24–71:7], and that therefore, even though the Debtor did not disclose this interest in his schedules, his verbal disclosure to Mr. Askanase constitutes sufficient disclosure for purposes of abandonment. That is to say, the Debtor's position is apparently that because he made oral disclosure of Silverbird to the initial trustee, when this Court first closed the case on May 8, 2014, the Debtor's interest in Silverbird, just like the Debtor's interest in EMG,

New Line's argument would only have merit if it could overcome the general rule of irrevocable abandonment embodied in § 544(c). The Fifth Circuit has stated that "limited exceptions, allowing revocation [of the abandonment of the property in dispute], exist where the property was concealed or where the trustee lacks knowledge or sufficient means of knowledge, of its existence." *In re Killebrew*, 888 F.2d 1516, 1520 n.10 (5th Cir. 1989) (internal citations and quotations omitted). In the case at bar, the Debtor, despite representing that EMG had a value of $1,000.00 as of the Petition Date, is now taking the position that EMG obtained ownership of the Treatment prior to the Petition Date; and there is no doubt that the Debtor will orchestrate the filing of a suit by EMG and contend that the Treatment is worth hundreds of thousands of dollars—which makes his representation that EMG is worth $1,000.00 to essentially constitute a concealment of this entity's true value. Are these circumstances sufficient for this Court to invoke the exception to the general rule of irrevocable abandonment and hold that when it reopened the case in January of 2016, the abandonment of EMG's interest to the Debtor that occurred on May 8, 2014 was revoked—thereby reinstating the estate's

---

was abandoned to the Debtor. If the Debtor's position is meritorious, then New Line's argument that approval of the Proposed Settlement violates the Opinion and the First Order is incorrect.

However, the Debtor's position has no merit. First, § 554(c) sets forth that the only property that is abandoned is "property scheduled under section 521(a)(1) of this title," and § 521(a)(1) sets forth that "[t]he debtor shall—(1) file . . . a schedule of assets . . . ." Thus, the only property that could have been abandoned to the Debtor on May 8, 2014 in the case at bar are assets that he actually scheduled in his initial Schedule B. Because he did not schedule his interest in Silverbird on his initial Schedule B, this interest was not abandoned to him when this Court first closed this case on May 8, 2014. Case law also supports this conclusion. *Guay v. Burack*, 677 F.3d 10, 20 (1st Cir. 2012) ("[The debtor] argues that the fact that the claims were discussed during the August 2009 meeting with the bankruptcy Trustee and creditors is proof that he did not attempt to conceal the claims. However, even if we were to accept that he attempted to disclose the existence of the claims at this meeting (and, for reasons discussed below, we do not), oral disclosure does not meet the requirements of the bankruptcy code. In *Jeffrey v. Desmond*, 70 F.3d 183 (1st Cir. 1995), we explained the importance of formally scheduling claims and the insufficiency of oral notification."); *In re Summers*, 320 B.R. 630, 643 (Bankr. E.D. Mich. 2005) ("The Debtor apparently still believes that it is enough that he answered questions in the Rule 2004 examination. Aside from the fact that this does not comply with the certification on the schedules themselves, the Debtor's reply also does not satisfy due process. There are other parties in interest to a bankruptcy case other than the trustee. A verbal response to one-on-one questioning by a trustee during a Rule 2004 examination is not the same as service of amendments on all entities affected . . . .").

interest in EMG?  If they are, then New Line's argument that the Proposed Settlement should not be approved is a legally viable argument.[18]

 However, this Court concludes that the facts in the case at bar do not allow for this Court to invoke the exception to the rule of irrevocable abandonment.  This is so because of the Fifth Circuit's language in *Killebrew*:

> The notion of easily revocable abandonment is not in accord with case law on abandonment. *See, e.g.*, *In re Hunter*, 76 B.R. 117, 118 (Bankr. S.D. Ohio 1987) ("The general rule in this area is well settled-once a trustee abandons property, the abandonment is irrevocable."); *In re Enriquez*, 22 B.R. [934,] 935–36 [(Bankr. D. Neb. 1982)] (abandonment held irrevocable, even when property is subsequently found to have greater value than previously believed); *In re Sutton*, 10 B.R. 737, 739–40 (Bankr. E.D. Va. 1981); (abandonment irrevocable, irrespective of later discovery that property had greater value than originally realized).

*Id.* at 1520.  The Fifth Circuit has telegraphed that the exception to the general rule is very narrow and that even if the abandoned property is found to have greater value than previously believed, such circumstances still do not justify revoking the abandonment.  Thus, even if EMG's value is not the $1,000.00 value that the Debtor originally scheduled it to have but rather is valued at hundreds of thousands of dollars due to EMG's alleged ownership of the Treatment, nevertheless the estate's interest in EMG is not reinstated.  The Debtor reacquired his interest in EMG on May 8, 2014—when this case was initially closed—and he has owned this entity ever since.  Thus, New Line's argument that approval of the Proposed Settlement contradicts the Opinion and the First Order because the Debtor will reacquire EMG simply fails as a matter of

---

[18] The Court wants to emphasize once again that merely because EMG might sue New Line on the grounds that EMG allegedly owns the Treatment and has been damaged by New Line's alleged misappropriation of the Treatment does not mean that this Court believes that EMG will have a meritorious lawsuit.  Just the contrary: this Court believes that such a lawsuit would be frivolous, as the Debtor has already testified that he—and he alone—has always owned the Treatment. *See supra* note 1.  The Debtor's alleged discovery of a written document showing that he made a pre-petition assignment of the Treatment to EMG is of no avail.  Indeed, at the hearing on the Motion to Reopen, the Debtor expressly testified that he had not transferred the Treatment to any third party.  [Dec. 1, 2015 Tr. 52:11–21].

law. Therefore, with respect to EMG, approval of the Proposed Settlement does not undermine the judicial process, as New Line would have this Court believe.

Even if reopening the case on January 22, 2016 did result in revocable abandonment of EMG—i.e., even if the estate did reacquire the interest in EMG—New Line's argument that the Trustee's proposed abandonment to the Debtor of this interest deprives New Line of the benefit of its bargain in the New Line/Trustee Agreement still does not carry the day. New Line's argument is that if the Debtor reacquires EMG, he will then authorize EMG to sue New Line for damages on the grounds that EMG all along has owned the Treatment and has suffered damages through New Line's alleged misappropriation of the Treatment. Yet, assuming that the Debtor does take such action—and this Court shares New Line's belief that he will—New Line has such strong defenses that it should be able to both prevail and obtain sanctions, including attorneys' fees, against the Debtor and any attorney who represents EMG in filing and prosecuting such a suit.[19] This is so because of the doctrines of collateral estoppel and judicial estoppel.

The doctrine of collateral estoppel concerns issue preclusion and prevents a party from litigating an issue that has already been litigated. The requirements for issue preclusion, as recognized by the Fifth Circuit, are as follows: "(1) the parties must be identical; (2) the issue to be precluded must be identical to that involved in the prior action; (3) the issue must have been actually litigated; and (4) the determination of the issue in the prior action must have been necessary to the resulting judgment." *In re Keaty*, 397 F.3d 264, 270–71 (5th Cir. 2005).

When the Debtor sought to reopen this case in 2015, he took the position in his Motion to Reopen that he—and he alone—owned the Treatment as of the Petition Date, and had simply

---

[19] Indeed, in the last District Court lawsuit that the Debtor filed, in the order dismissing this suit, District Judge Alfred H. Bennett found that the Debtor's litigious conduct "might suggest an abuse of the judicial process" and warned that if such behavior continued, "sanctions would likely be appropriate." *DeRosa-Grund v. Time Warner Inc.*, No. 4:15-cv-02763, 2015 WL 12806619, at *2 (S.D. Tex. Dec. 22, 2015) (Bennett, J.).

inadvertently failed to disclose it in his initial schedules, [Dec. 1, 2015 Tr. 63:1–15, 124:19–23, 153:14–154:3]; and he based his request for this Court to reopen the case exclusively on the grounds that he owned the Treatment on the Petition Date and therefore it was property of the estate that the Trustee needed to administer, [Doc. No. 92, p. 2 ¶¶ 5–11]. New Line opposed the Motion to Reopen on the grounds that it, not the Debtor, owned the Treatment.[20] [Doc. No. 94, pp. 6–7 ¶ 25]. This Court held a hearing on the Motion to Reopen and the Debtor testified definitively that he owned the Treatment. [Dec. 1, 2015 Tr. 124:19–23, 153:14–154:3]. New Line adduced testimony from its witness to the effect that New Line owned the Treatment. [*See* Dec. 1, 2015 Tr. 170:1–173:18]. The Court thereafter gave its ruling through its issuance of the Opinion, and expressly found that the Debtor owned the Treatment and that therefore it was property of the estate, [Opinion (Doc. No. 122, pp. 41–43 of 72)]—which, in turn, led to this Court reopening the case so that the Trustee could administer the Treatment, [*id.* at p. 44 of 72]. And, the Trustee did so by selling the estate's interest in the Treatment to New Line in exchange for $200,000.00. [Doc. No. 263]. So, there is no doubt whatsoever that there is one—and only one—Treatment. The Debtor's position presently—namely, that EMG has actually owned the Treatment since February 9, 2009 because the Debtor conveyed it to EMG by executing an assignment to that effect—is untenable as a matter of law because of the doctrine of collateral estoppel: in 2015, the Debtor and New Line actually litigated the issue of who owned the Treatment during the hearing on the Debtor's Motion to Reopen; the issue of whether the Debtor owned the Treatment was necessary to this Court making its decision on whether to grant the Motion to Reopen; this Court found that the Debtor owned the Treatment as of the Petition Date, and therefore found that the Treatment was property of the estate and that the case needed to be

---

[20] New Line took the position that it had previously purchased the Treatment. [Opinion (Doc. No. 122, p. 40 of 72)]; [Dec. 2, 2015 Tr. 30:7–31:19].

reopened so that the Trustee could administer the Treatment; and the Debtor cannot now relitigate this issue in an effort to prove that EMG owns the Treatment.[21]

The Debtor's position that Silverbird and/or EMG own the Treatment is also untenable because of the doctrine of judicial estoppel. This doctrine prevents a party from asserting a position in a legal proceeding that is inconsistent with a position taken by that party in a previous proceeding. *In re Reed*, 650 F.3d 571, 573–74 (5th Cir. 2011). "In assessing whether judicial estoppel should apply, [courts] look to see whether the following elements are present: (1) the party against whom judicial estoppel is sought has asserted a legal position that is plainly inconsistent with a prior position; (2) a court accepted the prior position; (3) the party did not act inadvertently." *Id.* at 574. At the hearing in 2015 on the Motion to Reopen, the Debtor took the positon that he—and he alone—owned the Treatment as of the Petition Date, and in taking this position he argued that this Court should reopen his case so that he could schedule the Treatment in order for the Trustee to administer this asset. This Court, after holding an evidentiary hearing,

---

[21] The Court notes that while the party who will doubtless be suing New Line in the future—either EMG or Silverbird, or both—is not the same party as the Debtor himself, the doctrine of collateral estoppel will still apply. The Fifth Circuit has expressly held that there are instances where a party to the first suit (here, New Line) can use issue preclusion against a plaintiff who was not a party to the first suit (here, Silverbird and/or EMG). *Terrell v. DeConna*, 877 F.2d 1267, 1270 (5th Cir. 1989). Specifically, "federal courts will bind a nonparty whose interests were represented adequately by a party in the original suit." *Id.* The Fifth Circuit has found that adequate representation exists between a party and a non-party "where a party to the original suit is so closely aligned to the non-party's interests as to be his virtual representative." *Id.* (quoting *Aerojet-General Corp. v. Askew*, 511 F.2d 710, 719 (5th Cir. 1975)). Stated differently, "[l]iteral identity of the parties is not required as part of the res judicata and collateral estoppel analysis so long as the party against whom enforcement is sought was in privity with a party involved in the initial decision." *In re Pace*, 456 B.R. 253, 268 (Bankr. W.D. Tex. 2011). Here, there is no question that the Debtor and Silverbird, as well as the Debtor and EMG, have always been in privity with one another. Indeed, even during the pendency of this reopened case when the Trustee has owned the membership interest in Silverbird, the Debtor, on behalf of Silverbird (as well as EMG and Holdings), has instructed an attorney, David Lake, who represents these three entities, to file pleadings on behalf of Silverbird, EMG, and Holdings, many of which have opposed relief sought by the Trustee—including the Trustee's sale of the Treatment to New Line. [Mar. 31, 2017 Tr. 11:25–15:23, 57:19–59:1, 69:14–20, 92:4–8]. Moreover, the Debtor is the managing member of Silverbird, [Opinion (Doc. No. 122, p. 7 ¶ 8)], the managing member of EMG, [New Line Ex. Y], and the manager/executive chairman of Holdings, [Mar. 31, 2017 Tr. 54:22–24]; [Opinion, (Doc. No. 122, p. 6 ¶ 5)]. If these circumstances do not constitute privity, then nothing does. Thus, EMG and Silverbird, if and when they sue New Line in the future for New Line's alleged misappropriation of the Treatment, will be unable to escape New Line's defense of collateral estoppel.

accepted the Debtor's position and reopened the case because this Court expressly found that the Debtor owned the Treatment as of the Petition Date and that the Treatment needed to be administered. And, there is no question that the Debtor did not act inadvertently when he took this position. He was clear and unequivocal in both the Motion to Reopen[22] and in his testimony that he, and he alone, owned the Treatment:

> Q: You always believed that you owned [the Treatment] even at the time at that you filled out the Bankruptcy Schedules, right?
> A: *I would say yes, I didn't think about it, but I would say that I believed I've always owned it.*

[Dec. 1, 2015 Tr. 124:19–23] (emphasis added).

> Q: Okay. So you told us that, to summarize here, you never let go of ownership of "The Conjuring" rights is what you testified, and the Perron rights and the Warren rights were transferred to my client after you filed your Bankruptcy Schedules, right? Yes or no?
> A: If I can parse it out.
> Q: Yes or no?
> A: *I always owned "The Conjuring" treatment rights.* When you conflate "The Conjuring" rights to include everything, it can't include everything, because they're separate and discreet bundles of rights. You [i.e., New Line] got—never got the treatment,
> your client never got the treatment rights. They got the rights from the Perron family under the bankruptcy agreement, and they got the Warren's rights under the Option Quitclaim Agreement, and that's the correct statement.

[*Id.* at 153:14–154:3] (emphasis added).[23]

---

[22] On September 23, 2015, the Debtor's counsel filed the Motion to Reopen, and expressly set forth that the Debtor wanted this Court to reopen this case "so that he may amend his Schedule B to disclose an additional asset that is property of his estate. The additional asset is a copyright to a motion picture treatment that was written prior to his petition date . . . ." [Doc. No. 92, p. 2 of 3].

[23] The Debtor's testimony that he has always owned the Treatment is borne out by the documentation introduced by New Line into the record at the Hearing. Specifically, Exhibits Q, R, S, and U are all documents that, although not verbatim the same, are nevertheless so similar that that this Court finds that they each represent the very Treatment that this Court found was owned by the Debtor and that the Trustee proceeded to administer, culminating with her sale of this asset to New Line in 2016 for $200,000.00 pursuant to the New Line/Trustee Settlement. [Doc. No. 263]. The Debtor's position now that there are multiple treatments—and that EMG owns one of them—is legally untenable and, if the Debtor makes such an allegation subsequently (through use of EMG, Silverbird, or some other entity that he owns and controls), he will have initiated a frivolous lawsuit deserving of sanctions—as suggested by District Judge Bennett. *See supra* note 19.

Thus, after this Court approves the Proposed Settlement, if the Debtor uses EMG to sue New Line on the grounds that EMG owns the Treatment and that New Line has misappropriated the Treatment to EMG's detriment, New Line can rely upon not only the collateral estoppel doctrine but also the doctrine of judicial estoppel to prevail in this suit and, additionally, to obtain sanctions against the Debtor and his chosen attorney (including attorneys' fees).[24] New Line's chances of doing so are extremely good based upon the judicially-created law governing sanctions (including, for example, the Supreme Court's holding in *Chambers v. NASCO*, 501 U.S. 32 (1991), that federal courts have the inherent power to police the conduct of the litigants and attorneys who appear in court), Rule 9011, Federal Rule 11, and District Judge Bennett's admonishment that if the Debtor continues his litigious conduct, then "sanctions would likely be appropriate." *DeRosa-Grund*, 2015 WL 12806619, at *2.

Granted, if the Debtor takes this course of action, New Line will initially have to spend time and money defending against the suit, but given this Court's belief that New Line will easily prevail and also recover its attorneys' fees and costs, this Court finds that, on balance, approving the Proposed Settlement serves to promote judicial integrity because one of its terms is that the Debtor receives none of the excess funds held by the Trustee—and the overriding objective of this Court in issuing the Opinion, the First Order, and the Second Order has been to prevent the Debtor from recovering any excess cash from the estate.

---

[24] As with the doctrine of collateral estoppel, those in privity with a prior order are also barred by the doctrine of judicial estoppel in a subsequent action. *Feuerbacher v. Wells Fargo Bank*, No. 4:15-CV-59, 2016 WL 3669744, at *9 n.2 (E.D. Tex. July 11, 2016), *appeal docketed*, No. 16-41343 (5th Cir. Sept. 27, 2016). Indeed, some circuits, including the Fifth Circuit, "have held that privity, though often present in judicial estoppel cases, is not required." *Austin v. McNamara*, No. 6:05-CV-247, 2007 WL 5787498, at *3 (E.D. Tex. Mar. 30, 2007) (citations omitted); *In re Coastal Plains, Inc.*, 179 F.3d at 205 n.3. *See also Total Petroleum, Inc. v. Davis*, 822 F.2d 734, 737 n.6 (8th Cir. 1987) (judicial estoppel does not require reliance or prejudice because it seeks to protect the courts). Thus, EMG and Silverbird, if and when they sue New Line in the future for New Line's alleged misappropriation of the Treatment, will be unable to escape New Line's defense of judicial estoppel.

Finally, this Court addresses New Line's argument that the First Order and the Opinion imposed a permanent bar against any asset that the Debtor failed to initially disclose from being abandoned such that the Debtor is able to reacquire his interest in the asset.  In fact, the First Order reads as follows: "None of the assets that the Debtor failed to initially disclose (but which he is now required to disclose in his amended Schedule B) may be abandoned *without an order from this Court*."  [Doc. No. 123, p. 3] (emphasis added).  This language shows that this Court left open the door that initially undisclosed assets could be abandoned but only if this Court signed an order approving such abandonment.  Here, the Trustee has come to this Court and requested as part of the Proposed Settlement that this Court approve abandonment of the estate's interest in Silverbird—which is the one asset remaining in the estate that the Debtor failed to initially disclose.  By approving the Proposed Settlement, this Court is not contradicting the First Order or, stated differently, undermining the integrity of the judicial system.  The First Order's language expressly leaves open the possibility that abandonment of any undisclosed asset—such as Silverbird—could take place.  Here, the Court is willing to approve the Trustee's abandonment of Silverbird—thereby allowing the Debtor to regain his interest in this entity— because in giving such approval, the Debtor is giving up any claim he has to excess proceeds held by the Trustee; and one overriding objective of this Court in issuing the Opinion, the First Order, and the Second Order was to prevent the Debtor from obtaining any excess proceeds held by the estate.

## IV. Conclusion

Pursuant to the case law that governs the evaluation of a proposed compromise, this Court has analyzed seven factors.  One of the factors—the difficulties of collecting a judgment— is inapplicable in this case.  Another factor—the paramount interest of creditors and

parties-in-interest with proper deference to their reasonable views—weighs against approval. A third factor—whether the proposed settlement is with an insider—also weighs against approval. The other four factors weigh in favor of approval. An analysis of three of these factors reflects that: (1) the Trustee negotiated with the Debtor at arm's length; (2) that there is more than a fifty percent probability that the Trustee will ultimately lose on the issue of whether the Debtor can be completely barred from receiving excess proceeds; and (3) if the appeals go forward, they will involve certain issues that are complex, will require extensive briefing that will substantially increase attorneys' fees, and will require an abundance of time and effort from Judge Lake to issue rulings. Finally, an analysis of the last factor—whether the Proposed Settlement promotes the integrity of the judicial system—weighs in favor of approval because under the terms of the Proposed Settlement, the Debtor will receive none of the excess proceeds. This is a result that, more than any other aspect of this dispute, achieves justice because it prevents the Debtor—who has repeatedly lied under oath and cheated the bankruptcy system—from receiving an immediate and substantial distribution of cash. All in all, four factors favor approval of the Proposed Settlement; two factors weigh against approval; and one factor is inapplicable. Of all of these factors, the Court places particularly significant weight on the last factor (promoting the integrity of the judicial system) and the "probability of ultimate success" factor—both of which weigh in favor of approving the Proposed Settlement. *See In re Adelphia Commc'ns. Corp.*, 327 B.R. at 160–65 (giving certain factors "some weight," "no weight," or "moderate weight").

Accordingly, keeping in mind that the Trustee's burden is not high in establishing that the balance of factors supports a finding that the Proposed Settlement is fair and equitable, *In re Roqumore*, 393 B.R. at 480, and also keeping in mind that this Court has discretion to give different weight to each of the factors, *In re Adelphia Commc'ns. Corp.*, 327 B.R. at 160–65, the

Court finds that the Trustee has met her burden of establishing that the balance of the factors weighs in favor of approving the Proposed Settlement.

This Court is acutely aware of New Line's argument that by approving the Proposed Settlement, the Debtor gains unquestionable and complete control of Silverbird, and that given the sordid history of his playing fast and loose with the truth and his willingness to sue New Line anywhere at any time, approval of the Proposed Settlement will generate more litigation between the Debtor and New Line. The Court acknowledges that its decision will give the Debtor—to use the words of New Line's own counsel—"more arrows in his quiver." [Mar. 10, 2017 Tr. 89:17]. However, as discussed herein, approval only gives the Debtor one more arrow in his quiver, as he already owns EMG and will only be regaining his interest in Silverbird as a result of this Court's approval of the Proposed Settlement. Moreover, if the Debtor, using these two entities, orchestrates more litigation against New Line, this Court believes that the probability of New Line quickly obtaining dismissals of these lawsuits, as well as obtaining sanctions against the Debtors and his surrogates (including attorneys' fees), is high. Thus, while approval of the Proposed Settlement does not insulate New Line from further attacks by the Debtor, any future attacks that he orchestrates will, as a matter of law, have no basis and should not tie up New Line in expensive and protracted litigation. To the extent that New Line is tied up in some litigation, this Court is willing to tolerate such a result in exchange for ensuring that the Debtor does not receive one red cent of the excess proceeds presently held by the Trustee.

In closing, this Court notes that in *Matter of Aweco*, the Fifth Circuit stated that:

> The decision of whether to approve a particular compromise lies within the discretion of the trial judge; an appellate court will reverse only when that discretion has been abused. The exercise of judicial discretion always carries with it responsibility. The term "discretion" denotes the absence of a hard and fast rule. *When invoked as a guide to judicial action, it means a sound discretion, that is to say, a*

*discretion exercised not arbitrarily or [willfully], but with regard to
what is right and equitable under the circumstances and the law, and
directed by the reason and conscience of the judge to a just result.*

725 F.2d at 297–98 (emphasis added) (internal citations and quotations omitted).

Ultimately, this Court believes that "what is right and equitable under the circumstances

and law" in the case at bar is for the Debtor to receive none of the excess proceeds associated

with this case. The Court holds this belief because the Debtor has abused the judicial system

and, as discussed in the Opinion, because the Debtor may have committed crimes under 18

U.S.C. that could be worthy of prosecution. Preventing him from receiving any of the excess

funds by approving the Proposed Settlement is the most "fair and equitable" result in this Court's

view.

An order granting the Application will be entered on the docket simultaneously herewith.


Signed on this 19th day of May, 2017.

Jeff Bohm
United States Bankruptcy Judge

# EXHIBIT G

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | | |
|---|---|---|
| EVERGREEN MEDIA HOLDINGS, LLC and TONY DEROSA-GRUND | § § § | |
| Plaintiffs, | § § | |
| v. | § § | CIVIL ACTION NO. 4:14-CV-00793 ("Senior Case") |
| WARNER BROS. ENTERTAINMENT, INC. and NEW LINE PRODUCTIONS, INC. | § § § § | |
| Defendants. | § | |

*Consolidated with*

| | | |
|---|---|---|
| EVERGREEN MEDIA HOLDINGS, LLC, TONY DEROSA-GRUND, and GERALD D. BRITTLE, | § § § § | |
| Plaintiffs, | § § | |
| v. | § § | CIVIL ACTION NO. 4:14-CV-01117 ("Junior Case") |
| LORRAINE WARREN, TONY SPERA, GRAYMALKIN MEDIA, LLC, NEW LINE PRODUCTIONS, INC., and WARNER BROS. ENTERTAINMENT, INC., | § § § § § | |
| Defendants. | § | |

**DEFENDANTS NEW LINE PRODUCTIONS, INC. AND WARNER BROS.
ENTERTAINMENT INC.'S**

**(1) MOTION TO STAY OR DISMISS ALL OF PLAINTIFFS
EVERGREEN MEDIA HOLDINGS, LLC AND TONY DEROSA-
GRUND'S CLAIMS IN FAVOR OF ONGOING ARBITRATION OR TO
TRANSFER VENUE; OR, ALTERNATIVELY, MOTION TO DISMISS
PLAINTIFFS EVERGREEN MEDIA HOLDINGS, LLC AND TONY
DEROSA-GRUND'S CLAIMS AGAINST NEW LINE PURSUANT TO
FEDERAL RULE OF CIVIL PROCEDURE 12(B)(6); AND**

**(2) MOTION TO DISMISS PLAINTIFF GERALD D. BRITTLE'S CLAIMS
PURSUANT TO FEDERAL RULE OF CIVIL PROCEDURE 12(B)(6)**

**TABLE OF CONTENTS**

Page

NATURE AND STAGE OF THE PROCEEDING.......................................................1

SUMMARY OF THE ARGUMENT ...........................................................................2

STATEMENT OF ISSUES .........................................................................................4

STATEMENT OF FACTS ..........................................................................................5

ARGUMENT ..............................................................................................................7

I.      ALL OF DeROSA-GRUND'S CLAIMS SHOULD BE STAYED OR
        DISMISSED IN FAVOR OF ARBITRATION, OR IN THE ALTERNATIVE,
        DeROSA-GRUND'S CLAIMS AGAINST NEW LINE SHOULD BE
        TRANSFERRED TO THE CENTRAL DISTRICT OF CALIFORNIA ...........................7

II.     PLAINTIFFS' COPYRIGHT INFRINGEMENT CLAIMS FAIL AS A MATTER
        OF LAW ..................................................................................................10

        A.      Standard of Review.....................................................................10

        B.      DeRosa-Grund Does Not Own A Copyright In The Demonologist.....................12

        C.      Plaintiffs Fail To Allege, And Cannot Allege, Substantial Similarity of
                Protected Elements Between The Works.................................................13

        D.      The Works At Issue ......................................................................14

                1.      The Warrens' "Annabelle" And "Enfield Poltergeist"
                        Investigations ....................................................................14
                2.      The Demonologist: Chapter III "Annabelle".............................15
                3.      New Line's Unreleased Motion Picture Production "Annabelle" ..............16
                4.      The Demonologist: Chapter XIV "The Enfield Voices" ..........................17
                5.      New Line's Unreleased Motion Picture Production "The Conjuring
                        2".................................................................................18

        E.      There Is No Actionable Similarity Between The Works ...........................19

III.    PLAINTIFFS' STATE LAW CLAIMS AGAINST NEW LINE ARE
        PREEMPTED ..........................................................................................22

IV.     THE DEPENDENT CLAIMS AGAINST NEW LINE FALL WITH THE
        CLAIMS DISCUSSED ABOVE...................................................................24

CONCLUSION.........................................................................................24

# TABLE OF AUTHORITIES

**Page(s)**

**FEDERAL CASES**

*Am. Exp. Co. v. Italian Colors Restaurant,*
    133 S.Ct. 2304 (2013) ..................................................................................................9

*Ambraco, Inc. v. Bossclip B.V.,*
    570 F.3d 233 (5th Cir. 2009) .......................................................................................9

*Architecture, LLC v. Simone Development Corp.,*
    602 F.3d 57 (2d Cir. 2010) .........................................................................................11

*Bell Atlantic Corp. v. Twombly,*
    127 S.Ct. 1955 (2007) ...........................................................................................10, 14

*Benay v. Warner Bros. Entmt.,*
    607 F.3d 620 (9th Cir. 2010) .....................................................................................20

*Campbell v. Walt Disney Co.,*
    718 F.Supp.2d 1108 (N.D. Cal. 2010) ......................................................................11

*Capcom Co., Ltd. v. MKR Group, Inc.,*
    2008 WL 4661479 (N.D. Cal. 2008) .........................................................................11

*Christianson v. West Publishing Co.,*
    149 F. 2d 202 (9th Cir. 1945) ....................................................................................10

*Cole v. Fed. Home Loan. Mortg. Group,*
    No. 3:11-cv-1833, 2012 WL 555194 (N.D. Tex. Jan. 23, 2012) ..............................24

*Compliance Review Services, Inc. v. Davis-Osuawu,*
    No. H-04-3635, 2006 WL 3541715 (S.D. Tex. 2006) ..........................................22, 23

*Daboub v. Gibbons,*
    42 F.3d 285 (5th Cir. 1995) .......................................................................................22

*Elsensohn v. St. Tammarny Parish Sheriff's Office,*
    530 F.3d 368 (5th Cir. 2008) .....................................................................................10

*Feist Publ'ns, Inc. v. Rural Tel. Serv. Co.,*
    499 U.S. 340 (1991) .........................................................................................11, 19, 20

*Funky Films, Inc. v. Time Warner Entm't Co.,*
    462 F.3d 1072 (9th Cir. 2006) ...................................................................................11

*Gemcraft Homes, Inc. v. Sumurdy*,
    688 F. Supp. 289 (E.D. Tex. 1988)..................................................................22, 23

*Houts v. Universal City Studios, Inc.*,
    603 F. Supp. 26 (C.D. Cal. 1984) ............................................................15, 16, 21

*Iqbal*,
    556 U.S. at 678.......................................................................................................14

*Midwest Mech. Contractors Inc. v. Commonwealth Constr. Co.*,
    801 F.2d 748 (5th Cir. 1986) ..................................................................................9

*Miller v. Universal City Studios, Inc.*,
    650 F.2d 1365 (5th Cir. 1981) ..............................................................................19

*Narell v. Freeman*,
    872 F.2d 907 (9th Cir. 1989) ..........................................................................20, 21

*Nelson v. PRN Prods.*,
    873 F.2d 1141 (8th Cir. 1989) ..............................................................................11

*Novak v. Warner Bros. Pictures, LLC*,
    387 Fed. Appx. 747 (9th Cir. 2010).......................................................................20

*Oliver v. Saint Germain Foundation*,
    41 F. Supp. 296 (S.D. Cal. 1941)....................................................................15, 21

*Peel & Co. v. The Rug Market*,
    238 F.3d 391 (5th Cir. 2001) ..........................................................................11, 12

*Positive Black Talk, Inc. v. Cash Money Records, Inc.*,
    394 F.3d 357 (5th Cir. 2004) ................................................................................11

*Randolph v. Dimension Films*,
    630 F.Supp.2d 741 (S.D. Tex. 2009) ("*Randolph I*").................................10, 11, 12, 13, 21

*Randolph v. Dimension Films*,
    634 F. Supp. 2d 779 (S.D. Tex. 2009) ("*Randolph II*")........................................10

*Rucker v. Harlequin Ent., Ltd.*,
    2013 WL 707922 (S.D. Tex. 2013) ("*Harlequin*")..............................10, 11, 12, 13

*Sybersound Records v. UAV*,
    517 F. 3d 1137 (9th Cir. 2008) .............................................................................13

*Tabachnik v. Dorsey*,
    257 Fed. Appx. 409 (2d Cir. 2007).......................................................................12

*Taylor v. IBM*,
    54 Fed. Appx. 794, 2002 WL 31845220 (5th Cir. 2002)........................................................12

*Turner v. Pavlicek*,
    No. H-10-00749, 2011 WL 4458757 (S.D. Tex. Sept. 22, 2011)............................................24

**FEDERAL STATUTES**

17 U.S.C. § 106(2) ........................................................................................................................23

17 U.S.C. § 501(a) ........................................................................................................................12

28 U.S.C. § 1404(a) ...............................................................................................................4, 5, 7, 9

FAA........................................................................................................................................4, 7, 8, 9

§ 3 of the Federal Arbitration Act ("FAA")..................................................................2, 4, 8, 9

**RULES**

Fed. R. Civ. P. 8(a) .....................................................................................................................10

Fed. R. Civ. P. 8(a)(2) ................................................................................................................10

Fed. R. Civ. P. 12(b)(6)...............................................................................................1, 10, 12, 24

**OTHER AUTHORITIES**

1 *Nimmer*, § 1.01(B)(1)................................................................................................................23

1 *Nimmer*, § 2.11..................................................................................................................15, 21

## NATURE AND STAGE OF THE PROCEEDING

Plaintiffs Evergreen Media Holdings, LLC and Tony DeRosa-Grund (collectively, "DeRosa-Grund") and Plaintiff Gerald D. Brittle (collectively with DeRosa-Grund, "Plaintiffs") spuriously allege that Defendants New Line Productions, Inc. and Warner Bros. Entertainment, Inc. (collectively, "New Line") have based its unreleased motion picture productions currently entitled "Annabelle" and "The Conjuring 2" on a book entitled *The Demonologist: The Extraordinary Career of Ed and Lorraine Warren* ("*The Demonologist*" or the "Book"), in order to avoid paying DeRosa-Grund a "rights payment" for the motion picture "Annabelle" under agreements previously entered into between the parties. Further, without alleging a single similarity between the works, Plaintiffs claim that New Line's motion pictures infringe on Brittle's copyright in *The Demonologist* and on DeRosa-Grund's purported right to exploit *The Demonologist* (the "Demonologist Option"). Because there is no basis in law or fact for any of Plaintiffs' claims, and because DeRosa-Grund's claims in this action are not properly before this court in any event, all of Plaintiffs' claims against New Line should be dismissed.

New Line brings this motion to stay or dismiss in favor of a currently pending arbitration in California, or in the alternative to transfer venue, as to all of the claims brought by DeRosa-Grund in this action: Counts I, II, III, IV, and XIII. Alternatively, New Line moves to dismiss all of DeRosa-Grund's claims against it in this action pursuant to Fed. R. Civ. P. 12(b)(6): Counts II, III, XII, and XIII. New Line further moves to dismiss all of Brittle's claims against it in this action pursuant to Fed. R. Civ. P. 12(b)(6): Counts X, XI, XII, and XIII.

Because New Line's motion pictures have not been released, and disclosing details about their content could fatally harm the market for these works, New Line has filed a Motion for Limited Protective Order (Dkt. 33), concurrently herewith, seeking to file synopses of the unreleased motion pictures under seal, and to lodge a copy of the motion picture "Annabelle"

1

and a script for "The Conjuring 2," which is still in development, with the Court for *in camera* review. Pending the Court's decision on New Line's Motion for Limited Protective Order (Dkt. 33), New Line has only included a minimal comparison between the works in this Motion, in order to protect the details of these unreleased motion pictures. New Line respectfully requests that it be allowed to file a supplemental brief with a more detailed comparison of the works after the Court rules on its Motion for Limited Protective Order.

## SUMMARY OF THE ARGUMENT

This action involves two sets of claims against New Line. One set arises from and relates to contracts among DeRosa-Grund and New Line. The other consists of facially meritless copyright infringement claims. All of the claims should be stayed or dismissed for the following reasons:

*First*, all of <u>DeRosa-Grund's</u> claims in this action (Counts I, II, III, IV, and XIII) are subject to binding arbitration, as they arise from rights he purportedly acquired under the Demonologist Option and the Warren Agreements.[1] The issue of who, in fact, owns the rights under the Demonologist Option and the Warren Agreements – New Line maintains it owns these rights – is currently being litigated in an ongoing arbitration between the parties in Los Angeles, California, which is being conducted subject to binding arbitration provisions in agreements entered into between New Line and DeRosa-Grund. As a result, pursuant to Section 3 of the

---

[1] As discussed in greater detail below, the "Demonologist Option" refers to rights DeRosa-Grund purportedly acquired from Brittle to exploit *The Demonologist.* However, DeRosa-Grund admits in the Complaint that these rights are only exercisable if Ms. Warren, the co-owner of the copyright in *The Demonologist*, grants DeRosa-Grund the same rights. Compl. ¶ 72. The "Warren Agreements" refers to a series of agreements entered into by a third party and DeRosa-Grund that purport to transfer rights in certain property related to the Warrens' paranormal investigations. The validity of the Warren Agreements is disputed, however, regardless of this dispute, any rights that actually existed under the Warren Agreements were expressly transferred to New Line under an agreement between New Line and DeRosa-Grund. Ex. 4, Quitclaim Agreement ¶ 1A(c)(i)(4)-(10)).

Federal Arbitration Act ("FAA"), these claims should be stayed or dismissed. Alternatively, DeRosa-Grund's claims should be transferred to the Central District of California, based on valid forum selection clauses in the parties' agreements.

*Second,* DeRosa-Grund's claim for copyright infringement against New Line (Count III) fails because DeRosa-Grund's allegations reveal that he has a mere option from only one of the two copyright owners of the Book, namely Brittle. Such an option is at most only a contract right to acquire a copyright ownership interest, according to the conditions of the agreement. It is not ownership of the copyright. Adding to its speculative nature, DeRosa-Grund cannot even exercise the option without the consent of Defendant Lorraine Warren, the other owner in *The Demonologist's* copyright. Based on this, DeRosa-Grund necessarily admits that he does not own a copyright interest in *The Demonologist*. But even if he were able to exercise his option with Ms. Warren's consent, it would give him, at most, a non-exclusive license from Brittle because that is all a co-owner of copyright can grant. The United States Copyright Act explicitly provides that a non-exclusive license is not a form of copyright ownership. As a result, DeRosa-Grund has no standing to bring any claim for copyright infringement. Accordingly, this claim fails as a matter of law.

*Third*, Plaintiffs' claims based on copyright infringement against New Line (Counts III and XI) fail because any similarities between the works relate to historical *facts*, and facts are not copyrightable. Though it deals with the supernatural, *The Demonologist* is presented entirely as a work of non-fiction, a factual account of the work of the Warrens. Plaintiffs are estopped to assert otherwise. Accordingly, because Brittle cannot own a copyright in the facts and events set forth in his book, he cannot base a copyright claim upon those facts. When the historical facts

are filtered out, there are no actionable similarities between New Line's motion pictures and the non-fiction Book. As a result, Plaintiffs' copyright infringement claims fail as a matter of law.

*Fourth*, the claims for tortious interference with contract against New Line (Counts II and X) are preempted by Plaintiffs' copyright infringement claims, and thus must be dismissed.

*Finally*, Plaintiffs' claims for declaratory judgment and civil conspiracy (Counts XII and XIII), to the extent they are derivative of the meritless claims discussed above, must be dismissed.

## STATEMENT OF ISSUES

1.      Whether all of DeRosa-Grund's claims (Counts I, II, III, IV, and XIII) should be stayed or dismissed pursuant to Section 3 of the FAA, or in the alternative, whether these claims should be transferred to the Central District of California pursuant to 28 U.S.C. § 1404(a) and the forum selection clauses in the agreements;

2.      Whether DeRosa-Grund's claim for copyright infringement (Count III) should be dismissed because he is not an owner of the relevant exclusive right in the Book's copyright and thus does not have standing to bring a copyright claim;

3.      Whether all of Plaintiffs' claims for copyright infringement (Counts III and XI) should be dismissed because, as a matter of law, there is no actionable similarity between the works;

4.      Whether Plaintiffs' state law claims (Counts II and X) against New Line are preempted by the United States Copyright Act; and

5.      Whether Plaintiffs' claims for declaratory judgment and civil conspiracy (Counts XII and XIII), to the extent they are dependent on the claims that fail, also fail as a matter of law.

## STATEMENT OF FACTS[2]

**The Works:**  There are three works at issue in this case: *The Demonologist* book, New Line's unreleased motion picture "Annabelle," and New Line's motion picture project "The Conjuring 2."

*The Demonologist* details several of Ed and Lorraine Warren's paranormal investigations. Ex. 1, *The Demonologist*.  The Warrens are real people and the book is presented as a work of non-fiction.  *Id.*, Author's Preface, p. ix.  Ms. Warren and Mr. Brittle co-own the copyright for the Book.  Request for Judicial Notice, Ex. 1, Declaration of William J. Stowe ("Stowe Decl."), Ex. G (federal copyright registration); *see also* Ex. 1, *The Demonologist* (the first page lists Ms. Warren and Brittle as copyright owners).  The Book contains a chapter entitled "Annabelle" discussing the Warrens' investigation of a possessed Raggedy Ann doll, and a chapter entitled "The Enfield Voices" discussing the Warrens' investigation of a haunted house in Enfield, England.  Ex. 1, *The Demonologist*.  Large portions of both chapters appear to be transcripts of tape recorded conversations.  *Id.*, pp. 40-50, 210-18.

New Line's unreleased "Annabelle" movie, though inspired by the real doll from the Warrens' paranormal investigation, features a fictitious couple who come to own the doll and relates events not found in or based on the Book.  Ex. 3, Declaration of Craig Alexander ("Alexander Decl."), ¶ 2, Ex. A.  New Line has completed principal photography of "Annabelle."  *Id.* ¶ 2.  It is set to be released in October 2014.  *Id.*

New Line is developing a motion picture project currently entitled "The Conjuring 2." *Id.* ¶ 3.  "The Conjuring 2" is still in the screenplay stage and dramatizes the well-publicized

---

[2] The arbitration clauses in the agreements between New Line and DeRosa-Grund, as well as facts related to the pending arbitration, were set forth in New Line's Motion to Dismiss or Stay in Favor of Ongoing Arbitration in the Senior Action (Dkt. 8, pp. 3-8).  New Line hereby refers to and incorporates those factual references herein.

Enfield Poltergeist haunting in Enfield, England during the late 1970s. *Id.*, Ex. B; Request for Judicial Notice, Stowe Decl., Exs. A-C.

The contents of the three works are summarized in more detail in § II.D.*, infra*.

**The Contracts:** There are three main contracts relevant to this motion to dismiss: Two agreements between New Line and DeRosa-Grund, and a purported option agreement between DeRosa-Grund and Brittle.

New Line and DeRosa-Grund entered into two agreements related to "The Conjuring" property in 2009: the Quitclaim Agreement, and Amendment thereto ("Quitclaim Agreement") and the Producer Loanout Agreement ("Producer Agreement") (collectively, the "Agreements"). The Agreements provide for binding arbitration over any disputes that "aris[e] out of or relate[] to [the] Agreement[s] or the interpretation, performance or breach thereof . . . ." Ex. 4, Quitclaim Agreement ¶ 21; Ex. 5, Producer Agreement ¶ 25.

Plaintiffs' Complaint alleges that DeRosa-Grund and Brittle entered into an agreement under which Brittle granted DeRosa-Grund an option to acquire Brittle's rights in *The Demonologist*, which he refers to as the Demonologist Option. Compl. ¶ 72. DeRosa-Grund admits, however, that his rights "are exercisable if and only if [DeRosa-Grund] secures corresponding rights from Mrs. Warren." *Id.* DeRosa-Grund does not (and cannot) allege that he secured such rights from Ms. Warren. *See* Compl. Tellingly, DeRosa-Grund fails to even attach a copy of the purported Demonologist Option to his Complaint. *See* Compl.

## ARGUMENT

I.    **ALL OF DeROSA-GRUND'S CLAIMS SHOULD BE STAYED OR DISMISSED IN FAVOR OF ARBITRATION, OR IN THE ALTERNATIVE, DeROSA-GRUND'S CLAIMS AGAINST NEW LINE SHOULD BE TRANSFERRED TO THE CENTRAL DISTRICT OF CALIFORNIA**[3]

Aside from the numerous legal defects with DeRosa-Grund's claims (discussed *infra*), **all** of DeRosa-Grund's claims in this action (Counts I, II, III, IV, and XIII) rely on his assertion that he owns the Warren Agreements and the Demonologist Option. Put another way, if DeRosa-Grund does not own the Warren Agreements and the Demonologist Option, he lacks standing to bring any of his current claims.

As more fully briefed in Defendants Warner Bros. Entertainment Inc. and New Line Productions, Inc.'s Motion to Dismiss or Stay in Favor of Ongoing Arbitration; or in the Alternative to Transfer Venue (Dkt. 8), New Line and DeRosa-Grund entered into two agreements related to "The Conjuring" property in 2009: the Quitclaim Agreement and the Producer Agreement. The Agreements provide for binding arbitration over any disputes that "aris[e] out of or relate[] to [the] Agreement[s] or the interpretation, performance or breach thereof . . . ." Ex. 4, Quitclaim Agreement ¶ 21; Ex. 5, Producer Agreement ¶ 25. Under the Agreements, <u>any</u> rights relating to the "Property" that DeRosa-Grund acquires *before* or *after* the Agreements are entered into are the property of New Line. Ex. 4, Quitclaim Agreement, ¶ 1A(d); Ex. 5, Producer Agreement, ¶ 9(a). The Property is broadly defined as the entire case file library (approximately 8,000 case files) related to the Warrens' paranormal investigations, the life stories of the Warrens, any prior scripts related to the project, and all rights under any agreement previously entered into between DeRosa-Grund and any other entity in his prior

---

[3] The standards for review to stay or dismiss claims under the FAA, and to transfer venue under 28 U.S.C. § 1404(a), were set forth in New Line's Motion to Dismiss or Stay in Favor of Ongoing Arbitration in the Senior Action (Dkt. 8, pp. 12-15). New Line hereby incorporates those standards here.

attempts to make a movie based on the Warrens' lives or case files. Ex. 4, Quitclaim Agreement ¶ 1A. The Quitclaim Agreement also lists the Warren Agreements as part of the Property that DeRosa-Grund explicitly quitclaimed to New Line. *Id.* ¶ 1A(c)(i)(4)-(10).

Based on the clear language in the Agreements, New Line is asserting in the Arbitration that it – and not DeRosa-Grund – owns the Demonologist Option and the Warren Agreements. Ex. 2, Declaration of Michael J. O'Connor, Ex. A, Second Amended Demand for Arbitration, ¶ 82. The arbitration is set for November 3-7, 2014, at which time the arbitrator will determine whether New Line or DeRosa-Grund owns the Warren Agreements and the Demonologist Option. *Id.* ¶ 2. Specifically, New Line has asked the Arbitrator for a declaration that "[a]ny rights acquired by DeRosa-Grund with respect to the Demonologist Option are the sole property of New Line under the Agreements" and that "[a]ny rights acquired by DeRosa-Grund under the Warren Agreements are the sole property of New Line under the terms of the Agreements." *Id.*, Ex. A, Second Amended Demand for Arbitration, ¶ 82.

Even if the Demonologist Option and Warren Agreements were not explicitly part of the ongoing Arbitration (they are), this Court should still stay or dismiss DeRosa-Grund's claims premised on his ownership of the Demonologist Option or the Warren Agreements, as such claims "aris[e] out of or relate[] to [the] Agreement[s] or the interpretation, performance or breach thereof . . . ." Ex. 4, Quitclaim Agreement ¶ 21; Ex. 5, Producer Agreement ¶ 25. Specifically, DeRosa-Grund's claims relate to and require, among other things, an interpretation of the Agreements to determine who in fact owns the Demonologist Option and the Warren Agreements.

Thus all of the claims brought by DeRosa-Grund in this action (Counts I, II, III, IV, and XIII) are clearly arbitrable and should be stayed or dismissed pursuant to Section 3 of the FAA

pending the resolution of an actively-litigated JAMS arbitration in California, which has been pending since June 2013. Ex. 4, Quitclaim Agreement ¶ 21; Ex. 5, Producer Agreement ¶ 25. As set forth in greater detail in New Line's Motion to Dismiss or Stay in Favor of Ongoing Arbitration in the Senior Action (Dkt. 8), and the Reply in Support thereof (Dkt. 28), "courts must 'rigorously enforce' arbitration agreements according to their terms." *Am. Exp. Co. v. Italian Colors Restaurant*, 133 S.Ct. 2304, 2309 (2013) (citation omitted). Section 3 of the FAA requires a mandatory stay of legal proceedings whenever the issues in a case are within the reach of an arbitration agreement. 9 U.S.C. § 3; *Midwest Mech. Contractors Inc. v. Commonwealth Constr. Co.*, 801 F.2d 748, 751 (5th Cir. 1986). In the alternative, DeRosa-Grund's claims against New Line should be transferred to the Central District of California, in light of the Agreements' forum selection clauses, pursuant to 28 U.S.C. § 1404(a); Ex. 4, Quitclaim Agreement ¶ 21; Ex. 5, Producer Agreement ¶ 25.

Moreover, the Court has the inherent authority to order a discretionary stay to control its own docket. *See Ambraco, Inc. v. Bossclip B.V.*, 570 F.3d 233, 243 (5th Cir. 2009). It should exercise such discretion and stay DeRosa-Grund's claims against Warren and Spera (Counts I, IV, and XIII), for although Warren and Spera are not signatories to the Agreements mandating arbitration, the claims DeRosa-Grund asserts against them will necessarily turn on whether DeRosa-Grund (or New Line) actually owns the Warren Agreements and the Demonologist Option – a decision the arbitrator will make in November 2014.

In the event the Court does not grant this motion to stay or dismiss DeRosa-Grund's claims, such claims fail for the reasons discussed below.

## II. PLAINTIFFS' COPYRIGHT INFRINGEMENT CLAIMS FAIL AS A MATTER OF LAW

### A. Standard of Review

Under Fed. R. Civ. P. 8(a), a pleading must contain "a short and plain statement of the claim showing that the pleader is entitled to relief." Fed. R. Civ. P. 8(a)(2). A defendant may bring a motion for "failure to state a claim upon which relief can be granted." Fed. R. Civ. P. 12(b)(6). The plaintiff must allege "more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." *Bell Atlantic Corp. v. Twombly*, 127 S.Ct. 1955, 1964-65 (2007); *see also Elsensohn v. St. Tammarny Parish Sheriff's Office*, 530 F.3d 368, 372 (5th Cir. 2008) (quoting *Twombly*, 127 S.Ct. at 1974). "Complaints alleging copyright infringement are no exception to this rule and can be decided as a matter of law." *Randolph v. Dimension Films*, 634 F. Supp. 2d 779, 787 (S.D. Tex. 2009) ("*Randolph II*"). Here, Plaintiffs' Complaint fails to allege how and in what manner the New Line's motion picture and unpublished script infringe any copyright in the Book. Thus, all of Plaintiffs' copyright infringement claims should be dismissed.

Alternatively, the Court may, on a Rule 12(b)(6) motion treat the works described in the Complaint as incorporated by reference into the pleadings, and compare the works to determine whether New Line's motion picture and unpublished script infringe the copyright in the Book. A court should dismiss a copyright claim pursuant to Rule 12(b)(6) where either the evidence demonstrates that no reasonable jury could find the two works at issue are substantially similar or the court determines that any such similarities pertain only to unprotected elements in the works. *Christianson v. West Publishing Co*., 149 F. 2d 202, 203-204 (9th Cir. 1945) (affirming grant of 12(b)(6) motion); *Rucker v. Harlequin Ent., Ltd.*, 2013 WL 707922, at *4 (S.D. Tex. 2013) ("*Harlequin*") (granting motion to dismiss for lack of substantial similarity); *Randolph v.*

*Dimension Films,* 630 F.Supp.2d 741, 749 (S.D. Tex. 2009) ("*Randolph I*") (granting motion to dismiss for lack of substantial similarity); *Campbell v. Walt Disney Co.*, 718 F.Supp.2d 1108 (N.D. Cal. 2010) (granting 12(b)(6) motion); *Capcom Co., Ltd. v. MKR Group*, *Inc*., 2008 WL 4661479 (N.D. Cal. 2008) (granting 12(b)(6) motion); *Nelson v. PRN Prods.*, 873 F.2d 1141, 1143-44 (8th Cir. 1989) (affirming grant of motion to dismiss based on lack of substantial similarity); *Architecture, LLC v. Simone Development Corp*., 602 F.3d 57 (2d Cir. 2010) (affirming grant of motion to dismiss based on lack of substantial similarity). "Works referenced in the pleading and critical to the claims are properly considered on a 12(b)(6) motion without converting it to one for summary judgment." *Harlequin*, 2013 U.S. Dist. LEXIS 26299, at *2; *Randolph I,* 630 F. Supp. 2d at 745.

Plaintiffs allege that New Line's motion picture "Annabelle" and the screenplay for "The Conjuring 2" ("The Conjuring 2" is still in development and is only a screenplay at this stage) infringe their copyright in *The Demonologist* (Counts III and XI). To prove copyright infringement, Plaintiffs must show "ownership of a valid copyright and actionable copying." *Feist Publ'ns, Inc. v. Rural Tel. Serv. Co.*, 499 U.S. 340, 361 (1991); *Peel & Co. v. The Rug Market*, 238 F.3d 391, 394 (5th Cir. 2001). "A plaintiff bringing a claim for copyright infringement must demonstrate (1) ownership of a valid copyright, and (2) copying of constituent elements of the work that are original." *Funky Films, Inc. v. Time Warner Entm't Co.*, 462 F.3d 1072, 1076 (9th Cir. 2006) (quoting *Feist*, 499 U.S. at 361); *accord Positive Black Talk, Inc. v. Cash Money Records, Inc.,* 394 F.3d 357, 367 (5th Cir. 2004); *Harlequin*, 2013 WL 707922, at *4 (citing *Funky Films*, 462 F.3d at 1076). "When, as here, there is no allegation of or direct evidence of copying, the second element requires the plaintiff to prove that the defendants had access to the plaintiff's copyrighted work and that there is substantial similarity of protected

elements between the works." *Harlequin*, 2013 WL 707922, at *4 (citing *Rice v. Fox Broad. Co.*, 330 F.3d 1170, 1174 (9th Cir. 2003).

The Court may dismiss a claim for copyright infringement at the pleadings stage. *Id.* ("Complaints alleging copyright infringement can be decided as a matter of law"); *see also Randolph I*, 630 F. Supp. 2d at 745 (substantial similarity may be decided as a matter of law on a motion to dismiss); *Taylor v. IBM*, 54 Fed. Appx. 794, 2002 WL 31845220, at *1 (5th Cir. 2002) (affirming dismissal of copyright infringement claim pursuant to Rule 12(b)(6)); *Tabachnik v. Dorsey*, 257 Fed. Appx. 409 (2d Cir. 2007) (same).

## B.   DeRosa-Grund Does Not Own A Copyright In *The Demonologist*

DeRosa-Grund has brought a claim for copyright infringement against New Line (Count III), based on his assertion that he owns the Demonologist Option. Compl. ¶¶ 87, 92. As a threshold requirement, however, DeRosa-Grund must allege that he actually owns the copyright at issue. *Peel & Co.*, 238 F.3d at 394; 17 U.S.C. § 501(a). Here, DeRosa-Grund admits that the Demonologist Option is only an option, that is, a contract right to acquire a copyright in the future under defined conditions. That is not ownership of a copyright. Additionally, that right is speculative because it is only "exercisable if and only if [DeRosa-Grund] secures corresponding rights from Ms. Warren." Compl. ¶ 72. DeRosa-Grund does not (and cannot) allege that he secured such rights from Ms. Warren, however, and thus, DeRosa-Grund has no copyright interest whatsoever. He has instead an unexercised option to obtain certain rights in the future assuming he can somehow persuade Ms. Warren to agree to grant him her corresponding rights. This admission is fatal to his copyright claims. *Peel & Co.*, 238 F.3d at 394.

In addition, and more fundamentally, under United States copyright law the most DeRosa-Grund could have through a grant from a single co-owner of a copyright (i.e., Brittle) is an option to obtain non-exclusive rights to the book (regardless of whether the option claims to

be for "exclusive" rights). *Sybersound Records v. UAV*, 517 F. 3d 1137, 1145 (9th Cir. 2008). In *Sybersound*, the plaintiff argued that it had standing to sue as a co-owner of the copyright for nine (9) songs, based on its contention that it "stepped into the shoes" of TVT, the actual co-owner of the copyright, when it received an "exclusive assignee and licensee" of TVT's copyright interest in the songs for the purpose of karaoke use. *Id.* The Ninth Circuit disagreed, finding that, "as a co-owner of the copyright, TVT could not grant an exclusive right in the karaoke-use interest of the nine referenced copyrights." *Id.* As the owner of a mere option to obtain non-exclusive rights, and, even if the option were exercised, as a mere licensee of non-exclusive rights, DeRosa-Grund lacks standing to bring a copyright infringement action against New Line. A licensee of non-exclusive rights is not a copyright owner. *Id.*

Thus, DeRosa-Grund's claim for copyright infringement should be dismissed with prejudice as any amendment would be incapable of curing the defects just described.

## C. Plaintiffs Fail To Allege, And Cannot Allege, Substantial Similarity of Protected Elements Between The Works

In order to establish copyright infringement, Plaintiffs must prove that New Line had access to the Plaintiffs' copyrighted work and that there is "substantial similarity of protected elements between the works." *Harlequin*, 2013 WL 707922, at *4 (citing *Rice*, 330 F.3d at 1174). However, here Plaintiffs fail to allege that New Line had access to the Book and, even more strikingly, Plaintiffs utterly fail to allege any substantial similarities between the works, whether in plot, theme, dialogue, mood, setting, pace, characters or sequence of events. *See Randolph I*, 630 F. Supp. 2d at 746-49. The Complaint is in fact completely and conspicuously silent on what protectable element or elements New Line allegedly "copied" from the Book. As more fully described below, that failure of allegation is not an oversight capable of cure. It is the inevitable result of the fundamentally dissimilar nature of the works at issue in the case—the

13

Book's wholly factual account of the actual work of the Warrens, and New Line's dramatized works which tell different, original stories inspired by the Warrens' work, but add characters and events not found in the Book.

Without meeting this basic pleading requirement as set forth in *Twombly* and *Iqbal*, Plaintiffs cannot possibly maintain these claims, nor can they prevent dismissal by relying on the conclusory statement that "Plaintiffs believe that New Line is attempting to . . . circumvent the [Agreements] by attempting to claim that their productions are based upon a parallel set of rights . . . in connection with chapters from *The Demonologist*." Compl. ¶ 39. Plaintiffs' failure and inability to plead even minimal facts is fatal to their claims. *Iqbal*, 556 U.S. at 678.

Accordingly, Counts III and XI should be dismissed. Because there is no actionable similarity between the works, as demonstrated *supra*, Plaintiffs' copyright claims should be dismissed with prejudice as any amendment would be futile.

## D. The Works At Issue

### 1. The Warrens' "Annabelle" And "Enfield Poltergeist" Investigations

The two historical Warren investigations at issue are "Annabelle" and the "Enfield Poltergeist." Compl. ¶ 39. The "Annabelle" case involved a Raggedy Ann doll named "Annabelle" that was possessed by a demonic spirit. *Id.* ¶¶ 26, 46. The "Enfield Poltergeist" case involved the Hodgson family, living in Enfield, England, who called the police after the children claimed that furniture was moving on its own and heard unexplained knocking sounds. Compl. ¶ 27, 47. This alarming activity escalated to the point where the children claimed to hear demonic voices, and claimed to have levitated. *Id.* ¶ 47.

The historical facts related to *both* the "Annabelle" and the "Enfield Poltergeist" cases have been widely reported on: The "Enfield Poltergeist" generated extensive media interest at the time of the alleged paranormal activities in the 1970s and was widely reported on by a

number of newspapers.  Request for Judicial Notice, Ex. 1, Stowe Decl., Exs. A-C.  In addition, the "Annabelle" case is an occult favorite and a simple Google search on the Internet returns a number of websites reporting the well-known facts of the case.  *Id.*, Exs. D-F.

### 2. *The Demonologist:* **Chapter III "Annabelle"**

The Book offers Brittle's purely factual account of the Warrens' investigations.  Indeed, in his Author's Preface, Brittle states:  "all the information presented in this book is true.  These are real cases that happened to real people[.]"  Ex. 1, *The Demonologist*, p. ix.  The Plaintiffs are estopped to assert now that any of the book is fictional.  1 *Nimmer*, §2.11; *Houts v. Universal City Studios, Inc.*, 603 F. Supp. 26 (C.D. Cal. 1984) (plaintiff author of book estopped to claim that case studies by medical examiner used to create episodes of the TV show "Quincy" were fictional); *Oliver v. Saint Germain Foundation*, 41 F. Supp. 296 (S.D. Cal. 1941) (plaintiff estopped to disavow earlier claim that his manuscript was dictated to him by spirits from another planet).

*The Demonologist*'s "Annabelle" chapter is essentially a transcript of a recorded interview conducted by Mr. Warren of two nurses who claimed they had communicated with a human spirit.  *Id.*, p. 39.  One nurse told Mr. Warren that a Raggedy Ann doll that her mother bought her for her birthday had begun to move around the apartment on its own.  *Id.*, pp. 40-41. The nurses further said that the doll started leaving notes written in a small child's handwriting. *Id.*, p. 41.  These incidents prompted the nurses to contact a medium who told them that a little girl named Anabelle Higgins had died on the property.  *Id.*, p. 42.  The medium told the nurses that the spirit of this little girl asked to move into the doll and stay with them.  *Id.*  The women said yes, and thereafter called the doll "Annabelle."  *Id.*, pp. 42-43.  The incidents with the doll

became more violent. *Id.*, pp. 44-46. Eventually an exorcism was performed, and the Warrens took the doll home with them to protect the public. *Id.*, p. 50.

The "Annabelle" chapter is purely factual, as it is essentially a recitation of a recorded interview conducted by the Warrens of the nurses who claimed that the doll they called "Annabelle" was possessed by the human spirit of a little girl who had died. Historical facts include: that there was a supposed demonically possessed doll named Annabelle; that two nurses owned the doll; that a medium told the nurses that the spirit of a deceased girl named Annabelle Higgins inhabited the doll; that the doll moved around by itself and communicated with its owners; that a priest tried to perform an exorcism of the doll; and that the Warrens investigated the case and later kept the doll.

### 3. **New Line's *Unreleased* Motion Picture Production "Annabelle"**[4]

New Line's unreleased motion picture "Annabelle," though inspired by the real doll from the Warrens' paranormal investigation, features a young couple who come to own the doll and relates events not found in or based on the Book. Ex. 3, Alexander Decl., ¶ 2, Ex. A. New Line has completed principal photography of "Annabelle." *Id.*, ¶ 2. It is set to be released in October 2014. *Id.*

The movie "Annabelle" is an original story in which a doll, though not a Raggedy Ann doll, is manipulated by a demonic spirit. *Id.*, Ex. A. Other than Ed and Lorraine Warren, the only individuals from the Annabelle chapter of *The Demonologist* appearing in the film are the

---

[4] As discussed above, because the parties could not agree on a stipulated protective order, in order to protect the value of its unreleased properties, New Line is filing this Motion without a detailed discussion of the motion picture productions "Annabelle" and "The Conjuring 2" pending the outcome of the Court's decision on New Lines' Motion for Limited Protective Order (Dkt. 33). New Line respectfully requests that it be allowed to file a supplemental brief containing a more detailed summary and analysis of the works upon the Court's determination of its Motion for Limited Protective Order (Dkt. 33).

real life nurses and their roommate who historically owned the Annabelle doll, and even then they make only a fleeting appearance in the film. *Id.* Instead of depicting the documented story of Annabelle, the movie revolves around a young couple who owned the Annabelle doll before the nurses acquired it. *Id.* While in this couple's possession, Annabelle haunts them through supernatural events depicted in the film. *Id.* Notably, the young couple and the story told in the movie are not found in the Book. *Id.* Although there is a character in the movie named "Annabelle Higgins," this character is an adult woman and is not the human spirit of a deceased young girl.[5]

### 4. *The Demonologist:* **Chapter XIV "The Enfield Voices"**

Half of *The Demonologist*'s "The Enfield Voices" chapter is spent discussing the Warrens' thoughts on the practice of demonology in general, and the other half is spent once again transcribing a recorded interview conducted by Mr. Warren related to the paranormal events that took place in England.

The chapter opens with a story in which Mr. Warren loses control of his car while driving in a place called the "Lord's Valley" in Pennsylvania. Ex. 1, *The Demonologist*, p. 207-08. The Warrens were discussing past paranormal investigations when the car began to swerve and lift off the ground. *Id.* The story appears to have been included in the chapter to illustrate the author's point that, "[n]ext to exorcism, demonology is perhaps the most dangerous business on earth." *Id.*, p. 208. The chapter then discusses the many precautions the Warrens take to keep themselves safe during their paranormal investigations. *Id.*, p. 208-09.

Next, the chapter recounts Mr. Warren's investigation into the alleged paranormal activity occurring in the home of a single mother and her children (the book does not identify the

---

[5] A synopsis of the movie "Annabelle" and a copy of the unreleased movie will be lodged with the Court upon determination of New Line's Motion for Limited Protective Order (Dkt. 33).

family by name). *Id.*, p. 210. The children allegedly drew the spirits into the house after playing with an Ouija board. *Id.* As a result, a demonic spirit entered the home and brought "six buddies" along. *Id.* The spirits caused "knockings, rappings, scratchings, [and] poundings," and as time went on, the phenomena intensified, causing the girls to levitate. *Id.* It is not clear from the chapter whether Lorraine Warren also travelled to England to investigate the case.

Mr. Warren thought that the most compelling aspect of the case was the voice manifestations of the six different spirits. *Id.*, p. 212. As a result, most of the discussion of the Enfield investigation is comprised of a lengthy transcript of an alleged conversation between Mr. Warren and the spirits. *Id.*, p. 212-18. Notably, the chapter does not discuss what happened to the family or how the case was resolved. *Id.*, p. 223. The chapter concludes with a discussion of Ms. Warren's opinion on why "so much negative supernatural activity [is] happening right now[.]" *Id.*, p. 219-23.

Historical facts include: that an unidentified family was haunted by demoniac spirits in a house in Enfield, England; that the family included a single mother and her children; that the children invited the spirits into the house while playing with an Ouija board; that there were unexplained knockings, scraping and poundings in the house; that allegedly furniture moved and the children levitated; and that the spirits vocalized.

### 5. New Line's *Unreleased* Motion Picture Production "The Conjuring 2"

New Line is developing a motion picture project currently entitled "The Conjuring 2," an original screenplay based on the "Enfield Poltergeist" haunting in Enfield, England during the late 1970s. Ex. 3, Alexander Decl., ¶ 3. The historical facts related to these paranormal events were widely reported on in the news. Request for Judicial Notice, Stowe Decl., Exs. A-C. Unlike the Book, "The Conjuring 2" actually tells the story of the Hodgson family and does not

merely report facts about the haunting as the Book largely does.  Ex. 1, Alexander Decl., Ex. B.

The screenplay also does not include any of the minor narrative elements included in the Book.

*Id.*  For example, "The Conjuring 2" does not open up with a flash back of the Warrens' car

sliding down a cliff (*id.*), and it does not include the lengthy dialogue between Mr. Warren and

six (6) demons inhabiting the home in Enfield, England, that makes up a large portion of the

discussion of the Warrens' investigation into the case in the Book.  *Id.*  Likewise, "The

Conjuring 2" is not presented in an interview format with Mr. Warren.  *Id.*  While the Warrens

do appear as characters in the movie, no one is disputing their existence as paranormal

investigators who investigated this case.[6]

**E.    There Is No Actionable Similarity Between The Works**

      Here, the only arguable similarities between the works are certain facts concerning the

cases.  Because facts are not subject to copyright protection, these claims must fail.

      Facts, like ideas, are not entitled to copyright protection.  In *Feist*, the Supreme Court of

the United States confirmed that "[t]o qualify for copyright protection, a work must be *original

to the author*." 499 U.S. at 345 (emphasis added).  "'No one may claim originality as to facts."

*Id.* at 347 (citations omitted). "The same is true of *all* facts – scientific, historical, biographical,

and news of the day. '[T]hey may not be copyrighted and are part of the public domain available

to every person.'" *Id.* at 348 (emphasis added).  Thus, facts themselves are beyond the scope of

copyright protection.  *Miller v. Universal City Studios, Inc*., 650 F.2d 1365, 1372 (5th Cir. 1981).

      While the selection and sequencing of facts may receive some limited copyright

protection, the very same facts may be reshuffled without infringement.  *Feist*, 499 U.S.  at 349.

---

[6] A synopsis of the current version of the screenplay for "The Conjuring 2" and a copy of the
current version of screenplay will be lodged with the Court upon determination of New Line's
Motion for Limited Protective Order (Dkt. 33).

"Thus, if the compilation author clothes facts with an original collocation of words, he or she may be able to claim a copyright in this written expression. Others may copy the underlying facts from the publication, but not the precise words used to present them." *Id.* at 348.

An instructive case on this issue, is the Ninth Circuit's decision in *Novak v. Warner Bros. Pictures, LLC*, 387 Fed. Appx. 747 (9th Cir. 2010). In *Novak*, the plaintiff alleged that the dramatic film *We Are Marshall* infringed on the copyright in plaintiff's documentary film about the tragedy that struck a university's football program after most of the players, coaches, and prominent supporters of the team, were killed is a plane crash in the 1970s. *Id.* at 748. The Ninth Circuit upheld the district court's dismissal of the claim, finding that, while the same historical facts underlie both productions, historical facts are not protected by copyright. *Id.* (citations omitted). The plaintiff argued that substantial similarity could be shown in the same sequencing of events in the opening montages of the two films, but the court disagreed, finding that the opening sequences significantly differed, in that the opening sequence in the documentary included the film's title and many additional shots of the town and university campus. *Id.* at 749. Because the only "concrete or articulable similarities" between the works consisted of historical facts and *scenes a faire*, the plaintiff could not show that the works were substantially similar, thus defeating her claim as a matter of law. *Id.* at 749. *Novak* is illustrative of how courts analyze copyright infringement claims where the works at issue are based on historical facts. *See Narell v. Freeman*, 872 F.2d 907, 911 (9th Cir. 1989) (copying historical facts from a copyrighted book was not actionable, because facts and ideas are not protected and the scope of protection for historical accounts is narrow indeed); *see also Benay v. Warner Bros. Entmt.*, 607 F.3d 620, 625 (9th Cir. 2010) (substantial similarities between a screenplay and a movie were not

20

actionable, since the similarities resulted from shared historical facts, familiar stock scenes, and characteristics naturally flowing from the works' shared basic plot premise).

Though it deals with the supernatural, the Book is presented entirely as a work of non-fiction, a factual account of the work of the Warrens. Plaintiffs are estopped to assert otherwise. 1 *Nimmer*, §2.11; *Houts*, 603 F. Supp. 26 (C.D. Cal. 1984); *Oliver*, 41 F. Supp. 296 (S.D. Cal. 1941). Accordingly, since Brittle cannot own a copyright in the facts and events set forth in his book, he cannot base a copyright claim upon those facts. These include the historical persons of Ed and Lorraine Warren; the family haunted in Enfield, England (unnamed in the Book, but the real life Hodgson family); and the nurses who owned a possessed doll named Annabelle. It also includes the historical facts of the possessed doll in Annabelle; the poltergeist in Enfield; the use of Ouija board, knocking sounds, levitation of children, and demonic voices in Enfield; and any other historical person or fact contained in the Book. *See Narell*, 872 F.2d 907, 911. These facts are not protectable.

Because New Line's works and the Book share historical inspiration, it is not surprising that there are some historical facts in common between the works such as the appearance of the Warrens, a possessed doll, or a haunted house is Enfield, England. It is also not actionable. In the Court's substantial similarity analysis all such facts must be filtered out as unprotectable elements. "A court must distinguish between the protectable and unprotectable material because a party claiming infringement may place no reliance upon any similarity in expression resulting from unprotectable elements." *Randolph I*, 630 F. Supp. 2d at 746 (citations omitted). And once the historical facts are "filtered" out of the substantial similarity analysis, there are no similarities between the Book and movies, much less "substantial" ones.

Accordingly, the copyright claims fail.

## III.    <u>PLAINTIFFS' STATE LAW CLAIMS AGAINST NEW LINE ARE PREEMPTED</u>

A state cause of action is preempted by Section 301 of the Copyright Act if the rights at issue come within the subject matter of copyright, as set forth in Sections 102 and 103, and the rights at issue are equivalent to the exclusive rights of Section 106. *Daboub v. Gibbons*, 42 F.3d 285, 289-90 (5th Cir. 1995); *Gemcraft Homes, Inc. v. Sumurdy*, 688 F. Supp. 289, 294 (E.D. Tex. 1988). In *Gemcraft*, the court found that architectural plans fixed in a tangible medium are within the subject matter of copyright. *Id.* The court held that "to the extent plaintiff's claims for tortious interference with contract complain that plaintiff has lost benefits from its exclusive rights to the architectural plans, the cause of action would be preempted." *Id.* at 295. Moreover, where the "defendant's alleged acts would violate both state law and federal copyright law, then the state right is deemed 'equivalent to copyright.'" *Compliance Review Services, Inc. v. Davis-Osuawu*, No. H-04-3635, 2006 WL 3541715, at *3-4 (S.D. Tex. 2006) (citations omitted) (claim for tortious interference with contract preempted where it arose out of the same set of operative facts as the copyright infringement claim).

Plaintiffs assert two claims for tortious interference of contract against New Line, both of which allege that New Line's motion pictures are based on *The Demonologist*: (1) in Count II, DeRosa-Grund alleges that New Line tortiously interfered with the Demonologist Option by creating the "Annabelle" and "The Conjuring 2" motion pictures "based on" *The Demonologist*; and (2) in Count X, Brittle alleges that New Line tortiously interfered with the Collaboration Agreement by "exploiting" chapters from *The Demonologist* for its motion pictures "Annabelle" and "The Conjuring 2." Compl. ¶¶ 78, 83, 127.

There can be no dispute that *The Demonologist*, a book, comes within the subject matter of copyright, as set forth in Sections 102 and 103. *Gemcraft Homes*, 688 F. Supp. at 294. In Count II, DeRosa-Grund alleges that New Line tortiously interfered with his exclusive right to

exploit *The Demonologist* under the Demonologist Option by basing its motion pictures on *The Demonologist*. Compl. ¶ 83. DeRosa-Grund's allegation that New Line interfered with his "exclusive rights" under the Demonologist Option is equivalent to the exclusive rights granted under Section 106, i.e., the right to prepare derivative works based on the copyrighted work. 17 U.S.C. § 106(2). As a result, DeRosa-Grund's claim is preempted as a matter of law. *Gemcraft Homes*, 688 F. Supp. at 295.

Brittle's claim that New Line tortiously interfered with the Collaboration Agreement by basing its motion pictures on *The Demonologist* (Count X), is based on the same conduct giving rise to his copyright infringement claim against New Line (Count XI), i.e., that New Line improperly based its motion pictures on *The Demonologist*. *Compare* Compl. ¶ 127, *with id.* ¶¶ 130, 131. As discussed above, where the "defendant's alleged acts would violate both state law and federal copyright law, then the state right is deemed 'equivalent to copyright.'" *Davis-Osuawu*, 2006 WL 3541715, at *3-4; *see also* 1 *Nimmer*, § 1.01(B)(1) (claim for interference with contract is pre-empted where not qualitatively different from claim for copyright infringement). Here, if New Line did in fact base its motion pictures on *The Demonologist*, as Brittle alleges, this conduct would give rise to a copyright claim by Brittle as the co-owner of *The Demonologist*. Accordingly, Brittle's state law claim is preempted. *Id.*

Finally, both of these claims fail for the additional reason that, as discussed in §II.D., New Line's motion picture productions are not "based on" *The Demonologist*, which can be proven by either a review of the Complaint (Plaintiffs allege no similarities between the works), or a review of the works themselves.

## IV. THE DEPENDENT CLAIMS AGAINST NEW LINE FALL WITH THE CLAIMS DISCUSSED ABOVE

Because the claims for declaratory judgment (Count XII) and civil conspiracy (Count XIII) against New Line are derivative of the claims discussed above, which fail as a matter of law, these dependent claims should be dismissed as well.  *See, e.g., Turner v. Pavlicek*, No. H-10-00749, 2011 WL 4458757, at *14 (S.D. Tex. Sept. 22, 2011) (noting that "a defendant's liability for conspiracy depends on participating in some underlying tort," and "[i]f the underlying tort claim fails, the conspiracy claim fails as well as a matter of law."); *Cole v. Fed. Home Loan. Mortg. Group*, No. 3:11-cv-1833, 2012 WL 555194, at *5 (N.D. Tex. Jan. 23, 2012) (dismissing claim for declaratory relief with prejudice where such claim was derivative of other meritless claims subject to dismissal).

## CONCLUSION

WHEREFORE New Line respectfully requests that this Court grant its motion to stay or dismiss all of DeRosa-Grund's claims in this action (Counts I, II, III, IV, and XIII) in favor of ongoing arbitration, or in the alternative, transfer venue to the Central District of California. Alternatively, New Line respectfully requests that all of DeRosa-Grund's claims against it be dismissed, with prejudice pursuant to Fed. R. Civ. P. 12(b)(6). New Line further respectfully requests that all of Brittle's claims against it (Counts X, XI, and XII) be dismissed, with prejudice pursuant to Fed. R. Civ. P. 12(b)(6).

Respectfully Submitted,

JACKSON WALKER L.L.P.

*/s/ Charles L. Babcock*
Charles L. "Chip" Babcock
State Bar No. 01479500
S.D. ID # 10982
*Attorney-in-Charge*
cbabcock@jw.com

1401 McKinney, Suite 1900
Houston, Texas 77010
(713) 752-4200
(713) 752-4221 – Fax

**ATTORNEYS FOR DEFENDANTS WARNER
BROS. ENTERTAINMENT, INC., NEW LINE
PRODUCTIONS, INC., TONY SPERA AND
LORRAINE WARREN**

OF COUNSEL:

JACKSON WALKER L.L.P.

Courtney T. Carlson
State Bar No. 24065004
S.D. ID # 1115579
ccarlson@jw.com
1401 McKinney, Suite 1900
Houston, Texas  77010
(713) 752-4200
(713) 752-4221 – Fax

## CERTIFICATE OF CONFERENCE

I hereby certify that I conferred with Plaintiffs' counsel prior to filing this Motion and was informed Plaintiffs are opposed to this Motion. Therefore, this Motion is necessary.

*/s/ Charles L. Babcock*
Charles L. Babcock

## CERTIFICATE OF SERVICE

I hereby certify that on June 18, 2014, a copy of the foregoing document was filed electronically using the Court's Electronic Case Filing System, which will provide electronic notification of its filing to all counsel who have appeared in this action.

*/s/ Charles L. Babcock*
Charles L. Babcock

514577

# EXHIBIT H

**IN RE JAMS ARBITRATION**

NEW LINE PRODUCTIONS, INC. and
WARNER BROS. ENTERTAINMENT,
INC., Claimants,

v.                                                    JAMS Reference No. 1210031019

TONY DeROSA-GRUND, EVERGREEN
MEDIA HOLDINGS, LLC, SILVERBIRD
MEDIA GROUP, LLC, and EVERGREEN
MEDIA GROUP, LLC, Respondents.

**DECLARATION OF GERALD BRITTLE**

I, GERALD BRITTLE, under penalty of perjury under the laws of the United States of America and the State of Virginia, declare and state that the following is true and correct:

1.      I have personal knowledge of the facts I state below, and if I were to be called as a witness, I could competently testify about what I have written in this declaration.  I write this declaration in support of Respondents in this arbitration proceeding.

2.      It is my understanding that New Line and Warner Bros. claim that they own "The Conjuring"  brand name which Mr. DeRosa-Grund conceived for the franchise he created based upon the Case Files of Ed and Lorraine Warren, including the trademark rights in his "THE CONJURING" trademark, because - with his permission - they used "The Conjuring" as the title of their motion picture.

3.      I further understand that they have minimized Mr. DeRosa-Grund's role as the creator and author of the story and treatment for "The Conjuring" theatrical motion picture.

4.      I know for a fact that Mr. DeRosa-Grund conceived of "The Conjuring" brand name for the franchise he created, used "THE CONJURING" as a trademark in connection with his franchise, long before he permitted New Line and Warner Bros. to use  "The Conjuring" as the title of their movie.

5.      Indeed, I know that Mr. DeRosa-Grund authored a treatment for one of the Warrens' case files and that he was the one to propose using "The Conjuring" franchise name as

1   the title of the movie based upon that treatment, and that he did that many years before New Line

2   or Warner Bros. came along.

3       6.      Moreover, because Mr. DeRosa-Grund wrote the original story and treatment for

4   "The Conjuring" theatrical motion picture and was so critically involved in the entire production

5   (even before there was a theatrical motion picture to produce!) that it is unfathomable to me that

6

7   he was not given credit as a writer on the theatrical motion picture by New Line or Warner Bros.

8       7.      I am very familiar with Mr. DeRosa-Grund and his experiences with Ed Warren

9   ("Mr. Warren") and Lorraine Warren ("Mrs. Warren") given that I am the author of the book

10  "The Demonologist."

11
        8.      For background purposes, on or about November 20, 1978, Mrs. Warren, Mr.
12
    Warren and I entered into, and executed, an agreement concerning publishing rights, and certain
13
    ancillary rights related thereto, in and to "The Demonologist." The agreement was amended, and
14
15  executed, on or about April 16, 1990 (collectively, the agreement and the amendment are

16  collectively referred to herein as the "Collaboration Agreement"). As set forth in the

17  Collaboration Agreement, "The Demonologist" concerned Mrs. Warren and Mr. Warren's "lives

18  and experiences as psychic investigators." A true and correct copy of the Collaboration

19  Agreement is attached hereto as Exhibit A.

20
        9.              Among other things, in the Collaboration Agreement, Mrs. Warren, Mr.
21
22  Warren, and I agreed as follows:

23      All contracts for the sale, lease, license or other disposition of any and all rights in to ["The
        Demonologist"] now existing or which may hereafter come into existence shall require the unanimous
24      consent of [me] and [Mrs. Warren and Mr. Warren].

25      10.     The Collaboration Agreement is valid and existing and continues in full force and

26  effect to the present day.

27

28

11.     Following years of substantial work by me, including, but not limited to, extensive interviews with Mrs. Warren and Mr. Warren, site-visits, testimonials, theological research and steps to vet the accuracy of "The Demonologist" by two Roman Catholic exorcists, "The Demonologist" was first released in or about December 1980 by Prentice-Hall, Inc. ("Prentice Hall").

12.     "The Demonologist" focused on paranormal investigations and experiences associated with Mrs. Warren and Mr. Warren.   "The Demonologist" is not related to "The Conjuring" theatrical motion picture or the "Perron Farmhouse" case file that Mr. DeRosa-Grund used in creating his original story and treatment for "The Conjuring" theatrical motion picture.

13.     Since it was first released in 1980, by Prentice Hall, "The Demonologist" has been re-released several times, always pursuant to and in compliance with the terms of the Collaboration Agreement, including, most recently, in or about September 2002 through iUniverse, pursuant to an agreement with iUniverse.

14.     In or about June 2013, notwithstanding the long-existing Collaboration Agreement, I received a telephone call from David Zindel ("Mr. Zindel"), the principal and owner of Graymalkin Media, LLC ("Graymalkin Media").   In the phone call, Mr. Zindel informed me that Mr. Spera, Mrs. Warren's son-in-law, had "taken charge" of "The Demonologist" and would now "change publishers" from iUniverse to Graymalkin Media.   Mr. Zindel further informed me that he would send a contract to me for his signature and represented that Mrs. Warren had already executed a contract with Graymalkin Media "changing publishers" for "The Demonologist" from iUniverse to Graymalkin Media.

15.     The actions of Mrs. Warren, Mr. Spera and Graymalkin Media are unlawful insofar as they are, among other things, in violation of the Collaboration Agreement.

16. In my experience, Mrs. Warren will say or do almost anything to improve her financial situation over others -- even going so far as to deny the existence of valid contracts and agreements when she sees an opportunity to personally make more money, i.e., when presented with the potential for financial gain.

17. Mrs. Warren will usually first try to claim that she never signed the contract and then, when the truth is exposed that she did, she shifts tactics and lies about the terms of the contract.

18. Mr. Spera aids and abets Mrs. Warren in this regard. I experienced the foregoing firsthand while dealing with Mr. Zindel.

19. When confronted by Mr. Zindel, I correctly informed him that Mr. Spera had no right or authority to "change publishers" in connection with "The Demonologist" in view of the Collaboration Agreement. In particular, I noted that the Collaboration Agreement requires the **unanimous** approval of both Mrs. Warren and me before any action to "change publishers" can be taken with respect to "The Demonologist." I have never given my approval to Mrs. Warren, Mr. Spera or Mr. Zindel to "change publishers", a fact that Mrs. Warren, Mr. Spera and Mr. Zindel have either hidden from third-parties or failed to disclose.

20. Notwithstanding the fact that in purporting to "change publishers" Mrs. Warren, Mr. Spera and Mr. Zindel violated the Collaboration Agreement. As a showing of good faith, I agreed to review contract proposed by Mr. Zindel which would have, if accepted by me, resolved the issues. However, on or about June 22, 2013, I rejected the proposed contract as it simply did not include acceptable terms.

21. Over the ensuing months, Mr. Zindel aggressively pursued me. For example, on July 3, 2013, Mr. Zindel wrote to me untenably saying, among other things, that "Mrs. Warren is free to exploit ["The Demonologist"] on a non-exclusive basis subject to her obligation to pay you

GRIMES LLC
ATTORNEYS AT LAW
CONNECTICUT
FLORIDA
NEW YORK

your proportional share of the profits." That communication was incredible to me! Mr. Zindel, and Mrs. Warren not only did not acknowledge the validity and existence of the Collaboration Agreement, but they fraudulently and incorrectly claimed that Mrs. Warren could proceed as a copyright co-owner **without** my involvement (i.e., they incredulously claimed that Mrs. Warren merely had an obligation to account to me regarding any monies she received).

22.     This situation is not governed by copyright law.  The relevant governing terms are embodied in the Collaboration Agreement wherein Mrs. Warren was precluded from doing anything without my involvement and approval.

23.     Faced with this reality, Mrs. Warren has effectively argued that the Collaboration Agreement either does not exist or that it does not say what it actually says -- she has done so in an attempt to gain a financial advantage, i.e., to make more money, from "The Demonologist" than what she is rightfully entitled to receive.

24.     On or about August 3, 2013, I spoke with Mrs. Warren directly and explained that the Collaboration Agreement, among other things, prohibits unilateral action by Mrs. Warren, or any of her agents, including Mr. Spera.  Instead of discussing the issue with me, Mrs. Warren told me to speak with Mr. Spera.

25.     Shortly after the conversation with Mrs. Warren, Mr. Spera responded to me via e-mail on or about August 3, 2013.   In summary, Mr. Spera ignored the existence of the Collaboration Agreement and rejected the fact that, as per the express language of the Collaboration Agreement, my approval was **required** before any steps could be taken to "change publishers."

26.     On or about August 4, 2013, I responded to Mr. Spera's e-mail.  In relevant part, I noted the existence of the Collaboration Agreement.

27.    That same day, Mr. Spera responded and, in relevant part, finally acknowledged the existence of the Collaboration Agreement and the obligation upon Mrs. Warren and me to unanimously agree to "change publishers" for "The Demonologist," but then said: "Don't call [Mrs. Warren] again. Don't e-mail me again. You were made aware of the publishing deal. You chose not [t]o participate.    It's now being handled by the publisher.    Send your petty correspondence to them."

28.    Inexplicably, without my approval, consent or knowledge, Mrs. Warren, Mr. Spera, and Graymalkin Media nevertheless moved forward and republished "The Demonologist" with Graymalkin Media as the "new publisher," in clear violation of the Collaboration Agreement.

29.    In an after-the-fact attempt to legitimize the actions of Mrs. Warren, Mr. Spera and Graymalkin Media, Mr. Zindel sent me an email on April 10, 2014 in which he made false statements and assertions, to wit:

[Mrs. Warren's] side has told me that no collaboration agreement was ever signed.
* * *
Even though [Mrs. Warren] owns 2/3 of the book according to US Copyright law.

30.    The effort by Mrs. Warren to try to claim that she never signed the Collaboration Agreement is part of a fraudulent *modus operandi* that Mrs. Warren has sought to use in the past and the assertion by Mr. Zindel that the copyright ownership was other than a 50/50 affair was a second falsity that I outright rejected.

31.    I am aware that On December 9, 2009, Robert Unkel contacted Tony DeRosa-Grund and claimed that he had an agreement with Mrs. Warren to act as her manager. When she was questioned regarding Mr. Unkel's claim, Mrs. Warren advised Mr. DeRosa-Grund and his legal representative in a telephone conference call that she had never signed an agreement with Mr. Unkel. In response, Mr. Unkel then produced a copy of the signed agreement, and further

GRIMES LLC
ATTORNEYS AT LAW
CONNECTICUT
FLORIDA
NEW YORK

added to his claim that he had paid a large advance payment to Mrs. Warren. Upon being confronted with this information, Mrs. Warren recanted and admitted that she had signed the agreement, but claimed that she had never received any payment from Mr. Unkel. Mr. Unkel then provided evidence of payment, whereupon, yet again, Mrs. Warren was forced to recant when confronted with the truth.

32.     Mrs. Warren's fraudulent claim that she did not sign the Collaboration Agreement is refuted by Judy Penney who witnessed the execution of the Collaboration Agreement by Mrs. Warren, Mr. Warren and me, and who, in fact, thereafter signed the Collaboration Agreement herself as a witness in their presence.

33.     Mrs. Warren's fraudulent claim that she did not sign the Collaboration Agreement is untrue given the fact that I am listed as the author of "The Demonologist" and Mrs. Warren's rights as a copyright claimant flow, if at all, via transfer through a "written agreement." As such, if Mrs. Warren continued to assert her fraudulent claim that she did not sign the Collaboration Agreement, she would be admitting that she has no claim of ownership in the copyright to "The Demonologist."

34.     Furthermore, Mrs. Warren's fraudulent claim that she did not sign the Collaboration Agreement is untrue given the fact that she accepted advances paid to her by the publisher on the original contract and has accepted, without contest, 50% of all book royalties owed to her since that time.

35.     Mrs. Warren, and by extension Mr. Spera and Graymalkin Media, have no rights in connection with "The Demonologist" that can be exploited by New Line and/or Warner Bros. without my permission. In view of their conduct, I will never work with Mr. Spera or Mrs. Warren ever again. I cannot trust Mrs. Warren or Mr. Spera, in view of the foregoing.

GRIMES LLC
ATTORNEYS AT LAW
CONNECTICUT
FLORIDA
NEW YORK

36.    Mr. DeRosa-Grund and his company, Evergreen Media Holdings, LLC, have an option from me to acquire my right to exploit "The Demonologist." They also have the right to exploit my "life story" and experiences, including my experiences and "life story" when I was writing "The Demonologist". In other words, there are two distinct rights, namely: (i) the right to exploit the book; and (ii) the right to exploit my "life rights"/"life story", e.g., to produce a "biopic" about me. It should be noted, as well, that, to the extent New Line and Warner Bros. appear interested in my book "The Demonologist" or would like to exploit my "life story", I have no interest in working with them. I trust Mr. DeRosa-Grund and feel that only he is able to truly do justice to my "life story". With respect to "The Demonologist", to the extent I have to work with Lorraine Warren to exploit it, I simply refuse to do so as I will never again work with Lorraine Warren.

I declare under penalty of perjury under the laws of the State of Virginia  that the foregoing is true and correct. Executed on November 3, 2014.

*Gerald Brittle*

GERALD BRITTLE

GRIMES LLC
ATTORNEYS AT LAW
CONNECTICUT
FLORIDA
NEW YORK

# EXHIBIT I

**JAMS ARBITRATION**
**Reference No. 1210031019**

New Line Productions, Inc. and Warner
Bros. Entertainment, Inc.,
      **Claimants and Counter-Respondents,**

         **v.**

Tony DeRosa-Grund; Evergreen Media
Holdings, LLC; Silverbird Media Group, LLC;
and Evergreen Media Group, LLC,
      **Respondents and Counter-Claimants.**

---

**FINAL AWARD**

**<u>Counsel</u>**:

Michael O'Connor, Esq.
Sarah Cronin, Esq.
Kelley, Drye & Warren, LLP
10100 Santa Monica Blvd., 23rd Fl.
Los Angeles, CA   90067-4008
Tel:   (310) 712-6100
Fax:   (310) 712-6199
moconnor@kelleydrye.com
scronin@kelleydrye.com

Counsel for Claimants and Counter-Respondents

Charles W. Grimes, Esq.
Michael R. Patrick, Esq.
Grimes LLC
488 Main Ave.
Norwalk, CT   06851-1008
Tel:   (203) 849-8300
Fax:   (203) 849-9300
grimes@gandb.com
Patrick@gandb.com

Counsel for Respondents and Counter-Claimants

1

NL003914

**Arbitrator**:

Judge Terry Friedman (Ret.)
JAMS
1601 Cloverfield Blvd
Suite 370 – South
Santa Monica, CA    90404
Tel: (310) 309-6206
Fax: (310) 396-7576
tfriedman@jamsadr.com

**Place of Arbitration**:   **Santa Monica, California**

**Date of Final Award**:   **February 4, 2015**

     The undersigned Arbitrator, having been designated by the parties in a Stipulation Re: Disclosure of Arbitrator, executed by Claimants/Counter-Respondents on October 14, 2014 and by Respondents/Counter-Claimants on October 15, 2014, and pursuant to arbitration clauses set forth in Paragraph 21 of an Option Quitclaim Agreement, made November 11, 2009 and executed by the parties and Paragraph 25 of a Producer Loanout Agreement, dated November 11, 2009 and executed by the parties, and having read and considered the submissions, documentary and testimonial proof, arguments and allegations of the parties, finds and concludes and issues this Final Award, as follows:

### I.  INTRODUCTION AND PROCEDURAL STATEMENT

     Claimant and Cross-Respondent New Line Productions, Inc. is a motion picture production company.    Its parent, Claimant and Cross-Respondent Warner Bros. Entertainment, Inc., is a multimedia entertainment company.[1]  Tony DeRosa-Grund is an individual who produces films and television programs.    Evergreen Media Holdings, LLC; Silverbird Media Group, LLC; and Evergreen Media Group, LLC are companies owned and/or controlled by DeRosa-Grund.[2]

     The parties initially selected Hon. Richard C. Neal (Ret.) to arbitrate this dispute.    Justice Neal issued Preliminary Conference Orders ("PCOs") No. 1 (August 26, 2013) and No. 2 (September 4, 2013), establishing procedures for the Arbitration.    Justice Neal also issued an Order denying Respondents' Motion for Interim Relief and Confirming Plenary Hearing Dates (October 4, 2013); an Order After Discovery Conference (January 17, 2014); an Order After Final Pretrial Phone Conference (January 23, 2014); an Order re Further Proceedings (April 21, 2014); an Order re Rescheduling Plenary Hearing (April 24, 2014); an Order re Lionsgate Documents and New Counsel for

---

[1]  Collectively, New Line and Warner Bros. will be identified as "Claimants" or "New Line."
[2]  Collectively, DeRosa-Grund, Evergreen Media Holdings, Silverbird Media and Evergreen Media Group will be identified as "Respondents" or "DeRosa-Grund."

NL003915

Respondents (June 6, 2014); an Order After Telephonic Status Conference (July 3, 2014), an Order re Motions denying Respondents' Motion for Leave to File Summary Disposition Motion, denying Respondents' Motion for Additional Discovery and granting Claimants' Motion for Leave to Amend Answer to Counterclaim (August 20, 2014); an Order denying Respondents' Letter Motion for Reconsideration and Other Relief (September 9, 2014); an Order Re Respondents' Letter Requests (September 21, 2014); a Final Further Order re Discovery denying Respondents' document requests (October 2, 2014); and an Order After Final Pretrial Phone Conference (October 2, 2014).

On October 13, 2014, JAMS served notice that Justice Neal regrettably withdrew as Arbitrator to undergo medical treatment[3] and that the undersigned Arbitrator had been appointed. The undersigned Arbitrator issued PCOs No. 3 (October 17, 2014), No. 4 (October 20, 2014), No. 5 (October 21, 2014), No. 6 (October 23, 2014), No. 7 (October 24, 2014) and No. 8 (November 10, 2014), which all regarded conduct of the Arbitration Hearing, and issued an Order denying Respondents' Motion to Continue (October 28, 2014).

The parties exchanged information.

The Arbitration Hearing was conducted on November 4 – 7, 2014.   Certified Shorthand Reporters Janet F. Murphy (CSR 9650) and Jan M. Roper (CSR 5705) transcribed the Hearing.

Each side offered documentary evidence at the Hearing, and such evidence was admitted as follows: New Line Exhibits ("NL") 1–375 and DeRosa-Grund Exhibits ("DRG") 1 – 127.   New Line's objections to DRG 13, 16 & 128 were overruled.   New Line's objection to DRG 17 was sustained on the ground it was not produced in discovery.   Each side called and cross-examined these witnesses: Craig Alexander, Kavita Amar, Gary Barkin, Faust Checho, Tony DeRosa-Grund, John Gatti, Walter Hamada, Richard Levin, Patrick Perkins, Allison Strina, Robert Wyman and Courtney Young. DeRosa-Grund offered Declarations of Craig Alexander, Gerald Brittle, DeRosa-Grund, Emily Morgatta,     REDACTED     Paul Rockeferry, Peter Safran, Harrison Smith, Tony Spera and Lorraine Warren.   New Line objected to the admission into evidence of these Declarations.   The Arbitrator overruled the objections to the DeRosa-Grund, Gatti and Lionsgate executive's Declarations and sustained the objections to the others.

At the conclusion of the presentation of testimony on November 7, 2014, the parties orally declared that they had no further evidence to offer and the undersigned Arbitrator declared the evidentiary portion of the Hearing closed.   The parties orally stipulated to file simultaneous Closing Briefs of unlimited length on December 8, 2014 and to present oral closing arguments in person on December 18, 2014.   The Arbitration Hearing was deemed closed on December 18, 2014.   A Partial Final Award was issued January 20, 2015, which found New Line to be the prevailing party and allowed the parties to file statements regarding New Line's entitled prejudgment interest.   New Line filed a timely statement of prejudgment interest.   DeRosa-Grund did not file a timely responsive statement, which was due February 3, 2015.   New Line filed a Request for Correction of computational, typographical or other similar errors on January 27, 2015.

## II.        FACTS

---

[3]  Justice Neal passed away on January 1, 2015.

NL003916

The following is a statement of those facts found by the Arbitrator to be true and necessary to the Award.    Facts not pertinent or necessary to the Award are omitted.    In preparing this statement of facts, the Arbitrator considered all testimony and admitted documentary evidence.    To the extent that this recitation differs from any party's position, that is the result of the Arbitrator's determinations as to credibility, determinations of relevance, burden of proof considerations, and the weighing of the evidence, both oral and written.

### A.        The Parties

DeRosa-Grund is an independent film and television producer.    He resides in Texas. DeRosa-Grund did not appear in person at the Hearing, citing health reasons.    A prior Hearing date in March 2014 was continued due to DeRosa-Grund being hospitalized due to serious medical issues. DeRosa-Grund was the producer of the theatrically released motion picture entitled *Josie and the Pussycats*.

New Line is a wholly owned subsidiary of Warner Bros.    Both New Line and Warner Bros. are headquartered in Los Angeles, California.

### B.        Pre-Agreement Negotiations

Lorraine and Ed Warren are longtime paranormal investigators.    The Warrens maintained notes of their investigations in Case Files.    DeRosa-Grund established a professional and personal relationship with the Warrens in the 1990s.    DeRosa-Grund endeavored to work with the Warrens to exploit their Case Files for theatrical purposes.    He drafted a film treatment and called it The Conjuring.    Along with co-producer Peter Safran, DeRosa-Grund pitched the treatment to various film studios.    DeRosa-Grund testified that six studios engaged in a bidding war for the property.

DeRosa-Grund contacted New Line Senior Vice-President for Business Affairs Craig Alexander in June 2009 and represented to Alexander that he had a life story agreement with the Warrens.    Alexander testified that DeRosa-Grund was not a well-known producer and that this was their first contact.    Safran pitched the project to Alexander.    New Line's creative executives were interested in acquiring the property in part because of the potential it offered for multiple motion pictures.    Later in Summer 2009, Alexander learned that DeRosa-Grund had entered a deal regarding "The Conjuring" with Summit Entertainment but that the deal had fallen through.    Summit executives informed Alexander that there were chain of title issues concerning DeRosa-Grund's Silver Bird and Evergreen entities, an involuntary bankruptcy involving DeRosa-Grund that could interfere with rights in "The Conjuring," and that Summit did not want to work with DeRosa-Grund because he was difficult.    "The Conjuring's" writers, Chad and Carey Hayes, wanted to continue working on the project and brought it back to New Line.

DeRosa-Grund testified that in a telephone conversation on December 1, 2009 in connection with their negotiating a Deal Memo to submit to the Bankruptcy Court, Alexander told him that he would be "locked for life" as a producer on any sequels to "The Conjuring."    Alexander denied making such a statement.    The Deal Memo did not contain any "locked for life" provision.

4

NL 35.    No evidence was presented to corroborate DeRosa-Grund's testimony that he would be "locked for life" or be attached on sequels.    In connection with efforts to resolve DeRosa-Grund's bankruptcy proceeding, Gatti's law partner David McGriff sent a Short Form Agreement to Alexander setting forth the deal points between DeRosa-Grund and New Line.    The Short Form Agreement made no mention of DeRosa-Grund producing sequels to "The Conjuring" or being "locked or life" or "attached." NL 33. Alexander testified that New Line could not run its business if terms such as "locked for life" or "attached" were agreed to between it and a producer but not expressly contained in a written agreement.

<h3 align="center">C.      The Agreements</h3>

DeRosa-Grund and New Line entered several agreements.    The most important agreements were the Option Quitclaim Agreement ("Quitclaim"), the Producer Loanout Agreement "PLA") and Amendment #1 to the Quitclaim ("Amendment") (collectively, "Agreements").    The Quitclaim and the PLA were each made on November 11, 2009.

<h3 align="center">1.      The Quitclaim Agreement</h3>

The pertinent provisions of the Quitclaim are these:

1A.   PROPERTY:
   (a)   Any and all literary material . . . in connection with the project currently known as "THE CONJURING" fka 'THE UNTITLED HAYES BROTHERS PROJECT" . . . fka "THE DEMONOLOGIST", including without limitation:
      (ii) Any and all drafts, revisions and rewrites of that certain screenplay entitled "The Conjuring" and any related material written by Chad Hayes and Carey Hayes.
      (iii) The entire case file library (approximately 8,000 case files) related to the Warrens' paranormal investigations ("Case Files"), including but not limited to, all interviews, case histories, photographs, notes, timelines (including the entire Case File for the Perrons and the timeline of events prepared by Andrea Perron) and the "Preferred Case Files."
   (b)   Any and all right, title and interest in and to the entire life stories of Ed and Lorraine Warren . . . . including without limitation, all paranormal investigations of the Warrens . . .
   (c)   Any and all agreements, assignments, instruments and other documents heretofore made pursuant to which services are to be rendered, and/or material furnished in connection with any and all motion pictures or other productions to be based in whole or in part on the Literary Material (the first production shall be referred to as the "Picture") or which transfer rights in and to the Literary Material, including without limitation, the following:
      (i)     Warren Documents
   (d)   Any and all rights and interests of any type and nature heretofore or hereafter acquired by the Company (DeRosa-Grund and his entities) with respect to the Property and/or pursuant to the Agreements, including without limitation, all motion picture and other rights to the life stories of the Warrens . . . and the characters of Ed and Lorraine Warren.
   (e)   The term "Property" shall mean (a) the Literary Material, (b) the Life Rights, (c) Other Rights and (d) the Agreements.
2.    OPTION:
   (a)   In consideration of the payment of $75,000 . . . New Line is hereby granted an exclusive irrevocable option to acquire all of Company's right, title and interest (except for the "Reserved

5

Rights" as defined below) in and to the Property . . .
    (c)  <u>Option Period Activities:</u>
        (ii)  <u>Warren Case Files</u>:  Within 7 days of Company's (sic)[4] payment of the Initial Option Payment, Company shall submit to New Line a summary of no less than 25 Case Files (including the Case Files involving the Perrons) that Company believes in good faith are best suited for motion picture development and production.  Within 30 days of New Line's receipt of such Case Files, New Line will select up to 25 Case Files for motion picture development in accordance with this Quitclaim Agreement ("Preferred Case Files") . . . If, at any time after selecting a Preferred Case File, New Line elects to exchange a Preferred Case File for a non-selected Case File from any of Company's submissions, New Line may make such an exchange in its discretion.

3.    <u>QUITCLAIM:</u>  Provided New Line duly exercises the Option during the Option Period and effects payment to Company of the Purchase Price, Company does hereby quitclaim to New Line all of Company's right, title and interest, excluding only the "Reserved Rights" (defined below) in and to the Property."

4.    <u>PURCHASE PRICE:</u>  The "Purchase Price" means . . . $750,000 (less the Initial Option Payment and any "Third Party Rights Payments" . . . As used herein, "Third Party Rights Payments" shall mean any monies payable by New Line to third parties (e.g., the Warrens . . . the Perrons . . . the bankruptcy court/trustee, etc.) in connection with any life story or other chain of title rights for the Property or the Picture . . .

5.    <u>ADDITIONAL PAYENTS/DEFERMENTS:</u>  If New Line exercises the Option and the Picture is produced and released by New Line pursuant to this Quitclaim Agreement and if Company is not in breach of any representation, warranty or agreement contained herein, Company shall be entitled to the following additional payments subject to the conditions specified and in accordance with the terms of the applicable exhibit attached hereto . . .
    (a)  <u>Deferments</u>
    (b)  <u>Theatrical Sequels and Remakes:</u>  If an English language feature-length live-action theatrical sequel or remake motion picture based on the Property is produced pursuant to the Rights, or if an English language feature-length live-action theatrical motion picture Case File Production is produced pursuant to the Rights, a sum equal to 100% of the Purchase Price . . . payable 50% within 10 days of the commencement of principal photography of each . . . and 50% within 10 days following the completion of principal photography of each . . . provided that, with respect to such sequels only, in the event that the DBO (domestic box office) for the immediately preceding sequel reaches or exceeds $125,000,000, New Line will give good faith consideration to raising the sequel payment under this Paragraph by up to 15% of the sequel payment of the immediately preceding sequel. . . For the avoidance of doubt, New Line's failure to increase the sequel payment in accordance with this Paragraph will not be a breach of this Quitclaim Agreement.

7.    <u>GRANT OF RIGHTS:</u>  Conditioned only upon New Line's exercise of the Option and payment of the Purchase Price, Company hereby sells, grants, conveys and assigns to New Line exclusively, in perpetuity and throughout the universe, the entire copyright (including, to the fullest extent permitted by law, all renewal, extension and reversion rights in every county of the world) and all right, title and interest in the Property (all of the foregoing being collectively referred to as the "Rights") in and to the Property, except for the "Reserved Rights" specified below. . . Without limiting the generality of the foregoing, the Rights in the Property herein granted include:

---

[4]  Reference to "Company" appears to be a typographical error.  New Line is the payor of the Initial Option Payment, not Company.

NL003919

(a)   <u>Audiovisual Works</u>   The right to produce audiovisual works of all types now know or hereafter devised, and sequels to and remakes thereof and all other types of derivative works based thereon intended for exploitation in any medium and delivery by any means or medium, now know or hereafter devised . . . and all music . . .

(b)   <u>Copyright/Exploitation Rights:</u>   With respect to works produced pursuant to the Rights, all copyrights, neighboring rights, trademarks and any and all other ownership and exploitation rights in the Property nor or hereafter recognized in any and all territories and jurisdictions . . .

(i)   <u>Life Rights:</u>   Upon exercise of the Option, New Line shall own the exclusive rights throughout the world, in perpetuity, to produce, distribute, exhibit, license and otherwise exploit, in any and all media . . . the Works, without limitation sequels and remakes, based on or portraying the life stories of the Warrens, the life stories of the Perrons . . . The rights granted by Company to New Line hereunder are in addition to, and this Quitclaim Agreement shall in no way limit, the rights with respect to the subject matter of this Quitclaim Agreement . . .

8.   <u>RESERVED RIGHTS:</u>   Company reserves the following rights in the Case Files, subject to the following terms and conditions: (i) Company shall have no right to utilize any elements from the Picture or any work produced pursuant to the Rights . . . (ii) the Warrens . . . may not appear as characters in any material developed based on the Reserved Rights, except as set forth in Paragraph 8(a) below, and (iii) New Line has the right to select any of the Case Files for development and use in connection with the Picture and other productions hereunder, whether or not such Case File is also being used in connection with the Reserved Rights.

(a)   <u>Television Rights:</u>   Subject to the foregoing and Paragraph 8(c) below, the right to produce episodic television series ("Company Television Series") based on the Case Files which are not selected by New Line as Preferred Case Files and the following ancillary rights to the Company Television Series . . . :   merchandising, soundtrack recording, video game, commercial tie-ups, home entertainment and music publishing . . . For the avoidance of doubt, Company may not include any aspect of the Preferred Case Files, the Picture or any New Line production in such Company Television Series or ancillary rights exploitation, and New Line has the exclusive right to develop and produce motion pictures and other related productions based on the Preferred Case Files . . .

(b)   <u>Comic Books/Graphic Novels:</u>   Subject to the foregoing, the right to publish comic books and graphic novels based on any Case Files which have been reviewed and specifically rejected by New Line in accordance with the procedure set forth in Paragraph 2(c)(ii) . . .

(c)   <u>First Negotiation/Last Refusal:</u>   If Company at any time proposes to negotiate with any party for the license, exercise or other disposition of any or all of the Reserved Rights (other than publishing rights to comic books and graphic novels), Company shall give New Line written notice thereof and New Line (and its affiliates) shall have an opportunity to so negotiate prior to Company so negotiating with any third party.   If New Line (or its affiliates) elects to so negotiate, Company and New Line (or its affiliates) shall negotiate in good faith for a period of not less than 30 days from the commencement of such negotiations, and if an agreement does not result therefrom Company may thereafter negotiate with any third party.   If Company at any time is prepared to enter into an agreement with a third party for the license, exercise or other disposition of any or all of the Reserved Rights (other than publishing rights) Company shall before entering into such agreement give New Line written notice of the proposed terms thereof . . . and the party involved.   In each instance, New Line (or its affiliates) shall then have 10 business days after receipt of Company's written notice in which to elect to acquire the rights involved on the monetary terms contained in the notice, it being understood that New Line (or its affiliates) shall not be obligated to meet non-monetary terms . . . set forth in such notice.

NL003920

10.   REPRESENTATIONS AND WARRANTIES:     Company makes the following representations and warranties with respect to the Property:

(a)   Company is the sole and exclusive owner of all of the rights granted and to be granted to New Line hereunder, and Company has the right to enter into and perform this Quitclaim Agreement.

(f)   As of the date of execution . . . of this Quitclaim Agreement by Company, the Agreements are in full force and effect . . .

11.   INDEMNITY BY COMPANY:     Company shall indemnify . . . New Line . . . free and harmless against any and all claims . . . or expenses and costs (including reasonable attorneys' fees) arising out of or resulting from . . . any breach by Company of any term or condition of this Quitclaim Agreement . . . and all exhibits hereto.     Should a claim or demand be made, Company shall give prompt notice thereof to New Line and New Line shall have the sole and exclusive right to defend, settle or compromise any claim or demand through counsel of its choice on such terms and in such manner as New Line shall in its sole discretion determine.     Company may join in any such action or proceeding . . . however New Line shall retain control of any such action.

13.   TERMINATION:     New Line and Company hereby agree that if New Line fails to pay the Company the Purchase Price as required herein, this Quitclaim Agreement shall be of no force and effect whatsoever and all right, title and interest quitclaimed hereunder shall automatically and immediately revert to Company without prejudice to Company's or New Line's claims (if any) for breach of the contract.

14.   TITLE:     Upon New Line's written request, Company . . . agrees to withdraw . . . its registration of the title "The Conjuring," if any, with the MPAA Registration Bureau and to allow New Line's registration of such title without prejudice.

17.   ENTIRE AGREEMENT:     This Quitclaim Agreement contains the entire understanding of the parties hereto and replaces any and all former agreements, understandings and representations, and contains all of the terms, conditions, understandings and promises of the parties hereto, relating in any way to the subject hereof.     This Quitclaim Agreement may not be modified except by a document signed by both parties.

18.   BINDING:     . . . All prior negotiations, agreements and writings pertaining to the subject matter hereof are merged herein.

19.   REMEDIES:

(a)   Injunctive Relief Against New Line:     Company acknowledges that in the event of a breach of any of New Line's obligations under this Quitclaim Agreement, the damage (if any) caused to Company thereby will not be irreparable or otherwise sufficient to give rise to a right of injunctive or other equitable relief . . . Company shall neither seek or be entitled to any equitable relief to restrict or interfere with New Line's right to develop, produce, distribute, market or exploit the Picture or any other productions produced pursuant to this Quitclaim Agreement . . .

(b)   New Line's Remedies:     Company acknowledges and agrees that the rights and privileges granted and agreed to be granted to New Line pursuant to this Quitclaim Agreement are of a special, unique, unusual extraordinary and intellectual character, making them difficult to replace and giving them a peculiar value, the loss of which cannot be reasonably compensated in damages in an action at law; that if Company shall breach any provision of this Quitclaim Agreement, new Line will be caused irreparable damage; and that, therefore, New Line shall be entitled as a matter of right, at its election, to enforce this Quitclaim Agreement and all of the provisions hereof by injunction or other equitable relief.

20.   CROSS-DEFAULT:     Any default by Company under any of the Agreements shall also be deemed a breach by Company of this Quitclaim Agreement.     Any default by Company under this Quitclaim

NL003921

Agreement shall also be deemed a breach by DeRosa-Grund of the Producer Agreement.
21.   GOVERNING LAW/DISPUTE RESOLUTION:   All controversies, claims or disputes between the parties to this Quitclaim Agreement arising out of or related to his Quitclaim Agreement or the interpretation, performance or breach thereof . . . and the determination of the scope or applicability of this agreement to arbitrate . . . shall be resolved according to the procedures set forth in Paragraph 21(a) below which shall constitute the sole dispute resolution mechanism hereunder.

    (a)   Arbitration:   All Disputes shall be submitted to final and binding arbitration . . . The arbitration shall be initiated and conducted according to . . . the JAMS Comprehensive (for claims over $250,000) Arbitration Rules and Procedures . . . including the Optional Appeal Procedure. . . The arbitrator shall follow California law and the Federal Rules of Evidence in adjudicating the Dispute . . . The arbitrator will provide a detailed written statement of decision . . . The parties shall be responsible for payment of their own attorneys' fees in connection with any proceedings under Paragraph 21(a).

    (e)   Governing Law/Jurisdiction and Venue:   This Quitclaim Agreement shall be governed and construed in accordance with the laws of the State of California applicable to contracts entered into and fully performed therein.
NL 26.

## 2.   The Producer Loanout Agreement

       Certain provisions in the PLA replicate provisions in the Quitclaim.   The pertinent, non-duplicative provisions of the PLA are these:
This agreement . . is entered into . . . in connection with the motion picture project presently entitled "THE CONJURING" ("Picture").
2.   DEVELOPMENT:
    (b)   Completion of Development:   In the event Company "Elects to Proceed to Production" of the Picture based on the screenplay supervised by Artist . . . subject to Paragraphs 14 and 16 below, Company shall be deemed to have engaged Artist's productions services on a "pay or play" basis for the "Basic Compensation", as defined in Paragraph 4 below . . . Company may "Elect to Proceed to Production" by written notice or shall be deemed to have "Elected to Proceed to Production" when Company has: . . . (iii) notified Artist in writing of the start date for the commencement of principal photography.
4.   COMPENSATION:
    (b)   Basic Compensation:   If Company engages Artist's production services on a "pay or play" basis . . . Lender shall be entitled to basic compensation in the amount of $500,000, less the Development Fee and any deductions . . .
7.   CREDIT: Company shall accord Artist the following credit in connection with the Picture:
    (a)   Personal Credit.   As individual producer substantially in the form "Produced By Tony DeRosa-Grund.   (i)   On the screen in all positive prints of the Picture, on a separate card . . .
    (b)   Production Credit.   A production credit substantially in the form "An Evergreen Media Group Production . . . (i) On the screen in all positive prints of the Picture, on a separate card . . .
9.   RIGHTS:
    (a)   Ownership:   All results and proceeds of every kind of the services heretofore and hereafter to be rendered by Lender (Evergreen Media Holdings, LLC) and/or Artist (Derosa-Grund) in connection with the Picture, including without limitation all ideas, suggestions, themes, plots, stories, characterizations, dialogue, titles and other material, whether in writing or not in writing, at any time

NL003922

heretofore or hereafter created or contributed by Lender and/or Artist which in any way relate to the Picture or to the material on which the Picture will be based (collectively "Material"), are and shall be deemed to be "works for hire" for Company (New Line).   Accordingly, Company is and shall be considered the author and . . . the sole and exclusive owner of the Material and all right, title and interest therein (the "Rights").   The Rights shall include without limitation all copyrights, neighboring rights, trademarks and any and all other ownership and exploitation rights in the Material now or hereafter recognized in any and all territories and jurisdictions including . . . the right to exploit the Material throughout the universe in perpetuity in all media, markets and language and in any manner now known or hereafter devised . . .

16.   <u>NO OBLIGATION TO PROCEED/"PAY OR PLAY"</u>:   Notwithstanding any other provision of this Agreement, Company shall have no obligation to utilize Artist's services . . .

22.   <u>CONFIDENTIALITY/PUBLICITY</u>:   Neither Lender nor Artist shall without Company's prior written approval, (i) issue or authorize the publication of any news story, publicity or publicity materials relating to the Picture, Artist's services hereunder, or Company, (ii) make any derogatory or knowingly false statements concerning the Picture, Company or any officers or employees of the Company, (iii) disclose any confidential information regarding Company or the Picture . . . or (iv) encourage any other individual to do any of the foregoing . . .

24.   <u>PREMIERE</u>:   If Lender and Artist perform all services required hereunder and are not in default hereof and Artist is accorded "produced by" credit on the Picture, Company shall invite Artist and a non-business companion to one U.S. celebrity premiere of the Picture . . . If Artist attends such a celebrity premiere . . . Artist and Artist's non-business companion shall be provided with round-trip transportation, first class . . . and first-class hotel accommodations.

26.   <u>MISCELLANEOUS</u>:

(a)   <u>Entire Understanding . . .</u>:   This Agreement expresses the entire understanding of the parties hereto and replaces any and all former agreements or understandings, written or oral, relating to the subject matter hereof.   Each of Lender and Artist hereby acknowledges that no representation or promise not expressly contained in this Agreement has been made by Company or any of its officers, employees, agents or representatives . . . This Agreement may not be modified except by a written instrument signed by all parties hereto . . .

NL 27.

Exhibit A:

12.   <u>Ownership</u>:   Participant expressly acknowledges that Participant has and will have    . . . no lien . . . to the Defined Gross of the Picture.

## 3.     Amendment to Quitclaim Agreement

The pertinent provisions of the Amendment, which is dated October 19, 2010, are these:

WHEREAS, New Line is currently negotiating an option and purchase agreement whereby New Line will acquire an exclusive option to purchase the Warren Rights directly from Lorraine Warren . . .

WHEREAS, upon New Line securing the Warren Rights, New Line has agreed to grant Company (DeRosa-Grund and his entities) certain, limited television series rights, subject to the terms and conditions set forth herein and in the Quitclaim Agreement.

For good and valuable consideration (the receipt and sufficiency of which are hereby acknowledged), the parties hereto hereby agree to amend the Quitclaim Agreement . . .

2.   <u>Case File Selection</u>.    . . . the procedure for submission, review and selection of the Case Files

10

NL003923

set forth in Paragraph 2(c)(ii) of the Quitclaim Agreement will no longer be applicable, and in lieu thereof, the procedure set forth below will govern . . .

    (ii)  <u>Warren Case Files</u>:  Within 7 days of Company's[5] payment of the Initial Option Payment, Company will submit to New Line a summary of no less than 25 Case Files (including the Case File involving the Perrons, and New Line hereby acknowledges receipt of 25 summaries) that Company believes in good faith are best suited for motion picture development and production. The parties acknowledge that, pursuant to the New Line/Warren Life Story Agreement currently being negotiated, Lorraine Warren has agreed to provide New Line with summaries of up to an additional 50 Case Files.   Accordingly, upon receipt of the additional Case File summaries from Lorraine Warren, New Line will select up to 25 Case Files (from Company's and Lorraine Warren's submissions) for motion picture development in accordance with this Quitclaim Agreement . . . The Case Files which are reviewed and rejected by New Line may be utilized by the Company in connection with a "Company Television Series" . . . If, at any time after selecting a Preferred Case File, New Line elects to exchange a Preferred Case File for a rejected Case File from any of Company's or Lorraine Warren's submissions, New Line may make such exchange in its discretion . . . New Line's Rights with respect to the Case Files shall be exclusive . . . Company hereby represents and warrants that as of the date of execution of the first amendment to this Quitclaim Agreement, none of the Case Files have been offered for, or are being considered for development as a "Company Television Series."

6.   <u>Assignment of Television and Other Rights</u>.  Throughout the Quitclaim Agreement, the defined term "Reserved Rights" is hereby replaced with "Quitclaimed Rights."   Paragraph 8 of the Quitclaim Agreement is hereby deleted and replaced with the following:

    8.   <u>QUITCLAIMED RIGHTS</u>:  . . . New Line hereby quitclaims the following rights in the Case Files to Company . . . subject to the following terms and conditions: (i) Company shall have no right to utilize any elements from the Picture or any work produced pursuant to the Rights . . . (iii) New Line has the right to select any of the Case Files for development and use in connection with the Picture and other productions hereunder, whether or not such Case File is also being used in connection with the Quitclaimed Rights . . .

        (a)   <u>Television Rights</u>.   [same as Quitclaim]
        (b)   <u>Comic Books/Graphic Novels</u>.   [same as Quitclaim]
        (c)   <u>First Negotiation/Last Refusal</u>.   [same as Quitclaim except term "Reserved Rights" replaced by "Quitclaimed Rights" . . .

8.   <u>Release/Development Fee and Partial Producer Advance</u>.   As consideration for the release of claims set forth below, New Line hereby agrees to advance the total sum of $25,000 to EMH . . . which shall be an advance of the following sums: (i) the second half of the Development Fee payable under Paragraph 4(a) of the Producer Agreement . . . and (ii) $12,500 of the Basic Compensation payable under Paragraph 4(b) of the Producer Agreement . . . the following is hereby added as Paragraph 24 of the Quitclaim Agreement.

    24.   <u>Release of Claims</u>.   Company acknowledges that, if DeRosa-Grund contributed any oral or written material to the screenplay for the motion picture currently entitled "The Conjuring" (including, but not limited to, a treatment), such material is owned and controlled by Company . . . Further, Company makes the following release of claims.   Company . . . covenant(s) not to sue, and release(s) and discharge(s) New Line, parent companies, affiliates, officers . . . from any and all claims.

---

[5] As in the Quitclaim, reference to "Company" appears to be a typographical error.   New Line is the payor of the Initial Option Payment, not Company.

NL003924

. . of whatever nature . . ., whether known or unknown, which have ever existed or which do exist prior to or as of the execution of the agreements set forth in the Conditions Precedent in Amendment #1, . . . related in any way to the rights granted under the New Line/Warren Life Story Agreement, the Property, the Picture or any other rights or agreements related to the foregoing, including . . the Quitclaim Agreement, the Producer Agreement . . . Further, Company . . . waives any and all rights which Company may have with respect to this Quitclaim Agreement, or the subject matter hereof, under the provisions of Section 1542 of the Civil Code of the State of California . . . NL 102.

### 4.        Negotiations of Quitclaim and PLA

Alexander and then New Line Business and Legal Affairs Counsel Allison Strina negotiated the agreements with DeRosa-Grund and his attorney, John Gatti, an experienced entertainment attorney who was then a partner and chair of the Litigation Department at the Stroock, Stroock and Lavan law firm.   DeRosa-Grund testified that Gatti is listed in the 100 Hollywood SuperLawyers. The negotiations were extensive.   Alexander testified that the negotiation of the deal with DeRosa-Grund was one of the most heavily negotiated deals on which he had ever worked.   There were 10 drafts of the Quitclaim and five drafts of the PLA.   Strina testified that Gatti did not extensively negotiate the Grant of Rights provision in the Quitclaim, requested no changes to the Additional Payments provision, did not negotiate the standard integration clause, never asked that the arbitration clause be removed, never asked for language attaching DeRosa-Grund to sequels or prequels and did not request that any breach be "material."

Early in the negotiations, after DeRosa-Grund called Strina three or four times within a couple hours while she was unavailable. DeRosa-Grund left a voice mail message for Strina that she did not need to return his phone calls and that he would just see her in the parking lot.   Strina perceived the message as a threat of physical violence and decided going forward she would speak only with Gatti.

Strina understood from her conversations with Gatti, that DeRosa-Grund carefully reviewed the drafts and made many comments.

Alexander negotiated New Line's acquisition of the entire universe of rights except for specific rights, which were reserved.    He testified that he never had any discussion with DeRosa-Grund or Gatti regarding DeRosa-Grund being a producer on sequels or remakes of "The Conjuring" or regarding DeRosa-Grund being compensated for sequels or remakes. Gatti drafted the short form agreement which contained no language regarding DeRosa-Grund producing sequels or remakes.   NL 33.

### 5.        Negotiation of Quitclaim Amendment

In August 2010, Gary Barkin, an attorney representing Lorraine Warren, informed New Line that Warren had reviewed the purported "Life Story Option Purchase Agreement" and three purported amendments between DeRosa-Grund and her and confirmed that her signatures were falsified.   Accordingly, Barkin asserted that the forged agreements "are of no force or effect."   New Line understood that Warren's allegation created a significant cloud of title regarding her life rights

NL003925

upon which the Quitclaim was based, posing significant risks to its investment.   NL 77.   Warren refused to enter into any direct deal with DeRosa-Grund.   NL 92.   New Line entered two agreements to resolve the cloud.   First, it entered the Life Story Option Purchase Agreement with Warren on December 7, 2009, by which it acquired her rights directly.   NL 117.   Second, it entered the Amendment to transfer certain of those rights back to DeRosa-Grund.   NL 102.

Strina and Gatti exchanged 14 drafts of the Amendment over a five month period.   New Line insisted on a broad release of rights in the Amendment because of numerous threats DeRosa-Grund had made to pursue civil and criminal actions against it.   DeRosa-Grund initially asked for $50,000 in consideration for the Release.   NL 103.

### D.        New Line Post-Agreements Performance

New Line entered an Assignment Agreement with Warner Bros. on January 1, 2010 to transfer its intellectual property rights to Warner Bros.   NL 40.

Prior to negotiation and execution of the Amendment, on April 16, 2010, New Line paid $75,000 to DeRosa-Grund and his entities as payment in full of the Initial Option Payment pursuant to Paragraph 2(a) of the Quitclaim.   NL 72.   After the Amendment resolved the chain of title cloud, New Line proceeded with production of "The Conjuring."   On February 8, 2011, New Line paid $25,000 to DeRosa-Grund and his entities as payment in full of the Advance pursuant to Paragraph 8 of the Amendment and as full payment of the second half of the Development Fee pursuant to Paragraph 4(b) of the PLA, as well as payment of $12,500 of Basic Compensation pursuant to Paragraph 4(b) of the PLA.   NL 116.   New Line also paid DeRosa-Grund and his entities eight weekly payments of $7812.50, totaling $62,500, for basic compensation during pre-production pursuant to Paragraph 4(b)(i) of the PLA.   NL 143.   In addition, New Line paid DeRosa-Grund and his entities $385,000 on February 1, 2012 as full payment of the Purchase Price less the Initial Option Payment and Third Party Rights Payments pursuant to Paragraph 4 of the Quitclaim.   NL 152.

Principal photography began in early 2012.   Safran was the on-set creative producer. DeRosa-Grund visited the set once. "The Conjuring" was released in July 2013.   It has grossed over $300,000,000.

On October 3, 2014, New Line released "Annabelle" as a motion picture.   It has grossed over $200,000,000.   New Line originally developed "Annabelle" as a direct-to-video release.   After a positive test screening in June 2014, Hamada, New Line's Senior Vice-President of Production, submitted "Annabelle" to New Line's greenlight committee, which approved it for theatrical release. New Line invested more money in "Annabelle" and shot six additional days of footage.   Once it decided to release "Annabelle" theatrically, New Line paid DeRosa-Grund $750,000.

### E.        DeRosa-Grund Post-Agreements Performance

#### 1.        Trademark Applications

On March 21, 2012 and May 3, 2012, DeRosa-Grund filed intent to use trademark applications with the United States Patent and Trademark Office (USPTO) for "The Conjuring"

13

NL003926

covering graphic novels, video games, clothing, board games, comics and entertainment services, which included a television series and motion pictures.   NL 161, 162, 171 & 172.   DeRosa-Grund disclosed these filings to New Line on September 18, 2012.   NL 192.   DeRosa-Grund also stated to New Line that he owned the trademark "The Conjuring" and that New Line could not use "The Conjuring" as the title to the motion picture without a licensing agreement with him.   *Id.*   He demanded that New Line remove the title from its test screening of the film that week.   *Id.*

New Line rejected DeRosa-Grund's demands and gave notice to Gatti that it would oppose DeRosa-Grund's trademark applications and seek its attorneys' fees.   NL 211.   It engaged trademark counsel to bring an opposition proceeding before the USPTO.   NL 239.   The Trademark Trial and Appeal Board granted New Line's Motion to Suspend the Trademark Process on July 29, 2013.   NL 272.   Thereafter, DeRosa-Grund abandoned his Applications.   NL 294.   New Line incurred $12,431 in attorneys' fees and costs.   NL 240, 254, 275, 301, 303, 308 and 333.

2.        **Negotiations with Lionsgate to Produce Television Series**

At the end of DeRosa-Grund's September 18, 2012 email to Alexander, he wrote: ". . . I am told that I am supposed to notify you – as per the contract between us, that we are selling the TV rights we enjoy as reserved rights.   My understanding is that we will probably have a "THE CONJURING" show on the air for next summer or fall's cycle at the latest.    Forgive me but I thought John was going to notify you yesterday about the TV series deal but since he is busy with other matters I am making the notification to you directly."   NL 192.   New Line responded to DeRosa-Grund that day, stating that he did not have any rights in "The Conjuring" and thus could not sell television rights.   NL 193.

On Friday, December 21, 2012 at 7:47 pm, Gatti emailed Alexander "confirming that several weeks ago prior to Thanksgiving Tony . . . notified New Line in writing that Evergreen Media had received an offer for the television rights for The Conjuring . . . Tony never received any written response to this notice.    I spoke with you shortly after Evergreen Media's notice of television rights offer was sent to New Line to discuss New Line's response if any to Evergreen's notice.    You confirmed to me that New Line had no interest . . . and that New Line would not match any television rights offer received by Evergreen Media . . ."   NL 208.

Alexander did not see Gatti's email until he returned from the holiday break on Monday, January 7, 2013.    Neither Gatti nor DeRosa-Grund at that time informed Alexander or anyone at New Line that DeRosa-Grund and Lionsgate, a film and television production company, executed a Term Sheet, as of January 3, 2013, revised January 9, 2013, whereby Lionsgate would purchase DeRosa-Grund's rights in "The Conjuring."   NL 209.

New Line learned about DeRosa-Grund's deal with Lionsgate in early May 2013.    On May 20, 2013, Amar of New Line informed legal counsel at Lionsgate that New Line owned all right, title and interest in "The Conjuring" picture and retained exclusive rights in the case file on which it is based.    Amar demanded that Lionsgate abandon use of "The Conjuring" title for the television series.   NL 222.    According to DeRosa-Grund, Lionsgate relinquished its rights in the television series as of September 11, 2013.   NL 298.

14

On December 12, 2013, Gatti notified New Line's counsel that notwithstanding New Line having waived its rights of first negotiation/last refusal based on "the parties prior dealings," DeRosa-Grund was notifying New Line of its intent to negotiate with a third-party for the license of reserved television series rights.   NL 307.   The notice requested a response by December 16, 2013. NL 307.   New Line responded on December 18, 2013 that it was exercising its right of first negotiation and was very interested in acquiring the television rights.   NL 310.   DeRosa-Grund informed New Line on December 19, 2013 that he had no desire to dispose of his reserved television rights.   NL 313.   Then, on January 6, 2014, DeRosa-Grund informed New Line that the 30 day "negotiation window" expires on January 11, 2014.   New Line wrote Gatti on January 7, 2014 that it would meet the same terms as set forth in the DeRosa-Grund – Lionsgate Term Sheet.   NL 316. DeRosa-Grund withdrew the offer.   NL 317.

In the course of his negotiations with Lionsgate, DeRosa-Grund disclosed to Lionsgate certain audience testing scores and the confidential planned release date for "The Conjuring".   NL 206 & 215.

### 3.     Registration of Sequel Titles with MPAA

On May 16, 2013, DeRosa-Grund registered ten sequel titles for "The Conjuring" with the Title Registration Bureau of the Motion Picture Association of America (MPAA).   NL 220.   New Line filed protests to each of the titles and registered its own titles, which DeRosa-Grund protested. MPAA rules prohibited use of the registered titles until the protests were resolved.   DeRosa-Grund withdrew his registrations, effective September 30, 2013.   NL 298.

### 4.     The Demonologist Option

DeRosa-Grund entered an option agreement with Gerald Brittle, the author of a book entitled *The Demonologist: The Extraordinary Career of Ed and Lorraine Warren*.   NL 1.   According to DeRosa-Grund, this option granted him motion picture rights in Brittle's book, including a chapter entitled "Annabelle."   NL 1.   DeRosa-Grund has not provided New Line a copy of the option agreement.   DeRosa-Grund sold his purported rights in Brittle's book to film producer Paul Rock, who threatened to enjoin New Line from releasing its motion picture "Annabelle".   NL 357.   New Line has tendered to DeRosa-Grund a demand that DeRosa-Grund indemnify it against Rock's threat. NL 358.   DeRosa-Grund refused New Line's demand.   NL 364.   New Line has incurred $22,779 in attorneys' fees in connection with Rock's threat.   NL 362.

### 5.     REDACTED

### 6.     Case Files

15

New Line on April 10, 2014 demanded that DeRosa-Grund provide it all of the approximate 8000 Case Files.   NL 327.   DeRosa-Grund contended that he had previously satisfied his obligation by providing to New Line the 25 case files New Line had selected and furthermore, that a "well-documented" fire at his home destroyed "materials he created in connection with the Warren files..   NL 328.

7.   **Texas Federal Court Lawsuits**

DeRosa-Grund filed a federal lawsuit against New Line and Warner Bros. in the U.S. District Court for the Southern District of Texas on March 28, 2014.   This suit (First Texas Lawsuit) pled causes of action for breach of contract and breach of the implied covenant of good faith and fair dealing against New Line and for tortuous interference with business relations, fraud in the inducement, promissory estoppel, conversion, declaratory relief and violation of Section 43(a) of the Lanham Act against both New Line and Warner Bros.   NL 325.

New Line filed a motion to stay or dismiss the First Texas Lawsuit pursuant to the Federal Arbitration Act because this Arbitration was pending.   The Court granted New Line's motion to dismiss on the ground that all of DeRosa-Grund's causes of action arise out of the Agreements subject to arbitration clauses and should be decided in this Arbitration.   NL 373.

DeRosa-Grund filed a second lawsuit in the U.S. District Court for the Southern District of Texas on April 23, 2014, alleging claims regarding "The Conjuring".   He voluntarily dismissed this suit (Second Texas Lawsuit).

New Line tendered a demand for defense and indemnification to DeRosa-Grund for its legal fees and costs incurred in defending against the First and Second Texas Lawsuit.   NL 335.   DeRosa-Grund refused.   New Line has incurred approximately $72,301 in attorneys' fees in defending against the Texas Lawsuits.   NL 332 & 360.

8.   **Other Acts**

DeRosa-Grund made numerous threats against New Line.   He threatened to engage in his own "independent publicity."   NL 248.

REDACTED

On October 8, 2010, DeRosa-Grund sent an email to Alexander, which stated, among other things, that he would not stand for his intellectual property being stolen, that whole passages in the scripts were lifted from his work and that he would return to the U.S. Attorney to address the issue.

F.   **Fees and Costs**

New Line advanced $49,498.63 in behalf of DeRosa-Grund for JAMS arbitration fees.   NL 361.   New Line also paid $11,148.43, representing one-half the costs of the stenographic record.

16

### G.      **Prejudgment Interest**

At a 7% per annum rate, the prejudgment interest on New Line's $107,511 damages amounts to $4117.56.

## III.      **DISCUSSION**

### A.      **The Pleadings**

New Line filed a Demand for Arbitration Before JAMS against DeRosa-Grund and his entities on June 5, 2013 and an Amended Demand on June 18, 2013.   The Demand and Amended Demand alleged claims for breach of contract and interference with trademark, intellectual property and other rights.   The breach of contract claim alleged that in violation of applicable agreements, Respondents filed Federal Trademark applications, registered titles with the MPAA and entered an agreement with Lionsgate to produce a television show entitled "The Conjuring".   New Line sought declaratory relief and an award of attorneys' fees and costs.

DeRosa-Grund and the entity Respondents filed an Amended Response to the Amended Demand on September 3, 2013.   The Amended Response generally denied all allegations, presented six affirmative defenses and asserted four counterclaims for breach of written contract and breach of the implied covenant of good faith and fair dealing against New Line and for intentional interference with economic relations and declaratory relief against New Line and Warner Bros.   DeRosa-Grund sought compensatory damages, declaratory relief and attorney fees and costs.   On December 19, 2013, DeRosa-Grund filed a Second Amended Response to the Amended Demand that, among other things, added claims for fraud in the inducement and promissory estoppel against New Line and prayed for rescission.

On September 18, 2013 New Line and Warner Bros. generally denied the original Counterclaim and presented 27 affirmative defenses.   On May 5, 2014, New Line filed an Answer to the Second Amended Counterclaim.   On January 17, 2014 and on May 30, 2014, New Line filed a Second Amended Demand for Arbitration, which among other things, added a claim for specific performance that DeRosa-Grund provide New Line an opportunity to exercise its right of last refusal regarding the Lionsgate deal.   DeRosa-Grund filed a Response to the Second Amended Demand on July 15, 2014, which asserted nine affirmative defenses and added counterclaims against both New Line and Warner Bros. for fraud in the inducement, promissory estoppel, conversion and violation of Section 43(a) of the Lanham Act and against New Line for fraud.

New Line asserted 43 affirmative defenses to what it termed DeRosa-Grund's Third Amended Counterclaims.

### B.      **Applicable Law**

California law, the JAMS Comprehensive Arbitration Rules and Procedures (JAMS Rules) and the Federal Rules of Evidence govern this Arbitration.

NL003930

The following is a summary of the relevant law that is applicable to the contested issues. Law that is not necessary to decide a contested issue is omitted.

A contract must be interpreted to give effect to the mutual, expressed intention of the parties. Where the parties have reduced their agreement to writing, their mutual intention is to be determined, whenever possible, from the language of the writing alone.   *Ben-Zvi v. Edmar Co.* (1995) 40 CA4th 468, 472-473.    Expressed objective intent, not unexpressed subjective intent, governs. *Vaillette v. Fireman's Fund Insurance Co.* (1993) 18 CA4th 680, 686.   "The language of a contract is to govern its interpretation, if the language is clear and explicit, and does not involve an absurdity." Civil Code §1638.    "(I)ntention must be ascertained from the words used, after taking ino consideration the entire contract and the circumstances under which it was made."   *Moss Development Co. v. Geary* (1974) 41 CA3d 9.   "The words of a contract are to be understood in their ordinary and popular sense . . . unless used by the parties in a technical sense, or unless a special meaning is given to them by usage, in which case the latter must be followed."   CC §1644.    Courts must give significance "to every word of a contract, when possible, and avoid an interpretation that renders a word surplusage."    *In re Tobacco Cases I* (2010) 186 ca4th 42, 49.

"The rule is well settled that in construing the terms of a contract the construction given it by the acts and conduct of the parties with knowledge of its terms, and before any controversy has arisen as to its meaning, is admissible on the issue of the parties' intent."   *Southern California Edison Co. v. Superior Court* (1995) 37 CA4th 839, 851.    In determining mutual intent, a court should give great weight to the subsequent conduct of the parties.    Pre-dispute, post-contracting conduct is admissible to demonstrate an ambiguity . . . and may reveal what the parties understood and intended those terms to mean.    *Cedars-Sinai Medical Center v. Shewry* (2006) 137 CA4th 964, 983.

"The correct rule (of California law) with reference to the admissibility of evidence as to trade usage . . . is that while words in a contract are ordinarily to be construed according to their plain, ordinary, popular or legal meaning, . . . yet if in reference to the subject matter of the contract, particular expressions have by trade usage acquired a different meaning, and both parties are engaged in that trade, the parties to the contract are deemed to have used them according to their different and peculiar sense as shown by such trade usage.    Parol evidence is admissible to establish the trade usage . . ." *City Savings and Loan Association v. General Insurance Co. of America* 386 F. Supp. 1210, 1217 (N. D., Cal. 1974).    "For evidence of custom to have potency it must be established that the parties to the contract were aware of the existence of the custom" and manifest their assent.   *Id.,* at 1218.

Extrinsic evidence is properly admissible to construe a written agreement only when the language is ambiguous and the evidence "is relevant to prove a meaning to which the language is reasonably susceptible."   *Winet v. Price* (1992) 4 CA4th 1159, 1165.

Interpretation of an assignment is determined as any contract.   *Mission Valley East, Inc. v. County of Kern* (1981) 120 CA3d 89, 96.    An assignment is valid if its language is "clear and positive." *Id.*

A broad integration clause bars extra-contractual promises regarding the agreement's subject matter and, accordingly, defeats an otherwise viable promissory estoppel claim based on the extra-contractual promises.   *AMC Teechnology, LLC v. Cisco Systems, Inc.*, 2012 WL 174949 (N.D.

NL003931

Cal.).

A plaintiff suing for breach of contract must prove he performed all conditions on his part or was excused from performance.   *Consolidated World Investment, Inc. v. Lido Preferred, Ltd.* (1992) 9 CA4th 373, 380.   A party to a contract seeking to hold the other party to the contract's obligations must first perform all conditions precedent.   CC §1439; *Pry Corporation of America v. Leach* (1960) 177 CA2d 632, 639-640.

"Every contract contains an implied covenant of good faith and fair dealing, obligating the contracting parties to refrain from doing anything which will have the effect of destroying or injuring the right of the other party to receive the fruits of the contract."   *Wolf v. Superior Court* (2003) 107 CA4th 25, 31.   The implied covenant cannot contradict the express terms of the contract.   *Carma Developers, Inc. v. Marathon Development California, Inc.* (1992) 2 C4th 342, 374.

An obligation to indemnify against claims, demands or liability includes the costs of defense incurred in good faith and in the exercise of reasonable discretion.   CC §2778(3). Whether an indemnity provision covers a particular case turns on contract interpretation.   *Zalkind v. Ceradyne, Inc.* (2011) 194 CA4th 1010, 1024.   The general rule that the term "indemnity" covers only third party claims does not apply "if the parties . . . use the term . . . to include direct liability as well . . . " *Id.*

"At common law, the exclusive right to (a trademark) grows out of its *use*, and not its mere adoption."   *In re Trade-Mark Cases.* 100 U.S. 82, 94.   A pitch to sell an idea to potential investors is not analogous to the sale of a trademark, which requires "prior use of the mark in a way sufficiently public to identify or distinguish the marked goods in an appropriate segment of the public mind as those of the adopter of the mark."   *Keane v. Fox Television Stations, Inc.* 297 F. Supp. 2d 921 (S.D. Tex. 2004), *affirmed Keane v. Fox Television Stations, Inc.*, 129 Fed. Appx. 874 (5th Cir. 2005).   The use must be continuous.   *Spin Master, Ltd. v. Zobmondo Entertainment, LLC*, 944 F. Supp. 2d 830, 851 (C.D. Cal. 2012).

"(A)ttempts to sell . . . property to a third party without adequate notice and opportunity to exercise the preemptive right of first negotiation constitute breach of contract enforceable by specific performance.   *Campbell v. Alger* (1999) 71 CA4th 200, 206.   Even if money damages would be sufficient compensation, it is proper to grant specific performance where the parties have agreed to such a remedy.   *DVD Copy Control Association, Inc. v. Kaleidescope, Inc.* (2009) 176 CA4th 697, 725.

"A cause of action for conversion requires allegations of plaintiff's ownership or right to possession of property; defendant's wrongful act toward or disposition of the property, interfering with plaintiff's possession; and damage to plaintiff.   Money cannot be the subject of a cause of action for conversion unless there is a specific, identifiable sum involved . . ." *PCO, Inc. v. Christiansen, Miller, Finnk, Glaser, Weil & Shapiro* (2007) 150 CA4th 384, 395.

The elements of a cause of action for interference with contract are: (1) plaintiff had a valid and existing contract; (2) the defendant had knowledge of the contract and intended to induce its breach; (3) the contract was in fact breached by the contracting party; (4) the breach was caused by the defendant's unjustified or wrongful conduct; and (5) the plaintiff has suffered damage.   *Dryden v.*

19

NL003932

*Tri-Valley Growers* (1977) 65 CA3d 990, 995.   Justification is an affirmative defense to tortuous interference.   *Lowell v. Mother's Cake & Cookie Co.* (1978) 79 CA3d 13, 18.

Section 43(a) of the Lanham Act forbids the use of false designations of origin and false descriptions or representations in the advertising and sale of goods and services.   15 USC §1125(a). The phrase "origin of goods" in §43(a) refers to "the producer of tangible goods offered for sale, not to the author of an idea embodied in the goods." *Dastor Corp v. Twentieth Century Fox Film Corp.*, 539 US 23, 37 (2003).

A court may issue a declaration of rights "in cases of actual controversy relating to the legal rights and duties of the respective parties."   CCP §1060.   "The purpose of declaratory relief is to liquidate uncertainties and controversies which might result in future litigation and whether a determination is proper . . . is a matter within the trial court's discretion."   *Interstate Marina Development Co. v. County of Los Angeles* (1984) 155 CA3d 435, 443.   It is available even when the disputed contract has already been breached.   *Columbia Pictures Corp. v. De Toth* (1945) 26 C2d 753, 761.

Challenges to JAMS jurisdiction are waived unless asserted in a response to a Demand, or shortly thereafter when circumstances first suggest an issue of arbitrability.   JAMS Rule 9(f).   "A claimant may not voluntarily submit his claim to arbitration, await the outcome, and, if the decision is unfavorable, then challenge the authority of the arbitrators to act."   *Ficek v. So. Pacific Co.*, 338 F.2d 655, 656-657 (9th Cir. 1964).   An arbitration agreement may be unenforceable if it is both procedurally and substantively unconscionable.   *Armendariz v. Foundation Health Psychare Services, Inc.* (2000) 24 C4th 83, 113-114.

## C.   Analysis

This analysis addresses only the central issues and determinations which the Arbitrator considers necessary to decide this case.

The essence of this dispute is interpretation of the Quitclaim, its Amendment and the PLA. New Line contends that these fully integrated Agreements are unambiguous.   DeRosa-Grund argues that the Agreements either should be interpreted in light of certain oral representations or strictly according only to their express terms.

### 1.       Witnesses

The credibility of the witnesses who negotiated the Agreements bears on interpretation of the Agreements.   The most important percipient witnesses were Alexander, DeRosa-Grund, Gatti and Strina.

Alexander is a smart, experienced entertainment industry executive.   He was knowledgeable about the industry and fully familiar with the negotiations of these Agreements and related business matters.   His frustrations with DeRosa-Grund were evident notwithstanding his controlled testimony.   His answers were direct and consistent with the documentary evidence. His demeanor raised no questions.   Overall, Alexander's testimony was entirely credible.

20

NL003933

DeRosa-Grund said that he felt well enough to testify.    His answers were articulate, coherent and subject matter responsive.    Perhaps DeRosa-Grund's absence impaired slightly the Arbitrator's perceptions of his credibility, as it was not possible to observe his demeanor.    However, inconsistencies between testimony and demeanor typically reveal negative attributes, so to the extent his absence had any impact, it likely did not disadvantage him.    More relevant to DeRosa-Grund's credibility was what he testified and the evidence, particularly regarding his behavior.    Much of his testimony seemed calculated.    Of particular concern was his testimony regarding his telephone conversation with Alexander on December 1, 2009, in which DeRosa-Grund alleged Alexander promised that he would be "locked for life."    This point was extremely important to DeRosa-Grund, yet there was no evidence to corroborate his version of the conversation – no testimony by Gatti that DeRosa-Grund informed him of this major development, no confirmation email to Alexander, no communication with his co-producer Safran.    To the contrary, DeRosa-Grund explained the absence of corroboration by stating "We trust people here in Texas."    Such a gratuitous, meaningless statement was unconvincing, especially by an intelligent, experienced entrepreneurial businessman. The credibility of DeRosa-Grund's stated belief that the Agreements did not transfer all his rights to New Line is severely undercut by the fact that in a February 2009 agreement, which he executed, he used the identical words "all right, title and interest" to transfer all the rights in "The Conjuring," including trademark rights from Silverbird to Evergreen Media, even though the term "trademark" did not appear in the agreement.    NL 11.    Also disturbing and undermining of DeRosa-Grund's credibility was the vast documentary and testimonial evidence of his hostile, threatening, angry personality.    He made numerous threats to New Line executives, but rarely followed through on them, which indicates that the threats may have been calculated attempts to manipulate.    There is ample evidence in this matter other than DeRosa-Grund's lack of credibility to reach the conclusions set forth below, but his non-credibility surely reinforced the conclusions.

Gatti is an impressive, highly experienced and accomplished entertainment attorney.    He recalled many details regarding the negotiation of the Agreements.    He testified responsively and coolly.    Some of his answers appeared to reflect the difficulty that, as DeRosa-Grund's past attorney, he had to defend a client whose legal position was weak.    For example, he testified that DeRosa-Grund's September 18, 2012 email to Alexander fulfilled his obligations to give New Line its right of last refusal when he wrote at the end of a long email regarding other subjects: "BTW – speaking of money.    I am told that I supposed to notify you . . . that we are selling the TV rights we enjoy as reserved rights.    My understanding is that we will probably have a "THE CONJURING" show on the air for next summer or fall's cycle at the latest.    Forgive me but I thought John was going to notify you yesterday about the TV series deal but since he is busy with other matters I am making the notification to you directly."    NL 192.    Such a non-specific, throwaway paragraph hardly fulfills the First Refusal/Last Negotiation provision in ¶8(c) of the Quitclaim or the Amendment, yet Gatti was stuck defending his client's position.    There were other instances when Gatti's testimony was unconvincing due to DeRosa-Grund's weak position.    Gatti testified that when he withdrew from representing DeRosa-Grund, his client owed him and Stroock a significant amount of fees, over "six figures."    He further testified that he and DeRosa-Grund had no "specific understanding" that if DeRosa-Grund recovered anything in this arbitration, he would use that to pay down his debt owed to Stroock.    Given DeRosa-Grund's aggressive litigation tendencies and his testimony that he learned about certain "troubling allegations" implicating Gatti for the first time at the Arbitration Hearing, Gatti may well have concerns that DeRosa-Grund might initiate a malpractice action against him,

NL003934

although nothing in this arbitration indicates that such an action would be justified.   Compromised by his past representation of DeRosa-Grund, Gatti was not a convincing witness.

Strina was an earnest, credible witness.

The credibility of the remaining percipient witnesses was not at issue.   Amar succeeded Strina after the Amendment was negotiated.   She seemed to be a competent entertainment attorney. Her testimony regarding DeRosa-Grund's Lionsgate deal was credible.   Barkin seemed objective and had no apparent stake in the outcome of this matter.   Checho's testimony was pointless.   Hamada was an impressive, straightforward witness.   Levin was a minor witness.   Perkins is an impressive, knowledgeable trademark attorney.   Young's testimony about arrangements she made for DeRosa-Grund at the premiere and about DeRosa-Grund's hostility and accusations was entirely credible.

Wyman was the sole expert witness.   He has an extensive 30 year history as a transactional entertainment attorney, specializing in television and film.   He was head of Business and Legal Affairs at New World Entertainment and practiced at the Rosenfeld, Meyer & Susman law firm before opening his own firm, Wyman & Isaacs.   He has testified as an expert witness for and against studios in several cases regarding such transactional issues as custom and practice regarding acquisition of rights agreements.   His principal testimony was as follows:

1.  The phrase "All rights, title and interest" is used all the time in the entertainment industry and means everything you have and everything there is.
2.  The term "Property" in the Quitclaim is catch-all language intended to include all rights, including trademarks, copyrights, screenplays.   The reason studios insist on such broad language is because they want to make sure they acquire all rights.
3.  The one-sided injunctive relief language in the Quitclaim is standard in the industry because studios invest millions of dollars to produce, market and distribute films and want no risk of interference.
4.  In the entertainment industry, the terms "element" and "aspect" mean anything that encompasses the underlying story, such as the story, the characters, the title, the locale.
5.  The custom and practice in the entertainment industry is that all terms are contained in a long form agreement and so that are no other written or unwritten agreements.
6.  "Locked for life" is always a negotiated term and it is used more in television than films.
7.  The phrase "all results and proceeds" in the PLA means whatever is created and worked upon by performance of the contracted services.
8.  "Work for hire" is a term from the Copyright Act, which has been adopted in the entertainment industry and means that all product of the work is owned by the studio.
9.  A "pay and play" provision is extremely uncommon because studios want to be able to remove a troublesome director.
10. The right to work on sequels is a negotiated term.
11.    REDACTED    would be encompassed by the term "any and all rights and interests . . . hereafter" and would fall within the PLA "work for hire" provision, as would The Demonologist.                               REDACTED

Not only was Wyman extremely impressive, knowledgeable and credible, his testimony regarding the meaning of entertainment industry custom and practice made sense.

22

NL003935

### 2.        Standing

Warner Bros. has standing in this arbitration.    In ruling on DeRosa-Grund's Motion for Leave to Take Additional Discovery, which in part sought to depose a person most knowledgeable from Warner Bros., Justice Neal stated that adding Warner Bros. as a party "appears . . . to be sensible and fair to both sides" because Warner Bros. is the assignee of rights in New Line's intellectual property, including the copyright to "The Conjuring", and would be bound by the outcome of the arbitration.    Order Re Motions, August 20, 2014.    Moreover, Warner Bros. is expressly identified as the entity that would distribute the Picture and manage accounting to DeRosa-Grund in Exhibit A to the Quitclaim and Exhibit A to the PLA.    NL 26 & 27.

### 3.        Arbitrability

DeRosa-Grund on his own and in behalf of his controlled entities, executed the Quitclaim and PLA, which contain explicit arbitration clauses.    In negotiating the agreements, he was represented by experienced, competent counsel, who kept him informed of the terms. DeRosa-Grund had entered numerous prior agreements containing arbitration clauses.    He is sophisticated and business-savvy.

DeRosa-Grund argues that the arbitration agreements are procedurally and substantively unconscionable.    This objection is untimely and waived, and furthermore, it is groundless. DeRosa-Grund has participated in this arbitration since filing his initial Response, his Amended Response and Counterclaims and Second Amended Response and Counterclaims.    He has filed discovery and numerous other motions seeking affirmative relief against New Line, including a motion requesting interim relief.    It is long past the time for him to argue that this arbitration is the improper process for resolution of the disputes between the parties.    Any grounds to object are waived.

Even if DeRosa-Grund had not waived his objections, he has no basis to challenge this arbitration on unconscionability grounds.    The agreements were extensively negotiated at arms-length, which negates any basis for procedural unconscionability.    The one-sided injunctive relief provisions in the arbitration clause are standard in the entertainment industry, and hence, cannot be considered to be substantively unconscionable.

### 4.        Interpretation of the Agreements

The Quitclaim and PLA clearly, repeatedly, consistently and unequivocally grant all rights to "The Conjuring" project, including all copyright and trademark rights, to New Line, except as quitclaimed or assigned back to DeRosa-Grund.    This is what the words say and how the entertainment industry does business.    On their face, even to a layperson, the terms "all right, title and interest" and "any and all rights and interest of any type and nature whatsoever heretofore or hereafter acquired" appear to be all-inclusive.    There are numerous infinity-like terms in the agreements used to describe the intellectual property acquired by New Line, such as:

Quitclaim ¶1A:    <u>PROPERTY</u>: "any and all literary material" including "the entire case file library (approximately 8000 case files)", "any and all right, title and interest" to entire the

23

NL003936

Warren life stories, "any and all rights and interests of any type and nature heretofore or hereafter acquired" by DeRosa-Grund.   "Property" means the Literary Material, the Life Rights, Other Rights and the Agreements.

Quitclaim ¶3:   QUITCLAIM: DeRosa-Grund quitclaims to New Line all "right, title and interest, excluding only the Reserved Rights" to the Property.

Quitclaim ¶7:   GRANT OF RIGHTS: DeRosa-Grund conveys to NewLine "exclusively, in perpertuity and throughout the universe, the entire copyright . . . and all right, title and interest in the Property except for the Reserved Rights.   The Rights in the Property include "all copyrights . . . trademarks."

PLA ¶9:   RIGHTS: All results of every kind of the services to be rendered by DR in connection with the Picture shall be deemed "works for hire" for NL.   "Accordingly, (New Line) is . . . the sole and exclusive owner of the Material and all right, title and interest therein.   The Rights shall include . . . all copyrights . . . trademarks and any and all other ownership and exploitation rights in the Material now or hereafter . . . including the right to exploit the Material throughout the universe in perpertuity in all media . . . "

It is unsurprising that such terms have been adopted as the custom and practice in the entertainment industry when a production company, studio or distributor seeks to acquire intellectual property rights, and especially so when the acquiring party is a studio that plans to spend millions of dollars to exploit the property.   It is noteworthy that even DeRosa-Grund himself recognized that such terminology transfers absolutely everything when he drafted and executed a transfer of all rights from one of his entities to another.   Any other interpretation of the Agreements would be absurd.

By contrast, the language regarding DeRosa-Grund's reserved or quitclaimed rights is narrow and limited.

**5.        Breaches of the Agreements**

**a.        Trademark Applications**

DeRosa-Grund had no right to file "intent to use" applications with the USPTO for the trademark in "The Conjuring" because he already had conveyed those rights to New Line in the Quitclaim and its Amendment.   His action clearly breached those agreements.   Although DeRosa-Grund later abandoned his improper applications, New Line incurred attorneys' fees to oppose the applications.

DeRosa-Grund held or retained no trademark rights in "The Conjuring."   He had not continuously used any such a mark sufficient to establish a common law right and, even if he had a common law trademark right, he transferred it by agreeing to the unambiguous provisions of the Quitclaim and PLA.

**b.        Lionsgate Negotiations**

24

NL003937

DeRosa-Grund never gave New Line written notice that he proposed to negotiate with Lionsgate regarding licensing of "The Conjuring" for a television series.    DeRosa-Grund's September 18, 2012 email gave notice of his intent to "sell" the television rights and informed New Line that the program would air in approximately one year.    This email was not written notice that he proposed to negotiate; rather it was notice that there was a done deal.    Likewise, Gatti's eve-of holiday break December 21, 2012 email to Alexander confirmed receipt of an offer for television rights, again not notice of a proposal to negotiate.    DeRosa-Grund's failure to give New Line first negotiation notice breached the Quitclaim.

Nor did DeRosa-Grund give New Line written notice of the proposed terms of its agreement with Lionsgate.    Those proposed terms were set forth in a Term Sheet, dated January 9, 2013.    However, DeRosa-Grund did not provide the proposed terms of its agreement with Lionsgate until sometime in December 2013 following a mediation session.    At about that same time, Gatti gave New Line purported "first negotiation" notice, but when New Line responded to exercise those rights, DeRosa-Grund rejected the idea of disposing his reserved television rights and later withdrew New Line's offer to meet the Lionsgate Term Sheet.    DeRosa-Grund's failure to give New Line proper last refusal notice breached the Quitclaim.

DeRosa-Grund's breach of the first negotiation/last refusal provision damaged New Line by depriving it from acquiring and exploiting the rights in the television series.    New Line is entitled to exercise its right to acquire the rights to the television series on the same terms as DeRosa-Grund negotiated with Lionsgate.    An order that DeRosa-Grund specifically perform is appropriate.

### c.        MPAA Title Registration

Lacking any right to do so, DeRosa-Grund registered ten film sequel titles with the MPAA for "The Conjuring".    So long as those registrations were active, New Line could not promote any sequel to the original.    The filings breached the Quitclaim.    Although DeRosa-Grund withdrew the registrations, New Line suffered damages due to the delay in promoting sequels and the attorneys' fees it incurred in protesting DeRosa-Grund's registrations and responding to DeRosa-Grund's protests to its subsequent competing registrations.

### d.        Case Files

New Line on April 10, 2014 demanded that DeRosa-Grund deliver to it all of the Case Files, as encompassed within the definition of "Property" in ¶1A of the Quitclaim.    DeRosa-Grund has not delivered the Case Files, explaining by implication that the Case Files were destroyed in a well-documented fire.    DeRosa-Grund provided no evidence to support this explanation, but it is not his burden to do so.    It is New Line's burden to provide evidence that DeRosa-Grund possessed the files at the time it demanded their production.    In the absence of any such evidence, New Line has not met its burden to prove that DeRosa-Grund breached the Quitclaim when he failed to turn over the Case Files.

### 6.        Breach of the Implied Covenant of Good Faith and Fair Dealing

NL003938

DeRosa-Grund's contract breaches also constitute breaches of the implied covenant of good faith and fair dealing.   Although DeRosa-Grund's failure to produce the 8000 Case Files did not breach the Quitclaim, he knew that New Line had acquired the Case Files and thus his failure to give New Line notice of their purported destruction by fire deprived New Line the opportunity to independently investigate and pursue potential other remedies to protect its interest, and thereby breached the implied covenant.

DeRosa-Grund breached the implied covenant of good faith and fair dealing in other ways. His refusal to indemnify New Line against his First and Second Texas Lawsuits also breached the implied covenant.   Paragraph 11 of the Quitclaim obligates DeRosa-Grund to indemnify New Line against all claims arising out of his breach of the agreement.   By initiating the Texas Lawsuits, DeRosa-Grund breached his covenant not to sue New Line for any claims arising prior to execution of the Amendment.

DeRosa-Grund disclosed highly proprietary, confidential information about "The Conjuring" to Lionsgate, including audience test scores and the confidential planned release date. This conduct breached the Quitclaim and also the implied covenant of good faith and fair dealing.

DeRosa-Grund's numerous, hyperbolic threats may constitute extortion, but absent evidence that he carried out any of them, New Line cannot prove that such conduct deprived it of the fruits of the agreements.   Hence, such conduct, however deplorable, did not breach the implied covenant.

### 7.        Declaratory Relief

There is no doubt that there is an actual controversy between the parties relating to their rights under the agreements.    To eliminate uncertainties which might result in future litigation, it is appropriate that the Arbitrator exercise discretion to make the following declarations consistent with the findings in §IIIC4, *supra* and in §10, *infra*, and based on the express terms of the Agreements:

(1)  DeRosa-Grund has no right, title or interest to and must cease and desist from using the title "The Conjuring," including but not limited to using the title "The Conjuring" in connection with any television series.

(2)  DeRosa-Grund has no trademark rights in the title "The Conjuring."

(3)                             REDACTED

(4)  Any rights acquired by DeRosa-Grund with respect to the Demonologist Option are the sole property of New Line under the Agreements and DeRosa-Grund is required to produce to New Line any agreement for any such rights with respect to the Demonologist Option.

(5)  Any rights acquired by DeRosa-Grund under any agreements with third parties related to the "Property" as that term is defined in the Agreements are the sole property of New Line under the Agreements and DeRosa-Grund is required to produce to New Line any agreement for any such rights.

(6)  DeRosa-Grund retained no rights whatsoever in "The 'Conjuring" project other than

NL003939

those specifically reserved pursuant to the terms of the Agreements.

(7) Any rights acquired by DeRosa-Grund under the Warren Agreements are the sole property of New Line under the terms of the Agreements.

(8) DeRosa-Grund has no right under the Agreements to be attached as a producer to any sequel, prequel, spin off, or remake of the Picture, including but not limited to motion pictures currently entitled "The Conjuring 2" and "Annabelle".

(9) Claimants have a right to produce direct-to-video productions under the Agreements, and DeRosa-Grund is not entitled to any payment under Paragraph 5(b) of the Quitclaim Agreement for any direct-to-video productions.

(10) DeRosa-Grund is not entitled to any additional payment in connection with the motion picture "Annabelle" beyond the $750,000 that Claimants have already paid him.

(11) As a result of DeRosa-Grund's breaches of the Agreements, he is not entitled to any contingent compensation under Paragraph 5 of the Quitclaim or Paragraph 5 of the PLA, including but not limited to "contingent deferment" (i.e., box offices bonuses) and profit participation.

(12) Claimants have not waived their Rights of First Negotiation/Last Refusal under Paragraph 8(c) of the Amendment to the Quitclaim, all of which remain in full effect/

(13) Claimants are entitled to accept the Lionsgate television series deal on the same monetary terms as set forth in the Lionsgate Term Sheet.

(14) New Line owns all right, title and interest to the approximately 8000 case files and other materials referenced in Paragraph 1A of the Quitclaim.

## 8.      Counterclaims

For the most part, determination of DeRosa-Grund's counterclaims depends on interpretation of the Agreements.    This analysis first discusses the Release contained in the Amendment and then addresses individual counterclaims.

## 9.      The Release

The Release contained in the Amendment is broad and unambiguous.    It expressly releases New Line from "any and all claims . . . whether known or unknown . . . arising from or relating in any way to the rights granted under the New Line/Warren Life Story Agreement, the Property, the Picture [*The Conjuring*] or any other rights or agreement related to the foregoing, including the Quitclaim, the PLA and the Certificate of Employment for the Picture."    DeRosa-Grund was represented by competent and experienced counsel, who extensively negotiated the Amendment and who kept DeRosa-Grund fully informed.

The Release bars any claim by DeRosa-Grund against New Line arising from anything that occurred prior to execution of the Release on February 7, 2011.    The following counterclaims are barred because they are based on actions that occurred prior to that date:

- Count III for fraud in the inducement, which is based on the allegation that Alexander made certain oral representations to DeRosa-Grund on December 1, 2009, including that he would be "attached" as producer to any film based on the Case Files, to induce him to enter the Quitclaim and the PLA.

27

NL003940

- Count IV for promissory estoppel, which is based on the same allegations as Count III.
- Count VI for intentional interference with economic relations, which is based on the allegation that New Line interfered with the Warren agreements by entering the New Line/Warren Life Story Agreement on December 7, 2009.
- Count VII for fraud, which is based on the allegation that New Line misrepresented that DeRosa-Grund's rights under the Amendment would not change the rights he had under the Quitclaim.
- Count X for violation of Section 43(a) of the Lanham Act, which is based on the allegation that New Line improperly refused to submit DeRosa-Grund for writing credit determination to the WGA, which was first raised by DeRosa-Grund in October 2010.

### 10.        Individual Counterclaims

#### a.        Breach of written contract

This claim alleges that New Line breached the Agreements by failing to timely select specific Case Files, by filing applications to register "The Conjuring" trademark with the USPTO and MPAA, by failing to pay additional payments and contingent compensation, by failing to provide periodic statements or profit participation payments and failing to timely and fully pay the Purchase Price for "Annabelle".   He seeks damages for these breaches as well as termination of the Quitclaim because New Line failed to pay additional compensation.

DeRosa-Grund breached the Agreements.    Therefore, he did not perform all his obligations and cannot establish all the elements of breach of contract against New Line.    Moreover, New Line did not breach any of its obligations.    First, neither the Quitclaim or the Amendment obligated New Line to select Case Files by a particular date.    Second, New Line owned all trademarks and therefore it, not DeRosa-Grund, had the sole right to file applications to register "The Conjuring" trademark.    Third, the Agreements expressly allowed New Line to withhold paying additional payments and contingent compensation to DeRosa-Grund if he was in default of either the Quitclaim or the PLA, and breaches of either the Quitclaim or the PLA were deemed breaches of the other. Fourth, DeRosa-Grund failed to present evidence establishing that New Line failed to provide periodic statements or profit participation payments.    Fifth, New Line did pay DeRosa-Grund the Purchase Price for "Annabelle" as soon as it decided to release it theatrically rather than direct-to-video. Since DeRosa-Grund failed to establish that New Line breached the Agreements and because New Line did pay him the Purchase Price for "The Conjuring," there is no basis for termination of the Agreements as a remedy.

#### b.        Breach of Implied Covenant of Good Faith and Fair Dealing

DeRosa-Grund alleges nine acts by New Line breached the implied covenant of good faith and fair dealing: 1) threatening to reduce his producer credits, 2) sending out public relations stories with false scenarios regarding the origin of the Picture, 3) refusing him access to screenings of the Picture, 4) reneging on promises to pay for his travel, 5) cutting off all communications with him, 6) refusing to employ him as a producer in connection with sequels and other films based on the Case Files, 7) failing to pay him all owed compensation, 8) falsely claiming he breached the Agreements

NL003941

by registering trademarks with the USPTO and titles with the MPAA and 9) failing to provide him participation statements and payments.

None of these alleged acts were shown to breach the implied covenant, as follows:
1) New Line provided producer credit to DeRosa-Grund consistent with the PLA.
2) DeRosa-Grund offered no evidence.
3) New Line allowed DeRosa-Grund to attend one premiere consistent with the PLA.
4) New Line was not obligated to reimburse DeRosa-Grund for travel costs to the set.
5) New Line was justified in cutting off direct communications with DeRosa because of his abusive conduct, however, New Line maintained full communication with his attorney.    In addition, nothing in the Agreements requires direct negotiations between New Line and DeRosa-Grund.
6) New Line was not obligated to employ DeRosa-Grund in sequels or other films.
7) New Line was not obligated to pay additional compensation to DeRosa-Grund because of his defaults and breaches.
8) New Line had the sole right to file applications to register "The Conjuring" trademark and to register titles with the MPAA.
9) DeRosa-Grund failed to present evidence establishing that New Line failed to provide periodic statements or profit participation payments.

### c.        Fraud in the Inducement

As discussed above in §IIIC9, this claim is barred by the Release.    Moreover, much of this claim relies on DeRosa-Grund's version of oral communications with Alexander, yet his lack of credibility renders his testimony entirely unreliable.    Finally, this claim is absolutely barred by the integration clauses in the Agreements.

### d.        Promissory Estoppel

As discussed above in §IIIC9, this claim also is barred by the Release.    Like the fraud in the inducement claim relies on DeRosa-Grund's version of oral communications with Alexander, yet his lack of credibility renders his testimony entirely unreliable.    This claim also is barred by the integration clauses in the Agreements.

### e.        Conversion

DeRosa-Grund claims that New Line failed to make certain payments to him.    As a matter of law, such a claim for money owed cannot be the basis of a conversion claim.    Besides, DeRosa-Grund has no ownership interest in the Defined Gross of the Picture, and therefore, has no right to receive profit participation.

### f.        Intentional Interference with Economic Relationship (re Lorraine Warren)

As discussed above in §IIIC9, this claim is barred by the Release.    Moreover,

NL003942

DeRosa-Grund executed the Amendment, which gave permission to New Line to enter a direct deal with Lorraine Warren to acquire her life rights.

### g.        Fraud

As discussed above in §IIIC9, this claim is barred by the Release.    This claim suffers further deficiencies.    First, it rests entirely on DeRosa-Grund's version of alleged, uncorroborated oral communications in which New Line assured him that his rights would remain the same under the Amendment.    DeRosa-Grund is simply not credible.    Second, DeRosa-Grund was represented by competent, experienced counsel in negotiating the Amendment.    Third, the New Line/Warren Life Story Agreement was attached to the Amendment for DeRosa-Grund and his counsel to review and compare to his then-current rights.

### h.        Intentional Interference with Economic Relationship (re Lionsgate)

New Line enjoys a full justification defense against this claim.    It had the right to inform Lionsgate of its Agreements with DeRosa-Grund, which it correctly alleged DeRosa-Grund had breached by failing to accord it the rights to First Negotiation and Last Refusal.

### i.        Lanham Act

This claim alleges that New Line engaged in a media campaign to purposefully hide the true origin of the Picture, namely that he had created, developed and owned the original story treatment and that New Line should have submitted his story and treatment to the Writers Guild of America for purposes of "Story by" credit.    DeRosa-Grund failed to offer any evidence in support of this claim.    More problematic, the Lanham Act applies only to the origin of tangible goods that are offered for sale, not the intellectual property embodied in such goods.

### j.        Declaratory Relief

Inasmuch as there is no merit to any of DeRosa-Grund's individual claims, there is no basis to grant any of the declaratory relief he requests, which essentially is a remedy available if were to prevail on the merits of any claim.

## IV.        CONCLUSION

This arbitration involved a powerful Hollywood studio that played by the rules and an independent producer who did not.    DeRosa-Grund knew how the system worked and cannot now complain that New Line defrauded him or breached its obligations to him.    Rather, it was DeRosa-Grund who did not abide by the crystal clear provisions of the Agreements.    Adoption of DeRosa-Grund's version of events would overturn the longstanding system that has governed Hollywood for decades and ignore the most basic rules of contract interpretation.

DeRosa-Grund's creative attorney made a valiant effort to represent a client who had

NL003943

knowingly signed away all his rights.      Yet portraying DeRosa-Grund as the underdog (which the evidence did not bear out) does not make him right.

For the reasons stated above, the Arbitrator finds and declares that:

1.      New Line proved by a preponderance of the evidence that DeRosa-Grund breached the Agreements by filing trademark applications for "The Conjuring" with the USPTO, by failing to give New Line notice of its right to first negotiation and last refusal for a television deal with Lionsgate and by filing "The Conjuring" sequel titles with the MPAA.

2.      New Line did not prove by a preponderance of the evidence that DeRosa-Grund breached the Quitclaim by not producing the 8000 Case Files.

3.      New Line proved by a preponderance of the evidence that DeRosa-Grund breached the implied covenant of good faith and fair dealing by the contract breaches set forth in #1 above and by failing to give New Line timely notice of the purported destruction of the Case Files in a fire, by refusing to indemnify New Line and by disclosing confidential information.

4.      New Line is entitled to monetary damages in the amount of $107,511, plus $4117.56 in prejudgment interest, calculated at a 7% per annum rate.

5.      New Line is entitled to an award of costs in the amount of $58,147.06.

6.      Declaratory Judgment is hereby entered that:

- DeRosa-Grund has no right, title or interest to and must cease and desist from using the title "The Conjuring," including but not limited to using the title "The Conjuring" in connection with any television series.
- DeRosa-Grund has no trademark rights in the title "The Conjuring."
- REDACTED


- Any rights acquired by DeRosa-Grund with respect to the Demonologist Option are the sole property of New Line under the Agreements and DeRosa-Grund is required to produce to New Line any agreement for any such rights with respect to the Demonologist Option.
- Any rights acquired by DeRosa-Grund under any agreements with third parties related to the "Property" as that term is defined in the Agreements are the sole property of New Line under the Agreements and DeRosa-Grund is required to produce to New Line any agreement for any such rights.
- DeRosa-Grund retained no rights whatsoever in "The 'Conjuring" project other than those specifically reserved pursuant to the terms of the Agreements.
- Any rights acquired by DeRosa-Grund under the Warren Agreements are the sole property of New Line under the terms of the Agreements.
- DeRosa-Grund has no right under the Agreements to be attached as a producer to any sequel, prequel, spin off, or remake of the Picture, including but not limited to the motion pictures currently entitled "The

NL003944

Conjuring 2" and "Annabelle."

- Claimants have a right to produce direct-to-video productions under the Agreements, and DeRosa-Grund is not entitled to any payment under Paragraph 5(b) of the Quitclaim Agreement for any direct-to-video productions.
- DeRosa-Grund is not entitled to any additional payment in connection with the motion picture "Annabelle" beyond the $750,000 that Claimants have already paid him.
- As a result of DeRosa-Grund's breaches of the Agreements, he is not entitled to any contingent compensation under Paragraph 5 of the Quitclaim or Paragraph 5 of the PLA, including but not limited to "contingent deferment" (i.e., box offices bonuses) and profit participation.
- Claimants have not waived their Rights of First Negotiation/Last Refusal under Paragraph 8(c) of the Amendment to the Quitclaim, all of which remain in full effect
- Claimants are entitled to accept the Lionsgate television series deal on the same monetary terms as set forth in the Lionsgate Term Sheet.
- New Line owns all right, title and interest to the approximately 8000 Case Files and other materials referenced in Paragraph 1A of the Quitclaim.

7. DeRosa-Grund did not meet his burden of proof on any of his Counterclaims.
8. New Line is the prevailing party in this arbitration.
9. Judgment is hereby entered in favor of New Line and against DeRosa-Grund.

Dated:     February 5, 2015

Judge Terry Friedman (Ret.)
Arbitrator

32

# EXHIBIT J

## LODGED WITH THE COURT

# EXHIBIT K

## LODGED WITH THE COURT

# EXHIBIT L

## LODGED WITH THE COURT

# EXHIBIT M

## LODGED WITH THE COURT

# EXHIBIT N

## <u>INTENTIONALLY OMITTED</u>

# EXHIBIT O

## LODGED WITH THE COURT

# EXHIBIT P



FOCUS - 2 of 26 DOCUMENTS

Copyright 1989 Factiva, a Dow Jones and Reuters Company
All Rights Reserved



(Copyright (c) 1989, Dow Jones & Co., Inc.)

**THE WALL STREET JOURNAL.**

U.S. EDITION

The Wall Street Journal

October 31, 1989 Tuesday

**LENGTH:** 1325 words

**HEADLINE:** And You Thought `Ghostbusters' Was Just a Movie Farce? --- Specialists in Spirits Dispatch Demons and Poltergeists;
 Exorcism Remains a Tool

**BYLINE:** By Bill Richards, Staff Reporter of The Wall Street Journal

**BODY:**

If there's somethin' strange in your neighborhood . . .

If there's something' weird and it don't look good.

Who ya gonna call?

For starters, some people call Ed and Lorraine Warren.

When it comes to busting ghosts, the Monroe, Conn., couple are perfect demons. They claim to have busted spirits, poltergeists and other spooks in hundreds of houses around the country. They say they now get three or four "legitimate" calls a week from people harried by haunts. "I firmly believe in angels, devils and ghosts," says Mr. Warren, whose business card identifies him as a "demonologist."

If psychics don't work, but your house still seems haunted, you can call any one of a swelling band of skeptics such as Richard Busch. A professional magician and musician, he heads the Pittsburgh branch of the Committee for the Scientific Investigation of the Paranormal. Mr. Busch says there is a scientific explanation for all haunts, and he can

And You Thought `Ghostbusters' Was Just a Movie Farce? --- Specialists in Spirits Dispatch Demons and Poltergeists;
Exorcism Remains a Tool The Wall Street Journal October 31, 1989 Tuesday

even tell you how to encourage the spirits. "All you have to do is eat a big pizza, and then go to bed," he says. "You'll have weird dreams, too."

Either way, the ghostbusting business is going like gangbusters. Tales of haunts and horrors are proliferating beyond the nation's Elm Streets and Amityvilles. "I get calls nearly every day from people who have ghosts in their house," says Raymond Hyman, a skeptical psychology professor at the University of Oregon.

In a public opinion poll published in the October issue of Parents Magazine, a third of those queried said they believe that ghosts or spirits make themselves known to people. "The movies, the books, the tabloids -- even Nancy Reagan is boosting this stuff," says Paul Kurtz, a philosophy professor at the State University of New York at Buffalo, who heads the Committee for the Scientific Investigation of the Paranormal. The committee, formed in 1967, now has 60 chapters around the world.

The spirits, of course, could hardly care less whether people do or don't believe in them. They don't even give a nod to human sensibilities by celebrating Halloween. For the spooks it's just another day of ectoplasmic business as usual, ghostbusters say; the holiday seems to occasion no unusual number of ghost reports.

One of the busiest ghostbusters is Robert Baker, a 68-year-old semi-retired University of Kentucky psychology professor whose bushy gray eyebrows arch at the mere mention of a ghost. Mr. Baker says he has personally bested more than 50 haunts, from aliens to poltergeists.

Mr. Baker heads the Kentucky Association of Science Educators and Skeptics. Like Hollywood's Ghostbusters, Kentucky's stand ready to roll when haunts get out of hand. But they don't careen around in an old Cadillac, wear funny suits or blast away at slimy spirits. Mr. Baker drives a 1987 Chevy and usually wears a tweed jacket on his ghostbusting forays.

"I've never met a ghost that couldn't be explained away by perfectly natural means," he says.

When a Louisville woman complained that a ghost was haunting her attic, Mr. Baker discovered a rat dragging a trap across the rafters.

A foul-smelling demon supposedly plagued a house in Mannington, Ky. Mr. Baker found an opening under the house that led to a fume-filled coal mine. When the weather cools, Mr. Baker says, hobos often hole up in abandoned houses. "People see activity in there, and the next thing you know, you've got a haunting," he says.

On a recent afternoon, Mr. Baker and a reporter go ghost-busting, visiting Kathleen Stinnett, a Lexington woman who has phoned the University of Kentucky to report mysterious happenings in her house. Mrs. Stinnett says she never believed in ghosts before, but lately her vacuum cleaner turned itself on, a telephone flew off its stand, doors slammed inexplicably, and she heard footsteps in her empty kitchen.

"I was doing the laundry and nearly broke my neck running upstairs to see who was there, and it was nobody," she says, eyes wide at the recollection.

Mr. Baker hears her out, pokes around a bit, asks a few questions and proposes some explanations. Of the self-starting vacuum cleaner, he says: "Could be Cuddles, {Mrs. Stinnett's dog}." The flying telephone: "You tangle the base cord around a chair leg, and the receiver does seem to fly off." The ghostly footsteps: "Interstate 64 is a block away, and heavy traffic can sure set a house to vibrating."

"I'm not sure he's explained everything," Mrs. Stinnett says grudgingly. "There are some things that have gone on here that nobody can explain," she says. Mr. Baker promises to return if the haunting continues.

For especially stubborn haunts, Mr. Baker carries a secret weapon, a vial of cornstarch. "I tell people it's the

And You Thought `Ghostbusters' Was Just a Movie Farce? --- Specialists in Spirits Dispatch Demons and Poltergeists;
Exorcism Remains a Tool The Wall Street Journal October 31, 1989 Tuesday

groundup bones of saints," he says. "I sprinkle a little around and tell the demons to leave. It's reassuring, and it usually works."

Oregon's Mr. Hyman has investigated claims of flying cats, apparitions and bouncing chandeliers and has come up with a plausible explanation, he says, for every one. "Invariably," he says, "eyewitnesses are untrustworthy."

Two years ago, a Canadian reader bet Omni Magazine $1,000 that it couldn't debunk the uncanny goings-on in "the Oregon Vortex," a former Indian burial ground in southern Oregon. To viewers from a distance, visitors to the spot seemed to shrink disproportionately, relative to the background. The magazine called in Mr. Hyman as a consultant.

He showed up with a carpenter's level, carefully measured every surface and showed how the apparent shrinkage was caused by the perspective. "A very striking illusion," Mr. Hyman says now, his voice dripping with skepticism, "but an illusion nevertheless." The Canadian wound up writing a check.

The Rev. Alphonsus Trabold, a theology professor and exorcism expert at St. Bonaventure University in Olean, N.Y., frequently is asked to exorcise unruly spirits, and he often obliges. "On certain occasions a spirit could be earthbound and make itself known," he says. "It happens."

Father Trabold often uses what he calls "a therapeutic exorcism": a few prayers and an admonition to the spirit to leave. "If the person believes there's an evil spirit, you ask it to be gone," he says. "The suggestion itself may do the healing."

But sometimes more energetic attacks are required. To wrestle with a demon in a house owned by a Litchfield, Conn., woman, the Warrens recently called in an exorcist, the Rev. Robert McKenna, a dissident clergyman who hews to the Catholic Church's old Latin liturgy. I attend, and so does a television crew from New York City.

Mr. Warren pronounces the Litchfield case "your typical demonic infestation." A Scottish dwarf built the small red house 110 years ago and now his demonic ghost haunts it, Mr. Warren says. The owner, who begs anonymity, asserts that the dwarf, appearing as a dark shadow, has manhandled her, tossing her around the living room and yanking out a hank of hair. Two previous exorcisms have failed.

"This is a very tenacious ghost," Mr. Warren says darkly.

Father McKenna moves through the house praying in Latin, urging the demon to split. Suddenly the woman begins swaying and then writhing. "She's being attacked by the demon," Mrs. Warren stagewhispers as the priest sprinkles holy water over the squirming woman, and the television camera grinds. A half-hour later, the woman is smiling and chatting; the demon seems to have gone. But Mr. Warren says the woman has "psychic burns" on her back from the confrontation. She declines to show them.

"This was an invisible, powerful force that's almost impossible for a layman to contemplate," Mr. Warren says solemnly as the ghostbusting entourage packs up to leave. "This time though," he says, "I think we got it."

---

Lyrics from "Ghostbusters" by Ray S. Parker Jr. 1984 by Golden Torch Music Corp. (ASCAP) and Raydiola Music (ASCAP). All administrative rights for the U.S. jointly controlled by both companies. International copyright secured. Made in USA. All rights Reserved. Reprinted by permission.

**NOTES:**
PUBLISHER: Dow Jones & Company

**LOAD-DATE:** December 6, 2004

# EXHIBIT Q

PAGE 20    DAILY MIRROR, Thursday, March 30, 1978

# GHOST STORY

SCIENTISTS from all over the world are now attending a conference on psychic phenomena at Cambridge University — and one subject on the agenda was a haunted council house in North London. The incredible story of one of the most fascinating ghost hunts of modern times is told here, just as it happened. But we have disguised the name of the family involved to save them further stress.



**PILLOW FLIGHT**   THIS pic shows one girl's pillow apparently flying of its own accord while her sister looks on.

**PILLOW FLIGHT**   THE pillow is folding about 1ft off the floor. The girl reacts by raising a hand in alarm.

ONE hot August evening a chest of drawers took off across the floor of Peggy H's sitting room.

This started an eerie chain of events that have terrified the family, amazed police and journalists and baffled scientists, doctors and researchers.

For the mystery of the moving chest has been followed by other amazing goings-on in the North London council house — flying objects that seem to be propelled by a supernatural force, a dancing teapot and a spine-chilling voice, apparently from the grave.

Perhaps the voice was the most frightening of all the sinister happenings that have surrounded the family of five.

It started in mid-December ... and it was no ghostly shriek heard only by members of the family. It was a rich, deep male voice.

Since then, I have spent hours chatting with it — and so have the baffled boffins.

Usually the voice speaks through Mrs. H's daughters, aged 11 and

## The strange case of the dancing teapot

13½, though often their lips do not move.

It chats to them as they lie in bed at night, wishes each of the family "Good morning" and often asks for dance music to be played.

It also gives itself a variety of names: Andrew Garner, Stewart Certain and Dirty Dick.

The Daily Mirror has spent weeks investigating this amazing story and talked to many people who claim to have seen mysterious happenings in the house.

### Spent

Psychic investigator Maurice Grosse has spent more than 1,000 hours watching the story unfold.

Grosse, a level-headed middle-aged businessman has made a signed, typewritten statement to the Mirror.

These are the astonishing events he claims to have witnessed:

● Marbles and plastic blocks flying across a room — after apparently materialising from walls and windows.

● A teapot dancing on a kitchen cabinet top.

● The shade on a bedlamp tilting 45 degrees, then straightening up.

● The lavatory door opening and closing when there was no one near it.

● A cardboard box full of cushions thrown at him while he was trying to communicate with the entity by knocking.

● A slipper thrown at him across a bedroom.

● A settee thrown up in the air and overturned when he was standing no more than a foot from it.

● Hearing footsteps walking across the ceiling when there was no one upstairs.

Says Grosse: "I have studied psychic phenomena for 40 years and this is the most exciting case I have come across or even read about. And I believe it will be the

best documented poltergeist case in history.

"Much of what is going on here is unique and the tests carried out are the most exhaustive in the history of psychic research.

"The family are going through a period of tremendous stress because of what happened.

Grosse remains convinced, despite the fact that in a harrowing scene in the family kitchen one of the girls tearfully confessed to TV ventriloquist Ray Allen that the whole voice episode was a hoax.

Ray, better known as the sidekick of dummy Lord Charles was called in by the Mirror to use his special knowledge to find out if the voice was a spoof.

The younger girl admitted to him, in my presence, that she and her sister had invented the voices to keep attention centred on them.

The next day the girl retracted her admission.

But even if her retraction were not valid, it adds to, not detracts from the other odd events in the house.

### Sad

The sisters knew nothing about the moving furniture and flying objects, but Dirty Dick and Andrew Garner were products of their imagination.

Ray Allen said later: "It's very sad, but those little girls obviously loved all the attention they got when objects were mysteriously moved around the house and they decided to keep the whole thing going by inventing the voices.

"But it got too late for them and they didn't know how to stop what they had started."

More people, however, as well as Grosse, feel certain that the manifestations are genuine.

## AND BUMPS THAT BAFFLE BOFFINS

MAURICE GROSSE was not the first person to witness things going bump in the North London night.

Before he was called in by the Society for Psychical Research, other independent witnesses had been amazed by what they saw. They were:

**THE POLICEWOMAN:** WPC Carolyn Heeps, one of the first outsiders called to the house, could scarcely believe her eyes as an armchair moved across the living room, apparently of its own accord.

**THE AUTHOR:** Guy Lyon Playfair, has spent countless days and nights observing the case. He has written two books on supernatural activity and spent four years observing ghostly goings on in Brazil.

He says: "This is my pet poltergeist case and by far the most interesting. I, personally, have witnessed five incidents for which no reasonable normal explanation has yet been suggested. Each was recorded on tape.

"On one occasion, to the younger girl got out of a heavy armchair, Playfair saw it slide forward and then overturn backwards. Next, while he was watching the girl, a table overturned in the kitchen.

"Once morning I saw a red slipper go over the top of the door of the bedroom opposite mine. I went into the room at once. There was only one place the slipper could be and it wasn't there. Only the older girl was in the room. When she went downstairs, there was the slipper on the bannisters ...

"On the doormat, Either it went round a corner on its own, or it

went through the wall."

Other incidents included a flying book that turned corners, a short conversation with "the voice" by means of rapping, and recording tapes and cables that mysteriously snapped.

**THE HYPNOTIST:** Sam Fletcher is a sergeant, a hypnotist and a member of the Magic Circle—and it was he in his role that he made two visits to the "haunted" house.

### Visited

He says: "Happenings in that house are very strongly suggestive of paranormal phenomena.

"I hypnotised the younger girl, and from what she told me and what observers have said, I feel there is a poltergeist presence in the house."

**THE ENGINEER:** David Annetts, product manager of Pye's business communications closed-circuit television, and four other Pye technical experts visited the house with highly sophisticated cameras equipment.

They set it up in the main bedroom where the girls were sleeping. But the cameras jammed and they record the first test scene out of the cassette and got entangled with the drive mechanism — so tightly that it would have taken the force of

a sledgehammer to set it there.

David says: "There's definitely something odd which I can't explain." David Robertson is assistant to Professor John Hasted, head of physics at London University's Birbeck College, who is supervising a series of tests on the girls.

He has heard knockings from empty rooms — one that he looked himself.

He says: "Once I saw a sideboard lift up at an angle and fall face down on the floor. Many strange things are unexplained."

**THE PHYSICIST:** Dr. Bernard Carr, Fellow of Trinity College, Cambridge, said that many odd things happened while he was there, but he did not see anything that was obviously paranormal.

The girls were being thrown out of bed and there were terrified cries from them that always after he had left the room.

**THE MAGICIAN:** Milbourne Christopher is one of the world's most skilled magicians. He is also chairman of the Occult Investigation Committee of the Society of American Magicians.

He believes the only psychic responsible for the events are high spirits of the girls.



WOW WILL APPEAR TOMORROW

# EXHIBIT R

**16** DAILY NEWS-RECORD, HARRISONBURG, VIRGINIA
FRIDAY, OCTOBER 30, 1981

# The Occult: No Laughing Matter

By CHRIS SIMMONS
News-Record Staff Writer

BRIDGEWATER — The next time you're tempted to pull out the old Ouija board, think twice.

According to demonologist Ed Warren, it could be the beginning of some very disturbing problems.

"You have opened the door," he warned a large crowd at Bridgewater College this week. "It doesn't have to come that night. But it will come."

What will come?

If you believe Warren, "it" could be unspeakably horrible demons intent on physically harming people foolish enough to challenge spirits daring and unspeakable manners.

Warren and his wife, Lorraine, presented a Halloween Week slide presentation on the supernatural here Wednesday night.

One of the slides showed a severely bruised young woman, who Warren said had been attacked after challenging a spirit to prove itself during a seance.

That night, he said, the girl suddenly felt a body in bed beside her and was subjected to a violent sexual assault by a non-human spirit.

Three days later, he said, the girl came to him for help.

"She looked like she was in a bad accident," Warren recalled.

The Connecticut ghost hunter said he actually saw hair being ripped from the girl's scalp and teeth marks appearing on her body as the invisible demon continued its attack.

Eventually, he said, the girl was exorcised.

Warren's message was obvious. As he put it, "You shouldn't fool around with the occult."

He went so far as to urge his chilled audience to take their Ouija boards into the faraway woods, bury them, make a sign of the cross over the mound and then sprinkle holy water on it.

The Warrens are two of the best known ghost hunters in the United States. They currently are involved in a court case where an accused murderer is claiming he was possessed by a demon.

In the Danbury, Conn. case, a teen-age boy is accused of stabbing a 40-year-old man to death.

The defense, according to the Associated Press, is claiming that the boy's body had been possessed by the devil several times before the man's death and then again at the moment of the attack.

Another celebrated case in which the

Warrens were involved was the Long Island haunting which became the basis for "The Amityville Horror."

Warren spoke only briefly about that case Wednesday and said that the literary license exercised in the book was unnecessary because the real case was scary enough.

The Warrens, who have been investigating weird happenings for 35 years, touched on several aspects of the supernatural during their two-hour presentation. Subjects included photos of ghosts, a rather lively Raggedy Ann doll, a girl who could walk through matter, nighttime awakenings, curses and plain old headaches.

The photos — many not particularly dramatic — purported to show ghosts popping up in unlikely places.

In one case, a couple had gone to a cemetery two weeks after the death of the wife's mother. They had a camera along, and the wife snapped a picture of her husband sitting in their car.

When the film was developed, Warren said, "there was Ma sitting in the back seat." He showed a slide of the picture.

The overrated Raggedy Ann doll, as Warren told it, came to life after being taken over by the spirit of a young girl who had been killed in an accident.

Eventually the doll turned violent and somehow began stabbing people. In one case, an acquaintance of the Warrens flung the doll aside and was almost killed when his brand-new car went inexplicably out of control.

"He was not killed because the devil can go only so far," said Warren.

The girl who could walk through matter lived in suburban London and was subject to all sorts of strange phenomena, Warren said.

"I have film of her levitating from (a) bed," he claimed. The footage was shown on Home Box Office, he added.

Warren said the girl "has actually passed through a brick wall."

The husband-and-wife team from Monroe, Conn., has supposedly investigated some 3,000 hauntings, and, as Warren noted, "We're not called in because of Casper the Ghost."

Demonic appearances at night also were discussed by Warren. The most likely time for these, he said, is 3 a.m. because spirits see that hour as an insult to the Trinity.

Typically, he indicated, the haunting begins when a person is awakened from a sound sleep by a touch or a sound.

Nothing can be seen, but the person knows something is there. Then, a ball of light will form and the person will

become paralyzed. The light, Warren said, will take on the shape of a ghost and the haunting will end.

Other ghosts, Warren suggested, are more tangible. He related a case where a pregnant woman would meet an old man along a New England beach every morning before the birth of her child. After the birth, she returned to the beach but could not find the old man. It turned out he had been dead 10 years.

"They (ghosts) can be as solid as we are," Warren said.

On a more subtle supernatural phenomena, Warren talked about the cursed chair of Thirsk, England — a chair that was kicked out from under its

hanged owner and now causes anyone who sits in it to die.

One thing Warren would not talk about was his worst experience with the supernatural.

"In giving it recognition and talking about it to you, your thinking about it could bring it on yourself," he explained.

Happily, Warren did reveal that not all ghosts are nasty. Some, apparently, are just there.

But if one of the evil spirits does happen to visit you one night, Warren had some advice — make the sign of the cross and command the demon in the name of Jesus Christ to leave.

"It will leave," he said. "It has to."

## Music Festival Group To Meet

EDINBURG — The annual dinner meeting of the Shenandoah Valley Music Festival Committee will be held Nov. 11 at Edinburg Mill.

Jane Cain, former assistant to the mayor of Milwaukee, will be the guest speaker. Also at the meeting, a new board of directors and officers for 1982 will be elected.



**BE A 49er**

make 49 payments on your **Christmas Savings Club...**

Valley National Will Give You Your 50th PAYMENT...

**Free!**

Select your club from the list at the right

| | |
|---|---|
| $ 3.00 each week for 49 weeks | $ 150.00 |
| $ 4.00 each week for 49 weeks | $ 200.00 |
| $ 5.00 each week for 49 weeks | $ 250.00 |
| $10.00 each week for 49 weeks | $ 500.00 |
| $20.00 each week for 49 weeks | $1000.00 |

Withdrawal from the club prior to maturity will result in a 1.00 penalty.



**Valley National Bank**
Harrisonburg-Bridgewater, Va.
Where People Come First

Member F.D.I.C.

**WEEKEND DOUBLE FEATURE**

HOURS:
Mon. & Tues. — 4-9 P.M.
Wed. — Closed
Thurs., Fri., Sat. & Sun. — 12 Noon-9 P.M.

**FRIDAY BUFFET**
5-9 P.M.

Barbecued Spareribs, Baked Fish Filets, Crab Cakes, Shrimp Chow Mein With Fried Rice, Fried Chicken, Meatloaf, Succotash, Macaroni & Cheese, Stewed Tomatoes, Green Beans, Salad Bar, Coffee or Tea.

**$5.95 Adults   $3.25 Children Under 12**

MENU SERVICE AVAILABLE WITH SALAD BAR ALSO

**SUNDAY BUFFET**
12 Noon-7 P.M.

Roast Turkey, Dressing & Gravy, Barbecued Spareribs, Beef Stroganoff With Noodles, Fried Chicken, Baked Western Ham With Pineapple Sauce, Squash Casserole, Green Beans, Sweet Potatoes, Mashed Potatoes, Assortment of Salads & Desserts, Coffee or Tea.

**$6.95 Adults   $3.25 Children Under 12**

**Sager's Restaurant**
Rt. 211, 7 Miles West Of Luray
On Massanutten Mountain
Or 3 Miles East Of New Market, Va.

---

Paid Political Advertisement

# Will Virginians Support Smear Tactics?

(The following is the text of an address given by Donald D. Litten at the Charlottesville Rotary Club on October 27, 1981. Senator Miller could not attend because he was campaigning with President Reagan.)

Mr. President, the Democratic nominee for Lt. Governor, Rotarians and guests:

Here in Jefferson's country it is appropriate to give at least one quote from the sage of Monticello. In view of my subject matter I have chosen this: "Advertisements," said Jefferson, "contain the only truths to be relied on in a newspaper."

Well, one week from today Virginians will vote. We have been doing that for a long time here in the Old Dominion. I am sure politicians have said in every election that each one was critical. I rather believe that Jefferson would have said that all elections are equal, but I also feel that some are perhaps more equal than others. It seems to me that this is one of the more equal because it will settle and probably for a long time whether negative or positive campaigning best appeals to Virginia.

**CONFLICTS OF INTEREST**

Let us talk, and talk directly, about conflicts of interest. There are two bills in question that have been commented on, that were passed by the General Assembly.

**THE COOP BILL**

One is the so-called "Cooperative Bill". In discussing a cooperative I think it is important to understand what it is and what it is not. It is not a business entity in the usual sense of the word. It has no stockholders. It makes no profits. It is organized for the purpose of consumers, putting together some sort of organization that will allow them to procure a service, such as electric service, at a minimum cost without profit. I will remember my first brush with cooperatives when I was a boy of 12 years and the man from VEPCO came to see my father about giving us electric power. At that time we didn't have it. I remember him telling my father that it would cost $6.50 a month. That was during the Depression and $6.50 a month was out of the question. I remember within a year after that when the electric co-operative then known as the REA came through and we were able to get electric power for $1.50 a month. In co-ops you read your own meter, you set your own rates by electing your own directors. The bill that Nathan drafted and voted for

(but didn't introduce) eliminated a double taxation on power. A block of electric power was being taxed once by VEPCO when it generated it and taxed again when the same block of power was sold to the electric cooperatives. The bill eliminated that double taxation and it resulted in a direct rate reduction on the electric bills of 700,000 consumers to the tune of $10 million. I know of no other recent legislation that has reduced electric rates. I know of a great deal that have increased it. There is no conflict, we say, in drafting and voting for a bill that helped 700,000 people reduce their staggering electric rates.

**EAST SIDE vs. WESTSIDE**

Now, the other bill. The other bill had to do with a basic unfairness in the law where people who lived east of the Blue Ridge were treated differently from people who lived west of the Blue Ridge. The people who lived east of the Blue Ridge were allowed to have a day in court if after 35 years mineral reservations on their land had not been mined. That day in court gave them a chance to prove to the judge that there were no minerals there-that land ever been mined and that the reservation should be removed. No such opportunity to have a day in court existed for people west of the Blue Ridge. Nathan is proud that he tried to eliminate this discrimination between the two sides of the mountain. The fact that he was only able to add one county to the bill instead of the whole west side in one year, and then add one more county the next year, seems nothing except that he was not able to gain a total victory. He intended at the next session, the one coming up, to introduce the bill again, and again try to make both sides of the mountain the same. No, he does not apologize for introducing legislation that helped his people in an attempt to put them on equal standing with the rest of the people in the state, and no, this is not a conflict of interest. There are problems with the Senate rules on conflict of interest and they are almost as bad as none at all, giving no real guidance. Nathan has proceeded on the basis of what he perceived to be right or wrong. Senator Miller, the senior member of the Senate, says that the only guide to conflict of interest is a

man's conscience and Nathan has proceeded under that theory. He has looked to the substance of legislation and not to its form. He has never promoted or voted for any bill in which he did not believe. He has never received a cent for voting for any bill.

**THE ISSUES THE USS SARATOGA**

When this campaign commenced Nathan thought that the race would be between himself and the gentleman from Portsmouth who used to be the mayor of that city and who used to be the chairman of the Virginia Democratic Party. He thought that the issues would be such things as the rehabilitation of the USS Saratoga. You will recall how Senator Warner and our other representatives in Congress were fighting to have this work done in Newport News. It meant 3000 jobs for Virginians. You will recall how the National Administration and President Carter wanted it done in Philadelphia. Do you recall that the gentleman from Portsmouth suddenly and inexplicably issued a public statement saying that the work ought to be done in Philadelphia rather than Newport News. That statement has puzzled Nathan ever since. It still continues to puzzle him. He has called on his opponent again and again for an explanation as to why a Virginian, the head of one of the two major parties in this state, would make such a statement. I call on him here tonight to answer that question. Was it because President Carter asked him to do so, or some member of the National Administration made such a request?

**COLLECTIVE BARGAINING**

Nathan thought there would be discussion about such things as collective bargaining for public employees. Nathan opposes it. His opponent says that he opposes strikes by public employees but that he favors meeting and conferring. The question is whether he favors unionization by these employees. Nathan does not.

**GUN CONTROL**

Or gun control legislation. While the gentleman from Portsmouth says he is opposed to it, he is in favor of legislation that would require a waiting period and would, in Nathan's opinion, open the door and eventually lead to registration and

confiscation. I am reminded of the fact that the United States income tax commenced with a maximum tax of 1 percent of income.

**LIBERALISM vs. CONSERVATISM**

But, basically, Nathan thought the campaign would be fought over the fact that his opponent is perceived to be, and does not really deny being, the most liberal of all the candidates running and that the voters of Virginia would have the choice to judge between the two classic political philosophies of conservatism and liberalism. The philosophy of the gentleman from Portsmouth can best be evidenced by the fact that he has supported such candidates as George McGovern, Jimmy Carter, and Henry Howell.

**THE PERSONAL ATTACKS**

But, unfortunately, Nathan has found himself the victim of negative campaigning amounting to smear tactics. It seems that he is running against Chuck Robb and Willard Moody and Hunter Andrews and Senator Brault and Andy Miller and Bill Hopkins and the entire Democratic hierarchy. All those have attacked him and his motives, his honesty, and his integrity. Even his religious beliefs have been called into play. And this about a man that I know and have known for years. Who neither drinks nor smokes. Who fails to his knees at night before he retires. A man who has

taken an active interest in such matters as Project Concern. A man who has helped hundreds of people. A man who is so open and so unassuming that no one even calls him by any name other than his first.

**THE KANGAROO COURT**

The hierarchy has hastily called a meeting of a Senate committee stacked 14 to 1 against Nathan. This committee reminds me of the old House UnAmerican Activities Committee and what someone said about that committee "Who would be cleared by this committee — not Washington who was a rebel, not Jefferson who wrote that all men are created equal, not Lincoln who admonished us to have malice toward none and charity toward all, or Wilson who wrote that our flag is a flag of liberty of the world."

**THE ISSUE IS JOINED**

Well, let the message go forth that regardless of all the forces aligned against him, Nathan will fight. He will go forward talking about the issues now and until the polls close next Tuesday. If he can isolate these forces and fight them one at a time, he will do so, but if he must fight them all together, then he will do that too. For the issue that is now joined is whether one can win a campaign in Virginia by smear tactics.

**THE VICIOUS ADS**

When I hear of the vicious ads that are

being levied against Nathan, discussing not the issues in the campaign or the things that ought to be discussed, that will have to be decided during the next four years, but rather attacking Nathan's honesty, integrity, and character, I cannot help but be reminded of another ad that appeared in a presidential election in 1964. I ask you to remember the little girl plucking a daisy and counting 1, 2, 3 ... while in the background a nuclear bomb exploded. The purpose of that ad was to show that the Republican candidate would start a nuclear war. The other candidate who won that election made a solemn commitment to the people of America that he would never send American boys to fight in Asian wars. There is a similarity I tell you, a sick and a sad similarity between these ads.

**THE CALL FOR FAIRNESS**

And so, my friends, we call on all fairminded Virginians, on all those who are disgusted with these tactics, who love this old and tradition-honored state as we do, to go to the polls and decide this issue.

QUO VADIS, VIRGINIA?

Donald Litten

MILLER FOR LT. GOVERNOR
...For the issue that is now joined is whether one can win a campaign in Virginia by smear tactics."

By Authority of William Earhart, Treas.
Miller For Lt. Governor



NATHAN MILLER

# EXHIBIT S

**Los Angeles Times** | ARTICLE COLLECTIONS

← Back to Original Article

# Ghosts Roam 'Most Haunted Area in U.S.' : Hauntings: New England boasts the oldest tales of the supernatural and has become a foundation for folklore.

October 26, 1989 | DEIRDRE WILSON | UNITED PRESS INTERNATIONAL

Dudleytown, Conn., is a cursed village in the northwest corner of Connecticut. It has been deserted since horror and misfortune struck its early settlers in the 1700s.

People went mad, were struck by lightning or fell ill.

The Penobscot Indian reservation in Maine is haunted by an evil white man who married and intimidated a small Indian woman a century ago as he tried to govern the area.

In Warren, Mass., a farmer named Maurice Theriault was once possessed with superhuman strength, was levitated and suffered bleeding when some spiritual being carved messages into his back.

New England is a ghost story waiting to be told. The nation's oldest settled region boasts the oldest tales of the supernatural and has become a foundation for folklore.

"You are living in the most haunted area of the United States," said Lorraine Warren, who together with her husband, Edward, has made a 40-year career out of smoking out the spooks that haunt New England's homes, land and other relics.

"It is the old that brings about the ghost syndrome. The older the area, the more chance of a tragedy. And tragedies often bring ghosts," Warren said.

Stories like Dudleytown, the Indian reservation and Theriault are just a few of the countless ghostly tales the couple have recounted in five books. Their most recent work is "The Ghost Hunters" (St. Martins Press).

Backed by a team of researchers, clergymen and scholars, the Warrens are considered among the foremost authorities of ghosts and the supernatural in New England.

The late Edgar Rowe Snow of Massachusetts was famous for lectures and books on ghosts, pirates and shipwrecks that plagued New England--stories of both fact and fancy.

Many New Englanders who never investigated or put pen to paper about their experiences have tales to tell about hauntings: A woman who died in childbirth at Salem Hospital in Salem, Mass., haunts a delivery room there; a ghost ship, the Palatine, capsized off Block Island two centuries ago and occasionally reappears off the Rhode Island coast.

Linda Degh, a folklore professor at Indiana University in Bloomington who has researched supernatural tales for a book on folklore, believes ghost stories--real or fantasy--are a part of America's culture.

"You see the same phenomenon coming up again and again," Degh said. "In old abandoned houses, there are noises, voices, smells. . . . They are the same stories: some restless spirit comes back. It can be benign or it can be evil.

"Whether there are ghosts or not, I don't know," Degh said. "It is as unscientific to say there are no ghosts as it is to say there are ghosts. There are no scientific experiments to prove either. We know that people are not liars when they feel something or hear something. Culturally, they are rational, even if they are irrational."

One of the more celebrated New England ghost stories took place in a mansion in Stratford, Conn., where a minister and his family lived.

Newspaper accounts from the period reported that on March 10, 1850, the Rev. Eliakim Phelps was returning home with his wife and two children when the family noticed black mourning cloth draped across the front door.

When the family entered, they were horrified to find a corpse shrouded and laid out in the parlor. The body was that of Goody Bassett, a woman hanged in 1661 as a witch.

By the time Phelps could summon a witness, the apparition had disappeared. The mystery had not.

The phenomenon at the Phelps mansion became known as the Stratford Knockings, a series of mysterious happenings that included rappings and thunderous knockings heard by witnesses who traveled long distances to confirm the clergyman's story.

State newspapers carried daily accounts and reporters came to investigate.

The Warrens were called in to investigate in 1971 after two of the town's police officers chased an apparition of a little girl up the stairs of the abandoned mansion while investigating a report of vandalism.

"They were both joking about the ghost. They went in through the back door and could hear something near the huge staircase," said Edward Warren, who is also director of the New England Society for Psychic Research--a network of researchers of the supernatural.

"They could see a small figure--like a child--dressed in a lace dress. When it ran up the staircase, they chased it to the third floor. It ran into a room and the officers saw a closet door closed. Thinking it was kids playing pranks, they opened the closet door. Nobody was there."

Warren said a photographer, using special equipment, was able to record on film a picture of the child the officers saw.

True or false, New England's ghost stories can capture the most skeptical audience here for nothing else but the enjoyment of a good yarn.

Degh says the stories may be a way of explaining death and the beyond.

"It's based really on the existential problems of humanity," she said, "that people are dying, life is very fragile and it is a hope that the dead can return.

"It's a kind of philosophy between life and death based on our ignorance of the final solution--finding out what will happen to us."

---

**Los Angeles Times**  Copyright 2017 Los Angeles Times